ACCEPTED
15-24-00118-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
12/18/2024 2:57 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00118-CV

# COURT OF APPEALS FOR THE FIFTEENTH DISTRICT OF TEXAS AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
12/18/2024 2:57:37 PM
CHRISTOPHER A. PRINE
Clerk

**Aspire Power Ventures, LP,**

*Appellant,*

v.

**Public Utility Commission of Texas, Electric Reliability Council of Texas, Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman,**

*Appellees.*

_____

**On Appeal from the 345th Judicial District Court
Travis County, Texas
Cause No. D-1-GN-24-003384
*Hon. Catherine A. Mauzy, Presiding***

_____

## APPELLANT'S APPENDIX IN LIEU OF CLERK'S RECORD

_____

Chrysta L. Castañeda
  Texas Bar No. 15325625
  chrysta@castaneda-firm.com
Nicole Michael
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Phone: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
Brent M. Rubin
Ken Carroll
CARRINGTON, COLEMAN,
  SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Phone: (214) 855-3000
Fax: (214) 580-2641

*Attorneys for Appellant Aspire Power Ventures, LP*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Contents ............................................................................2

Certificate Regarding Contents of Appendix ........................................4

Certificate of Service.......................................................................5

1. Docket Sheet.............................................................................6

2. Plaintiff's Original Petition and Application for Stay/Suspension and Temporary and Permanent Injunction (May 31, 2024) ......... 12

3. Assignment by Presiding Judge (June 11, 2024) ..........................34

4. Letter from Judge Mauzy (June 17, 2024) ..................................35

5. PUC Defendants' Original Answer (June 28, 2024).......................37

6. Plaintiff's First Amended Petition and Application for Stay/ Suspension and Temporary and Permanent Injunction (Aug. 13, 2024).........................................................................43

7. ERCOT's Original Answer (Sept. 9, 2024)...................................69

8. ERCOT's Plea to the Jurisdiction and Motion to Dismiss Under Rule 91a and Plea in Abatement (Sept. 9, 2024)..........................74

9. PUC Defendants' Amended Answer (Sept. 9, 2024)....................173

10. PUC Defendants' Plea to the Jurisdiction (Sept. 13, 2024) ........180

11. Letter to Judge Mauzy (Sept.24, 2024)....................................216

12. Letter to Judge Mauzy (Sept. 24, 2024)...................................228

13. Plaintiff's Second Amended Petition and Application for Stay/Suspension and Temporary and Permanent Injunction (Sept. 24, 2024).......................................................................269

14.  ERCOT's Amended Answer (Oct. 1, 2024) .................................. 299

15.  ERCOT's Amended Plea to the Jurisdiction and Motion to Dismiss Under Rule 91a and Plea in Abatement (Oct. 1, 2024) ............... 304

16.  Letter to Judge Mauzy (Oct. 4, 2024) ........................................ 413

17.  PUC Defendants' Amended Plea to Jurisdiction (Oct. 4, 2024) .................................................................................. 416

18.  Plaintiff's Consolidated Response to Amended Pleas to the Jurisdiction and ERCOT's 91a and Request for Abatement (Oct. 9, 2024) .................................................................................. 460

19.  Unopposed Motion for Judicial Notice (Oct. 9, 2024) .................. 505

20.  ERCOT's Reply in Support of its Amended Plea to the Jurisdiction and Motion to Dismiss Under Rule 91a and Plea in Abatement (Oct. 15, 2024) ......................................................... 545

21.  Order Granting Defendant ERCOT's Amended Plea to the Jurisdiction (Oct. 21, 2024) ........................................................ 723

22.  Order Granting Plaintiff's Unopposed Motion for Judicial Notice (Oct. 21, 2024) ................................................................ 725

23.  Order Granting PUCT Defendants' Amended Plea to the Jurisdiction (Oct. 21, 2024) ........................................................ 726

24.  Notice of Appeal (Oct. 28, 2024) ................................................ 728

25.  Request for Reporter's Record (Oct. 30, 2024) ............................ 733

26.  Notice of TRAP 34.5a Election (Nov. 8, 2024) ............................ 736

**RESPECTFULLY SUBMITTED,**

/s/ *Chrysta L. Castañeda*

Chrysta L. Castañeda
  Texas Bar No. 15325625
  chrysta@castaneda-firm.com
Nicole Michael
  Texas Bar No. 24067767
  nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Phone: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
  Texas Bar No. 00787881
  MLatin@ccsb.com
Brent M. Rubin
  Texas Bar No. 24086834
  BRubin@ccsb.com
Ken Carroll
  Texas Bar No. 03888500
  KCarroll@ccsb.com
CARRINGTON, COLEMAN,
  SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Phone: (214) 855-3000
Fax: (214) 580-2641

*Attorneys for Appellant Aspire Power Ventures, LP*

**CERTIFICATE REGARDING CONTENTS OF APPENDIX**

I hereby certify that the documents contained in this appendix to which this certification is attached are all the documents specified by Texas Rule of Appellate Procedure 34.5(a) and 34.5a(e).

/s/ *Brent M. Rubin*

## CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2024, a true and correct copy of the foregoing Appellee's Brief has been served via the authorized electronic filing system on counsel of record for Appellees:

John R. Hulme
  John.Hulme@oag.texas.gov
Amanda Atkinson Cagle
  Amanda.Cagle@oag.texas.gov
Jordan Pratt
  Jordan.Pratt@oag.texas.gov
Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC-066
Austin, TX 78711-2548

*Counsel for Appellees the*
*Public Utilities Commission of*
*Texas and its Chairman and*
*Commissioners*

Elliot Clark
  eclark@winstead.com
Elin Isenhower
  eisenhower@winstead.com
Winstead PC
600 W. 5th Street, Suite 900
Austin, TX 78701

*Counsel for Appellee ERCOT*

     */s/ Brent M. Rubin*

## 345th District Court

# Case Summary

## Case No. D-1-GN-24-003384

| | | | |
|---|---|---|---|
| **ASPIRE POWER VENTURES, LP VS. THOMAS GLEESON,LORI COBOS,JIMMY GLOTFELTY,KATHLEEN JACKSON,COURTNEY HJALTMAN** | § § § | Location: Judicial Officer: Filed on: | **345th District Court** **345TH, DISTRICT COURT** **05/31/2024** |

---

## Case Information

Case Type:   Other Civil

Case Status:   **10/21/2024   Closed**

## Statistical Closures

10/21/2024   Final Judgment - CV

---

## Assignment Information

**Current Case Assignment**

Case Number      D-1-GN-24-003384
Court            345th District Court
Date Assigned    05/31/2024
Judicial Officer 345TH, DISTRICT COURT

---

## Party Information

| | | |
|---|---|---|
| **Plaintiff** | **ASPIRE POWER VENTURES, LP** | Castaneda, Chrysta L *Retained* |
| | | CARROLL, KENNETH E. *Retained* |
| **Defendant** | **COBOS, LORI** | Hulme, John R *Retained* |
| | | Cagle, Amanda Atkinson |

**Appx. Page 6 of 740**

*Retained*
**PRATT, JORDAN TAYLOR**
*Retained*

**GLEESON, THOMAS**          **Hulme, John R**
                              *Retained*

                              **Cagle, Amanda Atkinson**
                              *Retained*
                              **PRATT, JORDAN TAYLOR**
                              *Retained*

**GLOTFELTY, JIMMY**          **Hulme, John R**
                              *Retained*

                              **Cagle, Amanda Atkinson**
                              *Retained*
                              **PRATT, JORDAN TAYLOR**
                              *Retained*

**HJALTMAN, COURTNEY**

**JACKSON, KATHLEEN**          **Hulme, John R**
                               *Retained*

                               **Cagle, Amanda Atkinson**
                               *Retained*
                               **PRATT, JORDAN TAYLOR**
                               *Retained*

---

# Case Events

05/31/2024
ORIGINAL PETITION/APPLICATION (OCA)
 *PLAINTIFF S ORIGINAL PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION*
 Party:  Plaintiff ASPIRE POWER VENTURES, LP


06/10/2024    EXECUTED SERVICE
               *EXECUTED CITATION THOMAS GLEESON*

06/10/2024    EXECUTED SERVICE
               *EXECUTED CITATION PUBLIC UTILITY COMMISSION OF TEXAS*


06/10/2024    EXECUTED SERVICE
               *EXECUTED CITATION KATHLEEN JACKSON*

**Appx. Page 7 of 740**

06/10/2024    EXECUTED SERVICE
                    *EXECUTED CITATION LORI COBOS*

06/10/2024    EXECUTED SERVICE
                    *EXECUTED RETURN SERVICE OF CITATION - JIMMY GLOTFELTY*
                    Party:   Plaintiff ASPIRE POWER VENTURES, LP


06/11/2024    ASSIGNMENT BY PRESIDING JUDGE
                    *JUDGE AMY CLARK MEACHUM'S ASSIGNMENT LETTER*

06/17/2024    COURT CORRESPONDENCE
                    *LETTER TO COUNSEL FROM JUDGE MAUZY*

06/17/2024
OTHER/NOTICE
    *NOTICE OF APPEARANCE OF COUNSEL AND DESIGNATION OF ATTORNEY IN CHARGE*
    Party:   Defendant COBOS, LORI;
               Defendant GLEESON, THOMAS;
               Defendant GLOTFELTY, JIMMY ;
               Defendant JACKSON, KATHLEEN


06/28/2024
ORIGINAL ANSWER/WAIVER
    *ORIGINAL ANSWER OF THE PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY*
    *COMMISSION OF TEXAS OFFICIALS*
    Party:   Defendant COBOS, LORI;
               Defendant GLEESON, THOMAS;
               Defendant GLOTFELTY, JIMMY ;
               Defendant JACKSON, KATHLEEN


08/13/2024
PLEADING
    *PLAINTIFF S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND*
    *TEMPORARY AND PERMANENT INJUNCTION*
    Party:   Plaintiff ASPIRE POWER VENTURES, LP


08/16/2024    EXECUTED SERVICE
                    *EXECUTED CITATION ELECTRIC REALIABILITY COUNCIL OF TEXAS*


08/21/2024    EXECUTED SERVICE
                    *EXECUTED CITATION COURTNEY HJALTMAN*

09/09/2024    ORIGINAL ANSWER/WAIVER
                    *ERCOT S ORIGINAL ANSWER*

<span style="color:red">**Appx. Page 8 of 740**</span>

09/09/2024

RESPONSE

*AMENDED ANSWER OF THE PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS*

Party:   Defendant COBOS, LORI;
         Defendant GLEESON, THOMAS;
         Defendant GLOTFELTY, JIMMY ;
         Defendant HJALTMAN, COURTNEY;
         Defendant JACKSON, KATHLEEN

09/09/2024

ORIGINAL ANSWER/WAIVER

*ERCOT S PLEA TO THE JURISDICTION AND ATERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT*

09/11/2024     OTHER/NOTICE

*LETTER COURT REGARDING HEARING REQUEST*

09/13/2024

RESPONSE

*DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS PLEA TO THE JURISDICTION*

09/17/2024     OTHER/NOTICE

*NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL*
Party:   Plaintiff ASPIRE POWER VENTURES, LP

09/24/2024

OTHER/NOTICE

*LETTER BRIEF TO COURT IN CONNECTION TO 10/1/24 STATUS CONFERENCE*

09/24/2024     OTHER/NOTICE

*PUBLIC UTILITY COMMISSION LETTER BRIEF TO COURT*

09/24/2024

PLEADING

*PLAINTIFF S SECOND AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION*
Party:   Plaintiff ASPIRE POWER VENTURES, LP

10/01/2024     RESPONSE

*ERCOT S AMENDED ANSWER*

**Appx. Page 9 of 740**

10/01/2024
RESPONSE
*ERCOT S AMENDED PLEA TO THE JURISDICTION AND ATERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT*


10/04/2024     OTHER/NOTICE
            *LETTER TO JUDGE MAUZY*

10/04/2024
RESPONSE
*DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS AMENDED PLEA TO THE JURISDICTION*


10/09/2024
RESPONSE
*PLAINTIFF S CONSOLIDATED RESPONSE TO DEFENDANTS AMENDED PLEAS TO THE JURISDICTION AND ERCOT s RULE 91a MOTION TO DISMISS AND REQUEST FOR ABATEMENT*
Party:   Plaintiff ASPIRE POWER VENTURES, LP


10/09/2024     MOTION
            *UNOPPOSED MOTION FOR JUDICIAL NOTICE*
            Party:   Plaintiff ASPIRE POWER VENTURES, LP

10/15/2024
RESPONSE
*ERCOT S REPLY IN SUPPORT OF ITS AMENDED PLEA TO THE JURISDICTION AND ALTERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT*


10/21/2024     JUDGMENT NOTICE MAILED

10/21/2024     CVD: FINAL JUDGMENT (OCA)

10/21/2024
FINAL OR PARTIAL DISPOSITION ORDER     (Judicial Officer: MAUZY, CATHERINE A)
*ORDER GRANTING PUCT DEFENDANTS AMENDED PLEA TO THE JURISDICTION*


10/21/2024     ORDER     (Judicial Officer: MAUZY, CATHERINE A)
            *ORDER (MOTION FOR JUDICIAL NOTICE)*

10/21/2024
FINAL OR PARTIAL DISPOSITION ORDER     (Judicial Officer: MAUZY, CATHERINE A)
*ORDER GRANTING DEFENDANT ERCOT'S AMENDED PLEA TO THE JURISDICTION*

**Appx. Page 10 of 740**

10/28/2024    NOTICE OF APPEAL
                    *NOTICE OF APPEAL BY PLAINTIFF ASPIRE POWER VENTURES, LP*

10/30/2024    OTHER/NOTICE
                    *LETTER FROM 15TH COA*

10/30/2024    OTHER/NOTICE
                    *REQUEST FOR REPORTER'S RECORD*

11/08/2024
OTHER/NOTICE
    *PLAINTIFF-APPELLANT ASPIRE POWER VENTURES, LP S NOTICE OF ELECTION UNDER*
    *TEX. R. APP. P. 34.5a*
    Party:   Plaintiff ASPIRE POWER VENTURES, LP

11/12/2024    OTHER/NOTICE
                    *LETTER FROM 15TH COA*

11/18/2024    OTHER/NOTICE
                    *RETURN NOTICE OF ORDER*

---

## Service Events

06/03/2024    **Citation**
                    GLEESON, THOMAS
                    Served: 06/05/2024
                    COBOS, LORI
                    Served: 06/05/2024
                    GLOTFELTY, JIMMY
                    Served: 06/05/2024
                    JACKSON, KATHLEEN
                    Served: 06/05/2024

08/15/2024    **Citation**
                    HJALTMAN, COURTNEY
                    Served: 08/16/2024

**Appx. Page 11 of 740**

5/31/2024 3:53 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Rosa Oneal

D-1-GN-24-003384

CAUSE NO. _____

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS |
| TEXAS, THOMAS GLEESON, LORI | § | |
| COBOS, JIMMY GLOTFELTY, AND | § | 345TH, DISTRICT COURT |
| KATHLEEN JACKSON, | § | |
| | | |
| *Defendants.* | | ___th JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION

Plaintiff Aspire Power Ventures, LP ("Aspire") files this its Original Petition and Application for Stay/Suspension and Temporary and Permanent Injunction against Defendants Public Utility of Commission of Texas ("PUC" or "Commission"), Thomas Gleeson, Lori Cobos, Jimmy Glotfelty and Kathleen Jackson (collectively, "Commissioners"), and respectfully shows the Court as follows:

## INTRODUCTION

1.     This lawsuit challenges the Commission's illegal disregard of the Administrative Procedure Act ("APA") relating to three orders that restrain the supply of electricity on the ERCOT grid ("Orders").[1] In 2023, the Orders forced unnecessary conservation warnings, threatened rolling blackouts and drove up the prices Texans paid for electricity. If the Court does not act to void the illegal Orders, 2024 threatens to be worse.

---

[1] The Orders are specifically identified in ¶ 25.

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

2.	The three Orders implemented the ERCOT Contingency Reserve Service ("ECRS"). ECRS is a failed attempt to increase the reliability of ERCOT's electric grid by paying electric generating companies to keep a portion of their **existing** generating capacity off the grid — in "reserve"— even when electricity demand is at a peak, including in hot summer months.

3.	ECRS is not based on sound reliability criteria and has resulted in ERCOT procuring reserves that far exceed the reserves procured by ERCOT's counterparts elsewhere in the country. Moreover, ECRS harms Texas electric consumers. According to ERCOT's Independent Market Monitor ("IMM"), which oversees ERCOT, ECRS inflated the cost of wholesale electricity in the period June through November 2023 by approximately $12 billion. If the Orders are allowed to stand, ECRS will inflict further economic harm on consumers.

4.	Aspire is an ERCOT Market Participant and has also suffered harm as a result of ECRS. Aspire buys electricity on ERCOT's wholesale market and has fixed-price contracts with other parties to sell electricity. ECRS makes electric prices much more volatile, which in turn makes it impossible for Aspire to adequately plan to purchase electricity on the wholesale market that it must then deliver to purchasers on a fixed-price basis. ECRS substantially increases the likelihood that Aspire will suffer losses on the contracts that it does place. If the Orders are permitted to stand, it will continue to suffer harm.

5.	The Commission illegally implemented ECRS by failing to even attempt to comply with the mandatory requirements of Texas's APA when it adopted the Orders. Therefore, Aspire seeks a declaratory judgment declaring the Orders void.

6.	The harm suffered by Aspire, other Market Participants and Texas consumers as a result of the Orders is incapable of being remedied by the payment of mere money damages. Illegal conservation notices cannot be undone, nor can any rolling blackouts issued as a result of the

illegal Orders. Furthermore, the Commission takes the position that if one of its orders is declared void, it is void only on a prospective basis and cannot have any effect on transactions that have already cleared. While Aspire vehemently disagrees with the Commission's position, the Commission essentially concedes that no money damages will remedy its illegal conduct.

7.     Accordingly, Aspire seeks a stay and/or suspension of ECRS and temporary and permanent injunctive relief. Unless the Court grants interim relief, with the hot summer months fast approaching, ECRS will inflict substantial, irreparable harm on Aspire, other market participants, and Texas consumers.

<div align="center">

**PARTIES AND PROCESS**

</div>

8.     Plaintiff Aspire Power Ventures, LP is a Texas limited partnership with its principal place of business in Houston, Texas

9.     Defendant Public Utility Commission of Texas is a state agency that may be served through its Executive Director, Connie Corona, at 1701 N. Congress Ave., Suite 7-110, Austin, TX 78701. *See* Tex. Civ. Prac. & Rem. Code § 101.102(c).

10.     Defendants Thomas Gleeson, Lori Cobos, Jimmy Glotfelty and Kathleen Jackson (collectively, "Commissioners") are the Chair and Commissioners of the Commission, respectively, and are being sued in their official capacity. They can be served with process at their principal place of business, 1701 N. Congress Ave., Suite 7-110, Austin, TX 78701.

11.     Additionally, because a state agency is a party, a copy of the petition is being mailed to the Attorney General in Austin, Texas, by United States Postal Service certified mail, return receipt requested. Tex. Civ. Prac. & Rem. Code § 30.004.

**VENUE**

12.     Venue in this declaratory judgment action challenging the validity of Commission Orders is mandatory in Travis County district court. Tex. Gov't Code § 2001.038(b).[2]

**JURISDICTION**

13.     Without prejudice to its rights to prosecute a direct appeal of the Orders under Texas Utilities Code 39.001(e) in the Third Court of Appeals, Aspire invokes the jurisdiction of this Court based, in part, on the Commission's own conduct in related litigation. Specifically, the APA provides that the validity of a rule may be determined in a declaratory judgment action brought in Travis County district court if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff. Texas Gov't Code § 2001.038(a)-(b). The Orders and their continued application interfere with and impair Aspire's legal rights and privileges, which confers jurisdiction on this Court.

14.     Aspire previously filed a Notice of Direct Appeal in the Third Court of Appeals challenging the ECRS Rules in *Aspire Power Ventures, LP v. Public Utility Commission of Texas*, No. 03-24-00102-CV. In the Notice, Aspire stated that the ECRS Rules are "competition rules," and "[j]udicial review of the validity of competition rules shall be commenced" in the Third (or soon-to-be Fifteenth) Court of Appeals, citing the Third Court's recent decision in *RWE Renewables Americas LLC v. Public Utility Commission of Texas*, 669 S.W.3d 566, 578-79 (Tex. App.—Austin 2023, pet. granted). Notice at 3-4. The Commission filed a petition for review in *RWE* that challenged, among other things, the Third Court's jurisdictional holding, and the Supreme Court of Texas granted the petition and heard oral argument in March.

---

[2] Aspire makes this contention subject to its position that the rules announced by the Orders are competition rules that are reviewable on direct appeal in the Third Court of Appeals. *See infra* ¶13-14.

15.     On April 12, 2024, the Commission filed a motion to abate Aspire's appeal of the Orders, based on its challenge to *RWE*'s jurisdictional holding. Aspire opposed the abatement, arguing, among other things, that abatement would impair Aspire's right to seek interim and permanent relief from the Orders. In a brief order, the Third Court abated the appeal. Because the Commission-requested abatement has cut off Aspire's right to seek relief in the Third Court of Appeals, and because the Commission takes the position that the review of these Orders belongs in district court, Aspire files this petition.

## FACTUAL BACKGROUND

### A. *Texas's Deregulated Electricity Market and ERCOT*

16.     The Public Utility Commission designated the Electric Reliability Council of Texas ("ERCOT") as the Independent System Operator ("ISO") for the electric grid that covers roughly 70% of Texas' land mass and serves approximately 90% of Texas' electricity consumers. ERCOT oversees the operation of the high voltage electric transmission system in Texas (which is also called ERCOT), the various markets administered by ERCOT in its capacity as an ISO, and the balancing of physical electricity supply and demand on the high voltage transmission system that ensures its reliability.

17.     ERCOT operates within a deregulated electric sector, insofar as there are competitive generators and competitive retailers. The ERCOT rules require that each participant in the market (a "Market Participant") belong to a specific category that best describes its activity. The Market Participant categories include power generators, competitive retailers, and transmission and distribution (wires) companies. Power generation companies produce electricity, ancillary services, or both. Transmission and distribution utilities are responsible for the power lines and other equipment that carry electricity from power plants and other generation facilities

to end-use consumers. Retail electric providers sell electricity to end-use consumers in the portions of the state with retail competition. Qualified Scheduling Entities ("QSEs") like Aspire are Market Participants as well.[3]

18. As the ISO, ERCOT has a number of responsibilities, including reliable operation of the grid. For technical reasons, electric supply and demand must always be maintained in balance at an equilibrium point of 60 Hertz, or else the electricity grid risks collapse. Therefore, at times, reserve generation needs to be dispatched to balance supply and demand. ERCOT accomplishes this balancing through the operation of a real time wholesale electricity market.

19. The primary tool that ERCOT uses to ensure that demand and supply are in constant balance, i.e., the foundation of the wholesale electricity market, is called Security Constrained Economic Dispatch ("SCED"). In general, ERCOT runs SCED at least every five minutes around the clock. Wholesale electricity is bought and sold based on the prices created by SCED. ERCOT averages the prices generated in several SCED intervals to create the wholesale spot prices across the ERCOT region. These wholesale electricity prices then allow individual Market Participants to make voluntary decisions about how much electricity they would like to produce or procure over that interval. When prices are high, generators are incentivized to produce more electricity and consumers to use less. Conversely, when prices are systemically low, generators are not incentivized to add additional capacity to the grid and consumers are not incentivized to invest in energy efficiency or conservation.

20. Because electricity is an instantaneous commodity where supply and demand must be equal at every point in time, ERCOT maintains Ancillary Services to assist the balancing process. Ancillary Services exist primarily to bridge the time gap between the five-minute SCED

---

[3] *See infra* ¶¶ 22-24.

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

dispatch interval output and fluctuations in demand and/or supply that may occur within this five minute interval.

21. Texas's electricity market is governed by the Public Utility Regulatory Act (Chapter 39 of the Texas Utilities Code), orders and regulations adopted by the Commission, and rules and "protocols" adopted by ERCOT. By statute, ERCOT's "protocols must be approved by the commission and must reflect the input of the commission." Act of May 30, 2021, 87th Leg., R.S., ch. 426, § 3, 2021 Tex. Gen. Laws 830, 831, *amended by* Act of May 28, 2023, 88th Leg., R.S., H.B. 1500, § 15.

## B. About Aspire

22. Aspire is a Qualified Scheduling Entity ("QSE") that participates in several of the markets administered by ERCOT.

23. In its capacity as a QSE, Aspire buys and sells wholesale electricity in the real time electricity market operated by ERCOT, serving as a conduit between companies that generate electricity and companies that sell electricity on a retail basis.

24. Accordingly, Aspire bears the risk of price fluctuations in spot electricity, because it must contractually commit in advance to buy and sell electricity at specific prices before SCED creates the actual wholesale market prices. Artificial fluctuations in prices, i.e., those that do not reflect the fundamentals of the market such as changes in weather, demand or generation, result in prices deviating from expectations. Because they are artificial and unexpected, these fluctuations not only represent an additional risk to Aspire but they also can result in financial losses for Aspire and other Market Participants. For example, when Aspire sells to a retail provider, it enters into an agreement to sell the retailer electricity at a fixed price and then bears the risk that the wholesale

price that Aspire purchases at will be higher than the contract price with the retail provider, resulting in a loss.

### C. ECRS: A Costly, Market-Distorting Attempt to Bolster Reliability

25. In a purported attempt to bolster the grid's reliability, ERCOT implemented a new Ancillary Service, ECRS, in June 2023. ECRS is the product of, among other things, three Commission Orders approving revisions to ERCOT's Nodal Protocols that Aspire challenges here:

• Order Approving ERCOT Revision Requests, NPRR 1096, Require Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (PUC Project No. 52934) (May 12, 2022);

• Order Approving ERCOT Revision Requests, NPRR 1148, Language Cleanup Related to ERCOT Contingency Reserve Service (ECRS) (PUC Project 54445) (Jan. 26, 2023); and

• Order Approving ERCOT Revision Requests, NPRR 1178, Expectations for Resources Providing ERCOT Contingency Reserve Service (PUC Project 54445) (Jun. 29, 2023).

(Together, the "Orders" or "ECRS Rules.")

26. The ostensible purpose of ECRS is to support grid reliability by increasing the level of reserves, i.e., generation capacity that is not available to be dispatched through the operation of SCED to meet demand. ERCOT pays generators who participate in ECRS to keep a portion of their current electric generating capacity from being dispatched by ERCOT through SCED, unless one of several operational criteria are met. If ECRS did not exist, this capacity would potentially be available to SCED directly and would, accordingly, be available for dispatch. In other words, if ECRS had never been implemented, electricity supply would certainly be no less than and would most likely be higher than it was after the implementation of ECRS. In most cases, an increase in supply causes prices to fall, all other things being equal.

27. In actual practice, ECRS does nothing to increase current electricity reserve capacity. Instead, it simply causes additional capacity to be withheld from meeting actual current

physical demand and often at intervals when that capacity is most needed, especially during hot summer days.

28.     As explained in more detail below, ERCOT's Independent Market Monitor ("IMM"), a watchdog created by the Texas Legislature, has identified a number of systemwide harms caused by ECRS. Specifically, the IMM concluded that ECRS has:

- Caused ERCOT to procure excessive reserves, that far exceed reserves held by ERCOT's counterparts elsewhere;

- Generated artificial shortages that produce massive inefficient market costs, totaling over $12 billion in 2023; and

- Diminished reliability by withholding capacity needed to manage transmission congestion.

29.     In 2023, the first year ECRS was implemented, ECRS prevented the use of 2,194 megawatts of generating capacity on average, allowing the ECRS capacity to run on only 40 occasions of typically very short duration. The trigger for deploying ECRS capacity is based on maintaining the 60 Hertz frequency on the ERCOT grid as well as the amount of generating capacity available to the system at a given time—neither of which can be known or accurately forecasted by anyone other than ERCOT.

30.     During the same period, ECRS, by withholding capacity from being dispatched in the real time market, distorted price signals by creating an administered or artificial scarcity condition. This artificial scarcity resulted in both higher prices and greater price volatility. In the limited periods in 2023 when the ECRS dispatch criteria were met and the capacity was dispatched to the grid, real time wholesale electricity prices became even less predictable for market participants. ECRS would suddenly permit more capacity to briefly appear, causing prices to abruptly drop, only to bounce back upwards when ECRS constrained participating capacity again.

31.     These artificial and unpredictable distortions in price signals and the resulting increased price volatility make it impossible for independent QSEs like Aspire to efficiently manage the risks that are inherent in fixed price bilateral contracts with both buyers and sellers of electricity. The criteria used to determine when ECRS capacity is allowed to be dispatched is not predictable and cannot be accurately forecasted by independent QSEs. So, because QSEs like Aspire cannot predict the brief and abrupt addition and removal of generation under ECRS, they cannot accurately forecast prices. Therefore, ECRS makes it extremely difficult for independent QSEs to offer fixed-price hedges to retail providers, substantially increases the price for their hedges, and in turn drives up the costs consumers ultimately pay for that electricity.

32.     Further, even if Aspire and other QSEs substantially increase what they charge retail providers for fixed-price hedges, the volatility introduced by ECRS still greatly increases the likelihood that QSEs will lose money on the hedges they offer to retailers.

33.     Some QSEs, like Aspire, do not own physical generation and are "non-affiliated." Many other QSEs do, and they use the affiliation between the QSE and the generation entity to effectively integrate their generation and load portfolios in much the same way that vertical integration linked supply and demand before restructuring occurred in 2003. Unexpected and artificial price distortions can be managed more efficiently under the "integrated QSE" business model because an integrated QSE can internalize (and net) the positive and negative effects of price fluctuations, something that Aspire and other non-affiliated QSEs cannot do. As a result, the fictitious prices and volatility caused by the implementation of ECRS not only leads to market inefficiency but also creates a specific and significant incentive for firms in the industry to "re-integrate" with the likely outcome that the industry concentration ratio will increase, thereby decreasing competition in both the generation and retail sectors.

34.     No other electricity market in the United States has a service similar to ECRS, yet these other markets are able to reliably balance supply and demand efficiently and without creating imaginary prices and are able to ensure grid reliability to the required standards.

### D. Making Matters Worse, the Commission Illegally Adopted the ECRS Rules

35.     To be valid, the ECRS Rules had to be adopted in substantial compliance with the APA, which contains a number of mandatory requirements aimed at facilitating a thorough rulemaking process that affords members of the public a meaningful opportunity to participate. But the Commission failed to do so, and the ECRS rules are therefore invalid. *See* Tex. Gov't Code § 2001.035 (a rule is voidable if a state agency does not substantially comply with the APA when adopting it).

36.     As a threshold matter, the ECRS Rules are "rules" to which the APA applies. Under the APA, a "rule" is defined as "a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy, or (ii) describes the procedure or practice requirements of a state agency." Tex. Gov't Code § 2001.003(6)(A). The "amendment or repeal of a prior rule" is also deemed agency rulemaking. *Id*. § 2001.003(6)(B), (C). The Commission's orders adopting the ECRS Rules imposed a policy of withholding available supply from the market as a reserve, thereby causing artificial shortages that raise the prices paid by Market Participants. The implementation of ECRS affects the private rights of Market Participants who purchase electricity at inflated prices. Moreover, electricity is an essential service, and Texans are impacted when those increased costs are passed on to consumers. Thus, ECRS Rules constitute a "rule" within the meaning of the APA because they represent the Commission's authority to control the electricity market supply and prices, and they affect the rights of private parties.

37.     Here, the Commission failed to substantially comply with three essential APA requirements: (1) notice, *see* Tex. Gov't Code §§ 2001.023-.025; (2) public participation, *see id.* §§ 2001.029-.030; and (3) the contents of the agency order, *id.* § 2001.033.

### 1. *The Commission Did Not Substantially Comply with the APA's Notice Requirements*

38.     When a state agency proposes a rule, the APA requires that the agency (a) "give at least 30 days' notice of its intention to adopt a rule before it adopts the rule," and (b) "file notice of the proposed rule with the secretary of state for publication in the Texas Register" at least 30 days before the agency adopts the rule. Tex. Gov't Code § 2001.023(a)-(b). The Commission did not give notice of the ECRS Rules in the Texas Register, but rather buried them in the Commission's website. And the Notices of Recommended Approval that ERCOT filed with the Commission were all filed less than thirty days before the Commission adopted each ECRS Rule:

|  | NPRR 1096 | NPRR 1148 | NPRR 1178 |
|---|---|---|---|
| *Notice of Recommended Approval filed w/ Commission* | 5/2/2022 | 1/6/2023 | 6/20/2023 |
| *Commission Approval Order* | 5/12/2022 | 1/26/2023 | 6/29/2023 |
| *Days Between Notice and Order* | 10 | 20 | 9 |

### 2. *The Commission Did Not Substantially Comply with the APA's Public Participation Requirements*

39.     Section 2001.029 of the APA establishes three public-participation requirements that a rulemaking agency must follow, none of which were followed here:

- *First*, a state agency must give "all interested persons a reasonable opportunity to submit data, views, or arguments, orally or in writing" before the agency adopts a rule. Tex. Gov't Code § 2001.029(a). The Commission never gave an opportunity for public comment.

- *Second*, the agency must "grant an opportunity for a public hearing before it adopts a substantive rule if a public hearing is requested by: (1) at least 25 persons; (2) a governmental subdivision or agency; or (3) an association having at least 25 members."

*Id.* § 2001.029(b). The Commission never gave an opportunity to request a public hearing.

- *Finally*, an agency must "consider fully all written and oral submissions about a proposed rule." *Id.* § 2001.029(c). But without adequate notice to the public, this requirement cannot be met because it is impossible to determine who might have desired to submit comments.

### 3. The Commission Did Not Substantially Comply with the APA's Public Participation Requirements

38.     Under the APA, an agency order that finally adopts a rule "must include":

(1) a reasoned justification for the rule as adopted consisting solely of:

(A) a summary of comments received from parties interested in the rule that shows the names of interested groups or associations offering comment on the rule and whether they were for or against its adoption;

(B) a summary of the factual basis for the rule as adopted which demonstrates a rational connection between the factual basis for the rule and the rule as adopted; and

(C) the reasons why the agency disagrees with party submissions and proposals;

(2) a concise restatement of the particular statutory provisions under which the rule is adopted and of how the agency interprets the provisions as authorizing or requiring the rule; and

(3) a certification that the rule, as adopted, has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Tex. Gov't Code § 2001.033(a). This information must appear within the four corners of the agency order adopting the Rule. The Orders adopting the ECRS Rules contain none of these materials. Therefore, the Commission did not substantially comply with the APA when adopting the ECRS Rules.

### E. ERCOT's Independent Market Monitor Confirms the Disastrous Effects of ECRS

39.     The Texas Legislature requires ERCOT to appoint an Independent Market Monitor ("IMM") "to detect and prevent market manipulation strategies, recommend measures to enhance

the efficiency of the wholesale market, and provide independent analysis of any material changes proposed to the wholesale market." Tex. Util. Code § 39.1515(a). Potomac Economics has served as ERCOT's IMM for nearly twenty years and is led by David Patton, PhD, an energy economist with nearly thirty years of experience.

40. The IMM recently issued a report slamming ERCOT's Ancillary Services methodology, and in particular, ECRS. The IMM explained that shortly after ECRS was implemented in June 2023, ERCOT decided to nearly double the amount of ten-minute reserves, resulting in the excessive purchase of electricity reserves compared to the reserves held for other U.S. power grids. Additionally, the IMM concluded ECRS is not based on sound reliability criteria, because it does not take into account the probability of contingencies and uncertainties that lead to reliability risks and fails to balance reliability objectives with the costs of satisfying reliability requirements.

41. Ultimately, the IMM concluded that ECRS generated artificial electricity shortages that produced massive, inflated costs for electricity sold on the wholesale market, totaling more than $12 Billion in the period June through November 2023. While not all of these costs were passed on to retail consumers, some of whom buy on fixed-price contracts, in the longer term, these artificially increased wholesale prices will negatively impact the retail prices Texans pay.

42. Finally, the IMM suggested fixes to ECRS, but ERCOT has not adopted the IMM's proposed fixes and has pushed off any consideration of those fixes. So, with summer 2024 fast approaching, and ECRS threatening to keep much needed capacity off the grid during this high-demand period, market participants and Texas electric consumers are poised to pay unnecessary, increased costs for electricity unless ECRS is promptly reined in or suspended.

## DECLARATORY JUDGMENT

43. Aspire incorporates by reference all of the allegations set forth above.

44. Aspire asserts that the ECRS Rules were not adopted in substantial compliance with the APA, making them invalid. *See* Tex. Gov't Code § 2001.035 (a rule is voidable if a state agency does not substantially comply with the APA when adopting it). The Commission, of course, disagrees. Because Aspire's rights, status, and other legal relations are affected by the ECRS Rules, declaratory relief is necessary and appropriate to resolve questions regarding the validity of the ECRS Rules.

45. Therefore, under Chapter 37 of the Texas Civil Practice and Remedies Code and Texas Government Code § 2001.038, Aspire seeks a declaration including, but not limited to, the following:

   a. Each of the ECRS Rules is a "rule" within the meaning of the APA

   b. The Commission did not substantially comply with mandatory requirements of the APA when adopting each of the ECRS Rules, including requirements for (1) notice under APA §§ 2001.023-.025; (2) public participation under §§ 2001.029-.030; and (3) the contents of the agency order under § 2001.033

   c. Each of the ECRS Rules is therefore invalid and void under Texas Government Code § 2001.035.

## APPLICATION FOR STAY, SUSPENSION, AND INJUNCTIVE RELIEF

46. Aspire incorporates by reference all of the allegations set forth above.

47. This Court has the power to enter a temporary injunction based on the Commission's failure to substantially comply with the APA when adopting the ECRS Rules. *Abbott v. Doe*, ___ S.W.3d ___, No. 03-22-00126-CV, 2024 WL 1340692, at *23-24 (Tex. App.—

Austin Mar. 29, 2024, no pet. h.) (collecting cases in which the court upheld temporary injunctions based on APA rulemaking challenges). Further, Texas Utilities Code § 15.004 provides that while an appeal of a regulatory authority's order is pending, a district court "may stay or suspend all or part of the operation of the order, ruling, or decision." *Cf.* Tex. Gov't Code § 2001.038 (providing that a validity challenge under the APA cannot be used to "stay a hearing in which a suspension, revocation, or cancellation of a license by a state agency is at issue" but imposing no other limitations on a court's ability to issue a stay). In deciding whether to grant a stay or suspension, the Court must follow the practices of a court exercising equity jurisdiction. Tex. Util. Code § 15.004.

48.     As set forth in more detail above, the Commission adopted the ECRS Rules without substantially complying with mandatory requirements in the APA, rendering the ECRS Rules voidable. Aspire has therefore established, at the very least, a probable right to the relief it seeks upon final hearing.

49.     If the operation of the ECRS Rules is not promptly stayed, suspended, or enjoined, Aspire and others will suffer immediate and irreparable injury as a result of the unlawfully adopted ECRS Rules, as set forth above. The injuries that Aspire and others will suffer are irreparable and cannot adequately be remedied at law.

50.     Even with regard to monetary losses, the Commission takes the position—in a case pending before the Supreme Court of Texas—that would preclude Aspire and other Market Participants from ever obtaining monetary relief. *See Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001) (per curiam) (irreparable injury must be shown because injunctive relief is "designed to provide remedy to cover those injuries for which there was not clear, full, and adequate relief at law"). The Commission has argued that because the APA provides that invalid

rules are voidable, not void, under Texas Government Section 2001.035(a), Commission orders are "binding until disaffirmed" and "any controversy concerning their validity will have no effect on transactions that have already occurred." Commission's Brief on the Merits at 12, *Public Utility Commission of Texas v. Luminant Energy Co.*, No. 23-0231 (Tex. Nov. 9, 2023); *see also id.* at 14 (under Commission's interpretation of "voidability" in APA, voidable orders "would remain in effect as to those transactions that have already occurred but would not govern future transactions"). If the ECRS Rules are not stayed or suspended during the pendency of this action, Aspire and other Market Participants will be purchasing electricity at prices inflated by ECRS without any way to recover.

51. On a similar note, in *Luminant*, the Commission has taken the position that a Court could not have ordered ERCOT to resettle past invoices for an electricity transaction, because in a direct appeal of a competition rule to the court of appeals, the only relief available is remand to the Commission. *Id.* at 18 (citing Tex. Util. Code § 39.001(f)). Similarly here, the APA provides that a court that finds that an agency has not substantially complied with its provisions may remand the rule to the agency. Tex. Gov't Code § 2001.040. Without a right to have invoices tainted by ECRS-inflated prices resettled, Aspire would have no path to a monetary remedy for the harm inflicted by ECRS.

52. Even if Aspire had the ability to potentially pass through *some* of the increased costs to its customers, that would not negate the irreparable nature of the injury ECRS causes. As explained above, Aspire has agreements with certain retail providers for fixed-price hedges, so Aspire bears the risk of price increases caused by ECRS in these contracts. *Cf. Sw. Elec. Power Co. v. Burlington N., Inc.*, 475 F. Supp. 510, 522 (E.D. Tex. 1979) (irreparable injury suffered by electric utility that had to pay increased costs to railroad for fuel transport not negated; case law

barred recovery of damages from railroad and pass-through agreement with customers "not assured" to be enforced because Public Utility Commission could disallow increase in fuel cost passed on to customer).

53.     Even if Aspire could, in theory, recover damages or other monetary relief because of the harms it suffered because of ECRS, Aspire will suffer an irreparable injury because "damages are very difficult to measure by any certain pecuniary standard." *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Among other things, ERCOT has chosen not to implement the systems that would allow it to meaningfully and correctly re-run SCED, even though it is technically possible to implement such systems and to re-calculate the dispatch and resulting prices as if ECRS had not run. The only adequate, effective, and complete relief is for the Court to stay or suspend the ECRS Rules.

54.     No bond should be necessary for the issuance of the stay, suspension, or temporary injunction because the Commission will not suffer any harm resulting from a stay or suspension of the ECRS Rules and is simply being required to comply with the APA. However, Aspire is willing to post a bond if the Court determines it appropriate. *See* Tex. R. Civ. P. 684.

55.     For all these reasons, pursuant to Texas Rule of Civil Procedure 680 *et seq.*, Texas Civil Practice and Remedies Code § 65.001 *et seq.*, and Texas Utilities Code § 15.004, Aspire respectfully requests a stay, suspension, and/or temporary and permanent injunction, staying or suspending the operation of the ECRS Rules and ordering and restraining the Commission, the Commissioners, their officers, agents, servants, employees, and attorneys, ERCOT, and all other persons in active concert or participation with them who receive actual notice of the order by

**Appx. Page 29 of 740**

personal service or otherwise (collectively, the "Injunction Restrained Parties") on the following terms:

**The Commission and ERCOT are prohibited from enforcing, using or otherwise allowing the ECRS Rules to operate.**

## PRAYER FOR RELIEF

For these reasons, Aspire respectfully requests that Defendants be cited to appear and answer, and that without waiving its right to challenge the ECRS Rules as competition rules in the Court of Appeals, that this Court:

1.  Issue the declaratory judgment requested by Aspire;

2.  Stay or suspend the operation of the ECRS Rules under Texas Utilities Code § 15.004;

3.  Issue the temporary and permanent injunctive relief requested by Aspire;

4.  Award Aspire costs, expenses, and attorneys' fees to the extent recoverable by law; and

5.  Award Aspire any other and further relief to which it may be justly entitled.

Respectfully Submitted,

*/s/ Chrysta L. Castañeda*
Chrysta L. Castañeda
Texas Bar No. 15325625
chrysta@castaneda-firm.com
Nicole Michael
Texas Bar No. 24067767
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Telephone: (214) 282-8579
Facsimile: (214) 602-9187

&

Monica Latin
Texas Bar No. 00787881
MLatin@ccsb.com

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

**Appx. Page 30 of 740**

Brent M. Rubin
Texas Bar No. 24086834
BRubin@ccsb.com
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL,
L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Ph: 214-855-3000
Fax: 214-580-2641

**ATTORNEYS FOR PLAINTIFF**

## VERIFICATION

STATE OF TEXAS        §

                           §

COUNTY OF FORT BEND    §

My name is Ron McNamara. I am over 18 years old and am competent to make this declaration.

I have a PhD in Economics from the University of California – Davis. I have worked, researched and taught in the field of electricity markets for over 35 years. I currently own my own firm, First Principles Economics, LLC, which provides consulting services related to electricity markets, Independent System Operators ("ISO"s) and Regional Transmission Operators ("RTO"s) across the world.

Of note, I was responsible for co-designing, and then implementing, operating and monitoring the New Zealand wholesale electricity market, which was the first nodal-based (locational marginal pricing) competitive wholesale electricity market in the world. The New Zealand market design is the foundation for all the electricity markets in the United States as well as the markets in Alberta, Central America, Singapore and the Philippines.

Subsequently, as the Vice President of Market Management and Chief Economist with the Midwest (now Midcontinent) ISO market (the largest geographic electricity market in the world), I was responsible for all aspects of the market – including operating the US$100 million per day Day-Ahead Market, establishing the locational marginal prices in the Day Ahead and Real Time markets, operating the US$600 million Financial Transmission Rights market, clearing and settlement of more than US$25 billion in annual market transactions as well as the purchase of more than US$400 million in transmission service.

I have been involved with projects relating to electric power supply in over 30 countries. I have authored papers relating to the operation of ISOs.

I was personally a member of the Technical Advisory Committee ("TAC") of ERCOT, the highest stakeholder committee in the ERCOT market, as well as other supporting stakeholder committees in ERCOT.

As a result of my knowledge, skill, experience, training, and education outlined above, I am qualified to opine on electricity markets and ISOs, including design, operating, monitoring and regulating them.

The facts contained in paragraphs 16-34, 52-53 of the preceding Original Petition and Application for Temporary and Permanent Injunction are based on my personal knowledge as well as facts and data of which I have been made aware/reviewed, and such facts and data are ones that an expert in electricity markets and ISOs would reasonably rely on.

---

**PLAINTIFF'S ORIGINAL PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

Appx. Page 32 of 740

## JURAT

My name is Ron McNamara, my date of birth is September 5, 1957, and my address is 5230 Weatherstone Circle, Sugar Land, Texas, USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Fort Bend County, State of Texas, on the 31st day of May, 2024.

_Ron McNamara_
Ron McNamara



**AMY CLARK MEACHUM**
**Local Administrative Judge**
**DISTRICT COURTS**

**Travis County Courthouse**
**P. O. Box 1748**
**Austin, TX 78767**

**(512) 854-9305**
**FAX (512) 854-9332**

June 11, 2024

Chrysta L. Castaneda
Nicole Michael
THE CASTANEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, TX 75201
*Via email: chrysta@castaneda-firm.com*
*Via email: nicole@castaneda-firm.com*

Monica Latin
Brent M. Rubin
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, LLP
901 Main St., Suite 5500
Dallas, TX 75202
*Via email: mlatin@ccsb.com*
*Via email: brubin@ccsb.com*

John Hulme
OFFICE OF THE ATTORNEY GENERAL OF TEXAS –
ENVIRONMENTAL PROTECTION DIVISION
PO Box 12548, MC-066
Austin, TX 77811-2548
*Via email: john.hulme@oag.texas.gov*

**Re: Cause No. D-1-GN-24-003384; Aspire Power Ventures, LP v. Public Utility Commission of Texas, et al.** *in the 345th Judicial District, Travis County, Texas*

Dear Counsel:

The above case will be assigned to **JUDGE CATHERINE MAUZY** according to Chapter 10.2 of our Local Rules. Please refer to Chapter 10.2 of our Local Rules for the proper method of proceeding from this point.

Thank you.

Sincerely,

AMY CLARK MEACHUM
Local Administrative Judge
Travis County, Texas

ACM/ral
xc: Ms. Velva Price, District Clerk

**Appx. Page 34 of 740**



**CATHERINE A. MAUZY**
**Judge**
(512) 854-4023

**VICTORIA CHAMBERS**
Court Operations Officer
(512) 854-4023

**419TH DISTRICT COURT**
HEMAN SWEATT COURTHOUSE
P. O. BOX 1748
AUSTIN, TEXAS 78767
FAX: (512) 854-2224

Velva L. Price
District Clerk
Travis County

**KATHRYN BURNSTEIN**
Staff Attorney
(512) 854-4029

**LEAH HAYES**
Official Court Reporter
(512) 854-9329

**SELINA HAMILTON**
Court Clerk
(512) 854-5827

June 17, 2024

Chrysta L. Castaneda
Nicole Michael
The Castaneda Firm
325 North St. Paul, Suite 2030
Dallas, Texas 75201
Via email: chrysta@castaneda-firm.com
Via email: nicole@castaneda-firm.com

John Hulme
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 77811-2548
Via email: john.hulme@oag.texas.org

Monica Latin
Brent Rubin
Carrington, Coleman, Sloman,
& Blumenthal, LLP
901 Main Street, Suite 5500
Dallas, Texas 75202
Via email: mlatin@ccsb.com
Via email: brubin@ccsb.com

RE:     Cause No. D-1-GN-24-003384; Aspire Power Ventures, LP v. Public Utility Commission of Texas, et al ., in the 345th Judicial District Court of Travis County, Texas

Dear Counsel:

This case has been assigned to the 419th District Court.

Please familiarize yourselves with Chapter 10 of the Travis County Local Rules, which requires that all orders, including agreed orders, be presented to this Court for approval. Chapter 10 also incorporates the Texas Rules of Appellate Procedure requirements on the "Requisites of Briefs," with some exceptions. The Court may reject briefs that do not comply with Chapter 10. Please note the requirement that appendices be separately bound from briefs.

As set out in Chapter 10 of the Travis County Local Rules, counsel should attempt to agree on a briefing schedule, including hearing or submission dates, and provide such agreement to the Court. If the parties cannot agree to such a schedule, please contact my Judicial Executive Assistant, Victoria Chambers at (512) 854-4023 or Victoria.Chambers@traviscountytx.gov. I prefer that the briefing schedule provide that the last brief be filed and delivered to the Court no later than thirty days before the schedule hearing date.

Although all settings in this case must be made through my JEA, Victoria Chambers, the parties are responsible for announcing with Court Administration as with any other civil case, per Local Rule Chapter 3.

<span style="color:red">**Appx. Page 35 of 740**</span>

I look forward to working with you on this case.

Sincerely,

Judge Catherine A. Mauzy

cc:     Ms. Velva Price, District Clerk

**Appx. Page 36 of 740**

6/28/2024 4:04 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Schmidt

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| PUBLIC UTILITY COMMISSION | § | |
| OF TEXAS, THOMAS GLEESON, | § | |
| LORI COBOS, JIMMY GLOTFELTY, | § | |
| and KATHLEEN JACKSON, | § | |
| *Defendants*. | § | 345th JUDICIAL DISTRICT |

## ORIGINAL ANSWER
## OF THE PUBLIC UTILITY COMMISSION OF TEXAS
## AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants Public Utility Commission of Texas ("PUCT"), Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, and Kathleen Jackson, in their official capacities as Commissioners of the PUCT (collectively, "PUCT Defendants"), through the Office of the Attorney General of Texas, file this Original Answer to the Original Petition and Application for Stay/Suspension and Temporary and Permanent Injunction ("Original Petition") of Aspire Power Ventures, LP ("Aspire").

### General Denial

The PUCT Defendants deny each and every allegation in Aspire's Original Petition and demand strict proof thereof. The PUCT Defendants reserve the right to amend their Original Answer as permitted under the Texas Rules of Civil Procedure.

**Appx. Page 37 of 740**

**Defenses**

1. The Court lacks jurisdiction over Aspire's claims against the PUCT Defendants in their official capacities because there is no waiver of their sovereign immunity to hear Aspire's challenges to the three orders at issue.

2. To the extent that Aspire failed to exhaust all administrative remedies in proceedings at the PUCT, the Court lacks jurisdiction over Aspire's claims against the PUCT Defendants.

3. To the extent that Aspire's Original Petition contains claims inconsistent with positions Aspire took in the administrative proceedings before the PUCT, the PUCT Defendants assert the defenses of waiver and estoppel.

4. To the extent that Aspire's Original Petition contains claims not raised by Aspire in the administrative proceedings before the PUCT, the PUCT Defendants assert the defenses of waiver and estoppel.

**Prayer**

WHEREFORE, HAVING FULLY ANSWERED, the PUCT Defendants pray that:

1. Aspire take nothing by its suit and PUCT Defendants recover their costs; and

2. PUCT Defendants further pray for such other relief, both at law and equity, to which they may show themselves to be justly entitled.

2

Appx. Page 38 of 740

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ John R. Hulme*
JOHN R. HULME
Assistant Attorney General
State Bar No. 10258400
John.Hulme@oag.texas.gov

AMANDA ATKINSON CAGLE
Assistant Attorney General
State Bar No. 00783569
Amanda.Cagle@oag.texas.gov

JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0911

**ATTORNEYS FOR THE PUBLIC
UTILITY COMMISSION OF TEXAS,**

3

**and THOMAS GLEESON, LORI COBOS, JIMMY GLOTFELTY, and KATHLEEN JACKSON, in their official capacities as Commissioners of the Public Utility Commission Texas**

4

## CERTIFICATE OF SERVICE

This is to certify that on June 28, 2024, a true and correct copy of the foregoing document was served on the following counsel by an electronic service provider and/or email:

Chrysta L. Castañeda
chrysta@castaneda-firm.com
Nicole Michael
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Tel: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
mlatin@ccsb.com
Brent M. Rubin
brubin@ccsb.com
CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Tel: (214) 855-3000
Fax: (214) 580-2641

*Counsel for Aspire Power Ventures, LP*

*/s/ John R. Hulme*
JOHN R. HULME

5

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of John Hulme
Bar No. 10258400
david.laurent@oag.texas.gov
Envelope ID: 89329798
Filing Code Description: Answer/Response
Filing Description: ORIGINAL ANSWER OF THE PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS
Status as of 6/30/2024 1:18 PM CST

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 6/28/2024 4:04:37 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 6/28/2024 4:04:37 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 6/28/2024 4:04:37 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 6/28/2024 4:04:37 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 6/28/2024 4:04:37 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 6/28/2024 4:04:37 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 6/28/2024 4:04:37 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 6/28/2024 4:04:37 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 6/28/2024 4:04:37 PM | SENT |

8/13/2024 10:47 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Nancy Ramirez

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | |
| TEXAS, ELECTRIC RELIABILITY | § | TRAVIS COUNTY, TEXAS |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN | § | |
| JACKSON,  AND COURTNEY | § | |
| HJALTMAN, | § | |
| | § | 345th JUDICIAL DISTRICT |
| *Defendants.* | | |

## PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION

Plaintiff Aspire Power Ventures, LP ("Aspire") files its First Amended Petition and Application for Stay/Suspension and Temporary and Permanent Injunction against Defendants Public Utility of Commission of Texas ("PUC"), Electric Reliability Council of Texas ("ERCOT"), Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman (collectively, "Commissioners") and respectfully shows the Court as follows:

## INTRODUCTION

1. The ERCOT Contingency Reserve Service ("ECRS") illegally restrains the supply of electricity on the ERCOT grid. ECRS is illegal for three reasons: *First*, ECRS violates the Public Utility Regulatory Act ("PURA"), which prohibits withholding supply from the market. *Second*, the PUC and ERCOT disregarded the

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

Appx. Page 43 of 740

requirements of the Administrative Procedure Act ("APA") with three PUC orders implementing ECRS (the "ECRS Rules"). *Third*, ERCOT's procedures for adopting rules, under rulemaking authority delegated by the PUC, do not comply with the APA.

2. ECRS is a failed attempt to increase the reliability of ERCOT's electric grid. Under ECRS, generating companies get paid to withhold some of their **existing** generating capacity from the grid—in "reserve"—even when electricity demand is at a peak, including in hot summer months. But PURA and the regulations enacted under it expressly outlaw the withholding of electricity as a market power abuse. *See* Tex. Util. Code § 39.157(a) (PUC charged with preventing market power abuses and defining withholding of production as a market power abuse); 16 Tex. Admin. Code §§ 25.501(j), 25.503(a)(6), (d) (same). ECRS violates these fundamental tenets of PURA.

3. Texas electric consumers have paid inflated rates because of ECRS. According to ERCOT's Independent Market Monitor ("IMM"), which oversees ERCOT, ECRS inflated the cost of wholesale electricity in the period June through November 2023 by approximately $12 billion. ECRS has also caused unnecessary conservation warnings and has increased the risk of ERCOT having to use drastic measures to ensure reliability. If the Court allows ECRS to stand, Texans will continue to suffer harm.

4. Aspire is an ERCOT Market Participant harmed by ECRS. Aspire buys electricity on ERCOT's wholesale market and has fixed-price contracts to sell

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

electricity. ECRS makes wholesale electric prices much more volatile. So, Aspire cannot adequately plan to buy electricity to fulfill its fixed-price contracts. ECRS also makes it much more likely that Aspire will suffer losses on its contracts by increasing wholesale prices. As long as ECRS continues to stand, Aspire will continue to suffer harm.

5. Making matters worse, the PUC and ERCOT implemented ECRS without even attempting to comply with the mandatory requirements of the APA. The APA ensures that the public gets an opportunity to participate in agency rulemaking and that agencies do not exceed their authority when making rules. But the process ERCOT and the PUC used to implement ECRS provided none of the APA's safeguards. Therefore, Aspire seeks a declaratory judgment declaring the ECRS Rules void.

6. In fact, the process for adopting rules concerning ERCOT's operations deliberately and illegally sidesteps the APA. The Legislature allowed the PUC to delegate its rulemaking responsibilities to ERCOT. But the Legislature did not dispense with the APA's mandatory requirements when allowing the PUC to delegate rulemaking responsibilities to ERCOT. And ERCOT's own rulemaking processes do not come close to meeting the APA's rulemaking requirements, nor does the PUC's condensed process for approving ERCOT-adopted rules. Aspire thus also seeks a declaration that ERCOT's rulemaking processes, on their own and when combined with the PUC's, do not substantially comply with the APA.

7. The harm suffered by Aspire, other Market Participants, and Texas due to ECRS cannot be remedied by the payment of mere money damages. False and unsettling conservation notices to the general public cannot be undone. Further, withholding generating capacity through ECRS necessarily means that ERCOT will have to rely more on the other tools to maintain reliability including operating reserves, Energy Emergency Alerts (EEAs), and even rolling blackouts, if necessary. The PUC also takes the position that if one of its orders is declared void, it is void only on a prospective basis and cannot have any effect on transactions that have already cleared. While Aspire disagrees with the PUC's position that prior transactions cannot be unwound, the PUC essentially concedes that no money damages would be available to remedy its illegal conduct.

8. Aspire thus seeks a stay and/or suspension of the ECRS Rules and temporary and permanent injunctive relief. Unless the Court grants interim relief, ECRS will continue to inflict substantial, irreparable harm on Aspire, other Market Participants, and Texas electric consumers.

## PARTIES AND PROCESS

9. Plaintiff Aspire Power Ventures, LP is a Texas limited partnership with its principal place of business in Houston, Texas.

10. Defendant Public Utility Commission of Texas is a state agency that has answered and therefore appeared.

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

11. Defendant Electric Reliability Council of Texas is a quasi-governmental agency that can be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

12. Defendants Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman (collectively, "Commissioners") are the Chair and Commissioners of the PUC, respectively, and are being sued in their official capacity. Gleeson, Cobos, Glotfelty, and Jackson have answered and therefore appeared. Hjaltman can be served with process at her principal place of business, 1701 N. Congress Ave., Suite 7-110, Austin, TX 78701.

13. Because a state agency is a party, a copy of this amended petition is being mailed to the Attorney General in Austin, Texas, by United States Postal Service certified mail, return receipt requested. Tex. Civ. Prac. & Rem. Code § 30.004.

## VENUE

14. Venue in this declaratory judgment action challenging the validity of rules is mandatory in Travis County district court. Tex. Gov't Code § 2001.038(b).

## JURISDICTION

15. The PUC has delegated its rulemaking powers to ERCOT to allow it to enact rules in the form of "protocols," and ERCOT protocols must be approved by the PUC. Tex. Util. Code § 39.151(d), (g-6); *Public Utility Commission of Texas v. RWE Renewables Americas, LLC v.*, No. 23-0555, 2024 WL 2983174, *4 (Tex. 2024). Rulemaking at both the PUC and ERCOT are subject to the Administrative

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

PAGE 5

Procedure Act ("APA"). *See* Tex. Gov't Code § 2001.003(7); *see also* Tex. Util. Code § 39.1511(a-1).

16. The APA provides that the validity of a rule may be determined in a declaratory judgment action brought in Travis County district court if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff. Texas Gov't Code § 2001.038(a)-(b). The ECRS Rules interfere with and impair Aspire's legal rights and privileges. Therefore, this Court has jurisdiction.

## FACTUAL BACKGROUND

### A. *The ERCOT System: Designed to Run Based on Principles of Competition*

17. When Texas deregulated its electricity market in 1999, the Legislature designed the system to operate based on principles of competition. Tex. Util. Code §§ 11.002, 39.001; *see also* 16 Tex. Admin. Code § 25.501(a) (requiring ERCOT protocols to be developed with consideration of microeconomic principles and to "promote economic efficiency in the production and consumption of electricity"). Public Utility Regulatory Act ("PURA"), the statutory framework under which the grid was deregulated, sought to avoid monopolistic behaviors by participants in the electricity market. PURA charged the PUC with policing and mitigating market power abuses. Tex. Util. Code § 39.157(a). PURA specifically defines the withholding of electricity as a market power abuse. *Id.*

18. In addition to PURA, Texas's electricity market is governed by orders and regulations adopted by the PUC and "protocols" adopted by ERCOT under rulemaking authority delegated by the PUC. ERCOT's protocols must be approved by the PUC. Tex. Util. Code § 39.151(g-6); *see* Act of May 30, 2021, 87th Leg., R.S., ch. 426, § 3, 2021 Tex. Gen. Laws 830, 831, *amended by* Act of May 28, 2023, 88th Leg., R.S., H.B. 1500, § 15.

19. The ERCOT Nodal Protocols are the rules promulgated by ERCOT which detail how ERCOT and market participants are required to operate and to interact with one another and how the wholesale electricity market is designed. Section 21 of ERCOT's Nodal Protocols details the process for adopting new protocols and revising existing protocols. A request to revise a Nodal Protocol is called a Nodal Protocol Revision Request ("NPRR"). After ERCOT adopts an NPRR, the PUC can approve the NPRR through an order.

### B. Texas's Deregulated Electricity Market and ERCOT

20. The PUC designated ERCOT as the Independent System Operator for the electric grid that covers roughly 70% of Texas' land mass and serves approximately 90% of Texas's electricity consumers. ERCOT oversees the operation of the high voltage electric transmission system in Texas (which is also called ERCOT), the various markets administered by ERCOT in its capacity as an Independent System Operator, and balancing of physical electricity supply and demand on the high voltage transmission system to ensure its reliability.

21. ERCOT operates within a deregulated electric sector, with competitive generators and competitive retailers. ERCOT's rules require that each participant in the market (a "Market Participant") belong to a specific category that best describes its activity. The Market Participant categories include power generators, competitive retailers, and transmission and distribution (wires) companies. Power generation companies produce electricity, ancillary services, or both. Transmission and distribution utilities are responsible for the power lines and other equipment that carry electricity from power plants and other generation facilities to end-use consumers. Retail electric providers sell electricity to end-use consumers in the parts of the state with retail competition. Qualified Scheduling Entities ("QSEs") like Aspire are also Market Participants and are addressed in more detail below.

22. ERCOT must ensure reliable operation of the grid. For technical reasons, electric supply and demand must always be maintained in balance at an equilibrium point of 60 Hertz, or else the grid risks collapse. Therefore, at times, reserve generation needs to be dispatched to the grid to balance supply and demand. ERCOT accomplishes this balancing by operating a real-time wholesale electricity market.

23. The primary tool ERCOT uses to ensure that demand and supply are in constant balance—the foundation of the wholesale electricity market—is called Security Constrained Economic Dispatch ("SCED"). ERCOT typically runs SCED at intervals of at least every five minutes around the clock. Wholesale electricity is bought and sold based on the prices generated by SCED. These wholesale electricity

prices then allow individual Market Participants to make voluntary decisions about how much electricity they would like to produce or procure over an interval. When prices are high, generators are incentivized to produce more electricity and consumers to use less. Conversely, when prices are low, generators are not incentivized to add additional capacity to the grid.

24. Because electricity is an instantaneous commodity where supply and demand must be equal at every point in time, ERCOT maintains Ancillary Services to assist the balancing process. Ancillary Services exist primarily to bridge the time gap between the five-minute SCED interval and fluctuations in supply or demand that may occur within this five-minute interval.

### C. About Aspire

25. Aspire is a Qualified Scheduling Entity ("QSE") that participates in several markets administered by ERCOT.

26. Aspire buys and sells wholesale electricity in ERCOT's real-time electricity market, serving as a conduit between companies that generate electricity and companies that sell electricity on a retail basis.

27. QSEs like Aspire bear the risk of price fluctuations in the real-time electricity market, because they must contractually commit in advance to buy and sell electricity at specific prices *before* SCED creates the actual wholesale market prices. As a result, artificial fluctuations in prices—fluctuations that don't reflect normal drivers of the market like changes in weather, demand, and generation— cause prices to deviate from expectations. Because they are unexpected, these

artificial fluctuations not only represent an additional risk to QSEs like Aspire but also can result in financial losses. For example, when Aspire sells to a retail provider, it enters into an agreement to sell the retailer electricity at a fixed price and then bears the risk that the wholesale price that Aspire buys at will be higher than the contract price with the retail provider, resulting in a loss.

### D. ECRS: A Costly, Market-Distorting Attempt to Bolster Reliability

28.     ERCOT implemented the ERCOT Contingency Reserve Service ("ECRS"), a new Ancillary Service, in June 2023. ERCOT has claimed ECRS bolsters the grid's reliability. But ECRS does not increase reliability, and ECRS unnecessarily increases the price of electricity.

29.     ECRS is the product of, among other things, three PUC orders approving revisions to ERCOT's Nodal Protocols that Aspire challenges here:

- Order Approving ERCOT Revision Requests, NPRR 1096, Require Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (PUC Project No. 52934) (May 12, 2022);

- Order Approving ERCOT Revision Requests, NPRR 1148, Language Cleanup Related to ERCOT Contingency Reserve Service (ECRS) (PUC Project 54445) (Jan. 26, 2023); and

- Order Approving ERCOT Revision Requests, NPRR 1178, Expectations for Resources Providing ERCOT Contingency Reserve Service (PUC Project 54445) (Jun. 29, 2023).

(Together, the "ECRS Rules.")

30.     ERCOT pays generators who participate in ECRS to withhold part of their generating capacity as reserves unless certain operational criteria are met. Reserves are electric generating capacity that is deliberately *not* made available to

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

meet demand. Without ECRS, this capacity would be available for dispatch to the market through the normal SCED process. So, ECRS is designed to intentionally decrease the supply of electricity available to the grid. And even a slight increase in supply during key periods when the grid is stressed could have a substantial effect on price, to the benefit of consumers.

31. ERCOT and the PUC argue ECRS supports reliability by increasing the level of reserves. But ECRS in fact does nothing to increase current electricity reserve capacity. Instead, ECRS stresses the grid by reducing the grid's ability to meet actual, current, physical demand, often at times when that capacity is most needed, especially during hot summer days.

32. As explained in more detail below, ERCOT's Independent Market Monitor ("IMM"), a watchdog created by the Texas Legislature with the express purpose of detecting and preventing market manipulation and recommending measures to improve the efficiency of ERCOT's wholesale market, has identified several harms caused by ECRS. The IMM concluded that ECRS has:

- Caused ERCOT to procure excessive reserves, which far exceed reserves held by ERCOT's counterparts elsewhere;

- Generated artificial shortages that produce massive inefficient market costs, totaling over $12 billion in 2023; and

- Diminished reliability by withholding capacity needed to manage transmission congestion.

33. In 2023, the first year ECRS was implemented, ECRS prevented the use of 2,194 megawatts of generating capacity on average. The capacity ECRS

---

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

Appx. Page 53 of 740

relegated to reserve was allowed to run on only 40 occasions, typically for a very short duration.

34. ECRS also distorted price signals by creating an artificial scarcity condition by withholding generating capacity. This artificial scarcity resulted in both higher prices and greater price volatility. In the limited periods in 2023 when the ECRS reserve capacity was dispatched to the grid, real-time wholesale electricity prices became even less predictable for market participants. ECRS would suddenly permit more capacity to briefly appear, causing prices to abruptly drop, only to bounce back when ECRS forced that capacity back into reserves.

35. These artificial and unpredictable distortions in price signals and the increased price volatility that resulted make it impossible for independent QSEs like Aspire to efficiently manage the risks that are inherent in fixed price bilateral contracts with both buyers and sellers of electricity. The criteria used to determine when ECRS capacity is allowed to be dispatched are unpredictable, and independent QSEs have no way to forecast them. So, because QSEs like Aspire cannot predict the abrupt addition and removal of generation under ECRS, they cannot accurately forecast prices. ECRS thus makes it much harder for independent QSEs to offer fixed-price hedges to retail providers, substantially increases the price for these hedges, and in turn drives up the costs consumers ultimately pay for that electricity. While the generators get paid to sit on the sidelines, consumers and the market lose.

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

Appx. Page 54 of 740

36.     Even if Aspire and other QSEs substantially increase what they charge retail providers for fixed-price hedges, the volatility introduced by ECRS still greatly increases the likelihood that QSEs will lose money on the hedges they offer to retailers.

37.     ECRS has another unfortunate consequence: it incentivizes vertical integration and concentration, which could decrease competition in the electricity industry. Some QSEs, like Aspire, do not own physical generation and are "non-affiliated." Many other QSEs do. These "affiliated" QSEs use the affiliation between the QSE and the generation entity to manage the unexpected and artificial price distortions caused by ECRS by internalizing (and netting) the positive and negative effects of price fluctuations. To deal with ECRS, these affiliated QSEs integrate their generation and buying/selling in the market, much like vertical integration linked supply and demand in Texas's electricity markets before restructuring in 2003. Thus, ECRS not only leads to market inefficiencies but also creates a significant incentive for firms in the industry to "re-integrate" with the likely outcome that the industry concentration ratio will increase, decreasing competition in both the generation and retail sectors.

38.     No other electricity market in the United States has a service like ECRS, yet these other markets can reliably balance supply and demand efficiently and without creating imaginary prices and can ensure grid reliability to the required standards.

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

Appx. Page 55 of 740

### E. Making Matters Worse, the PUC Illegally Adopted the ECRS Rules

39.    ECRS is unlawful for a second reason. The rules implementing ECRS were not adopted in substantial compliance with the Administrative Procedure Act ("APA"). So, these rules are invalid. *See* Tex. Gov't Code § 2001.035 (a rule is voidable if a state agency does not substantially comply with the APA when adopting it).

40.    The APA contains several mandatory, commonsense requirements aimed at facilitating a thorough rulemaking process that affords members of the public a meaningful opportunity to participate. These requirements include (1) notice, *see* Tex. Gov't Code §§ 2001.023-.025; (2) public participation, *see id.* §§ 2001.029-.030; and (3) the contents of the agency order, *id.* § 2001.033.

41.    The APA's requirements apply to "rules," and the ECRS Rules, adopted under rulemaking authority originally given to the PUC and then delegated to ERCOT, are "rules" to which the APA applies. See Tex. Util. Code § 39.121(d), (g-6); *RWE,* 2024 WL 2983174 at *2. The APA defines a "rule" broadly to include "a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy, or (ii) describes the procedure or practice requirements of a state agency." Tex. Gov't Code § 2001.003(6)(A). "Rules" also include "amendment or repeal of a prior rule." *Id.* § 2001.003(6)(B), (C)

42.    The ECRS Rules, adopted by ERCOT and approved by the PUC, are "rules" because they impose a policy of withholding available supply from the market as a reserve, which causes artificial shortages that raise electricity prices.

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

Appx. Page 56 of 740

43.    Neither ERCOT nor the PUC made any pretense of complying with the APA when adopting and approving the ECRS Rules, respectively. ERCOT followed its own processes for protocol revisions, which require far less than the APA in terms of notice, public participation, and the order. And the PUC largely relied on ERCOT's efforts in adopting the ECRS Rules, rather than undertaking its own efforts to satisfy the APA.

   *1.  ERCOT and the PUC Did Not Substantially Comply with the APA's Notice Requirements*

44.    When a state agency proposes a rule, the APA requires the agency to (a) "give at least 30 days' notice of its intention to adopt a rule before it adopts the rule," and (b) "file notice of the proposed rule with the secretary of state for publication in the Texas Register" at least 30 days before the agency adopts the rule. Tex. Gov't Code § 2001.023(a)-(b). Neither ERCOT nor the PUC gave notice of the ECRS Rules in the Texas Register, but rather buried them on their respective websites. *See* Nodal Protocol § 21.4.1(4). And the Notices of Recommended Approval ERCOT filed with the PUC were each filed less than thirty days before the PUC adopted the referenced Rule:

|  | NPRR 1096 | NPRR 1148 | NPRR 1178 |
|---|---|---|---|
| *Notice of Recommended Approval filed w/ PUC* | 5/2/2022 | 1/6/2023 | 6/20/2023 |
| *PUC Approval Order* | 5/12/2022 | 1/26/2023 | 6/29/2023 |
| *Days Between Notice and Order* | 10 | 20 | 9 |

---

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

## 2. *ERCOT and the PUC Did Not Substantially Comply with the APA's Public Participation Requirements*

45.    Section 2001.029 of the APA establishes three public-participation requirements that a rulemaking agency must follow, none of which were followed here:

- *First*, a state agency must give "all interested persons a reasonable opportunity to submit data, views, or arguments, orally or in writing" before the agency adopts a rule. Tex. Gov't Code § 2001.029(a). The PUC never gave an opportunity for public comment. ERCOT did not allow public comment and restricted comment to a limited group of stakeholders. *See* Nodal Protocol § 21.4.4(1), 21.4.5(1).

- *Second*, the agency must "grant an opportunity for a public hearing before it adopts a substantive rule if a public hearing is requested by: (1) at least 25 persons; (2) a governmental subdivision or agency; or (3) an association having at least 25 members." *Id.* § 2001.029(b). Neither ERCOT nor the PUC never gave an opportunity to request a public hearing.

- *Finally*, an agency must "consider fully all written and oral submissions about a proposed rule." *Id.* § 2001.029(c). But without adequate notice to the public, this requirement cannot be met because it is impossible to determine who might have desired to submit comments.

## 3. *ERCOT and the PUC Did Not Substantially Comply with the APA's Order Requirements*

46.    Under the APA, an agency order that finally adopts a rule "must include":

(1) a reasoned justification for the rule as adopted consisting solely of:

> (A) a summary of comments received from parties interested in the rule that shows the names of interested groups or associations offering comment on the rule and whether they were for or against its adoption;

> (B) a summary of the factual basis for the rule as adopted which demonstrates a rational connection between the factual basis for the rule and the rule as adopted; and

> > (C) the reasons why the agency disagrees with party submissions and proposals;
>
> (2) a concise restatement of the particular statutory provisions under which the rule is adopted and of how the agency interprets the provisions as authorizing or requiring the rule; and
>
> (3) a certification that the rule, as adopted, has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Tex. Gov't Code § 2001.033(a). This information must appear within the four corners of the agency order adopting the Rule. The PUC orders approving the ECRS Rules contain none of these materials. At best, ERCOT's materials relating to the ECRS rules, which appear in staff-prepared documents as opposed to an official PUC order, summarize comments about the rules and contain none of the other required materials. Therefore, ERCOT and the PUC did not substantially comply with the APA when adopting the ECRS Rules.

### F. ERCOT's Independent Market Monitor Confirms the Disastrous Effects of ECRS

47. The Texas Legislature requires ERCOT to appoint an Independent Market Monitor ("IMM") "to detect and prevent market manipulation strategies, recommend measures to enhance the efficiency of the wholesale market, and provide independent analysis of any material changes proposed to the wholesale market." Tex. Util. Code § 39.1515(a). Potomac Economics has served as ERCOT's IMM for nearly twenty years. David Patton, PhD, an energy economist with nearly thirty years of experience, leads Potomac Economics.

48.     The IMM recently issued a report slamming ECRS. The IMM explained that shortly after ECRS was implemented in June 2023, ERCOT decided to nearly double the amount of ten-minute reserves, causing ERCOT to buy excessive reserves compared to other U.S. power grids' reserves.

49.     The IMM also concluded ECRS is not based on sound reliability criteria. ECRS does not account for the probability of contingencies and uncertainties that lead to reliability risks. ECRS also fails to balance reliability objectives with the costs of satisfying reliability requirements.

50.     Ultimately, the IMM concluded that ECRS generated artificial electricity shortages that produced massive, inflated costs for electricity sold on the wholesale market, totaling more than $12 Billion between June through November 2023. While not all these costs were passed on to retail consumers, some of whom buy on fixed-price contracts, in the longer term, these artificially increased wholesale prices will necessarily negatively impact the retail prices Texans pay.

51.     As the IMM explained in testimony to the PUC on July 25, 2024, ECRS's deployment in 2023 caused forward prices for summer 2024 and 2025 to roughly double, which led consumers to have to pay "much, much higher" rates when signing new contracts with retail providers. The longer the problems with ECRS continue, the "larger the share of the costs hit Texas consumers."

52.     Finally, the IMM suggested fixes to ECRS, but ERCOT has not adopted the IMM's proposed fixes and has pushed off consideration of those fixes. So, with ECRS continuing to keep much needed capacity off the grid during  high-

demand periods, market participants and Texas electric consumers are poised to pay unnecessary, increased costs for electricity unless and until ECRS is promptly reined in or suspended.

## DECLARATORY JUDGMENT

53. Aspire incorporates by reference all of the allegations set forth above.

54. Aspire asserts that the ECRS Rules were not adopted in substantial compliance with the APA, making them invalid. *See* Tex. Gov't Code § 2001.035 (a rule is voidable if a state agency does not substantially comply with the APA when adopting it). ERCOT and the PUC disagree. Because Aspire's rights, status, and other legal relations are affected by the ECRS Rules, declaratory relief is necessary and appropriate to resolve questions regarding the validity of the ECRS Rules.

55. Aspire therefore seeks a declaration under Chapter 37 of the Texas Civil Practice and Remedies Code and Texas Government Code § 2001.038 including, but not limited to, the following:

a) Each of the ECRS Rules is a "rule" within the meaning of the APA.

b) The PUC and ERCOT did not substantially comply with mandatory requirements of the APA when adopting and approving each of the ECRS Rules, including requirements for (1) notice under APA §§ 2001.023-.025; (2) public participation under §§ 2001.029-.030; and (3) the contents of the agency order under § 2001.033.

c) Each of the ECRS Rules is therefore invalid and void under Texas Government Code § 2001.035.

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

d) Chapter 21 of ERCOT's Nodal Protocols, both on its own and when combined with the PUC's process for approving ERCOT protocols, does not provide a process for making and amending rules that substantially complies with APA §§ 2001.023-.025, .029-.030, .033.

Aspire further asserts that the ECRS Rules violate the fundamental limits of PURA in that they require generators to withhold power from the grid. Aspire seeks a declaration that:

a) The ECRS Rules violate PURA because they direct generators to withhold electricity from the grid in violation of Tex. Util. Code §39.157(a)

b) In promulgating the ECRS Rules, the Commissioners committed *ultra vires* acts for which they are liable in their official capacities. *See City of El Paso v. Heinrich,* 284 S.W.3d 366, 372-73 (Tex. 2009).

c) Each of the ECRS Rules is therefore invalid and void.

## APPLICATION FOR STAY, SUSPENSION, AND INJUNCTIVE RELIEF

56. Aspire incorporates by reference all of the allegations set forth above.

57. This Court has the power to enter a temporary injunction based on the failure to substantially comply with the APA when adopting the ECRS Rules. *Abbott v. Doe*, 691 S.W.3d 55, 91 (Tex. App.—Austin 2024, pet. filed) (collecting cases in which the court upheld temporary injunctions based on APA rulemaking challenges). Further, Texas Utilities Code § 15.004 provides that while an appeal of a regulatory authority's order is pending, a district court "may stay or suspend all or part of the

Appx. Page 62 of 740

operation of the order, ruling, or decision." *Cf.* Tex. Gov't Code § 2001.038 (providing that a validity challenge under the APA cannot be used to "stay a hearing in which a suspension, revocation, or cancellation of a license by a state agency is at issue" but imposing no other limitations on a court's ability to issue a stay). In deciding whether to grant a stay or suspension, the Court must follow the practices of a court exercising equity jurisdiction. Tex. Util. Code § 15.004.

58. The Court also has the power to enter a temporary injunction against the ECRS rules because they violate the fundamental limits of PURA. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 376 (Tex. 2009) ("[A] claimant who successfully proves an *ultra vires* claim is entitled to prospective injunctive relief, as measured from the date of injunction.").

59. As set forth in more detail above, ECRS adopted and the PUC approved the ECRS Rules without substantially complying with mandatory requirements in the APA, rendering the ECRS Rules voidable. Also, the ECRS Rules forced withholding of electricity, exceeding the limits of PURA. Aspire has therefore established, at the very least, a probable right to the relief it seeks upon final hearing.

60. If the operation of the ECRS Rules is not promptly stayed, suspended, or enjoined, Aspire and others will suffer immediate and irreparable injury as a result of the unlawfully adopted ECRS Rules that violate PURA, as set forth above. The injuries that Aspire and others will suffer are irreparable and cannot adequately be remedied at law.

Appx. Page 63 of 740

61. Even with regard to monetary losses, the PUC has taken the position that Aspire and other Market Participants from *ever* obtaining monetary relief. *See Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001) (per curiam) (irreparable injury must be shown because injunctive relief is "designed to provide remedy to cover those injuries for which there was not clear, full, and adequate relief at law"). Although the Supreme Court rejected the PUC's arguments in *Public Utility Commission of Tex. v. Luminant Energy Co. LLC* that injuries arising from PUC rules deemed invalid are not redressable, the PUC and ERCOT seem poised to erect barriers to monetary relief based on any challenges to rules that would require repricing. *See* No. 23-0231, 2024 WL 2982955, at \*5 (Tex. June 14, 2024). If the ECRS Rules are not stayed or suspended during the pendency of this action, Aspire and other Market Participants will be purchasing electricity at prices illegally inflated by ECRS. By contending that money damages are unavailable, the PUC and ERCOT cannot avoid the conclusion that injunctive relief is particularly appropriate to prevent ECRS from causing further harm.

62. Even if Aspire had the ability to potentially pass through *some* of the increased costs to its customers, that would not negate the irreparable nature of the injury ECRS causes. Because Aspire has agreements with certain retail providers for fixed-price hedges, Aspire bears the risk of unpredictable and unforeseeable price increases caused by ECRS. *Cf. Sw. Elec. Power Co. v. Burlington N., Inc.*, 475 F. Supp. 510, 522 (E.D. Tex. 1979) (irreparable injury suffered by electric utility that had to pay increased costs to railroad for fuel transport not negated; case law

barred recovery of damages from railroad and pass-through agreement with customers "not assured" to be enforced because PUC could disallow increase in fuel cost passed on to customer).

63.     Even if Aspire could, in theory, recover damages or other monetary relief because of the harms it suffered because of ECRS, Aspire will suffer an irreparable injury because "damages are very difficult to measure by any certain pecuniary standard." *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Among other things, ERCOT has chosen not to implement the systems that would allow it to meaningfully and correctly re-run SCED, even though it is technically possible to implement such systems and to re-calculate the dispatch and resulting prices as if ECRS had not run. The only adequate, effective, and complete relief is for the Court to stay or suspend the ECRS Rules.

64.     No bond should be necessary for the issuance of the stay, suspension, or temporary injunction because ERCOT and the PUC will not suffer any harm resulting from a stay or suspension of the ECRS Rules and is simply being required to comply with the APA. However, Aspire is willing to post a bond if the Court determines it appropriate. *See* Tex. R. Civ. P. 684.

65.     For all these reasons, pursuant to Texas Rule of Civil Procedure 680 *et seq.*, Texas Civil Practice and Remedies Code § 65.001 *et seq.*, and Texas Utilities Code § 15.004, Aspire respectfully requests a stay, suspension, and/or temporary and permanent injunction, staying or suspending the operation of the ECRS Rules

and ordering and restraining ERCOT, the PUC, the Commissioners, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise (collectively, the "Injunction Restrained Parties") on the following terms:

**The PUC and ERCOT are prohibited from enforcing, using, or otherwise allowing the ECRS Rules to operate.**

## PRAYER FOR RELIEF

For these reasons, Aspire respectfully requests that ERCOT and Hjaltman be cited to appear and answer, and that this Court:

1. Issue the declaratory judgment requested by Aspire;

2. Stay or suspend the operation of the ECRS Rules under Texas Utilities Code § 15.004;

3. Issue the temporary and permanent injunctive relief requested by Aspire;

4. Award Aspire costs, expenses, and attorneys' fees to the extent recoverable by law; and

5. Award Aspire any other and further relief to which it may be justly entitled.

Respectfully Submitted,

/s/ Chrysta L. Castañeda
Chrysta L. Castañeda
Texas Bar No. 15325625
chrysta@castaneda-firm.com
Nicole Michael
Texas Bar No. 24067767
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Telephone: (214) 282-8579
Facsimile: (214) 602-9187

&

Monica Latin
Texas Bar No. 00787881
MLatin@ccsb.com
Brent M. Rubin
Texas Bar No. 24086834
BRubin@ccsb.com
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Ph: 214-855-3000
Fax: 214-580-2641

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 13, 2024, a true and correct copy of the above and foregoing document was electronically filed with the Court and served on all counsel of record through the eFiling Service Provider pursuant to the Texas Rules of Civil Procedure.

/s/ Brent M. Rubin

**PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brent Rubin on behalf of Chrysta Castaneda
Bar No. 15325625
brubin@ccsb.com
Envelope ID: 90829164
Filing Code Description: Amended Filing
Filing Description: PLAINTIFF'S FIRST AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION
Status as of 8/13/2024 2:35 PM CST

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 8/13/2024 10:47:08 AM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 8/13/2024 10:47:08 AM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 8/13/2024 10:47:08 AM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 8/13/2024 10:47:08 AM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 8/13/2024 10:47:08 AM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 8/13/2024 10:47:08 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 8/13/2024 10:47:08 AM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 8/13/2024 10:47:08 AM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 8/13/2024 10:47:08 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 8/13/2024 10:47:08 AM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 8/13/2024 10:47:08 AM | SENT |

9/9/2024 9:34 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Schmidt

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS |
| TEXAS, ELECTRIC RELIABILITY | § | |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN JACKSON, | § | |
| AND COURTNEY HJALTMAN, | § | |
| *Defendants.* | § | 345TH JUDICIAL DISTRICT |

## ERCOT'S ORIGINAL ANSWER

Defendant Electric Reliability Council of Texas, Inc. ("ERCOT") files its Original Answer and respectfully shows this Court the following:

### I. JURISDICTION

1. This Court lacks subject-matter jurisdiction to adjudicate Plaintiff Aspire Power Ventures, LP's ("Aspire" or "Plaintiff") claims because the Public Utility Commission of Texas ("PUCT") approval orders and the ERCOT Nodal Protocols that are the subject of Plaintiffs' claims are not "rules" under the Administrative Procedure Act; thus, APA § 2001.038's limited immunity waiver does not apply here, and Aspire's suit is barred by sovereign immunity. Further, this Court lacks subject-matter jurisdiction because Aspire's claims against ERCOT fall within the exclusive jurisdiction of the PUCT, and Aspire failed to exhaust its administrative remedies before the PUCT prior to filing suit.

### II. GENERAL DENIAL

2. Pursuant to Texas Rule of Civil Procedure 92, ERCOT generally denies each and every claim and allegation contained in Plaintiff's Original Petition, and all amendments and supplements thereto, and demands strict proof thereof as required by law.

## III. AFFIRMATIVE DEFENSES

3.      Plaintiff's claims are barred, in whole or in part, by the doctrine of sovereign immunity.

4.      Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to exhaust its administrative remedies.

5.      Plaintiff's claims are barred, in whole or in part, because Plaintiff lacks standing to assert private claims for alleged violations of PURA.

6.      Plaintiff fails to state a cause of action against ERCOT upon which relief can be granted.

7.      Plaintiff's claims are barred, in whole or in part, by waiver, estoppel, and/or laches.

8.      Plaintiff's claims are barred, in whole or in part, by the two-year statute of limitations set forth in APA § 2001.035(b).

9.      Plaintiff is not entitled to recover attorneys' fees in this matter.

## PRAYER

ERCOT requests that the Court dismiss this case for lack of jurisdiction. Alternatively, ERCOT requests that upon proper motion or a final trial in this matter, a judgment be entered that Plaintiff takes nothing against ERCOT. ERCOT further requests all other relief, at law or in equity, to which it is or may be entitled.

Respectfully submitted,

**WINSTEAD PC**
600 W. 5th Street
Suite 900
Austin, Texas 78701
(512) 370-2800 telephone
(512) 370-2850 fax

By: _/s/ Elliot Clark_

    Elliot Clark            SBN 24012428
    eclark@winstead.com
    Elin Isenhower        SBN 24104206
    eisenhower@winstead.com

**ATTORNEYS FOR DEFENDANT
ELECTRIC RELIABILITY COUNCIL OF
TEXAS, INC.**

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of this document has been served on all counsel of record in accordance with the Texas Rules of Civil Procedure on September 9, 2024.

_/s/ Elliot Clark_
Elliot Clark

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 91774770
Filing Code Description: Answer/Response
Filing Description: ERCOT'S ORIGINAL ANSWER
Status as of 9/9/2024 3:36 PM CST

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Monica Latin | 787881 | mlatin@ccsb.com | 9/9/2024 9:34:56 AM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 9/9/2024 9:34:56 AM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 9/9/2024 9:34:56 AM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 9/9/2024 9:34:56 AM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David Laurent | | david.laurent@oag.texas.gov | 9/9/2024 9:34:56 AM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 9/9/2024 9:34:56 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 9/9/2024 9:34:56 AM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 9/9/2024 9:34:56 AM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 9/9/2024 9:34:56 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 9/9/2024 9:34:56 AM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/9/2024 9:34:56 AM | SENT |

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Elliot Clark | | eclark@winstead.com | 9/9/2024 9:34:56 AM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 91774770
Filing Code Description: Answer/Response
Filing Description: ERCOT'S ORIGINAL ANSWER
Status as of 9/9/2024 3:36 PM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Elliot Clark | | eclark@winstead.com | 9/9/2024 9:34:56 AM | SENT |
|---|---|---|---|---|
| Elin Isenhower | | eisenhower@winstead.com | 9/9/2024 9:34:56 AM | SENT |

9/9/2024 12:08 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Schmidt

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| **ASPIRE POWER VENTURES, LP,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **PUBLIC UTILITY COMMISSION OF** | § | **TRAVIS COUNTY, TEXAS** |
| **TEXAS, ELECTRIC RELIABILITY** | § | |
| **COUNCIL OF TEXAS, THOMAS** | § | |
| **GLEESON, LORI COBOS, JIMMY** | § | |
| **GLOTFELTY, KATHLEEN JACKSON,** | § | |
| **AND COURTNEY HJALTMAN,** | § | |
| *Defendants.* | § | **345ᵀᴴ JUDICIAL DISTRICT** |

### ERCOT'S PLEA TO THE JURISDICTION AND ATERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT

Defendant Electric Reliability Council of Texas, Inc. ("ERCOT") files this Plea to the Jurisdiction and Alternatively, Motion to Dismiss Under Rule 91(a) and Alternatively, Plea in Abatement, and respectfully requests the Court dismiss (or, alternatively, abate) Plaintiff Aspire Power Ventures, LP's ("Aspire") claims against ERCOT.

### SUMMARY

In this lawsuit, Aspire challenges "three PUC orders approving revisions to ERCOT's Nodal Protocols," under the purported jurisdiction of Section 2001.038 of the Administrative Procedure Act ("APA"). But the Texas Supreme Court recently held that a Public Utility Commission of Texas ("PUCT") "order approving" an ERCOT Protocol revision is "**not** an agency-adopted 'rule' under the Administrative Procedure Act." *PUCT v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024) (emphasis added). Because the three PUCT orders approving ERCOT Protocol revisions—defined by Aspire as the "ECRS Rules"—are not agency rules, this Court lacks jurisdiction under APA § 2001.038, and Aspire's claims must be dismissed. *Id.*

Nor can Aspire use APA § 2001.038 to challenge ERCOT's Protocol revision process. Just this term, the Texas Supreme Court sanctioned the existing revision process when it carefully analyzed

- 1 -

the legislatively required and PUCT-directed "detailed procedures for adopting and revising [ERCOT's] protocols," and concluded that "this painstaking procedure [leverages industry expertise] while maintaining transparency and affording interested parties plentiful opportunities to weigh in." *Id.* at 490. The Court **rejected** the argument that recent statutory changes show "the Legislature intended to overhaul that process entirely and effectively convert ERCOT Protocols into PUC rules subject to the same review procedures," noting "we do not discern such a sweeping intent from the language the Legislature chose." *Id.* at 491. In fact, the Court found the opposite, concluding the recent amendments "signal[] legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors." *Id.* at 492. Thus, neither PUCT orders approving Protocol revisions, nor the Protocols themselves are agency-adopted "rules" under the APA. This Court therefore lacks jurisdiction under APA § 2001.038—the sole jurisdictional basis pleaded by Aspire to support its claims—without which ERCOT's sovereign immunity bars Aspire's claims. *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611 (Tex. 2023).

Aspire was not without a potential remedy for the harm it claims. "PUC regulations provide a process for review of ERCOT Protocols, . . . which culminates in a suit for judicial review in district court." *RWE*, 691 S.W.3d at 492 n.11. But Aspire "did not engage in that process, choosing instead to utilize the inapplicable procedure for reviewing PUC [] rules." *Id.* Aspire's failure to exhaust its administrative remedies also deprives this Court of jurisdiction over Aspire's claims. *CPS Energy*, 671 S.W.3d at 618.

Even if the Court had jurisdiction, Aspire's claims have no basis in law and should be dismissed under Rule 91a. Aspire's procedural challenge fails as a matter of law because, as the *RWE* Court held weeks ago, the APA's rulemaking requirements do not apply to the ERCOT Protocols or PUCT orders finally approving those Protocols. Aspire's substantive challenge fares no better, as it is based solely on the claim that the ECRS program violates PURA § 39.157—a statute that directs *the*

- 2 -

**Appx. Page 75 of 740**

*PUCT* to protect against certain market power abuses. Nothing in PURA § 39.157 gives Aspire a private cause of action against the PUCT and ERCOT, and even if it did, that provision—which prohibits anticompetitive practices *by market participants*—is inapplicable to ERCOT.

Moreover, in another recent Texas Supreme Court decision, the Court recognized that the PUCT is charged with balancing two equally critical, yet potentially conflicting, legislative goals: preserving a competitive market, and ensuring grid reliability. Sometimes, competition must yield to reliability, and "[d]eciding when those circumstances are present—and how to respond—**is the Commission's job, not the judiciary's**." *PUCT v. Luminant Energy Co. LLC,* 691 S.W.3d 448, 463 (Tex. 2024) (emphasis added). It is, therefore, not for Aspire or this Court to second guess whether the ECRS program's costs outweigh its reliability benefits, as Aspire claims here.

In the unlikely event the Court determines it has jurisdiction and Aspire has pleaded viable claims, it should not proceed with this lawsuit because Aspire has failed to join all necessary and indispensable parties. When a party brings a declaratory judgment claim, as Aspire has done here, Texas law requires that "all persons who have or claim *any* interest that would be affected by the declaration *must* be made parties." Tex. Civ. Prac. & Rem. Code § 37.006(a) (emphasis added). Here, Aspire asks the Court to not only declare the ECRS program invalid—but to declare the entire ERCOT Protocol revision process invalid—thereby eviscerating the Protocols entirely and plunging the State's grid and market into chaos. This requested declaratory relief would affect the interests of hundreds of other market participants that participate in the ERCOT market and that have invested billions of dollars in reliance on the Protocols that govern the market, including by providing the ECRS Ancillary Service that Aspire seeks to prohibit.

As set forth below, the Court should dismiss all of Aspire's claims against ERCOT.

**Appx. Page 76 of 740**

**I.      ERCOT and the ERCOT Nodal Protocols**

ERCOT is the Independent System Operator ("ISO") and "essential organization" statutorily charged with operating the State's electric grid and wholesale electricity market—all while subject to the PUCT's "complete authority." *See* Public Utility Regulatory Act ("PURA")[2] §§ 39.151(a), (d). ERCOT does not generate, transmit, distribute, or sell electricity. Instead, ERCOT is the entity that Texas tasked with regulating Texas's intrastate grid and wholesale electricity market, subject to plenary control by the PUCT. *See* PURA §§ 39.151(a), (g); 16 Tex. Admin. Code ("TAC") § 25.361(b); *see also CPS Energy*, 671 S.W.3d at 611–12 (discussing ERCOT's history). All aspects of ERCOT's finances and operations are subject to the PUCT's control, and the State of Texas selects ERCOT's governing board. *Id.* at 623–26. As the Texas Supreme Court recently put it, "ERCOT and the PUC[T] are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and essential purposes." *RWE*, 691 S.W.3d at 490.

ERCOT manages Texas's intrastate grid and wholesale electricity market using statutory authority delegated to it by the PUCT to "establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants." *CPS Energy*, 671 S.W.3d at 626 (citing PURA §§ 39.151(d), (i), (j), (*l*)). In 2021, the Legislature amended PURA to specifically require the PUCT to approve any Protocols adopted by ERCOT and for ERCOT to "establish and implement a formal process for adopting new protocols or revisions to existing protocols." PURA § 39.151(g-6). As the Legislature knew when it added this requirement, ERCOT already had a longstanding collaborative, stakeholder-led process for adopting

---

[1] "[A] a court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554–55 (Tex. 2000).

[2] PURA is codified at Texas Utilities Code §§ 11.001–66.016.

and revising its Protocols, referred to as the Nodal Protocol Revision Request ("NPRR") process. *See* ERCOT Protocols § 21.2(1); *RWE*, 691 S.W.3d at 491. In compliance with the Legislature's directive, ERCOT revised its formal process to take into account the new requirement for PUCT approval of ERCOT-adopted Protocols. *RWE*, 691 S.W.3d at 490. The NPRR process is detailed in ERCOT Protocols § 21.

The NPRR process is extensive, providing multiple opportunities for comment and vote by representatives of each market segment, regulators, and consumers as the proposed Protocol revisions progress through ERCOT's Protocol Revision Subcommittee, Technical Advisory Committee, and State-appointed Board. ERCOT Protocols §§ 21.3, 21.4.1, 21.4.4, 21.4.5; *see also RWE*, 691 S.W.3d at 489–90 (describing ERCOT's detailed procedures for adopting and revising protocols).

Throughout the NPRR process, ERCOT employs its subject-matter experts in a range of relevant areas (including, e.g., economics, market design, and various engineering specialties) to analyze the effect of any proposal on ERCOT's functions and the grid and market. ERCOT Protocols §§ 21.4.6, 21.4.9. Because market participants like Aspire have a hands-on role in the Protocols' drafting and revision, ERCOT is able to harness their substantial expertise as well. Indeed, in its recent analysis and endorsement of ERCOT's Protocol revision process, the Texas Supreme Court recognized that this "painstaking procedure serves to **leverage the expertise of ERCOT members and industry stakeholders while maintaining transparency and affording interested parties plentiful opportunities to weigh in**." *RWE,* 691 S.W.3d at 490 (emphasis added).

The result of this "painstaking procedure" is thousands of pages of binding rules that govern every aspect of Texas's electric grid and wholesale market—not only the Protocols, but also numerous other "guides, policies and procedures" containing legally binding market rules. *See* ERCOT, *Market Rules*; PURA § 39.151(j). These ERCOT market rules are highly detailed and rife with technical

Appx. Page 78 of 740

specifications. *See, e.g.*, ERCOT Protocols §§ 3.22.2, 6.5.7.5, 8.1.1.4.1. For example, the Protocols governing certain ECRS charges include complex mathematical pricing formulas like this:

▲ 4.6.4.2.5      **ERCOT Contingency Reserve Service Charge**

(1)     Each QSE shall pay to ERCOT or be paid by ERCOT an ECRS charge for each hour as follows:

$$DAECRAMT_q = DAECRPR * DAECRQ_q$$

Where:

$$DAECRPR = (-1) * PCECRAMTTOT / DAECRQTOT$$

$$PCECRAMTTOT = \sum_q PCECRAMT_q$$

$$DAECRQTOT = \sum_q DAECRQ_q$$

$$DAECRQ_q = DAECRO_q - DASAECRQ_q$$

The PUCT has neither the staff nor deep technical knowledge necessary to craft these immensely complex rules. *See RWE*, 691 S.W.3d at 490 (acknowledging that the PUCT "lacks the expertise and staff resources to make informed regulatory decisions independent of ERCOT.") (cleaned up).

For this reason, and because "ERCOT is uniquely positioned to manage the electricity market by virtue of its technical expertise," *id.* at 487, the Legislature authorized the PUCT to delegate its rulemaking authority to ERCOT. PURA § 39.151(d). In so doing, the Legislature created a two-part, non-APA process by which (1) ERCOT first "adopt[s]" market rules using its own "formal process" (the NPRR process); and (2) the PUCT exercises its supervisory authority to finally "approve, reject, or remand" any ERCOT-adopted Protocol revisions. PURA § 39.151(g-6); *see also CPS*, 671 S.W.3d at 623; *RWE*, 691 S.W.3d at 487, 490–91.

## II.     Ancillary Services and ECRS.

As the PUCT-certified ISO, ERCOT must "ensure the reliability" of Texas's electric grid. PURA § 39.151(a)(2). To ensure the reliability of the grid, ERCOT must, among other things, make sure that the supply and demand of electricity on the ERCOT System are at all times balanced. *See* 16 TAC § 25.361(b)(4). "For the ERCOT grid to remain functional, electricity supply and demand must

**Appx. Page 79 of 740**

remain balanced at a frequency of 60 hertz [Hz]." *Luminant*, 691 S.W.3d at 455. Failure to maintain system frequency at 60 Hz can damage grid infrastructure and lead to system-wide power outages lasting weeks or months. *Id.* at 455 (recognizing that the sudden frequency decay during Winter Storm Uri threatened to put Texas in a "total grid collapse that would have plunged the state into darkness for weeks, maybe months.").

Ancillary Services are an essential tool ERCOT uses to help resolve system imbalances and ensure grid reliability. *See* PURA § 39.159(b) (requiring that ERCOT "procure[] ancillary or reliability services . . . to ensure appropriate [grid] reliability"). Ancillary Services can be provided by electric generators or consumers, and are used to increase or decrease the supply of electricity in a matter of minutes or even seconds, which is particularly critical in times of high demand (e.g., peak summer temperatures) or short supply (e.g., Winter Storm Uri, when historically low temperatures froze generation equipment). *See id.*; *see also* ERCOT Protocols §§ 3.17, 6.5.9.4. Because Ancillary Services are an integral component of maintaining any electric system reliability, they have long been used in various forms by ISOs around the nation.[3]

One type of Ancillary Service used by ERCOT is the herein complained-of ERCOT Contingency Reserve Service, or ECRS. ECRS was created through NPRR 863, which was proposed in January 2018 by a market participant.[4] After undergoing over a year of extensive vetting and revision by ERCOT and various market participants through the NPRR process, the creation of ECRS was approved and adopted by ERCOT's Board in February 2019.[5] Aspire could have filed a complaint

---

[3] *See, e.g.*, Federal Energy Regulatory Commission ("FERC") report on Energy and Ancillary Services Market Reforms to Address Changing System Needs (Sept. 2021), available here (outlining Ancillary Services products used by various ISOs and Regional Transmission Operators (RTOs) around the U.S.).

[4] *See* NPRR 863, Creation of Primary Frequency Response Service Product and Revisions to Response Service (Jan. 1, 2018), available here.

[5] *See* ERCOT Board Report on NPRR 863 (Feb. 13, 2019), available here. At that time, the PUCT was not required to approve ERCOT's adoption of NPRR 863. PUCT approval became mandatory in 2021 with the addition of PURA § 39.151(g-6).

**Appx. Page 80 of 740**

against ERCOT at the PUCT when ECRS was adopted five years ago—but it chose not to. *See RWE*, 691 S.W.3d at 490.

ECRS is the first new Ancillary Service in the ERCOT Region in more than 20 years.[6] It was developed to address certain reliability risks that ERCOT's other Ancillary Services do not adequately address, including those risks created by rapid grid modernization (e.g., increasing amounts of intermittent wind and solar generation resources), which are only compounded by the ever-present heightened reliability risks presented by ERCOT's intrastate nature.[7] "While all the other states in the Union have extensive interconnections with neighboring states, nearly 90% of Texas is covered by a single isolated grid with limited connections to external power supplies," *Texas v. Env't Prot. Agency*, 829 F.3d 405, 431 (5th Cir. 2016), meaning that, unlike the rest of the nation, the ERCOT grid cannot rely on its neighbors to prevent grid collapse. *See also id.* at 432 (recognizing that "ERCOT's independence makes the Texas electrical grid uniquely vulnerable to sudden power shortages"). ECRS was intended in large part to fulfill a similar role to that of the import capability that other power regions have at hand,[8] making it a critical reliability tool—a fact that no one but Aspire disputes.[9]

## III.    Aspire fails to exhaust its administrative remedies.

To be sure, ECRS—as ERCOT's first new Ancillary Service in decades—is still undergoing finetuning by ERCOT, at the directive of the PUCT and in close collaboration with market participants and the ERCOT Independent Market Monitor ("IMM"). The "ECRS Rules" Aspire complains of here are part of that finetuning, which is ongoing within the statutorily prescribed administrative process.

---

[6] PUCT Project No. 54445, *Review of Protocols Adopted by the Independent Organization*, Item No. 84 (July 22, 2024), available here.

[7] *See, e.g.*, ERCOT Protocols § 6.5.7.6.2.4(1) (listing purposes of ECRS).

[8] PUCT Project No. 54445, *Review of Protocols Adopted by the Independent Organization*, Item No. 84 (July 22, 2024), available here.

[9] *See generally* PUCT Project No. 54445, *Review of Protocols Adopted by the Independent Organization*, Item Nos. 81–90, available here.

Appx. Page 81 of 740

Most recently, in June 2024, ERCOT adopted NPRR 1224, which was intended to address concerns about when ECRS resources are deployed.[10] Aspire was among the market participants that provided comments to NPRR 1224, raising similar economic complaints it asserts here—but nowhere suggesting that ECRS is illegal or that the NPRR process in which it was engaging is illegal.[11] Though NPRR 1224 was approved by the various market stakeholders on ERCOT's Protocol Revision Subcommittee and Technical Advisory Committee, and was ultimately adopted by ERCOT's Board, the PUCT, in fact, recently *rejected* NPRR 1224 in its current form after receiving and conducting an open meaning on additional comments and concerns received from PUCT staff, the IMM, and market participants.[12]



As NPRR 1224 demonstrates, the prescribed formal NPRR process works—and it does so in a way that invites input and collaboration from all segments of the ERCOT market to create solutions that balance the needs of the entire grid and market.

---

[10] *See* NPRR 1224, ECRS Manual Deployment Triggers (Mar. 27, 2024), available here.

[11] *See* Aspire's Comments to NPRR 1224 (June 6, 2024), available here.

[12] *See* PUCT Project No. 54445, *Review of Protocols Adopted by the Independent Organization*, Item Nos. 81–90, available here.

Flouting this process, Aspire runs to this Court complaining of "three PUC orders implementing ECRS," and claiming—for the first time in *five years* since its creation—that ECRS is illegal.[13] *See* Am. Pet. ¶ 1. Specifically, Aspire challenges three "ECRS Rules":

> (1) a May 2022 PUCT order approving ERCOT NPRR 1096, which modified certain requirements for Energy Storage Resources providing ECRS;[14]
>
> (2) a January 2023 PUCT order approving ERCOT NPRR 1148, which was merely a language cleanup of the already-existing ECRS Protocols;[15] and
>
> (3) a June 2023 PUCT order approving ERCOT NPRR 1178, which clarified and updated expectations for Resources providing ECRS.[16]

Aspire chiefly complains that these three PUCT orders approving ERCOT Protocol revisions fail to comply with the APA. *See id.* ¶¶ 15–16, 54–55. Aspire also claims that these orders "violate PURA because they direct generators to withhold electricity from the grid in violation of Tex. Util. Code §39.157(a)." *Id.* ¶ 55. For both its procedural and substantive challenge, Aspire asks the Court to (1) declare the "ECRS Rules" invalid and void; and, (2) enjoin the PUCT and ERCOT "from enforcing, using, or otherwise allowing the ECRS Rules to operate." *Id.* ¶ 65.

Though Aspire seemingly tailors its requested declaratory and injunctive relief to invalidating the three above-enumerated PUCT orders, it spends the rest of its twenty-plus page petition lambasting the allegedly "illegal" ECRS program, suggesting it really seeks to have ECRS invalidated in its entirety.[17] *See id.* ¶ 1 (at the outset asserting that "[ECRS] illegally restrains the supply of electricity

---

[13] Notably, in its comments to NPRR 1224, Aspire claimed it was "fully supportive of the recommendations made by the IMM" to *improve* the ECRS program, not to abolish it, and even offered its own additional improvement recommendations therein.

[14] *See* Final ERCOT Board Report adopting NPRR 1096 (May 2, 2022), available here.

[15] *See* Final ERCOT Board Report adopting NPRR 1148 (Dec. 21, 2022), available here.

[16] *See* Final ERCOT Board Report adopting NPRR 1178 (June 20, 2023), available here.

[17] Aspire's definition of "ECRS Rules" creates ambiguity on this point. Aspire claims that "ECRS is the product of, *among other things*," these three enumerated PUCT orders, which it then defines as the "ECRS Rules." Pet. ¶ 29. Elsewhere, Aspire defines the "ECRS Rules" as the "three PUC orders *implementing ECRS*." *Id.* ¶ 1. One definition suggests that Aspire challenges ECRS program in its entirety, the other does not. To be clear, ECRS was adopted in 2019 before any PUCT approval order was required for Protocol revisions. None of the three orders "implements" ECRS. The three PUCT orders only approved Protocol revisions modifying certain rules of the already-adopted program. Again, the ECRS program was created five years ago and went into effect in 2023, after years of time and expense developing the program.

Appx. Page 83 of 740

on the ERCOT grid."). Not only that, but Aspire additionally challenges the *entire* ERCOT Protocol revision process, claiming this longstanding, painstaking process (that Aspire frequently participates in) fails to comply with the APA. *Id.* ¶ 55.[18] In other words, Aspire seeks not only to throw out the ECRS program—it also seeks to do away with the entire ERCOT market rulebook.

The Court need not reach the merits of these far-reaching claims, however. This case is easily resolved on the threshold jurisdictional question, which has already been answered in the Texas Supreme Court's recent decisions in *PUCT v. RWE Renewables Americas, LLC*[19] and *CPS Energy v. ERCOT.*[20] Those cases, discussed below, make clear that Aspire's claims must be dismissed with prejudice for want of subject-matter jurisdiction; thus, the Court need not reach ERCOT's alternative Rule 91a or Plea in Abatement unless it first finds it has jurisdiction.

## LEGAL STANDARDS

### I. Plea to the Jurisdiction.

A "court must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "Sovereign immunity from suit defeats a trial court's subject matter jurisdiction and thus is properly asserted in a plea to the jurisdiction." *Id.* at 225–226. Subject matter jurisdiction is also lacking "when the Legislature has granted [an] agency the sole authority to make an initial determination in a dispute"; in that instance, the court "lack[s] jurisdiction until the party has exhausted all administrative remedies before the agency." *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018).

---

[18] Specifically, Aspire asks for a declaration that "Chapter 21 of ERCOT's Nodal Protocols, both on its own and when combined with the PUC's process for approving ERCOT protocols, does not provide a process for making and amending rules that substantially complies with APA §§ 2001.023-.025, .029-.030, .033." *Id.* ¶ 55.

[19] 691 S.W.3d 484; *see also* **Appendix A**.

[20] 671 S.W.3d 605; *see also* **Appendix B.**

- 11 -

Whether a court has subject matter jurisdiction is a question of law. *Miranda*, 133 S.W.3d at 226. Where, as here, a plea to the jurisdiction challenges the pleadings, the court's task is to "determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Id.* If "the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 227.

## II.     Rule 91a.

Rule 91a authorizes dismissal of a cause of action that "has no basis in law or fact." Tex. R. Civ. P. 91a(1). "A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." *Id.* Whether dismissal on the pleadings is proper is a question of law. *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016). Legal conclusions "need not be taken as true in evaluating the sufficiency of the pleadings." *City of Austin v. Liberty Mut. Ins. Co.*, 431 S.W.3d 817, 826 (Tex. App.—Austin 2014, no pet.).

## ERCOT'S PLEA TO THE JURISDICTION

## I.     ERCOT's Sovereign Immunity Bars Aspire's Claims.

The Texas Supreme Court recently held "that ERCOT is entitled to sovereign immunity" as an "arm of the State government":

> We hold that ERCOT is entitled to sovereign immunity because PURA evinces clear legislative intent to vest it with the "'nature, purposes, and powers' of an 'arm of the State government'" and because doing so satisfies the political, pecuniary, and pragmatic policies underlying our immunity doctrines.

*CPS Energy*, 671 S.W.3d at 628. Absent legislative waiver, then, ERCOT is immune from suit. *See id.* It is Aspire's burden to establish such a waiver, *Rattray v. City of Brownsville*, 662 S.W.3d 860, 865 (Tex. 2023), and it has failed to do so here.

- 12 -

## A. Neither the ERCOT Protocols nor PUCT orders approving ERCOT Protocols are "rules" under the APA.

Aspire claims that this Court has jurisdiction under APA § 2001.038, which authorizes declaratory relief regarding the "validity or applicability of a rule" whose "threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Citing to the Texas Supreme Court's *RWE* decision issued just weeks ago, Aspire claims that "[r]ulemaking at both the PUC and ERCOT are subject to the [APA]." Am. Pet. ¶¶ 15–16. But *RWE* held precisely the opposite—that neither ERCOT's Protocols, nor the PUCT's orders approving the adoption of or revisions to those Protocols, are "rules" under the APA.[21] 691 S.W.3d at 492.

The facts in *RWE* mirror this case. There, a market participant, RWE, similarly challenged a PUCT order approving certain ERCOT Protocol revisions related to the price of energy during times of extreme energy shortages. *RWE*, 691 S.W.3d at 487–88. Just as Aspire attempts to do here, RWE entirely skirted the proper statutory administrative process, instead going directly to the Third Court of Appeals with its PUCT order challenge, claiming the order was a "competition rule" subject to direct appeal under PURA § 39.001(f).[22] *Id.* at 488–89. The Texas Supreme Court soundly rejected this claim, holding that the PUCT's Protocol revision approval order was not even a "rule" under the APA, much less a "competition rule" authorizing a direct appeal. *See id.* at 489–92.

The APA's rulemaking requirements, the *RWE* Court explained, are "exclusively and repeatedly directed at rules '**adopted**' by a '**state agency**.'" *Id.* at 491. (emphasis added) (citing APA

---

[21] Aspire's mischaracterization of the holding in *RWE* raises serious concerns about its candor, and ERCOT reserves the right to seek appropriate sanctions under Rule 13 of the Texas Rules of Civil Procedure.

[22] Aspire did the same. It filed a direct appeal in the Third Court of Appeals making the same complaints there that it makes here. *See Aspire Power Ventures, LP v. PUCT*, 03-24-00102-CV (filed Feb. 13, 2024), available here. Notably, the Third Court—over Aspire's objection—abated that appeal pending the Supreme Court's decision in RWE. *See* Memorandum Opinion (May 3, 2024), available here. The PUCT recently moved to dismiss the appeal based on RWE, and Aspire did not oppose the dismissal. *See* Unopposed Motion to Dismiss for Lack of Jurisdiction (Aug. 26, 2024), available here.

**Appx. Page 86 of 740**

§§ 2001.033(a), 2001.004(1)). Neither part of the two-part ERCOT Protocol revision process falls within this rubric. At step one, ERCOT is not a "state agency"—it is, as Aspire acknowledges, an "organ of government" that performs a "uniquely governmental" function with respect to managing the State's electric grid. *CPS Energy*, 671 S.W.3d at 617; *see also* Am. Pet. ¶ 11 (defining ERCOT as a "quasi-governmental agency"). ERCOT's adoption and revision of Protocols therefore does not constitute APA rulemaking. *See RWE*, 691 S.W.3d at 491. Nor do PUCT orders finally "approving" new or revised Protocols adopted by ERCOT constitute rules under the APA. *Id.*

That the PUCT is now required to formally approve each and every Protocol revision adopted by ERCOT does not change this analysis.[23] Seizing on that new requirement, RWE argued that, by this amendment, "the Legislature intended to overhaul" ERCOT's longstanding Protocol revision process and "effectively convert ERCOT protocols into PUC rules" subject to the APA. *RWE*, 691 S.W.3d at 491. The Court disagreed:

> **We do not discern such a sweeping intent from the language the Legislature chose**. For one thing, PURA makes clear that ERCOT, not the PUC, is the entity "adopting" new or revised ERCOT protocols. [PURA] § 39.1519(g-6). The PUC then "approves" the protocols. *See id.* This distinction is deceptively significant because the APA's requirements . . . are exclusively an repeatedly directed at rules "adopted" by a "state agency." . . . Indeed, the Legislature deliberately uses the term "adopt" throughout the APA—no reference is made to an agency's "approval" of a rule. . . .
> . . .
> We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that "adopts" ERCOT protocols given the comprehensive statutory use of that term.

*Id.* (emphasis added) (internal citations omitted).

The recent PURA amendments underscore that ERCOT's Protocol revision process is wholly separate from APA rulemaking. In addition to making the PUCT's Protocol approval mandatory, the

---

[23] While the ERCOT NPRR process has, pursuant to the PUCT's "complete authority" over ERCOT, "consistently been subject to PUC[T] oversight and review" even prior to this 2021 amendment, *RWE*, 691 S.W.3d at 491, PURA § 39.151(g-6) now makes the PUCT's review and approval mandatory for each and every new and revised Protocol adopted by ERCOT.

Appx. Page 87 of 740

Legislature made the NPRR Process mandatory, requiring that ERCOT "establish and implement a formal process for adopting new protocols or revisions to existing protocols." PURA § 39.151(g-6). As the *RWE* Court recognized, "ERCOT already had such a process in place; nevertheless, [this] requirement **signals legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors**," with only the latter falling under the APA. *RWE*, 691 S.W.3d at 492. Had the Legislature intended that ERCOT follow the APA's rulemaking procedures, it would not have vested ERCOT with discretion (subject, as with all things, to the PUCT's "complete authority") to establish and implement a "formal process" for adopting and revising its Protocols. *Cf., e.g., Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 499 (Tex. 1997) (recognizing that Tex. Agric. Code § 74.120(c) vests non-agency Boll Weevil Eradication Foundation with the authority to adopt rules that must comply with the APA's rulemaking requirements).[24]

Because neither the ERCOT Protocols nor PUCT orders approving ERCOT-adopted Protocols are "rules" under the APA, APA § 2001.038's limited immunity waiver does not apply here. This Court, therefore, lacks subject-matter jurisdiction, and must dismiss Aspire's suit with prejudice.[25] *See RWE*, 691 S.W.3d at 492; *R.R. Comm'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003) (holding no jurisdiction under APA § 2001.038 for claims regarding agency orders adopting field rules, which are not "rules" under the APA); *LMV-AL Ventures, LLC v. Tex. Dep't of Aging & Disability Servs.*, 520 S.W.3d 113, 124 (Tex. App.—Austin 2017, pet. denied) ("Section 2001.038 is a waiver of immunity and, therefore, is strictly construed in favor of retained immunity.").

---

[24] Tex. Agric. Code § 74.120(c) provides that any rules promulgated by the Foundation "must be adopted and published in accordance with state requirements," putting the Foundation's rulemaking within the APA's ambit. *Lewellen*, 952 S.W.2d at 499. No such language is found in anywhere in PURA. *See Hogan v. Zoanni*, 627 S.W.3d 163, 169 (Tex. 2021) ("We presume the Legislature chose statutory language deliberately and purposefully . . . and that it likewise excluded language deliberately and purposefully") (cleaned up).

[25] *See Harris County v. Sykes*, 136 S.W.3d 635, 639 (Tex. 2004) (holding that if a plaintiff fails to plead facts that demonstrate a waiver of immunity, "then the trial court should dismiss the plaintiff's action. Such a dismissal is with prejudice because a plaintiff should not be permitted to relitigate jurisdiction once that issue has been finally determined.").

**Appx. Page 88 of 740**

### B. The UDJA does not waive ERCOT's immunity.

Aspire also cannot show waiver of ERCOT's immunity under the Uniform Declaratory Judgment Act ("UDJA"). The UDJA "is not a general waiver of sovereign immunity; 'it does not enlarge a trial court's jurisdiction, and a litigant's request for declaratory relief does not alter a suit's underlying nature.'" *Creedmoor–Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 515 (Tex. App.—Austin 2010, no pet.) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 370 (Tex. 2009)). Thus, "sovereign immunity bars UDJA actions against the state and its political subdivisions absent a legislative waiver." *Tex. Dept. of Transp. v. Sefzik*, 355 S.W.3d 618, 620 (Tex. 2011). Outside of APA § 2001.038—which, for the reasons above, does not apply to Aspire's claims—no such waiver has been identified here.[26]

## II. This Court lacks jurisdiction because Aspire failed to exhaust its administrative remedies.

This Court also lacks subject-matter jurisdiction because the PUCT has exclusive jurisdiction over matters pertaining to ERCOT's operations as the PUCT-certified ISO, and Aspire failed to exhaust its administrative remedies before the PUCT before bringing suit.

"A state agency 'has exclusive jurisdiction when the Legislature has granted that agency the sole authority to make an initial determination in a dispute.'" *Chaparral*, 546 S.W.3d at 138 (quoting *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004)). When an agency has exclusive jurisdiction over a matter, the agency has "authority to resolve disputes that arise within the agency's regulatory arena," and courts lack jurisdiction over the matter until the complaining party has exhausted all administrative

---

[26] While the UDJA allows "[a] person ... whose rights ... are affected by a statute ... or municipal ordinance" to "have determined any question of construction or validity ... and obtain a declaration of rights ... thereunder," that limited immunity waiver does not apply here because neither the challenged Protocols nor PUCT orders are a "statute" or "municipal ordinance." Like all immunity waivers, this UDJA provision is strictly construed. *See, e.g.*, *Hensley v. State Comm'n on Judicial Conduct*, 692 S.W.3d 184, 200 (Tex. 2024) (holding that UDJA § 37.004(a)'s waiver did not apply to a judicial canon that "is neither an ordinance nor a statute but a rule promulgated by this Court.").

remedies before the agency. *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 544 (Tex. 2016); *Chaparral*, 546 S.W.3d at 137.

The Legislature may vest an agency with exclusive jurisdiction in two ways. First, a statute may expressly grant an agency exclusive jurisdiction over matters the statute governs. *Chaparral*, 546 S.W.3d at 138. Second, an agency has exclusive jurisdiction "when a pervasive regulatory scheme indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *Id.*

PURA § 39.151 constitutes such a pervasive regulatory scheme. *CPS Energy*, 671 S.W.3d at 618. As the Texas Supreme Court explained:

> Section 39.151 grants the PUC extensive and ultimate authority over an ISO. . . . the statute provides that the ISO "is directly responsible and accountable to the [PUC]," and the PUC "has complete authority to oversee and investigate [ERCOT]'s finances, budget, and operations" to ensure adequate performance of the ISO's "functions and duties." It grants the PUC authority over ERCOT's board makeup, its bylaws and protocols, and its ability to charge fees to its members. ERCOT is empowered to enact rules over market participants, but they must be approved by the PUC.
>
> Moreover, the PUC's authority over ERCOT is not solely regulatory; it has adjudicatory power as well. The PUC may "take appropriate action" against the ISO, including decertification, for the ISO's failure to adequately perform its functions or duties or for its failure to comply with Section 39.151. **Section 39.151's grant of extensive authority to the PUC over ERCOT and its detailed regulation of the particulars of ERCOT's functions constitute a pervasive regulatory scheme**.

*Id.* (emphasis added).

Aspire's claims fall directly within this pervasive regulatory scheme. ERCOT adopted and implements the ECRS program pursuant to its legislative directive to "ensure the reliability" of the grid. PURA § 39.151(a). As a part of this core statutory responsibility, the Legislature has further directed ERCOT to (1) establish requirements to meet the reliability needs of the ERCOT region; (2) determine the quantity and type of Ancillary Services needed to ensure grid reliability; and (3) to procure those necessary Ancillary Services. *See* PURA § 39.159(b). The PUCT is charged with ensuring that ERCOT adequately fulfills each of these responsibilities, and may take action against ERCOT

Appx. Page 90 of 740

should it fail to do so. *See id.* ("The [PUCT] shall ensure that [ERCOT] . . . procures ancillary or reliability services on a competitive basis . . . ."); *see also* PURA § 39.151(d) ("The commission may take appropriate action against [ERCOT]" if it "does not adequately perform [its] functions or duties . . . .").

Aspire contends that ERCOT failed to meet these statutory requirements by, among other things, "fail[ing] to balance reliability objectives with the costs of satisfying reliability requirements." *See* Am. Pet. ¶ 49. But "[b]ecause the proper performance of ERCOT's operations, functions, and duties comes within the PUC's 'complete' authority over ERCOT, and because the PUC is statutorily authorized to hold ERCOT accountable if, as [Aspire] alleges, ERCOT fails to properly perform," these "issues come within the PUC's exclusive jurisdiction." *CPS Energy*, 671 S.W.3d at 619. Aspire was therefore required to first allow the PUCT "to make important determinations" regarding the alleged unlawfulness of ERCOT's ECRS program "before [taking its] claim to the judicial system." *Chaparral Energy*, 546 S.W.3d at 145; *CPS Energy*, 671 S.W.3d at 620.

To be clear, Aspire always had a direct path to administrative and judicial review under PURA, PUC Rules, and ERCOT Protocols. After ERCOT adopted NPRR 863 creating the ECRS program (and, years later, NPRRs 1096, 1148, and 1178),[27] Aspire had a right to complain to the PUCT about ERCOT's actions. *See* ERCOT Protocols § 21.4.12.3(1). Had the PUCT agreed with Aspire, the PUCT could have suspended the NPRR's operation or ordered ERCOT to revise it. 16 TAC § 22.251(*o*).[28] If, on the other hand, the PUCT rejected Aspire's appeal, Aspire could have sought judicial review of

---

[27] Though not cited in Aspire's Amended Petition, there have been several other NPRRs affecting the ECRS program. *See, e.g.*, NPRRs 1015, 1079, 1196, 1213, 1224, 1232 (withdrawn), and 1244 (pending).

[28] There is an alternative route to administrative review. The PUC has an open project in which it reviews ERCOT-adopted Protocol revisions. *See* PUCT Docket No. 54445 ("Review of Rules Adopted by the Independent Organization"), available here. Market participants and other interested persons may file comments in that project advocating for or against approval of an ERCOT-adopted revision. In addition to NPRR 1224, discussed above, this recently happened with NPRR 1186: numerous parties filed comments with the PUCT, in response to which the PUCT remanded the revision to ERCOT with instructions to further revise it. *See* Docket No. 54445, Item No. 64 (Jan. 18, 2024), available here.

**Appx. Page 91 of 740**

that decision under the APA through the contested case process. PURA §§ 15.001, 39.003; *see also RWE*, 691 S.W.3d at 492 n.11 (recognizing that the "PUC regulations provide a process for review of ERCOT protocols . . . which culminates in a suit for judicial review in the district court.").

But Aspire chose to forego administrative review. Just like RWE, Aspire "did not engage in that process, choosing instead to utilize [an] inapplicable procedure" to challenge the ECRS Protocol revisions. *Id.* As in *RWE*, then, Aspire's claims must be dismissed for lack of jurisdiction for failure to exhaust administrative remedies. *Id.* at 492.

If the Court concludes, as it should, that it lacks jurisdiction over Aspire's claims, the case can be dismissed, and the Court need not consider ERCOT's alternative motions below.

## ERCOT'S RULE 91A MOTION TO DISMISS

Outlined above, recent Texas Supreme Court precedent makes clear that the Court lacks subject-matter jurisdiction over Aspire's claims. If the Court determines it has jurisdiction, however, it should still dismiss this action under Rule 91a because Aspire's claims have no basis in law.

## I.     ERCOT's Protocol revision process is not subject to APA rulemaking requirements.

Aspire's APA rulemaking challenge against ERCOT is twofold: first, Aspire complains that the ECRS Rules did not comply with the APA's notice and comment requirements and, on that basis, asks the Court to declare those rules invalid and void. Am. Pet. ¶ 55. Second, Aspire broadly asserts that ERCOT's Protocol revision process *as a whole* violates the APA. *Id.*

Neither claim has merit. As set forth above, the Texas Supreme Court just weeks ago held that ERCOT's Protocol revision process is not subject to the APA's rulemaking requirements. *See RWE*, 691 S.W.3d at 491. This is because ERCOT is not a "state agency," and it is well-settled that the APA applies only to "rules adopted by a state agency." *Id.* (cleaned up). If the Legislature wished for ERCOT to nonetheless follow the APA's rulemaking process, it could have required as much. *See Lewellen*, 952 S.W.2d at 499. Instead, it merely required ERCOT to use a "formal process" to "adopt[]

Appx. Page 92 of 740

new protocols or revis[e] . . . existing protocols," PURA § 39.151(g-6), knowing that ERCOT has long had its own detailed Protocol revision process in place. *See* ERCOT Protocols § 21. Aspire's APA challenge therefore fails as a matter of law.

## II. Aspire has no private cause of action for alleged PURA § 39.157 violations.

In addition to its procedural APA challenge, Aspire asks this Court to declare that the "ECRS Rules violate PURA because they direct generators to withhold electricity from the grid in violation of [PURA] § 39.157(a)," and to enjoin the ECRS Rules' implementation on that basis. Am. Pet. ¶¶ 55, 65. But PURA § 39.157 does not give market participants like Aspire a private cause of action—that statute is a directive from the Legislature *to the PUCT* to monitor and prosecute certain market abuses *by market participants*.

"The fact that a person has suffered harm from the violation of a statute does not automatically give rise to a private cause of action in favor of that person." *Bickham v. Dallas Cnty.*, 612 S.W.3d 663, 670 (Tex. App.—Dallas 2020, pet. denied). "When a private cause of action is alleged to derive from a constitutional or statutory provision," a court's "duty is to ascertain the drafters' intent." *Brown v. De La Cruz*, 156 S.W.3d 560, 563 (Tex. 2004). "[T]he existence of a private cause of action must be clearly implied in the statutory text." *Tex. Med. Res. LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 431 (Tex. 2023); *see also Brown*, 156 S.W.3d at 563.

Nothing in PURA § 39.157 expressly or impliedly grants Aspire the right to seek declaratory and injunctive relief against the PUCT and ERCOT. On the contrary, it is *the PUCT* that may penalize market participants like Aspire under that provision:

> (a) **The commission shall monitor market power** associated with the generation, transmission, distribution, and sale of electricity in this state. On a finding that market power abuses or other violations of this section are occurring, **the commission shall require reasonable mitigation of the market power by** ordering the construction of additional transmission or distribution facilities, by seeking an injunction or civil penalties as necessary to eliminate or to remedy the market power abuse or violation as authorized by Chapter 15, by imposing an administrative penalty as authorized by Chapter 15, by ordering the disgorgement of excess revenue as authorized by Chapter

- 20 -

15, or by suspending, revoking, or amending a certificate or registration as authorized by Section 39.356.

PURA § 39.157(a) (emphasis added).

As Texas courts have recognized, this PURA provision authorizes the PUCT—and only the PUCT—to protect against anticompetitive practices. *See Brazos Elec. Power Co-op, Inc. v. PUCT*, 101 S.W.3d 499, 503 (Tex. App.—Austin 2002, pet. denied) (recognizing PURA § 39.157 "require[s] the Commission to establish by rule a code of conduct to protect against anticompetitive practices"); *see also TXU Genration Co., LP v. PUCT*, 165 S.W.3d 821, 832 (Tex. App.—Austin 2005, pet. denied) (recognizing PURA § 39.157 "gives *the Commission* broad authority to monitor and remedy market power abuses.") (emphasis added). When, as here, "a statute explicitly provides certain rights of enforcement, but is silent as to the right sought to be enforced," courts "may presume that the Legislature intended for that right to not be included." *Witkowski v. Brian, Fooshee and Yonge Props.*, 181 S.W.3d 824, 831 (Tex. App.—Austin 2005, no pet.).[29]

"[T]he bar for implying a private cause of action is high," *Molina*, 659 S.W.3d at 431, and Aspire has not met it here with respect to its alleged PURA § 39.157 violations. That provision is clearly a tool for the market's *regulator* to prevent market abuses; it is not a tool for *the regulated* to sue for declaratory and injunctive relief. *See Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."). Aspire's attempts to turn PURA § 39.157 on its head must be rejected.

---

[29] To the extent Aspire suggests that it also has a private cause of against ERCOT under the Administrative Code, that claim similarly fails. Absent *legislative* creation of a private cause of action in PURA, the PUCT has no authority to create a cause of action by rule. *Sandoval*, 532 U.S. at 291. Even if it could, the PUCT rules Aspire points to vest only the PUCT, not private individuals, with the right to act if ERCOT violates the PUCT's rules. *See* 16 TAC §§ 25.503(p) ("If the commission finds that a market entity is in violation of this section, the commission may seek or impose any legal remedy it determines appropriate for the violation involved . . . .").

Appx. Page 94 of 740

**III.    The ECRS program does not violate PURA § 39.157.**

Even if Aspire could sue for alleged PURA § 39.157 violations, that statute has no application here. For one, the market power abuses PURA § 39.157 speaks to are anticompetitive practices ***by market participants***, not by ERCOT. ERCOT has no "market power"—it does not generate, transmit, or sell electricity. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (defining "market power" to mean "the ability of a single seller to raise price and restrict output."). Rather, as the PUCT-certified ISO, ERCOT acts strictly as a market clearinghouse, generating settlement statements and collecting and remitting payments for energy transactions in the ERCOT market. *RWE*, 691 S.W.3d at 489. ERCOT is revenue-neutral, and makes no profit from these transactions; it operates instead from a regulatory fee approved by the PUCT. *See* PURA § 39.151(e); *CPS Energy*, 671 S.W.3d at 627.[30]

What's more, ECRS is exclusively a reliability tool—it is not the type of anticompetitive "withholding of production" contemplated by PURA § 39.157.[31] Both ERCOT's energy dispatch system (the Security-Constrained Economic Dispatch) and all of ERCOT's Ancillary Services products, including ECRS, rely on having certain amounts of generation readily available on the sidelines. These generation reserves—what Aspire calls "withholding power"—are necessary to ensure ERCOT can keep supply and demand on the system in balance. If, as Aspire claims, ERCOT unlawfully withholds power by not dispatching available generation, then ERCOT's entire grid operation system could be called into question. Nothing in PURA § 39.157's text supports such a dangerous proposition.

---

[30] For this reason, the PUCT could not "disgorge[] excess revenue" from ERCOT, as PURA § 39.157 contemplates.

[31] Anticompetitive withholding of production as contemplated by PURA § 39.157 includes "[f]or example, a market participant who has market power [and] withhold[s] production from more efficient units and offer[s] its least efficient unit at that unit's marginal costs or higher, with confidence that the unit will be selected and set the price for all energy sold," as "[s]uch withholding of production may bring in enormous profit to the market participant." *See* PUCT Project No. 26201, Item No. 106, *Order Adopting New § 25.503 as approved at the January 29, 2004 Open Meeting* (Feb. 9, 2004), available here.

- 22 -

In fact, Aspire's argument would require that all Ancillary Services—by which ERCOT holds power in reserve to preserve grid reliability—are illegal under PURA. That absurd result would render meaningless the Legislature's express recognition of the need for such Ancillary Services. *See* PURA §§ 39.159(b)(2), 39.159(b)(3)(requiring the PUCT to ensure that ERCOT, at least annually, determines the amount of Ancillary Services needed and that ERCOT procure Ancillary Services). Ancillary Services, including ECRS, do not contravene any provision in PURA—they are required by it.

As in *Luminant* (and only if this Court has jurisdiction here, which it does not), "the judiciary's role is purely textual." *Luminant*, 691 S.W.3d at 464. Thus, even if PURA § 39.157 was implicated on these facts, its provisions cannot be divorced from their statutory context. While one of PURA's goals is to ensure a competitive electric market, as is reflected in PURA § 39.157, that goal must be balanced with PURA's other critical objective: to ensure the reliability of the State's electric grid. *See Luminant*, 691 S.W.3d at 461–64. As the Texas Supreme Court recognized just this term in a similar PUCT order challenge,[32] PURA expressly "acknowledges that the goal of prices set by competition may, in some circumstances, have to yield." *Id.* at 463. "**Deciding when those circumstances are present—and how to respond—is the Commission's job, not the judiciary's**," as it is the "Commission [that] has the expertise to manage the electric utility industry; the courts do not." *Id.* at 463–64 (holding that the "court of appeals thus strayed from its lane by inquiring whether the [challenged PUCT] Orders could have used competitive rather than regulatory methods to any greater extent than they did").

Here, Aspire seeks to invalidate three PUCT orders and the entire ECRS program based on the claim that ECRS's alleged costs outweigh its reliability benefits. *See* Am. Pet. ¶¶ 2, 28, 31, 49. Even

---

[32] In *Luminant*, a market participant challenged two PUCT emergency orders issued during Winter Storm Uri, which temporarily set the price of electricity at its statutory cap to help prevent grid collapse. *Luminant*, 691 S.W.3d at 452. Luminant in essence made the same argument Aspire does here—that the market impact of these orders far outweighed their reliability benefits and were, thus, unlawful. *See id.* at 462. The Court "decline[d] Luminant's invitation to second-guess the Orders' necessity and whether it was the price hike they enacted or the Commission's earlier load-shed directives that truly saved the grid from collapse." *Id.*; *see also* **Appendix C**.

- 23 -

accepting these allegations as true, whether ECRS correctly balances reliability benefits against its market impact is a question that the Texas Supreme Court has committed exclusively to the PUCT. *Luminant*, 691 S.W.3d at 463. The wisdom of the ECRS program is not for Aspire or this Court to second guess—particularly not where the PUCT, ERCOT, the IMM, and other market participants are all actively working to finetune that program to address concerns that have been properly raised in the administrative process.

## ERCOT'S PLEA IN ABATEMENT

In the unlikely event the Court determines both that it has jurisdiction and that Aspire pleaded viable claims, this suit must nonetheless be dismissed or abated because Aspire failed to join all necessary and indispensable parties.

The UDJA requires joinder of "all persons who have or claim any interest that would be affected by the declaration must be made parties." Tex. Civ. Prac. & Rem. Code § 37.006(a). "When a party asserts Section 37.006(a) as a bar to any judgment favoring a party who has failed to join all necessary parties, Rule of Civil Procedure 39's standards govern." *Amboree v. Bonton*, 575 S.W.3d 38, 44 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Under Rule 39, there are two types of parties: (1) those who are necessary for a just adjudication and that should be joined if feasible; and (2) those whose are so vital to the disposition of the suit that their absence deprives the court of jurisdiction. *See, e.g., Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 162–63 (Tex. 2004).

This case presents the latter circumstance, where the absence of affected market participants deprives the Court of jurisdiction and warrants dismissal of Aspire's claims. At a minimum, this suit must be abated to allow joinder of the necessary affected market participants.

## I.     The other ERCOT market participants are jurisdictionally indispensable.

"Rule 39 mandates joinder of persons whose interests would be affected by the judgment . . . [and] determines whether a trial court has authority to proceed without joining a person

- 24 -

whose presence in the litigation is made mandatory by the [UDJA]." *Brooks*, 141 S.W.3d at 162. Relevant here, Rule 39 directs that an absent party must be joined to the litigation if it (1) claims an interest relating to the subject of the action, and (2) is so situated that the disposition of the action in its absence may impair or impede its ability to protect that interest. Tex. R. Civ. P. 39(a)(2).

Generally, the failure to join all necessary parties triggers an analysis of "whether the court ought to proceed" or "whether the trial court should have refused to enter a judgment" until the necessary parties are joined. *Brooks*, 141 S.W.3d at 162. However, where a trial court's ruling would "clearly prejudice" the absent parties' rights, or where "a judgment would adversely affect the interests of absent parties who had no opportunity to assert their rights in the trial court," the failure to join those parties may constitute a jurisdictional defect. *See Vondy v. Comm'rs Court of Uvalde Cnty.*, 620 S.W.2d 104, 106-07 (Tex. 1981); *Sage St. Assocs. v. Fed. Ins. Co.*, 43 S.W.3d 100, 103 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

To determine whether a particular party is "jurisdictionally indispensable," courts "must examine the surrounding facts and circumstances of the case to determine if the interests of an absent party will be prejudiced and if an adequate judgment can be rendered for the parties before the court." *Sage St.*, 43 S.W.3d at 104. Courts must make this determination by "liberally construing the [UDJA] in light of its purpose—'to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.'" *Longoria v. Exxon Mobil Corp.*, 255 S.W.3d 174, 180 (Tex. App.—San Antonio 2008, no pet.).

Non-parties have been deemed "jurisdictionally indispensable," for example, where a declaratory judgment in their absence would "clearly prejudice" the non-parties' contractual rights or benefits. *See Sage St.*, 43 S.W.3d at 100. In *Sage Street*, the parties sought a declaratory judgment that a contractual assignment between two non-parties was void, thereby also voiding a settlement agreement between the two parties in the lawsuit. *Id.* at 101–03. The parties argued that the non-parties

**Appx. Page 98 of 740**

were not indispensable because a finding that the assignment was void was "incidental" to the declaratory judgment, and did not prejudice the non-parties because the judgment "is not binding on them." *Id.* at 104. The appellate court disagreed, finding that although the UDJA "expressly provides that it does not prejudice the rights of a person not a party to the proceeding, it is undeniable that the trial court's ruling would prejudice [the non-parties]." *Id.* Thus, the non-parties were "jurisdictionally indispensable" and required to be joined before a judgement could be rendered declaring the assignment void. *Id.*

Here, Aspire asks this Court to declare not only that the ECRS program is invalid—it also asks the Court to declare that ERCOT's entire Protocol revision process invalid, thereby calling into question the entire ERCOT market rulebook. The Protocols are thousands of pages, detailing the operation of the electric grid and the wholesale electric market. Those Protocols—developed over decades under the Protocol revision process that Aspire asks the Court to declare illegal—could all be deemed invalid if Aspire is granted the relief it seeks. *See* Am. Pet. at ¶ 54 (citing Tex. Gov't Code § 2001.035). Texas would be left without a market and with no enforceable means to operate its intrastate grid.

Such sweeping declaratory relief would substantially impact the interests of the hundreds of other market participants that participate in the ERCOT market and those that provide the ECRS Ancillary Service that Aspire seeks to prohibit. Market participants undoubtedly rely on established market rules when making important business and financial decisions—for example, when determining whether to build a new power plant, and when entering into bilateral agreements related the purchase and sale of energy and Ancillary Services. Like Aspire, market participants from every segment (e.g., generators, transmission and distribution providers, retail electric providers, and energy traders) commonly enter into such bilateral agreements with other market participants and consumers,

Appx. Page 99 of 740

and many (if not most or all) of these agreements are put at issue by Aspire's claims. Billions of dollars are at stake for market participants that Aspire failed to join as parties.

Because Aspire's request declaratory relief would "clearly prejudice" the pecuniary and other interests of the hundreds of other market participants, those market participants must be joined before a judgement could be rendered in this suit—or a temporary injunction considered.

## II.     Joinder of the affected market participants is feasible.

Joinder of all affected market participants is certainly feasible. ERCOT's Standard Form Market Participant Agreement, which each market participant must execute, contains a forum and venue selection clause making all market participants subject to Texas law and mandatory venue for all claims in Travis County, Texas. *See* Protocols § 22 (ERCOT standard form agreement) at § 11(A). Thus, each affected Market Participant is "subject to service of process," as required by Rule 39. *See* Tex. R. Civ. P. 39(a).

When a party requests that that the trial court join additional necessary parties whose interests would be determined in resolving the claims of the parties before the court, and the court determines that the non-parties fall with the purview of Rule 39 and are subject to service of process, the parties must be joined. *See* Tex. R. Civ. P. 39(a); *Kodiak*, 361 S.W.3d at 252; *Longoria*, 255 S.W.3d at 184. A trial court has no discretion to deny the request in a declaratory judgment action if the above are satisfied. *Kodiak*, 361 S.W.3d at 252. The number of necessary parties that must be joined has no bearing on this. *See, e.g.*, *Pierce v. Blalack*, 535 S.W.3d 35, 39–44 (Tex. App.—Texarkana 2017, no pet.) (affirming dismissal with prejudice where at least 286 necessary parties were identified, trial court ordered plaintiff to join and serve all parties, and plaintiff served only 55 parties); *Dahl v. Hartman*, 14 S.W.3d 434, 435–37 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (affirming trial court's dismissal with prejudice where plaintiff failed to serve and join 333 necessary parties). When necessary parties under Rule 39 are identified, the plaintiff faces two choices: either join and serve the necessary

- 27 -

Appx. Page 100 of 740

parties, or have its claims dismissed. The identity of all market participants is publicly available on ERCOT's website.[33]

Even if Aspire were to amend its petition again to remove its request to declare the Protocol revision process invalid, its request to declare the "ECRS Rules" invalid would still affect nearly all market participants, especially those participating in the ECRS program. ERCOT publishes Ancillary Service Obligation and Responsibility reports 180 days after each Operating Day that include the identity of the entities providing ECRS.[34] These market participants' interests will be clearly prejudiced by the declaratory relief sought by Aspire.

As explained above, the other ERCOT market participants are clearly necessary and indispensable under Rule 39, and each may be feasibly joined. Accordingly, ERCOT moves the Court to either dismiss Aspire's claims out of hand if the Court finds these market participants are jurisdictionally indispensable; or, alternatively, to abate this lawsuit for 30 days and order Aspire to affect their joinder. If Aspire fails to join the necessary market participants within that timeframe, ERCOT requests that the Court dismiss Aspire's claims.

<div align="center"><b><u>CONCLUSION</u></b></div>

For the reasons set forth herein, the Court should dismiss Aspire's claims against ERCOT. In the first instance, the Court lacks subject matter jurisdiction over Aspire's claims against ERCOT because Aspire's claims do not fall within APA § 31.0038's limited immunity waiver, and because Aspire failed to exhaust its administrative remedies. Alternatively, the Court should dismiss Aspire's claims against ERCOT pursuant to Rule 91a, as those claims have no basis in law. Alternatively, the Court should dismiss this lawsuit for failure to join the other necessary ERCOT market participants, or abate this lawsuit for 30 days and order Aspire to join these affected market participants. If Aspire

---

[33] *List of Market Participants in the ERCOT Region* (updated Sept. 9, 2024), available here.
[34] *AS Obligation and Responsibility* (updated Sept. 9, 2024), available here.

- 28 -

Appx. Page 101 of 740

fails or refuses to do so, the Court should dismiss Aspire's claims with prejudice. ERCOT requests such other and further relief, at law or in equity, to which it may be entitled.

Respectfully submitted,

**WINSTEAD PC**
600 W. 5th Street
Suite 900
Austin, Texas 78701
(512) 370-2800 telephone
(512) 370-2850 fax

By: */s/ Elliot Clark*
    Elliot Clark      SBN 24012428
    eclark@winstead.com
    Elin Isenhower    SBN 24104206
    eisenhower@winstead.com

**ATTORNEYS FOR DEFENDANT
ELECTRIC RELIABILITY COUNCIL OF
TEXAS, INC.**

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of this document has been served on all counsel of record in accordance with the Texas Rules of Civil Procedure on September 9, 2024.

*/s/ Elliot Clark*
Elliot Clark

**Appx. Page 102 of 740**

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP,<br>    *Plaintiff,* | §<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | |
| PUBLIC UTILITY COMMISSION OF<br>TEXAS, ELECTRIC RELIABILITY<br>COUNCIL OF TEXAS, THOMAS<br>GLEESON, LORI COBOS, JIMMY<br>GLOTFELTY, KATHLEEN JACKSON,<br>AND COURTNEY HJALTMAN,<br>    *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | TRAVIS COUNTY, TEXAS<br><br><br><br><br>345<sup>TH</sup> JUDICIAL DISTRICT |

## APPENDIX TO ERCOT'S PLEA TO THE JURISDICTION

| TAB | DESCRIPTION |
|---|---|
| **A** | *PUCT v. RWE Renewables Ams., LLC*, 691 S.W.3d 484 (Tex. 2024) |
| **B** | *CPS Energy v. ERCOT*, 671 S.W.3d 605 (Tex. 2023) |
| **C** | *PUCT v. Luminant Energy Co. LLC*, 691 S.W.3d 448 (Tex. 2024) |

# APPENDIX A

691 S.W.3d 484
Supreme Court of Texas.

PUBLIC UTILITY COMMISSION
OF TEXAS, Petitioner,

v.

RWE RENEWABLES AMERICAS, LLC
and TX Hereford Wind, LLC, Respondents

No. 23-0555
|
Argued March 19, 2024
|
OPINION DELIVERED: June 14, 2024

**Synopsis**

**Background:** Market participants filed direct appeal of order of Public Utility Commission (PUC), 2021 WL 3711693, approving protocols adopted by Electric Reliability Council of Texas (ERCOT) revising its protocols effectively setting price of electricity at regulatory maximum during emergency load-shed event, even if standard price-setting formula yielded different price. The Austin Court of Appeals, Jones, J., sitting by assignment, 669 S.W.3d 566, reversed and remanded. Review was granted.

The Supreme Court, Lehrmann, J., held that PUC's approval of ERCOT's revised protocols was not subject to direct review by court of appeals.

Vacated and dismissed.

**\*485** On Petition for Review from the Court of Appeals for the Third District of Texas

**Attorneys and Law Firms**

Lisa Hobbs, Kurt Kuhn, Austin, Stephanie C. Sparks, Dallas, for Respondent RWE Renewables Americas, LLC.

Macey Reasoner Stokes, George Harold Fibbe, J. Mark Little, Elisabeth Butler, Houston, Andrea Moore Stover, Patrick Leahy, Austin, for Amicus Curiae Calpine Corporation.

Elliot Clark, Wallace B. Jefferson, Austin, Rachel Anne Ekery, Houston, Nicholas Bacarisse, for Amicus Curiae Electric Reliability Council of Texas.

Michael J. Jewell, for Respondent TX Hereford Wind, LLC.

Ron Beal, Pro Se.

John R. Hulme, Angela V. Colmenero, Priscilla M. Hubenak, Austin, Brent Webster, Houston, S. Grant Dorfman, Bellaire, Lanora C. Pettit, Kyle D. Highful, Shawn Cowles, Atty. Gen. W. Kenneth Paxton Jr., for Petitioner.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Amicus Curiae Aspire Power Ventures, LP.

**Opinion**

Justice Lehrmann delivered the opinion of the Court.

In response to Winter Storm Uri, the Legislature amended the Public Utility Regulatory Act (PURA) to provide that protocols adopted by the Electric Reliability Council of Texas, or ERCOT, do not take effect before they are approved by the Public Utility Commission. ERCOT then adopted, and the PUC approved, a revision to its protocols effectively setting the price of electricity at the regulatory maximum under Energy Emergency Alert Level 3 conditions—the highest level of emergency that can be declared—even if the standard price-setting formula yields a different price. Pursuant to PURA's mechanism for seeking judicial review of the validity of "competition rules adopted by the commission [PUC]," Tex. Util. Code § 39.001(e), two market participants initiated a challenge to the PUC's approval order directly in the Third Court of Appeals. That court held the order was both substantively invalid—because the PUC exceeded its statutory authority by setting the price of electricity—and procedurally invalid—because the PUC failed to comply with the Administrative Procedure Act's rulemaking procedures in issuing the order.

We first consider whether, in light of the amendments to PURA requiring PUC approval of ERCOT protocols, the approval order constitutes a "competition rule[ ] adopted by the commission." *Id.* If it does not, the court of appeals lacked jurisdiction over the proceeding for judicial review of the order. If it does, we must then evaluate whether the court of appeals correctly **\*486** determined that the order is both procedurally and substantively invalid.

**Appx. Page 105 of 740**

67 Tex. Sup. Ct. J. 1096

We hold that the PUC's approval order is not a "competition rule[ ] adopted by the commission" subject to the judicial-review process for PUC rules. PURA envisions a separate process for ERCOT-adopted protocols, and the statutory requirement that the PUC approve those adopted protocols does not transform PUC *approval orders* into PUC *rules* eligible for direct review by a court of appeals. The Third Court of Appeals therefore lacked jurisdiction over this proceeding. Accordingly, we vacate the court of appeals' judgment and dismiss the case for lack of jurisdiction.[1]

## I

### A

PURA Section 39.151 requires the PUC to "certify an independent organization"—here, ERCOT—"to perform the functions prescribed by [that] section." *Id.* § 39.151(c).[2] Four such functions are listed, including "ensur[ing] the reliability and adequacy of the regional electric network" and "ensur[ing] that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region." *Id.* § 39.151(a)(2), (4).[3] PUC regulations likewise demand that the "protocols and other rules" adopted by ERCOT "promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system." 16 Tex. Admin. Code § 25.501(a).

ERCOT "is directly responsible and accountable to the commission," which "has complete authority to oversee and investigate [ERCOT's] finances, budget, and operations as necessary to ensure [ERCOT]'s accountability and to ensure that [ERCOT] adequately performs [its] functions and duties." Tex. Util. Code § 39.151(d). If ERCOT "does not adequately perform [its] functions or duties or does not comply with this section," the PUC may take "appropriate action," including decertification. *Id.*

ERCOT possesses rulemaking authority delegated to it by the PUC, as authorized by PURA. *See id.* § 39.151(d), (g-6); 16 Tex. Admin. Code § 25.362(c). The "Nodal Protocols" developed and implemented by ERCOT "provide the framework for the administration of the Texas electricity market." *Pub. Util. Comm'n v. Constellation Energy Commodities Grp., Inc.*, 351 S.W.3d 588, 594–95 (Tex. App.—Austin 2011, pet. denied). Even before recent PURA amendments, ERCOT's protocols were "subject to commission oversight and review." *See* Act of May 30, 2005, 79th Leg., R.S., ch. 797, § 9, 2005 Tex. Gen. Laws 2728, 2729–30 (codified at Tex. Util. Code § 39.151(d)) (amended 2021, 2023) **\*487** (current version at Tex. Util. Code § 39.151(g-6)).

ERCOT is uniquely positioned to manage the electricity market by virtue of its technical expertise, and ERCOT utilizes a variety of resources and systems to manage grid conditions. For example, ERCOT typically relies on a computer system that employs a mathematical formula to send price-based signals to energy generators regarding whether additional power is needed. *Luminant*, 691 S.W.3d at ——. The PUC has specifically delegated to ERCOT the task of developing protocols for how that mathematical formula calculates energy pricing in times of energy shortage, or "scarcity pricing." *Id.*; 16 Tex. Admin. Code § 25.509(b).

### B

In February 2021, Winter Storm Uri incapacitated the Texas electric grid and resulted in an Energy Emergency Alert Level 3 "load-shed" event, meaning ERCOT directed operators of the transmission system to reduce electricity consumption by involuntarily disconnecting customers from the grid. During the load-shed event, ERCOT and the PUC took various additional steps to balance supply and demand in the market to avoid total grid collapse. One such step was to supersede the standard price-setting system by administratively setting the wholesale price of electricity at the regulatory ceiling. In the storm's aftermath, ERCOT's Nodal Protocols were amended to codify the practice in case future load-shed events necessitated a similar response. That amendment is the subject of this suit.

### C

As noted, even before Uri, ERCOT's protocols were subject to commission oversight and review. After the storm, the Legislature amended PURA to additionally provide that "[r]ules adopted by an independent organization [i.e., ERCOT] ... may not take effect before receiving commission approval." Act of May 30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 830 (codified at Tex. Util. Code § 39.151(d)) (amended 2023) (current version at Tex.

**Appx. Page 106 of 740**

Util. Code § 39.151(g-6)).[4] In accordance with that provision, ERCOT's board of directors adopted Nodal Protocol Revision Request (NPRR) 1081, which would amend Nodal Protocol 6.5.7.3.1, and presented it to the PUC for approval. The revision would set the price of electricity at the regulatory ceiling during an emergency load-shed event to reflect scarcity of supply, regardless of whether the standard price-setting formula yields a different price. ERCOT reported to the PUC that the revision would "ensure that Real-Time energy prices reflect the VOLL [Value of Lost Load] when Load is being shed, which is fundamental **\*488** to an energy-only market design in order to provide effective economic signals." The proposal was accompanied by a report from ERCOT's board and an impact-analysis report. The PUC ultimately issued an order approving NPRR 1081.

It is undisputed that load shedding is not driven by market forces but is instead an important regulatory tool designed to protect the grid from long-term damage during an emergency. Load shedding accomplishes this by limiting the amount of demand that may enter the market so as not to exceed available supply. Of course, when that happens, demand *in* the market no longer accurately reflects demand *to enter* the market, and additional supply can only be "accurately" priced by considering the value of replacing that lost load. *See* Hearing of Sen. Comm. Bus. & Com., 87th Leg., R.S. (Feb. 25, 2021), 79–80 (discussing incentives for production at the cap). As supply decreases, the value of lost load increases until it is effectively at the regulatory cap. *Luminant*, 691 S.W.3d at ——.

**D**

On July 30, 2021, respondents RWE Renewables Americas, LLC and TX Hereford Wind, LLC (collectively, RWE) sought judicial review of the PUC's order by the Third Court of Appeals. RWE asserted that the court of appeals had jurisdiction under PURA Section 39.001(e) and alleged that the PUC both exceeded its statutory authority under PURA and failed to comply with the Administrative Procedure Act in issuing the order. The PUC responded that the order was not a PUC rule subject to direct review by the court of appeals or the APA's rulemaking requirements, and that the PUC properly issued the order in furtherance of its statutory authority to oversee ERCOT and ensure the reliability of the Texas electric grid.

The court of appeals held that the PUC's order constituted a "competition rule adopted by the commission" under Section 39.001(e), giving the court jurisdiction over the proceedings. 669 S.W.3d 566, 575 (Tex. App.—Austin 2023). The court of appeals then held that the PUC's order was invalid because (1) the PUC lacked the authority to approve NPRR 1081 under PURA and (2) the PUC had failed to substantially comply with the APA's rulemaking procedures. *Id.* at 576–77.[5] We granted the PUC's petition for review.

**II**

We necessarily begin by considering jurisdiction. The PUC challenges the court of appeals' subject matter jurisdiction over what is essentially a direct appeal of the PUC's order.

**A**

PURA specifically provides for judicial review of "competition rules adopted by the commission." Tex. Util. Code § 39.001(e) ("Judicial review of competition rules adopted by the commission shall be conducted under [the APA], except as otherwise provided by this chapter."). Unlike most suits for judicial review of an agency rule, review of a PUC competition rule begins in the court of appeals. *Id.*; *see also id.* § 39.001(f) ("A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals ....").[6]

**\*489** The PUC argues that its order approving NPRR 1081 is not a rule at all, much less a "competition rule," and that PURA thus does not authorize direct review of the order by the court of appeals. The APA defines "rule" as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency." Tex. Gov't Code § 2001.003(6)(A)(i)–(ii). The definition "includes the amendment or repeal of a prior rule" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *Id.* § 2001.003(6)(B)–(C).

**B**

PURA empowers the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants." Tex. Util. Code § 39.151(d). However, as noted, it also allows the PUC to "delegate these responsibilities to an independent organization," which the PUC has done by delegating rulemaking authority to ERCOT. *Id.*; *CPS Energy*, 671 S.W.3d at 616; *see* 16 Tex. Admin. Code § 25.362(c) (requiring ERCOT to "adopt and comply with procedures [subject to certain parameters] concerning the adoption and revision of ERCOT rules"). ERCOT has utilized this delegated rulemaking authority to establish operational rules known as the Nodal Protocols. Under those protocols, generators make offers in advance on how much electricity they are willing to sell and at what price. ERCOT, Nodal Protocols § 4.4.9 (May 1, 2024).[7] ERCOT uses those prices to match demand to the lowest-price provider. *Id.* § 4.5. ERCOT serves as "the central counterparty for all transactions" that it settles and "is deemed to be the sole buyer to each seller" (typically, an energy generator) "and the sole seller to each buyer" (typically, a retail user) "of all energy." *Id.* § 1.2(4). Operating as a sort of clearinghouse, it is ERCOT that generates settlement statements providing the terms under which market participants must make payments for energy transactions. *Id.* §§ 9.2.4(1), 9.5.4(1), 9.5.5.

In accordance with the PUC's direction, ERCOT has implemented detailed procedures for adopting and revising its protocols. "A request to make additions, edits, deletions, revisions, or clarifications to these Protocols ... is called a Nodal Protocol Revision Request (NPRR)." *Id.* § 21.1(1) (June 1, 2023). A variety of entities may use the NPRR process, including market participants, the PUC, the independent market monitor, and ERCOT itself. *Id.* § 21.2(1)(a), (c), (f), (g). NPRRs are posted on ERCOT's website and reviewed by ERCOT's Protocol Revision Subcommittee. *Id.* §§ 21.4.1(4), 21.3(1). Market participants and other entities may comment on an NPRR. *Id.* § 21.4.4(1). In fact, RWE participated in this process with respect to NPRR 1081 by submitting comments in opposition to it.[8]

**\*490** After considering the NPRR, the revision subcommittee may take one of several actions, including recommending approval of the revision or rejecting it. *Id.* § 21.4.4(3). ERCOT then posts a report describing the subcommittee's action. *Id.* § 21.4.4(5). Again, market participants and others may comment on the subcommittee report. *Id.* § 21.4.5(1). If the subcommittee recommends

approval, ERCOT prepares an impact analysis, *id.* § 21.4.6(1), which is reviewed by the subcommittee, *id.* § 21.4.7(1). The NPRR then moves to the Technical Advisory Committee, which considers the subcommittee report and the impact analysis. *Id.* § 21.4.8(1). If the advisory committee recommends approval of an NPRR, the committee forwards its report to the ERCOT board of directors, *id.* § 21.4.8(5), and the report is also posted online, *id.* § 21.4.8(4). ERCOT's board then has the opportunity to approve the NPRR or take other action.

Before PURA was amended to require PUC approval for protocol revisions to become effective, ERCOT would implement them on the first day of the month following approval by ERCOT's board. *Id.* § 21.6(1) (Jan. 1, 2021). Now that protocols "may not take effect before receiving commission approval," Tex. Util. Code § 39.151(g-6), they are implemented on the first day of the month following receipt of that approval, ERCOT, Nodal Protocols §§ 21.4.11(1), 21.6(1) (June 1, 2023).

A market participant, among others, may appeal a decision of the ERCOT board regarding an NPRR to the PUC. *Id.* § 21.4.12.3(1). The PUC's rules outline the procedure for review of ERCOT protocols. 16 Tex. Admin. Code §§ 22.251, 25.362(c)(5). Those rules generally require that a complainant exhaust the process outlined in Section 21 of the protocols before challenging the protocol with the PUC. *Id.* § 22.251(c). Exceptions exist when, for example, "the complainant seeks emergency relief necessary to resolve health or safety issues." *Id.* § 22.251(c)(1)(C). Generally, the complaint must be filed within thirty-five days of "the ERCOT conduct complained of." *Id.* § 22.251(d); ERCOT, Nodal Protocols § 21.4.12.3(1) (June 1, 2023). In response to the complaint, the PUC may, among other things, provide ERCOT with "guidance on the development and implementation of protocol revisions" and order ERCOT "to promptly develop protocol[ ] revisions for commission approval." 16 Tex. Admin. Code § 22.251(o)(3), (4). If the complainant is dissatisfied with the result of the PUC proceedings, it can then seek judicial review. Tex. Util. Code § 15.001.

This painstaking procedure serves to leverage the expertise of ERCOT members and industry stakeholders while maintaining transparency and affording interested parties plentiful opportunities to weigh in. Moreover, we recognize that ERCOT and the PUC are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and

essential purpose. As we recognized in *CPS Energy*, "ERCOT do[es] not fall neatly into any camp. It is a unique entity serving a role that is not clearly analogous to a public entity like a police department or a public school. Yet, it provides an essential governmental service." 671 S.W.3d at 623 (alteration in original) (citation and internal quotation marks omitted). While the PUC has broad administrative responsibilities, it simultaneously lacks "the expertise and staff resources" to make informed regulatory decisions independent of ERCOT. Sunset Advisory Comm., Staff Report with Commission Decisions: Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel 37 (Jan. **\*491** 2023).[9]

## C

A substantially similar version of the above-described process for adopting and revising ERCOT protocols has long been in effect. *See* ERCOT, Nodal Protocols § 21 (Mar. 1, 2005) (rev. Feb. 2010, Apr. 2011, May 2011, Oct. 2011, May 2012, Aug. 2012, Apr. 2013, Dec. 2013, May 2014, July 2016, Nov. 2016, Nov. 2017, Jan. 2021, Apr. 2023, June 2023). The legislative and regulatory schemes have in turn envisioned separate, complementary purposes of and procedures for PUC rules and ERCOT protocols, notwithstanding the fact that ERCOT and its protocols have consistently been subject to PUC oversight and review. Tex. Util. Code § 39.151(d). RWE nevertheless suggests that, by amending PURA to require formal PUC approval of ERCOT-adopted protocols at the tail end of the process, the Legislature intended to overhaul that process entirely and effectively convert ERCOT protocols into PUC rules subject to the same review procedures. We do not discern such a sweeping intent from the language the Legislature chose.

For one thing, PURA makes clear that ERCOT, not the PUC, is the entity "adopting" new or revised ERCOT protocols. *See id.* § 39.151(g-6). The PUC then "approves" the protocols. *See id.* This distinction is deceptively significant because the APA's requirements, which RWE insists must be satisfied, are exclusively and repeatedly directed at rules "adopted" by a "state agency." *See, e.g.*, Tex. Gov't Code § 2001.033(a) ("A state agency order finally adopting a rule must include: ....."). Indeed, the Legislature deliberately uses the term "adopt" throughout the APA—no reference is made to an agency's "approval" of a rule. *See, e.g., id.* § 2001.004(1) (requiring a state agency to "adopt rules of practice stating the nature and requirements of all available formal and informal

procedures").[10] By contrast, the APA uses the term "approve" to describe the *governor's* action on legislation that allows it to become the law. *Id.* § 2001.006(a)(2).

PURA reinforces this distinction. For example, in a suit for judicial review of a competition rule under Section 39.001, the rulemaking record includes "the order *adopting* the rule." Tex. Util. Code § 39.001(e)(4) (emphasis added). The PUC issues no such order with respect to ERCOT protocols. We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that "adopts" ERCOT protocols given the comprehensive statutory use of that term.

RWE and the court of appeals highlight that, under PURA as amended, an ERCOT protocol does not take effect until it receives PUC approval. 669 S.W.3d at 574; Tex. Util. Code § 39.151(g-6). True, but even in requiring PUC approval, the Legislature distinguished between ERCOT's role in adopting a protocol and the PUC's role in approving it. Tex. Util. Code § 39.151(g-6) ("*Protocols adopted by [* **\*492** *ERCOT]* ... may not take effect before receiving commission approval." (emphasis added)). Again, the Legislature deliberately employed these terms to communicate two distinct administrative actions that have distinct legal consequences. *See Galveston Indep. Sch. Dist. v. Jaco*, 331 S.W.3d 182, 185–86 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (highlighting the Legislature's distinct use of "adopt" and "approve" in statutes describing the duties of the commissioner of education); Tex. Educ. Code § 7.055(b)(41) ("The commissioner shall *adopt* rules relating to extracurricular activities under Section 33.081 and *approve or disapprove* University Interscholastic League rules and procedures under Section 33.083." (emphases added)).

Finally, we cannot ignore that when the Legislature amended PURA in 2021 to require PUC approval of the independent organization's (ERCOT's) protocols, it simultaneously added the requirement that the organization "establish and implement a formal process for adopting new protocols or revisions to existing protocols." Act of May 30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 832 (amended 2023) (codified at Tex. Util. Code § 39.151(g-6)). As discussed above, ERCOT already had such a process in place; nevertheless, the requirement signals legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors.

In sum, consistent with the well-established regulatory scheme and the legislation governing it, we hold that

**Appx. Page 109 of 740**

the PUC's order approving NPRR 1081 was a ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect. Consequently, the PUC's order was not an agency-adopted "rule" under the Administrative Procedure Act. In turn, because the court of appeals' jurisdiction under Utilities Code Section 39.001(e) is limited to review of "competition rules adopted by the commission," the court lacked jurisdiction over RWE's challenge to the PUC's approval order.[11]

## III

Having concluded that the court of appeals lacked jurisdiction over RWE's appeal of the PUC's approval order, we need not address RWE's remaining arguments. We note, however, that this Court contemporaneously holds in *Luminant* that the PUC did not exceed its authority under PURA in issuing temporary emergency orders that, like NPRR 1081, set the price of electricity at the regulatory ceiling during a period of emergency load-shed. 691 S.W.3d at ——.

* * * *

Because the PUC's order was not a "competition rule adopted by the commission" under PURA, Section 39.151 did not confer direct-review jurisdiction on the court of appeals. We therefore vacate the court of appeals' judgment and dismiss the suit for lack of jurisdiction.

## All Citations

691 S.W.3d 484, 67 Tex. Sup. Ct. J. 1096

Footnotes

1    In our contemporaneously issued opinion in *Public Utility Commission v. Luminant Energy Co.*, we hold that the PUC did not exceed its authority in issuing two emergency orders during Winter Storm Uri that operated to a similar end by temporarily setting the price of electricity at the regulatory ceiling. 691 S.W.3d 448, —— (Tex. June 14, 2024) (No. 22-0231).

2    A more detailed explanation of the Texas electricity market appears in this Court's opinion in *Luminant*. *See id.* at ——. We also recently engaged in a thorough discussion of ERCOT's history, and its role in the Texas electricity market, in *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611–12 (Tex. 2023).

3    The others are "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms" and "ensur[ing] that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information." Tex. Util. Code § 39.151(a)(1), (3).

4    As further amended in 2023, Section 39.151(g-6) currently provides:

In this subsection, a reference to a protocol includes a rule. Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval. To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or revisions to existing protocols. The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols. The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

Act of May 26, 2023, 88th Leg., R.S., ch. 464, § 4, 2023 Tex. Sess. Law Serv. (West) 1133 (codified at Tex. Util. Code § 39.151(g-6)).

5    In support of its first holding, the court relied on its own decision in *Luminant*, which we also review today. 669 S.W.3d at 576.

**Appx. Page 110 of 740**

6     When RWE instituted this proceeding, Section 39.001(e) provided for review in the Third Court of Appeals. In 2023, the Legislature amended Section 39.001(e) to provide for review by the Fifteenth Court of Appeals going forward. Act of May 22, 2023, 88th Leg., R.S., ch. 459, § 1.13, 2023 Tex. Sess. Law Serv. (West) 1119.

7     We cite the current version of the protocols unless substantive differences require citing the version in effect when the relevant events occurred. ERCOT's current protocols and a library of past versions of the protocols, with summaries of revisions, are available on ERCOT's website. Protocols - Nodal, https://www.ercot.com/mktrules/nprotocols.

8     RWE, Comment Letter on Nodal Protocol Request 1081 (June 23, 2021), https://www.ercot.com/mktrules/issues/NPRR1081#keydocs.

9     Available at https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf).

10     *See also* Tex. Gov't Code § 2001.006 (describing when a rule "adopted" under Section 2001.006(b) may take effect); *id.* § 2001.021(a) ("An interested person by petition to a state agency may request the adoption of a rule."); *id.* § 2001.023(a) ("A state agency shall give at least 30 days' notice of its intention to adopt a rule before it adopts the rule."); *id.* § 2001.030 ("On adoption of a rule, a state agency, if requested to do so by an interested person either before adoption or not later than the 30th day after the date of adoption, shall issue a concise statement of the principal reasons for and against its adoption.").

11     As noted, PUC regulations provide a process for review of ERCOT protocols, 16 Tex. Admin. Code §§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review in district court, Tex. Util. Code § 15.001. RWE did not engage in that process, choosing instead to utilize the inapplicable procedure for reviewing PUC competition rules.

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Appx. Page 111 of 740

# APPENDIX B

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Hensley v. State Commission on Judicial Conduct, Tex., June 28, 2024

671 S.W.3d 605
Supreme Court of Texas.

CPS ENERGY, Petitioner,

v.

ELECTRIC RELIABILITY
COUNCIL OF TEXAS, Respondent

Electric Reliability Council
of Texas, Inc., Petitioner,

v.

Panda Power Generation Infrastructure Fund, LLC d/b/a Panda Power Funds; Panda Sherman Power Holdings, LLC; Panda Sherman Power Intermediate Holdings I, LLC; Panda Sherman Power Intermediate Holdings II, LLC; Panda Sherman Power, LLC; Panda Temple Power Holdings, LLC; Panda Temple Power Intermediate Holdings I, LLC; Panda Temple Power Intermediate Holdings II, LLC; Panda Temple Power, LLC; Panda Temple Power II Holdings, LLC; Panda Temple Power II Intermediate Holdings I, LLC; Panda Temple Power II Intermediate Holdings II, LLC; and Panda Temple Power II, LLC, Respondents

No. 22-0056, No. 22-0196
|
Argued January 9, 2023
|
OPINION DELIVERED: June 23, 2023

**Synopsis**
**Background:** Municipally owned electric utility brought action against Electric Reliability Council of Texas (ERCOT) and ERCOT's former chief executive officer, alleging breach of contract, negligence, gross negligence, negligence per se, breach of fiduciary duty, and violations of Texas Constitution. The 285th District Court, Bexar County, Solomon Casseb, III, J., denied ERCOT's plea to the jurisdiction. ERCOT

and former chief executive officer appealed, and the San Antonio Court of Appeals, 648 S.W.3d 520, reversed. Utility petitioned for review, which was granted. In second proceeding, power company brought action against ERCOT for fraud, negligent misrepresentation, and breach of fiduciary duty, alleging that ERCOT's electricity capacity, demand, and reserves reports misled power company to invest $2.2 billion in building new power plants. ERCOT filed plea to the jurisdiction. The 15th District Court, Grayson County, James P. Fallon, J., denied plea. ERCOT filed interlocutory appeal and alternatively filed petition for writ of mandamus. The Dallas Court of Appeals, 552 S.W.3d 297, consolidated cases, dismissed interlocutory appeal for want of jurisdiction, and granted mandamus petition. Power company filed petition for writ of mandamus in the Supreme Court, and ERCOT filed conditional petition for review, both challenging the Court of Appeals' decision. The Supreme Court, 619 S.W.3d 628, dismissed petitions as moot. On remand, the District Court granted ERCOT's plea to the jurisdiction based on sovereign immunity. Power company appealed, and the Court of Appeals, 641 S.W.3d 893, reversed and remanded. ERCOT filed petition for review, which was granted.

**Holdings:** The Supreme Court, Hecht, C.J., held that:

ERCOT was an "organ of government" within the meaning of the definition of "governmental unit" under the Texas Tort Claims Act;

ERCOT derived its status and authority from statute, as required to fall within the definition of "governmental unit" under the Texas Tort Claims Act;

Utilities Code provision constituted a pervasive regulatory scheme which imparted to the Public Utilities Commission (PUC) exclusive jurisdiction over ERCOT;

company's contention that ERCOT failed to properly perform Public Utility Regulatory Act (PURA) requirement that it publish capacity, demand, and reserves reports (CDRs) by issuing fraudulent CDRs fell within the PUC's exclusive jurisdiction;

allegations ERCOT failed to properly implement protocols to ensure the integrity of its system during winter storm and failed to take reasonable precautions to meet its load projections or corrective action when projections showed

insufficient capacity came with PUC's exclusive jurisdiction; and

ERCOT has sovereign immunity as an arm of the State.

Affirmed; reversed and rendered.

Boyd, J., and Devine, J., filed a dissenting opinion in part in which Lehrmann, J., and Busby, J., joined.

**\*610** On Petition for Review from the Court of Appeals for the Fourth District of Texas

On Petition for Review from the Court of Appeals for the Fifth District of Texas

**Attorneys and Law Firms**

Elliot Clark, Wallace B. Jefferson, D. Blake Wilson, Austin, Rachel Anne Ekery, Houston, Nicholas B. Bacarisse, Ron H. Moss, Austin, for Respondents Electric Reliability Council of Texas, Inc., Magness, William L. "Bill" in 22-0056.

Brent Webster, Houston, John R. Hulme, Austin, Judd E. Stone II, Kyle Highful, Atty. Gen. W. Kenneth Paxton Jr., Bill Davis, Austin, for Amicus Curiae Public Utility Commission of Texas in 22-0056.

James Sullivan, for Amicus Curiae Abbott, Greg in 22-0056.

Jennifer Nicole Pulliam, Christopher D. Anderson, Bryan, for Amicus Curiae Rayburn Country Electrical Cooperative, Inc. in 22-0056.

Glenn Arlen Ballard Jr., Adam C. Kiehne, Houston, Harriet O'Neill, Austin, Lauren Valkenaar, Greta McFarling, Blake Stribling, Mukul S. Kelkar, Houston, Adrianna Jimenez, Barry A. Chasnoff, for Petitioner in 22-0056.

Patrick Leahy, Juliana Sersen, Austin, Macey Reasoner Stokes, George Harold Fibbe, Houston, Andrea Moore Stover, Austin, J. Mark Little, Houston, for Amicus Curiae Calpine Corporation in 22-0056.

John Hubbard, Katherine Coleman, Michael A. McMillin, Phillip Glynn Oldham, Austin, for Amicus Curiae Texas Industrial Energy Consumers in 22-0196.

Leslie Conant Thorne, Andrew W. Guthrie, Werner A. Powers, Dallas, Roger D. Sanders, Sherman, Ben L. Mesches, Christopher Knight, for Respondent in 22-0196.

Hobart Hind, George McMullin Jr., Dallas, for Amicus Curiae National Association of Subrogation Professionals in 22-0196.

Kyle Highful, Bill Davis, Austin, Brent Webster, Houston, Judd E. Stone II, Warren Kenneth Paxton, Austin, for Amicus Curiae Public Utility Commission of Texas in 22-0196.

James Sullivan, for Amicus Curiae Abbott, Greg in 22-0196.

Nicholas B. Bacarisse, Wallace B. Jefferson, Austin, Chad Vann Seely, Erika M. Kane, J. Hampton Skelton, Austin, Rachel Anne Ekery, Houston, Brandon Duane Gleason, Austin, Nathan Myrick Bigbee, for Petitioner The Electric Reliability Council of Texas, Inc. (ERCOT) in 22-0196.

**Opinion**

Chief Justice Hecht delivered the opinion of the Court, in which Justice Blacklock, Justice Bland, Justice Huddle, and Justice Young joined, and in which Justice Lehrmann, Justice Boyd, Justice Devine, and Justice Busby joined except as to Part IV.

These two cases present three questions concerning the Electric Reliability Council **\*611** of Texas, Inc.: (1) Is ERCOT a governmental unit as defined in the Texas Tort Claims Act and thereby entitled to pursue an interlocutory appeal from the denial of a plea to the jurisdiction? (2) Does the Public Utility Commission of Texas have exclusive jurisdiction over the parties' claims against ERCOT? And (3) is ERCOT entitled to sovereign immunity? The answer to all three questions is yes. In No. 22-0056,[1] we affirm the court of appeals' judgment[2] dismissing the claims against ERCOT. In No. 22-0196,[3] we reverse the court of appeals' judgment[4] and render judgment dismissing the claims against ERCOT.

**I**

"In its electrical grid, as in so many things, Texas stands alone."[5] Most of the state comprises the U.S. mainland's only *intra*state electrical grid,[6] which covers 75 percent of the state's acreage, carries about 90 percent of its electrical load, and includes more than 52,700 miles of transmission lines, 1,100 generation units, and 26 million electricity customers.[7] The Public Utility Regulatory Act (PURA) requires the Public Utility Commission (PUC) to certify an independent

system operator (ISO) for the Texas power region.[8] The PUC certified ERCOT, a membership-based 501(c)(4) nonprofit corporation.[9]

ERCOT was formed in 1970 by various Texas electric utilities that had interconnected their grids for greater reliability and increased capacity.[10] Membership was "available to any electric utility [that] own[ed], control[led] or operate[d] an electric power system in Texas".[11] In those days, each member utility operated its own control area, and ERCOT served an administrative role that "promote[d] reliable operations of power systems in Texas by providing a means to communicate and coordinate the planning and operation of *612 its members."[12]

In 1999, the Legislature restructured the electric utility industry in Texas.[13] It amended PURA to require the "[u]nbundling" of vertically integrated electric utility monopolies and established a fully competitive electric power industry.[14] The new structure required an ISO to operate the wholesale electric market and "ensure the reliability and adequacy" of the Texas power grid.[15] Since 2001, ERCOT has served as that "[e]ssential [o]rganization[ ]".[16]

The two cases before us stem from different facts and different parties, but they raise overlapping jurisdictional questions.

**A**

CPS Energy, a municipally owned utility that serves the San Antonio area, is a market participant in the ERCOT wholesale market. CPS buys and sells power through ERCOT, so ERCOT both collects money from CPS and pays money to CPS. The parties settle the amounts owed by each side and pay each other accordingly in what they call "settlement" payments. At issue here are payments from ERCOT to CPS. CPS' participation in the market is governed by the terms of a Standard Form Market Participant Agreement, PURA, and the ERCOT Protocols, which are rules promulgated by ERCOT to manage the market and the grid.

In February 2021, Texans endured the catastrophic Winter Storm Uri. On February 15, just as the storm hit, ERCOT declared its highest state of emergency, Emergency Energy Alert Level 3, and directed transmission operators to curtail firm load. The PUC then directed ERCOT to set the per-

megawatt-hour price of electricity at the highest permissible rate of $9,000 to reflect scarcity of supply. ERCOT recalled its firm load shed instructions on February 17 but kept prices at the cap rate for an additional 32 hours through the morning of February 19. CPS alleges that ERCOT should have ended its pricing intervention when it recalled its firm load shed instructions and that its failure to do so resulted in $16 billion in overcharges to market participants.

Some market participants defaulted after the storm. Pursuant to its Protocols, ERCOT then implemented its "short-pay" procedure and its "Default Uplift process".[17] These processes spread the impact of the default, allocating the loss among market participants—including CPS—by reducing the amounts they are owed by ERCOT.[18] CPS alleges that it was short-paid at least $18 million through the short-pay process. It also alleges that ERCOT intended to apply two downward adjustments to the credit in CPS' account by over $1 million each through the default-uplift process.[19]

 *613 CPS sued ERCOT and several of its officers for breach of contract, negligence, breach of fiduciary duty, and violations of the Texas Constitution.[20] ERCOT filed a plea to the jurisdiction, arguing that CPS' claims are barred by sovereign immunity and, alternatively, that the PUC has exclusive jurisdiction over the claim. The trial court denied the plea.[21]

ERCOT appealed, asserting that it is a governmental unit entitled to an interlocutory appeal from the denial of a plea to the jurisdiction.[22] ERCOT also sought review by petition for writ of mandamus in the event it is not entitled to an interlocutory appeal. After one court of appeals panel summarily denied mandamus relief,[23] ERCOT filed its petition for writ of mandamus in this Court[24] to continue the alternative path to review. A different court of appeals panel then held that ERCOT is a governmental unit entitled to take an interlocutory appeal, that the PUC has exclusive jurisdiction over CPS' claims, and that CPS' claims should be dismissed.[25] We granted review and set the case for oral argument on the same day as the case brought by the Panda Power Companies.[26]

**B**

**Appx. Page 115 of 740**

As part of ERCOT's functions, the PUC requires ERCOT to annually publish resource adequacy reports that project, for at least the next five years, the capability of existing electric generation resources to meet projected demand in the Texas power region.[27] ERCOT does so by publishing "Capacity, Demand, and Reserves" reports (CDRs). ERCOT's 2011 and 2012 CDRs projected a likelihood of severe energy shortfalls. Panda, a group of private-equity investors, alleges that it relied on these reports when it decided to invest billions of dollars to build three new power plants. After construction on the new plants began, ERCOT revised its CDRs and forecast a future oversupply of generation capacity. Panda sued ERCOT for fraud, negligent misrepresentation, and breach of fiduciary duty. Panda alleges that ERCOT's misleading reports caused it substantial financial harm and seeks damages in excess of $2 billion.

The procedural history of this case is long and complex, and we recite only what is relevant to the disposition of this appeal. ERCOT filed two pleas to the jurisdiction arguing that the PUC has exclusive jurisdiction over Panda's claims and that ERCOT has sovereign immunity. The trial court denied both. ERCOT appealed, arguing that it is a "governmental unit" under the Texas Tort Claims Act entitled to an interlocutory appeal from the denial of its **\*614** plea to the jurisdiction.[28] ERCOT alternatively sought review by mandamus. The court of appeals consolidated the appeal and mandamus petition and held that ERCOT is not a governmental unit entitled to an interlocutory appeal but that ERCOT has sovereign immunity.[29] Accordingly, the court of appeals dismissed ERCOT's interlocutory appeal for lack of jurisdiction, conditionally granted its petition for writ of mandamus, and directed the trial court to dismiss the case for lack of jurisdiction.[30] The trial court immediately complied, and Panda appealed. The court of appeals, then sitting en banc, changed course. Relying on three immunity cases decided by this Court in the interim, and with one justice dissenting, the court held that ERCOT is not entitled to sovereign immunity and that the PUC does not have exclusive jurisdiction over Panda's claims.[31] We granted ERCOT's petition for review.

## II

The first issue arises from CPS' petition: whether ERCOT is a governmental unit under the Texas Tort Claims Act and thus entitled to take an interlocutory appeal from the denial

of a plea to the jurisdiction.[32] "Although private institutions are not commonly understood to be a part 'of government,' we have held that a private institution can be a governmental unit", as is the case here.[33]

"[T]he general rule, with a few mostly statutory exceptions, is that an appeal may be taken only from a final judgment."[34] However, certain statutes authorize interlocutory appeals over particular kinds of trial court orders.[35] Section 51.014(a)(8) of the Civil Practice and Remedies Code authorizes an interlocutory appeal from a trial-court order that "grants or denies a plea to the jurisdiction by a governmental unit as that term is defined" in the Tort Claims Act.[36] In turn, the Tort Claims Act defines "[g]overnmental unit" to include not only the state and its agencies and political subdivisions, but also "any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution."[37] Thus, a private, non-governmental entity can qualify as a governmental unit under this definition, but only if (1) it is an institution, agency, or organ of government; and (2) it derives its status and authority as such from the Texas Constitution or statutes.[38]

#### \*615 A

In *LTTS Charter School, Inc. v. C2 Construction, Inc.*, we held that an open-enrollment charter school qualified as a governmental unit because it was "indisputably part of the Texas public-education system" and derived that status and authority from state statutes.[39] Our holding centered on various statutory pronouncements. We concluded that open-enrollment charter schools derive their status from the Education Code, which provides that they are "part of" the state's public-school system.[40] Their authority is also derived from the Education Code, which assigns them responsibilities for implementing the public-education system, provides them with substantial public funding and resources, grants them the same powers and privileges of traditional public schools, and subjects them to the same rules that govern public schools.[41] Finally, the Education Code designates open-enrollment charter schools as "governmental entit[ies]", "political subdivision[s]", and "local government[s]" for various purposes.[42]

Appx. Page 116 of 740

In *University of the Incarnate Word v. Redus* (*Redus I*), we concluded that a private university that operates a state-authorized police department qualifies as a governmental unit when defending suits relating to the department's actions.[43] We acknowledged that, unlike the charter schools at issue in *LTTS*, private universities do not receive public funding and are not statutorily labeled as governmental entities for any particular purpose.[44] Nevertheless, we observed that state statutes grant private universities the "status and authority" to operate a police department using commissioned peace officers and subject them to state law-enforcement rules and requirements, just like a municipal police department.[45] And although no statute expressly designates a private university or its police department as "part of" the state's law-enforcement system, we concluded that the university was an "organ of government" for purposes of its police department because it "operates as part of a larger governmental system" and performs the "uniquely governmental" function of law enforcement.[46]

**B**

CPS maintains that unlike in *LTTS* and *Redus I*, there are no strong legislative indicators of governmental-unit status in relation to ERCOT and that in concluding otherwise, the court of appeals applied an impermissibly broad view of "organ of government". It argues further that ERCOT does not perform a "uniquely governmental function" and that ERCOT's actions during the winter storm event were merely operational. For its part, ERCOT contends that it is an organ of government because it is an essential part of a larger governmental system, namely the PUC's regulation of electric utilities, as evidenced by its delegated rulemaking authority and various provisions of PURA.

**1**

As we recognized in *Redus I*, an "organ of government" is an entity that "operates as part of a larger governmental **\*616** system" and performs a "uniquely governmental" function.[47] Here, ERCOT operates as part of the state's broader electricity-regulation system under PURA and performs the uniquely governmental function of utilities regulation.

PURA was enacted "to establish a comprehensive and adequate regulatory system for public utilities", including electric utilities and telecommunications utilities.[48] Under PURA, the PUC—a governmental entity—was given the "general power" to regulate and supervise public utilities.[49] Within this larger governmental system of utilities regulation is the express requirement of an independent system operator for the Texas power region.[50] This ISO is tasked with ensuring that (1) all electricity buyers and sellers have nondiscriminatory access to the region's transmission and distribution system, (2) the region's electrical network is reliable and adequate, (3) information regarding a customer's choice of retail electric provider is timely available to those who need it, and (4) electricity production and delivery are accurately accounted for.[51]

ERCOT performs these functions under the direct oversight of the PUC and must do so in compliance with the requirements set forth in PURA.[52] In *LTTS*, we observed that the open-enrollment charter school was required to meet "financial, governing, and operational standards" under the Education Code and that the Commissioner of Education was empowered to audit the school and revoke its charter for failure to comply with the Code.[53] ERCOT is subject to similar requirements and more under PURA and by the PUC.

The PUC certifies the ISO, and, as the ISO, ERCOT is "directly responsible and accountable" to the PUC.[54] The PUC has extensive authority over ERCOT, including "complete authority" over ERCOT's "finances, budget, and operations"—including the ability to audit its financials—to ensure that ERCOT adequately performs its functions and duties.[55] The PUC has authority over ERCOT's bylaws and protocols, and the chairman of the PUC sits on ERCOT's board.[56] The PUC can penalize and even decertify ERCOT if it fails to adequately perform its functions and duties or if it fails to comply with PURA.[57]

Additionally, the regulation of utilities is "uniquely governmental".[58] As the certified ISO, ERCOT exercises delegated authority from the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network".[59] It is also tasked with "enforc[ing] operating standards" and establishing and overseeing payment procedures for transactions by market participants within the electrical **\*617** network.[60] Market participants are statutorily required to abide by all rules and procedures established by the ISO, and their failure to do so could result in a penalty.[61]

Because ERCOT performs a "uniquely governmental" function as part of a "larger governmental system", it is an organ of government.[62]

**2**

ERCOT also derives its "status and authority" from statute.[63] Its status derives from statute because PURA requires the PUC to "establish one or more independent organizations"—that is, an organization that is "sufficiently independent" of any electricity producer or seller—to serve as the region's ISO.[64] An independent organization can serve as the region's ISO only if the PUC certifies it for that purpose.[65] Its authority also comes from statute because PURA grants a certified ISO authority to supervise the Texas power region's transmission facilities and to coordinate its market transactions, transmissions planning, and network reliability.[66] Thus, although ERCOT is a private, nonprofit corporation, its "status" as the ISO for the Texas power region and its "authority" to act in that capacity derive directly from PURA.

Because ERCOT is an "organ of government the status and authority of which are derived from" statute, it is a "governmental unit" entitled to take an interlocutory appeal from the denial of a plea to the jurisdiction.[67]

**III**

The next issue, presented in both cases, is whether the PUC has exclusive jurisdiction over issues underlying the parties' claims against ERCOT. We conclude that it does.

Courts are presumed to have jurisdiction to resolve legal disputes.[68] "To overcome that presumption, the Constitution or another law must grant exclusive jurisdiction to another court or an administrative agency."[69] A statute may grant an agency exclusive jurisdiction either expressly or by establishing a "pervasive regulatory scheme" that impliedly "indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed."[70] Thus, to establish exclusive jurisdiction over a particular issue, there must be (1) an express or implied grant of exclusive jurisdiction and (2)

the issue must "fall[ ] within that jurisdictional scope."[71] If the agency's exclusive jurisdiction is established, the **\*618** claimant must pursue and exhaust all available administrative remedies before turning to the courts.[72] "Until then, the trial court lacks subject-matter jurisdiction" and must dismiss the claims with issues that come within the agency's exclusive jurisdiction.[73]

**A**

ERCOT does not claim that the PUC has been expressly granted exclusive jurisdiction over the issues underlying CPS' and Panda's claims; rather, it argues that Section 39.151 of the Utilities Code constitutes a pervasive regulatory scheme that imparts exclusive jurisdiction. We agree.

Section 39.151 grants the PUC extensive and ultimate authority over an ISO. As mentioned, the statute provides that the ISO "is directly responsible and accountable to the [PUC]," and the PUC "has *complete* authority to oversee and investigate [ERCOT]'s finances, budget, and operations" to ensure adequate performance of the ISO's "functions and duties."[74] It grants the PUC authority over ERCOT's board makeup, its bylaws and protocols, and its ability to charge fees to its members.[75] ERCOT is empowered to enact rules over market participants, but they must be approved by the PUC.[76] Moreover, the PUC's authority over ERCOT is not solely regulatory; it has adjudicatory power as well. The PUC may "take appropriate action" against the ISO, including decertification, for the ISO's failure to adequately perform its functions or duties or for its failure to comply with Section 39.151.[77] Section 39.151's grant of extensive authority to the PUC over ERCOT and its detailed regulation of the particulars of ERCOT's functions constitute a pervasive regulatory scheme.[78]

**B**

The next inquiry is whether issues underlying the parties' claims fall within the regulatory scheme's jurisdictional scope.[79] The question is whether "the Legislature intended ... the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed."[80] As to both Panda and CPS, we conclude that the issues underlying

their claims come within the scope of the PUC's exclusive jurisdiction.

**1**

We begin with Panda's issues. PURA requires that ERCOT publish CDRs that "identify[ ] existing and potential transmission and distribution constraints and system needs" within the Texas power region, including alternatives and recommendations for meeting those needs.[81] Panda contends that ERCOT **\*619** failed to properly perform this requirement by issuing fraudulent CDRs that inaccurately reported the capability of existing electric generation resources to meet projected demand in the Texas power region. Because the proper performance of ERCOT's operations, functions, and duties comes within the PUC's "complete" authority over ERCOT, and because the PUC is statutorily authorized to hold ERCOT accountable if, as Panda alleges, ERCOT fails to properly perform, we hold that Panda's issues come within the PUC's exclusive jurisdiction.[82]

Panda notes that the PUC "has no authority to determine whether ERCOT complied with the relevant common-law standards or to provide a remedy." While that is true, an agency's exclusive jurisdiction does not prevent an aggrieved party from pursuing damages or other relief in the trial court after the agency has exercised its exclusive jurisdiction over the relevant issues.[83]

**2**

Likewise, CPS' issues come within the jurisdictional scope of the PUC's exclusive jurisdiction. CPS alleges that, *inter alia*, ERCOT "failed to implement its protocols in a way to ensure the integrity of its system", "failed to take reasonable precautions to meet its load projections expected as a result of" Winter Storm Uri, "failed to take reasonable corrective action when it became clear that its own projections showed insufficient capacity to meet forecast demand", and failed to correct "an acknowledged $16 billion error". Additionally, CPS essentially seeks exemption from ERCOT's short-pay and default-uplift procedures for charges relating to the Winter Storm default because it claims that they are due to ERCOT's own error and its subsequent failure to retroactively reprice the alleged overcharge.

These issues involve "the very activit[ies] the [PUC] regulates."[84] CPS' issues implicate ERCOT's operations and billing, which fall under the PUC's "complete authority".[85] And while ERCOT oversees transaction settlement payment procedures, it does so by delegated authority from the PUC.[86] Additionally, CPS specifically alleged that ERCOT's actions (and inactions) violated Section 39.151 of the Utilities Code because it failed to perform its functions of "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity" and "ensur[ing] the reliability and adequacy of the regional electrical network".[87] By statute, the PUC is responsible for ensuring that ERCOT "adequately performs [its] functions and duties", and the PUC may take action against ERCOT should it fail to do so.[88] Thus, CPS' issues fall within the PUC's exclusive jurisdiction.

CPS raises a host of arguments to support its claim that the PUC does not have exclusive jurisdiction or that it is not required to exhaust administrative remedies. All fall short. CPS contends that the PUC does not have exclusive jurisdiction because it cannot adjudicate a contract claim or award damages. However, CPS' claim for breach of the Standard Form Market Participant Agreement involves whether **\*620** ERCOT properly implemented its protocols, which comes within the PUC's exclusive jurisdiction.[89] As to damages, as mentioned, an agency's exclusive jurisdiction does not prevent a party from pursuing damages or other relief in the trial court after it has exhausted administrative remedies.[90] Moreover, CPS primarily argues that its damages stem from ERCOT's alleged overcharge during the storm and its failure to retroactively reprice that overcharge. The PUC has authority to oversee transaction settlement procedures and authority over ERCOT's finances; therefore, presumably, it could order ERCOT to resettle its payments to CPS.[91]

CPS argues that it was not required to exhaust administrative remedies because it needed immediate injunctive relief.[92] But PUC rules permit the PUC to order ERCOT to suspend complained-of conduct while a complaint is pending.[93] CPS also argues that exhaustion of administrative remedies is inapplicable where the action concerns questions of law. But CPS' issues raise various fact questions including how much supply was available for the 32 hours after ERCOT recalled its firm load shed instructions, which is necessary to determine what the appropriate per-megawatt-hour price was.

Thus, this exception to the exhaustion requirement does not apply.[94]

Finally, CPS contends that exhaustion is not required because it asserts constitutional claims. Specifically, CPS argues that the loss allocation under the short-pay and default-uplift procedures amounts to an unconstitutional taking in violation of Article I, Section 17 of the Texas Constitution and an unconstitutional extension of credit in violation of Article XI, Section 3. However, "a litigant must avail itself of statutory remedies that may moot its takings claim, rather than directly institute a separate proceeding asserting such a claim."[95] Here, a decision from the PUC on the underlying issues could moot CPS' constitutional claims. Were the PUC to order adjustment of the alleged overcharge pricing or resettlement of ERCOT's payments to CPS, it would cure the alleged violations and obviate the need to assert the constitutional claims in court.[96] And even if it does not, a party is not precluded from pursuing its constitutional claims after exhaustion or from seeking judicial review of any PUC rulings on issues underlying those claims.[97]

In sum, the PUC has exclusive jurisdiction over CPS' claims. As a result of our holding, we need not address ERCOT's alternative argument regarding exclusive jurisdiction in Travis County district court or the Third Court of Appeals, nor its **\*621** argument that the PUC is an indispensable party.

## IV

ERCOT's primary argument is that it is entitled to sovereign immunity. We agree.

"Sovereign immunity provides that 'no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent.' "[98] It is " 'inherent' in Texas statehood and 'developed without any legislative or constitutional enactment.' "[99] In determining whether a legislatively authorized entity is entitled to share in the state's immunity, we look to whether "the governing statutory authority demonstrates legislative intent to grant an entity the 'nature, purposes, and powers' of an 'arm of the State government' ".[100] We also look to whether extending immunity would "satisfy the political, pecuniary, and pragmatic policies underlying our immunity doctrines."[101] If these requirements are met, the " 'entity

is a government unit unto itself' and is 'entitled to assert immunity in its own right' when it performs a 'governmental function.' "[102]

## A

Three of our recent cases explored the boundaries and contours of sovereign and governmental immunity and are pertinent to our analysis here. In *Rosenberg Development Corp. v. Imperial Performing Arts, Inc.*, we addressed for the first time whether a private entity could possess the "nature, purposes, and powers of an arm of the State government" and thus qualify as an entity protected by sovereign or governmental immunity.[103] *Rosenberg* involved an economic development corporation created by a municipality, as authorized by the Texas Development Corporation Act.[104] The economic development corporation was a private, nonprofit entity, but it was incorporated exclusively for a public purpose: to promote enterprises to spur economic growth in the city.[105] Under the statute, it was authorized to fund projects with tax dollars or the proceeds of revenue bonds.[106] It was also subject to compliance with the Texas Open Meetings Act and the Texas Public Information Act.[107] The municipality had some supervisory control over the corporation, but ultimately, "all the powers of the corporation [were] vested in the corporation's board of directors."[108] Importantly, the Development Corporation Act **\*622** provided that an economic development corporation "is not a political subdivision or a political corporation for purposes of the laws of this state", and it barred municipalities from delegating to the corporation any "attributes of sovereignty."[109] Ultimately, we concluded that the Development Corporation Act "evinces clear legislative intent that an economic development corporation is not an arm of state government."[110] We also held that granting immunity did not "satisfy the political, pecuniary, and pragmatic policies underlying our immunity doctrines" because "[g]overnmental immunity benefits the public by preventing disruptions of key governmental services," but economic development corporations do not perform essential services.[111]

Next, in *University of the Incarnate Word v. Redus* (*Redus II*), we considered whether sovereign immunity applied to the private university involved in *Redus I*, which was sued for

Appx. Page 120 of 740

the actions of its statutorily authorized police department.[112] We concluded that it was not immune because the university did not possess the nature, purposes, and powers of an arm of the state government, nor did applying sovereign immunity support the doctrine's nature and purposes.[113] Central to our holding was the lack of control the state exercised over the university and its police department. We noted that "[t]he State did not charter" the university, nor did it set the police "department's policies, procedures, or protocols."[114] We further observed that the state did not "hire or fire the [u]niversity's officers" and that "[t]he [u]niversity's administration, and its private governing board, are alone responsible for its police department's day-to-day operations and decision making."[115] Ultimately, because the university's police department was "not accountable to the government," we concluded that it was not an arm of the state.[116] We also held that extending sovereign immunity to the university did not further the doctrine's purposes of protecting the public treasury and preserving the separation of government power.[117] We observed that the university, not the state, funded the police department, and therefore no tax dollars were at stake.[118] This foreclosed any risk of invading the separation of powers because there could be no judicial reallocation of public funds.[119] Additionally, there were no concerns regarding the diversion of public funds from government functions in order to pay judgments.[120]

On the same day we decided *Redus II*, we also decided *El Paso Education Initiative v. Amex Properties*, issuing the first and only opinion in which we have extended sovereign or governmental immunity to a private entity under the arm-of-the-state analysis.[121] We observed that the Education Code expressly stated the Legislature's intent that open-enrollment charter schools be "immune from liability **\*623** and suit to the same extent as a [public] school district".[122] We concluded that, although charter schools are typically private, non-profit organizations, they have the nature, purposes, and powers of an arm of the state because they are regulated by and accountable to the state's Commissioner of Education, are largely publicly funded, educate nearly six percent of the state's students, "exercise the same powers and perform government tasks in the same manner as traditional public schools[,] ... expressly operate as part of the State's public education system, and ... are generally open to the public."[123] We also concluded that extending governmental immunity to open-enrollment charter schools would serve the doctrine's

nature and purposes by protecting public funds from lawsuits and judgments that would reallocate the funds from the Legislature's designated purpose.[124] It would also protect the separation of governmental powers by respecting the Legislature's policy choices on how to provide and fund a free, public education, as well as its express desire that charter schools have the same governmental immunity from suit and liability as public schools.[125]

**B**

ERCOT "do[es] not fall neatly into any camp".[126] It is a unique entity serving a role that is not clearly analogous to a public entity like a police department or a public school. Yet, it provides an essential governmental service. While the Legislature has not expressly stated a desire that ERCOT be immune from suit, as it did in *Amex Properties*, the "the governing statutory authority"—PURA—nevertheless "demonstrates legislative intent to grant [ERCOT] the 'nature, purposes, and powers' of an 'arm of the State government' ".[127] ERCOT operates under the direct control and oversight of the PUC, it performs the governmental function of utilities regulation, and it possesses the power to adopt and enforce rules pursuant to that role. In addition, recognizing immunity satisfies the "political, pecuniary, and pragmatic policies" underlying immunity because it prevents the disruption of key governmental services, protects public funds, and respects separation of powers principles.[128] Thus, ERCOT is immune from suit.

ERCOT's governmental nature is demonstrated most prominently by the level of control and authority the state exercises over it and its accountability to the state. In this regard, it is much like a state agency, and it stands in stark contrast to the private university in *Redus II*. The PUC certified ERCOT as the ISO, and, as set forth in Section 39.151 of the Utilities Code, it has "complete authority" over ERCOT's operations.[129] In other words, the state has complete authority over everything ERCOT does to perform its statutory functions. The statute also grants the PUC authority over ERCOT's governance. ERCOT's bylaws and protocols are subject to PUC approval, and they "must reflect the input of the [PUC]."[130] While ERCOT has a board of directors, the state controls **\*624** that too. Specifically, under Section 39.151, ERCOT's "governing body must be composed of [eight] persons selected by the ERCOT

board selection committee."[131] In turn, the board selection committee comprises members appointed by the three highest ranking officials in state government: the Governor, the Lieutenant Governor, and the Speaker of the House of Representatives.[132] In addition to the members selected by the committee, the board also includes two state officials, the Chairman of the PUC and the Counsellor of the Public Utility Counsel.[133] The final member of the board is ERCOT's CEO, whose selection is subject to PUC review and approval.[134]

Section 39.151 also grants the PUC "complete authority" over ERCOT's finances and budget.[135] ERCOT must submit its proposed annual budget to the PUC, which can "approve, disapprove, or modify any item" in it.[136] ERCOT is authorized to charge a system administration fee, but only after the PUC approves its budget and sets the fee range.[137] ERCOT must provide the PUC with reports that compare its actual expenditures with its budgeted expenditures, and the PUC is authorized to audit ERCOT's finances.[138]

In addition to the control the PUC exercises over ERCOT, Section 39.151(d) holds that ERCOT is "directly responsible and accountable to the [PUC]".[139] In *Amex Properties*, the open-enrollment charter school was entitled to governmental immunity in part because it "must adhere to state law and the [Commissioner of Education]'s regulations ... or risk revocation of its charter."[140] Here, the PUC is empowered to "take appropriate action against" ERCOT if it fails to adequately perform or adhere to the requirements set forth in Section 39.151, "including decertifying the organization or assessing an administrative penalty against the organization."[141] And should the PUC decide to decertify ERCOT, the statute requires that ERCOT "transfer[ ] [its] assets to the successor organization to ensure continuity of operations in the region", demonstrating the state's control and ownership of ERCOT's property.[142]

Finally, ERCOT is subject to requirements typically reserved for state entities. For example, among other things, ERCOT is subject to review (but not abolishment) under the Texas Sunset Act, and it is required to open its board meetings to the public.[143] While these requirements are not dispositive—the economic development corporation in *Rosenberg* was also subject to open meetings[144]—when coupled with **\*625** the state's control, they further support ERCOT's governmental nature.

The dissent argues that these statutory provisions are insufficient to show that ERCOT has been vested with the nature of an arm of the government.[145] Specifically, it argues that ERCOT would not be immune for discretionary and independent actions, and that a factual showing of actual control by the PUC of the complained-of conduct is necessary to determine whether ERCOT's actions were attributable to the government such that it shares in the state's immunity.[146] The dissent would wait to resolve the immunity question until after the PUC exercised its exclusive jurisdiction.[147] To come to this conclusion, the dissent relies heavily on cases involving derivative immunity for government contractors.[148] However, this reliance is misplaced. ERCOT is not a government contractor; it is an "[e]ssential [o]rganization[ ]" certified by the PUC pursuant to statute, and its argument for immunity is as an arm of the state, not derivative of the state.[149] In *Redus II*, we noted that a derivative immunity case, *Brown & Gay Engineering, Inc. v. Olivares*,[150] was "instructive" in holding that no control by or accountability to the state precludes arm-of-the-state immunity, but we have never held that a complete lack of discretion is required for immunity in an arm-of-the-state analysis for a legislatively authorized entity.[151] "Sovereign immunity is entity-based."[152] Our immunity inquiry looks to legislative intent, and Section 39.151's numerous provisions outlining the PUC's ultimate authority over ERCOT's operations, budget, governance, and property demonstrate the intent to vest ERCOT with the nature of an arm of the state independently of the PUC's actions on a given day.[153]

Moreover, the PUC had significant control and authority over the very conduct at issue in these cases. In CPS' case, the PUC issued the directive to ERCOT to increase pricing to $9,000 per megawatt-hour that resulted in CPS' alleged overcharge. The short-pay procedure and default-uplift process of which CPS complains are set forth in the ERCOT Protocols, and the Protocols are subject to PUC approval.[154] Finally, ERCOT's ability to conduct transaction settlements is through delegated authority from the PUC.[155] As to Panda, ERCOT is required by the PUC to publish CDRs, and those CDRs allegedly caused Panda's injury.[156] Panda conceded at oral argument that the PUC could have controlled the CDR data output had it wanted to.

Appx. Page 122 of 740

PURA also evinces a legislative intent to vest ERCOT with the "purposes" and **\*626** "powers" of an "arm of the State government."[157] PURA requires the PUC to certify an "[e]ssential [o]rganization[ ]" to operate a competitive electric market and to ensure "the reliability and adequacy" of the grid.[158] In this role, ERCOT regulates the electric utility market. It is statutorily authorized to establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants.[159] And market participants are statutorily obligated to abide by these rules.[160] This regulatory role over utilities is uniquely governmental.[161]

The fact that ERCOT is organized as a membership-based nonprofit corporation does not make it any less an arm of the state.[162] An entity's organizational form is not dispositive.[163] While corporations do not typically enjoy sovereign immunity, ERCOT is not a typical corporation. Apart from limited liability, one of the hallmarks of a corporation is management by a board of directors in accordance with corporate bylaws.[164] But here, the state has authority over both ERCOT's board and its bylaws.[165] Under Texas law, corporations have the power to, *inter alia*, own property, dispose of property, spend money, incur liabilities, and conduct their business.[166] However, ERCOT may not exercise any of those corporate powers independently of the state. ERCOT's assets are owned by the state.[167] ERCOT may not raise money, spend money, or obtain debt financing without PUC input and approval.[168] The "business" ERCOT conducts is governmental and for the public benefit, and it is set forth by statute and subject to PUC authority and oversight.[169] In short, the fact that the state is utilizing the corporate form to achieve its objectives for the Texas power region does not change governmental nature of ERCOT's actions.[170]

**\*627** In sum, "the governing statutory authority demonstrates legislative intent to grant [ERCOT] the 'nature, purposes, and powers' of an 'arm of the State government' ".[171]

**C**

Recognizing ERCOT's immunity also satisfies the "political, pecuniary, and pragmatic policies underlying our immunity doctrines."[172] "Governmental immunity benefits the public by preventing disruptions of key governmental services," and there are few things more fundamental to the state's ability to function than its electricity grid.[173]

The protection of public funds and assets justifies recognizing ERCOT's immunity. Even though ERCOT is not funded with tax dollars, any damages payments would nevertheless come from the state and the public. ERCOT is primarily funded by a system administration fee charged to wholesale buyers and sellers of electricity.[174] The fee is required to closely match the revenue necessary for its budget without exceeding it to avoid a surplus of funds.[175] In other words, ERCOT charges only what is necessary for it to function. Were a judgment rendered against it, ERCOT would be forced to raise the system administration fee to pay the judgment—assuming the PUC would authorize that[176]—resulting in higher costs for electricity for consumers.

Moreover, the Legislature appears to consider ERCOT's money and assets to be state assets. The system administration fee is statutorily authorized, subject to PUC approval, and collected pursuant to state power.[177] As mentioned, the PUC has authority over ERCOT's finances, including its ability to raise money and how it spends its money.[178] And were ERCOT to be decertified as the ISO, Section 39.151(d) requires that ERCOT "transfer[ ] [its] assets to the successor organization".[179] The state's ability to divest ERCOT of those assets and direct their transfer demonstrates the state's ownership over them. Thus, were the assets subject to judicial seizure, the judgment creditor would be the state —not ERCOT.

Finally, recognizing ERCOT's immunity respects separation of powers principles. The judicial imposition of a damages award against ERCOT would run afoul of the Legislature's determination that the PUC alone has "complete authority" over ERCOT's finances.[180] This directive necessarily prevents the courts from enforcing a monetary judgment against it.

Contrary to the dissent's claim, this does not leave ERCOT unaccountable.[181] It simply holds that the courts are not the proper avenue for redress. ERCOT is accountable to the state. Its shortfalls are being addressed by the Legislature, which

Appx. Page 123 of 740

is accountable to the people through the political process.[182] For example, in direct response **\*628** to the default of certain ERCOT market participants following Uri, the Legislature passed a bill authorizing the use of $800 million of the Rainy Day Fund for ERCOT to finance part of the default.[183] This helps ensure that short-paid market participants like CPS are repaid faster.[184] After the storm, the Legislature overhauled ERCOT's board of directors, making it more independent from electric-market stakeholders and further increasing governmental oversight.[185] It also passed an omnibus bill that required, among other things, weatherization of generation companies' and electric utilities' assets and gave ERCOT authority to inspect for compliance.[186] And it moved up ERCOT's Sunset date by two years, which ensured a comprehensive review of the organization in the near-term.[187]

We hold that ERCOT is entitled to sovereign immunity because PURA "evinces clear legislative intent"[188] to vest it with the " 'nature, purposes, and powers' of an 'arm of the State government' "[189] and because doing so satisfies the "political, pecuniary, and pragmatic policies underlying our immunity doctrines."[190] There is no evidence that ERCOT performs any functions outside its role as the ISO, but we note that ERCOT would not be immune outside that role. We also note that immunity would not bar CPS' constitutional claims.[191] Because we conclude that ERCOT enjoys sovereign immunity as an arm of the state, we need not and do not address ERCOT's argument that it is entitled to derivative immunity.

\* \* \* \* \*

In No. 22-0056, *CPS Energy v. Electric Reliability Council of Texas*, we affirm the court of appeals' judgment. CPS' motion to stay the court of appeals' dissolution of the trial court's temporary restraining order is dismissed as moot. In No. 22-0196, *Electric Reliability Council of Texas, Inc. v. Panda Power Generation Infrastructure Fund, LLC*, we reverse the court of appeals' judgment and dismiss the case for lack of jurisdiction.

Justice Boyd and Justice Devine filed a dissenting opinion, in which Justice Lehrmann and Justice Busby joined.

Justice Boyd and Justice Devine, joined by Justice Lehrmann and Justice Busby, dissenting.

**\*629** At the heart of sovereign immunity—the doctrine that the Sovereign cannot be sued without its consent—lies a contest between core values of constitutionalism.[1] On the one hand, constitutionalism entails a commitment to the rule of law: "the fundamental principle that government is subordinate to the law"[2] and the "very essence of civil liberty" that every individual has the right "to claim the protection of the laws, whenever he receives an injury."[3] "[I]f the laws furnish no remedy for the violation of a vested legal right," our government will "cease to deserve this high appellation" of "a government of laws, and not of men."[4]

On the other hand, sovereign immunity is essential as "a structural protection for democratic rule," preserving the separation of governmental powers and protecting legislative and executive policy-making—for example, the allocation of the public coffers—from judicial interference and control.[5] Although "protecting the purse comes at the expense of ensuring accountability under the law for the government's breaches,"[6] the political process often serves as a substitute for private lawsuits to deter arbitrary and imprudent governmental action. But immunizing the Sovereign creates considerable tension with the "very essence of civil liberty": it burdens injured individuals with the costs and consequences of the government's improvident actions and "foreclose[s]—absent a legislative waiver—the litigation and judicial remedies that would be available to the injured person had the complained-of acts been committed by private persons."[7]

In the face of this conflict of values, the touchstone for applying sovereign immunity must be the public's trust that the rules of the game are established for their benefit and by the proper institutions.[8] While **\*630** sovereign immunity was once theoretically justified by the feudal fiction that the "king can do no wrong,"[9] "in our system of government, the people"—not a king—"are the sovereign,"[10] and immunity must be for the benefit of *that* sovereign.[11] In applying the doctrine for the people's benefit, history and tradition serve as lodestars for ensuring trust.[12]

Although public trust may be challenging to earn, and even harder to sustain, the judiciary and the Legislature both play a

**Appx. Page 124 of 740**

vital role. "To facilitate equipoise in the doctrine's operation," the judiciary first determines its applicability, pruning and shaping its boundaries and contours.[13] And the Legislature, composed of the people's duly elected representatives, maintains the prerogative to waive any existing immunity.[14]

But the public's trust is undermined when the judiciary extends sovereign immunity, contrary to history and tradition, to what is undeniably not sovereign: purely private entities. Recently, the battle over the doctrine's conflicting values has protruded into a debate on whether private entities should be garbed with the Sovereign's immunity when they act as government contractors or legislatively authorized entities. For private entities acting as government contractors, this Court has contemplated but declined to apply derivative sovereign immunity in a conduct-specific inquiry based on the government's degree of control and the contractor's lack of discretion.[15] For entities the Legislature has specifically authorized to exist or act by statute, the Court has extended sovereign immunity if (1) the authorizing statute "evinces 'clear legislative intent' to vest the entity with the 'nature, purposes, and powers' of an 'arm of the State government' "[16] and (2) extending immunity "fits within the doctrine's underlying nature and purposes."[17] In both cases, the root justification **\*631** for possibly protecting private entities with the Sovereign's immunity is that, by statute or contract, they act as arms of the state: the government acted *through* the entity and the actions are *effectively attributed* to the government as "action taken by the government."[18]

Until today, however, this Court had never "extend[ed] sovereign immunity to a purely private entity—one neither created nor chartered by the government—even when that entity performs some governmental functions."[19] Broadly expanding the doctrine and primarily relying on the statutory oversight authority of the Public Utility Commission of Texas (the PUC), the Court declares that a purely private corporation, Electric Reliability Council of Texas, Inc. (ERCOT), may shield itself under the Sovereign's cloak of immunity as a legislatively authorized entity.[20] Yet unlike any other entity previously granted immunity by this Court, no statute designates ERCOT as a part of the government.[21]

For the reasons the Court explains, we join Parts I, II, and III of the Court's opinion and agree that ERCOT qualifies as a "governmental unit" under the Tort Claims Act (and thus can pursue an interlocutory appeal) and that the PUC has exclusive jurisdiction over the issues underlying the parties' claims against ERCOT. But because Texas law has not vested the private corporation ERCOT with the nature of an arm of the state, we respectfully disagree that sovereign immunity should broadly prohibit courts from exercising jurisdiction over claims against it. Specifically, we first address ERCOT's "nature" as an entity, then consider the "control" the State exerts over ERCOT, and finally evaluate whether extending sovereign immunity to ERCOT would promote the doctrine's nature and purposes. **\*632** We conclude that none of these factors supports the monumental alteration of the crucial concept of sovereign immunity the Court announces today.

Because the Court holds otherwise, the Legislature could, and in our opinion should, correct the Court's error. To circumscribe the Court's broad expansion of the doctrine, the Legislature could enact a rule of construction that it does not intend to grant private entities the "nature, purposes, and powers" of an arm of the state for the purposes of sovereign immunity unless it explicitly designates the entity as part of the government. The Legislature could also waive some or all of ERCOT's newfound immunity. In this way, the Legislature could begin restoring the public's trust following this Court's erroneous extension of *sovereign* immunity to a purely private corporation.

## I. ERCOT, Inc.

As mentioned, we have recognized that sovereign immunity may apply to an entity when a Texas statute "evinces 'clear legislative intent' to vest the entity with the 'nature, purposes, and powers' of an 'arm of the State government.' "[22] This standard requires us to begin by considering ERCOT's nature as an entity, not just the nature of its functions. That ERCOT performs governmental functions and serves a public purpose "says nothing about the nature of the entity itself."[23] We thus begin by considering ERCOT's history leading up to its current status as an entity, which indisputably establishes that ERCOT exists as a purely private entity created and operated by purely private industry participants and, although selected to perform important governmental functions, has never been designated, considered, or characterized as an arm of the state.

### A. ERCOT's History

**Appx. Page 125 of 740**

The "electrification of America" occurred rapidly.[24] Within a year after Thomas Edison invented the incandescent electric light bulb in 1878, major cities were using electricity to light streets and selected buildings.[25] Pouncing on the obvious economic opportunities, private firms scrambled to construct generators to serve individual buildings and properties. Seeing the bigger picture, Edison and his General Electric Company opened the first central power plant in 1882.[26] Within two months, the Pearl Street station in New York City boasted 203 customers, and then 513 the following year.[27] By 1889, Edison had built 500 small power plants to serve individual buildings and fifty-eight larger plants to serve several of America's larger cities.[28]

Initially, the scattered power plants and their electricity-distribution systems were "isolated, competitive, and unregulated."[29] **\*633** The private firms (along with a few cities and rural cooperatives) that constructed and operated the facilities enjoyed "vertically integrated monopolies," each generating, transmitting, and distributing electricity to its own eager consumers.[30] With very few interconnections between their grids, they each served (and charged) their own local customers and, in reality, rarely competed against one another.[31]

That situation began to change in 1892, when Edison's long-time personal assistant, Samuel Insull, left General Electric for the Chicago Edison Company and embarked on a storied career producing huge electric monopolies and, ultimately, the nation's electric grid.[32] By the early 1930s, eight companies controlled two-thirds of the nation's private power producers, and three of them controlled half.[33] Not surprisingly, complaints quickly arose that the nation's electricity system gave "tyrannical power and exclusive opportunity to a favored few."[34]

To promote the on-demand availability of electricity and the reliability of its delivery system at the lowest possible cost, the private, investor-owned utilities began interconnecting their individual grids and exchanging power between themselves.[35] Instead of constructing multiple expensive transmission lines to cover the same areas, they began sharing their lines and charging each other for the transmission service.[36] As the electricity they each produced separately combined in the transmission grids, areas suffering shortages could purchase extra amounts and pass the costs along to their customers.[37] Eventually, three main electricity grids developed within the U.S. mainland: "the Eastern Interconnection, the Western Interconnection, and the Texas Interconnection."[38]

The federal government and most states bought in to Insull's idea that the privately owned electric utilities were "natural monopolies."[39] Instead of fighting against the monopolies, the governments legitimized them in exchange for the right to heavily regulate their rates and services.[40] After the United States Supreme Court held in 1927 that the Constitution's commerce clause prohibits the states from regulating most *inter*state electricity transactions,[41] **\*634** Congress passed the Federal Power Act of 1935, authorizing the Federal Power Commission to regulate interstate electricity transmissions and wholesale sales and prohibiting unreasonable rates and undue discrimination.[42] Congress left it to the states, however, to regulate *intra*state transactions and retail sales made directly to consumers.[43]

The uniquely intrastate Texas power grid began its development in 1924 when two privately owned Texas utilities interconnected and later joined with others to create the North Texas Interconnected System.[44] In the 1940s, other Texas utilities joined to create the South Texas Interconnected System to support the nation's World War II efforts.[45] In the 1960s, the North Texas System and the South Texas System joined with other Texas utilities to create the Texas Interconnected System (TIS).[46] The members of TIS adopted their own rules and guidelines to govern their interconnected system and their purchases of power from one another.[47]

Seeking to increase the national grid's reliability, hundreds of the industry's participants joined together in 1968 to create the North American Electric Reliability Corporation (NERC) —a "not-for-profit international regulatory authority"— to operate as the national grid's "electric reliability organization."[48] Operating as a private, independent, membership-based association, NERC adopted voluntary rules and reliability standards to govern the "bulk power system"—the "entire connection of power plants and transmission lines for the United States, Canada, and Baja California in Mexico that make up the continental system of electricity generation and transmission."[49] NERC's primary purpose was to ensure "that the bulk power system has enough resources to provide electricity to customers at all times, and

**Appx. Page 126 of 740**

that electricity will be continuously delivered despite sudden or unexpected shocks to the system."[50]

Two years later, in 1970, TIS—joined by municipal utilities and rural electric cooperatives operating only within Texas—formed ERCOT to comply with NERC's **\*635** new voluntary reliability requirements.[51] Established as a "voluntary membership organization" serving as a "regional electric reliability council" under NERC's oversight, ERCOT's primary role was to coordinate electricity transfers among its members and to ensure reliability by maintaining the best possible balance between supply and demand on the Texas grid.[52]

In 1975, the Texas Legislature made its first major effort to regulate the intrastate and retail electric industry by enacting the first version of the Public Utility Regulatory Act (PURA75).[53] Like the 1935 Federal Power Act, PURA75 adopted the regulated-monopoly approach, declaring that electric utilities are "by definition monopolies in the areas they serve" and establishing a "comprehensive and adequate regulatory system" to ensure "just and reasonable" rates, operations, and services as a substitute for "the normal forces of competition."[54] It also created the PUC and empowered it to regulate and supervise the intrastate electricity industry.[55] PURA75 did not alter the nature or functions of ERCOT, however, which continued serving as its members' private coordinating organization for their Texas power grid.[56]

In the late 1970s, an international energy crisis, fears about nuclear power, and environmental concerns led Congress to pass the Public Utility Regulatory Policy Act.[57] This Act sought to promote increased electricity generation by directing the Federal Energy Regulatory Commission (FERC) —a federal agency created to replace the Federal Power Commission—to pass rules requiring private electric utilities to purchase power at a fair price from "qualifying facilities" that generated electricity using renewable, efficient sources.[58] The addition of these nonutility generators increased both competition in electricity generation and the demand for affordable access to the grids' transmission lines.[59]

By the late 1980s, however, policy views had shifted away from the regulated-monopolies approach in favor of electricity competition.[60] In 1992, Congress passed the Energy Policy Act, which amended the 1935 Federal Power Act to authorize FERC to combat "undue" rate discrimination by ordering utilities that owned transmission lines to make their lines available to their competitors.[61] In 1996, FERC exercised that authority by ordering all utilities that owned interstate transmission lines to "functional[ly] unbundl[e]" their **\*636** operations by separating their electricity-sales business from their transmission services and grant all wholesale buyers and sellers equal access to the transmission lines.[62] FERC's orders also encouraged the industry to establish "independent systems operators" (ISOs) to coordinate the companies' shared use of the transmission lines and the sale of power using those systems.[63] These orders "laid the groundwork for competition in wholesale electricity sales."[64]

Texas soon joined these national deregulation efforts. In 1995, the Legislature amended PURA to deregulate the wholesale electricity market.[65] These amendments required utilities that owned transmission lines to make their lines available to wholesale transmission customers.[66] ERCOT, as the industry-created, private, nonprofit corporation, continued to serve as the industry's coordinator of its privately owned transmission grid.

In 1999, the Legislature "overhauled" PURA "to create a 'fully competitive electric power industry' in Texas."[67] The thoroughly amended PURA now required all Texas electric utilities operating within the Texas power region to unbundle their services "into three distinct units: (1) a power-generation company; (2) a retail electric provider; and (3) a transmission and distribution utility," no later than January 1, 2002.[68] Under this new structure, the PUC continues to regulate rates charged by transmission and distribution utilities, but instead of regulating retail electricity rates, PURA created "a competitive retail electric market that allows each retail consumer to choose the customer's provider of electricity."[69]

To encourage the creation of generation and retail companies and vigorous competition between them, PURA now also required the PUC to ensure that all participants in the retail market would have equal access to the Texas power region's grid. The retail providers pay the transmission companies for the right to use the grid and then pass those costs along to their customers by incorporating them into their retail rates.[70]

The 1999 statutory amendments did not, however, create ERCOT, which had already existed as the industry-created, privately owned coordinating organization since 1970. Nor

Appx. Page 127 of 740

did the statute designate ERCOT as the ISO or give ERCOT any particular functions, duties, or powers. Instead, PURA requires industry participants **\*637** in each "power region" to "establish one or more independent organizations" to serve as the region's coordinating organization and empowers the PUC to "certify" the selected organizations to perform that function.[71] In 2001, the PUC certified ERCOT—which the industry had created in 1970 and formally established as a Texas nonprofit corporation in 1990—as the Texas power grid's ISO.[72] As a certified ISO, ERCOT's duties include managing the wholesale power market and ensuring the industry maintains generation capacity to meet projected demands.[73]

### B. ERCOT's Nature, Purposes, and Powers

With ERCOT's history and current status in mind, we now turn to whether PURA evinces clear legislative intent to vest ERCOT with the nature, purposes, and powers of an arm of the state government. ERCOT essentially concedes that the legislative scheme did not vest it with the nature of an arm of the state before the 1999 PURA amendments, but it insists that ERCOT's subsequent certification as the Texas power region's ISO fundamentally altered ERCOT's nature, purposes, and powers and transformed it into an arm of the state. We disagree.

As we have explained, ERCOT, an industry-created, private entity acting as the industry-designated, PUC-certified ISO for the Texas power region, is statutorily empowered to perform uniquely governmental functions as part of the state's electricity-regulation system: overseeing the region's transmission facilities, coordinating its participants' market transactions, transmissions planning, and network reliability, and—most significantly—exercising rule-making authority to govern the participants' operations.[74] Although ERCOT enjoyed many of these powers and performed many of these functions before 1999, its *functions* took on a different—and necessarily governmental—character when it began taking these actions as the certified ISO as part of the state's management of the competitive electricity market. Its *nature* as an entity, however, did not change.

Because ERCOT exercises statutorily authorized powers to perform governmental functions as part of the state's larger electricity-regulation program, we agree with the Court that it qualifies as a "governmental unit" under the Texas Tort

Claims Act.[75] But whether it also qualifies as an "arm of the state" that sovereign immunity protects presents a "separate question[ ]" and a "separate analytical framework[ ]."[76] To answer the sovereign-immunity question, we must focus on ERCOT's nature as an entity and not just the nature of its functions. That it performs **\*638** governmental functions and serves a public purpose "says nothing about the nature of the entity itself."[77]

As an entity, ERCOT began as a membership-based association of electric-industry participants, which later incorporated it as a private, nonprofit corporation. Its members consist mostly of private entities that participate in the deregulated electricity market, including electricity generators, marketers, utilities, retailers, and consumers.[78] The state did not create ERCOT or authorize its creation, and it has remained a private entity even after PURA's 1999 amendments. Its employees are not government employees and do not receive government retirement or other benefits.[79] It is funded not by tax dollars or legislative appropriations but by fees paid by its members and a system administration fee paid by wholesale electricity buyers.[80] It is governed by articles of incorporation and bylaws adopted by its members.[81] It is directly managed not by the PUC or another state agency but by its own board of directors.[82]

But as the Court notes, due to ERCOT's selection and certification as an ISO, PURA indirectly restricts and regulates ERCOT in numerous ways and indirectly grants it various functions and powers that are inherently governmental.[83] As we discuss further below, PURA's indirect grant and regulation of ERCOT's functions and powers are insufficient to alter its nature as a private entity. But our consideration of those functions and powers must begin with the recognition that all PURA's effects on ERCOT are *indirect*. Through all its provisions that empower, impede, or otherwise impact ERCOT, PURA never directly addresses ERCOT. Instead, it empowers, impedes, and impacts whatever ISO or other independent organization the "ERCOT" power region[84] has selected and the PUC has certified. PURA does not address, and therefore certainly does not alter, the private, nongovernmental nature of whatever entity is selected and certified as an ISO.

As an independent, privately owned, nonprofit corporation, ERCOT is subject to PURA's restrictions and requirements **\*639** only because it applied for and was granted the PUC's

Appx. Page 128 of 740

certification as the power region's ISO. The restrictions apply to ERCOT not because of its nature as an entity but because of its position as the PUC-certified ISO. The Legislature could have assigned an existing governmental entity or created a new one to serve as the ISO, or it could have amended PURA to directly address and regulate ERCOT itself in ways that could indicate an intent to transform it into a governmental entity that is, by nature, an arm of the state. But instead, the Legislature has authorized the PUC to select a private entity to fulfill the ISO's functions.[85] That choice was consistent with the 1999 PURA amendments, which deregulated the retail electricity market so that it would be subject to "normal forces of competition" and "customer choices," rather than state regulation.[86] Instead of governmentalizing the ISO, PURA authorizes the PUC to select a *private entity* to fill that role.

The PUC, in turn, chose to certify ERCOT as the ISO, but it has not understood the ISO, or ERCOT in particular, to be a governmental entity or otherwise protected by sovereign immunity. The PUC has adopted rules that purport to grant ERCOT protection against liability for certain specified actions.[87] Because sovereign immunity protects the government against both suit and liability, these rules would be unnecessary if ERCOT enjoys sovereign immunity. To the contrary, the PUC has expressly recognized that ERCOT may be subject to "civil relief that may be available under federal or state law."[88]

PURA never identifies the ISO as a governmental entity or expresses any intent that it be protected by sovereign immunity. It subjects the ISO to substantial regulation, but "heavily regulating an entity does not equate to conferring governmental-entity status."[89] Nor does it change the entity's "nature." In light of ERCOT's original and persistent nature as an industry-created, privately owned, nonprofit corporation, and in the absence of anything in PURA that purports to alter that nature, we conclude that PURA did not vest ERCOT with the nature, purposes, and powers of an arm of the state.

## II. State Control

Even if we were to ignore the fact that PURA never attempts to directly empower, impede, or impact ERCOT and instead assumed that all PURA's provisions addressing a PUC-certified ISO directly address ERCOT itself, we would still conclude that those provisions do not transform ERCOT's nature into that of an arm of the state. By indirectly granting

the PUC "complete authority to oversee and investigate" ERCOT's operations, finances, and budget "as necessary" to ensure accountability and adequate performance,[90] PURA provides the PUC with broad oversight authority over ERCOT (as the ISO). But for the PUC to act through ERCOT such that its actions are **\*640** effectively attributed to the government,[91] the PUC first must exercise its oversight authority to control ERCOT's actions, and, under PURA, the exercise of that authority must be "necessary."

As described below, our cases instruct that if a private entity has not been designated as part of the government and the government does not control the entity's conduct, the complained-of actions are considered the entity's independent and discretionary actions and it did not act as an arm of the state. Fundamentally, authority to oversee is not actual control. If the Court's inquiry rests on control, the proper question should be whether the PUC *exercised* its oversight authority to "sufficient[ly] control" ERCOT's complained-of actions such that they were "effectively attributable" to the government and were not ERCOT's discretionary actions.[92] As the PUC has exclusive jurisdiction over the issues underlying the parties' causes of action, we would, to "ensure[ ] an orderly procedure," at least wait for the PUC to "apply its expertise," "develop a complete factual record,"[93] and make relevant factual findings about any exercise of its oversight authority before determining whether or what type of immunity should be extended to ERCOT based on any government control.[94]

The Court instead concludes that PURA evinces clear legislative intent to vest ERCOT with the nature of an arm of the state because "ERCOT operates under the direct control and oversight of the PUC."[95] The Court relies largely on PURA provisions indirectly (1) granting the PUC "complete authority" over ERCOT's operations, finances, and budget, (2) making ERCOT "directly responsible and accountable to" the PUC, and (3) allowing the State to exercise some control or influence over ERCOT through various means, including by appointing members to the ERCOT board selection committee.[96] The Court, however, overreads both our case law and PURA and glosses over whether the complained-of conduct was not ERCOT's " 'independent action,' but rather 'action taken by the government.' "[97]

Appx. Page 129 of 740

## A. Relevant Case Law

The common-law doctrine of sovereign immunity rests on a historical tradition that precedes the constitutional founding of this State and even of the Union.[98] But **\*641** there is no history or tradition of extending common-law sovereign immunity to private corporations. As noted recently by Judge Oldham on the United States Court of Appeals for the Fifth Circuit, "[i]t's evident that at common law, both in England and the early American Republic, incorporated entities were not entitled to sovereign immunity," "regardless of whether they exercised governmental functions."[99] After extensive historical analysis,[100] Judge Oldham distilled the following rule: "If an entity has a separate legal status from the State (*e.g.*, as a corporation, LLC, or § 501(c)(3) nonprofit organization) ... the entity is not 'the State' and hence is not entitled to sovereign immunity."[101] But Judge Oldham noted that this rule would concern "what enjoys the State's sovereign immunity in *federal* court," and "States are obviously free to cloak non-State entities with all manner of governmental immunities in *state* court," citing as an example Section 12.1056(a) of the Texas Education Code.[102]

Texas's common-law history has followed a similar trajectory of considering private entities with a separate legal status from the State as not being an arm of the government. Indeed, we have departed from this rule as to private entities only once before today—in 2020.[103] But there, we relied on the same statute Judge Oldham referenced in his opinion, which directed that certain private entities have immunity to the same extent as public entities, and on a statutory designation that those entities were part of the state government.[104]

In that case, *El Paso Education Initiative, Inc. v. Amex Properties, LLC*, this Court extended governmental immunity[105] for the first time to a private entity—open-enrollment charter schools.[106] Although these schools are typically "private, nonprofit organization[s]," the Legislature expressly designated open-enrollment charter schools as "part of the public school system of this state" and directed that "[i]n matters related to operation of an open-enrollment charter school, an open-enrollment charter school or charter holder is immune from liability and suit to the same extent as a school district."[107] Because these charter schools "expressly operate as part of the State's public education system," are "accountable to State government through oversight of their charters and the receipt of substantial public funding," and "exercise the same powers and perform government tasks in **\*642** the same manner as traditional public schools," the Court concluded that they "act as an arm of the State government."[108]

On the same day as *Amex Properties*, the Court issued *University of the Incarnate Word v. Redus*.[109] There, the Court considered whether a private university, neither created nor chartered by the State, was entitled to sovereign immunity for actions taken by its legislatively authorized campus police department.[110] Specifically contrasting the Legislature's "limited authorization to private universities to commission peace officers" with its express "incorporation of open-enrollment charter schools into the State's public-education system," the Court noted that "no similar declaration exists" designating a private university as part of the government or directing that private universities have immunity from suit.[111] The Legislature did not "categorically transform[ ]" the private university's status to "government-entity status."[112]

In conducting its analysis, the *Redus* Court found "instructive" the "control" requirement contemplated in the government-contractor case *Brown & Gay Engineering, Inc. v. Olivares*.[113] The Court explained that "the extent to which the government *exercises* control ... is relevant" and "sovereign immunity *potentially* extends to the University if the complained-of conduct was not the University's 'independent action,' but rather 'action taken by the government.' "[114] Because the university's administration and governing board "are alone responsible for its police department's day-to-day operations and decision making" and not accountable to the taxpayers or public officials, the necessary control for the private university to be an arm of the state was absent.[115] Although the Court contemplated the entity's accountability to the government as a component of control, it did not hold that accountability would have been sufficient on its own to conclude that a private entity had the nature of an arm of the state; it held only that the absence of accountability demanded the conclusion that the government did not sufficiently control the entity for it to be considered an arm of the state.[116]

A month after *Redus*, the Court expounded on the *Brown & Gay* "control" requirement in the government-contractor case *Nettles v. GTECH Corp.*[117] At issue in *Nettles* was whether a government contractor for the Texas Lottery Commission

Appx. Page 130 of 740

had derivative immunity.[118] Because the Court concluded the control-based standard was not satisfied, it expressly declined **\*643** to recognize derivative sovereign immunity for contractors, just as it had declined to recognize such immunity in *Brown & Gay*.[119] But the Court clarified the standard as, put simply, asking "(1) did the government tell the contractor what to do and how to do it (as opposed to the contractor having 'some discretion in performing the contract'); and, if so, (2) did the contractor do as it was told?"[120]

As the Court explained in *Nettles*, applying this control-based standard requires looking "first to the 'complained-of conduct' in the pleadings" and then to any evidence " 'necessary to resolve the jurisdictional issues raised.' "[121] Ultimately, this control-based standard asks whether the government "had sufficient control over" the entity's actions such that they were "effectively attributable" to the government and were not the entity's "independent actions" or whether the entity "had some discretion."[122] Under the governing statute and the contract with the Texas Lottery Commission's contractor, "[f]inal decisions regarding the direction or control of the Lottery are always the prerogative of the [Commission] in its sole discretion,"[123] and the Commission has "broad authority and shall exercise strict control and close supervision over all lottery games."[124] But the Court held that "close supervision and final approval of work over which a contractor has discretion" do not make actions effectively attributable to the government.[125]

From these cases, we can derive a few controlling principles regarding the nature of an arm of the state. Private, incorporated entities have a distinct legal status separate from the State and, as a general proposition, are not an arm of the state. But when the Legislature expressly designates a private entity as part of the government and makes the entity accountable through government oversight —thereby "categorically transforming" the entity's status to "government-entity status"[126]—the government need not exercise actual control over the entity's actions for the entity to have the nature of an arm of the state.[127] If there is no express designation, however, sovereign immunity, at most, "potentially extends" to the private entity only if it is accountable to the government *and* the government "exercises control over the activities" such that the "complained-of conduct" is not " 'independent action,' but rather 'action taken by the government.' "[128] For a private

entity's action **\*644** to be "effectively attributable" to the government based on control, close supervision and final approval is insufficient when the entity has discretion to perform the work.[129]

## B. Oversight or Control

The Legislature has not designated ERCOT as part of the government but has indirectly directed that ERCOT (as a PUC-certified ISO) "is directly responsible and accountable to" the PUC.[130] Applying the above-mentioned case-law principles, our inquiry concerns the extent to which the government exercised control such that ERCOT's actions could be effectively attributed to the government.

The Court asserts that "ERCOT operates under the direct control and oversight of the PUC" and "the state has complete authority over everything ERCOT does to perform its statutory functions."[131] But this reads PURA too broadly. PURA grants the PUC "complete authority to *oversee and investigate* the organization's finances, budget, and operations *as necessary* to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties."[132] Only if ERCOT, as the PUC-certified ISO, "does not adequately perform the organization's functions or duties or does not comply with this section" is the PUC authorized to "take appropriate action ... including decertifying the organization or assessing an administrative penalty against the organization."[133] Insofar as ERCOT, through its discretionary and independent actions, "adequately perform[s]" its ISO functions and duties, the PUC's statutory authority to control ERCOT's operations appears to be limited.

The Court notes that ERCOT's bylaws and protocols require input from and approval by the PUC and that the PUC can "approve, disapprove, or modify any item" in ERCOT's proposed annual budget.[134] But bylaws, protocols, and budgets set broad constraints within which ERCOT can exercise its discretion, and this authority is akin to the "close supervision and final approval" that this Court has found insufficient to establish the necessary control.[135]

The Court points out that state officials, by appointing members of a board selection committee, have the power to indirectly appoint members of the board of directors for

**Appx. Page 131 of 740**

the PUC-certified ISO for the ERCOT power region.[136] But the power to appoint is the power to influence, not control.[137] Ultimately, no state official has **\*645** been put in charge of ERCOT, and a private board still runs the nonprofit corporation.[138] Two of the eleven-member board are state officials: the PUC Chairperson and the Public Counsel of the Office of the Public Utility Counsel.[139] Only the latter is a voting director—one of nine voting directors—and by statute, represents not the public at large but "residential and small commercial consumer interests."[140]

ERCOT is subject to some requirements typically reserved for state entities: it is "subject to review (but not abolishment) under the Sunset Act" and "required to open its board meetings to the public."[141] But ERCOT is also "not subject to state contracting standards, the Open Meetings Act, Administrative Procedure Act, or other requirements traditional state agencies must meet."[142] And "heavily regulating an entity does not equate to conferring governmental-entity status."[143]

Although the "PUC's oversight of ERCOT's finances, budget, and operations is essential," this oversight authority is necessary because ERCOT, as a private corporation, "is not subject to other traditional oversight mechanisms, such as the legislative appropriations process."[144] And without a determination that ERCOT is not adequately performing its functions and duties, the PUC's oversight authority is more like "close supervision" of ERCOT's discretionary and independent actions.[145]

If the PUC found that ERCOT did not adequately perform its duties as the PUC-certified ISO, the PUC would be statutorily authorized to "take appropriate action" and exercise its "complete authority."[146] But whether the PUC *exercised* its oversight authority to "sufficient[ly] control" ERCOT's complained-of actions such that they "were effectively attributable to" the PUC and were not "independent actions"[147] would depend on a factual and complaint-specific inquiry. Currently, the PUC mainly uses rulemaking proceedings and contested cases to guide and direct ERCOT's actions.[148] Although PURA "does not clearly identify how [the] PUC can give ERCOT direction outside of a contested case or rulemaking proceeding," the PUC "has broadly interpreted its statutory authority" to allow "informal mechanisms to guide ERCOT's actions, including **\*646**

verbal directives, memos, and orders."[149] But even if the PUC desired to exercise its oversight authority over ERCOT, it may lack the necessary resources and capabilities to do so.[150] In short, without an additional factual showing of actual control, the PUC's oversight authority does not "evince[ ] 'clear legislative intent' " to vest the private corporation ERCOT with the nature of an arm of the state.[151]

The Court claims ERCOT "is much like a state agency" based on the "level of control and authority the state exercises over it, and its accountability to the state."[152] But a state agency necessarily acts in the government's name as an express part of the government and does not perform proprietary functions.[153] There is two-way accountability: (1) state agencies are accountable to the State *and* (2) the government is directly accountable to the people for the state agency's actions.

The same is not true for ERCOT. ERCOT is a private corporation that has not been expressly designated as part of the government. The PUC may be accountable to the people for failing to exercise its **\*647** oversight authority, or state officials may be accountable for appointing the wrong people to the PUC or even to the ERCOT board selection committee. But this is not direct accountability for ERCOT's actions. The government can politically disclaim responsibility for the private corporation's actions when ERCOT acts at its discretion and not under the PUC's control. In other words, ERCOT's actions are not "effectively attributable" to the government unless the PUC exercised sufficient control over ERCOT's actions; otherwise, ERCOT, as a private entity, "had some discretion" to conduct "independent actions."[154]

Indeed, legislatively authorizing private entities to perform public purposes without designating them as part of the government may provide the government with the political benefit of not having express accountability for those entities' actions.[155] The government could avoid blame or responsibility for any negative repercussions by disavowing the private entity's improvident actions, which could encourage a hands-off approach with minimal oversight before any public outcry.[156] And if a private entity were granted broad sovereign immunity regardless of the government's actual control, the entity would have little incentive to seek direction or guidance from the overseeing governmental agency. But if immunity instead depended on the government's actual control, a private entity would be

**Appx. Page 132 of 740**

motivated to collaborate with and seek direction from the overseeing governmental agency to cloak its actions with the Sovereign's immunity.

Since the 2020 *Amex Properties* decision—the only previous decision from this Court to extend sovereign or governmental immunity to a private entity—the Legislature has known that this Court relies on statutory provisions expressly designating an entity as part of the government and directing that immunity applies to an entity.[157] Yet, the Legislature has not designated ERCOT as part of the government or directed that it should have immunity, notwithstanding the Lieutenant Governor's announcement of ERCOT reform as a top priority for the 2021 Legislative Session[158] and the Legislature's significant enactments reforming ERCOT (as the PUC-certified ISO).[159] If the Legislature had "categorically transform[ed]" ERCOT by designating the private corporation as part of the government—as it did for open-enrollment **\*648** charter schools—this case might be different.[160] But it did not.

The parties do not argue, and the record does not establish, that the PUC exercised sufficient control such that the complained-of ERCOT actions are "effectively attribute[able] to" the government.[161] As this Court has done in the government-contractor context,[162] we would not decide at this stage whether, under the standard for legislatively authorized entities, the government's exercise of some degree of actual control would extend the Sovereign's immunity to a private entity not expressly designated as part of the government.[163] Because the PUC has exclusive jurisdiction over the underlying issues in these cases, the PUC perhaps will develop the factual record and make fact findings about any control it exercised over ERCOT's complained-of conduct.[164] Should the parties pursue judicial relief after exhausting administrative remedies, this Court could consider any sovereign-immunity arguments based on control with the added benefit of a developed factual record. This approach would respect the Legislature's decisions to (1) not designate ERCOT as part of the government, (2) grant the PUC "complete authority" as specified in PURA over ERCOT's operations, and (3) establish a pervasive regulatory regime that provides the PUC with exclusive jurisdiction over issues that fall under the PUC's "complete authority."[165]

## III. Sovereign Immunity's Nature and Purposes

As mentioned, we have concluded that sovereign immunity might reach a legislatively authorized private entity if (1) the entity's authorizing statute "evinces 'clear legislative intent' to vest the entity with **\*649** the 'nature, purposes, and powers' of an 'arm of the State government' "[166] *and* (2) extending immunity "fits within the doctrine's underlying nature and purposes."[167] Even if we concluded that PURA has somehow altered ERCOT's nature as an entity, we would nevertheless conclude that extending sovereign immunity to ERCOT would not promote the doctrine's "political, pecuniary, and pragmatic" purposes.[168]

Politically, we continue to recognize sovereign immunity because it "preserves separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars."[169] By preserving the common-law doctrine of sovereign immunity, the courts maintain an "equilibrium among the branches of government" by allowing the Legislature to decide, as a policy matter, when to "allow tax resources to be shifted 'away from their intended purposes toward defending lawsuits and paying judgments.' "[170] In short, sovereign immunity prevents the courts from "intruding into" the policy-making branch's role of managing and appropriating the public's funds.[171]

By requiring a legislative decision to make tax dollars available to pay the costs of litigation and judgments, sovereign immunity serves the pecuniary purpose of ensuring "that the taxes the public pays are used 'for their intended purposes.' "[172] It "protects the public treasury by shielding the public 'from the costs and consequences of improvident actions of their governments,' "[173] particularly the "unforeseen" costs of "defending lawsuits and paying judgments."[174]

And pragmatically, sovereign immunity "serves to prevent governmental paralysis"[175] by protecting "the State and its political subdivisions from endless litigation," which "hamper[s] government functions."[176] It safeguards "the public as a whole" by protecting its governmental agencies from both the "distraction" of lawsuits and the risks that

litigants could control government action through the courts instead of through the political process.[177]

**\*650** Extending sovereign immunity to ERCOT would, at best, only minimally promote these purposes. ERCOT does not receive tax dollars or appropriated funds, so permitting judgments against it would not require the unforeseen diversion of tax dollars from their legislatively appropriated purpose or interfere with or usurp the Legislature's policy decisions on how to allocate tax revenues.[178] The Court concludes that although ERCOT's funds are not taxes, they are effectively public funds because PURA empowers the PUC to authorize and set the amounts of the regulatory fees ERCOT charges to buyers and sellers of wholesale electricity.[179] But even if regulatory fees charged *by state agencies* constitute public funds that are equivalent to tax dollars, ERCOT's funds are paid by private entities to a private entity and are never held by a governmental entity. Like any other private entity, ERCOT can procure insurance to protect its funds against liabilities.[180] Sovereign immunity exists to protect against "the payment of taxpayer dollars subject to legislative discretion," not the payment of private funds that may be authorized or regulated by statute.[181]

ERCOT urges that judgments in the cases against them would be financially devastating to ERCOT and could undermine PURA's regulatory scheme.[182] But despite this "too big to fail" argument, ERCOT is not as indispensable to the legislative scheme as ERCOT suggests. As explained, PURA does not designate ERCOT as the ISO; it merely requires the power region to designate an organization to serve as the ISO and authorizes the PUC to certify that organization.[183] In fact, PURA provides that the PUC might certify "one or more" ISOs for the Texas power region and recognizes that an ISO may be decertified and replaced by a "successor organization."[184] Under PURA, *an ISO* may be critical to the State's oversight of the electricity industry, but ERCOT is not. Like the private university at issue in *Redus*, any expense ERCOT "incurs will fall on" ERCOT, "not the government or its taxpayers."[185]

The interplay between the exclusive-jurisdiction and sovereign-immunity doctrines provides further reason not to extend immunity to ERCOT. Sovereign immunity is not necessary to preserve "separation-of-powers principles"[186] and maintain an "equilibrium among the **\*651** branches of government"[187]—the exclusive-jurisdiction doctrine serves

that function here. The PUC's exclusive jurisdiction respects the Legislature's decision to provide the executive branch, through the PUC, with "complete authority" over ERCOT.[188] It "honors the Legislature's intent that 'the appropriate body adjudicates the dispute' first, and thereby 'ensure[s] an orderly procedure to enforce those rights.' "[189] If litigation continues after the PUC has exercised its exclusive jurisdiction, any PUC fact findings would be given significant deference under the substantial-evidence rule.[190] And because the PUC applies its expertise in adjudicating issues first, litigation generally would not disrupt any key services without the PUC's first evaluating any complaint and determining ERCOT's continued fitness to serve as the ISO.[191] The PUC could determine whether decertification of ERCOT is appropriate and, if so, certify a successor ISO and transfer assets before any judicial litigation ensues.[192]

Although we acknowledge that extending sovereign immunity to ERCOT could offer some benefits for the State's efforts to ensure a reliable and economical electricity grid, we must also "remain ever mindful" of sovereign immunity's costs.[193] Sovereign immunity from suit "allows the 'improvident actions' of the government to go unredressed"[194] and thus "places the burden of shouldering" the "costs and consequences" of those actions "on injured individuals," rather than the entity that caused those consequences.[195] In short, "just as immunity is inherent to sovereignty, unfairness is inherent to immunity."[196] Under these circumstances, the cost of authorizing such "unfairness" to protect a purely private, nonsovereign entity outweighs any benefits. We thus conclude that extending sovereign immunity to ERCOT would not promote the doctrine's purposes.

**\*652 IV. The Public's Trust**

Finally, we must return to the concern over how the Court's decision will alter the public's trust in our State's justice system. The private corporation ERCOT, once unknown to the general public, has become a near-household name after more than 4.5 million people in Texas lost electric power during Winter Storm Uri.[197] For every three Texans, two lost power "for an average of 42 hours, during which they were without power on average for one single consecutive bloc of 31 hours, rather than for short rotating periods."[198]

Appx. Page 134 of 740

Not only did the storm expose needed improvements to the electric grid's reliability, but it also imposed a significant, tragic human toll:

> The Texas Department of State Health Services confirmed 246 deaths related to Winter Storm Uri, which included victims ranging from less than 1 year old to 102 years old. Hypothermia was the primary cause of the death for 161 people. The storm and power outages also exacerbated pre-existing illnesses, leading to the deaths of 25 people like the 83-year old Katy resident who lost power to the respirator he needed to live.... A grandmother and her three grandchildren likely numbered among the 10 Texans who died due to fires when attempts to warm their home ended in tragedy.[199]

Many lawsuits have already been filed against ERCOT based on damages resulting from the loss of electricity and the high wholesale prices ERCOT charged during Winter Storm Uri.[200]

The public expects and trusts that those injured can claim the protection of the laws and that those responsible—to the extent responsibility exists—will be held accountable: the government through the political process and at the ballot box[201] and private entities in court. But by granting sovereign immunity to a purely private entity that has not been designated as part of the government and without requiring a demonstration of the government's actual control over the complained-of conduct, the Court undermines this public trust.

The Legislature could, and in our opinion should, correct the Court's mistake. To specifically address the Court's holding as to ERCOT, the Legislature could waive ERCOT's newfound immunity in part or in full to give parties the right "to claim the protection of the laws, whenever he receives an injury."[202] More importantly, however, the Legislature could circumscribe this Court's broad and erroneous expansion of the sovereign-immunity doctrine to private entities. Although the judiciary defines sovereign immunity's **\*653** boundaries, "[b]ecause the legislature 'can modify or abrogate common law rules,' provided its intent is clear, we consider legislative intent in establishing the doctrine's common-law contours."[203] To clarify its intent, the Legislature could enact a law—a rule of construction for Texas courts to apply—that it does not intend to grant private entities (including private corporations like ERCOT) the "nature, purposes, and powers" of an arm of the state for the purposes of sovereign immunity unless it expressly designates the entity as part of the government.

Although such a rule of construction would generally establish the outer limits to the judicial extension of sovereign immunity, a governmental designation by the Legislature ultimately may or may not be sufficient to demonstrate the necessary indications for the judiciary to conclude that a private entity is entitled to sovereign immunity. But that is how it should be. The rule of construction would begin restoring the public's trust that private entities will not be extended sovereign immunity as legislatively authorized entities unless the people's duly elected representatives expressly designate the entity as part of the government and the judiciary determines that the entity is entitled to sovereign immunity.

This legislative rule of construction, however, should not be necessary to cabin the judicial expansion of sovereign immunity. Although "immunity is inherent to sovereignty, unfairness is inherent to immunity,"[204] especially when it is extended to what is not inherently sovereign: purely private entities. We therefore respectfully dissent from the Court's decision to extend sovereign immunity to the private corporation ERCOT.

**All Citations**

671 S.W.3d 605, 66 Tex. Sup. Ct. J. 1222

---

Footnotes

1    *CPS Energy v. Electric Reliability Council of Tex.*

2    648 S.W.3d 520 (Tex. App.—San Antonio 2021).

3    *Electric Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC.*

4    641 S.W.3d 893 (Tex. App.—Dallas 2022) (en banc).

Appx. Page 135 of 740

5    *Texas v. EPA*, 829 F.3d 405, 431 (5th Cir. 2016).

6    *See New York v. FERC*, 535 U.S. 1, 7, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) ("It is only in Hawaii and Alaska and on the 'Texas Interconnect'—which covers most of that State—that electricity is distributed entirely within a single State.").

7    *Oncor Elec. Delivery Co. v. Pub. Util. Comm'n*, 507 S.W.3d 706, 708 n.1 (Tex. 2017); *ERCOT Organization Backgrounder*, ERCOT, https://www.ercot.com/news/mediakit/backgrounder (last visited June 15, 2023); *Fact Sheet*, ERCOT (June 8, 2023), https://www.ercot.com/files/docs/2022/02/08/ERCOT_Fact_Sheet.pdf.

8    Tex. Util. Code § 39.151(a), (c). The Texas power region is also known as ERCOT. *See id.* § 31.002(5) (defining ERCOT as "the area in Texas served by electric utilities, municipally owned utilities, and electric cooperatives that is not synchronously interconnected with electric utilities outside the state"). To avoid confusion, we refer to the nonprofit corporation that is party to these cases as ERCOT and the area served by the interconnected grid as the Texas power region.

9    16 Tex. Admin. Code § 25.361; *ERCOT Organization Backgrounder, supra* note 7.

10   *See W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 808-809 (N.D. Tex. 1979); Jared M. Fleisher, *ERCOT's Jurisdictional Status: A Legal History and Contemporary Appraisal*, 3 Tex. J. Oil Gas & Energy L. 4, 10-11 (2008).

11   *W. Tex. Utils. Co.*, 470 F. Supp. at 808.

12   *Id.*; *see* Fleisher, *supra* note 10, at 11.

13   Act of May 27, 1999, 76th Leg., R.S., ch. 405 § 39, 1999 Tex. Gen. Laws 2543, 2558 (codified at Tex. Util. Code ch. 39).

14   Tex. Util. Code § 39.051; *see id.* § 39.001(a), (b); *Oncor Elec. Delivery Co.*, 507 S.W.3d at 708-709.

15   Tex. Util. Code § 39.151(a).

16   *Id.* § 39.151; 16 Tex. Admin. Code § 25.361. On May 28, 2023, the Legislature amended Section 39.151. The amendments are effective September 1, 2023, and they do not affect the proceeding analysis or our holding. *See* Act of May 28, 2023, 88th Leg., R.S., ch. 410, § 15, 2023 Tex. Sess. Law Serv. (H.B. 1500).

17   *See* ERCOT Nodal Protocols §§ 9.19(1)(d)-(e), 9.19.1.

18   *See id.* §§ 9.19(1)(d)-(e), 9.19.1.

19   CPS secured a temporary restraining order from the trial court that prevented ERCOT from applying these downward adjustments. The court of appeals dissolved its order extending the temporary restraining order when it dismissed CPS' claims. 648 S.W.3d at 541.

20   CPS also alleged that ERCOT's executives and board acted ultra vires and it sought prospective injunctive relief against downward adjustments for the storm-related default through the default-uplift process. CPS later nonsuited all individual defendants except Bill Magness, ERCOT's former CEO. The court of appeals determined that Magness was not a party to the plea to the jurisdiction that is the subject of this appeal. *Id.* at 532-533.

21   The trial court also denied ERCOT's motion to transfer venue to Travis County.

22   *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8).

23   661 S.W.3d 812 (Tex. App.—San Antonio 2021) (mem. op.).

24   *In re Elec. Reliability Council of Tex., Inc.*

25   648 S.W.3d at 531, 541.

Appx. Page 136 of 740

26      ERCOT's petition for writ of mandamus is dismissed as moot.

27      Tex. Util. Code § 39.155(b); 16 Tex. Admin. Code § 25.505(b).

28      Tex. Civ. Prac. & Rem. Code § 51.014(a)(8); *id.* § 101.001(3).

29      *Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 552 S.W.3d 297, 301 (Tex. App.—Dallas 2018), *pet. dism'd as moot*, 619 S.W.3d 628, 631 (Tex. 2021).

30      *Id.* Additional procedural history thereafter is available in this Court's prior opinion. *Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 632-634 (Tex. 2021).

31      641 S.W.3d at 899.

32      *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8); *id.* § 101.001(3).

33      *Univ. of the Incarnate Word v. Redus* (*Redus I*), 518 S.W.3d 905, 907 (Tex. 2017).

34      *Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 387 (Tex. 2020) (quoting *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001)).

35      *See id.* at 390 & n.3.

36      Tex. Civ. Prac. & Rem. Code § 51.014(a)(8); *see id.* § 101.001(3).

37      *Id.* § 101.001(3).

38      *Id.*; *Redus I*, 518 S.W.3d at 907.

39      342 S.W.3d 73, 76 (Tex. 2011).

40      *Id.* at 77.

41      *Id.* at 77-78.

42      *Id.* at 78 (quoting Tex. Educ. Code § 12.1053).

43      518 S.W.3d at 906.

44      *Id.* at 910.

45      *Id.* at 909; *see id.* at 910-911.

46      *Id.* at 909, 910, 911.

47      *Id.* at 910, 911.

48      Tex. Util. Code § 11.002(a).

49      *Id.* § 14.001; *see also id.* § 11.002(c).

50      *Id.* § 39.151(a).

51      *Id.*

52      *See id.* § 39.151(d).

53      342 S.W.3d at 80.

Appx. Page 137 of 740

54    Tex. Util. Code § 39.151(d).

55    *Id.* § 39.151(d), (d-4)(3); *see also id.* § 39.151(e).

56    *Id.* § 39.151(g-1).

57    *Id.* § 39.151(d), (d-4)(5).

58    *Redus I*, 518 S.W.3d at 911; *see Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.").

59    Tex. Util. Code § 39.151(d).

60    *Id.* § 39.151(i).

61    *Id.* § 39.151(j).

62    *Redus I*, 518 S.W.3d at 910, 911.

63    Tex. Civ. Prac. & Rem. Code § 101.001(3); *Redus I*, 518 S.W.3d at 907.

64    Tex. Util. Code § 39.151(a), (b).

65    *Id.* § 39.151(c).

66    *Id.* § 31.002(9); *see also id.* § 39.151.

67    Tex. Civ. Prac. & Rem. Code § 101.001(3); *id.* § 51.014(a)(8).

68    *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018) (citing *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004)); *see also* Tex. Const. art. V, § 8.

69    *Chaparral Energy*, 546 S.W.3d at 138 (citing *In re Sw. Bell Tel. Co.*, 235 S.W.3d 619, 624-625 (Tex. 2007)).

70    *Id.* (quoting *In re Sw. Bell Tel. Co.*, 235 S.W.3d at 624-625).

71    *Id.* at 139; *see id.* at 138.

72    *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 428 (Tex. 2017).

73    *Id.* (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002)).

74    Tex. Util. Code § 39.151(d) (emphasis added).

75    *Id.* § 39.151(d), (e), (g-1).

76    *Id.* § 39.151(d); *see also id.* § 39.151(j).

77    *Id.* § 39.151(d).

78    *Cf. In re Entergy Corp.*, 142 S.W.3d at 323 ("The Legislature's description of PURA as 'comprehensive,' coupled with the fact that PURA regulates even the particulars of a utility's operations and accounting, demonstrates the statute's pervasiveness.").

79    *See Chaparral Energy*, 546 S.W.3d at 139.

80    *Id.* at 138 (quoting *In re Sw. Bell Tel. Co.*, 235 S.W.3d at 624-625).

Appx. Page 138 of 740

81    Tex. Util. Code § 39.155(b); *see also* 16 Tex. Admin. Code § 25.505(c).

82    Tex. Util. Code § 39.151(d).

83    *See Chaparral Energy*, 546 S.W.3d at 141-142.

84    *In re Oncor Elec. Delivery Co.*, 630 S.W.3d 40, 49 (Tex. 2021).

85    Tex. Util. Code § 39.151(d).

86    *Id.* § 39.151(i).

87    *Id.* § 39.151(a)(1), (2).

88    *Id.* § 39.151(d).

89    *See id.* § 39.151(d) ("Rules adopted by an independent organization ... under delegated authority from the [PUC] are subject to [PUC] oversight ...."); *cf. Chaparral Energy*, 546 S.W.3d at 139-140 (holding that PUC had exclusive jurisdiction because the issue involved a public utility's services, even though customer asserted a breach-of-contract claim for money damages).

90    *Chaparral Energy*, 546 S.W.3d at 141-142.

91    *See* Tex. Util. Code § 39.151(d), (i).

92    *See Hous. Fed'n of Tchrs., Loc. 2415 v. Hous. Indep. Sch. Dist.*, 730 S.W.2d 644, 646 (Tex. 1987).

93    *See* 16 Tex. Admin. Code § 22.251(i).

94    *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 557-558 & n.13 (Tex. 2016).

95    *Garcia v. City of Willis*, 593 S.W.3d 201, 211 (Tex. 2019) (citing *City of Dallas v. Stewart*, 361 S.W.3d 562, 579 (Tex. 2012)).

96    *See id.* at 211-212.

97    *Chaparral Energy*, 546 S.W.3d at 141-142.

98    *Univ. of the Incarnate Word v. Redus* (*Redus II*), 602 S.W.3d 398, 403 (Tex. 2020) (quoting *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847)).

99    *Id.* at 403-404 (quoting *Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 429, 431 (Tex. 2016)).

100   *El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 527 (Tex. 2020) (quoting *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006)).

101   *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019).

102   *Redus II*, 602 S.W.3d at 405 (quoting *Ben Bolt*, 212 S.W.3d at 325-326).

103   571 S.W.3d at 749 (internal quotation marks omitted).

104   *Id.* at 741.

105   *Id.* at 741, 745.

106   *Id.* at 744.

Appx. Page 139 of 740

107    *Id.* at 745.

108    *Id.* (internal alterations and quotation marks omitted).

109    *Id.*

110    *Id.* at 750.

111    *Id.*

112    *See Redus II*, 602 S.W.3d at 401-402.

113    *See id.*

114    *Id.* at 407; *see id.* at 407-408.

115    *Id.* at 407.

116    *Id.* at 408.

117    *Id.* at 409.

118    *Id.*

119    *Id.*

120    *Id.* at 409-410.

121    602 S.W.3d at 529-530.

122    *Id.* at 529.

123    *Id.* at 528-530.

124    *Id.* at 530.

125    *Id.*

126    *Redus II*, 602 S.W.3d at 406.

127    *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

128    *Rosenberg*, 571 S.W.3d at 750.

129    Tex. Util. Code § 39.151(d).

130    *Id.* § 39.151(g-1).

131    *Id.* § 39.151(g), (g-1).

132    *Id.* § 39.1513.

133    *Id.* § 39.151(g-1). Under the recent amendments to Section 39.151, the PUC must have two commissioners on the ISO's board, the presiding officer of the PUC and one other commissioner who will serve a one-year term. *See* Act of May 28, 2023, *supra* note 16.

134    Tex. Util. Code § 39.151(g-1); 16 Tex. Admin. Code § 25.362(h).

Appx. Page 140 of 740

135     Tex. Util. Code § 39.151(d).

136     *Id.* § 39.151(d-1).

137     *Id.* § 39.151(e).

138     *Id.* § 39.151(d-4)(3), (e).

139     *Id.* § 39.151(d).

140     602 S.W.3d at 529.

141     Tex. Util. Code § 39.151(d).

142     *Id.*

143     *Id.* §§ 39.151(n), 39.1511.

144     571 S.W.3d at 745.

145     *See post* at 631 (Boyd & Devine, JJ., dissenting).

146     *Id.* at 639-41, 644-49.

147     *Id.* at 640.

148     *Id.* at 642-49.

149     Tex. Util. Code § 39.151; *id.* § 39.151(c).

150     461 S.W.3d 117, 125 (Tex. 2015).

151     *Redus II*, 602 S.W.3d at 407; *see Amex Props.*, 602 S.W.3d at 529-530.

152     *Redus II*, 602 S.W.3d at 407.

153     *See, e.g., Amex Props.*, 602 S.W.3d at 527 (noting that we look to the "governing statutory authority"). The dissent also takes issue with the fact that PURA does not directly address ERCOT, but instead regulates the ISO. *See post* at 638-40 (Boyd & Devine, JJ., dissenting). But ERCOT *is* the ISO for the Texas power region and is, therefore, subject to PURA while it serves in that role.

154     Tex. Util. Code § 39.151(d), (g-1).

155     *Id.* § 39.151(i).

156     *Id.* § 39.155; 16 Tex. Admin. Code § 25.505.

157     *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

158     Tex. Util. Code § 39.151; *id.* § 39.151(a).

159     *Id.* § 39.151(d), (i), (j), (*l*).

160     *Id.* § 39.151(j).

161     *See Ark. Elec. Coop. Corp.*, 461 U.S. at 377, 103 S.Ct. 1905.

162     *ERCOT Organization Backgrounder, supra* note 7.

163    *See Amex Props.*, 602 S.W.3d at 528-529.

164    Tex. Bus. Orgs. Code §§ 22.102, 22.152, 22.201.

165    *See* Tex. Util. Code § 39.151(g), (g-1); *id.* § 39.1513.

166    *See* Tex. Bus. Orgs. Code § 2.101(3), (4), (6), (7), (12), (22).

167    *See* Tex. Util. Code § 39.151(d).

168    *See id.* § 39.151(d), (d-1), (d-2).

169    *See id.* § 39.151(a), (c), (d); *see also id.* § 39.001(a).

170    Relying on a recent Fifth Circuit concurring opinion, *see Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 187-199 (5th Cir. 2023) (Oldham, J., concurring), the dissent contends that "there is no history or tradition of extending common-law sovereign immunity to private corporations." *Post* at 641 (Boyd & Devine, JJ., dissenting). We need not express any opinion on the correctness of that proposition today. But even assuming that it is correct, it does not address circumstances (like here) in which the state has exercised direct control over the corporation and has harnessed it for state-related objectives. Indeed, the U.S. Supreme Court has long recognized that the government cannot, for example, circumvent the state-action requirement by simply enlisting private entities to do its work. *See, e.g., Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). While a corporation is presumably *not* "the state", we reiterate that an entity's corporate form cannot in and of itself be dispositive of the immunity question.

171    *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

172    *Rosenberg*, 571 S.W.3d at 750.

173    *Id.*

174    Tex. Util. Code § 39.151(e).

175    *Id.*

176    *See id.* § 39.151(d), (d-1).

177    *Id.* § 39.151(e), (j).

178    *See id.* § 39.151(d), (d-1), (e).

179    *Id.* § 39.151(d).

180    *Id.*

181    *See post* at 646-47, 652-53 (Boyd & Devine, JJ., dissenting).

182    *See In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 297 (Tex. 2022) (observing various ways in which the Legislature could hold an agency accountable for the failure to carry out a statutory program and reasoning that a judicial remedy could "create[ ] a serious risk that the courts will intrude into the prerogatives of [the] other branches").

183    *See* Act of May 30, 2021, 87th Leg., R.S., ch. 908, §§ 1, 5, 2021 Tex. Gen. Laws 2218, 2218-2227 (H.B. 4492) (codified at Tex. Gov't Code § 404.0241, Tex. Util. Code §§ 39.601-39.609); *see also* Sunset Advisory Commission, Staff Report with Commission Decisions: Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel 106-107 (2023), https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf.

184    *See* Tex. Util. Code § 39.601(b)(1).

185    Act of May 30, 2021, 87th Leg., R.S., ch. 425, §§ 3, 4, 2021 Tex. Gen. Laws 830, 830-833 (S.B. 2) (codified at Tex. Util. Code §§ 39.151, 39.1513); *see also* Sunset Advisory Commission, *supra* note 183 at 1 ("In response to the disaster, the Legislature took swift action, completely overhauling PUC's and ERCOT's governance structures and making numerous changes to the electric industry and market ...."); *id.* at 106.

186    Act of May 30, 2021, 87th Leg., R.S., ch. 426, §§ 13, 16, 2021 Tex. Gen. Laws 833, 839-840, 841-843 (S.B. 3) (codified at Tex. Util. Code §§ 35.0021, 38.075); *see also* 16 Tex. Admin. Code § 25.55(b)(5), (d), (g); Sunset Advisory Commission, *supra* note 183, at 106.

187    Sunset Advisory Commission, *supra* note 183, at A1.

188    *Rosenberg*, 571 S.W.3d at 750.

189    *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

190    *Rosenberg*, 571 S.W.3d at 750.

191    *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

1    *See* Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and Judicial Independence*, 35 Geo. Wash. Int'l L. Rev. 521, 521 (2003).

2    *Phillips v. McNeill*, 635 S.W.3d 620, 627 (Tex. 2021) (citing Tex. Const. art. I, §§ 13, 19).

3    *Marbury v. Madison*, 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803); *see also* Tex. Const. art. I, §§ 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."), 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by due course of the law of the land.").

4    *Marbury*, 5 U.S. at 163 ("In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.").

5    *See* Harold J. Krent, *Reconceptualizing Sovereign Immunity*, 45 Vand. L. Rev. 1529, 1530 (1992); *see also* Tex. Const. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy[.]"); *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 409 (Tex. 2020) ("Sovereign immunity restrains judicial interference in the executive and legislative branches so that ultimately the people, not the courts, strike the policy balance between immunizing the government's actions and providing a judicial remedy."). Bolstering the doctrine are also modern political, pragmatic, and pecuniary justifications. *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 740 (Tex. 2019).

6    *Rosenberg*, 571 S.W.3d at 741.

7    *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 122 (Tex. 2015).

8    *See, e.g.*, Krent, *supra* note 5, at 1530 ("The dominant justification for sovereign immunity must be that we trust Congress, unlike any other entity, to set the rules of the game.").

9    *Rosenberg*, 571 S.W.3d at 740; *see also* *Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 431 n.5 (Tex. 2016) (discussing the historical anomaly of relying on the legal fiction that the king could do no wrong).

10    *Hall v. McRaven*, 508 S.W.3d 232, 253 (Tex. 2017) (Brown, J., concurring).

11    *See* Tex. Const. art. I, § 2 ("All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit.").

12    The application of immunity to the Sovereign rests on a common-law tradition long predating this State's constitutional founding. *See Hosner v. DeYoung*, 1 Tex. 764, 769 (1847) ("[N]o state can be sued in her own courts without her

consent[.]"); *see also Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (noting that at the time of *Hosner*, the common-law doctrine was "then more than six centuries old"). And "[l]ike sovereign immunity itself, its common-law limitations and exceptions have deep historical roots" and are "designed to ensure the rule of law." *Phillips v. McNeill*, 635 S.W.3d 620, 627-28 (Tex. 2021) (discussing the ultra vires exception to sovereign immunity and noting that the sovereign-immunity doctrine's limitations and exceptions "trac[e] their lineage to courts' issuance of writs of habeas corpus, mandamus, and injunction against government officials to check acts in excess of lawful authority or compel the performance of a clear legal duty").

13  *Rosenberg*, 571 S.W.3d at 741; *see also Wasson Ints.*, 489 S.W.3d at 432.

14  *Rosenberg*, 571 S.W.3d at 741.

15  See *Nettles v. GTECH Corp.*, 606 S.W.3d 726, 733 (Tex. 2020); *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 126 (Tex. 2015).

16  *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 405 (Tex. 2020) (quoting *Rosenberg*, 571 S.W.3d at 750, and *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006)).

17  *Id.* at 401 (quoting *Rosenberg*, 571 S.W.3d at 750).

18  *Id.* at 407 (quoting *Brown & Gay*, 461 S.W.3d at 125).

19  *Id.* at 401.

20  *Ante* at 623-24, 625-26, 628.

21  This Court has considered extending immunity to legislatively authorized entities four times and granted immunity twice. *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 527, 530 (Tex. 2020) (extending immunity to open-enrollment charter schools); *Redus*, 602 S.W.3d at 405, 413 (denying immunity to a private university for law-enforcement activities); *Rosenberg*, 571 S.W.3d at 750, 752 (denying immunity to an economic-development corporation created and operated by a municipality); *Ben Bolt*, 212 S.W.3d at 325-26 (extending immunity to a self-insurance fund composed of local political subdivisions). In *Amex Properties*, the Legislature expressly designated open-enrollment charter schools as part of the public school system and immune from suit and liability, 602 S.W.3d at 528-29 (quoting Tex. Educ. Code §§ 12.105, .1056(a)), and in *Ben Bolt*, "[b]ecause the term 'local government' includes a combination of political subdivisions," the self-insurance fund composed of local political subdivisions was itself a local governmental body, 212 S.W.3d at 324-25 (citing Tex. Gov't Code § 791.003(4)(A), (E)). *Ben Bolt* derived the test for legislatively authorized entities from a 1940 decision that did not involve sovereign immunity and instead concerned whether a statutorily created flood-control district constituted a separate and distinct governmental entity from the county. *See Harris Cnty. Flood Control Dist. v. Mann*, 135 Tex. 239, 140 S.W.2d 1098, 1101 (1940). As noted in later decisions, these flood-control districts are entitled to governmental immunity as constitutionally recognized "governmental agencies." *See* Tex. Const. art. XVI, § 59(b) (Flood-control "districts shall be governmental agencies and bodies politic and corporate with such powers of government[.]"); *Harris Cnty. Flood Control Dist. v. Mihelich*, 525 S.W.2d 506, 508 (Tex. 1975) ("Districts formed in accordance with Section 59 of Article XVI have been recognized to be governmental agencies and bodies politic and corporate, 'governed by the law applicable to counties,' with the same immunities from tort actions as were enjoyed by the State and its counties[.]").

22  *Redus*, 602 S.W.3d at 401, 405 (quoting *Rosenberg*, 571 S.W.3d at 750, and *Ben Bolt*, 212 S.W.3d at 325).

23  *Id.* at 407 (quoting *Rosenberg*, 571 S.W.3d at 750).

24  Robert L. Bradley, Jr., *The Origins of Political Electricity: Market Failure or Political Opportunism?*, 17 Energy L.J. 59, 61 (1996).

25  *Id.* at 59-60.

Appx. Page 144 of 740

26    Gina S. Warren, *Vanishing Power Lines and Emerging Distributed Generation*, 4 Wake Forest J.L. & Pol'y 347, 351 (2014); Hon. Richard D. Cudahy & William D. Henderson, *From Insull to Enron: Corporate (Re)regulation After the Rise and Fall of Two Energy Icons*, 26 Energy L.J. 35, 39 (2005).

27    Warren, *supra* note 26, at 350.

28    *Id.* at 350-51.

29    Mary Katherine Strahan, *Connecting Currents: Toward the Integration of North American Electricity Markets*, 21 Hous. J. Int'l L. 291, 292 n.8 (1999).

30    *Fed. Energy Reg. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267, 136 S.Ct. 760, 193 L.Ed.2d 661 (2016); *see also* Emily Hammonde & David B. Spence, *The Regulatory Contract in the Marketplace*, 69 Vand. L. Rev. 141, 149-50 (2016).

31    *New York v. Fed. Energy Reg. Comm'n*, 535 U.S. 1, 5, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002).

32    *See* Stephanie Phillips, *Federal Regulation for A "Resilient" Electricity Grid*, 46 Ecology L.Q. 415, 418 (2019); Warren, *supra* note 26, at 353-54; Cudahy & Henderson, *supra* note 26, at 41; Strahan, *supra* note 29, at 292 n.8.

33    Jeffrey D. Watkiss & Douglas W. Smith, *The Energy Policy Act of 1992—A Watershed for Competition in the Wholesale Power Market*, 10 Yale J. on Reg. 447, 450 (1993).

34    *Id.* at 451.

35    *W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 807 (N.D. Tex. 1979).

36    *New York*, 535 U.S. at 8-9, 122 S.Ct. 1012; *see also* Phillips, *supra* note 32, at 422.

37    *See* Hammonde & Spence, *supra* note 30, at 150-51.

38    *Id.* at 149-50.

39    Warren, *supra* note 26, at 353-54.

40    *See* Phillips, *supra* note 32, at 422; Hammonde & Spence, *supra* note 30, at 150-51.

41    *See Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89-90, 47 S.Ct. 294, 71 L.Ed. 549 (1927); *see also Fed. Energy Reg. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266, 136 S.Ct. 760, 193 L.Ed.2d 661 (2016); *New York*, 535 U.S. at 5-6, 122 S.Ct. 1012.

42    *New York*, 535 U.S. at 6-7, 122 S.Ct. 1012; *see also Gulf States Util. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 758, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); Strahan, *supra* note 29, at 292 n.8.

43    *Elec. Power Supply Ass'n*, 577 U.S. at 266-67, 136 S.Ct. 760; *see also* Phillips, *supra* note 32, at 423-24.

44    *W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 808 (N.D. Tex. 1979).

45    *Id.*; *see also* Daniel M. Gonzales, *Shockingly Certain: Why Is the Public Utility Commission of Texas Steadfast in Its Resolve to Keep Texas's Energy Market Deregulated Amidst Turmoil?*, 10 Tex. Tech Admin. L.J. 497, 500 (2009); Jared M. Fleisher, *ERCOT's Jurisdictional Status: A Legal History and Contemporary Appraisal*, 3 Tex. J. Oil Gas & Energy L. 4, 10 (2008).

46    *W. Tex. Utils.*, 470 F. Supp. at 808.

47    *Pub. Util. Comm. of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001); *see also* Gonzales, *supra* note 45, at 500.

Appx. Page 145 of 740

48 *Del. Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1, 11 (D.C. Cir. 2015); *see also About NERC*, North American Electric Reliability Corporation (2023), https://www.nerc.com/AboutNERC/Pages/default.aspx; Ryan Suit, *Charging Forward with NERC: An International Approach to Solving North America's Grid Problem*, 24 Rich. J.L. & Tech. 3, 15-16 (2018).

49 Suit, *supra* note 48, at 15. In 2007, NERC's reliability standards became legal mandates governing participants in the bulk power system. *Id.* at 16.

50 *Id.* at 15-16.

51 *See* Fleisher, *supra* note 45, at 10-11.

52 *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 186 (Tex. 2007); *see also W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 808 (N.D. Tex. 1979); Gonzales, *supra* note 45, at 500; Fleisher, *supra* note 45, at 10-11.

53 Gonzales, *supra* note 45, at 501-02. Before 1975, some municipalities regulated rates through franchise agreements allowing electric utilities to run distribution lines along city streets. *Id.* at 501.

54 Tex. Util. Code § 11.002.

55 *See* Gonzales, *supra* note 45, at 501-02; Fleisher, *supra* note 45, at 11.

56 *See* Fleisher, *supra* note 45, at 11.

57 Watkiss & Smith, *supra* note 33, at 452-54.

58 *New York v. Fed. Energy Reg. Comm'n*, 535 U.S. 1, 8-9, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002); *see also Fed. Energy Reg. Comm'n v. Mississippi*, 456 U.S. 742, 751, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); Phillips, *supra* note 32, at 424; Watkiss & Smith, *supra* note 33, at 452-54.

59 Hammonde & Spence, *supra* note 30, at 151.

60 *See* Phillips, *supra* note 32, at 424.

61 *New York*, 535 U.S. at 9, 122 S.Ct. 1012; *see also* Phillips, *supra* note 32, at 424; Watkiss & Smith, *supra* note 33, at 455-56, 487.

62 *New York*, 535 U.S. at 10-12, 122 S.Ct. 1012; *see also* Phillips, *supra* note 32, at 424-25.

63 *See* Phillips, *supra* note 32, at 424-25; Hammonde & Spence, *supra* note 30, at 152-53.

64 Hammonde & Spence, *supra* note 30, at 152.

65 *Pub. Util. Comm. of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001).

66 *Id.*

67 *State v. Pub. Util. Comm'n of Tex.*, 344 S.W.3d 349, 352 (Tex. 2011).

68 *Id.* PURA allowed the utilities to unbundle "through the creation of separate nonaffiliated companies, the creation of separate affiliated companies owned by a common holding company, or the sale of assets to a third party." *City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 237 (Tex. 2001).

69 *Oncor Elec. Delivery Co. v. Pub. Util. Comm'n of Tex.*, 507 S.W.3d 706, 711-12 (Tex. 2017); *see also Pub. Util. Comm'n of Tex.*, 344 S.W.3d at 352; *Tex. Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC*, 324 S.W.3d 95, 97-98 (Tex. 2010); Gonzales, *supra* note 45, at 502-03.

**Appx. Page 146 of 740**

70    *Oncor Elec. Delivery*, 507 S.W.3d at 712.

71    Tex. Util. Code § 39.151(a), (c). An "independent organization" is an ISO "or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller." *Id.* § 39.151(b).

72    *See* Tex. Pub. Util. Comm'n, *In re ERCOT*, Docket No. 22061, 2000 WL 33959260, at *4 (Apr. 4, 2000) (order); Fleisher, *supra* note 45, at 11; *About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

73    Tex. Util. Code § 39.151(a); *see also Fed. Energy Reg. Comm'n. v. Elec. Power Supply Ass'n*, 577 U.S. 260, 268, 136 S.Ct. 760, 193 L.Ed.2d 661 (2016) (explaining that ISOs "administer[ ] a portion of the grid, providing generators with access to transmission lines and ensuring that the network conducts electricity reliably"); Hammonde & Spence, *supra* note 30, at 152-53.

74    Tex. Util. Code §§ 31.002(9), 39.151.

75    *Ante* at 615-17.

76    *Univ. of the Incarnate Word v. Redus*, 518 S.W.3d 905, 911 (Tex. 2017).

77    *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 407 (Tex. 2020) (quoting *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019)).

78    *About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

79    *See Careers*, ERCOT (2023), http://www.ercot.com/careers.

80    Tex. Util. Code § 39.151(e); *see also About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

81    *See Amended and Restated Certificate of Formation of Electric Reliability Council of Texas, Inc.*, ERCOT (Jan. 31, 2019), https://www.ercot.com/files/docs/2019/02/06/ Amended_and_Restated_Certificate_of_Formation__eff_01.31.2019_.pdf; *Amended and Restated Bylaws of Electric Reliability Council of Texas, Inc.*, ERCOT (Oct. 12, 2021), https://www.ercot.com/files/docs/2022/09/09/01_Current% 20ERCOT% 20Bylaws.pdf.

82    *About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

83    *Ante* at 623-25, 625-26.

84    *See* Tex. Util. Code § 39.151. Somewhat confusingly, PURA designates the Texas power region for which ERCOT serves as the ISO as the "Electric Reliability Council of Texas" or "ERCOT." *Id.* § 31.002(5) (" 'Electric Reliability Council of Texas' or 'ERCOT' means the area in Texas served by electric utilities, municipally owned utilities, and electric cooperatives that is not synchronously interconnected with electric utilities outside the state."); *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 431 (5th Cir. 2016) (noting that the Texas grid "shares the name of its governing board, the Electric Reliability Council of Texas (ERCOT)").

85    Tex. Util. Code § 39.151(a), (c).

86    *See id.* § 39.001(a).

87    *See* 16 Tex. Admin. Code §§ 25.43(o)(2) (protecting ERCOT from liability for transitioning or attempting to transition a customer from a retail electric provider to a provider of last resort), .200(d) (protecting ERCOT from liability for negligently causing service interruptions while attempting to maintain system stability and safety), .361(c) (protecting ERCOT from liability for events beyond its control that could not reasonably be anticipated).

88    *Id.* § 25.362(j)(6).

89    *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019).

90    *See* Tex. Util. Code § 39.151(d).

91    *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 407 (Tex. 2020) (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)).

92    *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 733 (Tex. 2020).

93    *See Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 544 (Tex. 2016).

94    *See Redus*, 602 S.W.3d at 408 n.58 (surveying other state decisions and noting that (1) "[s]ome states hold that sovereign immunity does not extend to a private entity regardless of government control," (2) "[o]ther states hold that, if derivative immunity exists, it provides 'immunity' from liability if the defendant was not otherwise culpable," and (3) "to the extent it is recognized as 'immunity,' it is most often considered 'immunity from liability,' not immunity 'from suit' ").

95    *Ante* at 623.

96    *See id.* at 623-24 (citing Tex. Util. Code §§ 39.151(d), (d-1), (d-4)(3), (e), (g), (g-1), .1513).

97    *Redus*, 602 S.W.3d at 407 (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)).

98    *See Alden v. Maine*, 527 U.S. 706, 715-16, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("[T]he doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified."); *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (noting that in 1847, when this Court first recognized the doctrine in its second term, the rule was "then more than six centuries old").

99    *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 191 (5th Cir. 2023) (Oldham, J., concurring).

100   *Id.* at 191-98 (reviewing English common-law tradition, debates between Federalists and Anti-Federalists, and early American court cases).

101   *Id.* at 198.

102   *Id.* at 199 n.6.

103   *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 524 (Tex. 2020).

104   *See id.* at 528-31 (citing Tex. Educ. Code §§ 12.105, .1056(a)).

105   *Cf. Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 746 (Tex. 2019) (although not sovereign entities, political subdivisions share the State's immunity under the governmental-immunity doctrine when performing governmental functions as the State's agent).

106   *Amex Props.*, 602 S.W.3d at 529-30.

107   *Id.* at 528-29 (quoting Tex. Educ. Code §§ 12.105, .1056(a)).

108   *Id.* at 529-30; *see also Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 406 n.51 (Tex. 2020).

109   602 S.W.3d at 398.

110   *Id.* at 404.

111   *Id.* at 411-13 & n.79.

112   *Id.* at 412.

Appx. Page 148 of 740

113 *Id.* at 407 (citing *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)).

114 *Id.* (emphases added) (quoting *Brown & Gay*, 461 S.W.3d at 125). In *Brown & Gay*, the Court considered cases where "the complained-of conduct for which the contractor was immune was effectively attributed to the government. That is, the alleged cause of the injury was not the independent action of the contractor, but the action taken by the government *through* the contractor." 461 S.W.3d at 125.

115 *Redus*, 602 S.W.3d at 407-08.

116 *Id.*

117 606 S.W.3d 726, 731-36 (Tex. 2020).

118 *Id.* at 728.

119 *Id.* at 733.

120 *Id.* at 732 (footnote omitted) (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 130 n.6 (Hecht, C.J., concurring)); *see also Brown & Gay*, 461 S.W.3d at 125-26 ("In this case, the [plaintiffs] do not complain of harm caused by [the government contractor]'s implementing the [government]'s specifications or following any specific government directions or orders.").

121 606 S.W.3d at 733-34 (quoting *Brown & Gay*, 461 S.W.3d at 125, and *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)).

122 *Id.* at 733.

123 *Id.* at 735-36.

124 Tex. Gov't Code § 466.014(a); *Nettles*, 606 S.W.3d at 736.

125 *Nettles*, 606 S.W.3d at 736.

126 *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 412 (Tex. 2020).

127 *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 528-30 (Tex. 2020).

128 *Redus*, 602 S.W.3d at 407-08 (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)). The Court notes that "we have never held that a complete lack of discretion is required for immunity in an arm of the state analysis for a legislatively authorized entity." *Ante* at 625. But we also have never held that an entity not expressly designated as part of the government—like ERCOT—is entitled to sovereign immunity as a legislatively authorized entity.

129 *Nettles*, 606 S.W.3d at 731-37.

130 Tex. Util. Code § 39.151(d).

131 *Ante* at 623-24.

132 Tex. Util. Code § 39.151(d) (emphases added).

133 *Id.*; *see also* 16 Tex. Admin. Code § 25.364(d) (requiring the PUC to find that the ISO "has committed significant violations of PURA or [PUC] rules or failed to efficiently and effectively carry out the duties of an independent organization" before decertification).

134 *Ante* at 623-24 (quoting Tex. Util. Code § 39.151(d-1), (g-1)).

Appx. Page 149 of 740

135   *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 736 (Tex. 2020) ("But close supervision and final approval of work over which a contractor has discretion are not the same as the government specifying the manner in which a task is to be performed.").

136   *Ante* at 623-24 (citing Tex. Util. Code §§ 39.151(g), (g-1), .1513).

137   The provisions providing the appointment power do not give the government any formal control over the board members' decisions once appointed. *See* Tex. Util. Code §§ 39.151(g)–(g-6), .1513; *cf. In re Abbott*, 645 S.W.3d 276, 280 n.1 (Tex. 2022) ("The Governor frequently appoints these officers, but the state agencies' enabling statutes rarely give the Governor formal control over the officers' decisions once appointed.").

138   *See Governance*, ERCOT (2023), https://www.ercot.com/about/governance.

139   *See* Tex. Util. Code § 39.151(g-1).

140   *See id.* § 39.151(g-1)(2).

141   *Ante* at 624-25 (citing Tex. Util. Code §§ 39.151(n), .1511).

142   Sunset Advisory Commission, Staff Report with Commission Decisions: Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel 3 (January 2023), https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf.

143   *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019).

144   Sunset Advisory Commission, *supra* note 142, at 80.

145   *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 736 (Tex. 2020).

146   *See* Tex. Util. Code § 39.151(d).

147   *See Nettles*, 606 S.W.3d at 733.

148   Sunset Advisory Commission, *supra* note 142, at 41.

149   *Id.* ("While these informal methods may help the commission move quickly, they do not always adhere to best practices for openness, inclusiveness, and transparency."). The Sunset Commission has also recently found that the "PUC needs more formalized structures and processes when giving ERCOT direction that affects the electric industry and millions of Texans," *id.* at A1, and recommended that the Legislature "[a]uthorize [the] PUC to issue directives to ERCOT through written memos and orders, in addition to rulemaking and contested cases, and authorize stakeholders to formally provide input on theses directives," *id.* at A2. For emergency situations, the Sunset Commission recommended to the Legislature:

> Clarify that [the] PUC can only direct ERCOT outside of these methods in an emergency or other urgent situation that poses an imminent threat to public health, safety, or grid reliability. If [the] PUC's direction to ERCOT is still necessary 72 hours after the emergency or urgent situation, [the] PUC must use the more formal process established under the recommendation to provide documentation of its direction to ERCOT.

*Id.* Neither the PUC nor ERCOT argues that the PUC used formal or informal mechanisms to control ERCOT's complained-of actions.

150   For example, the Sunset Commission's Report explains:

> [The] PUC currently lacks the expertise and staff resources to independently analyze an abundance of electric data and information to make fully informed regulatory decisions, including evaluating their impacts on market participants and the general public....

**Appx. Page 150 of 740**

> While [the] PUC has complete authority to access ERCOT's data, which includes vast amounts of operational and financial data about electricity generation, consumption, and pricing, it lacks the technological capability to do so independently of ERCOT.... Further, any analysis provided by ERCOT may still carry inherent bias due to its focus on grid operations, which prioritizes reliability over considering the cost of such operations. Even if ERCOT were able to provide regulatory impact analysis, [the] PUC staff's current lack of analytical capabilities forces the agency to rely on ERCOT's analysis without independent verification.

*Id.* at 37-38; *see also id.* at A1 ("The Sunset Commission found [the] PUC was ill-prepared for the task [of being a more active overseer of ERCOT] and is woefully under-resourced given its critical responsibilities and the work that still lies ahead.").

151 *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 405, 407 (Tex. 2020) (quoting *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019)).

152 *Ante* at 623.

153 *See Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 433 (Tex. 2016). Of course, state officials could act ultra vires, which are not considered acts of the state. *See Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) ("The basic justification for this *ultra vires* exception to sovereign immunity is that *ultra vires* acts—or those acts without authority—should not be considered acts of the state at all.").

154 *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 733 (Tex. 2020).

155 *See Rosenberg*, 571 S.W.3d at 750 ("[M]erely engaging in an act that serves a public purpose says nothing about the nature of the entity itself[.]").

156 *See, e.g.*, Sunset Advisory Commission, *supra* note 142, at 1 (noting that after blackouts in 2011 "signaled potential underlying problems," the PUC's "business as usual continued," and with ERCOT "generally managing the grid, [the] PUC never had cause to take a step back and consider how things were working, how it might improve operations, or what funding and staff may be needed to do so").

157 *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 528-29 (Tex. 2020); *see also Redus*, 602 S.W.3d at 412 (noting that "[t]he statutory text demonstrates the legislature's awareness of the ramifications of government-entity status" and "[r]ather than categorically transforming a private university's status, the statute links immunity to the peace officers who perform law enforcement functions").

158 *Lt. Gov. Dan Patrick Announces Top 31 Priorities for the 2021 Session*, Off. of the Lieutenant Governor (Feb. 23, 2021), https://www.ltgov.texas.gov/2021/02/23/lt-gov-dan-patrick-announces-top-31-priorities-for-the-2021-session/.

159 *See* Act of May 30, 2021, 87th Leg., R.S., ch. 908, 2021 Tex. Gen. Laws 2218, 2218-27; Act of May 28, 2021, 87th Leg., R.S., ch. 950, 2021 Tex. Gen. Laws 2465, 2465-72.

160 *See Redus*, 602 S.W.3d at 412. Of course, the mere designation of a private entity as part of the government is not sufficient to establish the entity as an arm of the state entitled to sovereign immunity. *See id.* at 405.

161 *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 731 (Tex. 2020) (citing *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)). The Court asserts that "the PUC had significant control and authority over the very conduct at issue in these cases." *Ante* at 625. But "ha[ving] significant control and authority" is not the same as exercising control over the complained-of conduct. CPS Energy expressly distinguishes between ERCOT's and the PUC's actions, stating that it "is not contesting the entire five-day period [of high wholesale electricity prices], or the PUC Orders, but only ERCOT's failure to follow those orders during the storm's last 33 hours," and that "CPS Energy's complaints do not concern these PUC Orders. The problem lies in ERCOT's decision not to follow them." And although Panda may have agreed that "the PUC *could have* controlled the CDR data output had it wanted to," *id.* at 625 (emphasis added), the issue is whether the PUC actually controlled ERCOT.

162    *See Brown & Gay*, 461 S.W.3d at 126 ("We need not establish today whether some degree of control by the government would extend its immunity protection to a private party; we hold only that no control is determinative.").

163    *Redus*, 602 S.W.3d at 407 (noting that sovereign immunity "potentially extends" if the complained-of conduct was effectively "action taken by the government").

164    The Court implies that we should not consider specific conduct because "[s]overeign immunity is entity-based." *Ante* at 625 (quoting *Redus*, 602 S.W.3d at 407). But the Court then holds that "ERCOT would not be immune outside that role" as the ISO, distinguishing between ERCOT's *conduct* as an ISO and its *conduct* outside that role for immunity purposes. *Id.* at 628. To the extent sovereign immunity possibly applies when the private entity is not expressly designated as part of the government, it should depend on whether the government has oversight authority *and* actually exercised that authority and control over the conduct at issue.

165    *See* Tex. Util. Code § 39.151(d).

166    *Redus*, 602 S.W.3d at 405 (quoting *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019), and *Ben Bolt-Palito Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006)).

167    *Id.* at 401 (citing *Rosenberg*, 571 S.W.3d at 750).

168    *Rosenberg*, 571 S.W.3d at 740.

169    *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015).

170    *Rosenberg*, 571 S.W.3d at 740-41 (quoting *Brown & Gay*, 461 S.W.3d at 121).

171    *See Hughes v. Tom Green County*, 573 S.W.3d 212, 218 (Tex. 2019).

172    *Hillman v. Nueces County*, 579 S.W.3d 354, 361 (Tex. 2019) (quoting *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006)); *see also Chambers–Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 347 (Tex. 2019).

173    *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 404 (Tex. 2020) (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006)).

174    *Brown & Gay*, 461 S.W.3d at 123.

175    *Hughes*, 573 S.W.3d at 218.

176    *Ben Bolt-Palito Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 326 (Tex. 2006).

177    *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 704 (Tex. 2019) (quoting *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 839 (Tex. 2018), and *Reata Constr.*, 197 S.W.3d at 382).

178    *See Brown & Gay*, 461 S.W.3d at 121.

179    *Ante* at 624, 627; *see also* Tex. Util. Code § 39.151(e); *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 175 n.3 (Tex. 2013) (addressing regulatory fees, which "support a regulatory regime governing those who pay the fee").

180    *See Brown & Gay*, 461 S.W.3d at 124 n.7 ("[P]rivate parties ... have an established means of protecting themselves from the specter of costly litigation—insurance.").

181    *Hughes v. Tom Green County*, 573 S.W.3d 212, 220 (Tex. 2019).

Appx. Page 152 of 740

182 ERCOT admits, however, that although a "number of court cases have been brought against ERCOT arising out of the February 2021 extreme winter weather event," it "does not believe that the outcome of this litigation will affect its key functions." Elec. Reliability Council of Tex. (ERCOT), Self-Evaluation Report: A Report to the Texas Sunset Advisory Commission 14 (Sept. 2021), https://www.sunset.texas.gov/public/uploads/files/reports/ERCOT% 20SER_9-01-21.pdf.

183 *See* Tex. Util. Code § 39.151(a), (c).

184 *See id.* § 39.151(a), (d).

185 *See Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 410 (Tex. 2020).

186 *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015).

187 *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 740-41 (Tex. 2019).

188 Tex. Util. Code § 39.151(d).

189 *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 544 (Tex. 2016) (alteration in original) (quoting *Essenburg v. Dallas County*, 988 S.W.2d 188, 189 (Tex. 1998), and *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013)).

190 Tex. Util. Code § 15.001.

191 The PUC also purports to protect ERCOT from liability by mitigating risks of unforeseen expenditures through promulgated rules. *See* 16 Tex. Admin. Code §§ 25.200(d) (protecting ERCOT from liability "for its ordinary negligence" when it "cause[s] the interruption of transmission service for the purpose of maintaining ERCOT system stability and safety"), .361(c) ("ERCOT shall not be liable in damages for any act or event that is beyond its control and which could not be reasonably anticipated and prevented through the use of reasonable measures."); *cf. Rosenberg*, 571 S.W.3d at 751 (noting that "the statutory scheme itself contains provisions limiting liability and financial exposure" that prevent any "genuine risk of unforeseen expenditures").

192 *See* Tex. Util. Code § 39.151(d) ("The commission by rule shall adopt procedures governing decertification of an independent organization, selecting and certifying a successor organization, and transferring assets to the successor organization to ensure continuity of operations in the region."); 16 Tex. Admin. Code § 25.364 ("Decertification of an Independent Organization").

193 *See Rosenberg*, 571 S.W.3d at 751.

194 *Hall v. McRaven*, 508 S.W.3d 232, 243 (Tex. 2017).

195 *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121-22 (Tex. 2015).

196 *City of Galveston v. State*, 217 S.W.3d 466, 480 n.38 (Tex. 2007) (Willett, J., dissenting).

197 Fed. Energy Regul. Comm'n, N. Am. Elec. Reliability Corp., & Reg'l Entities, FERC, NERC and Regional Entity Staff Report: The February 2021 Cold Weather Outages in Texas and the South Central United States 9 (Nov. 16, 2021), https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and.

198 Sunset Advisory Commission, *supra* note 142, at 105 (quoting *Winter Storm 2021 and the Lifting of COVID-19 Restrictions in Texas*, Univ. of Hous. Hobby Sch. of Pub. Affs. (Mar. 25, 2021), https://uh.edu/hobby/winter2021/).

199 *Id.*

200 *See* Elec. Reliability Council of Tex. (ERCOT), *supra* note 182, at 14.

201 *See Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 411 (Tex. 2020) ("Political accountability is a vital counterweight to sovereign immunity's inequity.").

Appx. Page 153 of 740

202    *See Marbury v. Madison*, 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803); *see also Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 435 (Tex. 2016) ("If immunity is applicable, *then* the judiciary defers to the legislature to waive such immunity.").

203    *Redus*, 602 S.W.3d at 411 (footnote omitted) (quoting *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 51 (Tex. 2015)).

204    *Id.* at 410-11 (quoting *Hillman v. Nueces County*, 579 S.W.3d 354, 361 (Tex. 2019)).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Appx. Page 154 of 740

# APPENDIX C

691 S.W.3d 448
Supreme Court of Texas.

PUBLIC UTILITY COMMISSION
OF TEXAS, Petitioner,

v.

LUMINANT ENERGY
COMPANY LLC, Respondent

No. 23-0231
|
Argued January 30, 2024
|
OPINION DELIVERED: June 14, 2024

**Synopsis**

**Background:** Energy company sought judicial review of
Public Utility Commission's orders that directed the Electric
Reliability Council of Texas (ERCOT) to ensure that firm load
that was being shed was accounted for in ERCOT's scarcity-
pricing signals during a winter storm, which orders resulted
in ERCOT manually plugging a value into the scarcity-
pricing mechanism (SPM) that had the effect of raising the
wholesale price of electricity until the grid returned to normal
operations. After several parties intervened on each side, a
two-judge panel of the Austin Court of Appeals, 665 S.W.3d
166, determined that the orders exceeded the Commission's
authority and were invalid. Commission and parties aligned
with it petitioned for review.

**Holdings:** The Supreme Court, Hecht, C.J., held that:

energy company had constitutional standing to seek judicial
review of the orders;

judicial-review proceedings were not moot;

orders met the Administrative Procedure Act's (APA)
definition of a "rule,"

orders were "competition rules" under the Public Utility
Regulatory Act's (PURA) provision that authorized judicial
review of competition rules;

PURA permitted the orders; and

Commission substantially complied with the APA's
emergency rulemaking procedures.

Judgment of Court of Appeals reversed; judgment affirming
orders rendered.

**\*451** On Petition for Review from the Court of Appeals for
the Third District of Texas

**Attorneys and Law Firms**

J. Mark Little, Macey Reasoner Stokes, George Harold Fibbe,
Houston, Patrick Leahy, Andrea Moore Stover, Austin, for
Petitioners Calpine Corporation, Talen Energy Corporation.

William Peacock III, Pro Se.

Kurt Kuhn, Lisa Hobbs, Austin, Michael J. Jewell, for
Intervenor RWE Renewables Americas LLC.

Carter Gantt, Samuel W. Cooper, Houston, for Amicus Curiae
EDF Trading North America, LLC.

Mark Oakes, Austin, Warren S. Huang, Houston, James
Hughes, for Intervenors Pattern Gulf Wind LLC, Pattern
Panhandle Wind, LLC, Logan's Gap Wind LLC, Pattern
Energy Group LP.

Conor Harvey, Michelle Stratton, for Amicus Curiae Quality
Sausage Company, LLC.

Ben Barnes, Dallas, Anna Rotman, Houston, Andrea
DeLorimier, Austin, George W. Hicks, Jr., Jamie Aycock, for
Petitioner TexGen Power, LLC.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Petitioners
DGSP2 LLC, Distributed Generation Solutions LLC.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Amicus
Curiae Aspire Commodities, LP.

John F. Bash III, Austin, Szymon S. Barnas, Lindsay May
Weber, James C. Tecce, for Amicus Curiae Just Energy Texas
LP, Fulcrum Retail Energy, LLC, Hudson Energy Services
LLC, Just Energy Texas I Corp., and Just Energy Group, Inc.

Lara D. Pringle, Ewaen Woghiren, Jazmine Gomez, Houston,
for Amicus Curiae Via Renewables, Inc.

**Appx. Page 156 of 740**

Michael Boldt, Lino Mendiola, Austin, for Intervenor Exelon Generation Company, LLC.

David Benjamin Gerger, Houston, for Amicus Curiae The Chamber of Commerce of The United States of America.

Joseph A. Garnett, Houston, for Amicus Curiae JSW Steel (USA) Inc.

Michael J. Jewell, for Intervenor TX Hereford Wind, LLC.

Eric B. Storm, Austin, William W. Russell, Houston, Robert Scott Potosky, for Intervenor Texpo Power LP.

Mark Foster, Austin, Henry Joel Simmons, for Amicus Curiae B&B Theatres Operating Company, Inc., Boles Children's Home, Brooklet Energy Distribution, LLC, Eligo Energy TX, LLC, Hartman Income REIT Management, Inc., Tubes, Inc., and Young Energy, LLC.

Angela V. Colmenero, Austin, Brent Webster, Houston, Kyle D. Highful, Lanora C. Pettit, Sara B. Baumgardner, Atty. Gen. W. Kenneth Paxton Jr., A. Lee Czocher, Lisa A. Bennett, Judd Stone II, Ryan Baasch, for Petitioner Public Utility Commission of Texas.

Ron Beal, Pro Se.

Elliot Clark, Wallace B. Jefferson, Elin Isenhower, Austin, Rachel Anne Ekery, Houston, for Amicus Curiae Electric Reliability Council of Texas, Inc.

Jay Quine, for Amicus Curiae Hartman vREIT XXI, Inc.

Denis Fallon, Paul Pantano Junior, Neal E. Kumar, for Amicus Curiae Futures Industry Association, Inc.

William A. Moore, Melissa A. Lorber, Austin, Allyson N. Ho, Elizabeth Kiernan, Dallas, Daniel Jude Kelly, Irving, Joseph Barakat, Katherine Montoya, Amy Leila Prueger, Michael Lawrence Raiff, Trenton Van Oss, Stephanie Renee Zapata, for Respondent.

Warren S. Huang, Houston, Mark Oakes, Eric B. Storm, Austin, James Hughes, for Intervenor Pattern Panhandle Wind 2 LLC.

Joseph Cecere, for Amicus Curiae South Texas Electric Cooperative.

## Opinion

Chief Justice Hecht delivered the opinion of the Court.

**\*452** During Winter Storm Uri, with the Texas electric grid on the brink of collapse, the Public Utility Commission issued two orders, the effect of which was to raise the market price of electricity to the regulatory ceiling of $9,000/MWh[1] to reflect the scarcity of supply, thereby incentivizing generators capable of adding supply to do so and large industrial users to reduce their demand. Some market participants went bankrupt. Litigation ensued.[2]

In this case, the court of appeals held that the Commission's orders exceeded its authority under Chapter 39 of the Public Utility Regulatory Act (PURA) because the statute prohibits price-setting.[3] We disagree. We also hold that the Commission substantially complied with the Administrative Procedure Act's (APA) procedural rulemaking requirements, an issue the court of appeals did not reach. We reverse the judgment of the court of appeals and render judgment affirming the orders.[4]

**\*453 I**

**A**

The Legislature added Chapter 39 to PURA in 1999 as part of Texas' transition to a competitive retail electric market.[5] Though its provisions are wide-ranging, only a few are at issue here. Among subchapter A's "General Provisions" is Section 39.001, which includes several statements of "Legislative Policy and Purpose". There, in subsection (a), the Legislature states its finding that "the public interest in competitive electric markets requires", with some exceptions, that "electric services and their prices should be determined by customer choices and the normal forces of competition."[6] Continuing that theme, subsection (d) states that "[r]egulatory authorities ... shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter to the greatest extent feasible and shall adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition."[7]

Subsections (c), (e), and (f) address rules. Subsection (c) prohibits regulatory authorities from "mak[ing] rules or

Appx. Page 157 of 740

issu[ing] orders regulating competitive electric services, prices, or competitors or restricting or conditioning competition except as authorized in this title".[8] Subsections (e) and (f) authorize "[j]udicial review of competition rules"[9]—a concept we return to later—and set out the procedure for initiating such review directly in the court of appeals.[10]

The other provisions at issue are in subchapter D, which addresses "Market Structure". Section 39.151(c) requires the Commission to "certify an independent organization"—here, ERCOT[11] —"to perform the functions prescribed by this section."[12] Four functions are listed in subsection (a). The second is "ensur[ing] the reliability and adequacy of the regional electrical network".[13] The fourth is "ensur[ing] that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region."[14]

Section 39.151(d) sets out the Commission's oversight of ERCOT. "The commission shall adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators", or it may delegate that responsibility **\*454** to ERCOT.[15] ERCOT "is directly responsible and accountable to the commission", which "has complete authority to oversee and investigate [ERCOT's] finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties."[16] If ERCOT "does not adequately perform [its] functions or duties or does not comply with this section," the Commission can "take appropriate action", including decertification.[17]

**B**

As set out above, two of ERCOT's statutory duties are ensuring the adequacy and reliability of the electric grid and ensuring that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region.[18] Relatedly, the Commission is charged with making rules addressing those duties or delegating the rulemaking responsibility to ERCOT, over which the Commission has complete authority.[19] Under the Commission's rules, "ERCOT shall determine the market clearing prices of energy", "[e]xcept as otherwise directed by the commission".[20] "The protocols and other rules" adopted by ERCOT "shall promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system."[21]

Texas maintains an "energy only" market in which generators are compensated only for the energy they actually produce, as opposed to a "capacity market" in which generators are paid to maintain capacity for times of high demand. In an energy-only market, generators are incentivized to come online in times of high demand by higher prices for wholesale electricity. To ensure sufficient power generation during times of high demand, the Commission by rule established a scarcity-pricing mechanism—or SPM—and directed ERCOT to administer it.[22]

The SPM is a mathematical formula run on ERCOT's computers that sends price-based signals to energy generators regarding whether additional power is needed. Its goal is to ensure that in times of energy shortage, prices adequately account for high demand and the amount of reserves needed to keep the lights on. The formula should result in an inverse correlation between energy capacity in the grid and the price of electricity—the less energy available, the higher the price to incentivize generators to add power.

The SPM is complex, but only a few of its components need explanation here. The Commission by rule sets a ceiling on the price of energy, called the high system-wide offer cap, or HCAP. In February 2021, the HCAP was $9,000/ MWh.[23] Another component of the SPM is the value of lost load or VOLL, which reflects the hypothetical price a customer would pay to avoid the loss of electrical service. The **\*455** SPM was designed so that in times of extreme scarcity, when forced blackouts are imminent or occurring due to an insufficient supply of electricity to meet demand, the wholesale price of electricity approaches the VOLL. By Commission rule, the VOLL in February 2021 was set to be equal to the HCAP of $9,000/MWh.[24]

**C**

Appx. Page 158 of 740

For the ERCOT grid to remain functional, electricity supply and demand must remain balanced at a frequency of 60 hertz. The grid can operate at a frequency of 59.4 hertz for up to nine minutes before grid failure occurs.

Winter Storm Uri descended upon Texas over Valentine's Day weekend of 2021, bringing frigid air from the North Pole and record snowfall and low temperatures. As energy demand soared, almost 50% of the power-generation equipment in Texas froze and went offline. In the early morning hours of Monday, February 15, energy reserves dipped low enough to trigger the first level of grid emergency, Emergency Energy Alert Level 1. Within about an hour, reserves had dipped lower, triggering EEA2 and then EEA3—the highest level of alert. After breaching EEA3, ERCOT's protocols required it to "shed firm load"—start mandatory rolling blackouts—which it did. Available power continued to fall, which necessitated massive, more widespread blackouts. That morning, the grid operated at or below 59.4 hertz for just over four minutes. Texas was fewer than five minutes away from a total grid collapse that would have plunged the state into darkness for weeks, maybe months.

The mandatory blackouts averted the worst-case scenario, but ERCOT remained in EEA3. ERCOT called the Commission's attention to a problem that ERCOT perceived in the pricing signals that the SPM was sending to the market. Because the system was in load shed—mandatory blackouts were occurring—the price of energy should have been at the VOLL and HCAP of $9,000/MWh to incentivize generation. Instead, the price was fluctuating to as low as $1,200. ERCOT was having to hold some energy in reserve to maintain the system, and it believed the SPM interpreted the existence of those reserves to mean that load shed was no longer occurring.

**D**

The Commission called an emergency meeting for the evening of February 15. The notice advised that the meeting was "necessary to allow the Commission to address the imminent threat to public health and safety due to this loss of electricity for millions of citizens in the ERCOT region." At the meeting, the Commission would determine whether to "exercise its authority under section 39.151 of [PURA] to ensure that the electricity market provides clear signals to generators of the value of generation when customer loads must be shed to protect the ERCOT system". Specifically, the Commission would "consider whether the system demand

component of energy prices should be set at the system-wide offer cap when firm load is being shed." "Without such decisions," the notice stated, "the continuing lack of electricity for some of the citizens of Texas could result in loss of life or damage to property that otherwise could be prevented."

After a short meeting, the Commission issued the first of two orders at issue in this case. Citing the language in Section 39.151(d) that gives the Commission complete authority over ERCOT, the order "directs ERCOT to ensure that firm load **\*456** that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals":

**ORDER DIRECTING ERCOT TO TAKE ACTION AND GRANTING EXCEPTION TO COMMISSION RULES**

On February 12, 2021, pursuant to Texas Government Code § 418.014, in response to an extreme winter weather event, Governor Greg Abbott issued a Declaration of a State of Disaster for all counties in Texas.

Further, on February 15, 2021, the Electric Reliability Council of Texas, Inc. (ERCOT) declared its highest state of emergency, an Emergency Energy Alert Level 3 (EEA3), due to exceptionally high electric demand exceeding supply. ERCOT has directed transmission operators in the ERCOT region to curtail more than 10,000 megawatts (MW) of firm load. The ERCOT System is expected to remain in EEA3, and firm load shed is expected to continue, for a sustained period of time in light of the expected duration of the extreme weather event.

This Order addresses two significant market anomalies identified during this EEA3 event.

**I. Energy Prices Lower than System-Wide Offer Cap During Load-Shed Event**

ERCOT has informed the Commission that energy prices across the system are clearing at less than $9,000, which is the current system-wide offer cap pursuant to 16 TAC § 25.505(g)(6)(B). At various times today, energy prices across the system have been as low as approximately $1,200. The Commission believes this outcome is inconsistent with the fundamental design of the ERCOT market. Energy prices should reflect scarcity of the supply. If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest.

Utilities Code § 39.151(d) gives the Commission "complete authority" over ERCOT, the independent organization certified by the Commission pursuant to § 39.151. Further, 16 TAC § 25.501(a) provides that ERCOT determines market clearing prices of energy and other ancillary services in the ERCOT market unless "otherwise directed by the commission."

Pursuant to this authority, the Commission determines that adjustments are needed to ERCOT prices to ensure they accurately reflect the scarcity conditions in the market. Accordingly, the Commission directs ERCOT to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals. The Commission further directs ERCOT to correct any past prices such that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals.[25]

The following day, February 16, the Commission issued a second order that is identical to the first except that it rescinds the last sentence under part I of the February *457 15 order directing ERCOT to correct past prices.

ERCOT acted on the Commission's directive by manually plugging a value into the SPM that would have the effect of raising the price of electricity to $9,000. This manual change remained in place until the grid returned to normal operations on February 19.

**E**

The storm's fallout was substantial. All three commissioners resigned. The Legislature sprang into action, enacting laws to improve preparation for winter weather emergencies[26] and to stabilize the market by offering a securitization program to market participants who had suffered defaults or losses from the high prices.[27] Still, some utilities went bankrupt.

Luminant is a power company that both buys and sells electricity. Although its sales offset some of the losses from purchasing electricity during the storm, Luminant claims that it suffered a net loss of a billion dollars from purchasing electricity at $9,000 during the storm. Luminant filed administrative challenges to the invoices it received for those purchases[28] and, in March 2021, sought judicial review of the Orders in the court of appeals under PURA Section 39.001(e)-(f). Several parties intervened on each side.

A two-judge panel rejected each of the jurisdictional objections raised by the Commission and held that the Orders exceed the Commission's authority under PURA and are therefore invalid.[29] The court did not reach Luminant's alternative argument that the Orders fail to comply with the procedural rulemaking requirements of the APA. The Commission and parties aligned with it filed petitions for review, which we granted.[30]

**II**

We start, as we must, with jurisdiction. The Commission challenges the court of appeals' subject-matter jurisdiction on three bases.

**A**

The Commission raises issues of standing and mootness. "Constitutional standing requires a concrete injury that is both traceable to the defendant's conduct and redressable by court order."[31] The Commission acknowledges that being overcharged for electricity is the "sort of pocketbook injury [that] is a prototypical form of injury in fact",[32] but it argues that Luminant's injuries are not redressable through this appeal. Specifically, the Commission argues that what Luminant "ultimately seek[s]" is "retrospective repricing"— it wants its money back—and PURA does not authorize the court of appeals to grant that relief. The court can only "render *458 judgment affirming the rule or reversing and, if appropriate on reversal, remand[ ] the rule to the commission for further proceedings, consistent with the court's opinion and judgment."[33]

But Luminant has challenged the invoices it received during the storm in an administrative proceeding, which is abated pending the outcome of this litigation. If the court of appeals' judgment invalidating the Orders were upheld, the decision would be binding in the administrative process. The Commission points out that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "[34] The Commission argues that whether Luminant could recoup its losses in the administrative proceeding is speculative because ERCOT does not maintain a fund of money—it just facilitates market transactions— and any payment would come out of the pocket of other

Appx. Page 160 of 740

market participants. Essentially, the Commission's argument is that the egg cannot be unscrambled. Yet potentially it can. Luminant points us to ERCOT protocols authorizing invoice repricing and market-wide resettlements[35] and to a market-wide resettlement that occurred just prior to the storm.[36] We conclude that Luminant has standing to seek judicial review of the Orders.[37]

We are likewise unpersuaded by the Commission's argument that Luminant's appeal was moot[38] before it even began. The Commission argues that the Orders expired on their own terms when the market returned to normal operations on February 19, 2021. But Luminant suffered financial loss as a result of the Orders. Following the Commission's logic would mean that short-term rules could never be challenged. That is not the law.[39]

**B**

PURA authorizes judicial review of **\*459** *competition rules.*[40] The Commission argues that the Orders are not rules at all, much less competition rules. The APA defines *rule* as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency".[41] The definition "includes the amendment or repeal of a prior rule" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures."[42] The Commission argues that the Orders do not meet this definition because "they applied only to a single, discrete event: the EEA3 event that occurred [during Winter Storm Uri]."

We conclude that the Orders meet the APA's definition of a rule. They directed ERCOT to implement the Commission's policy that "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest." This policy applied to all market transactions.[43] And while the Orders were addressed to ERCOT, the policy they implemented affected market participants directly.[44]

We also conclude that the Orders are competition rules within the meaning of PURA. The statute does not define competition rule. Citing dictionary definitions of

*competition* and derivative terms, the Commission proffers that "competition rules are anti-monopolistic rules geared toward curbing the effects of monopolies and other anti-competitive practices." There is no language in PURA to support such a narrow construction. We need not delineate the precise contours of competition rule. The Orders were adopted under Chapter 39. A fair reading of Section 39.001 indicates that a rule regulating pricing of the wholesale electricity market is within the term's ambit.[45]

**\*460** The Commission points out that in 2023, the Legislature amended Chapter 39 to distinguish between rulemaking and a written order of the Commission adopted by majority vote and to authorize the Commission to give ERCOT verbal directives in an emergency.[46] The Commission argues that these amendments codify its preexisting authority to direct ERCOT through a written order that is distinct from rulemaking. Yet there is nothing in the text reflecting the Legislature's intent either to confirm existing authority of the Commission or to give the Commission new authority, and the amendments did not take effect until September 1, 2023. Our task, therefore, is to determine whether the Orders are competition rules under the 2021 version of PURA such that they could be challenged by direct appeal to the court of appeals. We hold that they are.

Having concluded that the court of appeals had jurisdiction over Luminant's suit, we turn to the merits.

**III**

The Commission argues that the court of appeals erred in its conclusion that the Orders exceed the Commission's authority under PURA. We agree.

**A**

Agency rules are presumed valid, and the challenger has the burden of proving a rule's invalidity.[47] A challenger can meet this burden by showing that the challenged rule (1) contravenes specific statutory language; (2) runs counter to the general objectives of the statute; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions.[48] Only (1) and (2) are at issue here.

Appx. Page 161 of 740

We discern a statute's objectives from its plain text.[49] That text must always be read "in context—not isolation."[50] We "give meaning to every word in a statute, harmonizing each provision",[51] while "consider[ing] the context and framework of the entire statute", in order **\*461** to "meld its words into a cohesive reflection of legislative intent."[52] At the same time, "[w]e take statutes as we find them, presuming the Legislature included words that it intended to include and omitted words it intended to omit."[53]

**B**

The court of appeals' opinion acknowledges some of these principles, yet its analysis departs from them. The court compared the legislative findings on the desirability of competition in Section 39.001(a) and (d)[54] with the language setting out ERCOT's responsibility to ensure the reliability of the power grid and the Commission's responsibility to make rules on that topic in Section 39.151(a) and (d).[55] The court then phrased "[a] threshold question" as "whether the authority granted by Section 39.151 qualifies, or is qualified by, the limitations imposed by 39.001."[56] "Put another way," the court said, "the question is whether, or to what extent, Section 39.151's directive to ensure system reliability provides an exception to Section 39.001's general preference for reliance on competition rather than regulation to set prices."[57]

The court observed that "Section 39.151 is silent as to whether 'regulatory' rather than 'competitive' methods may be adopted to ensure grid reliability."[58] From there, it concluded that "the Commission's actions must be subject to the constraint provided by the text of Section 39.001."[59] The court believed this result to be directed by "the whole-text canon", which, the court said, "require[d] that [it] give effect to the phrase 'greatest extent feasible' " in Section 39.001(d).[60] To find that the Orders complied with the statement in Section 39.001(d) that the Commission "shall authorize or order competitive rather than regulatory methods to achieve the goals of [Chapter 39] to the greatest extent feasible", the court said that it "must find that the Orders could not have used 'competitive rather than regulatory methods' to any greater extent than they did as issued."[61] "This [it] [could not] do" because, prior to the Orders' being issued, the "SPM did not result in 'HCAP' pricing."[62]

**C**

The whole-text canon "calls on the judicial interpreter to consider the entire text, **\*462** in view of its structure and of the physical and logical relation of its many parts."[63] It incorporates the principles of statutory interpretation we have set out above.[64] The canon does not support the court of appeals' analysis or conclusion. Applying it yields the opposite result. Instead of treating Sections 39.001 and 39.151 as conflicting,[65] the court should have asked whether they can be harmonized[66] within the context and framework of the entire statute,[67] giving effect to both.[68] The answer is yes.

Section 39.001 announces the legislative policy that the price of electricity should be determined by competition while also acknowledging that the new market will not be completely unregulated. Subsection (a) states that prices should be determined by competition "except for transmission and distribution services and for the recovery of stranded costs".[69] Subsection (c) reflects the Legislature's understanding that "[r]egulatory authorities" may indeed have to "make rules or issue orders regulating ... prices ... or restricting ... competition" by stating that such rules can only be made "as authorized in this title".[70] Subsection (d) provides that "[r]egulatory authorities ... shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter", but then the Legislature added, "to the greatest extent feasible".[71] Subsection (d) also directs regulatory authorities to "adopt rules and issue orders that are both practical and limited *so as to impose the least impact* on competition."[72] Luminant argues that Section 39.001 prohibits the Commission from engaging in any act whatsoever that regulates prices, but it gets there by disregarding much of the section's language.[73]

**\*463** The subchapters that follow flesh out how the transition to a competitive market will take place and how the new market will be structured. They reveal an additional legislative policy: the provision of reliable electric service. Within a subchapter addressing retail competition, Section 39.101 directs the Commission, prior to the transition's being completed, to establish protections entitling a customer "to safe, reliable, and reasonably priced electricity, including protection against service disconnections in an extreme

Appx. Page 162 of 740

weather emergency".[74] Later, Section 39.151 expressly directs ERCOT to "ensure the reliability and adequacy of the regional electrical network"[75] and gives the Commission "complete authority" to ensure that ERCOT adequately performs that duty, which includes rulemaking "relating to the reliability of the regional electrical network".[76] In sum, the Orders are authorized by Section 39.151. Nothing in Section 39.001 changes that;[77] to the contrary, Section 39.001 acknowledges that the goal of prices set by competition may, in some circumstances, have to yield.

Deciding when those circumstances are present—and how to respond—is the Commission's job, not the judiciary's. We addressed the judiciary's limited role in reviewing agency rules for validity in *Texas Board of Chiropractic Examiners v. Texas Medical Ass'n.*[78] That case involved rules by the Chiropractic Examiners Board defining two terms that the Legislature had used in defining the scope of chiropractic practice.[79] The Medical Association challenged the rules' validity under the APA, arguing that the rules enlarged the scope of chiropractic beyond its statutory bounds.

We criticized the trial court for "weigh[ing] evidence—specifically, witness testimony presenting each side's view of the appropriate line between chiropractic and [medicine]—as if it were doing the Board's work anew."[80] We reiterated that "[t]he proper question for the court was whether, despite [the rules'] presumption of validity, [they] contravene[ ] the Act's specific text or run[ ] counter to its purpose as a matter of law."[81] This textual analysis "ensures that courts will stay in their lane."[82] "Judges are experts in statutory analysis, not in healthcare", we said.[83] "To prevent expensive and time-consuming usurpations of administrative agencies' policymaking work, the court's inquiry in a ... suit challenging the validity of an agency rule must be limited."[84]

The lessons of *Chiropractic Examiners* apply squarely here. The Commission has the expertise to manage the electric utility industry; the courts do not. The court of appeals thus strayed from its lane by inquiring **\*464** whether the Orders could have used " 'competitive rather than regulatory methods' to any greater extent than they did".[85] And for the same reason, we must decline Luminant's invitation to second-guess the Orders' necessity and whether it was the price hike they enacted or the Commission's earlier load-shed directives that truly saved the grid from collapse.

When the claim is that an agency rule exceeds the scope of statutory law, the judiciary's role is purely textual. We have concluded that the Orders do not "contravene[ ] specific statutory language" or "run[ ] counter to the general objectives of" Chapter 39, so the presumption of validity holds.[86]

## IV

Because of the court of appeals' holding on PURA, the court did not reach Luminant's alternative argument that the Orders violate the APA's rulemaking procedures. The issue is fully briefed in this Court, and the parties urge us to address it. We do and conclude that the Orders substantially comply with the statutory requirements.

The Government Code authorizes a state agency to "adopt an emergency rule without prior notice or hearing, or with an abbreviated notice and a hearing that it finds practicable, if the agency":

> (1) finds that an imminent peril to the public health, safety, or welfare ... requires adoption of a rule on fewer than 30 days' notice; and

> (2) states in writing the reasons for [that] finding ....[87]

The finding of imminent peril "shall [be] set forth in an emergency rule's preamble".[88] The agency "shall file" the emergency rule and the written reasons for it "in the office of the secretary of state for publication in the Texas Register".[89] The Legislature has determined that substantial compliance with these requirements is enough to defeat a procedural challenge to an emergency rule.[90] "A mere technical defect that does not result in prejudice to a person's rights or privileges is not grounds for invalidation of a rule."[91]

## A

The requirement of a written finding of imminent peril and reasons for that finding in the rule's preamble is satisfied by language in the Orders' introductory paragraphs, which note:

- the Governor's having issued a statewide disaster declaration under Section 418.014 of the Government Code;[92]

**Appx. Page 163 of 740**

- ERCOT's having "declared its highest state of emergency", an EEA3, "due to exceptionally high electric demand exceeding supply";

**\*465** • ERCOT's having directed transmission operators to shed load; and

- the expectations that ERCOT would remain in EEA3 and load shed would continue "for a sustained period of time in light of the expected duration of the extreme weather event."

Luminant complains that the Commission did not quote the exact statutory language under a heading titled "preamble". But only substantial compliance is required. We have said that "[a]n agency's order substantially complies with" a procedural rulemaking requirement if it "accomplishes the legislative objectives underlying the requirement" and "comes fairly within [its] character and scope".[93] The requirement that a reasoned finding of imminent peril be set out at the beginning ensures that the agency explains to the public why it is not following the usual procedures and timeline before making the rule. The language the Commission included in the Orders' introduction achieves that goal.[94]

**B**

It is undisputed that the Commission did not file the Orders with the Secretary of State to be published in the Texas Register. Publication in the Register is the only formal statutory notice requirement for an emergency rule,[95] but under the Secretary's regulations, there is an almost two-week gap between the deadline for filing a rule and the date of its publication in the Register.[96] If the Commission had filed the Orders with the Secretary but done nothing else, the Orders would have expired before any interested party received notice of them.

Elsewhere, the APA states that an "agency shall take appropriate measures to make emergency rules known to persons who may be affected by them."[97] The Commission did that by immediately posting the Orders on its website. The Orders were also summarized and linked in a notice that was posted on ERCOT's website and emailed to its distribution list. Under the circumstances, these measures provided better and faster notice to interested parties and the public than publication in the Register would have.

Luminant argues that substantial compliance does not apply to the filing requirement because the APA provides that emergency rules become "effective immediately on filing with the secretary of state".[98] Yet the statutory text says that it does. "A rule is voidable unless a state agency adopts it **\*466** in substantial compliance with Sections 2001.0225 through 2001.034."[99] The filing requirement for an emergency rule is in Section 2001.034(d).

Finally, neither Luminant nor any other respondent has articulated any prejudice resulting from the Commission's failure to file the Orders with the Secretary.[100] There is no dispute that respondents had actual notice of the Orders. Luminant contends that the Commission's "hasty process ... cost Luminant and other market participants hundreds of millions of dollars". But that complaint is about the Orders' substance, not their procedure.

We hold that the Commission substantially complied with the APA's emergency rulemaking procedure.

* * * * *

We reverse the judgment of the court of appeals and render judgment affirming the Orders.[101]

Justice Huddle and Justice Young did not participate in the decision.

**All Citations**

691 S.W.3d 448, 67 Tex. Sup. Ct. J. 1070

Footnotes

1    MWh is an abbreviation for megawatt hour, which is a unit of energy.

2     *See Pub. Util. Comm'n of Tex. v. RWE Renewables Ams.*, LLC, 691 S.W.3d 484 (Tex. June 14 2024) (No. 23-0555)); *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605 (Tex. 2023).

3     665 S.W.3d 166, 191-192 (Tex. App.—Austin 2023).

4     *See* Tex. R. App. P. 60.2(c) ("The Supreme Court may ... reverse the lower court's judgment in whole or in part and render the judgment that the lower court should have rendered[.]"); Tex. Util. Code § 39.001(f) ("The court of appeals shall render judgment affirming the rule or reversing .... The Texas Rules of Appellate Procedure apply to an appeal brought under this section to the extent not inconsistent with this section.").

5     Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, 1999 Tex. Gen. Laws 2543, 2558 (codified at Tex. Util. Code ch. 39).

6     Tex. Util. Code § 39.001(a).

7     *Id.* § 39.001(d).

8     *Id.* § 39.001(c).

9     *Id.* § 39.001(e).

10     *Id.* § 39.001(e)-(f). When Luminant filed its suit for judicial review, Section 39.001(e) provided for review in the Third Court of Appeals. In 2023, the Legislature amended Section 39.001(e) to provide for review by the Fifteenth Court of Appeals going forward. Act of May 21, 2023, 88th Leg., R.S., ch. 459, § 1.13, 2023 Tex. Gen. Laws ___.

11     *See CPS Energy*, 671 S.W.3d at 611-612 (giving the history of ERCOT).

12     Tex. Util. Code § 39.151(c).

13     *Id.* § 39.151(a)(2).

14     *Id.* § 39.151(a)(4). The others are "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms", *id.* § 39.151(a)(1), and "ensur[ing] that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information", *id.* § 39.151(a)(3).

15     *Id.* § 39.151(d).

16     *Id.*

17     *Id.*

18     *Id.* § 39.151(a)(2), (4).

19     *Id.* § 39.151(d).

20     16 Tex. Admin. Code § 25.501(a).

21     *Id.*

22     *Id.* § 25.509(b).

23     *Id.* § 25.505(g)(6)(B) (version in effect between May 30, 2019, and July 13, 2021). Today the HCAP is $5,000/MWh. *Id.* § 25.509(b)(6)(B).

24     *Id.* § 25.505(g)(6)(C), (E) (version in effect between May 30, 2019, and July 13, 2021).

25     Commission rules also set a floor price for energy, called the low system-wide offer cap or LCAP. In February 2021, the LCAP was the greater of $2,000/MWh or 50 times the natural gas price index value determined by ERCOT. *Id.* §

**Appx. Page 165 of 740**

25.505(g)(6)(A) (version in effect between May 30, 2019, and July 13, 2021). In part II of the order, the Commission suspended the LCAP due to abnormal fuel prices. "Due to exceptionally high natural gas prices at this time, if the LCAP is calculated as '50 times the natural gas price index value,' it may exceed the high system-wide offer cap (HCAP) of $9,000 per MWh", the order explains.

Respondents do not challenge the part of the orders suspending the LCAP.

26    Act of May 30, 2021, 87th Leg., R.S., ch. 426, 2021 Tex. Gen. Laws 833 (S.B. 3).

27    Act of May 30, 2021, 87th Leg., R.S., ch. 908, 2021 Tex. Gen. Laws 2218 (H.B. 4492).

28    The administrative proceedings are abated until this litigation concludes.

29    665 S.W.3d at 192.

30    Our references to the arguments of the Commission include the arguments of all petitioners, and our references to the arguments of Luminant include the arguments of all respondents.

31    *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021) (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 154-155 (Tex. 2012)).

32    *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 251 (Tex. 2023) (quoting *Collins v. Yellen*, 594 U.S. 220, 141 S. Ct. 1761, 1779, 210 L.Ed.2d 432 (2021)).

33    Tex. Util. Code § 39.001(f).

34    *Heckman*, 369 S.W.3d at 154-155 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

35    *See* ERCOT Nodal Protocols §§ 6.3(4), 20.10.

36    *See* Pub. Util. Comm'n of Tex., Complaints and Appeals of DC Energy Tex., LLC and Monterey TX, LLC Against ERCOT, Docket No. 50871 (Feb. 12, 2021) (final order at 11), https://interchange.puc.texas.gov/Documents/50871_32_1110661.pdf.

37    *See San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 625 (Tex. 2021) (concluding that homeowners whose properties flooded during Hurricane Harvey had standing to sue the River Authority for statutory takings under Chapter 2007 of the Government Code, even though Chapter 2007 does not authorize damages, because the statute provides other remedies, including "invalidation of the governmental action resulting in the taking").

38    About mootness, we recently wrote:

The mootness doctrine—a constitutional limitation founded in the separation of powers between the governmental branches—prohibits courts from issuing advisory opinions. A case becomes moot when (1) a justiciable controversy no longer exists between the parties, (2) the parties no longer have a legally cognizable interest in the case's outcome, (3) the court can no longer grant the requested relief or otherwise affect the parties' rights or interests, or (4) any decision would constitute an impermissible advisory opinion.

*Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634-635 (Tex. 2021) (citation omitted).

39    *See City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 572 S.W.2d 290, 300 (Tex. 1978) (holding that the cities' challenge to an interim order of the Commission granting a rate increase was not moot, even though it had been superseded by a final order, because "if the interim order should be determined to be invalid, ... this court could grant relief by allowing the cities to recover the temporary rates paid under the interim order").

Appx. Page 166 of 740

40    *See* Tex. Util. Code § 39.001(e) ("Judicial review of competition rules adopted by the commission shall be conducted under Chapter 2001, Government Code, except as otherwise provided by this chapter."); *id.* § 39.001(f) ("A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals ....").

41    Tex. Gov't Code § 2001.003(6)(A).

42    *Id.* § 2001.003(6)(B)-(C).

43    *Cf. El Paso Hosp. Dist. v. Tex. Health & Hum. Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008) (holding that HHSC's imposition of a cutoff date for selecting claims data from which to calculate Medicaid reimbursement rates was a statement of general applicability because it "affect[ed] all hospitals receiving reimbursement for inpatient Medicaid services"); *id.* ("Thus, no question exists that the February 28 cutoff is a statement of general applicability because it applies to all hospitals."); *see also R.R. Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003) ("By 'general applicability', the APA definition references statements that affect the interest of the public at large such that they cannot be given the effect of law without public input.").

44    *Cf. El Paso Hosp. Dist.*, 247 S.W.3d at 714-715 (explaining that "the February 28 cutoff [was] not a statement regarding the agency's internal management or organization but rather affect[ed] the Hospitals' private rights" by "directly affecting [their] right to reimbursement").

      The parties dispute whether part I of the Orders, being challenged here, amended the pricing rules then in effect. *See* Tex. Gov't Code § 2001.003(6)(B). We need not resolve that dispute. However, we note that part II of the Orders, which has not been challenged, expressly "grant[s] an exception to" the pricing rules by suspending the LCAP then in effect. *See supra* note 25.

45    *See* Tex. Util. Code § 39.001(a) (mentioning "electric services and their prices"); *id.* § 39.001(c) (prohibiting rules that regulate "prices" "except as authorized in this title").

      Indeed, the Commission has previously labeled a rule it described as "governing the enforcement of wholesale electricity markets and ERCOT administered markets" as a competition rule. Pub. Util. Comm'n of Tex., Re Enforcement of Wholesale Market Rules, Project No. 26201, 230 P.U.R.4th 361, 2004 WL 367935, at *2 (Feb. 9, 2004) (order adopting 16 Tex. Admin. Code § 25.503). In addition, the Orders cite Section 39.151(d) specifically, and the Commission has designated rules adopted under Section 39.151 as competition rules. *See, e.g.*, Pub. Util. Comm'n of Tex., Order Adopting Amendment to § 25.363 as Approved at the June 20, 2014 Open Meeting, Project No. 41949 (July 1, 2014) (at 1), https://interchange.puc.texas.gov/Documents/41949_12_798868.pdf.

46    *See* Act of May 28, 2023, 88th Leg., R.S., ch. 410, § 17, 2023 Tex. Gen. Laws ___ (H.B. 1500) (codified at Tex. Util. Code § 39.1514); *see* Tex. Util. Code § 39.1514(a) (stating a general rule that "[t]he commission may direct [ERCOT] to take an official action only through: (1) a contested case; (2) rulemaking; or (3) a memorandum or written order adopted by a majority vote"); *id.* § 39.1514(c) (authorizing the Commission to "use a verbal directive to direct [ERCOT] to take an official action in an urgent or emergency situation", while requiring the Commission to "establish criteria for determining whether a situation is urgent or an emergency" and to "establish a process" for issuing emergency directives).

47    *Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 569 (citing *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017)).

48    *Id.* (citing *Marriage & Fam. Therapists*, 511 S.W.3d at 33).

49    *Id.* (citing *Marriage & Fam. Therapists*, 511 S.W.3d at 33).

50    *State v. Hollins*, 620 S.W.3d 400, 407 (Tex. 2020).

51    *Hogan v. Zoanni*, 627 S.W.3d 163, 175 (Tex. 2021).

52    *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017).

53 *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014).

54 *See* Tex. Util. Code § 39.001(a) (stating that "the public interest in competitive electric markets requires that, [with some listed exceptions], electric services and their prices should be determined by customer choices and the normal forces of competition"); *id.* § 39.001(d) ("Regulatory authorities ... shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter to the greatest extent feasible and shall adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition.").

55 *See id.* § 39.151(a)(2) (listing "ensure the reliability and adequacy of the regional electrical network" among ERCOT's functions); *id.* § 39.151(d) ("The commission shall adopt and enforce rules relating to the reliability of the regional electrical network ... or may delegate [that] responsibilit[y] to an independent organization.").

56 665 S.W.3d at 191.

57 *Id.*

58 *Id.*

59 *Id.*

60 *Id.*

61 *Id.*

62 *Id.*

63 Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) [hereinafter Reading Law].

64 The authors explain:

Many of the other principles of interpretation are derived from the whole-text canon—for example, the rules that an interpretation that furthers the document's purpose should be favored (§ 4 [presumption against ineffectiveness]), that if possible no word should be rendered superfluous (§ 26 [surplusage canon]), that a word or phrase is presumed to bear the same meaning throughout the document (§ 25 [presumption of consistent usage]), that provisions should be interpreted in a way that renders them compatible rather than contradictory (§ 27 [harmonious-reading canon]), that irreconcilably contradictory provisions should be given no effect (§ 29 [irreconcilability canon]), and that associated words bear on one another's meaning (*noscitur a sociis*) (§ 31 [associated-words canon]).

*Id.* at 168.

65 *See* 665 S.W.3d at 191.

66 *Hogan*, 627 S.W.3d at 175; *see* Reading Law, *supra* note 63, at 180 ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.").

67 *Cadena Comercial*, 518 S.W.3d at 326; *see* Reading Law, *supra* note 63, at 167 ("The text must be construed as a whole.").

68 *Hogan*, 627 S.W.3d at 175; *see* Reading Law, *supra* note 63, at 174 ("If possible, every word and every provision is to be given effect ....").

69 Tex. Util. Code § 39.001(a).

70 *Id.* § 39.001(c).

71 *Id.* § 39.001(d).

72    *Id.* (emphasis added).

73    Luminant urges that "to the greatest extent feasible" in Section 39.001(d) modifies the phrase immediately preceding it, "to achieve the goals of this chapter", rather than the earlier language directing the Commission to "authorize or order competitive rather than regulatory methods". But this reading does not change the sentence's overall meaning because the sentence must be read in context. And as we explain, the Legislature acknowledges in other statutory language, including the very next sentence, that competitive methods may not always suffice to achieve all the chapter's goals.

74    *Id.* § 39.101(a)(1).

75    *Id.* § 39.151(a)(2).

76    *Id.* § 39.151(d).

77    "[A] preamble or purpose clause ... cannot expand [text] beyond its permissible meaning. If they could, they would be the purposivists' playground ...."). Reading Law, *supra* note 63, at 35.

78    616 S.W.3d 558.

79    *Id.* at 560.

80    *Id.* at 571.

81    *Id.*

82    *Id.*

83    *Id.*

84    *Id.*

85    665 S.W.3d at 191 (quoting Tex. Util. Code § 39.001(d)).

86    *Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 569.

87    Tex. Gov't Code § 2001.034(a). An emergency rule "may be effective for not longer than 120 days and may be renewed once for not longer than 60 days." *Id.* § 2001.034(c).

88    *Id.* § 2001.034(b).

89    *Id.* § 2001.034(d).

90    *See id.* § 2001.035(a) ("A rule is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034.").

91    *Id.* § 2001.035(d).

92    To do so, the Governor must "find[ ] a disaster has occurred or that the occurrence or threat of disaster is imminent." *Id.* § 418.014(a).

93    *Nat'l Ass'n of Indep. Insurers v. Tex. Dep't of Ins.*, 925 S.W.2d 667, 669 (Tex. 1996).

94    Luminant also argues that the Commission was required to comply with Section 2001.033, which requires that a final state agency order adopting a rule include "a reasoned justification" for it. *See* Tex. Gov't Code § 2001.033(a)(1). This requirement applies to a final rules order promulgated in the ordinary course, not an emergency rule adopted under Section 2001.034. The "reasoned justification" required by Section 2001.033 must include "a summary of comments received from parties interested in the rule" and "the reasons why the agency disagrees with party submissions and

proposals". *Id.* § 2001.033(a)(1)(A), (C). But emergency rulemaking is authorized when there is not time for a notice-and-comment period. *See id.* § 2001.034(a) (authorizing the adoption of "an emergency rule without prior notice or hearing").

95    *See id.* § 2001.034(d).

96    *See* 1 Tex. Admin. Code § 91.6(a) ("The Texas Register publishes 52 issues yearly, excluding indexes. Friday is the day of publication."); *id.* § 91.6(b) ("Rule filing deadline: 12:00 noon, Monday, the week before publication.").

97    Tex. Gov't Code § 2001.036(b).

98    *Id.* § 2001.036(a)(2).

99    *Id.* § 2001.035(a).

100   *See id.* § 2001.035(d) ("A mere technical defect that does not result in prejudice to a person's rights or privileges is not grounds for invalidation of a rule."); *cf. City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 264 (Tex. 2001) (Owen, J., concurring) ("[W]e have previously held that failure to follow procedural requirements of statutes or rules is not reversible error without a showing of harm." (citing *Imperial Am. Res. Fund, Inc. v. R.R. Comm'n of Tex.*, 557 S.W.2d 280, 288 (Tex. 1977))).

101   Tex. Util. Code § 39.001(f); Tex. R. App. P. 60.2(c).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 91788041
Filing Code Description: Answer/Response
Filing Description: ERCOT'S PLEA TO THE JURISDICTION AND ATERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT
Status as of 9/10/2024 8:43 AM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 9/9/2024 12:08:27 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 9/9/2024 12:08:27 PM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 9/9/2024 12:08:27 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 9/9/2024 12:08:27 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 9/9/2024 12:08:27 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 9/9/2024 12:08:27 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 9/9/2024 12:08:27 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 9/9/2024 12:08:27 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 9/9/2024 12:08:27 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 9/9/2024 12:08:27 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 9/9/2024 12:08:27 PM | SENT |

Case Contacts

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 91788041
Filing Code Description: Answer/Response
Filing Description: ERCOT'S PLEA TO THE JURISDICTION AND ATERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT
Status as of 9/10/2024 8:43 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 9/9/2024 12:08:27 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/9/2024 12:08:27 PM | SENT |

9/9/2024 9:55 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Schmidt

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION | § | |
| OF TEXAS, ELECTRIC | § | TRAVIS COUNTY, TEXAS |
| RELIABILITY COUNCIL OF TEXAS, | § | |
| THOMAS GLEESON, LORI COBOS, | § | |
| JIMMY GLOTFELTY, KATHLEEN | § | |
| JACKSON, and COURTNEY | § | |
| HJALTMAN, | § | |
| *Defendants*. | § | 345th JUDICIAL DISTRICT |

## AMENDED ANSWER
## OF THE PUBLIC UTILITY COMMISSION OF TEXAS
## AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS

TO THE HONORABLE JUDGE OF SAID COURT:

Defendants Public Utility Commission of Texas ("PUCT"), Thomas Gleeson,

Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their

official capacities as Commissioners of the PUCT (collectively, "PUCT

Defendants"), through the Office of the Attorney General of Texas, file this

Amended Answer to the First Amended Petition and Application for

Stay/Suspension and Temporary and Permanent Injunction ("Amended Petition") of

Aspire Power Ventures, LP ("Aspire").

## General Denial

The PUCT Defendants deny each and every allegation in Aspire's Amended Petition and demand strict proof thereof. The PUCT Defendants reserve the right to amend their answer as permitted under the Texas Rules of Civil Procedure.

## Defenses

1. The Court lacks jurisdiction over Aspire's claims against the PUCT Defendants in their official capacities because there is no waiver of their sovereign immunity to hear Aspire's challenges to the three orders at issue.

2. To the extent that Aspire failed to exhaust all administrative remedies in proceedings at the PUCT, the Court lacks jurisdiction over Aspire's claims against the PUCT Defendants.

3. The PUCT Defendants assert the defenses of waiver and estoppel to any claims that are inconsistent with positions Aspire took in the administrative proceedings before the PUCT.

4. The PUCT Defendants assert the defenses of waiver and estoppel to any claims not raised by Aspire in the administrative proceedings before the PUCT.

## Prayer

WHEREFORE, HAVING FULLY ANSWERED, the PUCT Defendants pray that:

2

1. Aspire take nothing by its suit and PUCT Defendants recover their costs; and

2. PUCT Defendants further pray for such other relief, both at law and equity, to which they may show themselves to be justly entitled.

> Respectfully submitted,
>
> KEN PAXTON
> Attorney General of Texas
>
> BRENT WEBSTER
> First Assistant Attorney General
>
> RALPH MOLINA
> Deputy First Assistant Attorney General
>
> JAMES LLOYD
> Deputy Attorney General for Civil
> Litigation
>
> KELLIE E. BILLINGS-RAY
> Chief, Environmental Protection Division
>
> */s/ John R. Hulme*
> JOHN R. HULME
> Assistant Attorney General
> State Bar No. 10258400
> John.Hulme@oag.texas.gov
>
> AMANDA ATKINSON CAGLE
> Assistant Attorney General
> State Bar No. 00783569
> Amanda.Cagle@oag.texas.gov
>
> JORDAN PRATT
> Assistant Attorney General
> State Bar No. 24140277
> Jordan.Pratt@oag.texas.gov

3

Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 320-0911

**ATTORNEYS FOR THE PUBLIC UTILITY COMMISSION OF TEXAS, and THOMAS GLEESON, LORI COBOS, JIMMY GLOTFELTY, KATHLEEN JACKSON, and COURTNEY HJALTMAN, in their official capacities as Commissioners of the Public Utility Commission Texas**

4

## CERTIFICATE OF SERVICE

This is to certify that on September 9, 2024, a true and correct copy of the foregoing document was served on the following counsel by an electronic service provider and/or email:

Chrysta L. Castañeda
chrysta@castaneda-firm.com
Nicole Michael
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Tel: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
mlatin@ccsb.com
Brent M. Rubin
brubin@ccsb.com
CARRINGTON, COLEMAN,
SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Tel: (214) 855-3000
Fax: (214) 580-2641

*Counsel for Plaintiff*
*Aspire Power Ventures, LP*

Elliot Clark
eclark@winstead.com
Elin Isenhower
eisenhower@winstead.com
WINSTEAD PC
401 Congress Avenue, Suite 2100
Austin, Texas 78701
Tel: (512) 370-2800
Fax: (512) 370-2850

*Counsel for Defendant*
*Electric Reliability Council of Texas*

/s/ John R. Hulme
JOHN R. HULME

5

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of John Hulme
Bar No. 10258400
david.laurent@oag.texas.gov
Envelope ID: 91776543
Filing Code Description: RESPONSE
Filing Description: AMENDED ANSWER OF THE PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS
Status as of 9/9/2024 3:40 PM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 9/9/2024 9:55:38 AM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 9/9/2024 9:55:38 AM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 9/9/2024 9:55:38 AM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 9/9/2024 9:55:38 AM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 9/9/2024 9:55:38 AM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 9/9/2024 9:55:38 AM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 9/9/2024 9:55:38 AM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 9/9/2024 9:55:38 AM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 9/9/2024 9:55:38 AM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 9/9/2024 9:55:38 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 9/9/2024 9:55:38 AM | SENT |

Case Contacts

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of John Hulme
Bar No. 10258400
david.laurent@oag.texas.gov
Envelope ID: 91776543
Filing Code Description: RESPONSE
Filing Description: AMENDED ANSWER OF THE PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS
Status as of 9/9/2024 3:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 9/9/2024 9:55:38 AM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/9/2024 9:55:38 AM | SENT |

9/13/2024 3:47 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Nancy Rodriguez

Cause No. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS |
| TEXAS, ELECTRIC RELIABILITY | § | |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN JACKSON, | § | |
| and COURTNEY HJALTMAN, | § | |
| *Defendants*. | § | 345TH JUDICIAL DISTRICT |

---

**DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND
PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS'
PLEA TO THE JURISDICTION**

---

Aspire's suit challenges and seeks to enjoin three amendments to ERCOT's operating standards or "protocols," which the PUCT Defendants[1] approved on May 12, 2022; January 26, 2023; and June 29, 2023. The PUCT Defendants move to dismiss Aspire's suit for lack of jurisdiction.

## I.     Standard of Review

A court "must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation

---

[1] Public Utility Commission of Texas ("PUCT" or "Commission") and Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Chairman and Commissioners of the PUCT (collectively, the "PUCT Defendants.")

to proceed." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Whether the Court has subject-matter jurisdiction is a question of law. *Id*. Moreover, courts have an "obligation" to consider a plea to the jurisdiction asserting immunity when filed. *See In re Lazy W District No. 1*, 493 S.W.3d 538, 544 (Tex. 2016) (orig. proceeding). In short, jurisdiction must be resolved first; only after it has been determined can Aspire's claims for injunctive relief be heard.

The Court lacks jurisdiction over this case for several reasons. The first is sovereign immunity. Plaintiff's suit against the Commission and its officials in their official capacity is a suit against the State. "[A] suit against government employees in their official capacities is, in all respects, a suit against the State." *De Mino v. Sheridan,* 176 S.W.3d 359, 366 (Tex. App.–Houston [1st Dist.] 2004, no pet.). The trial court lacks subject-matter jurisdiction absent a showing that the Texas Legislature by statute or express permission has given the State's consent to being sued in this matter. *See Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). There is no such consent here, as Aspire invokes a statutory provision that only authorizes judicial review of agency rules. But the matter at issue here is not an agency rule. *Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024) (PUCT order approving ERCOT protocol amendment "was not an agency-adopted 'rule' under the Administrative Procedure Act."). *See* Attach. 1. Thus, the limited waiver of the State's sovereign immunity

2

under Texas Gov't Code § 2001.038 is not applicable here.

Nor does the *ultra vires* exception to sovereign immunity apply. Aspire alleges "the [PUCT] Commissioners committed ultra vires acts for which they are liable in their official capacities." Am. Pet. ¶ 55. But "[a]n ultra vires action requires a plaintiff to 'allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.'" *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). The PUCT Commissioners have not acted *ultra vires* by reviewing and ratifying amendments to the Electric Reliability Council of Texas ("ERCOT") protocols—because their actions are *specifically authorized by* Tex. Util. Code § 39.151. *See e.g.* Tex. Util. Code § 39.151(g-6): "The commission may approve, reject, or remand with suggested modifications . . . protocols adopted by [ERCOT]." *See* Attach. 2. Thus, the ultra vires exception does not apply and Aspire's lawsuit against the PUCT officials in their official capacity is barred by sovereign immunity.

## II.    Factual Background

Aspire's suit challenges three different amendments to ERCOT's operating standards or "protocols," each approved in due course by the PUCT, as the Texas Public Utility Regulatory Act ("PURA") has authorized since 2021. Tex. Util. Code § 39.151(g-6). Defendant ERCOT is the Commission's designated electric grid operator. Tex. Util. Code § 39.151(d), (i), (j). ERCOT manages the Texas electric

3

Appx. Page 182 of 740

grid under authority delegated to it by PUCT to "establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants." *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 626 (Tex. 2023). These protocols consist of thousands of pages of highly technical standards that govern every aspect of the electric grid and the wholesale electric market, including detailed specifications and complex pricing formulas. *Id.* at 616-17; *Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 486-87 (Tex. 2024). ERCOT develops these protocols through an elaborate stakeholder process involving electric market participants, providing extensive opportunities for market participant involvement and comment, that is described in the recent Supreme Court decision in *RWE Renewables*, 691 S.W.3d at 490 (protocol development process "serves to leverage the expertise of ERCOT members and industry stakeholders while maintaining transparency and affording interested parties plentiful opportunities to weigh in").

The specific protocol amendments challenged in this suit relate to ERCOT's Contingency Reserve Service ("ECRS"), a type of "ancillary service" that the grid operator uses to balance supply and demand and keep the grid operating. *See* Tex. Util. Code § 39.159(b) (grid operator to "procure[] ancillary or reliability services . . . to ensure appropriate reliability"); § 35.004(e) ("'[A]ncillary services' means

4

services necessary to facilitate the transmission of electric energy including load following, standby power, backup power, reactive power, and any other services as the commission may determine by rule."); *see also* 16 Tex. Admin. Code § 25.5(9); ERCOT Nodal Protocols § 2.1. The particular ancillary service program at issue in this case, ECRS, was originally created in 2019. As ERCOT has explained in its own plea to the jurisdiction filed in this case, ECRS was developed to address reliability risks that the grid operator's other ancillary services did not adequately address, "including those risks created by rapid grid modernization (e.g., increasing amounts of intermittent wind and solar generation resources), which are only compounded by the ever-present heightened reliability risks presented by ERCOT's intrastate nature." ERCOT Plea to the Jurisdiction 8 (citing ERCOT Protocols § 6.5.7.6.2.4(1) (listing purposes of ECRS)). The latter need refers to the fact that the ERCOT grid is generally not interconnected to the grids in other parts of the country and thus it is uniquely vulnerable to sudden power shortages. *Id.* (ECRS is a critical reliability tool fulfilling a similar role to import capability in other parts of the country).

Aspire does not challenge the initial creation of ECRS, which occurred in 2019, but rather three later amendments to ECRS that were approved by the PUCT over a year ago. Am. Pet. ¶ 29; *see also* ¶ 1 (defining the three challenged orders implementing ECRS as the "ECRS Rules"). The Commission approved the first and only substantive amendment of the three ECRS protocol amendments Aspire

5

Appx. Page 184 of 740

challenges in May 2022. The two other ECRS approval orders at issue (approved in 2023) merely cleaned up the language in the underlying ECRS protocol (Nodal Protocol Revision Request, or "NPRR" 1148) and set forth clarifications and expectations regarding the ECRS protocol (NPRR 1178). Tex. Pub. Util. Comm'n, *Review of Protocols Adopted by the Independent Organization,* Project No. 54445.

Aspire did not file its original petition in this case until May 31, 2024, over two years after the PUCT order approving ERCOT's first protocol amendment and more than a year after the Commission approved the latter two protocol amendments. On August 13, 2024, Aspire filed an Amended Petition adding ERCOT as a defendant,[2] asserting new causes of action relating to the same ECRS protocols that the PUCT ratified, complaining of ERCOT and the PUCT's actions in connection with the ECRS protocols, and seeking associated relief. Am. Pet. ¶ 5 ("[T]he PUC and ERCOT implemented ECRS without even attempting to comply with the mandatory requirements of the APA"), ¶ 19.

The ERCOT protocol that actually created the ECRS program, NPRR 863, was adopted in February 2019. Rather than the three protocol amendments at issue in this suit, most of Aspire's complaints are about the ECRS program generally, indicating its actual objective in this lawsuit is to invalidate the ECRS program in its

---

[2] The Amended Petition also added new PUCT Commissioner Hjaltman as a defendant.

6

entirety. Am. Pet. ¶¶ 28-38. But the 2019 protocol that established ECRS was adopted before PURA was amended to add the requirement that the PUCT approve protocols before they take effect. As with the 2022 and 2023 protocol amendments challenged in this suit, Aspire did not complain to the Commission about ERCOT's conduct in adopting the 2019 protocols through the procedure provided in the PUCT rules and, therefore, has failed to exhaust administrative remedies as to any of the ECRS protocols. *See* Section V below.

### III. The Court lacks jurisdiction over Aspire's declaratory judgment claim because the PUCT's approval orders at issue are not agency rules.

Aspire's suit seeks a declaratory judgment under the Texas Administrative Procedure Act, Tex. Gov't Code § 2001.038.[3] That provision only authorizes declaratory judgments regarding the validity or applicability of ***agency rules***. Tex. Gov't Code § 2001.038(a) ("The validity or applicability of a rule . . . may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff."). But the recent *RWE Renewables* decision of the Supreme Court makes clear that these PUCT approval orders are not agency rules. In *RWE Renewables*, the Supreme Court held that the PUCT's

[3] Aspire also seeks an injunction and a stay under PURA Section 15.004 in connection with this Tex. Gov't Code § 2001.038 declaratory claim. The Court lacks jurisdiction over these requests as well.

7

protocol-approval determinations, such as those of which Aspire complains in this case, are ***not*** agency "rules." *Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024) (PUCT order approving ERCOT protocol amendment was "a ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect," and "[c]onsequently, the PUC's order was not an agency-adopted 'rule' under the Administrative Procedure Act.").

In *RWE*, the plaintiff (like Aspire, an ERCOT wholesale market participant) was likewise challenging a PUCT order approving an ERCOT protocol amendment. But the Supreme Court rejected RWE's contention that the PUCT approval order at issue was a PUCT rule. The Court held that "PURA envisions a separate process for ERCOT-adopted protocols, and the statutory requirement that the PUC approve those adopted protocols does not transform PUC approval orders into PUC rules." *RWE Renewables*, 691 S.W.3d at 486. Thus, the PUCT order approving ERCOT's protocol amendment was only "a ratification decision" and "[c]onsequently, the PUC's order was not an agency-adopted 'rule' under the Administrative Procedure Act." *Id*. at 492. Here the Court noted that PURA designated ERCOT as the entity that "adopts" new or revised protocols, Tex. Util. Code § 39.151(g-6), which the PUCT (its overseer) then "approves." *Id*. The APA's requirements, on the other hand, refers and imposes requirements only with reference to an agency's adoption

8

of a rule. *RWE*, 691 S.W.3d at 491 ("We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that 'adopts' ERCOT protocols given the comprehensive statutory use of that term.").

The Supreme Court's holding in *RWE* conclusively answers the jurisdictional question in this case—the PUCT's approval orders are not agency-adopted rules that Aspire can challenge under the APA, Tex. Gov't Code § 2001.038. There is no waiver of sovereign immunity. For this simple reason alone, the Court lacks jurisdiction over all of Aspire's claims against the PUCT. Because PUCT's approval order was not a rule under *RWE*, the Court has no jurisdiction over Aspire's declaratory judgment claims against the PUCT under Tex. Gov't Code § 2001.038. *See also R.R. Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 70 (Texas. 2003) (no Section 2001.038 jurisdiction regarding agency orders adopting field rules that were not APA rules).

## IV.   The Court lacks jurisdiction over this case because Aspire's complaints about ERCOT's protocols must have been brought to the Commission.

To the extent Aspire challenges the protocol amendments themselves, the case should be dismissed because the PUCT has exclusive jurisdiction over Aspire's complaints about ERCOT's adoption of the challenged protocol amendments. Aspire's complaints must have been brought first to the Commission. Subject-matter jurisdiction is lacking "when the Legislature has granted [an] agency the sole authority to make an initial determination in a dispute," and thus the Court lacks

9

jurisdiction "until the party has exhausted all administrative remedies before the agency." *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018). This includes any complaints about the protocols that ERCOT has adopted.

Exclusive jurisdiction may be created by express statutory language or through the creation of a pervasive regulatory scheme indicating that "the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *Id*. at 138 (quoting *In re Sw. Bell Tel.*, 235 S.W.3d 619, 624-25 (Tex. 2007)). PURA Section 39.151, attached to this plea, sets forth a detailed framework outlining the PUCT's oversight and "complete authority" over ERCOT's functions. *See* Attach. 2. In *CPS Energy v. Electric Reliability Council of Texas*, 671 S.W.3d 605, 618 (Tex. 2023), the Supreme Court held that the PUCT's comprehensive regulatory authority over its designated grid operator, ERCOT, was such a pervasive regulatory scheme establishing exclusive jurisdiction with the agency that it deprived the Court of the authority to hear the dispute. *Id.* ("[PURA] Section 39.151's grant of extensive authority to the PUC over ERCOT and its detailed regulation of the particulars of ERCOT's functions constitute a pervasive regulatory scheme.").

Aspire's allegations about the protocol amendments themselves plainly fall within this scheme: they involve ERCOT's development of standards designed to

10

ensure the reliability of the ERCOT grid through ancillary services programs such as ECRS. Had Aspire filed complaints about ERCOT's protocol amendments with the Commission, and the Commission sustained ERCOT's action, then Aspire could have challenged that determination in this Court in accordance with the APA's judicial review provisions. Tex. Gov't Code § 2001.171. But Aspire did not file such a complaint with the PUCT, and the Court lacks jurisdiction to hear these complaints. For this additional reason, this Court lacks jurisdiction over Aspire's amended petition.

## V. The Court lacks jurisdiction over any challenge to the Commission's 2022 and 2023 protocol amendments because Aspire failed to exhaust its administrative remedies.

Aspire's attempt to frame the Commission's validation decisions as "rules" is not totally surprising given that Aspire did not pursue the necessary administrative remedies to bring a suit challenging the 2022 and 2023 protocol amendments, and it is far too late for it to do so now. Again, to have pursued any such challenge, Aspire must have first exhausted its administrative remedies by (1) complaining to ERCOT about each of the three protocol amendments and then (2) filing a complaint with the Commission about each of the three protocol amendments. Aspire did neither of these, for any of the three challenged protocol amendments. Thus, Aspire failed to exhaust all available administrative remedies. To the extent Aspire's Amended

11

Petition could somehow be read as challenging the PUCT's orders, the Court lacks jurisdiction over this case for this reason.

Under the APA "[a] person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter." Tex. Gov't Code § 2001.171. The Commission's rules set out those procedures. Under PUCT rules, affected entities may issue formal complaints to the PUCT regarding ERCOT action. 16 Tex. Admin. Code § 22.251(b). Under these well-established procedures, Aspire must have sought relief through ERCOT's alternative dispute resolution ("ADR") procedures before then filing a formal complaint with the Commission. *Id.* § 22.251(c). When ADR is required, the complainant must file a formal complaint with the Commission within 35 days after completing ADR. *Id.* § 22.251(d).

Aspire failed to file such a complaint after ERCOT approved the protocol amendments in 2022 and 2023, even though it had notice of and ample opportunity to comment and participate in the protocol-development process at ERCOT. *See* Section II above discussing ERCOT protocol amendment process; *RWE Renewables*, 691 S.W.3d at 490. Aspire then needed to complain of ERCOT's action to the Commission under 16 Tex. Admin. Code § 22.251. Again, it did not. Had Aspire exhausted its administrative remedies as the law requires, the Commission decision on that complaint would then be subject to judicial review under Tex. Gov't

12

Appx. Page 191 of 740

Code § 2001.171. Here again, the Supreme Court's recent decision in *RWE Renewables* is instructive, as it confirms that such a complaint is the proper way to challenge an ERCOT protocol. *RWE Renewables*, 691 S.W.3d at 492 n.11 ("PUC regulations provide a process for review of ERCOT protocols, 16 Tex. Admin. Code §§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review in district court, Tex. Util. Code § 15.001."). Because Aspire did not avail itself of these remedies, the Court has no jurisdiction over this suit. *See* Section VI below.

**VI.    The Court lacks jurisdiction over this 2024 case because Aspire waited over a year to file suit to challenge the PUCT protocol-approval orders.**

Had Aspire followed the proper procedure to complain about the 2022 and 2023 protocol amendments as the Supreme Court explained in *RWE* (it did not), its complaint about the Commission's approval of ERCOT's protocols would have been subject to judicial review under the APA—had it timely filed suit. Here again, it did not. Instead of following the proper procedure before the agency, Aspire instead skipped ahead to directly challenge the PUCT's 2022 and 2023 approval orders in district court. But Aspire's *2024* suit challenging the Commission's *2022* and *2023* approval decisions was, in any event, filed far too late. A challenge to an agency order must be brought within 30 days of the denial of the motion for rehearing. Tex. Gov't Code § 2001.176(a). Aspire did not file any sort of rehearing request after the approval orders were issued. Even if it had filed such a request, the motion would have been overruled by operation of law in 2023. *Id.* § 2001.146(c). Aspire would

13

Appx. Page 192 of 740

then have been required to bring its suit within 30 days. *Id.* § 2001.176(a). Aspire did not file this suit until late May 2024, far too late to invoke this Court's jurisdiction.

The obvious lateness of the suit aside, there is yet another problem fatal to the Court's jurisdiction here: Aspire did not even try to participate in the proceeding in which the protocols were approved. It did not file anything at all (an intervention request, comments, or an objection) in response to ERCOT's requests for approval of three protocol amendments Aspire challenges.

## VII. The Court lacks jurisdiction over Aspire's ultra vires claims because the PUCT Commissioners' review and approval of the ERCOT protocol amendments was within their statutory authority.

The ultra vires doctrine allows suits against government officials who are alleged to have acted outside their legal authority. *Hall*, 508 S.W.3d at 238. To assert a valid ultra vires claim, the plaintiff "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Schroeder v. Escalera Ranch Owners' Ass'n*, 646 S.W.3d 329, 332 (Tex. 2022) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). A government officer with some discretion to interpret and apply the law acts without legal authority "if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Id*. (quoting *Hall*, 508 S.W.3d at 238). "If the challenged actions 'were not truly

14

outside the officer's authority or in conflict with the law,' then the plaintiff has not stated a valid ultra vires claim and governmental immunity will bar the suit." *Id*. at 332-33 (quoting *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021)).

Mere allegations that a state official's acts were unconstitutional or "without legal authority" are not enough to satisfy the ultra vires exception to sovereign immunity. *Creedmoor-Maha Water Supply Corp. v. Tex. Comm'n on Env't Quality*, 307 S.W.3d 505, 515 (Tex. App.—Austin 2010, no pet.). "[I]f the plaintiff alleges only facts demonstrating acts within the officer's legal authority and discretion, the claim seeks to control state action, and is barred by sovereign immunity." *Id*. at 515-16. When determining whether a party has asserted a valid ultra vires claim, courts "construe the relevant statutory provisions and apply them to the facts as alleged in the pleadings." *Cockrell Inv. Partners, L.P. v. Middle Pecos Groundwater Conservation Dist*., 677 S.W.3d 727, 744 (Tex. App.—El Paso 2023, pet. pending).

Aspire has not alleged *any* facts that the PUCT Commissioners acted outside their legal authority. Indeed, the action they challenge is one they are statutorily mandated to do: under PURA, PUCT must review and approve all of ERCOT's protocol amendments before they are allowed to take effect. Tex. Util. Code § 39.151(g-6). Instead, all of Aspire's ultra vires conduct allegations take issue with the decisions reached by PUCT in its protocol-ratification order or the process by which the order was issued. To the extent Aspire complains about the procedures the

15

Appx. Page 194 of 740

PUCT employed in making a decision plainly within its authority, that is not a proper ultra vires claim. (And in any event, the Supreme Court has explained in *RWE Renewables* that the Commission's protocol ratification decisions are not rules and that the Commission was not required to employ APA procedures in adopting them.)

To the extent that Aspire complains about the decision that the PUCT made (that is, approving a protocol that is allegedly contrary to PURA's prohibition on market participants withholding power from the ERCOT wholesale market), that is not the proper subject of an *ultra vires* claim, either. The Commission is statutorily charged with "approv[ing], reject[ing], or remand[ing] with suggested modifications to [ERCOT]'s governing body protocols adopted by the organization." Tex. Util. Code § 39.151(g-6). Thus, the determination of whether a proposed protocol amendment complies with PURA is within the Commission's discretion to make. Aspire's challenge to the Commissioners' exercise of discretion in carrying out their statutory duty to review ERCOT protocol amendments does not establish true ultra vires conduct. *See Schroeder*, 646 S.W.3d at 335 ("Even if incorrect in their conclusion, the Commissioners did not exceed the scope of their authority."); *see also Hall*, 508 S.W.3d at 243 ("Based on the unrestricted nature of McRaven's authority under Section 5.4.6, we find his discretion to interpret collateral federal privacy law to be 'absolute' . . . . As such, McRaven—whether right or wrong—was not without legal authority in making that determination."). Because Aspire

16

Appx. Page 195 of 740

complains only of the Commissioners' exercise of discretion under the applicable statute—and has failed to allege any conduct exceeding the Commissioners' authority under that statute—Aspire has not properly pled a valid ultra vires claim within the exception to the State's sovereign immunity. *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021) (plaintiff asserting an ultra vires claim must "allege facts affirmatively demonstrating actionable ultra vires conduct by state officials in order to avoid dismissal on jurisdictional grounds due to sovereign immunity").

Under Tex. Util. Code § 39.151(d), (g-6), the Commission undeniably had the authority and discretion to issue the 2022 and 2023 orders Aspire challenges. The ultra vires exception to sovereign immunity does not apply.

## PRAYER

The PUCT Defendants pray that this Court dismiss all claims against the PUCT and the PUCT Commissioner defendants for lack of jurisdiction. The PUCT Defendants further pray for all other relief to which they may be entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

17

Appx. Page 196 of 740

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ John R. Hulme*
JOHN R. HULME
Special Counsel
State Bar No. 10258400
John.Hulme@oag.texas.gov

AMANDA ATKINSON CAGLE
Assistant Attorney General
State Bar No. 00783569
Amanda.Cagle@oag.texas.gov

JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | *Fax* (512) 320-0911

***Attorneys for the Public Utility Commission of Texas and Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Chairman and Commissioners of the Public Utility Commission of Texas***

18

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the following attorneys via the Court's electronic filing case management system and/or electronic mail on September 13, 2024:

Chrysta L. Castañeda
chrysta@castaneda-firm.com
Nicole Michael
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Tel: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
MLatin@ccsb.com
Brent M. Rubin
BRubin@ccsb.com
CARRINGTON, COLEMAN,
SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Tel: (214) 855-3000
Fax: (214) 580-2641

*Attorneys for Plaintiff*
*Aspire Power Ventures, LP*

Elliot Clark
eclark@winstead.com
Elin Isenhower
eisenhower@winstead.com
WINSTEAD PC
401 Congress Avenue, Suite 2100
Austin, Texas 78701
Tel: (512) 370-2800
Fax: (512) 370-2850

*Attorneys for Defendant*
*Electric Reliability Council of Texas*

/s/ John R. Hulme
JOHN R. HULME

**Appx. Page 198 of 740**

# Attachment 1

*Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484 (Tex. 2024)

691 S.W.3d 484
Supreme Court of Texas.

PUBLIC UTILITY COMMISSION
OF TEXAS, Petitioner,

v.

RWE RENEWABLES AMERICAS, LLC
and TX Hereford Wind, LLC, Respondents

No. 23-0555
|
Argued March 19, 2024
|
OPINION DELIVERED: June 14, 2024

**Synopsis**

**Background:** Market participants filed direct appeal of order of Public Utility Commission (PUC), ⚑2021 WL 3711693, approving protocols adopted by Electric Reliability Council of Texas (ERCOT) revising its protocols effectively setting price of electricity at regulatory maximum during emergency load-shed event, even if standard price-setting formula yielded different price. The Austin Court of Appeals, Jones, J., sitting by assignment, ⚑669 S.W.3d 566, reversed and remanded. Review was granted.

The Supreme Court, Lehrmann, J., held that PUC's approval of ERCOT's revised protocols was not subject to direct review by court of appeals.

Vacated and dismissed.

**Procedural Posture(s):** On Appeal; Review of Administrative Decision.

**\*485** On Petition for Review from the Court of Appeals for the Third District of Texas

**Attorneys and Law Firms**

Lisa Hobbs, Kurt Kuhn, Austin, Stephanie C. Sparks, Dallas, for Respondent RWE Renewables Americas, LLC.

Macey Reasoner Stokes, George Harold Fibbe, J. Mark Little, Elisabeth Butler, Houston, Andrea Moore Stover, Patrick Leahy, Austin, for Amicus Curiae Calpine Corporation.

Elliot Clark, Wallace B. Jefferson, Austin, Rachel Anne Ekery, Houston, Nicholas Bacarisse, for Amicus Curiae Electric Reliability Council of Texas.

Michael J. Jewell, for Respondent TX Hereford Wind, LLC.

Ron Beal, Pro Se.

John R. Hulme, Angela V. Colmenero, Priscilla M. Hubenak, Austin, Brent Webster, Houston, S. Grant Dorfman, Bellaire, Lanora C. Pettit, Kyle D. Highful, Shawn Cowles, Atty. Gen. W. Kenneth Paxton Jr., for Petitioner.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Amicus Curiae Aspire Power Ventures, LP.

**Opinion**

Justice Lehrmann delivered the opinion of the Court.

In response to Winter Storm Uri, the Legislature amended the Public Utility Regulatory Act (PURA) to provide that protocols adopted by the Electric Reliability Council of Texas, or ERCOT, do not take effect before they are approved by the Public Utility Commission. ERCOT then adopted, and the PUC approved, a revision to its protocols effectively setting the price of electricity at the regulatory maximum under Energy Emergency Alert Level 3 conditions —the highest level of emergency that can be declared— even if the standard price-setting formula yields a different price. Pursuant to PURA's mechanism for seeking judicial review of the validity of "competition rules adopted by the commission [PUC]," TEX. UTIL. CODE § 39.001(e), two market participants initiated a challenge to the PUC's approval order directly in the Third Court of Appeals. That court held the order was both substantively invalid—because the PUC exceeded its statutory authority by setting the price of electricity—and procedurally invalid—because the PUC failed to comply with the Administrative Procedure Act's rulemaking procedures in issuing the order.

We first consider whether, in light of the amendments to PURA requiring PUC approval of ERCOT protocols, the approval order constitutes a "competition rule[ ] adopted by the commission." *Id.* If it does not, the court of appeals lacked jurisdiction over the proceeding for judicial review of the order. If it does, we must then evaluate whether the court of appeals correctly **\*486** determined that the order is both procedurally and substantively invalid.

Appx. Page 200 of 740

We hold that the PUC's approval order is not a "competition rule[ ] adopted by the commission" subject to the judicial-review process for PUC rules. PURA envisions a separate process for ERCOT-adopted protocols, and the statutory requirement that the PUC approve those adopted protocols does not transform PUC *approval orders* into PUC *rules* eligible for direct review by a court of appeals. The Third Court of Appeals therefore lacked jurisdiction over this proceeding. Accordingly, we vacate the court of appeals' judgment and dismiss the case for lack of jurisdiction. [1]

## I

### A

PURA Section 39.151 requires the PUC to "certify an independent organization"—here, ERCOT—"to perform the functions prescribed by [that] section." *Id.* § 39.151(c). [2] Four such functions are listed, including "ensur[ing] the reliability and adequacy of the regional electric network" and "ensur[ing] that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region." *Id.* § 39.151(a)(2), (4). [3] PUC regulations likewise demand that the "protocols and other rules" adopted by ERCOT "promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system." 16 TEX. ADMIN. CODE § 25.501(a).

ERCOT "is directly responsible and accountable to the commission," which "has complete authority to oversee and investigate [ERCOT's] finances, budget, and operations as necessary to ensure [ERCOT]'s accountability and to ensure that [ERCOT] adequately performs [its] functions and duties." TEX. UTIL. CODE § 39.151(d). If ERCOT "does not adequately perform [its] functions or duties or does not comply with this section," the PUC may take "appropriate action," including decertification. *Id.*

ERCOT possesses rulemaking authority delegated to it by the PUC, as authorized by PURA. *See id.* § 39.151(d), (g-6); 16 TEX. ADMIN. CODE § 25.362(c). The "Nodal Protocols" developed and implemented by ERCOT "provide the framework for the administration of the Texas electricity market." *Pub. Util. Comm'n v. Constellation Energy*

*Commodities Grp., Inc.*, 351 S.W.3d 588, 594–95 (Tex. App.—Austin 2011, pet. denied). Even before recent PURA amendments, ERCOT's protocols were "subject to commission oversight and review." *See* Act of May 30, 2005, 79th Leg., R.S., ch. 797, § 9, 2005 Tex. Gen. Laws 2728, 2729–30 (codified at TEX. UTIL. CODE § 39.151(d)) (amended 2021, 2023) **\*487** (current version at TEX. UTIL. CODE § 39.151(g-6)).

ERCOT is uniquely positioned to manage the electricity market by virtue of its technical expertise, and ERCOT utilizes a variety of resources and systems to manage grid conditions. For example, ERCOT typically relies on a computer system that employs a mathematical formula to send price-based signals to energy generators regarding whether additional power is needed. *Luminant*, 691 S.W.3d at ——. The PUC has specifically delegated to ERCOT the task of developing protocols for how that mathematical formula calculates energy pricing in times of energy shortage, or "scarcity pricing." *Id.*; 16 TEX. ADMIN. CODE § 25.509(b).

### B

In February 2021, Winter Storm Uri incapacitated the Texas electric grid and resulted in an Energy Emergency Alert Level 3 "load-shed" event, meaning ERCOT directed operators of the transmission system to reduce electricity consumption by involuntarily disconnecting customers from the grid. During the load-shed event, ERCOT and the PUC took various additional steps to balance supply and demand in the market to avoid total grid collapse. One such step was to supersede the standard price-setting system by administratively setting the wholesale price of electricity at the regulatory ceiling. In the storm's aftermath, ERCOT's Nodal Protocols were amended to codify the practice in case future load-shed events necessitated a similar response. That amendment is the subject of this suit.

### C

As noted, even before Uri, ERCOT's protocols were subject to commission oversight and review. After the storm, the Legislature amended PURA to additionally provide that "[r]ules adopted by an independent organization [i.e., ERCOT] ... may not take effect before receiving commission approval." Act of May 30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 830 (codified at TEX.

UTIL. CODE § 39.151(d)) (amended 2023) (current version at TEX. UTIL. CODE § 39.151(g-6)).[4] In accordance with that provision, ERCOT's board of directors adopted Nodal Protocol Revision Request (NPRR) 1081, which would amend Nodal Protocol 6.5.7.3.1, and presented it to the PUC for approval. The revision would set the price of electricity at the regulatory ceiling during an emergency load-shed event to reflect scarcity of supply, regardless of whether the standard price-setting formula yields a different price. ERCOT reported to the PUC that the revision would "ensure that Real-Time energy prices reflect the VOLL [Value of Lost Load] when Load is being shed, which is fundamental **\*488** to an energy-only market design in order to provide effective economic signals." The proposal was accompanied by a report from ERCOT's board and an impact-analysis report. The PUC ultimately issued an order approving NPRR 1081.

It is undisputed that load shedding is not driven by market forces but is instead an important regulatory tool designed to protect the grid from long-term damage during an emergency. Load shedding accomplishes this by limiting the amount of demand that may enter the market so as not to exceed available supply. Of course, when that happens, demand *in* the market no longer accurately reflects demand *to enter* the market, and additional supply can only be "accurately" priced by considering the value of replacing that lost load. *See* Hearing of Sen. Comm. Bus. & Com., 87th Leg., R.S. (Feb. 25, 2021), 79–80 (discussing incentives for production at the cap). As supply decreases, the value of lost load increases until it is effectively at the regulatory cap. *Luminant,* 691 S.W.3d at ——.

### D

On July 30, 2021, respondents RWE Renewables Americas, LLC and TX Hereford Wind, LLC (collectively, RWE) sought judicial review of the PUC's order by the Third Court of Appeals. RWE asserted that the court of appeals had jurisdiction under PURA Section 39.001(e) and alleged that the PUC both exceeded its statutory authority under PURA and failed to comply with the Administrative Procedure Act in issuing the order. The PUC responded that the order was not a PUC rule subject to direct review by the court of appeals or the APA's rulemaking requirements, and that the PUC properly issued the order in furtherance of its statutory authority to oversee ERCOT and ensure the reliability of the Texas electric grid.

The court of appeals held that the PUC's order constituted a "competition rule adopted by the commission" under Section 39.001(e), giving the court jurisdiction over the proceedings. 669 S.W.3d 566, 575 (Tex. App.—Austin 2023). The court of appeals then held that the PUC's order was invalid because (1) the PUC lacked the authority to approve NPRR 1081 under PURA and (2) the PUC had failed to substantially comply with the APA's rulemaking procedures. *Id.* at 576–77.[5] We granted the PUC's petition for review.

### II

We necessarily begin by considering jurisdiction. The PUC challenges the court of appeals' subject matter jurisdiction over what is essentially a direct appeal of the PUC's order.

### A

PURA specifically provides for judicial review of "competition rules adopted by the commission." TEX. UTIL. CODE § 39.001(e) ("Judicial review of competition rules adopted by the commission shall be conducted under [the APA], except as otherwise provided by this chapter."). Unlike most suits for judicial review of an agency rule, review of a PUC competition rule begins in the court of appeals. *Id.*; *see also id.* § 39.001(f) ("A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals ....").[6]

**\*489** The PUC argues that its order approving NPRR 1081 is not a rule at all, much less a "competition rule," and that PURA thus does not authorize direct review of the order by the court of appeals. The APA defines "rule" as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency." TEX. GOV'T CODE § 2001.003(6)(A)(i)–(ii). The definition "includes the amendment or repeal of a prior rule" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *Id.* § 2001.003(6)(B)–(C).

**B**

PURA empowers the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants." TEX. UTIL. CODE § 39.151(d). However, as noted, it also allows the PUC to "delegate these responsibilities to an independent organization," which the PUC has done by delegating rulemaking authority to ERCOT. *Id.*; 🚩*CPS Energy*, 671 S.W.3d at 616; *see* 16 TEX. ADMIN. CODE § 25.362(c) (requiring ERCOT to "adopt and comply with procedures [subject to certain parameters] concerning the adoption and revision of ERCOT rules"). ERCOT has utilized this delegated rulemaking authority to establish operational rules known as the Nodal Protocols. Under those protocols, generators make offers in advance on how much electricity they are willing to sell and at what price. ERCOT, NODAL PROTOCOLS § 4.4.9 (May 1, 2024).[7] ERCOT uses those prices to match demand to the lowest-price provider. *Id.* § 4.5. ERCOT serves as "the central counterparty for all transactions" that it settles and "is deemed to be the sole buyer to each seller" (typically, an energy generator) "and the sole seller to each buyer" (typically, a retail user) "of all energy." *Id.* § 1.2(4). Operating as a sort of clearinghouse, it is ERCOT that generates settlement statements providing the terms under which market participants must make payments for energy transactions. *Id.* §§ 9.2.4(1), 9.5.4(1), 9.5.5.

In accordance with the PUC's direction, ERCOT has implemented detailed procedures for adopting and revising its protocols. "A request to make additions, edits, deletions, revisions, or clarifications to these Protocols ... is called a Nodal Protocol Revision Request (NPRR)." *Id.* § 21.1(1) (June 1, 2023). A variety of entities may use the NPRR process, including market participants, the PUC, the independent market monitor, and ERCOT itself. *Id.* § 21.2(1) (a), (c), (f), (g). NPRRs are posted on ERCOT's website and reviewed by ERCOT's Protocol Revision Subcommittee. *Id.* §§ 21.4.1(4), 21.3(1). Market participants and other entities may comment on an NPRR. *Id.* § 21.4.4(1). In fact, RWE participated in this process with respect to NPRR 1081 by submitting comments in opposition to it.[8]

**\*490** After considering the NPRR, the revision subcommittee may take one of several actions, including recommending approval of the revision or rejecting it.

*Id.* § 21.4.4(3). ERCOT then posts a report describing the subcommittee's action. *Id.* § 21.4.4(5). Again, market participants and others may comment on the subcommittee report. *Id.* § 21.4.5(1). If the subcommittee recommends approval, ERCOT prepares an impact analysis, *id.* § 21.4.6(1), which is reviewed by the subcommittee, *id.* § 21.4.7(1). The NPRR then moves to the Technical Advisory Committee, which considers the subcommittee report and the impact analysis. *Id.* § 21.4.8(1). If the advisory committee recommends approval of an NPRR, the committee forwards its report to the ERCOT board of directors, *id.* § 21.4.8(5), and the report is also posted online, *id.* § 21.4.8(4). ERCOT's board then has the opportunity to approve the NPRR or take other action.

Before PURA was amended to require PUC approval for protocol revisions to become effective, ERCOT would implement them on the first day of the month following approval by ERCOT's board. *Id.* § 21.6(1) (Jan. 1, 2021). Now that protocols "may not take effect before receiving commission approval," TEX. UTIL. CODE § 39.151(g-6), they are implemented on the first day of the month following receipt of that approval, ERCOT, NODAL PROTOCOLS §§ 21.4.11(1), 21.6(1) (June 1, 2023).

A market participant, among others, may appeal a decision of the ERCOT board regarding an NPRR to the PUC. *Id.* § 21.4.12.3(1). The PUC's rules outline the procedure for review of ERCOT protocols. 16 TEX. ADMIN. CODE §§ 22.251, 25.362(c)(5). Those rules generally require that a complainant exhaust the process outlined in Section 21 of the protocols before challenging the protocol with the PUC. *Id.* § 22.251(c). Exceptions exist when, for example, "the complainant seeks emergency relief necessary to resolve health or safety issues." *Id.* § 22.251(c)(1)(C). Generally, the complaint must be filed within thirty-five days of "the ERCOT conduct complained of." *Id.* § 22.251(d); ERCOT, NODAL PROTOCOLS § 21.4.12.3(1) (June 1, 2023). In response to the complaint, the PUC may, among other things, provide ERCOT with "guidance on the development and implementation of protocol revisions" and order ERCOT "to promptly develop protocol[ ] revisions for commission approval." 16 TEX. ADMIN. CODE § 22.251(o)(3), (4). If the complainant is dissatisfied with the result of the PUC proceedings, it can then seek judicial review. TEX. UTIL. CODE § 15.001.

This painstaking procedure serves to leverage the expertise of ERCOT members and industry stakeholders while

**Appx. Page 203 of 740**

maintaining transparency and affording interested parties plentiful opportunities to weigh in. Moreover, we recognize that ERCOT and the PUC are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and essential purpose. As we recognized in *CPS Energy*, "ERCOT do[es] not fall neatly into any camp. It is a unique entity serving a role that is not clearly analogous to a public entity like a police department or a public school. Yet, it provides an essential governmental service." 671 S.W.3d at 623 (alteration in original) (citation and internal quotation marks omitted). While the PUC has broad administrative responsibilities, it simultaneously lacks "the expertise and staff resources" to make informed regulatory decisions independent of ERCOT. SUNSET ADVISORY COMM., STAFF REPORT WITH COMMISSION DECISIONS: PUBLIC UTILITY COMMISSION OF TEXAS, ELECTRIC RELIABILITY COUNCIL OF TEXAS, OFFICE OF PUBLIC UTILITY COUNSEL 37 (Jan. **\*491** 2023).[9]

**C**

A substantially similar version of the above-described process for adopting and revising ERCOT protocols has long been in effect. *See* ERCOT, NODAL PROTOCOLS § 21 (Mar. 1, 2005) (rev. Feb. 2010, Apr. 2011, May 2011, Oct. 2011, May 2012, Aug. 2012, Apr. 2013, Dec. 2013, May 2014, July 2016, Nov. 2016, Nov. 2017, Jan. 2021, Apr. 2023, June 2023). The legislative and regulatory schemes have in turn envisioned separate, complementary purposes of and procedures for PUC rules and ERCOT protocols, notwithstanding the fact that ERCOT and its protocols have consistently been subject to PUC oversight and review. TEX. UTIL. CODE § 39.151(d). RWE nevertheless suggests that, by amending PURA to require formal PUC approval of ERCOT-adopted protocols at the tail end of the process, the Legislature intended to overhaul that process entirely and effectively convert ERCOT protocols into PUC rules subject to the same review procedures. We do not discern such a sweeping intent from the language the Legislature chose.

For one thing, PURA makes clear that ERCOT, not the PUC, is the entity "adopting" new or revised ERCOT protocols. *See id.* § 39.151(g-6). The PUC then "approves" the protocols. *See id.* This distinction is deceptively significant because the APA's requirements, which RWE insists must be satisfied, are exclusively and repeatedly directed at rules "adopted"

by a "state agency." *See, e.g.*, TEX. GOV'T CODE § 2001.033(a) ("A state agency order finally adopting a rule must include: ...."). Indeed, the Legislature deliberately uses the term "adopt" throughout the APA—no reference is made to an agency's "approval" of a rule. *See, e.g., id.* § 2001.004(1) (requiring a state agency to "adopt rules of practice stating the nature and requirements of all available formal and informal procedures").[10] By contrast, the APA uses the term "approve" to describe the *governor's* action on legislation that allows it to become the law. *Id.* § 2001.006(a)(2).

PURA reinforces this distinction. For example, in a suit for judicial review of a competition rule under Section 39.001, the rulemaking record includes "the order *adopting* the rule." TEX. UTIL. CODE § 39.001(e)(4) (emphasis added). The PUC issues no such order with respect to ERCOT protocols. We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that "adopts" ERCOT protocols given the comprehensive statutory use of that term.

RWE and the court of appeals highlight that, under PURA as amended, an ERCOT protocol does not take effect until it receives PUC approval. 669 S.W.3d at 574; TEX. UTIL. CODE § 39.151(g-6). True, but even in requiring PUC approval, the Legislature distinguished between ERCOT's role in adopting a protocol and the PUC's role in approving it. TEX. UTIL. CODE § 39.151(g-6) ("*Protocols adopted by [* **\*492** *ERCOT]* ... may not take effect before receiving commission approval." (emphasis added)). Again, the Legislature deliberately employed these terms to communicate two distinct administrative actions that have distinct legal consequences. *See Galveston Indep. Sch. Dist. v. Jaco*, 331 S.W.3d 182, 185–86 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (highlighting the Legislature's distinct use of "adopt" and "approve" in statutes describing the duties of the commissioner of education); TEX. EDUC. CODE § 7.055(b)(41) ("The commissioner shall *adopt* rules relating to extracurricular activities under Section 33.081 and *approve or disapprove* University Interscholastic League rules and procedures under Section 33.083." (emphases added)).

Finally, we cannot ignore that when the Legislature amended PURA in 2021 to require PUC approval of the independent organization's (ERCOT's) protocols, it simultaneously added the requirement that the organization "establish and implement a formal process for adopting new protocols or revisions to existing protocols." Act of May

30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 832 (amended 2023) (codified at TEX. UTIL. CODE § 39.151(g-6)). As discussed above, ERCOT already had such a process in place; nevertheless, the requirement signals legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors.

In sum, consistent with the well-established regulatory scheme and the legislation governing it, we hold that the PUC's order approving NPRR 1081 was a ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect. Consequently, the PUC's order was not an agency-adopted "rule" under the Administrative Procedure Act. In turn, because the court of appeals' jurisdiction under Utilities Code Section 39.001(e) is limited to review of "competition rules adopted by the commission," the court lacked jurisdiction over RWE's challenge to the PUC's approval order. [11]

Having concluded that the court of appeals lacked jurisdiction over RWE's appeal of the PUC's approval order, we need not address RWE's remaining arguments. We note, however, that this Court contemporaneously holds in *Luminant* that the PUC did not exceed its authority under PURA in issuing temporary emergency orders that, like NPRR 1081, set the price of electricity at the regulatory ceiling during a period of emergency load-shed. 691 S.W.3d at ——.

\* \* \* \*

Because the PUC's order was not a "competition rule adopted by the commission" under PURA, Section 39.151 did not confer direct-review jurisdiction on the court of appeals. We therefore vacate the court of appeals' judgment and dismiss the suit for lack of jurisdiction.

**All Citations**

691 S.W.3d 484, 67 Tex. Sup. Ct. J. 1096

**III**

---

**Footnotes**

1    In our contemporaneously issued opinion in *Public Utility Commission v. Luminant Energy Co.*, we hold that the PUC did not exceed its authority in issuing two emergency orders during Winter Storm Uri that operated to a similar end by temporarily setting the price of electricity at the regulatory ceiling. 691 S.W.3d 448, —— (Tex. June 14, 2024) (No. 22-0231).

2    A more detailed explanation of the Texas electricity market appears in this Court's opinion in *Luminant*. *See id.* at ——. We also recently engaged in a thorough discussion of ERCOT's history, and its role in the Texas electricity market, in *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611–12 (Tex. 2023).

3    The others are "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms" and "ensur[ing] that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information." TEX. UTIL. CODE § 39.151(a)(1), (3).

4    As further amended in 2023, Section 39.151(g-6) currently provides:

In this subsection, a reference to a protocol includes a rule. Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval. To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or

revisions to existing protocols. The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols. The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

Act of May 26, 2023, 88th Leg., R.S., ch. 464, § 4, 2023 Tex. Sess. Law Serv. (West) 1133 (codified at TEX. UTIL. CODE § 39.151(g-6)).

5    In support of its first holding, the court relied on its own decision in *Luminant*, which we also review today. 669 S.W.3d at 576.

6    When RWE instituted this proceeding, Section 39.001(e) provided for review in the Third Court of Appeals. In 2023, the Legislature amended Section 39.001(e) to provide for review by the Fifteenth Court of Appeals going forward. Act of May 22, 2023, 88th Leg., R.S., ch. 459, § 1.13, 2023 Tex. Sess. Law Serv. (West) 1119.

7    We cite the current version of the protocols unless substantive differences require citing the version in effect when the relevant events occurred. ERCOT's current protocols and a library of past versions of the protocols, with summaries of revisions, are available on ERCOT's website. Protocols - Nodal, https://www.ercot.com/mktrules/nprotocols.

8    RWE, Comment Letter on Nodal Protocol Request 1081 (June 23, 2021), https://www.ercot.com/mktrules/issues/NPRR1081#keydocs.

9    Available     at     https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf).

10   *See also* TEX. GOV'T CODE § 2001.006 (describing when a rule "adopted" under Section 2001.006(b) may take effect); *id.* § 2001.021(a) ("An interested person by petition to a state agency may request the adoption of a rule."); *id.* § 2001.023(a) ("A state agency shall give at least 30 days' notice of its intention to adopt a rule before it adopts the rule."); *id.* § 2001.030 ("On adoption of a rule, a state agency, if requested to do so by an interested person either before adoption or not later than the 30th day after the date of adoption, shall issue a concise statement of the principal reasons for and against its adoption.").

11   As noted, PUC regulations provide a process for review of ERCOT protocols, 16 TEX. ADMIN. CODE §§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review in district court, TEX. UTIL. CODE § 15.001. RWE did not engage in that process, choosing instead to utilize the inapplicable procedure for reviewing PUC competition rules.

---

**End of Document**                                                 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Attachment 2

Tex. Util. Code § 39.151

Vernon's Texas Statutes and Codes Annotated
  Utilities Code (Refs & Annos)
    Title 2. Public Utility Regulatory Act (Refs & Annos)
      Subtitle B. Electric Utilities (Refs & Annos)
        Chapter 39. Restructuring of Electric Utility Industry
          Subchapter D. Market Structure

V.T.C.A., Utilities Code § 39.151

§ 39.151. Essential Organizations

Effective: September 1, 2023

Currentness

(a) A power region must establish one or more independent organizations to perform the following functions:

(1) ensure access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms;

(2) ensure the reliability and adequacy of the regional electrical network;

(3) ensure that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information; and

(4) ensure that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region.

(b) "Independent organization" means an independent system operator or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller.

(c) The commission shall certify an independent organization or organizations to perform the functions prescribed by this section. The commission shall apply the provisions of this section and Sections 39.1511, 39.1512, and 39.1515 so as to avoid conflict with a ruling of a federal regulatory body.

(d) The commission shall adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants, or may delegate those responsibilities to an independent organization . An independent organization certified by the commission is directly responsible and accountable to the commission. The commission has complete authority to oversee and investigate the independent organization's finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties. The independent organization shall fully cooperate with the commission in the commission's oversight and investigatory functions. The commission may take appropriate action against an independent organization that does not adequately perform the organization's functions or duties or does not comply

with this section, including decertifying the organization or assessing an administrative penalty against the organization. The commission by rule shall adopt procedures governing decertification of an independent organization, selecting and certifying a successor organization, and transferring assets to the successor organization to ensure continuity of operations in the region. The commission may not implement, by order or by rule, a requirement that is contrary to an applicable federal law or rule.

(d-1) The commission shall require an independent organization certified by the commission under this section to submit to the commission the organization's entire proposed annual budget. The commission shall review the proposed budgets either annually or biennially and may approve, disapprove, or modify any item included in a proposed budget. The commission by rule shall establish the type of information or documents needed to effectively evaluate the proposed budget and reasonable dates for the submission of that information or those documents. The commission shall establish a procedure to provide public notice of and public participation in the budget review process.

(d-2) Except as otherwise agreed to by the commission and an independent organization certified by the commission under this section, the organization must submit to the commission for review and approval proposals for obtaining debt financing or for refinancing existing debt. The commission may approve, disapprove, or modify a proposal.

(d-3) An independent organization certified by the commission under this section shall develop proposed performance measures to track the organization's operations. The independent organization must submit the proposed performance measures to the commission for review and approval. The commission shall review the organization's performance as part of the budget review process under Subsection (d-1). The commission shall prepare a report at the time the commission approves the organization's budget detailing the organization's performance and submit the report to the lieutenant governor, the speaker of the house of representatives, and each house and senate standing committee that has jurisdiction over electric utility issues.

(d-4) The commission may:

(1) require an independent organization to provide reports and information relating to the independent organization's performance of the functions prescribed by this section and relating to the organization's revenues, expenses, and other financial matters;

(2) prescribe a system of accounts for an independent organization;

(3) conduct audits of an independent organization's performance of the functions prescribed by this section or relating to its revenues, expenses, and other financial matters and may require an independent organization to conduct such an audit;

(4) inspect an independent organization's facilities, records, and accounts during reasonable hours and after reasonable notice to the independent organization;

(5) assess administrative penalties against an independent organization that violates this title or a rule or order adopted by the commission and, at the request of the commission, the attorney general may apply for a court order to require an independent organization to comply with commission rules and orders in the manner provided by Chapter 15; and

Appx. Page 209 of 740

(6) resolve disputes between an affected person and an independent organization and adopt procedures for the efficient resolution of such disputes.

(e) After approving the budget of an independent organization under Subsection (d-1), the commission shall authorize the organization to charge to wholesale buyers and sellers a system administration fee, within a range determined by the commission, that is reasonable and competitively neutral to fund the independent organization's approved budget. The commission shall investigate the organization's cost efficiencies, salaries and benefits, and use of debt financing and may require the organization to provide any information needed to effectively evaluate the reasonableness and neutrality of the fee or to evaluate the effectiveness or efficiency of the organization. The commission shall work with the organization to establish the detail of information, both current and historical, and the time frames the commission needs to effectively evaluate the fee. The commission shall require the organization to closely match actual revenues generated by the fee and other sources of revenue with revenue necessary to fund the budget, taking into account the effect of a fee change on market participants and consumers, to ensure that the budget year does not end with surplus or insufficient funds. The commission shall require the organization to submit to the commission, on a schedule determined by the commission, reports that compare actual expenditures with budgeted expenditures.

(e-1) The review and approval of a proposed budget under Subsection (d-1) or a proceeding to authorize and set the range for the amount of a fee under Subsection (e) is not a contested case for purposes of Chapter 2001, Government Code.

(f) In implementing this section, the commission may cooperate with the utility regulatory commission of another state or the federal government and may hold a joint hearing or make a joint investigation with that commission.

(g) To maintain certification as an independent organization for the ERCOT power region under this section, an organization's governing body must be composed of persons selected by the ERCOT board selection committee.

(g-1) The bylaws of an independent organization certified for the ERCOT power region must be approved by and reflect the input of the commission. The bylaws must require that every member of the governing body be a resident of this state and must prohibit a legislator from serving as a member. The governing body must be composed of:

(1) two members of the commission as ex officio nonvoting members:

(A) one of whom must be the presiding officer of the commission; and

(B) one of whom must be designated by the presiding officer of the commission to serve a one-year term on the governing body ;

(2) the counsellor as an ex officio voting member representing residential and small commercial consumer interests;

(3) the chief executive officer of the independent organization as an ex officio nonvoting member; and

Appx. Page 210 of 740

(4) eight members selected by the selection committee under Section 39.1513 with executive-level experience in any of the following professions:

    (A) finance;

    (B) business;

    (C) engineering, including electrical engineering;

    (D) trading;

    (E) risk management;

    (F) law; or

    (G) electric market design.

(g-2) Members of the governing body are entitled to receive a salary for their service.

(g-3) A person does not qualify for selection as a member of the governing body of an independent organization for the ERCOT power region if the person has a fiduciary duty or assets in the electricity market for that region.

(g-4) To maintain certification as an independent organization under this section, the organization's governing body may not include more than two members who are employed by an institution of higher education, as defined by Section 61.003, Education Code, in a professorial role.

(g-5) A former member of the governing body of an independent organization certified under this section may not, before the second anniversary of the date the member ceases to be a member of the governing body, engage in an activity that requires registration under Chapter 305, Government Code.

(g-6) In this subsection, a reference to a protocol includes a rule. Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval. To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or revisions to existing protocols. The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols. The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

<Text of (g-7) as provided by Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 15, eff. Sept. 1, 2023>

(g-7) The presiding officer of the commission shall designate commissioners to serve terms on the independent organization's governing body under Subsection (g-1)(1)(B) in the order in which the commissioners were first appointed to the commission. A commissioner may not serve an additional term until each commissioner has served a term.

<Text of (g-7) as provided by Acts 2023, 88th Leg., ch. 464 (S.B. 2013), § 4, eff. June 9, 2023.>

(g-7) To maintain certification as an independent organization under this section, the organization must:

(1) identify all employee positions in the organization that are critical to the security of the electric grid; and

(2) before hiring a person for a position described by Subdivision (1), obtain from the Department of Public Safety or a private vendor criminal history record information relating to the prospective employee and any other background information considered necessary by the independent organization or required by the commission.

(h) The ERCOT independent system operator may meet the criteria relating to the other functions of an independent organization provided by Subsection (a) by adopting procedures and acquiring resources needed to carry out those functions, consistent with any rules or orders of the commission.

(i) The commission may delegate authority to the existing independent system operator in ERCOT to enforce operating standards within the ERCOT regional electrical network and to establish and oversee transaction settlement procedures. The commission may establish the terms and conditions for the ERCOT independent system operator's authority to oversee utility dispatch functions after the introduction of customer choice.

(j) A retail electric provider, municipally owned utility, electric cooperative, power marketer, transmission and distribution utility, or power generation company shall observe all scheduling, operating, planning, reliability, and settlement policies, rules, guidelines, and procedures established by the independent system operator in ERCOT. Failure to comply with this subsection may result in the revocation, suspension, or amendment of a certificate as provided by Section 39.356 or in the imposition of an administrative penalty as provided by Section 39.357.

(j-1) Notwithstanding Subsection (j) of this section, Section 39.653(c), or any other law, the independent system operator in the ERCOT power region may not reduce payments to or uplift short-paid amounts to a municipally owned utility that becomes subject to the jurisdiction of that independent system operator on or after May 29, 2021, and before December 30, 2021, related to a default on a payment obligation by a market participant that occurred before May 29, 2021.

(k) To the extent the commission has authority over an independent organization outside of ERCOT, the commission may delegate authority to the independent organization consistent with Subsection (i).

(l) No operational criteria, protocols, or other requirement established by an independent organization, including the ERCOT independent system operator, may adversely affect or impede any manufacturing or other internal process operation associated with an industrial generation facility, except to the minimum extent necessary to assure reliability of the transmission network.

(m) A power region outside of ERCOT shall be deemed to have met the requirement to establish an independent organization to perform the transmission functions specified in Subsection (a) if the Federal Energy Regulatory Commission has approved a regional transmission organization for the region and found that the regional transmission organization meets the requirements of Subsection (a).

(n) An independent organization certified by the commission under this section is subject to review under Chapter 325, Government Code (Texas Sunset Act), but is not abolished under that chapter.The independent organization shall be reviewed during the periods in which the Public Utility Commission of Texas is reviewed.

(n-1) Expired.

(o) An independent organization certified by the commission under this section shall:

(1) conduct internal cybersecurity risk assessment, vulnerability testing, and employee training to the extent the independent organization is not otherwise required to do so under applicable state and federal cybersecurity and information security laws; and

(2) submit a report annually to the commission on the independent organization's compliance with applicable cybersecurity and information security laws.

(p) Information submitted in a report under Subsection (o) is confidential and not subject to disclosure under Chapter 552, Government Code.

**Credits**
Added by Acts 1999, 76th Leg., ch. 405, § 39, eff. Sept. 1, 1999. Amended by Acts 2005, 79th Leg., ch. 797, § 9, eff. Sept. 1, 2005; Acts 2011, 82nd Leg., ch. 1232 (S.B. 652), § 1.09, eff. June 17, 2011; Acts 2013, 83rd Leg., ch. 170 (H.B. 1600), § 1.08, eff. Sept. 1, 2013; Acts 2019, 86th Leg., ch. 509 (S.B. 64), § 23, eff. Sept. 1, 2019; Acts 2021, 87th Leg., ch. 425 (S.B. 2), § 3, eff. June 8, 2021; Acts 2021, 87th Leg., ch. 908 (H.B. 4492), § 3, eff. June 16, 2021; Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 15, eff. Sept. 1, 2023; Acts 2023, 88th Leg., ch. 464 (S.B. 2013), § 4, eff. June 9, 2023.

Notes of Decisions (25)

V. T. C. A., Utilities Code § 39.151, TX UTIL § 39.151
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Appx. Page 213 of 740

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of John Hulme
Bar No. 10258400
david.laurent@oag.texas.gov
Envelope ID: 92018492
Filing Code Description: RESPONSE
Filing Description: DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS' PLEA TO THE JURISDICTION
Status as of 9/16/2024 9:36 AM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 9/13/2024 3:47:51 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 9/13/2024 3:47:51 PM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 9/13/2024 3:47:51 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 9/13/2024 3:47:51 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 9/13/2024 3:47:51 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 9/13/2024 3:47:51 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |

Case Contacts

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of John Hulme
Bar No. 10258400
david.laurent@oag.texas.gov
Envelope ID: 92018492
Filing Code Description: RESPONSE
Filing Description: DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS' PLEA TO THE JURISDICTION
Status as of 9/16/2024 9:36 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 9/13/2024 3:47:51 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/13/2024 3:47:51 PM | SENT |

9/24/2024 10:16 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Norma Ybarra



Austin | Charlotte | Dallas | Fort Worth | Houston | Nashville | New York | San Antonio | The Woodlands

September 24, 2024

direct dial: 512.370.2802
eclark@winstead.com

***Via E-Filing***

Hon. Catherine Mauzy
418th Judicial District Court
1700 Guadalupe, 11th Floor
Austin, Texas 78701

Re: **Letter Brief re: Required Resolution of ERCOT's and the PUCT's Pleas to the Jurisdiction Prior to Any Temporary Injunction Hearing**; Cause No. D-1-GN-24-003384; *Aspire Power Ventures, LP ("Aspire") v. Public Utility Commission of Texas ("PUCT"), Electric Reliability Council of Texas, Inc. ("ERCOT"), et al.*

Dear Judge Mauzy:

Defendant ERCOT submits this letter brief to the Court for consideration in connection with the upcoming Review/Status Conference set by the Court on October 1, 2024 at 2:00 p.m. For the reasons set forth herein, ERCOT contends that the jurisdictional questions raised by ERCOT's and the PUCT's Pleas to the Jurisdiction must be resolved before the Court conducts a hearing on Aspire's requested temporary injunction.

Aspire first brought claims against ERCOT in this lawsuit on August 13, 2024. ERCOT timely filed its Answer, as well as its Plea to the Jurisdiction and Alternatively, Motion to Dismiss under Rule 91(a) and Alternatively, Plea in Abatement ("ERCOT's Jurisdictional Plea") on September 9, 2024. Defendants PUCT, Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Commissioners of the PUCT (collectively, "PUCT Defendants") filed a Plea to the Jurisdiction on September 13, 2024 ("PUCT Defendants' Jurisdictional Plea" and together with ERCOT's Jurisdictional Plea, the "Jurisdictional Pleas").

ERCOT agreed to discuss the case with Aspire before appearing in this lawsuit; advised Aspire that it would file a plea to the jurisdiction; and attempted to reach an agreement as to setting hearings on the to-be filed jurisdictional plea and Aspire's request for a temporary injunction. Despite their best efforts, the parties were not able to reach agreement.

The issue before the Court is whether it should first determine if it has jurisdiction before conducting a temporary injunction hearing. ERCOT submits that the answer is straightforward and indisputable. "Without jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex Parte McCardle*, 74 U.S. 506 (1869)). A court may not "resolve contested questions of law when its jurisdiction is in doubt." *Id.* at 101. Thus, it is black letter law that a "trial court must determine at its earliest opportunity

<span style="color:red">**Appx. Page 216 of 740**</span>

whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

Because jurisdiction is so clearly lacking here, the Court can and should decide the Jurisdictional Pleas as soon as possible—and certainly before having a hearing on a costly and time-consuming temporary injunction hearing that will be unnecessary if the Court dismisses the lawsuit. A straightforward application of the law to Aspire's claims shows there is no jurisdiction here:

1. For this Court to have jurisdiction under Texas Government Code § 2001.038, Aspire must be contesting an agency-adopted rule. *R.R. Comm'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003); *see also Gant v. Abbott*, 574 S.W.3d 625, 631 (Tex. App.—Austin 2019, no pet.) ("When no rule is being challenged, a claimant cannot obtain declaratory relief under the APA . . .").

2. The Texas Supreme Court recently held that a PUC order approving a revision to ERCOT Protocols is "not an agency-adopted 'rule' under the Administrative Procedure Act." *PUCT v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024).

3. This case involves "three PUC orders approving revisions to ERCOT Nodal Protocols that Aspire challenges." Am. Pet. at ¶ 29.

4. Because Aspire is not challenging an agency-adopted rule, this Court has no jurisdiction under the APA and the lawsuit should be dismissed.

Aspire claims that "ERCOT reads [*RWE*] very differently than Plaintiff." Aspire Letter Brief at 2 (filed Sept. 11, 2024). True, but what matters is how the Court reads *RWE*. ERCOT, accordingly, attaches the *RWE* opinion to this Letter Brief for the Court's convenience. **There is no way to credibly read *RWE* except as saying that PUCT orders approving ERCOT Protocol revisions are not agency-adopted rules subject to the APA.** Accordingly, Aspire cannot bring an "action under the APA's general method to challenge the validity of a rule," Aspire Letter Brief at 2, when it is plainly not challenging a "rule" under the APA.

Aspire's suggestion that ERCOT's request for the Court to hear the Jurisdictional Pleas first is some sort of tactic or gamesmanship is completely unfounded. Because jurisdiction is lacking, ERCOT had a duty to raise the issue. *Bd. of License Comm'rs of Town of Tiverton v. Pastore*, 469 U.S. 238, 240 (1985) (per curiam) (reminding "counsel that they have a 'continuing duty to inform the Court of any development which may conceivably affect the outcome' of the litigation" (quoting *Fusari v. Steinberg*, 419 U.S. 379, 391 (1975) (Burger, C.J., concurring))).

Aspire's insistence that the Court hold an injunction hearing before or simultaneously with the Jurisdictional Pleas is both improper and impractical. ERCOT will be prejudiced by being forced to pull employee witnesses from their responsibilities of operating the grid in order to prepare for and attend an all-day injunction hearing, and by incurring the significant attorneys' fees required for an injunction hearing. Absent jurisdiction, ERCOT's and the PUCT's immunity is intended to guard against exactly this type of prejudice. *CPS Energy v. ERCOT*, 671 S.W.3d 605, 623 (Tex. 2023) (recognizing that immunity "prevents the disruption of key governmental services, protects public funds, and respects separation of powers principles.").

As a practical matter, the Court will not be able to hear the Jurisdictional Pleas and conduct a temporary injunction hearing in one day. ERCOT has requested a two-hour hearing to have the Jurisdictional Pleas heard.[1] And a temporary injunction hearing would likely last at least a full day. Aspire acknowledges that if the Court finds jurisdiction lacking, "the case will end" with no need for an injunction hearing. Aspire Letter Brief at 2. And ERCOT believes that will be the inevitable outcome, so there is no need for the parties to waste time and resources preparing for an injunction hearing that never takes place.

As explained in ERCOT's Jurisdictional Plea, Aspire improperly asks this Court to substitute its judgment as to the wisdom and benefit of a complicated Ancillary Service that was first adopted by ERCOT in 2019 to help ensure grid reliability. The PUCT, ERCOT, the IMM and Market Participants are still actively working on refinements to ECRS—utilizing the intended regulatory process. Before the Court entertains Aspire's request that the Court swerve out if its lane and into ongoing policy making, it must be certain of its jurisdiction. "A court that carelessly exceeds the constitutional boundaries on its own power can hardly claim the authority to determine whether another co-equal branch of government has done the same." *In re Hotze*, 627 S.W.3d 642, 646 (Tex. 2020) (Blacklock, J. concurring); *PUCT v. Luminant Energy Co. LLC*, 691 S.W.3d 448, 463-464 (finding the court of appeals "strayed from its lane" by second guessing policy making decisions).

Thank you for your time and attention to this matter.

Sincerely,

Elliot Clark

Cc:     Counsel of record via E-filing

---

[1] ERCOT's Jurisdictional Plea includes an alternative Rule 91a Motion to Dismiss and a Plea in Abatement that will also need to be argued at that hearing. Aspire is entitled to 14 days-notice of a hearing under TRCP 91a.6, and the Court is supposed to rule within a specified time frame, TRCP 91a.3(c). And because Aspire seeks relief that will prejudice hundreds of market participants not before the Court, the Court should not rush to set an injunction hearing without first confirming it has all necessary parties before it—if it first concludes it has jurisdiction.

691 S.W.3d 484
Supreme Court of Texas.

PUBLIC UTILITY COMMISSION
OF TEXAS, Petitioner,

v.

RWE RENEWABLES AMERICAS, LLC
and TX Hereford Wind, LLC, Respondents

No. 23-0555
|
Argued March 19, 2024
|
OPINION DELIVERED: June 14, 2024

**Synopsis**
**Background:** Market participants filed direct appeal of order of Public Utility Commission (PUC), 2021 WL 3711693, approving protocols adopted by Electric Reliability Council of Texas (ERCOT) revising its protocols effectively setting price of electricity at regulatory maximum during emergency load-shed event, even if standard price-setting formula yielded different price. The Austin Court of Appeals, Jones, J., sitting by assignment, 669 S.W.3d 566, reversed and remanded. Review was granted.

The Supreme Court, Lehrmann, J., held that PUC's approval of ERCOT's revised protocols was not subject to direct review by court of appeals.

Vacated and dismissed.

**\*485** On Petition for Review from the Court of Appeals for the Third District of Texas

**Attorneys and Law Firms**

Lisa Hobbs, Kurt Kuhn, Austin, Stephanie C. Sparks, Dallas, for Respondent RWE Renewables Americas, LLC.

Macey Reasoner Stokes, George Harold Fibbe, J. Mark Little, Elisabeth Butler, Houston, Andrea Moore Stover, Patrick Leahy, Austin, for Amicus Curiae Calpine Corporation.

Elliot Clark, Wallace B. Jefferson, Austin, Rachel Anne Ekery, Houston, Nicholas Bacarisse, for Amicus Curiae Electric Reliability Council of Texas.

Michael J. Jewell, for Respondent TX Hereford Wind, LLC.

Ron Beal, Pro Se.

John R. Hulme, Angela V. Colmenero, Priscilla M. Hubenak, Austin, Brent Webster, Houston, S. Grant Dorfman, Bellaire, Lanora C. Pettit, Kyle D. Highful, Shawn Cowles, Atty. Gen. W. Kenneth Paxton Jr., for Petitioner.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Amicus Curiae Aspire Power Ventures, LP.

**Opinion**

Justice Lehrmann delivered the opinion of the Court.

In response to Winter Storm Uri, the Legislature amended the Public Utility Regulatory Act (PURA) to provide that protocols adopted by the Electric Reliability Council of Texas, or ERCOT, do not take effect before they are approved by the Public Utility Commission. ERCOT then adopted, and the PUC approved, a revision to its protocols effectively setting the price of electricity at the regulatory maximum under Energy Emergency Alert Level 3 conditions—the highest level of emergency that can be declared—even if the standard price-setting formula yields a different price. Pursuant to PURA's mechanism for seeking judicial review of the validity of "competition rules adopted by the commission [PUC]," Tex. Util. Code § 39.001(e), two market participants initiated a challenge to the PUC's approval order directly in the Third Court of Appeals. That court held the order was both substantively invalid—because the PUC exceeded its statutory authority by setting the price of electricity—and procedurally invalid—because the PUC failed to comply with the Administrative Procedure Act's rulemaking procedures in issuing the order.

We first consider whether, in light of the amendments to PURA requiring PUC approval of ERCOT protocols, the approval order constitutes a "competition rule[ ] adopted by the commission." *Id.* If it does not, the court of appeals lacked jurisdiction over the proceeding for judicial review of the order. If it does, we must then evaluate whether the court of appeals correctly **\*486** determined that the order is both procedurally and substantively invalid.

**Appx. Page 219 of 740**

We hold that the PUC's approval order is not a "competition rule[ ] adopted by the commission" subject to the judicial-review process for PUC rules. PURA envisions a separate process for ERCOT-adopted protocols, and the statutory requirement that the PUC approve those adopted protocols does not transform PUC *approval orders* into PUC *rules* eligible for direct review by a court of appeals. The Third Court of Appeals therefore lacked jurisdiction over this proceeding. Accordingly, we vacate the court of appeals' judgment and dismiss the case for lack of jurisdiction.[1]

## I

### A

PURA Section 39.151 requires the PUC to "certify an independent organization"—here, ERCOT—"to perform the functions prescribed by [that] section." *Id.* § 39.151(c).[2] Four such functions are listed, including "ensur[ing] the reliability and adequacy of the regional electric network" and "ensur[ing] that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region." *Id.* § 39.151(a)(2), (4).[3] PUC regulations likewise demand that the "protocols and other rules" adopted by ERCOT "promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system." 16 Tex. Admin. Code § 25.501(a).

ERCOT "is directly responsible and accountable to the commission," which "has complete authority to oversee and investigate [ERCOT's] finances, budget, and operations as necessary to ensure [ERCOT]'s accountability and to ensure that [ERCOT] adequately performs [its] functions and duties." Tex. Util. Code § 39.151(d). If ERCOT "does not adequately perform [its] functions or duties or does not comply with this section," the PUC may take "appropriate action," including decertification. *Id.*

ERCOT possesses rulemaking authority delegated to it by the PUC, as authorized by PURA. *See id.* § 39.151(d), (g-6); 16 Tex. Admin. Code § 25.362(c). The "Nodal Protocols" developed and implemented by ERCOT "provide the framework for the administration of the Texas electricity market." *Pub. Util. Comm'n v. Constellation Energy Commodities Grp., Inc.*, 351 S.W.3d 588, 594–95 (Tex.

App.—Austin 2011, pet. denied). Even before recent PURA amendments, ERCOT's protocols were "subject to commission oversight and review." *See* Act of May 30, 2005, 79th Leg., R.S., ch. 797, § 9, 2005 Tex. Gen. Laws 2728, 2729–30 (codified at Tex. Util. Code § 39.151(d)) (amended 2021, 2023) **\*487** (current version at Tex. Util. Code § 39.151(g-6)).

ERCOT is uniquely positioned to manage the electricity market by virtue of its technical expertise, and ERCOT utilizes a variety of resources and systems to manage grid conditions. For example, ERCOT typically relies on a computer system that employs a mathematical formula to send price-based signals to energy generators regarding whether additional power is needed. *Luminant*, 691 S.W.3d at ——. The PUC has specifically delegated to ERCOT the task of developing protocols for how that mathematical formula calculates energy pricing in times of energy shortage, or "scarcity pricing." *Id.*; 16 Tex. Admin. Code § 25.509(b).

### B

In February 2021, Winter Storm Uri incapacitated the Texas electric grid and resulted in an Energy Emergency Alert Level 3 "load-shed" event, meaning ERCOT directed operators of the transmission system to reduce electricity consumption by involuntarily disconnecting customers from the grid. During the load-shed event, ERCOT and the PUC took various additional steps to balance supply and demand in the market to avoid total grid collapse. One such step was to supersede the standard price-setting system by administratively setting the wholesale price of electricity at the regulatory ceiling. In the storm's aftermath, ERCOT's Nodal Protocols were amended to codify the practice in case future load-shed events necessitated a similar response. That amendment is the subject of this suit.

### C

As noted, even before Uri, ERCOT's protocols were subject to commission oversight and review. After the storm, the Legislature amended PURA to additionally provide that "[r]ules adopted by an independent organization [i.e., ERCOT] ... may not take effect before receiving commission approval." Act of May 30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 830 (codified at Tex. Util. Code § 39.151(d)) (amended 2023) (current version at Tex.

**Appx. Page 220 of 740**

Util. Code § 39.151(g-6)).[4] In accordance with that provision, ERCOT's board of directors adopted Nodal Protocol Revision Request (NPRR) 1081, which would amend Nodal Protocol 6.5.7.3.1, and presented it to the PUC for approval. The revision would set the price of electricity at the regulatory ceiling during an emergency load-shed event to reflect scarcity of supply, regardless of whether the standard price-setting formula yields a different price. ERCOT reported to the PUC that the revision would "ensure that Real-Time energy prices reflect the VOLL [Value of Lost Load] when Load is being shed, which is fundamental **\*488** to an energy-only market design in order to provide effective economic signals." The proposal was accompanied by a report from ERCOT's board and an impact-analysis report. The PUC ultimately issued an order approving NPRR 1081.

It is undisputed that load shedding is not driven by market forces but is instead an important regulatory tool designed to protect the grid from long-term damage during an emergency. Load shedding accomplishes this by limiting the amount of demand that may enter the market so as not to exceed available supply. Of course, when that happens, demand *in* the market no longer accurately reflects demand *to enter* the market, and additional supply can only be "accurately" priced by considering the value of replacing that lost load. *See* Hearing of Sen. Comm. Bus. & Com., 87th Leg., R.S. (Feb. 25, 2021), 79–80 (discussing incentives for production at the cap). As supply decreases, the value of lost load increases until it is effectively at the regulatory cap. *Luminant*, 691 S.W.3d at ——.

### D

On July 30, 2021, respondents RWE Renewables Americas, LLC and TX Hereford Wind, LLC (collectively, RWE) sought judicial review of the PUC's order by the Third Court of Appeals. RWE asserted that the court of appeals had jurisdiction under PURA Section 39.001(e) and alleged that the PUC both exceeded its statutory authority under PURA and failed to comply with the Administrative Procedure Act in issuing the order. The PUC responded that the order was not a PUC rule subject to direct review by the court of appeals or the APA's rulemaking requirements, and that the PUC properly issued the order in furtherance of its statutory authority to oversee ERCOT and ensure the reliability of the Texas electric grid.

The court of appeals held that the PUC's order constituted a "competition rule adopted by the commission" under Section 39.001(e), giving the court jurisdiction over the proceedings. 669 S.W.3d 566, 575 (Tex. App.—Austin 2023). The court of appeals then held that the PUC's order was invalid because (1) the PUC lacked the authority to approve NPRR 1081 under PURA and (2) the PUC had failed to substantially comply with the APA's rulemaking procedures. *Id.* at 576–77.[5] We granted the PUC's petition for review.

### II

We necessarily begin by considering jurisdiction. The PUC challenges the court of appeals' subject matter jurisdiction over what is essentially a direct appeal of the PUC's order.

### A

PURA specifically provides for judicial review of "competition rules adopted by the commission." Tex. Util. Code § 39.001(e) ("Judicial review of competition rules adopted by the commission shall be conducted under [the APA], except as otherwise provided by this chapter."). Unlike most suits for judicial review of an agency rule, review of a PUC competition rule begins in the court of appeals. *Id.*; *see also id.* § 39.001(f) ("A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals ....").[6]

**\*489** The PUC argues that its order approving NPRR 1081 is not a rule at all, much less a "competition rule," and that PURA thus does not authorize direct review of the order by the court of appeals. The APA defines "rule" as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency." Tex. Gov't Code § 2001.003(6)(A)(i)–(ii). The definition "includes the amendment or repeal of a prior rule" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *Id.* § 2001.003(6)(B)–(C).

### B

Appx. Page 221 of 740

PURA empowers the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants." Tex. Util. Code § 39.151(d). However, as noted, it also allows the PUC to "delegate these responsibilities to an independent organization," which the PUC has done by delegating rulemaking authority to ERCOT. *Id.*; *CPS Energy*, 671 S.W.3d at 616; *see* 16 Tex. Admin. Code § 25.362(c) (requiring ERCOT to "adopt and comply with procedures [subject to certain parameters] concerning the adoption and revision of ERCOT rules"). ERCOT has utilized this delegated rulemaking authority to establish operational rules known as the Nodal Protocols. Under those protocols, generators make offers in advance on how much electricity they are willing to sell and at what price. ERCOT, Nodal Protocols § 4.4.9 (May 1, 2024).[7] ERCOT uses those prices to match demand to the lowest-price provider. *Id.* § 4.5. ERCOT serves as "the central counterparty for all transactions" that it settles and "is deemed to be the sole buyer to each seller" (typically, an energy generator) "and the sole seller to each buyer" (typically, a retail user) "of all energy." *Id.* § 1.2(4). Operating as a sort of clearinghouse, it is ERCOT that generates settlement statements providing the terms under which market participants must make payments for energy transactions. *Id.* §§ 9.2.4(1), 9.5.4(1), 9.5.5.

In accordance with the PUC's direction, ERCOT has implemented detailed procedures for adopting and revising its protocols. "A request to make additions, edits, deletions, revisions, or clarifications to these Protocols ... is called a Nodal Protocol Revision Request (NPRR)." *Id.* § 21.1(1) (June 1, 2023). A variety of entities may use the NPRR process, including market participants, the PUC, the independent market monitor, and ERCOT itself. *Id.* § 21.2(1)(a), (c), (f), (g). NPRRs are posted on ERCOT's website and reviewed by ERCOT's Protocol Revision Subcommittee. *Id.* §§ 21.4.1(4), 21.3(1). Market participants and other entities may comment on an NPRR. *Id.* § 21.4.4(1). In fact, RWE participated in this process with respect to NPRR 1081 by submitting comments in opposition to it.[8]

**\*490** After considering the NPRR, the revision subcommittee may take one of several actions, including recommending approval of the revision or rejecting it. *Id.* § 21.4.4(3). ERCOT then posts a report describing the subcommittee's action. *Id.* § 21.4.4(5). Again, market participants and others may comment on the subcommittee report. *Id.* § 21.4.5(1). If the subcommittee recommends

approval, ERCOT prepares an impact analysis, *id.* § 21.4.6(1), which is reviewed by the subcommittee, *id.* § 21.4.7(1). The NPRR then moves to the Technical Advisory Committee, which considers the subcommittee report and the impact analysis. *Id.* § 21.4.8(1). If the advisory committee recommends approval of an NPRR, the committee forwards its report to the ERCOT board of directors, *id.* § 21.4.8(5), and the report is also posted online, *id.* § 21.4.8(4). ERCOT's board then has the opportunity to approve the NPRR or take other action.

Before PURA was amended to require PUC approval for protocol revisions to become effective, ERCOT would implement them on the first day of the month following approval by ERCOT's board. *Id.* § 21.6(1) (Jan. 1, 2021). Now that protocols "may not take effect before receiving commission approval," Tex. Util. Code § 39.151(g-6), they are implemented on the first day of the month following receipt of that approval, ERCOT, Nodal Protocols §§ 21.4.11(1), 21.6(1) (June 1, 2023).

A market participant, among others, may appeal a decision of the ERCOT board regarding an NPRR to the PUC. *Id.* § 21.4.12.3(1). The PUC's rules outline the procedure for review of ERCOT protocols. 16 Tex. Admin. Code §§ 22.251, 25.362(c)(5). Those rules generally require that a complainant exhaust the process outlined in Section 21 of the protocols before challenging the protocol with the PUC. *Id.* § 22.251(c). Exceptions exist when, for example, "the complainant seeks emergency relief necessary to resolve health or safety issues." *Id.* § 22.251(c)(1)(C). Generally, the complaint must be filed within thirty-five days of "the ERCOT conduct complained of." *Id.* § 22.251(d); ERCOT, Nodal Protocols § 21.4.12.3(1) (June 1, 2023). In response to the complaint, the PUC may, among other things, provide ERCOT with "guidance on the development and implementation of protocol revisions" and order ERCOT "to promptly develop protocol[ ] revisions for commission approval." 16 Tex. Admin. Code § 22.251(o)(3), (4). If the complainant is dissatisfied with the result of the PUC proceedings, it can then seek judicial review. Tex. Util. Code § 15.001.

This painstaking procedure serves to leverage the expertise of ERCOT members and industry stakeholders while maintaining transparency and affording interested parties plentiful opportunities to weigh in. Moreover, we recognize that ERCOT and the PUC are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and

**Appx. Page 222 of 740**

essential purpose. As we recognized in *CPS Energy*, "ERCOT do[es] not fall neatly into any camp. It is a unique entity serving a role that is not clearly analogous to a public entity like a police department or a public school. Yet, it provides an essential governmental service." 671 S.W.3d at 623 (alteration in original) (citation and internal quotation marks omitted). While the PUC has broad administrative responsibilities, it simultaneously lacks "the expertise and staff resources" to make informed regulatory decisions independent of ERCOT. Sunset Advisory Comm., Staff Report with Commission Decisions: Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel 37 (Jan. **\*491** 2023).[9]

**C**

A substantially similar version of the above-described process for adopting and revising ERCOT protocols has long been in effect. *See* ERCOT, Nodal Protocols § 21 (Mar. 1, 2005) (rev. Feb. 2010, Apr. 2011, May 2011, Oct. 2011, May 2012, Aug. 2012, Apr. 2013, Dec. 2013, May 2014, July 2016, Nov. 2016, Nov. 2017, Jan. 2021, Apr. 2023, June 2023). The legislative and regulatory schemes have in turn envisioned separate, complementary purposes of and procedures for PUC rules and ERCOT protocols, notwithstanding the fact that ERCOT and its protocols have consistently been subject to PUC oversight and review. Tex. Util. Code § 39.151(d). RWE nevertheless suggests that, by amending PURA to require formal PUC approval of ERCOT-adopted protocols at the tail end of the process, the Legislature intended to overhaul that process entirely and effectively convert ERCOT protocols into PUC rules subject to the same review procedures. We do not discern such a sweeping intent from the language the Legislature chose.

For one thing, PURA makes clear that ERCOT, not the PUC, is the entity "adopting" new or revised ERCOT protocols. *See id.* § 39.151(g-6). The PUC then "approves" the protocols. *See id.* This distinction is deceptively significant because the APA's requirements, which RWE insists must be satisfied, are exclusively and repeatedly directed at rules "adopted" by a "state agency." *See, e.g.*, Tex. Gov't Code § 2001.033(a) ("A state agency order finally adopting a rule must include: ...."). Indeed, the Legislature deliberately uses the term "adopt" throughout the APA—no reference is made to an agency's "approval" of a rule. *See, e.g., id.* § 2001.004(1) (requiring a state agency to "adopt rules of practice stating the nature and requirements of all available formal and informal

procedures").[10] By contrast, the APA uses the term "approve" to describe the *governor's* action on legislation that allows it to become the law. *Id.* § 2001.006(a)(2).

PURA reinforces this distinction. For example, in a suit for judicial review of a competition rule under Section 39.001, the rulemaking record includes "the order *adopting* the rule." Tex. Util. Code § 39.001(e)(4) (emphasis added). The PUC issues no such order with respect to ERCOT protocols. We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that "adopts" ERCOT protocols given the comprehensive statutory use of that term.

RWE and the court of appeals highlight that, under PURA as amended, an ERCOT protocol does not take effect until it receives PUC approval. 669 S.W.3d at 574; Tex. Util. Code § 39.151(g-6). True, but even in requiring PUC approval, the Legislature distinguished between ERCOT's role in adopting a protocol and the PUC's role in approving it. Tex. Util. Code § 39.151(g-6) ("*Protocols adopted by [* **\*492** *ERCOT] ...* may not take effect before receiving commission approval." (emphasis added)). Again, the Legislature deliberately employed these terms to communicate two distinct administrative actions that have distinct legal consequences. *See Galveston Indep. Sch. Dist. v. Jaco*, 331 S.W.3d 182, 185–86 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (highlighting the Legislature's distinct use of "adopt" and "approve" in statutes describing the duties of the commissioner of education); Tex. Educ. Code § 7.055(b)(41) ("The commissioner shall *adopt* rules relating to extracurricular activities under Section 33.081 and *approve or disapprove* University Interscholastic League rules and procedures under Section 33.083." (emphases added)).

Finally, we cannot ignore that when the Legislature amended PURA in 2021 to require PUC approval of the independent organization's (ERCOT's) protocols, it simultaneously added the requirement that the organization "establish and implement a formal process for adopting new protocols or revisions to existing protocols." Act of May 30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 832 (amended 2023) (codified at Tex. Util. Code § 39.151(g-6)). As discussed above, ERCOT already had such a process in place; nevertheless, the requirement signals legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors.

In sum, consistent with the well-established regulatory scheme and the legislation governing it, we hold that

**Appx. Page 223 of 740**

the PUC's order approving NPRR 1081 was a ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect. Consequently, the PUC's order was not an agency-adopted "rule" under the Administrative Procedure Act. In turn, because the court of appeals' jurisdiction under Utilities Code Section 39.001(e) is limited to review of "competition rules adopted by the commission," the court lacked jurisdiction over RWE's challenge to the PUC's approval order.[11]

## III

Having concluded that the court of appeals lacked jurisdiction over RWE's appeal of the PUC's approval order, we need not address RWE's remaining arguments. We note, however,

that this Court contemporaneously holds in *Luminant* that the PUC did not exceed its authority under PURA in issuing temporary emergency orders that, like NPRR 1081, set the price of electricity at the regulatory ceiling during a period of emergency load-shed. 691 S.W.3d at ——.

* * * *

Because the PUC's order was not a "competition rule adopted by the commission" under PURA, Section 39.151 did not confer direct-review jurisdiction on the court of appeals. We therefore vacate the court of appeals' judgment and dismiss the suit for lack of jurisdiction.

**All Citations**

691 S.W.3d 484, 67 Tex. Sup. Ct. J. 1096

Footnotes

1   In our contemporaneously issued opinion in *Public Utility Commission v. Luminant Energy Co.*, we hold that the PUC did not exceed its authority in issuing two emergency orders during Winter Storm Uri that operated to a similar end by temporarily setting the price of electricity at the regulatory ceiling. 691 S.W.3d 448, —— (Tex. June 14, 2024) (No. 22-0231).

2   A more detailed explanation of the Texas electricity market appears in this Court's opinion in *Luminant*. *See id.* at ——. We also recently engaged in a thorough discussion of ERCOT's history, and its role in the Texas electricity market, in *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611–12 (Tex. 2023).

3   The others are "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms" and "ensur[ing] that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information." Tex. Util. Code § 39.151(a)(1), (3).

4   As further amended in 2023, Section 39.151(g-6) currently provides:

   In this subsection, a reference to a protocol includes a rule. Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval. To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or revisions to existing protocols. The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols. The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

   Act of May 26, 2023, 88th Leg., R.S., ch. 464, § 4, 2023 Tex. Sess. Law Serv. (West) 1133 (codified at Tex. Util. Code § 39.151(g-6)).

5   In support of its first holding, the court relied on its own decision in *Luminant*, which we also review today. 669 S.W.3d at 576.

**Appx. Page 224 of 740**

6      When RWE instituted this proceeding, Section 39.001(e) provided for review in the Third Court of Appeals. In 2023, the Legislature amended Section 39.001(e) to provide for review by the Fifteenth Court of Appeals going forward. Act of May 22, 2023, 88th Leg., R.S., ch. 459, § 1.13, 2023 Tex. Sess. Law Serv. (West) 1119.

7      We cite the current version of the protocols unless substantive differences require citing the version in effect when the relevant events occurred. ERCOT's current protocols and a library of past versions of the protocols, with summaries of revisions, are available on ERCOT's website. Protocols - Nodal, https://www.ercot.com/mktrules/nprotocols.

8      RWE, Comment Letter on Nodal Protocol Request 1081 (June 23, 2021), https://www.ercot.com/mktrules/issues/NPRR1081#keydocs.

9      Available at https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf).

10      *See also* Tex. Gov't Code § 2001.006 (describing when a rule "adopted" under Section 2001.006(b) may take effect); *id.* § 2001.021(a) ("An interested person by petition to a state agency may request the adoption of a rule."); *id.* § 2001.023(a) ("A state agency shall give at least 30 days' notice of its intention to adopt a rule before it adopts the rule."); *id.* § 2001.030 ("On adoption of a rule, a state agency, if requested to do so by an interested person either before adoption or not later than the 30th day after the date of adoption, shall issue a concise statement of the principal reasons for and against its adoption.").

11      As noted, PUC regulations provide a process for review of ERCOT protocols, 16 Tex. Admin. Code §§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review in district court, Tex. Util. Code § 15.001. RWE did not engage in that process, choosing instead to utilize the inapplicable procedure for reviewing PUC competition rules.

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 92372463
Filing Code Description: No Fee Documents
Filing Description: LETTER BRIEF TO COURT IN CONNECTION TO 10/1/24 STATUS CONFERENCE
Status as of 9/24/2024 10:22 AM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 9/24/2024 10:16:47 AM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 9/24/2024 10:16:47 AM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 9/24/2024 10:16:47 AM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 9/24/2024 10:16:47 AM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 9/24/2024 10:16:47 AM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 9/24/2024 10:16:47 AM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 9/24/2024 10:16:47 AM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 9/24/2024 10:16:47 AM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 9/24/2024 10:16:47 AM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 9/24/2024 10:16:47 AM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 9/24/2024 10:16:47 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 9/24/2024 10:16:47 AM | SENT |

Case Contacts

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 92372463
Filing Code Description: No Fee Documents
Filing Description: LETTER BRIEF TO COURT IN CONNECTION TO 10/1/24 STATUS CONFERENCE
Status as of 9/24/2024 10:22 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 9/24/2024 10:16:47 AM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/24/2024 10:16:47 AM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 9/24/2024 10:16:47 AM | SENT |

9/24/2024 5:49 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Norma Ybarra



## KEN PAXTON

ATTORNEY GENERAL OF TEXAS

September 24, 2024

**VIA E-FILING**

Hon. Catherine A. Mauzy
419th Civil District Court
1700 Guadalupe, 11th floor
Austin, Texas 78701

Re:     Cause No. D-1-GN-24-003384; *Aspire Power Ventures, LP v. Public Utility Commission of Texas, et al.*; in the 345th District Court of Travis County

Dear Judge Mauzy:

The Public Utility Commission of Texas and its Commissioners ("PUCT Defendants") submit this letter in conjunction with the Review/Status Conference set for October 1 at 2:00 p.m.

The PUCT Defendants have filed a plea to the jurisdiction in this case, as has Defendant Electric Reliability Council of Texas ("ERCOT"). Because the Court must first decide whether it has jurisdiction before proceeding to consider the merits of the case, *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004), the PUCT Defendants and ERCOT are both urging that a two-hour hearing on their pleas be set before any consideration of plaintiff Aspire Power Ventures' request for a temporary injunction. That injunction request would require a full day hearing, including numerous witnesses discussing highly complex matters involved with the management of the ERCOT grid. Thus, that injunction request cannot in any event be heard on the same day as Defendants' pleas. And scheduling that injunction hearing would be a waste of the PUCT and ERCOT's resources in preparing for and attending such a hearing if the Court lacks jurisdiction over this case.

Indeed, the PUCT Defendants submit there can be little question that the Court does not have jurisdiction and that the injunction hearing will not be necessary. As the PUCT Defendants explain in their plea to jurisdiction, the Supreme Court's recent decision in *Public Utility Commission of Texas v. RWE Renewables, Americas, LLC*, 691 S.W.3d 484 (Tex. 2024) makes clear that the PUCT approval

orders at issue are not agency adopted rules and thus are not subject to challenge under Tex. Gov't Code § 2001.038 and not the proper subject of an ultra vires claim. Thus, there is no waiver of sovereign immunity in this case, and it should be dismissed.

A copy of the PUCT Defendants' plea to the jurisdiction, filed September 13, is attached. The Supreme Court's recent decision in *RWE Renewables* is attached to that plea.

Respectfully,

*/s/ John R. Hulme*
JOHN R. HULME
Special Counsel
State Bar No. 10258400
John.Hulme@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | *Fax* (512) 320-0911

**Attorneys for the Public Utility Commission of Texas and Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Chairman and Commissioners of the Public Utility Commission of Texas**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the following attorneys via the Court's electronic filing case management system and/or electronic mail on September 24, 2024:

Chrysta L. Castañeda
chrysta@castaneda-firm.com
Nicole Michael
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Tel: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
MLatin@ccsb.com
Brent M. Rubin
BRubin@ccsb.com
CARRINGTON, COLEMAN,
SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Tel: (214) 855-3000
Fax: (214) 580-2641

*Attorneys for Plaintiff*
*Aspire Power Ventures, LP*

Elliot Clark
eclark@winstead.com
Elin Isenhower
eisenhower@winstead.com
WINSTEAD PC
401 Congress Avenue, Suite 2100
Austin, Texas 78701
Tel: (512) 370-2800
Fax: (512) 370-2850

*Attorneys for Defendant*
*Electric Reliability Council of Texas*

*/s/ John R. Hulme*
JOHN R. HULME

9/13/2024 3:47 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Nancy Rodriguez

Cause No. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS |
| TEXAS, ELECTRIC RELIABILITY | § | |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN JACKSON, | § | |
| and COURTNEY HJALTMAN, | § | |
| *Defendants*. | § | 345TH JUDICIAL DISTRICT |

---

**DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND
PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS'
PLEA TO THE JURISDICTION**

---

Aspire's suit challenges and seeks to enjoin three amendments to ERCOT's operating standards or "protocols," which the PUCT Defendants[1] approved on May 12, 2022; January 26, 2023; and June 29, 2023. The PUCT Defendants move to dismiss Aspire's suit for lack of jurisdiction.

**I.      Standard of Review**

A court "must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation

---

[1] Public Utility Commission of Texas ("PUCT" or "Commission") and Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Chairman and Commissioners of the PUCT (collectively, the "PUCT Defendants.")

**Appx. Page 231 of 740**

to proceed." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Whether the Court has subject-matter jurisdiction is a question of law. *Id*. Moreover, courts have an "obligation" to consider a plea to the jurisdiction asserting immunity when filed. *See In re Lazy W District No. 1*, 493 S.W.3d 538, 544 (Tex. 2016) (orig. proceeding). In short, jurisdiction must be resolved first; only after it has been determined can Aspire's claims for injunctive relief be heard.

The Court lacks jurisdiction over this case for several reasons. The first is sovereign immunity. Plaintiff's suit against the Commission and its officials in their official capacity is a suit against the State. "[A] suit against government employees in their official capacities is, in all respects, a suit against the State." *De Mino v. Sheridan,* 176 S.W.3d 359, 366 (Tex. App.–Houston [1st Dist.] 2004, no pet.). The trial court lacks subject-matter jurisdiction absent a showing that the Texas Legislature by statute or express permission has given the State's consent to being sued in this matter. *See Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). There is no such consent here, as Aspire invokes a statutory provision that only authorizes judicial review of agency rules. But the matter at issue here is not an agency rule. *Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024) (PUCT order approving ERCOT protocol amendment "was not an agency-adopted 'rule' under the Administrative Procedure Act."). *See* Attach. 1. Thus, the limited waiver of the State's sovereign immunity

2

under Texas Gov't Code § 2001.038 is not applicable here.

Nor does the *ultra vires* exception to sovereign immunity apply. Aspire alleges "the [PUCT] Commissioners committed ultra vires acts for which they are liable in their official capacities." Am. Pet. ¶ 55. But "[a]n ultra vires action requires a plaintiff to 'allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.'" *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). The PUCT Commissioners have not acted *ultra vires* by reviewing and ratifying amendments to the Electric Reliability Council of Texas ("ERCOT") protocols—because their actions are *specifically authorized by* Tex. Util. Code § 39.151. *See e.g.* Tex. Util. Code § 39.151(g-6): "The commission may approve, reject, or remand with suggested modifications . . . protocols adopted by [ERCOT]." *See* Attach. 2. Thus, the ultra vires exception does not apply and Aspire's lawsuit against the PUCT officials in their official capacity is barred by sovereign immunity.

## II.    Factual Background

Aspire's suit challenges three different amendments to ERCOT's operating standards or "protocols," each approved in due course by the PUCT, as the Texas Public Utility Regulatory Act ("PURA") has authorized since 2021. Tex. Util. Code § 39.151(g-6). Defendant ERCOT is the Commission's designated electric grid operator. Tex. Util. Code § 39.151(d), (i), (j). ERCOT manages the Texas electric

3

grid under authority delegated to it by PUCT to "establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants." *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 626 (Tex. 2023). These protocols consist of thousands of pages of highly technical standards that govern every aspect of the electric grid and the wholesale electric market, including detailed specifications and complex pricing formulas. *Id*. at 616-17; *Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 486-87 (Tex. 2024). ERCOT develops these protocols through an elaborate stakeholder process involving electric market participants, providing extensive opportunities for market participant involvement and comment, that is described in the recent Supreme Court decision in *RWE Renewables*, 691 S.W.3d at 490 (protocol development process "serves to leverage the expertise of ERCOT members and industry stakeholders while maintaining transparency and affording interested parties plentiful opportunities to weigh in").

The specific protocol amendments challenged in this suit relate to ERCOT's Contingency Reserve Service ("ECRS"), a type of "ancillary service" that the grid operator uses to balance supply and demand and keep the grid operating. *See* Tex. Util. Code § 39.159(b) (grid operator to "procure[] ancillary or reliability services . . . to ensure appropriate reliability"); § 35.004(e) ("'[A]ncillary services' means

4

services necessary to facilitate the transmission of electric energy including load following, standby power, backup power, reactive power, and any other services as the commission may determine by rule."); *see also* 16 Tex. Admin. Code § 25.5(9); ERCOT Nodal Protocols § 2.1. The particular ancillary service program at issue in this case, ECRS, was originally created in 2019. As ERCOT has explained in its own plea to the jurisdiction filed in this case, ECRS was developed to address reliability risks that the grid operator's other ancillary services did not adequately address, "including those risks created by rapid grid modernization (e.g., increasing amounts of intermittent wind and solar generation resources), which are only compounded by the ever-present heightened reliability risks presented by ERCOT's intrastate nature." ERCOT Plea to the Jurisdiction 8 (citing ERCOT Protocols § 6.5.7.6.2.4(1) (listing purposes of ECRS)). The latter need refers to the fact that the ERCOT grid is generally not interconnected to the grids in other parts of the country and thus it is uniquely vulnerable to sudden power shortages. *Id.* (ECRS is a critical reliability tool fulfilling a similar role to import capability in other parts of the country).

Aspire does not challenge the initial creation of ECRS, which occurred in 2019, but rather three later amendments to ECRS that were approved by the PUCT over a year ago. Am. Pet. ¶ 29; *see also* ¶ 1 (defining the three challenged orders implementing ECRS as the "ECRS Rules"). The Commission approved the first and only substantive amendment of the three ECRS protocol amendments Aspire

5

Appx. Page 235 of 740

challenges in May 2022. The two other ECRS approval orders at issue (approved in 2023) merely cleaned up the language in the underlying ECRS protocol (Nodal Protocol Revision Request, or "NPRR" 1148) and set forth clarifications and expectations regarding the ECRS protocol (NPRR 1178). Tex. Pub. Util. Comm'n, *Review of Protocols Adopted by the Independent Organization,* Project No. 54445.

Aspire did not file its original petition in this case until May 31, 2024, over two years after the PUCT order approving ERCOT's first protocol amendment and more than a year after the Commission approved the latter two protocol amendments. On August 13, 2024, Aspire filed an Amended Petition adding ERCOT as a defendant,[2] asserting new causes of action relating to the same ECRS protocols that the PUCT ratified, complaining of ERCOT and the PUCT's actions in connection with the ECRS protocols, and seeking associated relief. Am. Pet. ¶ 5 ("[T]he PUC and ERCOT implemented ECRS without even attempting to comply with the mandatory requirements of the APA"), ¶ 19.

The ERCOT protocol that actually created the ECRS program, NPRR 863, was adopted in February 2019. Rather than the three protocol amendments at issue in this suit, most of Aspire's complaints are about the ECRS program generally, indicating its actual objective in this lawsuit is to invalidate the ECRS program in its

---

[2] The Amended Petition also added new PUCT Commissioner Hjaltman as a defendant.

Appx. Page 236 of 740

entirety. Am. Pet. ¶¶ 28-38. But the 2019 protocol that established ECRS was adopted before PURA was amended to add the requirement that the PUCT approve protocols before they take effect. As with the 2022 and 2023 protocol amendments challenged in this suit, Aspire did not complain to the Commission about ERCOT's conduct in adopting the 2019 protocols through the procedure provided in the PUCT rules and, therefore, has failed to exhaust administrative remedies as to any of the ECRS protocols. *See* Section V below.

### III. The Court lacks jurisdiction over Aspire's declaratory judgment claim because the PUCT's approval orders at issue are not agency rules.

Aspire's suit seeks a declaratory judgment under the Texas Administrative Procedure Act, Tex. Gov't Code § 2001.038.[3] That provision only authorizes declaratory judgments regarding the validity or applicability of **agency rules**. Tex. Gov't Code § 2001.038(a) ("The validity or applicability of a rule . . . may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff."). But the recent *RWE Renewables* decision of the Supreme Court makes clear that these PUCT approval orders are not agency rules. In *RWE Renewables*, the Supreme Court held that the PUCT's

---

[3] Aspire also seeks an injunction and a stay under PURA Section 15.004 in connection with this Tex. Gov't Code § 2001.038 declaratory claim. The Court lacks jurisdiction over these requests as well.

Appx. Page 237 of 740

protocol-approval determinations, such as those of which Aspire complains in this case, are **not** agency "rules." *Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024) (PUCT order approving ERCOT protocol amendment was "a ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect," and "[c]onsequently, the PUC's order was not an agency-adopted 'rule' under the Administrative Procedure Act.").

In *RWE*, the plaintiff (like Aspire, an ERCOT wholesale market participant) was likewise challenging a PUCT order approving an ERCOT protocol amendment. But the Supreme Court rejected RWE's contention that the PUCT approval order at issue was a PUCT rule. The Court held that "PURA envisions a separate process for ERCOT-adopted protocols, and the statutory requirement that the PUC approve those adopted protocols does not transform PUC approval orders into PUC rules." *RWE Renewables*, 691 S.W.3d at 486. Thus, the PUCT order approving ERCOT's protocol amendment was only "a ratification decision" and "[c]onsequently, the PUC's order was not an agency-adopted 'rule' under the Administrative Procedure Act." *Id*. at 492. Here the Court noted that PURA designated ERCOT as the entity that "adopts" new or revised protocols, Tex. Util. Code § 39.151(g-6), which the PUCT (its overseer) then "approves." *Id*. The APA's requirements, on the other hand, refers and imposes requirements only with reference to an agency's adoption

8

of a rule. *RWE*, 691 S.W.3d at 491 ("We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that 'adopts' ERCOT protocols given the comprehensive statutory use of that term.").

The Supreme Court's holding in *RWE* conclusively answers the jurisdictional question in this case—the PUCT's approval orders are not agency-adopted rules that Aspire can challenge under the APA, Tex. Gov't Code § 2001.038. There is no waiver of sovereign immunity. For this simple reason alone, the Court lacks jurisdiction over all of Aspire's claims against the PUCT. Because PUCT's approval order was not a rule under *RWE*, the Court has no jurisdiction over Aspire's declaratory judgment claims against the PUCT under Tex. Gov't Code § 2001.038. *See also R.R. Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 70 (Texas. 2003) (no Section 2001.038 jurisdiction regarding agency orders adopting field rules that were not APA rules).

**IV.    The Court lacks jurisdiction over this case because Aspire's complaints about ERCOT's protocols must have been brought to the Commission.**

To the extent Aspire challenges the protocol amendments themselves, the case should be dismissed because the PUCT has exclusive jurisdiction over Aspire's complaints about ERCOT's adoption of the challenged protocol amendments. Aspire's complaints must have been brought first to the Commission. Subject-matter jurisdiction is lacking "when the Legislature has granted [an] agency the sole authority to make an initial determination in a dispute," and thus the Court lacks

9

jurisdiction "until the party has exhausted all administrative remedies before the agency." *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018). This includes any complaints about the protocols that ERCOT has adopted.

Exclusive jurisdiction may be created by express statutory language or through the creation of a pervasive regulatory scheme indicating that "the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *Id*. at 138 (quoting *In re Sw. Bell Tel.*, 235 S.W.3d 619, 624-25 (Tex. 2007)). PURA Section 39.151, attached to this plea, sets forth a detailed framework outlining the PUCT's oversight and "complete authority" over ERCOT's functions. *See* Attach. 2. In *CPS Energy v. Electric Reliability Council of Texas*, 671 S.W.3d 605, 618 (Tex. 2023), the Supreme Court held that the PUCT's comprehensive regulatory authority over its designated grid operator, ERCOT, was such a pervasive regulatory scheme establishing exclusive jurisdiction with the agency that it deprived the Court of the authority to hear the dispute. *Id.* ("[PURA] Section 39.151's grant of extensive authority to the PUC over ERCOT and its detailed regulation of the particulars of ERCOT's functions constitute a pervasive regulatory scheme.").

Aspire's allegations about the protocol amendments themselves plainly fall within this scheme: they involve ERCOT's development of standards designed to

10

ensure the reliability of the ERCOT grid through ancillary services programs such as ECRS. Had Aspire filed complaints about ERCOT's protocol amendments with the Commission, and the Commission sustained ERCOT's action, then Aspire could have challenged that determination in this Court in accordance with the APA's judicial review provisions. Tex. Gov't Code § 2001.171. But Aspire did not file such a complaint with the PUCT, and the Court lacks jurisdiction to hear these complaints. For this additional reason, this Court lacks jurisdiction over Aspire's amended petition.

## V. The Court lacks jurisdiction over any challenge to the Commission's 2022 and 2023 protocol amendments because Aspire failed to exhaust its administrative remedies.

Aspire's attempt to frame the Commission's validation decisions as "rules" is not totally surprising given that Aspire did not pursue the necessary administrative remedies to bring a suit challenging the 2022 and 2023 protocol amendments, and it is far too late for it to do so now. Again, to have pursued any such challenge, Aspire must have first exhausted its administrative remedies by (1) complaining to ERCOT about each of the three protocol amendments and then (2) filing a complaint with the Commission about each of the three protocol amendments. Aspire did neither of these, for any of the three challenged protocol amendments. Thus, Aspire failed to exhaust all available administrative remedies. To the extent Aspire's Amended

11

Petition could somehow be read as challenging the PUCT's orders, the Court lacks jurisdiction over this case for this reason.

Under the APA "[a] person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter." Tex. Gov't Code § 2001.171. The Commission's rules set out those procedures. Under PUCT rules, affected entities may issue formal complaints to the PUCT regarding ERCOT action. 16 Tex. Admin. Code § 22.251(b). Under these well-established procedures, Aspire must have sought relief through ERCOT's alternative dispute resolution ("ADR") procedures before then filing a formal complaint with the Commission. *Id*. § 22.251(c). When ADR is required, the complainant must file a formal complaint with the Commission within 35 days after completing ADR. *Id*. § 22.251(d).

Aspire failed to file such a complaint after ERCOT approved the protocol amendments in 2022 and 2023, even though it had notice of and ample opportunity to comment and participate in the protocol-development process at ERCOT. *See* Section II above discussing ERCOT protocol amendment process; *RWE Renewables*, 691 S.W.3d at 490. Aspire then needed to complain of ERCOT's action to the Commission under 16 Tex. Admin. Code § 22.251. Again, it did not. Had Aspire exhausted its administrative remedies as the law requires, the Commission decision on that complaint would then be subject to judicial review under Tex. Gov't

12

Code § 2001.171. Here again, the Supreme Court's recent decision in *RWE Renewables* is instructive, as it confirms that such a complaint is the proper way to challenge an ERCOT protocol. *RWE Renewables*, 691 S.W.3d at 492 n.11 ("PUC regulations provide a process for review of ERCOT protocols, 16 Tex. Admin. Code §§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review in district court, Tex. Util. Code § 15.001."). Because Aspire did not avail itself of these remedies, the Court has no jurisdiction over this suit. *See* Section VI below.

## VI. The Court lacks jurisdiction over this 2024 case because Aspire waited over a year to file suit to challenge the PUCT protocol-approval orders.

Had Aspire followed the proper procedure to complain about the 2022 and 2023 protocol amendments as the Supreme Court explained in *RWE* (it did not), its complaint about the Commission's approval of ERCOT's protocols would have been subject to judicial review under the APA—had it timely filed suit. Here again, it did not. Instead of following the proper procedure before the agency, Aspire instead skipped ahead to directly challenge the PUCT's 2022 and 2023 approval orders in district court. But Aspire's *2024* suit challenging the Commission's *2022* and *2023* approval decisions was, in any event, filed far too late. A challenge to an agency order must be brought within 30 days of the denial of the motion for rehearing. Tex. Gov't Code § 2001.176(a). Aspire did not file any sort of rehearing request after the approval orders were issued. Even if it had filed such a request, the motion would have been overruled by operation of law in 2023. *Id.* § 2001.146(c). Aspire would

13

Appx. Page 243 of 740

then have been required to bring its suit within 30 days. *Id.* § 2001.176(a). Aspire did not file this suit until late May 2024, far too late to invoke this Court's jurisdiction.

The obvious lateness of the suit aside, there is yet another problem fatal to the Court's jurisdiction here: Aspire did not even try to participate in the proceeding in which the protocols were approved. It did not file anything at all (an intervention request, comments, or an objection) in response to ERCOT's requests for approval of three protocol amendments Aspire challenges.

## VII. The Court lacks jurisdiction over Aspire's ultra vires claims because the PUCT Commissioners' review and approval of the ERCOT protocol amendments was within their statutory authority.

The ultra vires doctrine allows suits against government officials who are alleged to have acted outside their legal authority. *Hall*, 508 S.W.3d at 238. To assert a valid ultra vires claim, the plaintiff "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Schroeder v. Escalera Ranch Owners' Ass'n*, 646 S.W.3d 329, 332 (Tex. 2022) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). A government officer with some discretion to interpret and apply the law acts without legal authority "if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Id*. (quoting *Hall*, 508 S.W.3d at 238). "If the challenged actions 'were not truly

14

outside the officer's authority or in conflict with the law,' then the plaintiff has not stated a valid ultra vires claim and governmental immunity will bar the suit." *Id*. at 332-33 (quoting *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021)).

Mere allegations that a state official's acts were unconstitutional or "without legal authority" are not enough to satisfy the ultra vires exception to sovereign immunity. *Creedmoor-Maha Water Supply Corp. v. Tex. Comm'n on Env't Quality*, 307 S.W.3d 505, 515 (Tex. App.—Austin 2010, no pet.). "[I]f the plaintiff alleges only facts demonstrating acts within the officer's legal authority and discretion, the claim seeks to control state action, and is barred by sovereign immunity." *Id*. at 515-16. When determining whether a party has asserted a valid ultra vires claim, courts "construe the relevant statutory provisions and apply them to the facts as alleged in the pleadings." *Cockrell Inv. Partners, L.P. v. Middle Pecos Groundwater Conservation Dist*., 677 S.W.3d 727, 744 (Tex. App.—El Paso 2023, pet. pending).

Aspire has not alleged *any* facts that the PUCT Commissioners acted outside their legal authority. Indeed, the action they challenge is one they are statutorily mandated to do: under PURA, PUCT must review and approve all of ERCOT's protocol amendments before they are allowed to take effect. Tex. Util. Code § 39.151(g-6). Instead, all of Aspire's ultra vires conduct allegations take issue with the decisions reached by PUCT in its protocol-ratification order or the process by which the order was issued. To the extent Aspire complains about the procedures the

15

PUCT employed in making a decision plainly within its authority, that is not a proper ultra vires claim. (And in any event, the Supreme Court has explained in *RWE Renewables* that the Commission's protocol ratification decisions are not rules and that the Commission was not required to employ APA procedures in adopting them.)

To the extent that Aspire complains about the decision that the PUCT made (that is, approving a protocol that is allegedly contrary to PURA's prohibition on market participants withholding power from the ERCOT wholesale market), that is not the proper subject of an *ultra vires* claim, either. The Commission is statutorily charged with "approv[ing], reject[ing], or remand[ing] with suggested modifications to [ERCOT]'s governing body protocols adopted by the organization." Tex. Util. Code § 39.151(g-6). Thus, the determination of whether a proposed protocol amendment complies with PURA is within the Commission's discretion to make. Aspire's challenge to the Commissioners' exercise of discretion in carrying out their statutory duty to review ERCOT protocol amendments does not establish true ultra vires conduct. *See Schroeder*, 646 S.W.3d at 335 ("Even if incorrect in their conclusion, the Commissioners did not exceed the scope of their authority."); *see also Hall*, 508 S.W.3d at 243 ("Based on the unrestricted nature of McRaven's authority under Section 5.4.6, we find his discretion to interpret collateral federal privacy law to be 'absolute' . . . . As such, McRaven—whether right or wrong—was not without legal authority in making that determination."). Because Aspire

16

complains only of the Commissioners' exercise of discretion under the applicable statute—and has failed to allege any conduct exceeding the Commissioners' authority under that statute—Aspire has not properly pled a valid ultra vires claim within the exception to the State's sovereign immunity. *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021) (plaintiff asserting an ultra vires claim must "allege facts affirmatively demonstrating actionable ultra vires conduct by state officials in order to avoid dismissal on jurisdictional grounds due to sovereign immunity").

Under Tex. Util. Code § 39.151(d), (g-6), the Commission undeniably had the authority and discretion to issue the 2022 and 2023 orders Aspire challenges. The ultra vires exception to sovereign immunity does not apply.

### PRAYER

The PUCT Defendants pray that this Court dismiss all claims against the PUCT and the PUCT Commissioner defendants for lack of jurisdiction. The PUCT Defendants further pray for all other relief to which they may be entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

17

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

*/s/ John R. Hulme*
JOHN R. HULME
Special Counsel
State Bar No. 10258400
John.Hulme@oag.texas.gov

AMANDA ATKINSON CAGLE
Assistant Attorney General
State Bar No. 00783569
Amanda.Cagle@oag.texas.gov

JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | *Fax* (512) 320-0911

***Attorneys for the Public Utility Commission of Texas and Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Chairman and Commissioners of the Public Utility Commission of Texas***

18

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the following attorneys via the Court's electronic filing case management system and/or electronic mail on September 13, 2024:

Chrysta L. Castañeda
chrysta@castaneda-firm.com
Nicole Michael
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Tel: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
MLatin@ccsb.com
Brent M. Rubin
BRubin@ccsb.com
CARRINGTON, COLEMAN,
SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Tel: (214) 855-3000
Fax: (214) 580-2641

**Attorneys for Plaintiff**
**Aspire Power Ventures, LP**

Elliot Clark
eclark@winstead.com
Elin Isenhower
eisenhower@winstead.com
WINSTEAD PC
401 Congress Avenue, Suite 2100
Austin, Texas 78701
Tel: (512) 370-2800
Fax: (512) 370-2850

**Attorneys for Defendant**
**Electric Reliability Council of Texas**

*/s/ John R. Hulme*
JOHN R. HULME

19

# Attachment 1

*Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484 (Tex. 2024)

691 S.W.3d 484
Supreme Court of Texas.

PUBLIC UTILITY COMMISSION
OF TEXAS, Petitioner,

v.

RWE RENEWABLES AMERICAS, LLC
and TX Hereford Wind, LLC, Respondents

No. 23-0555
|
Argued March 19, 2024
|
OPINION DELIVERED: June 14, 2024

**Synopsis**

**Background:** Market participants filed direct appeal of order of Public Utility Commission (PUC), 🚩 2021 WL 3711693, approving protocols adopted by Electric Reliability Council of Texas (ERCOT) revising its protocols effectively setting price of electricity at regulatory maximum during emergency load-shed event, even if standard price-setting formula yielded different price. The Austin Court of Appeals, Jones, J., sitting by assignment, 🚩 669 S.W.3d 566, reversed and remanded. Review was granted.

The Supreme Court, Lehrmann, J., held that PUC's approval of ERCOT's revised protocols was not subject to direct review by court of appeals.

Vacated and dismissed.

**Procedural Posture(s):** On Appeal; Review of Administrative Decision.

**\*485** On Petition for Review from the Court of Appeals for the Third District of Texas

**Attorneys and Law Firms**

Lisa Hobbs, Kurt Kuhn, Austin, Stephanie C. Sparks, Dallas, for Respondent RWE Renewables Americas, LLC.

Macey Reasoner Stokes, George Harold Fibbe, J. Mark Little, Elisabeth Butler, Houston, Andrea Moore Stover, Patrick Leahy, Austin, for Amicus Curiae Calpine Corporation.

Elliot Clark, Wallace B. Jefferson, Austin, Rachel Anne Ekery, Houston, Nicholas Bacarisse, for Amicus Curiae Electric Reliability Council of Texas.

Michael J. Jewell, for Respondent TX Hereford Wind, LLC.

Ron Beal, Pro Se.

John R. Hulme, Angela V. Colmenero, Priscilla M. Hubenak, Austin, Brent Webster, Houston, S. Grant Dorfman, Bellaire, Lanora C. Pettit, Kyle D. Highful, Shawn Cowles, Atty. Gen. W. Kenneth Paxton Jr., for Petitioner.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Amicus Curiae Aspire Power Ventures, LP.

**Opinion**

Justice Lehrmann delivered the opinion of the Court.

In response to Winter Storm Uri, the Legislature amended the Public Utility Regulatory Act (PURA) to provide that protocols adopted by the Electric Reliability Council of Texas, or ERCOT, do not take effect before they are approved by the Public Utility Commission. ERCOT then adopted, and the PUC approved, a revision to its protocols effectively setting the price of electricity at the regulatory maximum under Energy Emergency Alert Level 3 conditions —the highest level of emergency that can be declared— even if the standard price-setting formula yields a different price. Pursuant to PURA's mechanism for seeking judicial review of the validity of "competition rules adopted by the commission [PUC]," TEX. UTIL. CODE § 39.001(e), two market participants initiated a challenge to the PUC's approval order directly in the Third Court of Appeals. That court held the order was both substantively invalid—because the PUC exceeded its statutory authority by setting the price of electricity—and procedurally invalid—because the PUC failed to comply with the Administrative Procedure Act's rulemaking procedures in issuing the order.

We first consider whether, in light of the amendments to PURA requiring PUC approval of ERCOT protocols, the approval order constitutes a "competition rule[ ] adopted by the commission." *Id.* If it does not, the court of appeals lacked jurisdiction over the proceeding for judicial review of the order. If it does, we must then evaluate whether the court of appeals correctly **\*486** determined that the order is both procedurally and substantively invalid.

We hold that the PUC's approval order is not a "competition rule[ ] adopted by the commission" subject to the judicial-review process for PUC rules. PURA envisions a separate process for ERCOT-adopted protocols, and the statutory requirement that the PUC approve those adopted protocols does not transform PUC *approval orders* into PUC *rules* eligible for direct review by a court of appeals. The Third Court of Appeals therefore lacked jurisdiction over this proceeding. Accordingly, we vacate the court of appeals' judgment and dismiss the case for lack of jurisdiction. [1]

## I

### A

PURA Section 39.151 requires the PUC to "certify an independent organization"—here, ERCOT—"to perform the functions prescribed by [that] section." *Id.* § 39.151(c). [2] Four such functions are listed, including "ensur[ing] the reliability and adequacy of the regional electric network" and "ensur[ing] that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region." *Id.* § 39.151(a)(2), (4). [3] PUC regulations likewise demand that the "protocols and other rules" adopted by ERCOT "promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system." 16 TEX. ADMIN. CODE § 25.501(a).

ERCOT "is directly responsible and accountable to the commission," which "has complete authority to oversee and investigate [ERCOT's] finances, budget, and operations as necessary to ensure [ERCOT]'s accountability and to ensure that [ERCOT] adequately performs [its] functions and duties." TEX. UTIL. CODE § 39.151(d). If ERCOT "does not adequately perform [its] functions or duties or does not comply with this section," the PUC may take "appropriate action," including decertification. *Id.*

ERCOT possesses rulemaking authority delegated to it by the PUC, as authorized by PURA. *See id.* § 39.151(d), (g-6); 16 TEX. ADMIN. CODE § 25.362(c). The "Nodal Protocols" developed and implemented by ERCOT "provide the framework for the administration of the Texas electricity market." *Pub. Util. Comm'n v. Constellation Energy*

*Commodities Grp., Inc.*, 351 S.W.3d 588, 594–95 (Tex. App.—Austin 2011, pet. denied). Even before recent PURA amendments, ERCOT's protocols were "subject to commission oversight and review." *See* Act of May 30, 2005, 79th Leg., R.S., ch. 797, § 9, 2005 Tex. Gen. Laws 2728, 2729–30 (codified at TEX. UTIL. CODE § 39.151(d)) (amended 2021, 2023) **\*487** (current version at TEX. UTIL. CODE § 39.151(g-6)).

ERCOT is uniquely positioned to manage the electricity market by virtue of its technical expertise, and ERCOT utilizes a variety of resources and systems to manage grid conditions. For example, ERCOT typically relies on a computer system that employs a mathematical formula to send price-based signals to energy generators regarding whether additional power is needed. *Luminant*, 691 S.W.3d at ——. The PUC has specifically delegated to ERCOT the task of developing protocols for how that mathematical formula calculates energy pricing in times of energy shortage, or "scarcity pricing." *Id.*; 16 TEX. ADMIN. CODE § 25.509(b).

### B

In February 2021, Winter Storm Uri incapacitated the Texas electric grid and resulted in an Energy Emergency Alert Level 3 "load-shed" event, meaning ERCOT directed operators of the transmission system to reduce electricity consumption by involuntarily disconnecting customers from the grid. During the load-shed event, ERCOT and the PUC took various additional steps to balance supply and demand in the market to avoid total grid collapse. One such step was to supersede the standard price-setting system by administratively setting the wholesale price of electricity at the regulatory ceiling. In the storm's aftermath, ERCOT's Nodal Protocols were amended to codify the practice in case future load-shed events necessitated a similar response. That amendment is the subject of this suit.

### C

As noted, even before Uri, ERCOT's protocols were subject to commission oversight and review. After the storm, the Legislature amended PURA to additionally provide that "[r]ules adopted by an independent organization [i.e., ERCOT] ... may not take effect before receiving commission approval." Act of May 30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 830 (codified at TEX.

**Appx. Page 252 of 740**

UTIL. CODE § 39.151(d)) (amended 2023) (current version at TEX. UTIL. CODE § 39.151(g-6)). [4] In accordance with that provision, ERCOT's board of directors adopted Nodal Protocol Revision Request (NPRR) 1081, which would amend Nodal Protocol 6.5.7.3.1, and presented it to the PUC for approval. The revision would set the price of electricity at the regulatory ceiling during an emergency load-shed event to reflect scarcity of supply, regardless of whether the standard price-setting formula yields a different price. ERCOT reported to the PUC that the revision would "ensure that Real-Time energy prices reflect the VOLL [Value of Lost Load] when Load is being shed, which is fundamental **\*488** to an energy-only market design in order to provide effective economic signals." The proposal was accompanied by a report from ERCOT's board and an impact-analysis report. The PUC ultimately issued an order approving NPRR 1081.

It is undisputed that load shedding is not driven by market forces but is instead an important regulatory tool designed to protect the grid from long-term damage during an emergency. Load shedding accomplishes this by limiting the amount of demand that may enter the market so as not to exceed available supply. Of course, when that happens, demand *in* the market no longer accurately reflects demand *to enter* the market, and additional supply can only be "accurately" priced by considering the value of replacing that lost load. *See* Hearing of Sen. Comm. Bus. & Com., 87th Leg., R.S. (Feb. 25, 2021), 79–80 (discussing incentives for production at the cap). As supply decreases, the value of lost load increases until it is effectively at the regulatory cap. *Luminant*, 691 S.W.3d at ——.

**D**

On July 30, 2021, respondents RWE Renewables Americas, LLC and TX Hereford Wind, LLC (collectively, RWE) sought judicial review of the PUC's order by the Third Court of Appeals. RWE asserted that the court of appeals had jurisdiction under PURA Section 39.001(e) and alleged that the PUC both exceeded its statutory authority under PURA and failed to comply with the Administrative Procedure Act in issuing the order. The PUC responded that the order was not a PUC rule subject to direct review by the court of appeals or the APA's rulemaking requirements, and that the PUC properly issued the order in furtherance of its statutory authority to oversee ERCOT and ensure the reliability of the Texas electric grid.

The court of appeals held that the PUC's order constituted a "competition rule adopted by the commission" under Section 39.001(e), giving the court jurisdiction over the proceedings. 669 S.W.3d 566, 575 (Tex. App.—Austin 2023). The court of appeals then held that the PUC's order was invalid because (1) the PUC lacked the authority to approve NPRR 1081 under PURA and (2) the PUC had failed to substantially comply with the APA's rulemaking procedures. *Id.* at 576–77. [5] We granted the PUC's petition for review.

**II**

We necessarily begin by considering jurisdiction. The PUC challenges the court of appeals' subject matter jurisdiction over what is essentially a direct appeal of the PUC's order.

**A**

PURA specifically provides for judicial review of "competition rules adopted by the commission." TEX. UTIL. CODE § 39.001(e) ("Judicial review of competition rules adopted by the commission shall be conducted under [the APA], except as otherwise provided by this chapter."). Unlike most suits for judicial review of an agency rule, review of a PUC competition rule begins in the court of appeals. *Id.*; *see also id.* § 39.001(f) ("A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals ...."). [6]

**\*489** The PUC argues that its order approving NPRR 1081 is not a rule at all, much less a "competition rule," and that PURA thus does not authorize direct review of the order by the court of appeals. The APA defines "rule" as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency." TEX. GOV'T CODE § 2001.003(6)(A)(i)–(ii). The definition "includes the amendment or repeal of a prior rule" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *Id.* § 2001.003(6)(B)–(C).

B

PURA empowers the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants." TEX. UTIL. CODE § 39.151(d). However, as noted, it also allows the PUC to "delegate these responsibilities to an independent organization," which the PUC has done by delegating rulemaking authority to ERCOT. *Id.*; 🚩*CPS Energy*, 671 S.W.3d at 616; *see* 16 TEX. ADMIN. CODE § 25.362(c) (requiring ERCOT to "adopt and comply with procedures [subject to certain parameters] concerning the adoption and revision of ERCOT rules"). ERCOT has utilized this delegated rulemaking authority to establish operational rules known as the Nodal Protocols. Under those protocols, generators make offers in advance on how much electricity they are willing to sell and at what price. ERCOT, NODAL PROTOCOLS § 4.4.9 (May 1, 2024). [7] ERCOT uses those prices to match demand to the lowest-price provider. *Id.* § 4.5. ERCOT serves as "the central counterparty for all transactions" that it settles and "is deemed to be the sole buyer to each seller" (typically, an energy generator) "and the sole seller to each buyer" (typically, a retail user) "of all energy." *Id.* § 1.2(4). Operating as a sort of clearinghouse, it is ERCOT that generates settlement statements providing the terms under which market participants must make payments for energy transactions. *Id.* §§ 9.2.4(1), 9.5.4(1), 9.5.5.

In accordance with the PUC's direction, ERCOT has implemented detailed procedures for adopting and revising its protocols. "A request to make additions, edits, deletions, revisions, or clarifications to these Protocols ... is called a Nodal Protocol Revision Request (NPRR)." *Id.* § 21.1(1) (June 1, 2023). A variety of entities may use the NPRR process, including market participants, the PUC, the independent market monitor, and ERCOT itself. *Id.* § 21.2(1) (a), (c), (f), (g). NPRRs are posted on ERCOT's website and reviewed by ERCOT's Protocol Revision Subcommittee. *Id.* §§ 21.4.1(4), 21.3(1). Market participants and other entities may comment on an NPRR. *Id.* § 21.4.4(1). In fact, RWE participated in this process with respect to NPRR 1081 by submitting comments in opposition to it. [8]

**\*490** After considering the NPRR, the revision subcommittee may take one of several actions, including recommending approval of the revision or rejecting it.

*Id.* § 21.4.4(3). ERCOT then posts a report describing the subcommittee's action. *Id.* § 21.4.4(5). Again, market participants and others may comment on the subcommittee report. *Id.* § 21.4.5(1). If the subcommittee recommends approval, ERCOT prepares an impact analysis, *id.* § 21.4.6(1), which is reviewed by the subcommittee, *id.* § 21.4.7(1). The NPRR then moves to the Technical Advisory Committee, which considers the subcommittee report and the impact analysis. *Id.* § 21.4.8(1). If the advisory committee recommends approval of an NPRR, the committee forwards its report to the ERCOT board of directors, *id.* § 21.4.8(5), and the report is also posted online, *id.* § 21.4.8(4). ERCOT's board then has the opportunity to approve the NPRR or take other action.

Before PURA was amended to require PUC approval for protocol revisions to become effective, ERCOT would implement them on the first day of the month following approval by ERCOT's board. *Id.* § 21.6(1) (Jan. 1, 2021). Now that protocols "may not take effect before receiving commission approval," TEX. UTIL. CODE § 39.151(g-6), they are implemented on the first day of the month following receipt of that approval, ERCOT, NODAL PROTOCOLS §§ 21.4.11(1), 21.6(1) (June 1, 2023).

A market participant, among others, may appeal a decision of the ERCOT board regarding an NPRR to the PUC. *Id.* § 21.4.12.3(1). The PUC's rules outline the procedure for review of ERCOT protocols. 16 TEX. ADMIN. CODE §§ 22.251, 25.362(c)(5). Those rules generally require that a complainant exhaust the process outlined in Section 21 of the protocols before challenging the protocol with the PUC. *Id.* § 22.251(c). Exceptions exist when, for example, "the complainant seeks emergency relief necessary to resolve health or safety issues." *Id.* § 22.251(c)(1)(C). Generally, the complaint must be filed within thirty-five days of "the ERCOT conduct complained of." *Id.* § 22.251(d); ERCOT, NODAL PROTOCOLS § 21.4.12.3(1) (June 1, 2023). In response to the complaint, the PUC may, among other things, provide ERCOT with "guidance on the development and implementation of protocol revisions" and order ERCOT "to promptly develop protocol[ ] revisions for commission approval." 16 TEX. ADMIN. CODE § 22.251(o)(3), (4). If the complainant is dissatisfied with the result of the PUC proceedings, it can then seek judicial review. TEX. UTIL. CODE § 15.001.

This painstaking procedure serves to leverage the expertise of ERCOT members and industry stakeholders while

maintaining transparency and affording interested parties plentiful opportunities to weigh in. Moreover, we recognize that ERCOT and the PUC are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and essential purpose. As we recognized in 🚩*CPS Energy*, "ERCOT do[es] not fall neatly into any camp. It is a unique entity serving a role that is not clearly analogous to a public entity like a police department or a public school. Yet, it provides an essential governmental service." 🚩671 S.W.3d at 623 (alteration in original) (citation and internal quotation marks omitted). While the PUC has broad administrative responsibilities, it simultaneously lacks "the expertise and staff resources" to make informed regulatory decisions independent of ERCOT. SUNSET ADVISORY COMM., STAFF REPORT WITH COMMISSION DECISIONS: PUBLIC UTILITY COMMISSION OF TEXAS, ELECTRIC RELIABILITY COUNCIL OF TEXAS, OFFICE OF PUBLIC UTILITY COUNSEL 37 (Jan. **\*491** 2023).[9]

**C**

A substantially similar version of the above-described process for adopting and revising ERCOT protocols has long been in effect. *See* ERCOT, NODAL PROTOCOLS § 21 (Mar. 1, 2005) (rev. Feb. 2010, Apr. 2011, May 2011, Oct. 2011, May 2012, Aug. 2012, Apr. 2013, Dec. 2013, May 2014, July 2016, Nov. 2016, Nov. 2017, Jan. 2021, Apr. 2023, June 2023). The legislative and regulatory schemes have in turn envisioned separate, complementary purposes of and procedures for PUC rules and ERCOT protocols, notwithstanding the fact that ERCOT and its protocols have consistently been subject to PUC oversight and review. TEX. UTIL. CODE § 39.151(d). RWE nevertheless suggests that, by amending PURA to require formal PUC approval of ERCOT-adopted protocols at the tail end of the process, the Legislature intended to overhaul that process entirely and effectively convert ERCOT protocols into PUC rules subject to the same review procedures. We do not discern such a sweeping intent from the language the Legislature chose.

For one thing, PURA makes clear that ERCOT, not the PUC, is the entity "adopting" new or revised ERCOT protocols. *See id.* § 39.151(g-6). The PUC then "approves" the protocols. *See id.* This distinction is deceptively significant because the APA's requirements, which RWE insists must be satisfied, are exclusively and repeatedly directed at rules "adopted"

by a "state agency." *See, e.g.*, TEX. GOV'T CODE § 2001.033(a) ("A state agency order finally adopting a rule must include: ...."). Indeed, the Legislature deliberately uses the term "adopt" throughout the APA—no reference is made to an agency's "approval" of a rule. *See, e.g., id.* § 2001.004(1) (requiring a state agency to "adopt rules of practice stating the nature and requirements of all available formal and informal procedures").[10] By contrast, the APA uses the term "approve" to describe the *governor's* action on legislation that allows it to become the law. *Id.* § 2001.006(a)(2).

PURA reinforces this distinction. For example, in a suit for judicial review of a competition rule under Section 39.001, the rulemaking record includes "the order *adopting* the rule." TEX. UTIL. CODE § 39.001(e)(4) (emphasis added). The PUC issues no such order with respect to ERCOT protocols. We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that "adopts" ERCOT protocols given the comprehensive statutory use of that term.

RWE and the court of appeals highlight that, under PURA as amended, an ERCOT protocol does not take effect until it receives PUC approval. 🚩669 S.W.3d at 574; TEX. UTIL. CODE § 39.151(g-6). True, but even in requiring PUC approval, the Legislature distinguished between ERCOT's role in adopting a protocol and the PUC's role in approving it. TEX. UTIL. CODE § 39.151(g-6) ("*Protocols adopted by [*🚩 **\*492** *ERCOT]* ... may not take effect before receiving commission approval." (emphasis added)). Again, the Legislature deliberately employed these terms to communicate two distinct administrative actions that have distinct legal consequences. *See Galveston Indep. Sch. Dist. v. Jaco*, 331 S.W.3d 182, 185–86 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (highlighting the Legislature's distinct use of "adopt" and "approve" in statutes describing the duties of the commissioner of education); TEX. EDUC. CODE § 7.055(b)(41) ("The commissioner shall *adopt* rules relating to extracurricular activities under Section 33.081 and *approve or disapprove* University Interscholastic League rules and procedures under Section 33.083." (emphases added)).

Finally, we cannot ignore that when the Legislature amended PURA in 2021 to require PUC approval of the independent organization's (ERCOT's) protocols, it simultaneously added the requirement that the organization "establish and implement a formal process for adopting new protocols or revisions to existing protocols." Act of May

30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 832 (amended 2023) (codified at TEX. UTIL. CODE § 39.151(g-6)). As discussed above, ERCOT already had such a process in place; nevertheless, the requirement signals legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors.

In sum, consistent with the well-established regulatory scheme and the legislation governing it, we hold that the PUC's order approving NPRR 1081 was a ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect. Consequently, the PUC's order was not an agency-adopted "rule" under the Administrative Procedure Act. In turn, because the court of appeals' jurisdiction under Utilities Code Section 39.001(e) is limited to review of "competition rules adopted by the commission," the court lacked jurisdiction over RWE's challenge to the PUC's approval order. [11]

Having concluded that the court of appeals lacked jurisdiction over RWE's appeal of the PUC's approval order, we need not address RWE's remaining arguments. We note, however, that this Court contemporaneously holds in *Luminant* that the PUC did not exceed its authority under PURA in issuing temporary emergency orders that, like NPRR 1081, set the price of electricity at the regulatory ceiling during a period of emergency load-shed. 691 S.W.3d at ——.

\* \* \* \*

Because the PUC's order was not a "competition rule adopted by the commission" under PURA, Section 39.151 did not confer direct-review jurisdiction on the court of appeals. We therefore vacate the court of appeals' judgment and dismiss the suit for lack of jurisdiction.

**All Citations**

691 S.W.3d 484, 67 Tex. Sup. Ct. J. 1096

### III

---

### Footnotes

1    In our contemporaneously issued opinion in *Public Utility Commission v. Luminant Energy Co.*, we hold that the PUC did not exceed its authority in issuing two emergency orders during Winter Storm Uri that operated to a similar end by temporarily setting the price of electricity at the regulatory ceiling. 691 S.W.3d 448, —— (Tex. June 14, 2024) (No. 22-0231).

2    A more detailed explanation of the Texas electricity market appears in this Court's opinion in *Luminant*. *See id.* at ——. We also recently engaged in a thorough discussion of ERCOT's history, and its role in the Texas electricity market, in *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611–12 (Tex. 2023).

3    The others are "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms" and "ensur[ing] that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information." TEX. UTIL. CODE § 39.151(a)(1), (3).

4    As further amended in 2023, Section 39.151(g-6) currently provides:

In this subsection, a reference to a protocol includes a rule. Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval. To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or

**Appx. Page 256 of 740**

revisions to existing protocols. The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols. The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

Act of May 26, 2023, 88th Leg., R.S., ch. 464, § 4, 2023 Tex. Sess. Law Serv. (West) 1133 (codified at TEX. UTIL. CODE § 39.151(g-6)).

5 In support of its first holding, the court relied on its own decision in *Luminant*, which we also review today. 669 S.W.3d at 576.

6 When RWE instituted this proceeding, Section 39.001(e) provided for review in the Third Court of Appeals. In 2023, the Legislature amended Section 39.001(e) to provide for review by the Fifteenth Court of Appeals going forward. Act of May 22, 2023, 88th Leg., R.S., ch. 459, § 1.13, 2023 Tex. Sess. Law Serv. (West) 1119.

7 We cite the current version of the protocols unless substantive differences require citing the version in effect when the relevant events occurred. ERCOT's current protocols and a library of past versions of the protocols, with summaries of revisions, are available on ERCOT's website. Protocols - Nodal, https://www.ercot.com/mktrules/nprotocols.

8 RWE, Comment Letter on Nodal Protocol Request 1081 (June 23, 2021), https://www.ercot.com/mktrules/issues/NPRR1081#keydocs.

9 Available at https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf).

10 *See also* TEX. GOV'T CODE § 2001.006 (describing when a rule "adopted" under Section 2001.006(b) may take effect); *id.* § 2001.021(a) ("An interested person by petition to a state agency may request the adoption of a rule."); *id.* § 2001.023(a) ("A state agency shall give at least 30 days' notice of its intention to adopt a rule before it adopts the rule."); *id.* § 2001.030 ("On adoption of a rule, a state agency, if requested to do so by an interested person either before adoption or not later than the 30th day after the date of adoption, shall issue a concise statement of the principal reasons for and against its adoption.").

11 As noted, PUC regulations provide a process for review of ERCOT protocols, 16 TEX. ADMIN. CODE §§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review in district court, TEX. UTIL. CODE § 15.001. RWE did not engage in that process, choosing instead to utilize the inapplicable procedure for reviewing PUC competition rules.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Attachment 2

Tex. Util. Code § 39.151

Vernon's Texas Statutes and Codes Annotated
  Utilities Code (Refs & Annos)
    Title 2. Public Utility Regulatory Act (Refs & Annos)
      Subtitle B. Electric Utilities (Refs & Annos)
        Chapter 39. Restructuring of Electric Utility Industry
          Subchapter D. Market Structure

V.T.C.A., Utilities Code § 39.151

§ 39.151. Essential Organizations

Effective: September 1, 2023
Currentness

(a) A power region must establish one or more independent organizations to perform the following functions:

(1) ensure access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms;

(2) ensure the reliability and adequacy of the regional electrical network;

(3) ensure that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information; and

(4) ensure that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region.

(b) "Independent organization" means an independent system operator or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller.

(c) The commission shall certify an independent organization or organizations to perform the functions prescribed by this section. The commission shall apply the provisions of this section and Sections 39.1511, 39.1512, and 39.1515 so as to avoid conflict with a ruling of a federal regulatory body.

(d) The commission shall adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants, or may delegate those responsibilities to an independent organization . An independent organization certified by the commission is directly responsible and accountable to the commission. The commission has complete authority to oversee and investigate the independent organization's finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties. The independent organization shall fully cooperate with the commission in the commission's oversight and investigatory functions. The commission may take appropriate action against an independent organization that does not adequately perform the organization's functions or duties or does not comply

Appx. Page 259 of 740

with this section, including decertifying the organization or assessing an administrative penalty against the organization. The commission by rule shall adopt procedures governing decertification of an independent organization, selecting and certifying a successor organization, and transferring assets to the successor organization to ensure continuity of operations in the region. The commission may not implement, by order or by rule, a requirement that is contrary to an applicable federal law or rule.

(d-1) The commission shall require an independent organization certified by the commission under this section to submit to the commission the organization's entire proposed annual budget. The commission shall review the proposed budgets either annually or biennially and may approve, disapprove, or modify any item included in a proposed budget. The commission by rule shall establish the type of information or documents needed to effectively evaluate the proposed budget and reasonable dates for the submission of that information or those documents. The commission shall establish a procedure to provide public notice of and public participation in the budget review process.

(d-2) Except as otherwise agreed to by the commission and an independent organization certified by the commission under this section, the organization must submit to the commission for review and approval proposals for obtaining debt financing or for refinancing existing debt. The commission may approve, disapprove, or modify a proposal.

(d-3) An independent organization certified by the commission under this section shall develop proposed performance measures to track the organization's operations. The independent organization must submit the proposed performance measures to the commission for review and approval. The commission shall review the organization's performance as part of the budget review process under Subsection (d-1). The commission shall prepare a report at the time the commission approves the organization's budget detailing the organization's performance and submit the report to the lieutenant governor, the speaker of the house of representatives, and each house and senate standing committee that has jurisdiction over electric utility issues.

(d-4) The commission may:

(1) require an independent organization to provide reports and information relating to the independent organization's performance of the functions prescribed by this section and relating to the organization's revenues, expenses, and other financial matters;

(2) prescribe a system of accounts for an independent organization;

(3) conduct audits of an independent organization's performance of the functions prescribed by this section or relating to its revenues, expenses, and other financial matters and may require an independent organization to conduct such an audit;

(4) inspect an independent organization's facilities, records, and accounts during reasonable hours and after reasonable notice to the independent organization;

(5) assess administrative penalties against an independent organization that violates this title or a rule or order adopted by the commission and, at the request of the commission, the attorney general may apply for a court order to require an independent organization to comply with commission rules and orders in the manner provided by Chapter 15; and

Appx. Page 260 of 740

(6) resolve disputes between an affected person and an independent organization and adopt procedures for the efficient resolution of such disputes.

(e) After approving the budget of an independent organization under Subsection (d-1), the commission shall authorize the organization to charge to wholesale buyers and sellers a system administration fee, within a range determined by the commission, that is reasonable and competitively neutral to fund the independent organization's approved budget. The commission shall investigate the organization's cost efficiencies, salaries and benefits, and use of debt financing and may require the organization to provide any information needed to effectively evaluate the reasonableness and neutrality of the fee or to evaluate the effectiveness or efficiency of the organization. The commission shall work with the organization to establish the detail of information, both current and historical, and the time frames the commission needs to effectively evaluate the fee. The commission shall require the organization to closely match actual revenues generated by the fee and other sources of revenue with revenue necessary to fund the budget, taking into account the effect of a fee change on market participants and consumers, to ensure that the budget year does not end with surplus or insufficient funds. The commission shall require the organization to submit to the commission, on a schedule determined by the commission, reports that compare actual expenditures with budgeted expenditures.

(e-1) The review and approval of a proposed budget under Subsection (d-1) or a proceeding to authorize and set the range for the amount of a fee under Subsection (e) is not a contested case for purposes of Chapter 2001, Government Code.

(f) In implementing this section, the commission may cooperate with the utility regulatory commission of another state or the federal government and may hold a joint hearing or make a joint investigation with that commission.

(g) To maintain certification as an independent organization for the ERCOT power region under this section, an organization's governing body must be composed of persons selected by the ERCOT board selection committee.

(g-1) The bylaws of an independent organization certified for the ERCOT power region must be approved by and reflect the input of the commission. The bylaws must require that every member of the governing body be a resident of this state and must prohibit a legislator from serving as a member. The governing body must be composed of:

(1) two members of the commission as ex officio nonvoting members:

(A) one of whom must be the presiding officer of the commission; and

(B) one of whom must be designated by the presiding officer of the commission to serve a one-year term on the governing body ;

(2) the counsellor as an ex officio voting member representing residential and small commercial consumer interests;

(3) the chief executive officer of the independent organization as an ex officio nonvoting member; and

**Appx. Page 261 of 740**

(4) eight members selected by the selection committee under Section 39.1513 with executive-level experience in any of the following professions:

    (A) finance;

    (B) business;

    (C) engineering, including electrical engineering;

    (D) trading;

    (E) risk management;

    (F) law; or

    (G) electric market design.

(g-2) Members of the governing body are entitled to receive a salary for their service.

(g-3) A person does not qualify for selection as a member of the governing body of an independent organization for the ERCOT power region if the person has a fiduciary duty or assets in the electricity market for that region.

(g-4) To maintain certification as an independent organization under this section, the organization's governing body may not include more than two members who are employed by an institution of higher education, as defined by Section 61.003, Education Code, in a professorial role.

(g-5) A former member of the governing body of an independent organization certified under this section may not, before the second anniversary of the date the member ceases to be a member of the governing body, engage in an activity that requires registration under Chapter 305, Government Code.

(g-6) In this subsection, a reference to a protocol includes a rule. Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval. To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or revisions to existing protocols. The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols. The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

**Appx. Page 262 of 740**

<Text of (g-7) as provided by Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 15, eff. Sept. 1, 2023>

(g-7) The presiding officer of the commission shall designate commissioners to serve terms on the independent organization's governing body under Subsection (g-1)(1)(B) in the order in which the commissioners were first appointed to the commission. A commissioner may not serve an additional term until each commissioner has served a term.

<Text of (g-7) as provided by Acts 2023, 88th Leg., ch. 464 (S.B. 2013), § 4, eff. June 9, 2023.>

(g-7) To maintain certification as an independent organization under this section, the organization must:

   (1) identify all employee positions in the organization that are critical to the security of the electric grid; and

   (2) before hiring a person for a position described by Subdivision (1), obtain from the Department of Public Safety or a private vendor criminal history record information relating to the prospective employee and any other background information considered necessary by the independent organization or required by the commission.

(h) The ERCOT independent system operator may meet the criteria relating to the other functions of an independent organization provided by Subsection (a) by adopting procedures and acquiring resources needed to carry out those functions, consistent with any rules or orders of the commission.

(i) The commission may delegate authority to the existing independent system operator in ERCOT to enforce operating standards within the ERCOT regional electrical network and to establish and oversee transaction settlement procedures. The commission may establish the terms and conditions for the ERCOT independent system operator's authority to oversee utility dispatch functions after the introduction of customer choice.

(j) A retail electric provider, municipally owned utility, electric cooperative, power marketer, transmission and distribution utility, or power generation company shall observe all scheduling, operating, planning, reliability, and settlement policies, rules, guidelines, and procedures established by the independent system operator in ERCOT. Failure to comply with this subsection may result in the revocation, suspension, or amendment of a certificate as provided by Section 39.356 or in the imposition of an administrative penalty as provided by Section 39.357.

(j-1) Notwithstanding Subsection (j) of this section, Section 39.653(c), or any other law, the independent system operator in the ERCOT power region may not reduce payments to or uplift short-paid amounts to a municipally owned utility that becomes subject to the jurisdiction of that independent system operator on or after May 29, 2021, and before December 30, 2021, related to a default on a payment obligation by a market participant that occurred before May 29, 2021.

(k) To the extent the commission has authority over an independent organization outside of ERCOT, the commission may delegate authority to the independent organization consistent with Subsection (i).

(l) No operational criteria, protocols, or other requirement established by an independent organization, including the ERCOT independent system operator, may adversely affect or impede any manufacturing or other internal process operation associated with an industrial generation facility, except to the minimum extent necessary to assure reliability of the transmission network.

**Appx. Page 263 of 740**

(m) A power region outside of ERCOT shall be deemed to have met the requirement to establish an independent organization to perform the transmission functions specified in Subsection (a) if the Federal Energy Regulatory Commission has approved a regional transmission organization for the region and found that the regional transmission organization meets the requirements of Subsection (a).

(n) An independent organization certified by the commission under this section is subject to review under Chapter 325, Government Code (Texas Sunset Act), but is not abolished under that chapter.The independent organization shall be reviewed during the periods in which the Public Utility Commission of Texas is reviewed.

(n-1) Expired.

(o) An independent organization certified by the commission under this section shall:

(1) conduct internal cybersecurity risk assessment, vulnerability testing, and employee training to the extent the independent organization is not otherwise required to do so under applicable state and federal cybersecurity and information security laws; and

(2) submit a report annually to the commission on the independent organization's compliance with applicable cybersecurity and information security laws.

(p) Information submitted in a report under Subsection (o) is confidential and not subject to disclosure under Chapter 552, Government Code.

**Credits**

Added by Acts 1999, 76th Leg., ch. 405, § 39, eff. Sept. 1, 1999. Amended by Acts 2005, 79th Leg., ch. 797, § 9, eff. Sept. 1, 2005; Acts 2011, 82nd Leg., ch. 1232 (S.B. 652), § 1.09, eff. June 17, 2011; Acts 2013, 83rd Leg., ch. 170 (H.B. 1600), § 1.08, eff. Sept. 1, 2013; Acts 2019, 86th Leg., ch. 509 (S.B. 64), § 23, eff. Sept. 1, 2019; Acts 2021, 87th Leg., ch. 425 (S.B. 2), § 3, eff. June 8, 2021; Acts 2021, 87th Leg., ch. 908 (H.B. 4492), § 3, eff. June 16, 2021; Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 15, eff. Sept. 1, 2023; Acts 2023, 88th Leg., ch. 464 (S.B. 2013), § 4, eff. June 9, 2023.

Notes of Decisions (25)

V. T. C. A., Utilities Code § 39.151, TX UTIL § 39.151
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of John Hulme
Bar No. 10258400
david.laurent@oag.texas.gov
Envelope ID: 92018492
Filing Code Description: RESPONSE
Filing Description: DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS' PLEA TO THE JURISDICTION
Status as of 9/16/2024 9:36 AM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Elliot Clark | | eclark@winstead.com | 9/13/2024 3:47:51 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 9/13/2024 3:47:51 PM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Monica Latin | 787881 | mlatin@ccsb.com | 9/13/2024 3:47:51 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 9/13/2024 3:47:51 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 9/13/2024 3:47:51 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 9/13/2024 3:47:51 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| David Laurent | | david.laurent@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 9/13/2024 3:47:51 PM | SENT |

Case Contacts

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of John Hulme
Bar No. 10258400
david.laurent@oag.texas.gov
Envelope ID: 92018492
Filing Code Description: RESPONSE
Filing Description: DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS' PLEA TO THE JURISDICTION
Status as of 9/16/2024 9:36 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 9/13/2024 3:47:51 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/13/2024 3:47:51 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Monique Edwards on behalf of John Hulme
Bar No. 10258400
monique.edwards@oag.texas.gov
Envelope ID: 92410517
Filing Code Description: No Fee Documents
Filing Description: PUBLIC UTILITY COMMISSION LETTER BRIEF TO COURT
Status as of 9/25/2024 5:57 AM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 9/24/2024 5:49:42 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 9/24/2024 5:49:42 PM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 9/24/2024 5:49:42 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 9/24/2024 5:49:42 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 9/24/2024 5:49:42 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 9/24/2024 5:49:42 PM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 9/24/2024 5:49:42 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 9/24/2024 5:49:42 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 9/24/2024 5:49:42 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 9/24/2024 5:49:42 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 9/24/2024 5:49:42 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 9/24/2024 5:49:42 PM | SENT |

Case Contacts

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Monique Edwards on behalf of John Hulme
Bar No. 10258400
monique.edwards@oag.texas.gov
Envelope ID: 92410517
Filing Code Description: No Fee Documents
Filing Description: PUBLIC UTILITY COMMISSION LETTER BRIEF TO COURT
Status as of 9/25/2024 5:57 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 9/24/2024 5:49:42 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/24/2024 5:49:42 PM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 9/24/2024 5:49:42 PM | SENT |

9/24/2024 3:15 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Nancy Rodriguez

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | |
| TEXAS, ELECTRIC RELIABILITY | § | TRAVIS COUNTY, TEXAS |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN | § | |
| JACKSON, AND COURTNEY | § | |
| HJALTMAN, | § | |
| | § | 345th JUDICIAL DISTRICT |
| *Defendants.* | | |

## PLAINTIFF'S SECOND AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION

Plaintiff Aspire Power Ventures, LP ("Aspire") files its Second Amended

Petition and Application for Stay/Suspension and Temporary and Permanent

Injunction against Defendants Public Utility of Commission of Texas ("PUC"),

Electric Reliability Council of Texas ("ERCOT"), Thomas Gleeson, Lori Cobos,

Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman (collectively,

"Commissioners") and respectfully shows the Court as follows:

## INTRODUCTION

1.      The ERCOT Contingency Reserve Service ("ECRS") illegally restrains

the supply of electricity on the ERCOT grid. ECRS is illegal for three reasons: *First*,

ECRS violates the Public Utility Regulatory Act ("PURA"), which prohibits

withholding supply from the market. *Second*, the PUC and ERCOT disregarded the

---

**PLAINTIFF'S SECOND AMENDED PETITION AND APPLICATION FOR
STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

requirements of the Administrative Procedure Act ("APA") with PUC orders and ERCOT protocols implementing ECRS (the "ECRS Rules"). *Third*, ERCOT's procedures for adopting rules, under rulemaking authority delegated by the PUC, do not comply with the APA.

2. ECRS is a failed attempt to increase the reliability of ERCOT's electricity grid. Under ECRS, generating companies get paid to withhold some of their **existing** generating capacity from the grid—in "reserve"—even when electricity demand is at a peak, including in hot summer months. But PURA and the regulations enacted under it expressly outlaw the withholding of electricity as a market power abuse. *See* Tex. Util. Code § 39.157(a) (PUC charged with preventing market power abuses and defining withholding of production as a market power abuse); 16 Tex. Admin. Code §§ 25.501(j), 25.503(a)(6), (d) (same). ECRS violates these fundamental tenets of PURA.

3. Texas electricity consumers have paid inflated rates because of ECRS. According to ERCOT's Independent Market Monitor ("IMM"), which oversees ERCOT, ECRS inflated the cost of wholesale electricity in the period June through November 2023 by approximately $12 billion. ECRS has also caused unnecessary conservation warnings and has increased the risk of ERCOT having to use drastic measures to ensure reliability. If the Court allows ECRS to stand, Texans will continue to suffer harm.

4. Aspire is an ERCOT Market Participant harmed by ECRS. Aspire buys electricity on ERCOT's wholesale market and has fixed-price contracts to sell

electricity. ECRS makes wholesale electricity prices much more volatile. So, Aspire cannot adequately plan to buy electricity to fulfill its fixed-price contracts. ECRS also makes it much more likely that Aspire will suffer losses on its contracts by increasing wholesale prices. As long as ECRS continues to stand, Aspire will continue to suffer harm.

5.     Making matters worse, the PUC and ERCOT implemented ECRS without even attempting to comply with the mandatory requirements of the APA. The APA ensures that the public gets an opportunity to participate in agency rulemaking and that agencies do not exceed their authority when making rules. But the process ERCOT and the PUC used to implement ECRS provided none of the APA's safeguards. Therefore, Aspire seeks a declaratory judgment declaring the ECRS Rules void.

6.     In fact, the process for adopting rules concerning ERCOT's operations deliberately and illegally sidesteps the APA. The Legislature allowed the PUC to delegate its rulemaking responsibilities to ERCOT. But the Legislature did not dispense with the APA's mandatory requirements when allowing the PUC to delegate rulemaking responsibilities to ERCOT. And ERCOT's own rulemaking processes do not come close to meeting the APA's rulemaking requirements, nor does the PUC's condensed process for approving ERCOT-adopted rules. Aspire thus also seeks a declaration that ERCOT's rulemaking processes, on their own and when combined with the PUC's, do not substantially comply with the APA.

Appx. Page 271 of 740

7.      The harm suffered by Aspire, other Market Participants, and Texas due to ECRS cannot be remedied by the payment of mere money damages. False and unsettling conservation notices to the general public cannot be undone. Further, withholding generating capacity through ECRS necessarily means that ERCOT will have to rely more on the other tools to maintain reliability including operating reserves, Energy Emergency Alerts ("EEAs"), and even rolling blackouts, if necessary. The PUC also takes the position that if one of its orders is declared void, it is void only on a prospective basis and cannot have any effect on transactions that have already cleared. While Aspire disagrees with the PUC's position that prior transactions cannot be unwound, the PUC essentially concedes that no money damages would be available to remedy its illegal conduct.

8.      Aspire thus seeks a stay or suspension of the ECRS Rules and temporary and permanent injunctive relief. Unless the Court grants interim relief, ECRS will continue to inflict substantial, irreparable harm on Aspire, other Market Participants, and Texas electricity consumers.

## PARTIES AND PROCESS

9.      Plaintiff Aspire Power Ventures, LP is a Texas limited partnership with its principal place of business in Houston, Texas.

10.      Defendant Public Utility Commission of Texas is a state agency that has answered and therefore appeared.

11.      Defendant Electric Reliability Council of Texas is a quasi-governmental agency that has answered and therefore appeared.

12. Defendants Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman (collectively, "Commissioners") are the Chair and Commissioners of the PUC, respectively, and are being sued in their official capacity. The Commissioners have answered and therefore appeared.

13. Because a state agency is a party, a copy of this second amended petition is being mailed to the Attorney General in Austin, Texas, by United States Postal Service certified mail, return receipt requested. Tex. Civ. Prac. & Rem. Code § 30.004.

## VENUE

14. Venue in this declaratory judgment action challenging the validity of rules is mandatory in Travis County district court. Tex. Gov't Code § 2001.038(b).

## JURISDICTION

15. The PUC has delegated its rulemaking powers to ERCOT to allow it to enact rules in the form of "protocols," and ERCOT protocols must be approved by the PUC. Tex. Util. Code § 39.151(d), (g-6); *Pub. Util. Comm'n of Tex. v. RWE Renewables Americas, LLC*, 691 S.W.3d 484, 487 (Tex. 2024).. Rulemaking at both the PUC and ERCOT are subject to the Administrative Procedure Act. *See* Tex. Gov't Code § 2001.003(7); *see also* Tex. Util. Code § 39.1511(a-1).

16. The APA provides that the validity of a rule may be determined in a declaratory judgment action brought in Travis County district court if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff. Texas Gov't Code §

2001.038(a)-(b). The ECRS Rules interfere with and impair Aspire's legal rights and privileges. Therefore, this Court has jurisdiction.

## FACTUAL BACKGROUND

### A. *The ERCOT System: Designed to Run Based on Principles of Competition*

17.    When Texas deregulated its electricity market in 1999, the Legislature designed the system to operate based on principles of competition. Tex. Util. Code §§ 11.002, 39.001; *see also* 16 Tex. Admin. Code § 25.501(a) (requiring ERCOT protocols to be developed with consideration of microeconomic principles and to "promote economic efficiency in the production and consumption of electricity"). Public Utility Regulatory Act ("PURA"), the statutory framework under which the grid was deregulated, sought to avoid monopolistic behaviors by participants in the electricity market. PURA charged the PUC with policing and mitigating market power abuses. Tex. Util. Code § 39.157(a). PURA specifically defines the withholding of electricity as a market power abuse. *Id.*

18.    In addition to PURA, Texas's electricity market is governed by orders and regulations adopted by the PUC and "protocols" adopted by ERCOT under rulemaking authority delegated by the PUC. Since June 2021, ERCOT's protocols must be approved by the PUC. Tex. Util. Code § 39.151(g-6); *see* Act of May 30, 2021, 87th Leg., R.S., ch. 426, § 3, 2021 Tex. Gen. Laws 830, 831, *amended by* Act of May 28, 2023, 88th Leg., R.S., H.B. 1500, § 15. Before PURA required PUC

approval of ERCOT protocols, ERCOT protocols were subject to "commission oversight and review." *RWE*, 691 S.W.3d at 486-87.

19. The ERCOT Nodal Protocols are the rules promulgated by ERCOT that detail how ERCOT and market participants are required to operate and to interact with one another and how the wholesale electricity market is designed. Section 21 of ERCOT's Nodal Protocols details the process for adopting new protocols and revising existing protocols. A request to revise a Nodal Protocol is called a Nodal Protocol Revision Request ("NPRR"). After ERCOT adopts an NPRR, the PUC can approve the NPRR through an order.

### B. Texas's Deregulated Electricity Market and ERCOT

20. The PUC designated ERCOT as the Independent System Operator for the electricity grid that covers roughly 70% of Texas's land mass and serves approximately 90% of Texas's electricity consumers. ERCOT oversees the operation of the high voltage electricity transmission system in Texas (which is also called ERCOT), the various markets administered by ERCOT in its capacity as an Independent System Operator, and balancing of physical electricity supply and demand on the high voltage transmission system to ensure its reliability.

21. ERCOT operates within a deregulated electricity sector, with competitive generators and competitive retailers. ERCOT's rules require that each participant in the market (a "Market Participant") belong to a specific category that best describes its activity. The Market Participant categories include power generators, competitive retailers, and transmission and distribution (wires)

companies. Power generation companies produce electricity, provide ancillary services, or both. Transmission and distribution utilities are responsible for the power lines and other equipment that carry electricity from power plants and other generation facilities to end-use consumers. Retail electricity providers sell electricity to end-use consumers in the parts of the state with retail competition. Qualified Scheduling Entities like Aspire are also Market Participants and are addressed in more detail below.

22.    ERCOT must ensure reliable operation of the grid. For technical reasons, electricity supply and demand must always be maintained in balance at an equilibrium point of 60 Hertz, or else the grid risks collapse. Therefore, at times, reserve generation needs to be dispatched to the grid to balance supply and demand. ERCOT accomplishes this balancing by operating a real-time wholesale electricity market.

23.    The primary tool ERCOT uses to ensure that demand and supply are in constant balance—the foundation of the wholesale electricity market—is called Security Constrained Economic Dispatch ("SCED"). ERCOT typically runs SCED at intervals of at least every five minutes around the clock. Wholesale electricity is bought and sold based on the prices generated by SCED. These wholesale electricity prices then allow individual Market Participants to make voluntary decisions about how much electricity they would like to produce or procure over an interval. When prices are high, generators are incentivized to produce more electricity and

**PLAINTIFF'S SECOND AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

Appx. Page 276 of 740

consumers to use less. Conversely, when prices are low, generators are not incentivized to add additional capacity to the grid.

24. Because electricity is an instantaneous commodity where supply and demand must be equal at every point in time, ERCOT maintains Ancillary Services to assist the balancing process. Ancillary Services exist primarily to bridge the time gap between the five-minute SCED interval and fluctuations in supply or demand that may occur within this five-minute interval.

### C. *About Aspire*

25. Aspire is a Qualified Scheduling Entity ("QSE") that participates in several markets administered by ERCOT.

26. Aspire buys and sells wholesale electricity in ERCOT's real-time electricity market, serving as a conduit between companies that generate electricity and companies that sell electricity on a retail basis.

27. QSEs like Aspire bear the risk of price fluctuations in the real-time electricity market, because they must contractually commit in advance to buy and sell electricity at specific prices *before* SCED creates the actual wholesale market prices. As a result, artificial fluctuations in prices—fluctuations that don't reflect normal drivers of the market like changes in weather, demand, and generation—cause prices to deviate from expectations. Because they are unexpected, these artificial fluctuations not only represent an additional risk to QSEs like Aspire but also can result in financial losses. For example, when Aspire sells to a retail provider, it enters into an agreement to sell the retailer electricity at a fixed price

Appx. Page 277 of 740

and then bears the risk that the wholesale price that Aspire buys at will be higher than the contract price with the retail provider, resulting in a loss.

### D. ECRS: A Costly, Market-Distorting Attempt to Bolster Reliability

28.     ERCOT implemented the ERCOT Contingency Reserve Service or ECRS, a new Ancillary Service, in June 2023. ERCOT has claimed ECRS bolsters the grid's reliability. But ECRS does not increase reliability, and ECRS unnecessarily increases the price of electricity.

29.     ECRS is the product of, among other things, ERCOT protocol revisions and, when applicable, PUC orders approving revisions to ERCOT's Nodal Protocols that Aspire challenges here:

- NPRR 863, Creation of ERCOT Contingency Reserve Service and Revisions to Responsive Reserve (Feb. 12, 2019);

- NPRR 992, Updated Day-Ahead Liability for NPRR863, Creation of ERCOT Contingency Reserve Service and Revisions to Responsive Reserve (Aug. 11, 2020);

- NPRR 1015, Clarification of DAM implementation of NPRR863 Phase 2 (Aug. 11, 2020);

- NPRR 1079, Day-Ahead Market RRS / ECRS 48-Hour Report Clarification (Aug. 10, 2021);

- NPRR 1096, Require Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (April 28, 2022);

- NPRR 1148, Language Cleanup Related to ERCOT Contingency Reserve Service (ECRS) (Dec. 20, 2022);

- NPRR 1178, Expectations for Resources Providing ERCOT Contingency Reserve Service (Jun. 20, 2023).

- NPRR 1196, Correction of NCLR Ancillary Service Failed Quantity Calculations under NPRR1149 (Dec. 19, 2023);

- NPRR 1213, Allow DGRs and DESRs on Circuits Subject to Load Shed to Provide ECRS and Clarify Language Regarding DGRs and DESRs Providing Non-Spin (Feb. 27, 2024);

- NPRR 1224, ECRS Manual Deployment Triggers (June 18, 2024, 2024);

- Order Approving ERCOT Revision Requests, NPRR 1079, Day-Ahead Market RRS / ECRS 48-Hour Report Clarification (PUC Project No. 52307) (Aug. 24, 2021);

- Order Approving ERCOT Revision Requests, NPRR 1096, Require Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (PUC Project No. 52934) (May 12, 2022);

- Order Approving ERCOT Revision Requests, NPRR 1148, Language Cleanup Related to ERCOT Contingency Reserve Service (ECRS) (PUC Project 54445) (Jan. 26, 2023); and

- Order Approving ERCOT Revision Requests, NPRR 1178, Expectations for Resources Providing ERCOT Contingency Reserve Service (PUC Project 54445) (Jun. 29, 2023);

- Order Approving ERCOT Revision Requests, NPRR 1196, Correction of NCLR Ancillary Service Failed Quantity Calculations under NPRR1149 (PUC Project No. 54445) (Feb. 1, 2024); and

- Order Approving ERCOT Revision Requests, NPRR 1213, Allow DGRs and DESRs on Circuits Subject to Load Shed to Provide ECRS and Clarify Language Regarding DGRs and DESRs Providing Non-Spin (Apr. 11, 2024).

(Together, the "ECRS Rules.")

30.     ERCOT pays generators who participate in ECRS to withhold part of their generating capacity as reserves unless certain operational criteria are met. Reserves are electricity generating capacity that is deliberately *not* made available to meet demand. Without ECRS, this capacity would be available for dispatch to the

**Appx. Page 279 of 740**

market through the normal SCED process. So, ECRS is designed to intentionally decrease the supply of electricity available to the grid. And even a slight increase in supply during key periods when the grid is stressed could have a substantial effect on price, to the benefit of consumers.

31. ERCOT and the PUC argue ECRS supports reliability by increasing the level of reserves. But ECRS in fact does nothing to increase current electricity reserve capacity. Instead, ECRS stresses the grid by reducing the grid's ability to meet actual, current, physical demand, often at times when that capacity is most needed, especially during hot summer days.

32. As explained in more detail below, ERCOT's Independent Market Monitor or IMM, a watchdog created by the Texas Legislature with the express purpose of detecting and preventing market manipulation and recommending measures to improve the efficiency of ERCOT's wholesale market, has identified several harms caused by ECRS. The IMM concluded that ECRS has:

- Caused ERCOT to procure excessive reserves, which far exceed reserves held by ERCOT's counterparts elsewhere;

- Generated artificial shortages that produce massive inefficient market costs, totaling over $12 billion in 2023; and

- Diminished reliability by withholding capacity needed to manage transmission congestion.

33. In 2023, the first year ECRS was implemented, ECRS prevented the use of 2,194 megawatts of generating capacity on average. The capacity ECRS

**Appx. Page 280 of 740**

relegated to reserve was allowed to run on only 40 occasions, typically for a very short duration.

34. ECRS also distorted price signals by creating an artificial scarcity condition by withholding generating capacity. This artificial scarcity resulted in both higher prices and greater price volatility. In the limited periods in 2023 when the ECRS reserve capacity was dispatched to the grid, real-time wholesale electricity prices became even less predictable for market participants. ECRS would suddenly permit more capacity to briefly appear, causing prices to abruptly drop, only to bounce back when ECRS forced that capacity back into reserves.

35. These artificial and unpredictable distortions in price signals and the increased price volatility that resulted make it impossible for independent QSEs like Aspire to efficiently manage the risks that are inherent in fixed-price bilateral contracts with both buyers and sellers of electricity. The criteria used to determine when ECRS capacity is allowed to be dispatched are unpredictable, and independent QSEs have no way to forecast them. So, because QSEs like Aspire cannot predict the abrupt addition and removal of generation under ECRS, they cannot accurately forecast prices. ECRS thus makes it much harder for independent QSEs to offer fixed-price hedges to retail providers, substantially increases the price for these hedges, and in turn drives up the costs consumers ultimately pay for that electricity. While the generators get paid to sit on the sidelines, consumers and the market lose.

Appx. Page 281 of 740

36.     Even if Aspire and other QSEs substantially increase what they charge retail providers for fixed-price hedges, the volatility introduced by ECRS still greatly increases the likelihood that QSEs will lose money on the hedges they offer to retailers.

37.     ECRS has another unfortunate consequence: it incentivizes vertical integration and concentration, which could decrease competition in the electricity industry. Some QSEs, like Aspire, do not own physical generation and are "non-affiliated." Many other QSEs do. These "affiliated" QSEs use the affiliation between the QSE and the generation entity to manage the unexpected and artificial price distortions caused by ECRS by internalizing (and netting) the positive and negative effects of price fluctuations. To deal with ECRS, these affiliated QSEs integrate their generation and buying/selling in the market, much like vertical integration linked supply and demand in Texas's electricity markets before restructuring in 2003. Thus, ECRS not only leads to market inefficiencies but also creates a significant incentive for firms in the industry to "re-integrate" with the likely outcome that the industry concentration ratio will increase, decreasing competition in both the generation and retail sectors.

38.     No other electricity market in the United States has a service like ECRS, yet these other markets can reliably balance supply and demand efficiently and without creating imaginary prices and can ensure grid reliability to the required standards.

## E. ERCOT Did Not Have Authority to Create a New Ancillary Service like ECRS

39. ECRS is also illegal because it exceeds the rulemaking authority that PUC could delegate to ERCOT.

40. PURA recognizes that ancillary services, like ECRS, must be created by PUC, not ERCOT. Specifically, 2021 amendments to PURA recognize that ancillary services are "services necessary to facilitate the transmission of electric energy including load following, standby power, backup power, reactive power, and any other services *as the commission may determine by rule*," whereas ERCOT has a more limited role limited to modifying ancillary services after PUC has created them. Tex. Util. Code § 35.004(e); *see also id.* § 35.004(g) (directing the commission to review the type of ancillary services needed for the ERCOT market and to evaluate whether additional ancillary services are needed); *id.* § 35.004(j) (PUC must require ERCOT to "*modify the design, procurement, and cost allocation* of ancillary services for the region in a manner consistent with cost-causation principles and on a nondiscriminatory basis" (emphasis added)).

41. Therefore, NPRR 863, which created ECRS, and which was never adopted by PUC, as a rule or otherwise, exceeded ERCOT's authority. Further, all subsequent ERCOT protocols modifying ECRS, and PUC approvals of such protocols, are also invalid not only because of their own failures to comport with Texas Utilities Code § 35.004 but also because ERCOT's initial creation of ECRS was invalid.

**PLAINTIFF'S SECOND AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION**

Appx. Page 283 of 740

### F. Making Matters Worse, the PUC Illegally Approved and ERCOT Illegally Adopted the ECRS Rules

42. ECRS is unlawful for a third reason. The rules implementing ECRS were not adopted in substantial compliance with the Administrative Procedure Act. So, these rules are invalid. *See* Tex. Gov't Code § 2001.035 (a rule is voidable if a state agency does not substantially comply with the APA when adopting it).

43. The APA contains several mandatory, commonsense requirements aimed at facilitating a thorough rulemaking process that affords members of the public a meaningful opportunity to participate. These requirements include (1) notice, *see* Tex. Gov't Code §§ 2001.023-.025; (2) public participation, *see id.* §§ 2001.029-.030; and (3) the contents of the agency order, *id.* § 2001.033.

44. The APA's requirements apply to "rules," and the ECRS Rules, adopted under rulemaking authority originally given to the PUC and then delegated to ERCOT, are "rules" to which the APA applies. *See* Tex. Util. Code § 39.121(d), (g-6); *RWE*, 691 S.W.3d at 486-87. The APA defines a "rule" broadly to include "a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy, or (ii) describes the procedure or practice requirements of a state agency." Tex. Gov't Code § 2001.003(6)(A). "Rules" also include "amendment or repeal of a prior rule." *Id.* § 2001.003(6)(B), (C)

45. The ECRS Rules, adopted by ERCOT and approved by the PUC, are "rules" because they impose a policy of withholding available supply from the market as a reserve, which causes artificial shortages that raise electricity prices.

46. Neither ERCOT nor the PUC made any pretense of complying with the APA when adopting and approving the ECRS Rules, respectively. ERCOT followed its own processes for protocol revisions, which require far less than the APA in terms of notice, public participation, and the order. And the PUC largely relied on ERCOT's efforts in adopting the ECRS Rules, rather than undertaking its own efforts to satisfy the APA.

### 1. ERCOT and the PUC Did Not Substantially Comply with the APA's Notice Requirements

47. When a state agency proposes a rule, the APA requires the agency to (a) "give at least 30 days' notice of its intention to adopt a rule before it adopts the rule," and (b) "file notice of the proposed rule with the secretary of state for publication in the Texas Register" at least 30 days before the agency adopts the rule. Tex. Gov't Code § 2001.023(a)-(b). Neither ERCOT nor the PUC gave notice of the ECRS Rules in the Texas Register, but rather buried them on their respective websites. *See* Nodal Protocol § 21.4.1(4).

### 2. ERCOT and the PUC Did Not Substantially Comply with the APA's Public Participation Requirements

48. Section 2001.029 of the APA establishes three public-participation requirements that a rulemaking agency must follow, none of which were followed here:

- *First*, a state agency must give "all interested persons a reasonable opportunity to submit data, views, or arguments, orally or in writing" before the agency adopts a rule. Tex. Gov't Code § 2001.029(a). The PUC never gave an opportunity for public comment. ERCOT did not allow

Appx. Page 285 of 740

public comment and restricted comment to a limited group of stakeholders. *See* Nodal Protocol § 21.4.4(1), 21.4.5(1).

- *Second*, the agency must "grant an opportunity for a public hearing before it adopts a substantive rule if a public hearing is requested by: (1) at least 25 persons; (2) a governmental subdivision or agency; or (3) an association having at least 25 members." *Id.* § 2001.029(b). Neither ERCOT nor the PUC ever gave an opportunity to request a public hearing.

- *Finally*, an agency must "consider fully all written and oral submissions about a proposed rule." *Id.* § 2001.029(c). But without adequate notice to the public, this requirement cannot be met because it is impossible to determine who might have desired to submit comments.

### 3. ERCOT and the PUC Did Not Substantially Comply with the APA's Order Requirements

49. Under the APA, an agency order that adopts a rule "must include":

(1) a reasoned justification for the rule as adopted consisting solely of:

> (A) a summary of comments received from parties interested in the rule that shows the names of interested groups or associations offering comment on the rule and whether they were for or against its adoption;

> (B) a summary of the factual basis for the rule as adopted which demonstrates a rational connection between the factual basis for the rule and the rule as adopted; and

> (C) the reasons why the agency disagrees with party submissions and proposals;

(2) a concise restatement of the particular statutory provisions under which the rule is adopted and of how the agency interprets the provisions as authorizing or requiring the rule; and

(3) a certification that the rule, as adopted, has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Tex. Gov't Code § 2001.033(a). This information must appear within the four

corners of the agency order adopting the rule. Neither the PUC orders approving

the ECRS Rules nor the ERCOT pronouncements adopting them contain any of these items. At best, ERCOT's materials relating to the ECRS rules, which appear in staff-prepared documents as opposed to an official PUC order, summarize comments about the rules and contain none of the other required materials. Therefore, ERCOT and the PUC did not substantially comply with the APA when adopting the ECRS Rules.

### G. ERCOT's Independent Market Monitor Confirms the Disastrous Effects of ECRS

50. The Texas Legislature requires ERCOT to appoint an Independent Market Monitor "to detect and prevent market manipulation strategies, recommend measures to enhance the efficiency of the wholesale market, and provide independent analysis of any material changes proposed to the wholesale market." Tex. Util. Code § 39.1515(a). Potomac Economics has served as ERCOT's IMM for nearly twenty years. David Patton, PhD, an energy economist with nearly thirty years of experience, leads Potomac Economics.

51. The IMM recently issued a report slamming ECRS. The IMM explained that shortly after ECRS was implemented in June 2023, ERCOT decided to nearly double the amount of ten-minute reserves, causing ERCOT to buy excessive reserves compared to other U.S. power grids' reserves.

52. The IMM also concluded ECRS is not based on sound reliability criteria. ECRS does not account for the probability of contingencies and

uncertainties that lead to reliability risks. ECRS also fails to balance reliability objectives with the costs of satisfying reliability requirements.

53. Ultimately, the IMM concluded that ECRS caused artificial electricity shortages that produced massively inflated costs for electricity sold on the wholesale market, totaling more than $12 Billion between June through November 2023. While not all these costs were passed on to retail consumers, some of whom buy on fixed-price contracts, in the longer term, these artificially increased wholesale prices will necessarily negatively impact the retail prices Texans pay.

54. As the IMM explained in testimony to the PUC on July 25, 2024, ECRS's deployment in 2023 caused forward prices for summer 2024 and 2025 to roughly double, which led consumers to have to pay "much, much higher" rates when signing new contracts with retail providers. The longer the problems with ECRS continue, the "larger the share of the costs hit Texas consumers."

55. Finally, the IMM suggested fixes to ECRS, but ERCOT has not adopted the IMM's proposed fixes and has pushed off consideration of those fixes. So, with ECRS continuing to keep much needed capacity off the grid during high-demand periods, market participants and Texas electricity consumers are poised to pay unnecessary, increased costs for electricity unless ECRS is promptly reined in or suspended.

## DECLARATORY JUDGMENT

56. Aspire incorporates by reference all of the allegations set forth above.

57. Aspire asserts that the ECRS Rules were not adopted in substantial compliance with the APA, making them invalid. *See* Tex. Gov't Code § 2001.035 (a rule is voidable if a state agency does not substantially comply with the APA when adopting it). ERCOT and the PUC disagree. Because Aspire's rights, status, and other legal relations are affected by the ECRS Rules, declaratory relief is necessary and appropriate to resolve questions regarding the validity of the ECRS Rules.

58. Aspire therefore seeks a declaration under Chapter 37 of the Texas Civil Practice and Remedies Code and Texas Government Code § 2001.038 including, but not limited to, the following:

   a) Each of the ECRS Rules is a "rule" within the meaning of the APA.

   b) The PUC and ERCOT did not substantially comply with mandatory requirements of the APA when adopting and approving each of the ECRS Rules, including requirements for (1) notice under APA §§ 2001.023-.025; (2) public participation under §§ 2001.029-.030; and (3) the contents of the agency order under § 2001.033.

   c) Each of the ECRS Rules is therefore invalid and void under Texas Government Code § 2001.035.

   d) NPRR 863, which created ECRS, is invalid because ERCOT did not have the authority to create new ancillary services. Accordingly, ECRS, and any subsequent modifications to ECRS, are also invalid.

   e) Chapter 21 of ERCOT's Nodal Protocols, both on its own and when combined with the PUC's process for approving ERCOT protocols, does

Appx. Page 289 of 740

not provide a process for making and amending rules that substantially complies with APA §§ 2001.023-.025, .029-.030, .033.

59. Aspire further asserts that the ECRS Rules violate the fundamental limits of PURA in that they require generators to withhold power from the grid. Aspire seeks a declaration that:

a) The ECRS Rules violate PURA because they direct generators to withhold electricity from the grid in violation of Tex. Util. Code § 39.157(a)

b) By approving the ECRS Rules, the Commissioners committed *ultra vires* acts for which they are liable in their official capacities because ECRS was unlawfully created by an ERCOT protocol, not a PUC rule. *See City of El Paso v. Heinrich,* 284 S.W.3d 366, 372-73 (Tex. 2009).

c) Each of the ECRS Rules is therefore invalid and void.

## APPLICATION FOR STAY, SUSPENSION, AND INJUNCTIVE RELIEF

60. Aspire incorporates by reference all of the allegations set forth above.

61. This Court has the power to enter a temporary injunction based on the failure to substantially comply with the APA when adopting the ECRS Rules. *Abbott v. Doe*, 691 S.W.3d 55, 91 (Tex. App.—Austin 2024, pet. filed) (collecting cases in which the court upheld temporary injunctions based on APA rulemaking challenges). Further, Texas Utilities Code § 15.004 provides that while an appeal of a regulatory authority's order is pending, a district court "may stay or suspend all or part of the operation of the order, ruling, or decision." *Cf.* Tex. Gov't Code §

2001.038 (providing that a validity challenge under the APA cannot be used to "stay a hearing in which a suspension, revocation, or cancellation of a license by a state agency is at issue" but imposing no other limitations on a court's ability to issue a stay). In deciding whether to grant a stay or suspension, the Court must follow the practices of a court exercising equity jurisdiction. Tex. Util. Code § 15.004.

62. The Court also has the power to enter a temporary injunction against the ECRS rules because they violate the fundamental limits of PURA. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 376 (Tex. 2009) ("[A] claimant who successfully proves an *ultra vires* claim is entitled to prospective injunctive relief, as measured from the date of injunction.").

63. As set forth in more detail above, ERCOT adopted and the PUC approved the ECRS Rules without substantially complying with mandatory requirements in the APA, rendering the ECRS Rules voidable. Also, the ECRS Rules forced withholding of electricity, exceeding the limits of PURA. Aspire has therefore established, at the very least, a probable right to the relief it seeks upon final hearing.

64. If the operation of the ECRS Rules is not promptly stayed, suspended, or enjoined, Aspire and others will suffer immediate and irreparable injury as a result of the unlawfully adopted ECRS Rules that violate PURA, as set forth above. The injuries that Aspire and others will suffer are irreparable and cannot adequately be remedied at law.

65.     Even with regard to monetary losses, the PUC has taken the position that Aspire and other Market Participants cannot *ever* obtain monetary relief. *See Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001) (per curiam) (irreparable injury must be shown because injunctive relief is "designed to provide remedy to cover those injuries for which there was not clear, full, and adequate relief at law"). The Supreme Court rejected the PUC's arguments in *Public Utility Commission of Tex. v. Luminant Energy Co. LLC* that injuries arising from PUC rules deemed invalid are not redressable, *See* 691 S.W.3d 448, 458 (Tex. 2024). But the PUC and ERCOT seem poised to erect barriers to monetary relief based on any challenges to rules that would require repricing. If the ECRS Rules are not stayed or suspended during the pendency of this action, Aspire and other Market Participants will be purchasing electricity at prices illegally inflated by ECRS. By contending that money damages are unavailable, the PUC and ERCOT cannot avoid the conclusion that injunctive relief is particularly appropriate to prevent ECRS from causing further harm.

66.     Even if Aspire had the ability to potentially pass through *some* of the increased costs to its customers, that would not negate the irreparable nature of the injury ECRS causes. Because Aspire has agreements with certain retail providers for fixed-price hedges, Aspire bears the risk of unpredictable and unforeseeable price increases caused by ECRS. *Cf. Sw. Elec. Power Co. v. Burlington N., Inc.*, 475 F. Supp. 510, 522 (E.D. Tex. 1979) (irreparable injury suffered by electric utility that had to pay increased costs to railroad for fuel transport not negated; case law

barred recovery of damages from railroad and pass-through agreement with customers "not assured" to be enforced because PUC could disallow increase in fuel cost passed on to customer).

67.     Even if Aspire could, in theory, recover damages or other monetary relief because of the harms it suffered because of ECRS, Aspire will suffer an irreparable injury because "damages are very difficult to measure by any certain pecuniary standard." *Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Among other things, ERCOT has chosen not to implement the systems that would allow it to meaningfully and correctly re-run SCED, even though it is technically possible to implement such systems and to re-calculate the dispatch and resulting prices as if ECRS had not run. The only adequate, effective, and complete relief is for the Court to stay or suspend the ECRS Rules.

68.     No bond should be necessary for the issuance of the stay, suspension, or temporary injunction because ERCOT and the PUC will not suffer any harm resulting from a stay or suspension of the ECRS Rules and are simply being required to comply with the APA. However, Aspire is willing to post a bond if the Court determines it to be appropriate. *See* Tex. R. Civ. P. 684.

69.     For all these reasons, pursuant to Texas Rule of Civil Procedure 680 *et seq.*, Texas Civil Practice and Remedies Code § 65.001 *et seq.*, and Texas Utilities Code § 15.004, Aspire respectfully requests a stay, suspension, and/or temporary and permanent injunction, staying or suspending the operation of the ECRS Rules

and ordering and restraining ERCOT, the PUC, the Commissioners, their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise (collectively, the "Injunction Restrained Parties") on the following terms:

> **The PUC and ERCOT are prohibited from enforcing, using, or otherwise allowing the ECRS Rules to operate.**

## PRAYER FOR RELIEF

For these reasons, Aspire respectfully requests that this Court:

1. Issue the declaratory judgment requested by Aspire;

2. Stay or suspend the operation of the ECRS Rules under Texas Utilities Code § 15.004;

3. Issue the temporary and permanent injunctive relief requested by Aspire;

4. Award Aspire costs, expenses, and attorneys' fees to the extent recoverable by law; and

5. Award Aspire any other and further relief to which it may be justly entitled.

Respectfully Submitted,

*/s/ Chrysta L. Castañeda*
Chrysta L. Castañeda
Texas Bar No. 15325625
chrysta@castaneda-firm.com
Nicole Michael
Texas Bar No. 24067767
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Telephone: (214) 282-8579
Facsimile: (214) 602-9187

&

Monica Latin
Texas Bar No. 00787881
MLatin@ccsb.com
Brent M. Rubin
Texas Bar No. 24086834
BRubin@ccsb.com
Ken Carroll
Texas Bar No. 03888500
KCarroll@ccsb.com
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Ph: 214-855-3000
Fax: 214-580-2641

**ATTORNEYS FOR PLAINTIFF**

**Appx. Page 295 of 740**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 24, 2024, a true and correct copy of the above and foregoing document was electronically filed with the Court and served on all counsel of record through the eFiling Service Provider pursuant to the Texas Rules of Civil Procedure.

*/s/ Brent M. Rubin*
Brent M. Rubin

**Appx. Page 296 of 740**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brent Rubin
Bar No. 24086834
brubin@ccsb.com
Envelope ID: 92398255
Filing Code Description: Amended Filing
Filing Description: PLAINTIFF'S SECOND AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION
Status as of 9/26/2024 4:22 PM CST

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 9/24/2024 3:15:41 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 9/24/2024 3:15:41 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 9/24/2024 3:15:41 PM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 9/24/2024 3:15:41 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 9/24/2024 3:15:41 PM | SENT |

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 9/24/2024 3:15:41 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 9/24/2024 3:15:41 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 9/24/2024 3:15:41 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 9/24/2024 3:15:41 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 9/24/2024 3:15:41 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 9/24/2024 3:15:41 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 9/24/2024 3:15:41 PM | SENT |

Case Contacts

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brent Rubin
Bar No. 24086834
brubin@ccsb.com
Envelope ID: 92398255
Filing Code Description: Amended Filing
Filing Description: PLAINTIFF'S SECOND AMENDED PETITION AND APPLICATION FOR STAY/SUSPENSION AND TEMPORARY AND PERMANENT INJUNCTION
Status as of 9/26/2024 4:22 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 9/24/2024 3:15:41 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/24/2024 3:15:41 PM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 9/24/2024 3:15:41 PM | SENT |

10/1/2024 9:03 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Schmidt

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS |
| TEXAS, ELECTRIC RELIABILITY | § | |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN JACKSON, | § | |
| AND COURTNEY HJALTMAN, | § | |
| *Defendants.* | § | 345TH JUDICIAL DISTRICT |

## ERCOT'S AMENDED ANSWER

Defendant Electric Reliability Council of Texas, Inc. ("ERCOT") hereby files its Amended Answer, and respectfully shows this Court the following:

## I. JURISDICTION

1. This Court lacks subject-matter jurisdiction to adjudicate Plaintiff Aspire Power Ventures, LP's ("Aspire" or "Plaintiff") claims because the Public Utility Commission of Texas ("PUCT") approval orders and the ERCOT Nodal Protocols that are the subject of Aspire's claims are not "rules" under the Administrative Procedure Act; thus, APA § 2001.038's limited immunity waiver does not apply here, and Aspire's suit is barred by sovereign immunity. Further, this Court lacks subject-matter jurisdiction because Aspire's claims against ERCOT fall within the exclusive jurisdiction of the PUCT, and Aspire failed to exhaust its administrative remedies before the PUCT prior to filing suit.

## II. GENERAL DENIAL

2. Pursuant to Texas Rule of Civil Procedure 92, ERCOT generally denies each and every claim and allegation contained in Plaintiff's Second Amended Petition, and all amendments and supplements thereto, and demands strict proof thereof as required by law.

**Appx. Page 299 of 740**

## III. AFFIRMATIVE DEFENSES

3. Plaintiff's claims are barred, in whole or in part, by the doctrine of sovereign immunity.

4. Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to exhaust its administrative remedies.

5. Plaintiff's claims are barred, in whole or in part, because Plaintiff lacks standing to assert private claims for alleged violations of PURA.

6. Plaintiff fails to state a cause of action against ERCOT upon which relief can be granted.

7. Plaintiff's claims are barred, in whole or in part, by waiver, estoppel, and/or laches.

8. Plaintiff's claims are barred, in whole or in part, by the two-year statute of limitations set forth in APA § 2001.035(b).

9. Plaintiff's claims are barred, in whole or in part, by the filed rate doctrine.

10. Plaintiff is not entitled to recover attorneys' fees in this matter.

## PRAYER

ERCOT requests that the Court dismiss this case for lack of jurisdiction. Alternatively, ERCOT requests that upon proper motion or a final trial in this matter, a judgment be entered that Plaintiff takes nothing against ERCOT. ERCOT further requests all other relief, at law or in equity, to which it is or may be entitled.

Respectfully submitted,

**WINSTEAD PC**
600 W. 5th Street
Suite 900
Austin, Texas 78701
(512) 370-2800 telephone
(512) 370-2850 fax


By: _/s/ Elliot Clark_____

    Elliot Clark                 SBN 24012428
    eclark@winstead.com
    Elin Isenhower          SBN 24104206
    eisenhower@winstead.com

**ATTORNEYS FOR DEFENDANT**
**ELECTRIC RELIABILITY COUNCIL OF**
**TEXAS, INC.**


**CERTIFICATE OF SERVICE**

By my signature below, I hereby certify that a true and correct copy of this document has been served on all counsel of record in accordance with the Texas Rules of Civil Procedure on October 1, 2024.


_/s/ Elliot Clark_____
Elliot Clark

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 92633768
Filing Code Description: RESPONSE
Filing Description: ERCOT'S AMENDED ANSWER
Status as of 10/1/2024 11:24 AM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 10/1/2024 9:03:27 AM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 10/1/2024 9:03:27 AM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 10/1/2024 9:03:27 AM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 10/1/2024 9:03:27 AM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 10/1/2024 9:03:27 AM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 10/1/2024 9:03:27 AM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 10/1/2024 9:03:27 AM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 10/1/2024 9:03:27 AM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/1/2024 9:03:27 AM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/1/2024 9:03:27 AM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 10/1/2024 9:03:27 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/1/2024 9:03:27 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 92633768
Filing Code Description: RESPONSE
Filing Description: ERCOT'S AMENDED ANSWER
Status as of 10/1/2024 11:24 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 10/1/2024 9:03:27 AM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 10/1/2024 9:03:27 AM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 10/1/2024 9:03:27 AM | SENT |

10/1/2024 9:05 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Schmidt

**CAUSE NO. D-1-GN-24-003384**

| | | |
|---|---|---|
| **ASPIRE POWER VENTURES, LP,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **PUBLIC UTILITY COMMISSION OF** | § | **TRAVIS COUNTY, TEXAS** |
| **TEXAS, ELECTRIC RELIABILITY** | § | |
| **COUNCIL OF TEXAS, THOMAS** | § | |
| **GLEESON, LORI COBOS, JIMMY** | § | |
| **GLOTFELTY, KATHLEEN JACKSON,** | § | |
| **AND COURTNEY HJALTMAN,** | § | |
| *Defendants.* | § | **345ᵀᴴ JUDICIAL DISTRICT** |

**ERCOT'S AMENDED PLEA TO THE JURISDICTION AND ATERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT**

Defendant Electric Reliability Council of Texas, Inc. ("ERCOT") files this Amended Plea to the Jurisdiction and Alternatively, Motion to Dismiss Under Rule 91(a) and Alternatively, Plea in Abatement, and respectfully requests the Court dismiss (or, alternatively, abate) Plaintiff Aspire Power Ventures, LP's ("Aspire") claims.[1]

---

[1] ERCOT files this amended plea and amended Rule 91a motion to dismiss because after ERCOT filed its original plea and Rule 91a motion on September 9, 2024, Aspire filed its Second Amended Petition on September 24, 2024. The new petition does not change the fundamental jurisdictional issues before the Court, but it adds an additional substantive claim against ERCOT, arguing ERCOT lacks the ability to develop ancillary services programs. That claim against ERCOT, like the previously asserted claims against ERCOT, is subject to the PUCT's exclusive jurisdiction and is barred by ERCOT's sovereign immunity. On the merits, that claim is not plausible and should be dismissed under Rule 91a.

- 1 -

**Appx. Page 304 of 740**

**TABLE OF CONTENTS**

Page

I. SUMMARY ..................................................................................................................3

II. BACKGROUND .........................................................................................................6

    A. ERCOT and the ERCOT Nodal Protocols .................................................6

    B. Ancillary Services and ECRS. ....................................................................9

    C. Aspire fails to exhaust its administrative remedies. ..................................11

III. LEGAL STANDARDS .............................................................................................14

    A. Plea to the Jurisdiction. .............................................................................14

    B. Rule 91a. ...................................................................................................15

IV. ERCOT'S PLEA TO THE JURISDICTION .............................................................15

    A. ERCOT's Sovereign Immunity Bars Aspire's Claims. ............................15

        1. Neither the ERCOT Protocols nor PUCT orders approving ERCOT Protocols are "rules" under the APA. ......................................................15

        2. The UDJA does not waive ERCOT's immunity. ...................................18

    B. This Court lacks jurisdiction because the PUCT has exclusive jurisdiction, and Aspire failed to exhaust its administrative remedies. ..................................................19

V. ERCOT'S RULE 91A MOTION TO DISMISS .......................................................22

    A. Aspire's claims are barred by the filed rate doctrine. ...............................22

        1. Filed rates are per se reasonable and unassailable in judicial proceedings. ...............22

        2. Electricity prices in ERCOT are filed rates that may not be judicially lowered by this Court through equitable relief. ..................................................24

    B. ERCOT's Protocol revision process is not subject to APA rulemaking requirements...25

    C. Aspire has no private cause of action for alleged PURA § 39.157 violations...................26

    D. The ECRS program does not violate PURA § 39.157. ...............................28

    E. ERCOT had the authority to develop ECRS ..............................................30

VI. ERCOT'S PLEA IN ABATEMENT ..........................................................................33

    A. The other ERCOT market participants are jurisdictionally indispensable........................34

    B. Joinder of the affected market participants is feasible. ..............................36

CONCLUSION ...............................................................................................................38

CERTIFICATE OF SERVICE .......................................................................................39

APPENDIX TO ERCOT'S AMENDED PLEA TO THE JURISDICTION ...................40

**Appx. Page 305 of 740**

# I.    SUMMARY

In this lawsuit, Aspire challenges "ERCOT protocol revisions and, when applicable, PUC orders approving revisions to ERCOT's Nodal Protocols," Sec. Am. Pet. at ¶ 29, under the purported jurisdiction of Section 2001.038 of the Administrative Procedure Act ("APA").[2] But the Texas Supreme Court recently held in a similar challenge that a Public Utility Commission of Texas ("PUCT") "order approving" an ERCOT Protocol revision is "**not** an agency-adopted 'rule' under the Administrative Procedure Act." *PUCT v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024) (emphasis added). Because the PUCT orders approving ERCOT Protocol revisions are not agency rules, this Court lacks jurisdiction under APA § 2001.038, and Aspire's claims must be dismissed. *Id.*

Nor can Aspire use APA § 2001.038 to challenge ERCOT's Protocol revision process or specific Protocols. In *RWE*, decided just this term, the Texas Supreme Court sanctioned the existing Protocol revision process when it carefully analyzed the legislatively required and PUCT-directed "detailed procedures for adopting and revising [ERCOT's] protocols," and concluded that "this painstaking procedure [leverages industry expertise] while maintaining transparency and affording interested parties plentiful opportunities to weigh in." *Id.* at 490. The Court **rejected** the argument that "ERCOT Protocols [are like] PUC rules subject to the same review procedures." *Id.* at 491. In fact, the Court found the opposite, concluding that a recent statutory amendment "signals legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors." *Id.* at 492. Thus, neither PUCT orders approving Protocol revisions, nor the Protocols themselves are agency-adopted "rules" under the APA. This Court therefore lacks jurisdiction under APA § 2001.038—the sole jurisdictional basis pleaded by Aspire to support its claims—without which sovereign immunity bars Aspire's claims. *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611 (Tex. 2023). And any complaint by

---

[2] The APA is codified at Texas Government Code Chapter 2001.

Appx. Page 306 of 740

Aspire about ERCOT's Protocols is subject to the exclusive jurisdiction of the PUCT. *CPS Energy*, 671 S.W.3d at 620 ("[W]hether ERCOT properly implemented its protocols . . . comes within the PUC's exclusive jurisdiction.").

Aspire was not without a potential remedy for the harm it claims. "PUC regulations provide a process for review of ERCOT Protocols, . . . which culminates in a suit for judicial review in district court." *RWE*, 691 S.W.3d at 492 n.11. But Aspire "did not engage in that process, choosing instead to utilize the inapplicable procedure for reviewing PUC [] rules." *Id.* Aspire's failure to exhaust its administrative remedies also deprives this Court of jurisdiction over Aspire's claims. *CPS Energy*, 671 S.W.3d at 618.

Even if the Court had jurisdiction, Aspire's claims have no basis in law and should be dismissed under Rule 91a. Aspire's procedural challenge fails as a matter of law because, as the *RWE* Court held weeks ago, the APA's rulemaking requirements do not apply to the ERCOT Protocols or PUCT orders finally approving those Protocols. Aspire's substantive challenges fare no better.

To start, Aspire's claims are barred by the filed rate doctrine, which "bars judicial recourse against a regulated entity based upon allegations that the entity's 'filed rate' is too high, unfair or unlawful." *Tex. Com. Energy v. TXU Energy, Inc.* ("*TCE*"), 413 F.3d 503, 508 (5th Cir. 2005). The whole premise of Aspire's lawsuit is that "ECRS unnecessarily increases the price of electricity," results in "both higher prices and greater price volatility," "increases the likelihood that QSEs [like Aspire] will lose money on the hedges they offer to retailers," and has "led consumers to pay 'much, much higher' rates." Sec. Am. Pet. ¶¶ 28, 34, 36, and 54. But wholesale electricity prices set by ERCOT under the PUCT's oversight and plenary authority are filed rates under the filed rate doctrine, and are thus "unassailable in judicial proceedings." *TCE*, 413 F.3d at 508–10.

Appx. Page 307 of 740

Aspire also alleges that the ERCOT Contingency Reserve Service ("ECRS") violates Public Utility Regulatory Act ("PURA")[3] § 39.157—a statute that directs *the PUCT* to protect against certain market power abuses. Nothing in PURA § 39.157 gives Aspire a private cause of action against the PUCT and ERCOT, and even if it did, that provision—which prohibits anticompetitive practices *by market participants*—is inapplicable here.

In another recent Texas Supreme Court decision, the Court recognized that the PUCT is charged with balancing two equally critical, yet potentially conflicting, legislative goals: preserving a competitive market, and ensuring grid reliability. Sometimes, competition must yield to reliability, and "[d]eciding when those circumstances are present—and how to respond—**is the Commission's job, not the judiciary's**." *PUCT v. Luminant Energy Co. LLC,* 691 S.W.3d 448, 463 (Tex. 2024) (emphasis added). It is, therefore, not for Aspire or this Court to second guess through litigation whether the ECRS program's costs outweigh its reliability benefits, as Aspire claims here.

Aspire also now claims that ERCOT lacked the authority to develop the ECRS Ancillary Service[4] program in the first instance, making it illegal. But the Legislature requires the PUCT to ensure that *ERCOT* "determines the . . . characteristics of ancillary . . . services necessary" to reliably operate the grid. PURA § 39.159(b). The Legislature did not just authorize ERCOT to develop Ancillary Service programs—it mandated that ERCOT develop those programs.

In the unlikely event the Court determines it has jurisdiction and Aspire has pleaded viable claims, it should not proceed with this lawsuit because Aspire has failed to join all necessary and indispensable parties. When a party brings a declaratory judgment claim, as Aspire has done here, Texas law requires that "all persons who have or claim *any* interest that would be affected by the

---

[3] PURA is codified at Texas Utilities Code §§ 11.001–66.016.

[4] "Ancillary Service" is defined in the ERCOT Nodal Protocols as "A service necessary to support the transmission of energy to Loads while maintaining reliable operation of the Transmission Service Provider's (TSP's) transmission system using Good Utility Practice." Protocols § 2.1.

**Appx. Page 308 of 740**

declaration *must* be made parties." Tex. Civ. Prac. & Rem. Code § 37.006(a) (emphasis added). Here, Aspire asks the Court to not only declare the ECRS program invalid—but to declare the entire ERCOT Protocol revision process invalid—thereby eviscerating the Protocols entirely and plunging the State's grid and market into chaos. This requested declaratory relief would affect the interests of hundreds of other market participants that participate in the ERCOT market and that have invested billions of dollars in reliance on the Protocols that govern the market, including by providing the ECRS Ancillary Service that Aspire seeks to prohibit.

As set forth below, the Court should dismiss all of Aspire's claims against ERCOT.

## II.     BACKGROUND[5]

### A.     ERCOT and the ERCOT Nodal Protocols

ERCOT is the Independent System Operator ("ISO") and "essential organization" statutorily charged with operating the State's electric grid and wholesale electricity market—all while subject to the PUCT's "complete authority." *See* Public Utility Regulatory Act ("PURA")[6] §§ 39.151(a), (d). ERCOT does not generate, transmit, distribute, or sell electricity. Instead, ERCOT is the entity that Texas tasked with regulating Texas's intrastate grid and wholesale electricity market, subject to plenary control by the PUCT. *See* PURA §§ 39.151(a), (g); 16 Tex. Admin. Code ("TAC") § 25.361(b); *see also CPS Energy*, 671 S.W.3d at 611–12 (discussing ERCOT's history). All aspects of ERCOT's finances and operations are subject to the PUCT's control, and the State of Texas selects ERCOT's governing board. *Id.* at 623–26. As the Texas Supreme Court recently put it, "ERCOT and the PUC[T] are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and essential purposes." *RWE*, 691 S.W.3d at 490.

---

[5] "[A] a court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554–55 (Tex. 2000).

[6] PURA is codified at Texas Utilities Code §§ 11.001–66.016.

Appx. Page 309 of 740

ERCOT manages Texas's intrastate grid and wholesale electricity market using statutory authority delegated to it by the PUCT to "establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants." *CPS Energy*, 671 S.W.3d at 626 (citing PURA §§ 39.151(d), (i), (j), (*l*)). In 2021, the Legislature amended PURA to specifically require the PUCT to approve any Protocols adopted by ERCOT and for ERCOT to "establish and implement a formal process for adopting new protocols or revisions to existing protocols." PURA § 39.151(g-6). As the Legislature knew when it added this requirement, ERCOT already had a longstanding collaborative, stakeholder-led process for adopting and revising its Protocols, referred to as the Nodal Protocol Revision Request ("NPRR") process.[7] *See* ERCOT Protocols § 21.2(1); *RWE*, 691 S.W.3d at 491. In compliance with the Legislature's directive, ERCOT revised its formal process to take into account the new requirement for PUCT approval of ERCOT-adopted Protocols. *RWE*, 691 S.W.3d at 490. The NPRR process is detailed in ERCOT Protocols § 21.[8]

The NPRR process is extensive, providing multiple opportunities for comment and vote by representatives of each market segment, regulators, and consumers as the proposed Protocol revisions progress through ERCOT's Protocol Revision Subcommittee, Technical Advisory Committee, and State-appointed Board. ERCOT Protocols §§ 21.3, 21.4.1, 21.4.4, 21.4.5; *see also RWE*, 691 S.W.3d at 489–90 (describing ERCOT's detailed procedures for adopting and revising Protocols).

Throughout the NPRR process, ERCOT employs its subject-matter experts in a range of relevant areas (including, e.g., economics, market design, and various engineering specialties) to

---

[7] Although NPRRs are specific to revisions of the ERCOT Nodal Protocols, "NPRR process" is used herein as a shorthand for all of the various Revision Request processes that ERCOT employs. Other binding documents, such as the Nodal Operating Guides or the Planning Guides, when going through a revision are referred to as Nodal Operating Guide Revision Requests ("NOGRR") or Planning Guide Revision Requests ("PGRR"), but these all are reviewed through the ERCOT stakeholder process and are ultimately approved, rejected, or remanded by the PUCT.

[8] The ERCOT Protocols are available on ERCOT's website here.

Appx. Page 310 of 740

analyze the effect of any proposal on ERCOT's functions and the grid and market. ERCOT Protocols §§ 21.4.6, 21.4.9. Because market participants like Aspire have a hands-on role in the Protocols' drafting and revision through the NPRR process, ERCOT is able to harness their substantial expertise as well. Indeed, in its recent analysis and endorsement of ERCOT's Protocol revision process, the Texas Supreme Court recognized that this "painstaking procedure serves to **leverage the expertise of ERCOT members and industry stakeholders while maintaining transparency and affording interested parties plentiful opportunities to weigh in**." *RWE,* 691 S.W.3d at 490 (emphasis added).

The result of this "painstaking procedure" is thousands of pages of binding rules that govern every aspect of Texas's electric grid and wholesale market—not only the Protocols, but also numerous other "guides, policies and procedures" containing legally binding market rules. *See* ERCOT, *Market Rules*; PURA § 39.151(j). These ERCOT market rules are highly detailed and rife with technical specifications. *See, e.g.,* ERCOT Protocols §§ 3.22.2, 6.5.7.5, 8.1.1.4.1. For example, the Protocols governing certain ECRS charges include complex mathematical pricing formulas like this:

▲ 4.6.4.2.5 **ERCOT Contingency Reserve Service Charge**

(1) Each QSE shall pay to ERCOT or be paid by ERCOT an ECRS charge for each hour as follows:

$$DAECRAMT_q = DAECRPR * DAECRQ_q$$

Where:

$$DAECRPR = (-1) * PCECRAMTTOT / DAECRQTOT$$

$$PCECRAMTTOT = \sum_q PCECRAMT_q$$

$$DAECRQTOT = \sum_q DAECRQ_q$$

$$DAECRQ_q = DAECRO_q - DASAECRQ_q$$

The PUCT has neither the staff nor the deep technical knowledge necessary to craft these immensely complex rules. *See RWE*, 691 S.W.3d at 490 (acknowledging that the PUCT "lacks the expertise and staff resources to make informed regulatory decisions independent of ERCOT.") (cleaned up).

Appx. Page 311 of 740

For this reason, and because "ERCOT is uniquely positioned to manage the electricity market by virtue of its technical expertise," *id.* at 487, the Legislature authorized the PUCT to delegate its rulemaking authority to ERCOT. PURA § 39.151(d). In so doing, the Legislature created a two-part, non-APA process by which (1) ERCOT first "adopt[s]" market rules using its own "formal process" (the NPRR process); and (2) the PUCT exercises its supervisory authority to finally "approve, reject, or remand" any ERCOT-adopted Protocol revisions. PURA § 39.151(g-6); *see also CPS*, 671 S.W.3d at 623; *RWE*, 691 S.W.3d at 487, 490–91.

## B. Ancillary Services and ECRS.

As the PUCT-certified ISO, ERCOT must "ensure the reliability" of Texas's electric grid. PURA § 39.151(a)(2). To ensure the reliability of the grid, ERCOT must, among other things, make sure that the supply and demand of electricity on the ERCOT System are at all times balanced. *See* 16 TAC § 25.361(b)(4). "For the ERCOT grid to remain functional, electricity supply and demand must remain balanced at a frequency of 60 hertz [Hz]." *Luminant*, 691 S.W.3d at 455. Failure to maintain system frequency at 60 Hz can damage grid infrastructure and lead to system-wide power outages potentially lasting weeks or months. *Id.* at 455 (recognizing that the sudden frequency decay during Winter Storm Uri threatened to put Texas in a "total grid collapse that would have plunged the state into darkness for weeks, maybe months.").

Ancillary Services are an essential tool ERCOT uses to help resolve system imbalances and ensure grid reliability. *See* PURA § 39.159(b) (requiring that ERCOT "procure[] ancillary or reliability services . . . to ensure appropriate [grid] reliability"). Ancillary Services can be provided by electric generators and certain consumers, and are used to increase or decrease the supply of electricity in a matter of minutes or even seconds, which is particularly critical in times of high demand (e.g., peak summer temperatures) or short supply (e.g., Winter Storm Uri, when historically low temperatures froze generation equipment). *See id.*; *see also* ERCOT Protocols §§ 3.17, 6.5.9.4. Because Ancillary

- 9 -

Appx. Page 312 of 740

Services are an integral component of maintaining any electric system reliability, they have long been used in various forms by ISOs around the nation.[9]

One type of Ancillary Service used by ERCOT is ECRS, about which Aspire complains here. ECRS was first developed through NPRR 863, which was proposed in January 2018 by a market participant.[10] After undergoing over a year of extensive vetting and revision by ERCOT and various market participants through the NPRR process, the creation of ECRS was approved and adopted by ERCOT's Board in February 2019.[11] Aspire could have filed a complaint against ERCOT at the PUCT when ECRS was adopted five years ago—but it chose not to. *See RWE*, 691 S.W.3d at 490. And that complaint, had it been filed, could have culminated in a suit for judicial review under the substantial evidence rule. 16 TAC §§ 22.251, 25.362(c)(5), PURA § 15.001, APA §§ 2001.171, 2001.174; *RWE*, 691 S.W.3d at 490, 492 n.11.

ECRS is the first new Ancillary Service in the ERCOT Region in more than 20 years.[12] It was developed to address certain reliability risks that ERCOT's other Ancillary Services do not adequately address, including those risks created by rapid changes to the grid (e.g., increasing amounts of intermittent wind and solar generation resources), which are only compounded by the ever-present heightened reliability risks presented by ERCOT's intrastate nature.[13] "While all the other states in the Union have extensive interconnections with neighboring states, nearly 90% of Texas is covered by a

---

[9] *See, e.g.*, Federal Energy Regulatory Commission ("FERC") report on Energy and Ancillary Services Market Reforms to Address Changing System Needs (Sept. 2021), available here (outlining Ancillary Services products used by various ISOs and Regional Transmission Operators (RTOs) around the U.S.).

[10] *See* NPRR 863, Creation of Primary Frequency Response Service Product and Revisions to Response Service (Jan. 1, 2018), available here.

[11] *See* ERCOT Board Report on NPRR 863 (Feb. 13, 2019), available here. At that time, the PUCT was not required to approve ERCOT's adoption of NPRR 863. PUCT approval became mandatory in 2021 with the addition of PURA § 39.151(g-6). But the PUCT had complete oversight of the ERCOT Protocols even before the mandatory approval process. *RWE*, 691 S.W.3d at 491.

[12] PUCT Project No. 54445, *Review of Protocols Adopted by the Independent Organization*, Item No. 84 (July 22, 2024), available here.

[13] *See, e.g.*, ERCOT Protocols § 6.5.7.6.2.4(1) (listing purposes of ECRS).

Appx. Page 313 of 740

single isolated grid with limited connections to external power supplies," *Texas v. Env't Prot. Agency*, 829 F.3d 405, 431 (5th Cir. 2016), meaning that, unlike the rest of the nation, the ERCOT grid largely cannot rely on its neighbors to prevent grid collapse. *See also id.* at 432 (recognizing that "ERCOT's independence makes the Texas electrical grid uniquely vulnerable to sudden power shortages"). ECRS was intended in large part to fulfill a similar role to that of the import capability that other power regions have at hand,[14] making it a critical reliability tool—a fact that no one but Aspire disputes.[15]

## C.        Aspire fails to exhaust its administrative remedies.

To be sure, ECRS—as ERCOT's first new Ancillary Service in decades—is still undergoing finetuning by ERCOT, at the directive of the PUCT and in close collaboration with market participants and the ERCOT Independent Market Monitor ("IMM"). The "ECRS Rules" Aspire complains of here reflect that finetuning, which is ongoing within the statutorily prescribed administrative process.

Most recently, in June 2024, ERCOT adopted NPRR 1224, which was intended to address concerns about when ECRS resources are deployed.[16] Aspire was among the market participants that provided comments to NPRR 1224, raising similar economic complaints it asserts here—but nowhere suggesting that ECRS is illegal or that the NPRR process in which it was engaging is illegal.[17] Though NPRR 1224 was approved by the various market stakeholders on ERCOT's Protocol Revision Subcommittee and Technical Advisory Committee, and was ultimately adopted by ERCOT's Board of Directors, the PUCT, in fact, recently *rejected* NPRR 1224 at an open meeting in July 2024 after receiving additional comments and concerns from PUCT staff, the IMM, and market participants.[18]

---

[14] PUCT Project No. 54445, *Review of Protocols Adopted by the Independent Organization*, Item No. 84 (July 22, 2024), available here.

[15] *See generally* PUCT Project No. 54445, *Review of Protocols Adopted by the Independent Organization*, Item Nos. 81–90, available here.

[16] *See* NPRR 1224, ECRS Manual Deployment Triggers (Mar. 27, 2024), available here.

[17] *See* Aspire's Comments to NPRR 1224 (June 6, 2024), available here.

[18] *See* PUCT Project No. 54445, *Review of Protocols Adopted by the Independent Organization*, Item Nos. 81–90, available here.

Appx. Page 314 of 740

PROJECT NO. 54445          PUBLIC UTILITY COMMISSION
                                FILING CLERK

REVIEW OF PROTOCOLS ADOPTED        §     PUBLIC UTILITY COMMISSION
BY THE INDEPENDENT                 §
ORGANIZATION                       §            OF TEXAS

**ORDER REJECTING ERCOT NODAL PROTOCOL REVISION REQUEST 1224**

This Order addresses a proposed revision to Electric Reliability Council of Texas (ERCOT) protocols: NPRR1224, *ECRS Manual Deployment Triggers*. Pursuant to PURA § 39.151(g-6), the Commission rejects the proposed revision request.

At its meeting on June 18, 2024, the ERCOT Board of Directors (Board) recommended Commission approval of NPRR1224, *ECRS Manual Deployment Triggers*. On June 21, 2024, ERCOT filed a copy of its Board Report, which includes an ERCOT Market Impact Statement, and ERCOT Impact Analysis.[1] These supporting ERCOT documents constitute the market impact analysis. Commission Staff filed a memorandum on July 22, 2024, related to NPRR1224 in which it recommends against approval of the proposed revision request.

The Commission finds that NPRR1224 should not be approved as recommended by the ERCOT Board. Accordingly, the Commission orders that NPRR1224 be rejected.

As NPRR 1224 demonstrates, the prescribed formal NPRR process works—and it does so in a way that invites input and collaboration from all segments of the ERCOT market to create solutions that balance the needs of the entire grid and market.

Flouting this process, Aspire runs to this Court complaining—for the first time in *five years* since its creation—that ECRS is illegal.[19] *See* Sec. Am. Pet. ¶ 1. Originally, Aspire challenged three "ECRS Rules"[20]:

> (1) a May 2022 PUCT order approving ERCOT NPRR 1096, which modified certain requirements for Energy Storage Resources providing ECRS;[21]
>
> (2) a January 2023 PUCT order approving ERCOT NPRR 1148, which was merely a language cleanup of the already-existing ECRS Protocols;[22] and
>
> (3) a June 2023 PUCT order approving ERCOT NPRR 1178, which clarified and updated expectations for Resources providing ECRS.[23]

---

[19] Notably, in its comments to NPRR 1224, Aspire claimed it was "fully supportive of the recommendations made by the IMM" to *improve* the ECRS program, not to abolish it, and even offered its own additional improvement recommendations therein.

[20] *See* First Am. Pet. ¶ 29.

[21] *See* Final ERCOT Board Report adopting NPRR 1096 (May 2, 2022), available here.

[22] *See* Final ERCOT Board Report adopting NPRR 1148 (Dec. 21, 2022), available here.

[23] *See* Final ERCOT Board Report adopting NPRR 1178 (June 20, 2023), available here.

Aspire has since amended its petition and now defines the "ECRS Rules" subject to its complaint to include those three orders, plus a host of other Protocol revisions and PUCT approval orders related to ECRS, including the originating NPRR 863. Sec. Am. Pet. ¶ 29.[24] Aspire's broadened definition does not give this Court jurisdiction. If anything, by clarifying that its suit largely takes aim at ERCOT-adopted Protocols,[25] Aspire has pled itself directly into the exclusive jurisdiction of the PUCT. *CPS Energy*, 671 S.W.3d at 620 ("whether ERCOT properly implemented its protocols . . . comes within the PUC's exclusive jurisdiction.").

Aspire chiefly complains that the PUCT orders approving ERCOT Protocol revisions and the Protocols themselves fail to comply with the APA. *See id.* ¶¶ 15–16, 57–58. Aspire also claims that these approval orders and Protocols "violate PURA because they direct generators to withhold electricity from the grid in violation of Tex. Util. Code §39.157(a)," *Id.* ¶ 59, and that "NPRR 863, which created ECRS, is invalid because ERCOT did not have the authority to create new ancillary services," *Id.* ¶ 58. For both its procedural and substantive challenge, Aspire asks the Court to (1) declare the "ECRS Rules" invalid and void; and, (2) enjoin the PUCT and ERCOT "from enforcing, using, or otherwise allowing the ECRS Rules to operate." *Id.* ¶¶ 58, 69. Not only that, but Aspire additionally challenges the *entire* ERCOT Protocol revision process, claiming this longstanding, painstaking process (that Aspire frequently participates in) fails to comply with the APA. *Id.* ¶ 58.[26] In other words, Aspire seeks not only to throw out the ECRS program—it also seeks to do away with the entire ERCOT market rulebook.

---

[24] Aspire's new definition of "ECRS Rules" now includes 10 NPRRs and 6 PUCT approval orders.

[25] *See* ERCOT's Original Plea at 10 n.17 (explaining ambiguity caused by previous definitions of "ECRS Rules") (filed Sept. 9, 2024).

[26] Specifically, Aspire asks for a declaration that "Chapter 21 of ERCOT's Nodal Protocols, both on its own and when combined with the PUC's process for approving ERCOT protocols, does not provide a process for making and amending rules that substantially complies with APA §§ 2001.023-.025, .029-.030, .033." *Id.* ¶ 58.

Appx. Page 316 of 740

The Court need not reach the merits of these far-reaching claims, however. This case is easily resolved on the threshold jurisdictional question, which has already been answered in the Texas Supreme Court's recent decisions in *PUCT v. RWE Renewables Americas, LLC*[27] and *CPS Energy v. ERCOT*.[28] Those cases, discussed below, make clear that Aspire's claims must be dismissed with prejudice for want of subject-matter jurisdiction; thus, the Court need not reach ERCOT's alternative Rule 91a or Plea in Abatement unless it first finds it has jurisdiction.

### III. LEGAL STANDARDS

**A. Plea to the Jurisdiction.**

A "court must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). "Sovereign immunity from suit defeats a trial court's subject matter jurisdiction and thus is properly asserted in a plea to the jurisdiction." *Id.* at 225–226. Subject-matter jurisdiction is also lacking "when the Legislature has granted [an] agency the sole authority to make an initial determination in a dispute"; in that instance, the court "lack[s] jurisdiction until the party has exhausted all administrative remedies before the agency." *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018).

Whether a court has subject-matter jurisdiction is a question of law. *Miranda*, 133 S.W.3d at 226. Where, as here, a plea to the jurisdiction challenges the pleadings, the court's task is to "determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause." *Id.* If "the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 227.

---

[27] 691 S.W.3d 484; *see also* **Appendix A**.
[28] 671 S.W.3d 605; *see also* **Appendix B.**

- 14 -

**B. Rule 91a.**

Rule 91a authorizes dismissal of a cause of action that "has no basis in law or fact." Tex. R. Civ. P. 91a(1). "A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." *Id.* Whether dismissal on the pleadings is proper is a question of law. *City of Dallas v. Sanchez*, 494 S.W.3d 722, 724 (Tex. 2016). Legal conclusions "need not be taken as true in evaluating the sufficiency of the pleadings." *City of Austin v. Liberty Mut. Ins. Co.*, 431 S.W.3d 817, 826 (Tex. App.—Austin 2014, no pet.).

## IV. ERCOT'S PLEA TO THE JURISDICTION

**A. ERCOT's Sovereign Immunity Bars Aspire's Claims.**

The Texas Supreme Court recently held "that ERCOT is entitled to sovereign immunity" as an "arm of the State government":

> We hold that ERCOT is entitled to sovereign immunity because PURA evinces clear legislative intent to vest it with the "'nature, purposes, and powers' of an 'arm of the State government'" and because doing so satisfies the political, pecuniary, and pragmatic policies underlying our immunity doctrines.

*CPS Energy*, 671 S.W.3d at 628. Absent legislative waiver, then, ERCOT is immune from suit. *See id.* It is Aspire's burden to establish such a waiver, *Rattray v. City of Brownsville*, 662 S.W.3d 860, 865 (Tex. 2023), and it has failed to do so here.

**1. Neither the ERCOT Protocols nor PUCT orders approving ERCOT Protocols are "rules" under the APA.**

Aspire claims that this Court has jurisdiction under APA § 2001.038, which authorizes declaratory relief regarding the "validity or applicability of a rule" whose "threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Citing to the Texas Supreme Court's *RWE* decision issued just weeks ago, Aspire asserts that "[r]ulemaking at both the PUC and ERCOT are subject to the [APA]." Sec. Am. Pet. ¶¶ 15–16;

- 15 -

*see also id.* ¶ 44 (representing that *RWE* stands for the proposition that Protocols and PUCT orders approving protocol revisions are APA "rules"). **But *RWE* held precisely the opposite—that neither ERCOT's Protocols, nor the PUCT's orders approving the adoption of or revisions to those Protocols, are "rules" under the APA.**[29] 691 S.W.3d at 492.

The facts in *RWE* mirror this case. There, a market participant, RWE, similarly challenged a PUCT order approving certain ERCOT Protocol revisions related to the price of energy during times of extreme energy shortages. *RWE*, 691 S.W.3d at 487–88. Just as Aspire attempts to do here, RWE entirely skirted the proper statutory administrative process, instead going directly to the Third Court of Appeals with its PUCT order challenge, claiming the order was a "competition rule" subject to direct appeal under PURA § 39.001(f).[30] *Id.* at 488–89. The Texas Supreme Court soundly rejected this claim, holding that the PUCT's Protocol revision approval order was not even a "rule" under the APA, much less a "competition rule" authorizing a direct appeal. *See id.* at 489–92.

The APA's rulemaking requirements, the *RWE* Court explained, are "exclusively and repeatedly directed at rules '**adopted**' by a '**state agency**.'" *Id.* at 491. (emphasis added) (citing APA §§ 2001.033(a), 2001.004(1)). Neither part of the two-part ERCOT Protocol revision process falls within this rubric. At step one, ERCOT is not a "state agency"—it is, as Aspire acknowledges, an "organ of government" that performs a "uniquely governmental" function with respect to managing the State's electric grid. *CPS Energy*, 671 S.W.3d at 617; *see also* Sec. Am. Pet. ¶ 11 (defining ERCOT as a "quasi-governmental agency"). ERCOT's adoption and revision of Protocols therefore does not

---

[29] Aspire's mischaracterization of the holding in *RWE* raises serious concerns about its candor, and ERCOT reserves the right to seek appropriate sanctions under Rule 13 of the Texas Rules of Civil Procedure.

[30] Aspire did the same. It filed a direct appeal in the Third Court of Appeals making the same complaints there that it makes here. *See Aspire Power Ventures, LP v. PUCT*, 03-24-00102-CV (filed Feb. 13, 2024), available here. Notably, the Third Court—over Aspire's objection—abated that appeal pending the Supreme Court's decision in *RWE*. *See* Memorandum Opinion (May 3, 2024), available here. The PUCT recently moved to dismiss the appeal based on *RWE*, and Aspire did not oppose the dismissal. *See* Unopposed Motion to Dismiss for Lack of Jurisdiction (Aug. 26, 2024), available here. The case was recently transferred to the Fifteenth Court of Appeals, and on September 26, 2024, the court dismissed the appeal for lack of jurisdiction. *See* Memorandum Opinion (Sept. 26, 2024), available here.

**Appx. Page 319 of 740**

constitute APA rulemaking. *See RWE*, 691 S.W.3d at 491. Nor do PUCT orders finally "approving" new or revised Protocols adopted by ERCOT, or rejecting or remanding them, constitute rules under the APA. *Id.*

That the PUCT is now required to formally approve each and every Protocol revision adopted by ERCOT does not change this analysis.[31] Seizing on that new requirement, RWE argued that, by this amendment, "the Legislature intended to overhaul" ERCOT's longstanding Protocol revision process and "effectively convert ERCOT protocols into PUC rules" subject to the APA. *RWE*, 691 S.W.3d at 491. The Court disagreed:

> **We do not discern such a sweeping intent from the language the Legislature chose**. For one thing, PURA makes clear that ERCOT, not the PUC, is the entity "adopting" new or revised ERCOT protocols. [PURA] § 39.1519(g-6). The PUC then "approves" the protocols. *See id.* This distinction is deceptively significant because the APA's requirements . . . are exclusively and repeatedly directed at rules "adopted" by a "state agency." . . . Indeed, the Legislature deliberately uses the term "adopt" throughout the APA—no reference is made to an agency's "approval" of a rule. . . .
>  . . .
> We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that "adopts" ERCOT protocols given the comprehensive statutory use of that term.

*Id.* (emphasis added) (internal citations omitted).

The recent PURA amendments underscore that ERCOT's Protocol revision process is wholly separate from APA rulemaking. In addition to making the PUCT's Protocol approval mandatory, the Legislature made the NPRR process mandatory, requiring that ERCOT "establish and implement a formal process for adopting new protocols or revisions to existing protocols." PURA § 39.151(g-6). As the *RWE* Court recognized, "ERCOT already had such a process in place; nevertheless, [this] requirement **signals legislative recognition that ERCOT rulemaking and PUC rulemaking are**

---

[31] While the ERCOT NPRR process has, pursuant to the PUCT's "complete authority" over ERCOT, "consistently been subject to PUC[T] oversight and review" even prior to this 2021 amendment, *RWE*, 691 S.W.3d at 491, PURA § 39.151(g-6) now makes the PUCT's review and approval mandatory for each and every new and revised Protocol adopted by ERCOT.

- 17 -

**Appx. Page 320 of 740**

**independent endeavors**." *RWE*, 691 S.W.3d at 492. Had the Legislature intended that ERCOT follow the APA's rulemaking procedures, it would not have vested ERCOT with discretion (subject, as with all things, to the PUCT's "complete authority") to establish and implement a "formal process" for adopting and revising its Protocols. *Cf., e.g.*, *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 499 (Tex. 1997) (recognizing that Tex. Agric. Code § 74.120(c) vests non-agency Boll Weevil Eradication Foundation with the authority to adopt rules that must comply with the APA's rulemaking requirements).[32]

Because neither the ERCOT Protocols nor PUCT orders approving ERCOT-adopted Protocols are "rules" under the APA, APA § 2001.038's limited immunity waiver does not apply here. This Court, therefore, lacks subject-matter jurisdiction, and must dismiss Aspire's suit with prejudice.[33] *See RWE*, 691 S.W.3d at 492; *R.R. Comm'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003) (holding no jurisdiction under APA § 2001.038 for claims regarding agency orders adopting field rules, which are not "rules" under the APA); *LMV-AL Ventures, LLC v. Tex. Dep't of Aging & Disability Servs.*, 520 S.W.3d 113, 124 (Tex. App.—Austin 2017, pet. denied) ("Section 2001.038 is a waiver of immunity and, therefore, is strictly construed in favor of retained immunity.").

### 2. The UDJA does not waive ERCOT's immunity.

Aspire also cannot show waiver of ERCOT's immunity under the Uniform Declaratory Judgment Act ("UDJA"). The UDJA "is not a general waiver of sovereign immunity; 'it does not enlarge a trial court's jurisdiction, and a litigant's request for declaratory relief does not alter a suit's underlying nature.'" *Creedmoor–Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d

---

[32] Tex. Agric. Code § 74.120(c) provides that any rules promulgated by the Foundation "must be adopted and published in accordance with state requirements," putting the Foundation's rulemaking within the APA's ambit. *Lewellen*, 952 S.W.2d at 499. No such language is found anywhere in PURA. *See Hogan v. Zoanni*, 627 S.W.3d 163, 169 (Tex. 2021) ("We presume the Legislature chose statutory language deliberately and purposefully . . . and that it likewise excluded language deliberately and purposefully") (cleaned up).

[33] *See Harris County v. Sykes*, 136 S.W.3d 635, 639 (Tex. 2004) (holding that if a plaintiff fails to plead facts that demonstrate a waiver of immunity, "then the trial court should dismiss the plaintiff's action. Such a dismissal is with prejudice because a plaintiff should not be permitted to relitigate jurisdiction once that issue has been finally determined.").

**Appx. Page 321 of 740**

505, 515 (Tex. App.—Austin 2010, no pet.) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 370 (Tex. 2009)). Thus, "sovereign immunity bars UDJA actions against the state and its political subdivisions absent a legislative waiver." *Tex. Dept. of Transp. v. Sefzik*, 355 S.W.3d 618, 620 (Tex. 2011). Outside of APA § 2001.038—which, for the reasons above, does not apply to Aspire's claims—no such waiver has been identified here.[34]

**B.      This Court lacks jurisdiction because the PUCT has exclusive jurisdiction, and Aspire failed to exhaust its administrative remedies.**

This Court also lacks subject-matter jurisdiction because the PUCT has exclusive jurisdiction over matters pertaining to ERCOT's operations and Protocols as the PUCT-certified ISO, and Aspire failed to exhaust its administrative remedies before the PUCT before bringing suit.

"A state agency 'has exclusive jurisdiction when the Legislature has granted that agency the sole authority to make an initial determination in a dispute.'" *Chaparral*, 546 S.W.3d at 138 (quoting *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004)). When an agency has exclusive jurisdiction over a matter, the agency has "authority to resolve disputes that arise within the agency's regulatory arena," and courts lack jurisdiction over the matter until the complaining party has exhausted all administrative remedies before the agency. *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 544 (Tex. 2016); *Chaparral*, 546 S.W.3d at 137.

The Legislature may vest an agency with exclusive jurisdiction in two ways. First, a statute may expressly grant an agency exclusive jurisdiction over matters the statute governs. *Chaparral*, 546 S.W.3d at 138. Second, an agency has exclusive jurisdiction "when a pervasive regulatory scheme indicates

_____

[34] While the UDJA allows "[a] person ... whose rights ... are affected by a statute ... or municipal ordinance" to "have determined any question of construction or validity ... and obtain a declaration of rights ... thereunder," that limited immunity waiver does not apply here because neither the challenged Protocols nor PUCT orders are a "statute" or "municipal ordinance." Like all immunity waivers, this UDJA provision is strictly construed. *See, e.g.*, *Hensley v. State Comm'n on Judicial Conduct*, 692 S.W.3d 184, 200 (Tex. 2024) (holding that UDJA § 37.004(a)'s waiver did not apply to a judicial canon that "is neither an ordinance nor a statute but a rule promulgated by this Court.").

**Appx. Page 322 of 740**

that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *Id.*

PURA § 39.151 constitutes such a pervasive regulatory scheme. *CPS Energy*, 671 S.W.3d at 618. As the Texas Supreme Court explained:

> Section 39.151 grants the PUC extensive and ultimate authority over an ISO. . . . the statute provides that the ISO "is directly responsible and accountable to the [PUC]," and the PUC "has complete authority to oversee and investigate [ERCOT]'s finances, budget, and operations" to ensure adequate performance of the ISO's "functions and duties." **It grants the PUC authority over ERCOT's** board makeup, its bylaws and **protocols**, and its ability to charge fees to its members. ERCOT is empowered to enact rules over market participants, but they must be approved by the PUC.
>
> Moreover, the PUC's authority over ERCOT is not solely regulatory; it has adjudicatory power as well. The PUC may "take appropriate action" against the ISO, including decertification, for the ISO's failure to adequately perform its functions or duties or for its failure to comply with Section 39.151. **Section 39.151's grant of extensive authority to the PUC over ERCOT and its detailed regulation of the particulars of ERCOT's functions constitute a pervasive regulatory scheme**.

*Id.* (emphasis added).

Aspire's claims against ERCOT fall directly within this pervasive regulatory scheme. ERCOT adopted and implements the ECRS program pursuant to its legislative directive to "ensure the reliability" of the grid. PURA § 39.151(a). As a part of this core statutory responsibility, the Legislature has further directed ERCOT to (1) establish requirements to meet the reliability needs of the ERCOT region; (2) determine the quantity and type of Ancillary Services needed to ensure grid reliability; and (3) to procure those necessary Ancillary Services. *See* PURA § 39.159(b). The PUCT is charged with ensuring that ERCOT adequately fulfills each of these responsibilities, and may take action against ERCOT should it fail to do so. *See id.* § 39.159(b) ("The [PUCT] shall ensure that [ERCOT] . . . determines the quantity and characteristics of ancillary or reliability services . . . [and] procures ancillary or reliability services on a competitive basis . . . ."); *see also* PURA § 39.151(d) ("The commission may take appropriate action against [ERCOT]" if it "does not adequately perform [its] functions or duties . . . .").

- 20 -

**Appx. Page 323 of 740**

Aspire contends that ERCOT failed to meet these statutory requirements by, among other things, "fail[ing] to balance reliability objectives with the costs of satisfying reliability requirements," *See* Sec. Am. Pet. ¶ 52, and because "NPRR 863, which created ECRS . . . exceeded ERCOT's authority," Sec. Am. Pet. ¶ 41. But "[b]ecause the proper performance of ERCOT's operations, functions, and duties comes within the PUC's 'complete' authority over ERCOT, and because the PUC is statutorily authorized to hold ERCOT accountable if, as [Aspire] alleges, ERCOT fails to properly perform," these "issues come within the PUC's exclusive jurisdiction." *CPS Energy*, 671 S.W.3d at 619. Aspire was therefore required to first allow the PUCT "to make important determinations" regarding the alleged unlawfulness of ERCOT's ECRS program "before [taking its] claim to the judicial system." *Chaparral Energy*, 546 S.W.3d at 145; *CPS Energy*, 671 S.W.3d at 620.

To be clear, Aspire always had a direct path to administrative and judicial review under PURA, PUC Rules, and ERCOT Protocols. After ERCOT adopted NPRR 863 creating the ECRS program (and, in the years following, the other NPRRs now added to Aspire's Second Amended Petition),[35] Aspire had a right to complain to the PUCT about ERCOT's actions. *See* ERCOT Protocols § 21.4.12.3(1); 16 TAC §§ 22.251, 25.362(c)(5); *RWE*, 691 S.W.3d at 490, 492 n.11. Had the PUCT agreed with Aspire, the PUCT could have suspended the NPRR's operation or ordered ERCOT to revise it. 16 TAC § 22.251(*o*).[36] If, on the other hand, the PUCT rejected Aspire's appeal, Aspire could have sought judicial review of that decision under the APA through the contested case process and under the substantial evidence rule. PURA §§ 15.001, 39.003; APA §§ 2001.003(1), 2001.171.

---

[35] As previously discussed, Aspire's First Amended Petition defined only three PUCT approval orders as the "ECRS Rules." Its Second Amended Petition now cites several more as well as the actual NPRRs and includes them all as part of its new definition of "ECRS Rules." Sec. Am. Pet ¶ 29.

[36] There is an alternative route to administrative review. The PUC has an open project in which it reviews ERCOT-adopted Protocol revisions. *See* PUCT Docket No. 54445 ("Review of Rules Adopted by the Independent Organization"), available here. Market participants and other interested persons may file comments in that project advocating for or against approval of an ERCOT-adopted revision. In addition to NPRR 1224, discussed above, this recently happened with NPRR 1186: numerous parties filed comments with the PUCT, in response to which the PUCT remanded the revision to ERCOT with instructions to further revise it. *See* Docket No. 54445, Item No. 64 (Jan. 18, 2024), available here.

**Appx. Page 324 of 740**

2001.174, 2001.176; *see also RWE*, 691 S.W.3d at 492 n.11 (recognizing that the "PUC regulations provide a process for review of ERCOT protocols . . . which culminates in a suit for judicial review in the district court.").

But Aspire chose to forego administrative review. Just like RWE, Aspire "did not engage in that process, choosing instead to utilize [an] inapplicable procedure" to challenge the ECRS Protocol revisions. *Id.* As in *RWE*, then, Aspire's claims must be dismissed for lack of jurisdiction for failure to exhaust administrative remedies. *Id.* at 492.

If the Court concludes, as it should, that it lacks jurisdiction over Aspire's claims, the case can be dismissed, and the Court need not consider ERCOT's alternative motions below.

## V.  ERCOT'S RULE 91A MOTION TO DISMISS

Outlined above, recent Texas Supreme Court precedent makes clear that the Court lacks subject-matter jurisdiction over Aspire's claims. If the Court determines it has jurisdiction, however, it should still dismiss this action under Rule 91a because Aspire's claims have no basis in law.

### A.  Aspire's claims are barred by the filed rate doctrine

Aspire asks this Court to enjoin ERCOT from utilizing ECRS to reliably operate the grid, alleging "consumers have paid inflated rates because of ECRS," and without judicial intervention, "Aspire and other Market Participants will be purchasing electricity at prices illegally inflated by ECRS." Sec. Am. Pet. ¶¶ 3, 65. Aspire's claims must be dismissed, as they fall squarely within the filed rate doctrine.

#### 1.  Filed rates are *per se* reasonable and unassailable in judicial proceedings.

The filed rate doctrine applies when state law creates a state regulatory agency and a statutory scheme under which the agency determines reasonable rates for the services provided. *See CenterPoint Energy Res. Corp. v. Ramirez,* 640 S.W.3d 205, 212 (Tex. 2022); *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 216 (Tex. 2002); *Hous. Lighting & Power Co. v. Auchan USA, Inc.*, 995 S.W.2d 668, 672–75 (Tex.

**Appx. Page 325 of 740**

1999). The doctrine "says, in essence, that 'any rate filed with and approved by the appropriate regulatory agency has the imprimatur of government,'" *Sw. Bell Tel. Co. v. Metro-Link Telecom, Inc.*, 919 S.W.2d 687, 692 (Tex. App.—Houston [14th Dist.] 1996, writ denied), making those rates "per se reasonable and unassailable in judicial proceedings." *TCE*, 413 F.3d at 508 (cleaned up).

The filed rate doctrine accordingly "bars judicial recourse . . . based upon allegations that the entity's 'filed rate' is too high, unfair, or unlawful." *TCE*, 413 F.3d at 507; *see also Metro-Link*, 919 S.W.2d at 692–93 (filed rate doctrine "prohibits a customer from claiming a lower rate than" the filed rate approved by the regulatory agency). The doctrine also categorically bars claims alleging that a plaintiff has been "forced to pay prices for electricity in excess of rates that would have been achieved in a competitive market," and forecloses judicial relief based on a hypothetical comparison of "the filed rate and the rate that might have been approved absent the conduct in issue." *Jenkins v. Entergy Corp.*, 187 S.W.3d 785, 805 (Tex. App.—Corpus Christi 2006, no pet.).

The doctrine's purpose is twofold: First, the reasonableness of rates in a regulated industry is a question reserved solely for the governing regulatory body. *Minicron SBC Corp., v. Worldcom, Inc.*, 994 S.W.2d 785, 789 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (citing *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156 161-64 (1922)). If courts were to enforce rates other than those approved by the governing regulatory agency, they would invade this exclusive province of the regulatory agency—in this case, the PUCT, which "has the expertise to manage the electric utility industry; the courts do not." *Luminant*, 691 S.W.3d at 463. Second, the doctrine prevents utilities from discriminating in the prices they charge for the same service among different ratepayers. *Id.* (citing *Maislin Indus. v Primary Steel, Inc.*, 497 U.S. 116, 126 (1990)). If courts could recalculate agency-approved rates for certain litigants, discrimination would result among customers.

**Appx. Page 326 of 740**

**2. Electricity prices in ERCOT are filed rates that may not be judicially lowered by this Court through equitable relief.**

Though the filed rate doctrine originated in the context of federal regulation, the doctrine "applies equally where state law creates a state agency and a statutory scheme pursuant to which the state agency determines reasonable rates." *Metro-Link,* 919 S.W.2d at 692–93. And it applies whether a regulatory agency actively sets and approves rates, or merely monitors market-based rates and maintains oversight authority. *See TCE*, 413 F.3d at 509–10 (the "PUCT's oversight over the market is sufficient to conclude that the [ERCOT] BES[37] energy rates are 'filed' within the meaning of the filed rate doctrine."); *Util. Choice v. TXU Corp.*, No. H-05-573, 2005 WL 3307524, at *2, 4 (S.D. Tex. Dec. 6, 2005) (extending *TCE*'s holding with respect to spot market rates to bilateral transactions; recognizing that the "filed rate doctrine bars claims for damages stemming from rates approved by the PUCT in the Texas energy market.").

In *TCE,* the Fifth Circuit applied the filed rate doctrine to affirm dismissal of claims against ERCOT, as well as a number of generators and market participants, for allegedly conspiring to manipulate ERCOT rates "during severe winter weather" when "the price for electricity on the [ERCOT] market soared." *TCE*, 413 F.3d at 506. The *TCE* district court also applied the filed rate doctrine to dismiss a breach of contract claim against ERCOT based on "ERCOT's failure to follow its own protocols." *Id.* at 507. Upon analyzing the Texas electric market's regulatory structure and PURA's pervasive regulatory scheme, the *TCE* court concluded that the PUCT's plenary oversight authority brings ERCOT wholesale rates within the ambit of the filed rate doctrine. *See id.* at 509–10.

Likewise, in *Utility Choice,* the district court dismissed claims relating to "alleged manipulation of the Texas energy market to create substantial price increases" because the claims "challenge[d] the

---

[37] "BES" refers to the Balancing Energy Service ("BES") market, which is another name for the EROCT wholesale market. "The BES market is a bid-based wholesale market for short-term electricity power" and ERCOT "administer[s] the BES market." *TCE*, 413 F.3d at 506.

**Appx. Page 327 of 740**

[ERCOT] rates paid, and are thus barred by the filed rate doctrine." 2005 WL 3307524, at *4. Recognizing that "the Fifth Circuit has held that the filed rate doctrine bars claims for damages stemming from rates approved by the PUCT in the Texas energy market," the *Utility Choice* court **dismissed claims for equitable and injunctive relief**, finding that "such relief would require the Court to determine the appropriateness of the rates charged by Defendants and unduly infringe upon the rate setting authority held by the PUCT." *Id.* at *18–21; *see also Winn v. Alamo Title Ins. Co.*, Case No. A-09-CA-214-SS, 2009 WL 7099484, at *2 (W.D. Tex. May 14, 2009), *aff'd*, 372 Fed. Appx. 461 (5th Cir. March 30, 2010) (dismissing claims for declaratory and injunctive relief and monetary damages under the filed rate doctrine). The court in *Utility Choice* acknowledged that the PUCT "has been given the responsibility to ensure conditions are not unreasonably preferential, prejudicial, discriminatory, predatory, or anticompetitive" and, as such, granting the plaintiffs' requested relief "would affect market rates and infringe upon the powers of the PUCT." *Id.*

Aspire asks this Court to intervene in the ERCOT wholesale market and judicially lower ERCOT's filed rates by enjoining the ECRS program, thereby preventing that Ancillary Service from affecting energy prices that Aspire alleges are too high and it should not have to pay. The filed rate doctrine prohibits this Court from granting Aspire the relief it seeks. The doctrine is meant to keep courts "out of the rate-making process . . . recogniz[ing] that (1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." *Winn*, 2009 WL 7099484, at *4.

**B.    ERCOT's Protocol revision process is not subject to APA rulemaking requirements.**

Aspire's APA rulemaking challenge against ERCOT is threefold: first, Aspire complains that the ECRS Rules did not comply with the APA's notice and comment requirements and, on that basis, asks the Court to declare those rules invalid and void. Sec. Am. Pet. ¶ 58. Second, Aspire alleges that

- 25 -

Appx. Page 328 of 740

NPRR 863 is invalid because ERCOT has no authority to create new Ancillary Services. *Id.* Finally, Aspire broadly asserts that ERCOT's Protocol revision process *as a whole* violates the APA. *Id.*

None of these claims have merit. As set forth above, the Texas Supreme Court just weeks ago held that ERCOT's Protocol revision process is not subject to the APA's rulemaking requirements. *See RWE*, 691 S.W.3d at 491. This is because ERCOT is not a "state agency," and it is well-settled that the APA applies only to "rules adopted by a state agency." *Id.* (cleaned up). If the Legislature wished for ERCOT to nonetheless follow the APA's rulemaking process, it could have required as much. *See Lewellen*, 952 S.W.2d at 499. Instead, it merely required ERCOT to use a "formal process" to "adopt[] new protocols or revis[e] . . . existing protocols," PURA § 39.151(g-6), knowing that ERCOT has long had its own detailed Protocol revision process in place. *See* ERCOT Protocols § 21. Aspire's APA challenge therefore fails as a matter of law.

**C.      Aspire has no private cause of action for alleged PURA § 39.157 violations.**

In addition to its procedural APA challenge, Aspire asks this Court to declare that the "ECRS Rules violate PURA because they direct generators to withhold electricity from the grid in violation of [PURA] § 39.157(a)," and to enjoin the ECRS Rules' implementation on that basis. Sec. Am. Pet. ¶¶ 59, 69. But PURA § 39.157 does not give market participants like Aspire a private cause of action—that statute is a directive from the Legislature *to the PUCT* to monitor and prosecute certain market abuses *by market participants*.

"The fact that a person has suffered harm from the violation of a statute does not automatically give rise to a private cause of action in favor of that person." *Bickham v. Dallas Cnty.*, 612 S.W.3d 663, 670 (Tex. App.—Dallas 2020, pet. denied). "When a private cause of action is alleged to derive from a constitutional or statutory provision," a court's "duty is to ascertain the drafters' intent." *Brown v. De La Cruz,* 156 S.W.3d 560, 563 (Tex. 2004). "[T]he existence of a private cause of action must be clearly

**Appx. Page 329 of 740**

implied in the statutory text." *Tex. Med. Res. LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 431 (Tex. 2023); *see also Brown*, 156 S.W.3d at 563.

Nothing in PURA § 39.157 expressly or impliedly grants Aspire the right to seek declaratory and injunctive relief against the PUCT and ERCOT. On the contrary, it is *the PUCT* that may penalize market participants like Aspire under that provision:

> (a) **The commission shall monitor market power** associated with the generation, transmission, distribution, and sale of electricity in this state. On a finding that market power abuses or other violations of this section are occurring, **the commission shall require reasonable mitigation of the market power by** ordering the construction of additional transmission or distribution facilities, by seeking an injunction or civil penalties as necessary to eliminate or to remedy the market power abuse or violation as authorized by Chapter 15, by imposing an administrative penalty as authorized by Chapter 15, by ordering the disgorgement of excess revenue as authorized by Chapter 15, or by suspending, revoking, or amending a certificate or registration as authorized by Section 39.356.

PURA § 39.157(a) (emphasis added).

As Texas courts have recognized, this PURA provision authorizes the PUCT—and only the PUCT—to protect against anticompetitive practices. *See Brazos Elec. Power Co-op, Inc. v. PUCT*, 101 S.W.3d 499, 503 (Tex. App.—Austin 2002, pet. denied) (recognizing PURA § 39.157 "require[s] the Commission to establish by rule a code of conduct to protect against anticompetitive practices"); *see also TXU Generation Co., LP v. PUCT*, 165 S.W.3d 821, 832 (Tex. App.—Austin 2005, pet. denied) (recognizing PURA § 39.157 "gives *the Commission* broad authority to monitor and remedy market power abuses.") (emphasis added). And the PUCT has, in turn, carried out that legislative mandate through its own rules. *See* 16 TAC §§ 25.503(a)(6), 25.503(g). When, as here, "a statute explicitly provides certain rights of enforcement, but is silent as to the right sought to be enforced," courts "may presume that the Legislature intended for that right to not be included." *Witkowski v. Brian, Fooshee and Yonge Props.*, 181 S.W.3d 824, 831 (Tex. App.—Austin 2005, no pet.).[38]

---

[38] To the extent Aspire suggests that it also has a private cause of against ERCOT under the Administrative Code, that claim similarly fails. Absent *legislative* creation of a private cause of action in PURA, the PUCT has no authority to create a

Appx. Page 330 of 740

"[T]he bar for implying a private cause of action is high," *Molina*, 659 S.W.3d at 431, and Aspire has not met it here with respect to its alleged PURA § 39.157 violations. That provision is clearly a tool for the market's *regulator* to prevent market abuses; it is not a tool for *the regulated* to sue for declaratory and injunctive relief. *See Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."). Aspire's attempts to turn PURA § 39.157 on its head must be rejected.

## D. The ECRS program does not violate PURA § 39.157.

Even if Aspire could sue for alleged PURA § 39.157 violations, that statute has no application here. For one, the market power abuses PURA § 39.157 speaks to are anticompetitive practices *by market participants*, not by ERCOT. ERCOT has no "market power"—it does not generate, transmit, or sell electricity. *See Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992) (defining "market power" to mean "the ability of a single seller to raise price and restrict output."); *see also* 16 TAC § 25.503(g) (defining "prohibited activities" and excluding "acts or practices expressly allowed by the Protocols."). Rather, as the PUCT-certified ISO, ERCOT acts strictly as a market clearinghouse, generating settlement statements and collecting and remitting payments for energy transactions in the ERCOT market. *RWE*, 691 S.W.3d at 489. ERCOT is revenue-neutral, and makes no profit from these transactions; it operates instead from a regulatory fee approved by the PUCT. *See* PURA § 39.151(e); *CPS Energy*, 671 S.W.3d at 627.[39]

---

cause of action by rule. *Sandoval*, 532 U.S. at 291. Even if it could, the PUCT rules Aspire points to vest only the PUCT, not private individuals, with the right to act if ERCOT violates the PUCT's rules. *See* 16 TAC §§ 25.503(p) ("If the commission finds that a market entity is in violation of this section, the commission may seek or impose any legal remedy it determines appropriate for the violation involved . . . .").

[39] For this reason, the PUCT could not "disgorge[] excess revenue" from ERCOT, as PURA § 39.157 contemplates.

Appx. Page 331 of 740

What's more, ECRS is exclusively a reliability tool—it is not the type of anticompetitive "withholding of production" contemplated by PURA § 39.157.[40] Both ERCOT's energy dispatch system (the Security-Constrained Economic Dispatch) and all of ERCOT's Ancillary Service products, including ECRS, rely on having certain amounts of generation readily available on the sidelines. These generation reserves—what Aspire calls "withholding power"—are necessary to ensure ERCOT can keep supply and demand on the system in balance. If, as Aspire claims, ERCOT unlawfully withholds power by not dispatching available generation, then ERCOT's entire grid operation system could be called into question. Nothing in PURA § 39.157's text supports such a dangerous proposition.

In fact, Aspire's argument would require that all Ancillary Services—by which ERCOT holds power capacity in reserve on standby to preserve grid reliability—are illegal under PURA. That absurd result would render meaningless the Legislature's express recognition of the need for such Ancillary Services. *See* PURA §§ 39.159(b)(2), 39.159(b)(3)(requiring the PUCT to ensure that ERCOT, at least annually, determines the amount of Ancillary Services needed and that ERCOT procure Ancillary Services). Ancillary Services, including ECRS, do not contravene any provision in PURA—they are required by it.

As in *Luminant* (and only if this Court has jurisdiction here, which it does not), "the judiciary's role is purely textual." *Luminant*, 691 S.W.3d at 464. Thus, even if PURA § 39.157 was implicated on these facts (and it is not), its provisions cannot be divorced from their statutory context. While one of PURA's goals is to ensure a competitive electric market, as is reflected in PURA § 39.157, that goal must be balanced with PURA's other critical objective: to ensure the reliability of the State's electric

---

[40] Anticompetitive withholding of production as contemplated by PURA § 39.157 includes "[f]or example, a market participant who has market power [and] withhold[s] production from more efficient units and offer[s] its least efficient unit at that unit's marginal costs or higher, with confidence that the unit will be selected and set the price for all energy sold," as "[s]uch withholding of production may bring in enormous profit to the market participant." *See* PUCT Project No. 26201, Item No. 106, *Order Adopting New § 25.503 as approved at the January 29, 2004 Open Meeting* (Feb. 9, 2004), available here.

Appx. Page 332 of 740

grid. *See Luminant*, 691 S.W.3d at 461–64. As the Texas Supreme Court recognized just this term in a similar PUCT order challenge,[41] PURA expressly "acknowledges that the goal of prices set by competition may, in some circumstances, have to yield." *Id.* at 463. "**Deciding when those circumstances are present—and how to respond—is the Commission's job, not the judiciary's**," as it is the "Commission [that] has the expertise to manage the electric utility industry; the courts do not." *Id.* at 463–64 (holding that the "court of appeals thus strayed from its lane by inquiring whether the [challenged PUCT] Orders could have used competitive rather than regulatory methods to any greater extent than they did").

Here, Aspire seeks to invalidate various PUCT orders and the entire ECRS program based on the claim that ECRS's alleged costs outweigh its reliability benefits. *See* Sec. Am. Pet. ¶¶ 2, 28, 31, 52. Even accepting these allegations as true, whether ECRS correctly balances reliability benefits against its market impact is a question that the Legislature, as affirmed by the Texas Supreme Court, has committed exclusively to the PUCT. *Luminant*, 691 S.W.3d at 463. The wisdom of the ECRS program is not for Aspire or this Court to second guess—particularly not where the PUCT, ERCOT, the IMM, and other market participants are all actively working to finetune that program to address concerns that have been properly raised in the administrative process.

## E.     ERCOT had the authority to develop ECRS

New to its Second Amended Petition, Aspire asserts that ERCOT did not have the authority to develop the ECRS program, claiming that only the PUCT can create Ancillary Services. *See* Sec. Am. Pet. ¶¶ 39–41. From this premise, Aspire seeks a declaration that NPRR 863 and any subsequent

---

[41] In *Luminant*, a market participant challenged two PUCT emergency orders issued during Winter Storm Uri, which temporarily set the price of electricity at its statutory cap to help prevent grid collapse. *Luminant*, 691 S.W.3d at 452. Luminant in essence made the same argument Aspire does here—that the market impact of these orders far outweighed their reliability benefits and were, thus, unlawful. *See id.* at 462. The Court "decline[d] Luminant's invitation to second-guess the Orders' necessity and whether it was the price hike they enacted or the Commission's earlier load-shed directives that truly saved the grid from collapse." *Id.*; *see also* **Appendix C**.

modifications to ECRS are invalid. *Id.* ¶ 58. Aspire's latest theory is facially without merit and should be dismissed.

Aspire misconstrues PURA § 35.004(e), which it relies on to claim that ERCOT lacks authority to develop new Ancillary Services. That provision, in its entirety, states:

> **(e)** *In this section*, "ancillary services" means services necessary to facilitate the transmission of electric energy including load following, standby power, backup power, reactive power, and any other services as the commission may determine by rule.

PURA § 35.004(e)(emphasis added).

On its face, this definition—applicable only to section 35.004—identifies certain types of Ancillary Services, with a final catchall for "any other services as the commission may determine by rule." Ignoring the plain statutory text, Aspire reads the concluding phrase to mean that "ancillary services, like ECRS, must be created by [the] PUC[T], not ERCOT." Sec. Am. Pet. ¶ 40. But that is not what the statute says. Read in its proper context, and based on the plain language used, the concluding phrase simply means that if the PUCT determines by rule that some other type of reliability service should be deemed an Ancillary Service for purposes of PURA § 35.004, then those services are included in this definition. Nothing in this statutory language prohibits ERCOT from developing new Ancillary Services, especially when the Legislature elsewhere *requires* ERCOT to develop Ancillary Services, as explained below.

By its new argument, Aspire also overlooks the fact that ECRS is a form of "standby power"—a type of Ancillary Service prescribed in PURA § 35.004. This is significant because it completely dismantles Aspire's other theory that ECRS violates PURA § 39.157(a) by "withholding power." As explained above, *see supra* § V.D, Ancillary Services, by design and necessity, keep power on standby to enable ERCOT to balance the grid—its most fundamental reliability obligation. If keeping "standby power" for Ancillary Services was a violation of PURA constituting market power abuse—as Aspire argues—the Legislature would presumably not condone it as a type of Ancillary Service.

- 31 -

Appx. Page 334 of 740

Aspire's attempt to minimize ERCOT's role in developing Ancillary Services based on PURA § 35.004(h)[42] fares no better. That provision expressly authorizes ERCOT to modify the design of "ancillary services" as defined in PURA § 35.004(e). As noted, ECRS is a form of "standby power" already recognized by the statute as an Ancillary Service that ERCOT is free to modify.

Aspire's proffered interpretation is also rendered implausible by other, later-enacted PURA provisions.[43] For example, in 2023, the Legislature added PURA § 39.159(d), which provides, in relevant part:

> **(d)** The commission shall require the independent organization certified under Section 39.151 for the ERCOT power region **to develop** and implement **an ancillary services program** to procure dispatchable reliability reserve services on a day-ahead and real-time basis to account for market uncertainty.

PURA § 39.159(d) (emphasis added).[44] If, as Aspire claims, the Legislature intended the 25-year-old concluding phrase in PURA § 35.004(e)'s definition to prohibit ERCOT from developing any new Ancillary Services, and to vest that authority only with the PUCT, it would not have mandated that *ERCOT* first develop an Ancillary Services program to procure dispatchable reliability reserve services.

Aspire's argument also ignores that the Legislature requires *ERCOT* to determine the characteristics of Ancillary Services needed to ensure reliability, PURA § 39.159(b)(2), and mandates that ERCOT procure those Ancillary Services, *Id.* at § 39.159(b)(3). If PURA § 35.004 meant what Aspire argues, the Legislature would have instead required the PUCT to determine and procure the Ancillary Services needed to stabilize the grid. It did not, and the Court cannot ignore this clear

---

[42] Aspire mis-cites this section as 35.004(j), Sec. Am. Pet. ¶ 40, which does not exist. Based on the quoted language, Aspire meant to cite § 35.004(h).

[43] Aspire incorrectly states that PURA § 35.004(e) was added in 2021. Sec. Am. Pet ¶ 40. That definition has existed in PURA § 35.004 since its initial passage in 1999, when Texas's electricity market was deregulated. It was simply moved up in 2021. *See* S.B. 7, 76th Leg., R.S. (1999), available here. PURA §§ 35.004(g) and (h) were added in 2021, *see* S.B. 3, 87th Leg., R.S. (2021), but neither of those sections prohibit ERCOT from developing Ancillary Services, they just require the PUCT to monitor Ancillary Services in place, determine if any further services are warranted, and direct ERCOT to improve them when necessary. Regardless, the later statutory additions in 2023 would prevail in the unlikely event the Court agrees with Aspire's interpretation and finds the statutes in conflict.

[44] Added by H.B. 1500, 88th Leg., R.S. (2023), available here.

expression of legislative intent. *See San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 628 (Tex. 2021) ("It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous.") (cleaned up).

Finally, Aspire's argument that ERCOT is powerless to develop Ancillary Services ignores that the Legislature has expressly authorized the PUCT to delegate its rulemaking powers to ERCOT to develop and adopt market rules "relating to the reliability of the regional electrical network." PURA § 39.151(d); *CPS Energy*, 671 S.W.3d at 616. That does not make the market rules ERCOT develops subject to the APA, as the Texas Supreme Court already held in *RWE*. 671 S.W.3d at 489–492. But it does mean that ERCOT can—and, in fact, by Legislative mandate *must*—develop the Ancillary Services needed to reliably operate the grid. PURA §§ 39.151(a)(2), (d); *id.* §§ 39.159(b), (d).

## VI.   ERCOT'S PLEA IN ABATEMENT

In the unlikely event the Court determines both that it has jurisdiction and that Aspire pleaded viable claims, this suit must nonetheless be dismissed or abated because Aspire failed to join all necessary and indispensable parties.

The UDJA requires joinder of "all persons who have or claim any interest that would be affected by the declaration must be made parties." Tex. Civ. Prac. & Rem. Code § 37.006(a). "When a party asserts Section 37.006(a) as a bar to any judgment favoring a party who has failed to join all necessary parties, Rule of Civil Procedure 39's standards govern." *Amboree v. Bonton*, 575 S.W.3d 38, 44 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Under Rule 39, there are two types of parties: (1) those who are necessary for a just adjudication and that should be joined if feasible; and (2) those who are so vital to the disposition of the suit that their absence deprives the court of jurisdiction. *See, e.g., Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 162–63 (Tex. 2004).

**Appx. Page 336 of 740**

This case presents the latter circumstance, where the absence of affected market participants deprives the Court of jurisdiction and warrants dismissal of Aspire's claims. At a minimum, this suit must be abated to allow joinder of the necessary affected market participants.

**A.      The other ERCOT market participants are jurisdictionally indispensable.**

"Rule 39 mandates joinder of persons whose interests would be affected by the judgment . . . [and] determines whether a trial court has authority to proceed without joining a person whose presence in the litigation is made mandatory by the [UDJA]." *Brooks*, 141 S.W.3d at 162. Relevant here, Rule 39 directs that an absent party must be joined to the litigation if it (1) claims an interest relating to the subject of the action, and (2) is so situated that the disposition of the action in its absence may impair or impede its ability to protect that interest. Tex. R. Civ. P. 39(a)(2).

Generally, the failure to join all necessary parties triggers an analysis of "whether the court ought to proceed" or "whether the trial court should have refused to enter a judgment" until the necessary parties are joined. *Brooks*, 141 S.W.3d at 162. However, where a trial court's ruling would "clearly prejudice" the absent parties' rights, or where "a judgment would adversely affect the interests of absent parties who had no opportunity to assert their rights in the trial court," the failure to join those parties may constitute a jurisdictional defect. *See Vondy v. Comm'rs Court of Uvalde Cnty.*, 620 S.W.2d 104, 106-07 (Tex. 1981); *Sage St. Assocs. v. Fed. Ins. Co.*, 43 S.W.3d 100, 103 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

To determine whether a particular party is "jurisdictionally indispensable," courts "must examine the surrounding facts and circumstances of the case to determine if the interests of an absent party will be prejudiced and if an adequate judgment can be rendered for the parties before the court." *Sage St.*, 43 S.W.3d at 104. Courts must make this determination by "liberally construing the [UDJA] in light of its purpose—'to settle and to afford relief from uncertainty and insecurity with respect to

- 34 -

Appx. Page 337 of 740

rights, status, and other legal relations.'" *Longoria v. Exxon Mobil Corp.*, 255 S.W.3d 174, 180 (Tex. App.—San Antonio 2008, no pet.).

Non-parties have been deemed "jurisdictionally indispensable," for example, where a declaratory judgment in their absence would "clearly prejudice" the non-parties' contractual rights or benefits. *See Sage St.*, 43 S.W.3d at 100. In *Sage Street*, the parties sought a declaratory judgment that a contractual assignment between two non-parties was void, thereby also voiding a settlement agreement between the two parties in the lawsuit. *Id.* at 101–03. The parties argued that the non-parties were not indispensable because a finding that the assignment was void was "incidental" to the declaratory judgment, and did not prejudice the non-parties because the judgment "is not binding on them." *Id.* at 104. The appellate court disagreed, finding that although the UDJA "expressly provides that it does not prejudice the rights of a person not a party to the proceeding, it is undeniable that the trial court's ruling would prejudice [the non-parties]." *Id.* Thus, the non-parties were "jurisdictionally indispensable" and required to be joined before a judgement could be rendered declaring the assignment void. *Id.*

Here, Aspire asks this Court to declare not only that the ECRS program is invalid—it also asks the Court to declare that ERCOT's entire Protocol revision process is invalid, thereby calling into question the entire ERCOT market rulebook. The Protocols are thousands of pages, detailing the operation of the electric grid and the wholesale electric market. Those Protocols—developed over decades under the Protocol revision process that Aspire asks the Court to declare illegal—could all be deemed invalid if Aspire is granted the relief it seeks. *See* Sec. Am. Pet. at ¶ 57 (citing Tex. Gov't Code § 2001.035). Texas would be left without a market and with no enforceable means to operate its intrastate grid.

Such sweeping declaratory relief would substantially impact the interests of the hundreds of other market participants that participate in the ERCOT market and those that provide the ECRS

Appx. Page 338 of 740

Ancillary Service that Aspire seeks to prohibit. Market participants undoubtedly rely on established market rules when making important business and financial decisions—for example, when determining whether to build a new power plant, and when entering into bilateral agreements related the purchase and sale of energy and Ancillary Services. Like Aspire, market participants from every segment (e.g., generators, transmission and distribution providers, retail electric providers, and energy traders) commonly enter into such bilateral agreements with other market participants and consumers, and many (if not most or all) of these agreements are put at issue by Aspire's claims. Billions of dollars are at stake for market participants that Aspire failed to join as parties.

Because Aspire's requested declaratory relief would "clearly prejudice" the pecuniary and other interests of the hundreds of other market participants, those market participants must be joined before a judgement could be rendered in this suit—or a temporary injunction considered.

**B.      Joinder of the affected market participants is feasible.**

Joinder of all affected market participants is certainly feasible. ERCOT's Standard Form Market Participant Agreement, which each market participant must execute, contains a forum and venue selection clause making all market participants subject to Texas law and mandatory venue for all claims in Travis County, Texas. *See* Protocols § 22 (ERCOT standard form agreement) at § 11(A). Thus, each affected Market Participant is "subject to service of process," as required by Rule 39. *See* Tex. R. Civ. P. 39(a).

When a party requests that the trial court join additional necessary parties whose interests would be determined in resolving the claims of the parties before the court, and the court determines that the non-parties fall within the purview of Rule 39 and are subject to service of process, the parties must be joined. *See* Tex. R. Civ. P. 39(a); *Kodiak*, 361 S.W.3d at 252; *Longoria*, 255 S.W.3d at 184. A trial court has no discretion to deny the request in a declaratory judgment action if the above are satisfied. *Kodiak*, 361 S.W.3d at 252. The number of necessary parties that must be joined has no

- 36 -

bearing on this. *See, e.g.*, *Pierce v. Blalack*, 535 S.W.3d 35, 39–44 (Tex. App.—Texarkana 2017, no pet.) (affirming dismissal with prejudice where at least 286 necessary parties were identified, trial court ordered plaintiff to join and serve all parties, and plaintiff served only 55 parties); *Dahl v. Hartman*, 14 S.W.3d 434, 435–37 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (affirming trial court's dismissal with prejudice where plaintiff failed to serve and join 333 necessary parties). When necessary parties under Rule 39 are identified, the plaintiff faces two choices: either join and serve the necessary parties, or have its claims dismissed. The identity of all market participants is publicly available on ERCOT's website.[45]

Even if Aspire were to amend its petition again to remove its request to declare the Protocol revision process invalid, its request to declare the "ECRS Rules" invalid would still affect nearly all market participants, especially those participating in the ECRS program. ERCOT publishes Ancillary Service Obligation and Responsibility reports 180 days after each Operating Day that include the identity of the entities providing ECRS.[46] These market participants' interests will be clearly prejudiced by the declaratory relief sought by Aspire.

As explained above, the other ERCOT market participants are clearly necessary and indispensable under Rule 39, and each may be feasibly joined. Accordingly, ERCOT moves the Court to either dismiss Aspire's claims out of hand if the Court finds these market participants are jurisdictionally indispensable; or, alternatively, to abate this lawsuit for 30 days and order Aspire to affect their joinder. If Aspire fails to join the necessary market participants within that timeframe, ERCOT requests that the Court dismiss Aspire's claims.

---

[45] *List of Market Participants in the ERCOT Region* (updated Sept. 26, 2024), available here.
[46] *AS Obligation and Responsibility* (updated Sept. 26, 2024), available here.

Appx. Page 340 of 740

## CONCLUSION

For the reasons set forth herein, the Court should dismiss Aspire's claims against ERCOT. In the first instance, the Court lacks subject matter jurisdiction over Aspire's claims because Aspire's claims do not fall within APA § 2001.0038's limited immunity waiver, and because Aspire failed to exhaust its administrative remedies. Alternatively, the Court should dismiss Aspire's claims against ERCOT pursuant to Rule 91a, as those claims have no basis in law. Alternatively, the Court should dismiss this lawsuit for failure to join the other necessary ERCOT market participants, or abate this lawsuit for 30 days and order Aspire to join these affected market participants. If Aspire fails or refuses to do so, the Court should dismiss Aspire's claims with prejudice. ERCOT requests such other and further relief, at law or in equity, to which it may be entitled.

Respectfully submitted,

**WINSTEAD PC**
600 W. 5th Street
Suite 900
Austin, Texas 78701
(512) 370-2800 telephone
(512) 370-2850 fax

By: _/s/ Elliot Clark_
    Elliot Clark         SBN 24012428
    eclark@winstead.com
    Elin Isenhower       SBN 24104206
    eisenhower@winstead.com

**ATTORNEYS FOR DEFENDANT ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.**

Appx. Page 341 of 740

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of this document has been served on all counsel of record in accordance with the Texas Rules of Civil Procedure on October 1, 2024.

/s/ Elliot Clark
Elliot Clark

Appx. Page 342 of 740

| | | | |
|---|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF | |
| *Plaintiff,* | § | | |
| | § | | |
| **v.** | § | | |
| | § | | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS | |
| TEXAS, ELECTRIC RELIABILITY | § | | |
| COUNCIL OF TEXAS, THOMAS | § | | |
| GLEESON, LORI COBOS, JIMMY | § | | |
| GLOTFELTY, KATHLEEN JACKSON, | § | | |
| AND COURTNEY HJALTMAN, | § | | |
| *Defendants.* | § | 345TH JUDICIAL DISTRICT | |

## APPENDIX TO ERCOT'S AMENDED PLEA TO THE JURISDICTION

**TAB**      **DESCRIPTION**

**A**      *PUCT v. RWE Renewables Ams., LLC*, 691 S.W.3d 484 (Tex. 2024)

**B**      *CPS Energy v. ERCOT*, 671 S.W.3d 605 (Tex. 2023)

**C**      *PUCT v. Luminant Energy Co. LLC*, 691 S.W.3d 448 (Tex. 2024)

**Appx. Page 343 of 740**

# APPENDIX A

691 S.W.3d 484
Supreme Court of Texas.

PUBLIC UTILITY COMMISSION
OF TEXAS, Petitioner,

v.

RWE RENEWABLES AMERICAS, LLC
and TX Hereford Wind, LLC, Respondents

No. 23-0555
|
Argued March 19, 2024
|
OPINION DELIVERED: June 14, 2024

**Synopsis**
**Background:** Market participants filed direct appeal of order of Public Utility Commission (PUC), 2021 WL 3711693, approving protocols adopted by Electric Reliability Council of Texas (ERCOT) revising its protocols effectively setting price of electricity at regulatory maximum during emergency load-shed event, even if standard price-setting formula yielded different price. The Austin Court of Appeals, Jones, J., sitting by assignment, 669 S.W.3d 566, reversed and remanded. Review was granted.

The Supreme Court, Lehrmann, J., held that PUC's approval of ERCOT's revised protocols was not subject to direct review by court of appeals.

Vacated and dismissed.

 **\*485**  On Petition for Review from the Court of Appeals for the Third District of Texas

**Attorneys and Law Firms**

Lisa Hobbs, Kurt Kuhn, Austin, Stephanie C. Sparks, Dallas, for Respondent RWE Renewables Americas, LLC.

Macey Reasoner Stokes, George Harold Fibbe, J. Mark Little, Elisabeth Butler, Houston, Andrea Moore Stover, Patrick Leahy, Austin, for Amicus Curiae Calpine Corporation.

Elliot Clark, Wallace B. Jefferson, Austin, Rachel Anne Ekery, Houston, Nicholas Bacarisse, for Amicus Curiae Electric Reliability Council of Texas.

Michael J. Jewell, for Respondent TX Hereford Wind, LLC.

Ron Beal, Pro Se.

John R. Hulme, Angela V. Colmenero, Priscilla M. Hubenak, Austin, Brent Webster, Houston, S. Grant Dorfman, Bellaire, Lanora C. Pettit, Kyle D. Highful, Shawn Cowles, Atty. Gen. W. Kenneth Paxton Jr., for Petitioner.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Amicus Curiae Aspire Power Ventures, LP.

**Opinion**

Justice Lehrmann delivered the opinion of the Court.

In response to Winter Storm Uri, the Legislature amended the Public Utility Regulatory Act (PURA) to provide that protocols adopted by the Electric Reliability Council of Texas, or ERCOT, do not take effect before they are approved by the Public Utility Commission. ERCOT then adopted, and the PUC approved, a revision to its protocols effectively setting the price of electricity at the regulatory maximum under Energy Emergency Alert Level 3 conditions—the highest level of emergency that can be declared—even if the standard price-setting formula yields a different price. Pursuant to PURA's mechanism for seeking judicial review of the validity of "competition rules adopted by the commission [PUC]," Tex. Util. Code § 39.001(e), two market participants initiated a challenge to the PUC's approval order directly in the Third Court of Appeals. That court held the order was both substantively invalid—because the PUC exceeded its statutory authority by setting the price of electricity—and procedurally invalid—because the PUC failed to comply with the Administrative Procedure Act's rulemaking procedures in issuing the order.

We first consider whether, in light of the amendments to PURA requiring PUC approval of ERCOT protocols, the approval order constitutes a "competition rule[ ] adopted by the commission." *Id.* If it does not, the court of appeals lacked jurisdiction over the proceeding for judicial review of the order. If it does, we must then evaluate whether the court of appeals correctly  **\*486**  determined that the order is both procedurally and substantively invalid.

**Appx. Page 345 of 740**

We hold that the PUC's approval order is not a "competition rule[ ] adopted by the commission" subject to the judicial-review process for PUC rules. PURA envisions a separate process for ERCOT-adopted protocols, and the statutory requirement that the PUC approve those adopted protocols does not transform PUC *approval orders* into PUC *rules* eligible for direct review by a court of appeals. The Third Court of Appeals therefore lacked jurisdiction over this proceeding. Accordingly, we vacate the court of appeals' judgment and dismiss the case for lack of jurisdiction.[1]

## I

### A

PURA Section 39.151 requires the PUC to "certify an independent organization"—here, ERCOT—"to perform the functions prescribed by [that] section." *Id.* § 39.151(c).[2] Four such functions are listed, including "ensur[ing] the reliability and adequacy of the regional electric network" and "ensur[ing] that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region." *Id.* § 39.151(a)(2), (4).[3] PUC regulations likewise demand that the "protocols and other rules" adopted by ERCOT "promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system." 16 Tex. Admin. Code § 25.501(a).

ERCOT "is directly responsible and accountable to the commission," which "has complete authority to oversee and investigate [ERCOT's] finances, budget, and operations as necessary to ensure [ERCOT]'s accountability and to ensure that [ERCOT] adequately performs [its] functions and duties." Tex. Util. Code § 39.151(d). If ERCOT "does not adequately perform [its] functions or duties or does not comply with this section," the PUC may take "appropriate action," including decertification. *Id.*

ERCOT possesses rulemaking authority delegated to it by the PUC, as authorized by PURA. *See id.* § 39.151(d), (g-6); 16 Tex. Admin. Code § 25.362(c). The "Nodal Protocols" developed and implemented by ERCOT "provide the framework for the administration of the Texas electricity market." *Pub. Util. Comm'n v. Constellation Energy Commodities Grp., Inc.*, 351 S.W.3d 588, 594–95 (Tex.

App.—Austin 2011, pet. denied). Even before recent PURA amendments, ERCOT's protocols were "subject to commission oversight and review." *See* Act of May 30, 2005, 79th Leg., R.S., ch. 797, § 9, 2005 Tex. Gen. Laws 2728, 2729–30 (codified at Tex. Util. Code § 39.151(d)) (amended 2021, 2023) **\*487** (current version at Tex. Util. Code § 39.151(g-6)).

ERCOT is uniquely positioned to manage the electricity market by virtue of its technical expertise, and ERCOT utilizes a variety of resources and systems to manage grid conditions. For example, ERCOT typically relies on a computer system that employs a mathematical formula to send price-based signals to energy generators regarding whether additional power is needed. *Luminant*, 691 S.W.3d at ——. The PUC has specifically delegated to ERCOT the task of developing protocols for how that mathematical formula calculates energy pricing in times of energy shortage, or "scarcity pricing." *Id.*; 16 Tex. Admin. Code § 25.509(b).

### B

In February 2021, Winter Storm Uri incapacitated the Texas electric grid and resulted in an Energy Emergency Alert Level 3 "load-shed" event, meaning ERCOT directed operators of the transmission system to reduce electricity consumption by involuntarily disconnecting customers from the grid. During the load-shed event, ERCOT and the PUC took various additional steps to balance supply and demand in the market to avoid total grid collapse. One such step was to supersede the standard price-setting system by administratively setting the wholesale price of electricity at the regulatory ceiling. In the storm's aftermath, ERCOT's Nodal Protocols were amended to codify the practice in case future load-shed events necessitated a similar response. That amendment is the subject of this suit.

### C

As noted, even before Uri, ERCOT's protocols were subject to commission oversight and review. After the storm, the Legislature amended PURA to additionally provide that "[r]ules adopted by an independent organization [i.e., ERCOT] ... may not take effect before receiving commission approval." Act of May 30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 830 (codified at Tex. Util. Code § 39.151(d)) (amended 2023) (current version at Tex.

Appx. Page 346 of 740

Util. Code § 39.151(g-6)).[4] In accordance with that provision, ERCOT's board of directors adopted Nodal Protocol Revision Request (NPRR) 1081, which would amend Nodal Protocol 6.5.7.3.1, and presented it to the PUC for approval. The revision would set the price of electricity at the regulatory ceiling during an emergency load-shed event to reflect scarcity of supply, regardless of whether the standard price-setting formula yields a different price. ERCOT reported to the PUC that the revision would "ensure that Real-Time energy prices reflect the VOLL [Value of Lost Load] when Load is being shed, which is fundamental **\*488** to an energy-only market design in order to provide effective economic signals." The proposal was accompanied by a report from ERCOT's board and an impact-analysis report. The PUC ultimately issued an order approving NPRR 1081.

It is undisputed that load shedding is not driven by market forces but is instead an important regulatory tool designed to protect the grid from long-term damage during an emergency. Load shedding accomplishes this by limiting the amount of demand that may enter the market so as not to exceed available supply. Of course, when that happens, demand *in* the market no longer accurately reflects demand *to enter* the market, and additional supply can only be "accurately" priced by considering the value of replacing that lost load. *See* Hearing of Sen. Comm. Bus. & Com., 87th Leg., R.S. (Feb. 25, 2021), 79–80 (discussing incentives for production at the cap). As supply decreases, the value of lost load increases until it is effectively at the regulatory cap. *Luminant*, 691 S.W.3d at ——.

### D

On July 30, 2021, respondents RWE Renewables Americas, LLC and TX Hereford Wind, LLC (collectively, RWE) sought judicial review of the PUC's order by the Third Court of Appeals. RWE asserted that the court of appeals had jurisdiction under PURA Section 39.001(e) and alleged that the PUC both exceeded its statutory authority under PURA and failed to comply with the Administrative Procedure Act in issuing the order. The PUC responded that the order was not a PUC rule subject to direct review by the court of appeals or the APA's rulemaking requirements, and that the PUC properly issued the order in furtherance of its statutory authority to oversee ERCOT and ensure the reliability of the Texas electric grid.

The court of appeals held that the PUC's order constituted a "competition rule adopted by the commission" under Section 39.001(e), giving the court jurisdiction over the proceedings. 669 S.W.3d 566, 575 (Tex. App.—Austin 2023). The court of appeals then held that the PUC's order was invalid because (1) the PUC lacked the authority to approve NPRR 1081 under PURA and (2) the PUC had failed to substantially comply with the APA's rulemaking procedures. *Id.* at 576–77.[5] We granted the PUC's petition for review.

### II

We necessarily begin by considering jurisdiction. The PUC challenges the court of appeals' subject matter jurisdiction over what is essentially a direct appeal of the PUC's order.

### A

PURA specifically provides for judicial review of "competition rules adopted by the commission." Tex. Util. Code § 39.001(e) ("Judicial review of competition rules adopted by the commission shall be conducted under [the APA], except as otherwise provided by this chapter."). Unlike most suits for judicial review of an agency rule, review of a PUC competition rule begins in the court of appeals. *Id.*; *see also id.* § 39.001(f) ("A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals ....").[6]

**\*489** The PUC argues that its order approving NPRR 1081 is not a rule at all, much less a "competition rule," and that PURA thus does not authorize direct review of the order by the court of appeals. The APA defines "rule" as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency." Tex. Gov't Code § 2001.003(6)(A)(i)–(ii). The definition "includes the amendment or repeal of a prior rule" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *Id.* § 2001.003(6)(B)–(C).

### B

**Appx. Page 347 of 740**

PURA empowers the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants." Tex. Util. Code § 39.151(d). However, as noted, it also allows the PUC to "delegate these responsibilities to an independent organization," which the PUC has done by delegating rulemaking authority to ERCOT. *Id.*; *CPS Energy*, 671 S.W.3d at 616; *see* 16 Tex. Admin. Code § 25.362(c) (requiring ERCOT to "adopt and comply with procedures [subject to certain parameters] concerning the adoption and revision of ERCOT rules"). ERCOT has utilized this delegated rulemaking authority to establish operational rules known as the Nodal Protocols. Under those protocols, generators make offers in advance on how much electricity they are willing to sell and at what price. ERCOT, Nodal Protocols § 4.4.9 (May 1, 2024).[7] ERCOT uses those prices to match demand to the lowest-price provider. *Id.* § 4.5. ERCOT serves as "the central counterparty for all transactions" that it settles and "is deemed to be the sole buyer to each seller" (typically, an energy generator) "and the sole seller to each buyer" (typically, a retail user) "of all energy." *Id.* § 1.2(4). Operating as a sort of clearinghouse, it is ERCOT that generates settlement statements providing the terms under which market participants must make payments for energy transactions. *Id.* §§ 9.2.4(1), 9.5.4(1), 9.5.5.

In accordance with the PUC's direction, ERCOT has implemented detailed procedures for adopting and revising its protocols. "A request to make additions, edits, deletions, revisions, or clarifications to these Protocols ... is called a Nodal Protocol Revision Request (NPRR)." *Id.* § 21.1(1) (June 1, 2023). A variety of entities may use the NPRR process, including market participants, the PUC, the independent market monitor, and ERCOT itself. *Id.* § 21.2(1)(a), (c), (f), (g). NPRRs are posted on ERCOT's website and reviewed by ERCOT's Protocol Revision Subcommittee. *Id.* §§ 21.4.1(4), 21.3(1). Market participants and other entities may comment on an NPRR. *Id.* § 21.4.4(1). In fact, RWE participated in this process with respect to NPRR 1081 by submitting comments in opposition to it.[8]

**\*490** After considering the NPRR, the revision subcommittee may take one of several actions, including recommending approval of the revision or rejecting it. *Id.* § 21.4.4(3). ERCOT then posts a report describing the subcommittee's action. *Id.* § 21.4.4(5). Again, market participants and others may comment on the subcommittee report. *Id.* § 21.4.5(1). If the subcommittee recommends

approval, ERCOT prepares an impact analysis, *id.* § 21.4.6(1), which is reviewed by the subcommittee, *id.* § 21.4.7(1). The NPRR then moves to the Technical Advisory Committee, which considers the subcommittee report and the impact analysis. *Id.* § 21.4.8(1). If the advisory committee recommends approval of an NPRR, the committee forwards its report to the ERCOT board of directors, *id.* § 21.4.8(5), and the report is also posted online, *id.* § 21.4.8(4). ERCOT's board then has the opportunity to approve the NPRR or take other action.

Before PURA was amended to require PUC approval for protocol revisions to become effective, ERCOT would implement them on the first day of the month following approval by ERCOT's board. *Id.* § 21.6(1) (Jan. 1, 2021). Now that protocols "may not take effect before receiving commission approval," Tex. Util. Code § 39.151(g-6), they are implemented on the first day of the month following receipt of that approval, ERCOT, Nodal Protocols §§ 21.4.11(1), 21.6(1) (June 1, 2023).

A market participant, among others, may appeal a decision of the ERCOT board regarding an NPRR to the PUC. *Id.* § 21.4.12.3(1). The PUC's rules outline the procedure for review of ERCOT protocols. 16 Tex. Admin. Code §§ 22.251, 25.362(c)(5). Those rules generally require that a complainant exhaust the process outlined in Section 21 of the protocols before challenging the protocol with the PUC. *Id.* § 22.251(c). Exceptions exist when, for example, "the complainant seeks emergency relief necessary to resolve health or safety issues." *Id.* § 22.251(c)(1)(C). Generally, the complaint must be filed within thirty-five days of "the ERCOT conduct complained of." *Id.* § 22.251(d); ERCOT, Nodal Protocols § 21.4.12.3(1) (June 1, 2023). In response to the complaint, the PUC may, among other things, provide ERCOT with "guidance on the development and implementation of protocol revisions" and order ERCOT "to promptly develop protocol[ ] revisions for commission approval." 16 Tex. Admin. Code § 22.251(o)(3), (4). If the complainant is dissatisfied with the result of the PUC proceedings, it can then seek judicial review. Tex. Util. Code § 15.001.

This painstaking procedure serves to leverage the expertise of ERCOT members and industry stakeholders while maintaining transparency and affording interested parties plentiful opportunities to weigh in. Moreover, we recognize that ERCOT and the PUC are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and

essential purpose. As we recognized in *CPS Energy*, "ERCOT do[es] not fall neatly into any camp. It is a unique entity serving a role that is not clearly analogous to a public entity like a police department or a public school. Yet, it provides an essential governmental service." 671 S.W.3d at 623 (alteration in original) (citation and internal quotation marks omitted). While the PUC has broad administrative responsibilities, it simultaneously lacks "the expertise and staff resources" to make informed regulatory decisions independent of ERCOT. Sunset Advisory Comm., Staff Report with Commission Decisions: Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel 37 (Jan. **\*491** 2023).[9]

## C

A substantially similar version of the above-described process for adopting and revising ERCOT protocols has long been in effect. *See* ERCOT, Nodal Protocols § 21 (Mar. 1, 2005) (rev. Feb. 2010, Apr. 2011, May 2011, Oct. 2011, May 2012, Aug. 2012, Apr. 2013, Dec. 2013, May 2014, July 2016, Nov. 2016, Nov. 2017, Jan. 2021, Apr. 2023, June 2023). The legislative and regulatory schemes have in turn envisioned separate, complementary purposes of and procedures for PUC rules and ERCOT protocols, notwithstanding the fact that ERCOT and its protocols have consistently been subject to PUC oversight and review. Tex. Util. Code § 39.151(d). RWE nevertheless suggests that, by amending PURA to require formal PUC approval of ERCOT-adopted protocols at the tail end of the process, the Legislature intended to overhaul that process entirely and effectively convert ERCOT protocols into PUC rules subject to the same review procedures. We do not discern such a sweeping intent from the language the Legislature chose.

For one thing, PURA makes clear that ERCOT, not the PUC, is the entity "adopting" new or revised ERCOT protocols. *See id.* § 39.151(g-6). The PUC then "approves" the protocols. *See id.* This distinction is deceptively significant because the APA's requirements, which RWE insists must be satisfied, are exclusively and repeatedly directed at rules "adopted" by a "state agency." *See, e.g.*, Tex. Gov't Code § 2001.033(a) ("A state agency order finally adopting a rule must include: ....."). Indeed, the Legislature deliberately uses the term "adopt" throughout the APA—no reference is made to an agency's "approval" of a rule. *See, e.g., id.* § 2001.004(1) (requiring a state agency to "adopt rules of practice stating the nature and requirements of all available formal and informal

procedures").[10] By contrast, the APA uses the term "approve" to describe the *governor's* action on legislation that allows it to become the law. *Id.* § 2001.006(a)(2).

PURA reinforces this distinction. For example, in a suit for judicial review of a competition rule under Section 39.001, the rulemaking record includes "the order *adopting* the rule." Tex. Util. Code § 39.001(e)(4) (emphasis added). The PUC issues no such order with respect to ERCOT protocols. We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that "adopts" ERCOT protocols given the comprehensive statutory use of that term.

RWE and the court of appeals highlight that, under PURA as amended, an ERCOT protocol does not take effect until it receives PUC approval. 669 S.W.3d at 574; Tex. Util. Code § 39.151(g-6). True, but even in requiring PUC approval, the Legislature distinguished between ERCOT's role in adopting a protocol and the PUC's role in approving it. Tex. Util. Code § 39.151(g-6) ("*Protocols adopted by [* **\*492** *ERCOT] ...* may not take effect before receiving commission approval." (emphasis added)). Again, the Legislature deliberately employed these terms to communicate two distinct administrative actions that have distinct legal consequences. *See Galveston Indep. Sch. Dist. v. Jaco*, 331 S.W.3d 182, 185–86 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (highlighting the Legislature's distinct use of "adopt" and "approve" in statutes describing the duties of the commissioner of education); Tex. Educ. Code § 7.055(b)(41) ("The commissioner shall *adopt* rules relating to extracurricular activities under Section 33.081 and *approve or disapprove* University Interscholastic League rules and procedures under Section 33.083." (emphases added)).

Finally, we cannot ignore that when the Legislature amended PURA in 2021 to require PUC approval of the independent organization's (ERCOT's) protocols, it simultaneously added the requirement that the organization "establish and implement a formal process for adopting new protocols or revisions to existing protocols." Act of May 30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 832 (amended 2023) (codified at Tex. Util. Code § 39.151(g-6)). As discussed above, ERCOT already had such a process in place; nevertheless, the requirement signals legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors.

In sum, consistent with the well-established regulatory scheme and the legislation governing it, we hold that

**Appx. Page 349 of 740**

the PUC's order approving NPRR 1081 was a ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect. Consequently, the PUC's order was not an agency-adopted "rule" under the Administrative Procedure Act. In turn, because the court of appeals' jurisdiction under Utilities Code Section 39.001(e) is limited to review of "competition rules adopted by the commission," the court lacked jurisdiction over RWE's challenge to the PUC's approval order.[11]

### III

Having concluded that the court of appeals lacked jurisdiction over RWE's appeal of the PUC's approval order, we need not address RWE's remaining arguments. We note, however, that this Court contemporaneously holds in *Luminant* that the PUC did not exceed its authority under PURA in issuing temporary emergency orders that, like NPRR 1081, set the price of electricity at the regulatory ceiling during a period of emergency load-shed. 691 S.W.3d at ——.

* * * *

Because the PUC's order was not a "competition rule adopted by the commission" under PURA, Section 39.151 did not confer direct-review jurisdiction on the court of appeals. We therefore vacate the court of appeals' judgment and dismiss the suit for lack of jurisdiction.

### All Citations

691 S.W.3d 484, 67 Tex. Sup. Ct. J. 1096

### Footnotes

1    In our contemporaneously issued opinion in *Public Utility Commission v. Luminant Energy Co.*, we hold that the PUC did not exceed its authority in issuing two emergency orders during Winter Storm Uri that operated to a similar end by temporarily setting the price of electricity at the regulatory ceiling. 691 S.W.3d 448, —— (Tex. June 14, 2024) (No. 22-0231).

2    A more detailed explanation of the Texas electricity market appears in this Court's opinion in *Luminant. See id.* at ——. We also recently engaged in a thorough discussion of ERCOT's history, and its role in the Texas electricity market, in *CPS Energy v. ERCOT*, 671 S.W.3d 605, 611–12 (Tex. 2023).

3    The others are "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms" and "ensur[ing] that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information." Tex. Util. Code § 39.151(a)(1), (3).

4    As further amended in 2023, Section 39.151(g-6) currently provides:

   In this subsection, a reference to a protocol includes a rule. Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval. To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or revisions to existing protocols. The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols. The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

   Act of May 26, 2023, 88th Leg., R.S., ch. 464, § 4, 2023 Tex. Sess. Law Serv. (West) 1133 (codified at Tex. Util. Code § 39.151(g-6)).

5    In support of its first holding, the court relied on its own decision in *Luminant*, which we also review today. 669 S.W.3d at 576.

**Appx. Page 350 of 740**

6    When RWE instituted this proceeding, Section 39.001(e) provided for review in the Third Court of Appeals. In 2023, the Legislature amended Section 39.001(e) to provide for review by the Fifteenth Court of Appeals going forward. Act of May 22, 2023, 88th Leg., R.S., ch. 459, § 1.13, 2023 Tex. Sess. Law Serv. (West) 1119.

7    We cite the current version of the protocols unless substantive differences require citing the version in effect when the relevant events occurred. ERCOT's current protocols and a library of past versions of the protocols, with summaries of revisions, are available on ERCOT's website. Protocols - Nodal, https://www.ercot.com/mktrules/nprotocols.

8    RWE, Comment Letter on Nodal Protocol Request 1081 (June 23, 2021), https://www.ercot.com/mktrules/issues/NPRR1081#keydocs.

9    Available at https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf).

10    *See also* Tex. Gov't Code § 2001.006 (describing when a rule "adopted" under Section 2001.006(b) may take effect); *id.* § 2001.021(a) ("An interested person by petition to a state agency may request the adoption of a rule."); *id.* § 2001.023(a) ("A state agency shall give at least 30 days' notice of its intention to adopt a rule before it adopts the rule."); *id.* § 2001.030 ("On adoption of a rule, a state agency, if requested to do so by an interested person either before adoption or not later than the 30th day after the date of adoption, shall issue a concise statement of the principal reasons for and against its adoption.").

11    As noted, PUC regulations provide a process for review of ERCOT protocols, 16 Tex. Admin. Code §§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review in district court, Tex. Util. Code § 15.001. RWE did not engage in that process, choosing instead to utilize the inapplicable procedure for reviewing PUC competition rules.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

**Appx. Page 351 of 740**

# APPENDIX B

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Hensley v. State Commission on Judicial Conduct, Tex., June 28, 2024

671 S.W.3d 605
Supreme Court of Texas.

CPS ENERGY, Petitioner,

v.

ELECTRIC RELIABILITY
COUNCIL OF TEXAS, Respondent
Electric Reliability Council
of Texas, Inc., Petitioner,

v.

Panda Power Generation Infrastructure Fund, LLC d/b/a Panda Power Funds; Panda Sherman Power Holdings, LLC; Panda Sherman Power Intermediate Holdings I, LLC; Panda Sherman Power Intermediate Holdings II, LLC; Panda Sherman Power, LLC; Panda Temple Power Holdings, LLC; Panda Temple Power Intermediate Holdings I, LLC; Panda Temple Power Intermediate Holdings II, LLC; Panda Temple Power, LLC; Panda Temple Power II Holdings, LLC; Panda Temple Power II Intermediate Holdings I, LLC; Panda Temple Power II Intermediate Holdings II, LLC; and Panda Temple Power II, LLC, Respondents

No. 22-0056, No. 22-0196
|
Argued January 9, 2023
|
OPINION DELIVERED: June 23, 2023

**Synopsis**

**Background:** Municipally owned electric utility brought action against Electric Reliability Council of Texas (ERCOT) and ERCOT's former chief executive officer, alleging breach of contract, negligence, gross negligence, negligence per se, breach of fiduciary duty, and violations of Texas Constitution. The 285th District Court, Bexar County, Solomon Casseb, III, J., denied ERCOT's plea to the jurisdiction. ERCOT

and former chief executive officer appealed, and the San Antonio Court of Appeals, 648 S.W.3d 520, reversed. Utility petitioned for review, which was granted. In second proceeding, power company brought action against ERCOT for fraud, negligent misrepresentation, and breach of fiduciary duty, alleging that ERCOT's electricity capacity, demand, and reserves reports misled power company to invest $2.2 billion in building new power plants. ERCOT filed plea to the jurisdiction. The 15th District Court, Grayson County, James P. Fallon, J., denied plea. ERCOT filed interlocutory appeal and alternatively filed petition for writ of mandamus. The Dallas Court of Appeals, 552 S.W.3d 297, consolidated cases, dismissed interlocutory appeal for want of jurisdiction, and granted mandamus petition. Power company filed petition for writ of mandamus in the Supreme Court, and ERCOT filed conditional petition for review, both challenging the Court of Appeals' decision. The Supreme Court, 619 S.W.3d 628, dismissed petitions as moot. On remand, the District Court granted ERCOT's plea to the jurisdiction based on sovereign immunity. Power company appealed, and the Court of Appeals, 641 S.W.3d 893, reversed and remanded. ERCOT filed petition for review, which was granted.

**Holdings:** The Supreme Court, Hecht, C.J., held that:

ERCOT was an "organ of government" within the meaning of the definition of "governmental unit" under the Texas Tort Claims Act;

ERCOT derived its status and authority from statute, as required to fall within the definition of "governmental unit" under the Texas Tort Claims Act;

Utilities Code provision constituted a pervasive regulatory scheme which imparted to the Public Utilities Commission (PUC) exclusive jurisdiction over ERCOT;

company's contention that ERCOT failed to properly perform Public Utility Regulatory Act (PURA) requirement that it publish capacity, demand, and reserves reports (CDRs) by issuing fraudulent CDRs fell within the PUC's exclusive jurisdiction;

allegations ERCOT failed to properly implement protocols to ensure the integrity of its system during winter storm and failed to take reasonable precautions to meet its load projections or corrective action when projections showed

insufficient capacity came with PUC's exclusive jurisdiction; and

ERCOT has sovereign immunity as an arm of the State.

Affirmed; reversed and rendered.

Boyd, J., and Devine, J., filed a dissenting opinion in part in which Lehrmann, J., and Busby, J., joined.

**\*610** On Petition for Review from the Court of Appeals for the Fourth District of Texas

On Petition for Review from the Court of Appeals for the Fifth District of Texas

**Attorneys and Law Firms**

Elliot Clark, Wallace B. Jefferson, D. Blake Wilson, Austin, Rachel Anne Ekery, Houston, Nicholas B. Bacarisse, Ron H. Moss, Austin, for Respondents Electric Reliability Council of Texas, Inc., Magness, William L. "Bill" in 22-0056.

Brent Webster, Houston, John R. Hulme, Austin, Judd E. Stone II, Kyle Highful, Atty. Gen. W. Kenneth Paxton Jr., Bill Davis, Austin, for Amicus Curiae Public Utility Commission of Texas in 22-0056.

James Sullivan, for Amicus Curiae Abbott, Greg in 22-0056.

Jennifer Nicole Pulliam, Christopher D. Anderson, Bryan, for Amicus Curiae Rayburn Country Electrical Cooperative, Inc. in 22-0056.

Glenn Arlen Ballard Jr., Adam C. Kiehne, Houston, Harriet O'Neill, Austin, Lauren Valkenaar, Greta McFarling, Blake Stribling, Mukul S. Kelkar, Houston, Adrianna Jimenez, Barry A. Chasnoff, for Petitioner in 22-0056.

Patrick Leahy, Juliana Sersen, Austin, Macey Reasoner Stokes, George Harold Fibbe, Houston, Andrea Moore Stover, Austin, J. Mark Little, Houston, for Amicus Curiae Calpine Corporation in 22-0056.

John Hubbard, Katherine Coleman, Michael A. McMillin, Phillip Glynn Oldham, Austin, for Amicus Curiae Texas Industrial Energy Consumers in 22-0196.

Leslie Conant Thorne, Andrew W. Guthrie, Werner A. Powers, Dallas, Roger D. Sanders, Sherman, Ben L. Mesches, Christopher Knight, for Respondent in 22-0196.

Hobart Hind, George McMullin Jr., Dallas, for Amicus Curiae National Association of Subrogation Professionals in 22-0196.

Kyle Highful, Bill Davis, Austin, Brent Webster, Houston, Judd E. Stone II, Warren Kenneth Paxton, Austin, for Amicus Curiae Public Utility Commission of Texas in 22-0196.

James Sullivan, for Amicus Curiae Abbott, Greg in 22-0196.

Nicholas B. Bacarisse, Wallace B. Jefferson, Austin, Chad Vann Seely, Erika M. Kane, J. Hampton Skelton, Austin, Rachel Anne Ekery, Houston, Brandon Duane Gleason, Austin, Nathan Myrick Bigbee, for Petitioner The Electric Reliability Council of Texas, Inc. (ERCOT) in 22-0196.

**Opinion**

Chief Justice Hecht delivered the opinion of the Court, in which Justice Blacklock, Justice Bland, Justice Huddle, and Justice Young joined, and in which Justice Lehrmann, Justice Boyd, Justice Devine, and Justice Busby joined except as to Part IV.

These two cases present three questions concerning the Electric Reliability Council **\*611** of Texas, Inc.: (1) Is ERCOT a governmental unit as defined in the Texas Tort Claims Act and thereby entitled to pursue an interlocutory appeal from the denial of a plea to the jurisdiction? (2) Does the Public Utility Commission of Texas have exclusive jurisdiction over the parties' claims against ERCOT? And (3) is ERCOT entitled to sovereign immunity? The answer to all three questions is yes. In No. 22-0056,[1] we affirm the court of appeals' judgment[2] dismissing the claims against ERCOT. In No. 22-0196,[3] we reverse the court of appeals' judgment[4] and render judgment dismissing the claims against ERCOT.

**I**

"In its electrical grid, as in so many things, Texas stands alone."[5] Most of the state comprises the U.S. mainland's only *intra*state electrical grid,[6] which covers 75 percent of the state's acreage, carries about 90 percent of its electrical load, and includes more than 52,700 miles of transmission lines, 1,100 generation units, and 26 million electricity customers.[7] The Public Utility Regulatory Act (PURA) requires the Public Utility Commission (PUC) to certify an independent

Appx. Page 354 of 740

system operator (ISO) for the Texas power region.[8] The PUC certified ERCOT, a membership-based 501(c)(4) nonprofit corporation.[9]

ERCOT was formed in 1970 by various Texas electric utilities that had interconnected their grids for greater reliability and increased capacity.[10] Membership was "available to any electric utility [that] own[ed], control[led] or operate[d] an electric power system in Texas".[11] In those days, each member utility operated its own control area, and ERCOT served an administrative role that "promote[d] reliable operations of power systems in Texas by providing a means to communicate and coordinate the planning and operation of *612 its members."[12]

In 1999, the Legislature restructured the electric utility industry in Texas.[13] It amended PURA to require the "[u]nbundling" of vertically integrated electric utility monopolies and established a fully competitive electric power industry.[14] The new structure required an ISO to operate the wholesale electric market and "ensure the reliability and adequacy" of the Texas power grid.[15] Since 2001, ERCOT has served as that "[e]ssential [o]rganization[ ]".[16]

The two cases before us stem from different facts and different parties, but they raise overlapping jurisdictional questions.

A

CPS Energy, a municipally owned utility that serves the San Antonio area, is a market participant in the ERCOT wholesale market. CPS buys and sells power through ERCOT, so ERCOT both collects money from CPS and pays money to CPS. The parties settle the amounts owed by each side and pay each other accordingly in what they call "settlement" payments. At issue here are payments from ERCOT to CPS. CPS' participation in the market is governed by the terms of a Standard Form Market Participant Agreement, PURA, and the ERCOT Protocols, which are rules promulgated by ERCOT to manage the market and the grid.

In February 2021, Texans endured the catastrophic Winter Storm Uri. On February 15, just as the storm hit, ERCOT declared its highest state of emergency, Emergency Energy Alert Level 3, and directed transmission operators to curtail firm load. The PUC then directed ERCOT to set the per-

megawatt-hour price of electricity at the highest permissible rate of $9,000 to reflect scarcity of supply. ERCOT recalled its firm load shed instructions on February 17 but kept prices at the cap rate for an additional 32 hours through the morning of February 19. CPS alleges that ERCOT should have ended its pricing intervention when it recalled its firm load shed instructions and that its failure to do so resulted in $16 billion in overcharges to market participants.

Some market participants defaulted after the storm. Pursuant to its Protocols, ERCOT then implemented its "short-pay" procedure and its "Default Uplift process".[17] These processes spread the impact of the default, allocating the loss among market participants—including CPS—by reducing the amounts they are owed by ERCOT.[18] CPS alleges that it was short-paid at least $18 million through the short-pay process. It also alleges that ERCOT intended to apply two downward adjustments to the credit in CPS' account by over $1 million each through the default-uplift process.[19]

 *613 CPS sued ERCOT and several of its officers for breach of contract, negligence, breach of fiduciary duty, and violations of the Texas Constitution.[20] ERCOT filed a plea to the jurisdiction, arguing that CPS' claims are barred by sovereign immunity and, alternatively, that the PUC has exclusive jurisdiction over the claim. The trial court denied the plea.[21]

ERCOT appealed, asserting that it is a governmental unit entitled to an interlocutory appeal from the denial of a plea to the jurisdiction.[22] ERCOT also sought review by petition for writ of mandamus in the event it is not entitled to an interlocutory appeal. After one court of appeals panel summarily denied mandamus relief,[23] ERCOT filed its petition for writ of mandamus in this Court[24] to continue the alternative path to review. A different court of appeals panel then held that ERCOT is a governmental unit entitled to take an interlocutory appeal, that the PUC has exclusive jurisdiction over CPS' claims, and that CPS' claims should be dismissed.[25] We granted review and set the case for oral argument on the same day as the case brought by the Panda Power Companies.[26]

B

**Appx. Page 355 of 740**

As part of ERCOT's functions, the PUC requires ERCOT to annually publish resource adequacy reports that project, for at least the next five years, the capability of existing electric generation resources to meet projected demand in the Texas power region.[27] ERCOT does so by publishing "Capacity, Demand, and Reserves" reports (CDRs). ERCOT's 2011 and 2012 CDRs projected a likelihood of severe energy shortfalls. Panda, a group of private-equity investors, alleges that it relied on these reports when it decided to invest billions of dollars to build three new power plants. After construction on the new plants began, ERCOT revised its CDRs and forecast a future oversupply of generation capacity. Panda sued ERCOT for fraud, negligent misrepresentation, and breach of fiduciary duty. Panda alleges that ERCOT's misleading reports caused it substantial financial harm and seeks damages in excess of $2 billion.

The procedural history of this case is long and complex, and we recite only what is relevant to the disposition of this appeal. ERCOT filed two pleas to the jurisdiction arguing that the PUC has exclusive jurisdiction over Panda's claims and that ERCOT has sovereign immunity. The trial court denied both. ERCOT appealed, arguing that it is a "governmental unit" under the Texas Tort Claims Act entitled to an interlocutory appeal from the denial of its **\*614** plea to the jurisdiction.[28] ERCOT alternatively sought review by mandamus. The court of appeals consolidated the appeal and mandamus petition and held that ERCOT is not a governmental unit entitled to an interlocutory appeal but that ERCOT has sovereign immunity.[29] Accordingly, the court of appeals dismissed ERCOT's interlocutory appeal for lack of jurisdiction, conditionally granted its petition for writ of mandamus, and directed the trial court to dismiss the case for lack of jurisdiction.[30] The trial court immediately complied, and Panda appealed. The court of appeals, then sitting en banc, changed course. Relying on three immunity cases decided by this Court in the interim, and with one justice dissenting, the court held that ERCOT is not entitled to sovereign immunity and that the PUC does not have exclusive jurisdiction over Panda's claims.[31] We granted ERCOT's petition for review.

## II

The first issue arises from CPS' petition: whether ERCOT is a governmental unit under the Texas Tort Claims Act and thus entitled to take an interlocutory appeal from the denial

of a plea to the jurisdiction.[32] "Although private institutions are not commonly understood to be a part 'of government,' we have held that a private institution can be a governmental unit", as is the case here.[33]

"[T]he general rule, with a few mostly statutory exceptions, is that an appeal may be taken only from a final judgment."[34] However, certain statutes authorize interlocutory appeals over particular kinds of trial court orders.[35] Section 51.014(a)(8) of the Civil Practice and Remedies Code authorizes an interlocutory appeal from a trial-court order that "grants or denies a plea to the jurisdiction by a governmental unit as that term is defined" in the Tort Claims Act.[36] In turn, the Tort Claims Act defines "[g]overnmental unit" to include not only the state and its agencies and political subdivisions, but also "any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution."[37] Thus, a private, non-governmental entity can qualify as a governmental unit under this definition, but only if (1) it is an institution, agency, or organ of government; and (2) it derives its status and authority as such from the Texas Constitution or statutes.[38]

### \*615 A

In *LTTS Charter School, Inc. v. C2 Construction, Inc.*, we held that an open-enrollment charter school qualified as a governmental unit because it was "indisputably part of the Texas public-education system" and derived that status and authority from state statutes.[39] Our holding centered on various statutory pronouncements. We concluded that open-enrollment charter schools derive their status from the Education Code, which provides that they are "part of" the state's public-school system.[40] Their authority is also derived from the Education Code, which assigns them responsibilities for implementing the public-education system, provides them with substantial public funding and resources, grants them the same powers and privileges of traditional public schools, and subjects them to the same rules that govern public schools.[41] Finally, the Education Code designates open-enrollment charter schools as "governmental entit[ies]", "political subdivision[s]", and "local government[s]" for various purposes.[42]

**Appx. Page 356 of 740**

In *University of the Incarnate Word v. Redus* (*Redus I*), we concluded that a private university that operates a state-authorized police department qualifies as a governmental unit when defending suits relating to the department's actions.[43] We acknowledged that, unlike the charter schools at issue in *LTTS*, private universities do not receive public funding and are not statutorily labeled as governmental entities for any particular purpose.[44] Nevertheless, we observed that state statutes grant private universities the "status and authority" to operate a police department using commissioned peace officers and subject them to state law-enforcement rules and requirements, just like a municipal police department.[45] And although no statute expressly designates a private university or its police department as "part of" the state's law-enforcement system, we concluded that the university was an "organ of government" for purposes of its police department because it "operates as part of a larger governmental system" and performs the "uniquely governmental" function of law enforcement.[46]

**B**

CPS maintains that unlike in *LTTS* and *Redus I*, there are no strong legislative indicators of governmental-unit status in relation to ERCOT and that in concluding otherwise, the court of appeals applied an impermissibly broad view of "organ of government". It argues further that ERCOT does not perform a "uniquely governmental function" and that ERCOT's actions during the winter storm event were merely operational. For its part, ERCOT contends that it is an organ of government because it is an essential part of a larger governmental system, namely the PUC's regulation of electric utilities, as evidenced by its delegated rulemaking authority and various provisions of PURA.

**1**

As we recognized in *Redus I*, an "organ of government" is an entity that "operates as part of a larger governmental **\*616** system" and performs a "uniquely governmental" function.[47] Here, ERCOT operates as part of the state's broader electricity-regulation system under PURA and performs the uniquely governmental function of utilities regulation.

PURA was enacted "to establish a comprehensive and adequate regulatory system for public utilities", including electric utilities and telecommunications utilities.[48] Under PURA, the PUC—a governmental entity—was given the "general power" to regulate and supervise public utilities.[49] Within this larger governmental system of utilities regulation is the express requirement of an independent system operator for the Texas power region.[50] This ISO is tasked with ensuring that (1) all electricity buyers and sellers have nondiscriminatory access to the region's transmission and distribution system, (2) the region's electrical network is reliable and adequate, (3) information regarding a customer's choice of retail electric provider is timely available to those who need it, and (4) electricity production and delivery are accurately accounted for.[51]

ERCOT performs these functions under the direct oversight of the PUC and must do so in compliance with the requirements set forth in PURA.[52] In *LTTS*, we observed that the open-enrollment charter school was required to meet "financial, governing, and operational standards" under the Education Code and that the Commissioner of Education was empowered to audit the school and revoke its charter for failure to comply with the Code.[53] ERCOT is subject to similar requirements and more under PURA and by the PUC.

The PUC certifies the ISO, and, as the ISO, ERCOT is "directly responsible and accountable" to the PUC.[54] The PUC has extensive authority over ERCOT, including "complete authority" over ERCOT's "finances, budget, and operations"—including the ability to audit its financials—to ensure that ERCOT adequately performs its functions and duties.[55] The PUC has authority over ERCOT's bylaws and protocols, and the chairman of the PUC sits on ERCOT's board.[56] The PUC can penalize and even decertify ERCOT if it fails to adequately perform its functions and duties or if it fails to comply with PURA.[57]

Additionally, the regulation of utilities is "uniquely governmental".[58] As the certified ISO, ERCOT exercises delegated authority from the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network".[59] It is also tasked with "enforc[ing] operating standards" and establishing and overseeing payment procedures for transactions by market participants within the electrical **\*617** network.[60] Market participants are statutorily required to abide by all rules and procedures established by the ISO, and their failure to do so could result in a penalty.[61]

**Appx. Page 357 of 740**

Because ERCOT performs a "uniquely governmental" function as part of a "larger governmental system", it is an organ of government.[62]

**2**

ERCOT also derives its "status and authority" from statute.[63] Its status derives from statute because PURA requires the PUC to "establish one or more independent organizations"—that is, an organization that is "sufficiently independent" of any electricity producer or seller—to serve as the region's ISO.[64] An independent organization can serve as the region's ISO only if the PUC certifies it for that purpose.[65] Its authority also comes from statute because PURA grants a certified ISO authority to supervise the Texas power region's transmission facilities and to coordinate its market transactions, transmissions planning, and network reliability.[66] Thus, although ERCOT is a private, nonprofit corporation, its "status" as the ISO for the Texas power region and its "authority" to act in that capacity derive directly from PURA.

Because ERCOT is an "organ of government the status and authority of which are derived from" statute, it is a "governmental unit" entitled to take an interlocutory appeal from the denial of a plea to the jurisdiction.[67]

**III**

The next issue, presented in both cases, is whether the PUC has exclusive jurisdiction over issues underlying the parties' claims against ERCOT. We conclude that it does.

Courts are presumed to have jurisdiction to resolve legal disputes.[68] "To overcome that presumption, the Constitution or another law must grant exclusive jurisdiction to another court or an administrative agency."[69] A statute may grant an agency exclusive jurisdiction either expressly or by establishing a "pervasive regulatory scheme" that impliedly "indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed."[70] Thus, to establish exclusive jurisdiction over a particular issue, there must be (1) an express or implied grant of exclusive jurisdiction and (2)

the issue must "fall[ ] within that jurisdictional scope."[71] If the agency's exclusive jurisdiction is established, the **\*618** claimant must pursue and exhaust all available administrative remedies before turning to the courts.[72] "Until then, the trial court lacks subject-matter jurisdiction" and must dismiss the claims with issues that come within the agency's exclusive jurisdiction.[73]

**A**

ERCOT does not claim that the PUC has been expressly granted exclusive jurisdiction over the issues underlying CPS' and Panda's claims; rather, it argues that Section 39.151 of the Utilities Code constitutes a pervasive regulatory scheme that imparts exclusive jurisdiction. We agree.

Section 39.151 grants the PUC extensive and ultimate authority over an ISO. As mentioned, the statute provides that the ISO "is directly responsible and accountable to the [PUC]," and the PUC "has *complete* authority to oversee and investigate [ERCOT]'s finances, budget, and operations" to ensure adequate performance of the ISO's "functions and duties."[74] It grants the PUC authority over ERCOT's board makeup, its bylaws and protocols, and its ability to charge fees to its members.[75] ERCOT is empowered to enact rules over market participants, but they must be approved by the PUC.[76] Moreover, the PUC's authority over ERCOT is not solely regulatory; it has adjudicatory power as well. The PUC may "take appropriate action" against the ISO, including decertification, for the ISO's failure to adequately perform its functions or duties or for its failure to comply with Section 39.151.[77] Section 39.151's grant of extensive authority to the PUC over ERCOT and its detailed regulation of the particulars of ERCOT's functions constitute a pervasive regulatory scheme.[78]

**B**

The next inquiry is whether issues underlying the parties' claims fall within the regulatory scheme's jurisdictional scope.[79] The question is whether "the Legislature intended ... the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed."[80] As to both Panda and CPS, we conclude that the issues underlying

their claims come within the scope of the PUC's exclusive jurisdiction.

### 1

We begin with Panda's issues. PURA requires that ERCOT publish CDRs that "identify[ ] existing and potential transmission and distribution constraints and system needs" within the Texas power region, including alternatives and recommendations for meeting those needs.[81] Panda contends that ERCOT **\*619** failed to properly perform this requirement by issuing fraudulent CDRs that inaccurately reported the capability of existing electric generation resources to meet projected demand in the Texas power region. Because the proper performance of ERCOT's operations, functions, and duties comes within the PUC's "complete" authority over ERCOT, and because the PUC is statutorily authorized to hold ERCOT accountable if, as Panda alleges, ERCOT fails to properly perform, we hold that Panda's issues come within the PUC's exclusive jurisdiction.[82]

Panda notes that the PUC "has no authority to determine whether ERCOT complied with the relevant common-law standards or to provide a remedy." While that is true, an agency's exclusive jurisdiction does not prevent an aggrieved party from pursuing damages or other relief in the trial court after the agency has exercised its exclusive jurisdiction over the relevant issues.[83]

### 2

Likewise, CPS' issues come within the jurisdictional scope of the PUC's exclusive jurisdiction. CPS alleges that, *inter alia*, ERCOT "failed to implement its protocols in a way to ensure the integrity of its system", "failed to take reasonable precautions to meet its load projections expected as a result of" Winter Storm Uri, "failed to take reasonable corrective action when it became clear that its own projections showed insufficient capacity to meet forecast demand", and failed to correct "an acknowledged $16 billion error". Additionally, CPS essentially seeks exemption from ERCOT's short-pay and default-uplift procedures for charges relating to the Winter Storm default because it claims that they are due to ERCOT's own error and its subsequent failure to retroactively reprice the alleged overcharge.

These issues involve "the very activit[ies] the [PUC] regulates."[84] CPS' issues implicate ERCOT's operations and billing, which fall under the PUC's "complete authority".[85] And while ERCOT oversees transaction settlement payment procedures, it does so by delegated authority from the PUC.[86] Additionally, CPS specifically alleged that ERCOT's actions (and inactions) violated Section 39.151 of the Utilities Code because it failed to perform its functions of "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity" and "ensur[ing] the reliability and adequacy of the regional electrical network".[87] By statute, the PUC is responsible for ensuring that ERCOT "adequately performs [its] functions and duties", and the PUC may take action against ERCOT should it fail to do so.[88] Thus, CPS' issues fall within the PUC's exclusive jurisdiction.

CPS raises a host of arguments to support its claim that the PUC does not have exclusive jurisdiction or that it is not required to exhaust administrative remedies. All fall short. CPS contends that the PUC does not have exclusive jurisdiction because it cannot adjudicate a contract claim or award damages. However, CPS' claim for breach of the Standard Form Market Participant Agreement involves whether **\*620** ERCOT properly implemented its protocols, which comes within the PUC's exclusive jurisdiction.[89] As to damages, as mentioned, an agency's exclusive jurisdiction does not prevent a party from pursuing damages or other relief in the trial court after it has exhausted administrative remedies.[90] Moreover, CPS primarily argues that its damages stem from ERCOT's alleged overcharge during the storm and its failure to retroactively reprice that overcharge. The PUC has authority to oversee transaction settlement procedures and authority over ERCOT's finances; therefore, presumably, it could order ERCOT to resettle its payments to CPS.[91]

CPS argues that it was not required to exhaust administrative remedies because it needed immediate injunctive relief.[92] But PUC rules permit the PUC to order ERCOT to suspend complained-of conduct while a complaint is pending.[93] CPS also argues that exhaustion of administrative remedies is inapplicable where the action concerns questions of law. But CPS' issues raise various fact questions including how much supply was available for the 32 hours after ERCOT recalled its firm load shed instructions, which is necessary to determine what the appropriate per-megawatt-hour price was.

**Appx. Page 359 of 740**

Thus, this exception to the exhaustion requirement does not apply.[94]

Finally, CPS contends that exhaustion is not required because it asserts constitutional claims. Specifically, CPS argues that the loss allocation under the short-pay and default-uplift procedures amounts to an unconstitutional taking in violation of Article I, Section 17 of the Texas Constitution and an unconstitutional extension of credit in violation of Article XI, Section 3. However, "a litigant must avail itself of statutory remedies that may moot its takings claim, rather than directly institute a separate proceeding asserting such a claim."[95] Here, a decision from the PUC on the underlying issues could moot CPS' constitutional claims. Were the PUC to order adjustment of the alleged overcharge pricing or resettlement of ERCOT's payments to CPS, it would cure the alleged violations and obviate the need to assert the constitutional claims in court.[96] And even if it does not, a party is not precluded from pursuing its constitutional claims after exhaustion or from seeking judicial review of any PUC rulings on issues underlying those claims.[97]

In sum, the PUC has exclusive jurisdiction over CPS' claims. As a result of our holding, we need not address ERCOT's alternative argument regarding exclusive jurisdiction in Travis County district court or the Third Court of Appeals, nor its **\*621** argument that the PUC is an indispensable party.

## IV

ERCOT's primary argument is that it is entitled to sovereign immunity. We agree.

"Sovereign immunity provides that 'no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent.' "[98] It is " 'inherent' in Texas statehood and 'developed without any legislative or constitutional enactment.' "[99] In determining whether a legislatively authorized entity is entitled to share in the state's immunity, we look to whether "the governing statutory authority demonstrates legislative intent to grant an entity the 'nature, purposes, and powers' of an 'arm of the State government' ".[100] We also look to whether extending immunity would "satisfy the political, pecuniary, and pragmatic policies underlying our immunity doctrines."[101] If these requirements are met, the " 'entity

is a government unit unto itself' and is 'entitled to assert immunity in its own right' when it performs a 'governmental function.' "[102]

## A

Three of our recent cases explored the boundaries and contours of sovereign and governmental immunity and are pertinent to our analysis here. In *Rosenberg Development Corp. v. Imperial Performing Arts, Inc.*, we addressed for the first time whether a private entity could possess the "nature, purposes, and powers of an arm of the State government" and thus qualify as an entity protected by sovereign or governmental immunity.[103] *Rosenberg* involved an economic development corporation created by a municipality, as authorized by the Texas Development Corporation Act.[104] The economic development corporation was a private, nonprofit entity, but it was incorporated exclusively for a public purpose: to promote enterprises to spur economic growth in the city.[105] Under the statute, it was authorized to fund projects with tax dollars or the proceeds of revenue bonds.[106] It was also subject to compliance with the Texas Open Meetings Act and the Texas Public Information Act.[107] The municipality had some supervisory control over the corporation, but ultimately, "all the powers of the corporation [were] vested in the corporation's board of directors."[108] Importantly, the Development Corporation Act **\*622** provided that an economic development corporation "is not a political subdivision or a political corporation for purposes of the laws of this state", and it barred municipalities from delegating to the corporation any "attributes of sovereignty."[109] Ultimately, we concluded that the Development Corporation Act "evinces clear legislative intent that an economic development corporation is not an arm of state government."[110] We also held that granting immunity did not "satisfy the political, pecuniary, and pragmatic policies underlying our immunity doctrines" because "[g]overnmental immunity benefits the public by preventing disruptions of key governmental services," but economic development corporations do not perform essential services.[111]

Next, in *University of the Incarnate Word v. Redus* (*Redus II*), we considered whether sovereign immunity applied to the private university involved in *Redus I*, which was sued for

Appx. Page 360 of 740

the actions of its statutorily authorized police department.[112] We concluded that it was not immune because the university did not possess the nature, purposes, and powers of an arm of the state government, nor did applying sovereign immunity support the doctrine's nature and purposes.[113] Central to our holding was the lack of control the state exercised over the university and its police department. We noted that "[t]he State did not charter" the university, nor did it set the police "department's policies, procedures, or protocols."[114] We further observed that the state did not "hire or fire the [u]niversity's officers" and that "[t]he [u]niversity's administration, and its private governing board, are alone responsible for its police department's day-to-day operations and decision making."[115] Ultimately, because the university's police department was "not accountable to the government," we concluded that it was not an arm of the state.[116] We also held that extending sovereign immunity to the university did not further the doctrine's purposes of protecting the public treasury and preserving the separation of government power.[117] We observed that the university, not the state, funded the police department, and therefore no tax dollars were at stake.[118] This foreclosed any risk of invading the separation of powers because there could be no judicial reallocation of public funds.[119] Additionally, there were no concerns regarding the diversion of public funds from government functions in order to pay judgments.[120]

On the same day we decided *Redus II*, we also decided *El Paso Education Initiative v. Amex Properties*, issuing the first and only opinion in which we have extended sovereign or governmental immunity to a private entity under the arm-of-the-state analysis.[121] We observed that the Education Code expressly stated the Legislature's intent that open-enrollment charter schools be "immune from liability **\*623** and suit to the same extent as a [public] school district".[122] We concluded that, although charter schools are typically private, non-profit organizations, they have the nature, purposes, and powers of an arm of the state because they are regulated by and accountable to the state's Commissioner of Education, are largely publicly funded, educate nearly six percent of the state's students, "exercise the same powers and perform government tasks in the same manner as traditional public schools[,] ... expressly operate as part of the State's public education system, and ... are generally open to the public."[123] We also concluded that extending governmental immunity to open-enrollment charter schools would serve the doctrine's

nature and purposes by protecting public funds from lawsuits and judgments that would reallocate the funds from the Legislature's designated purpose.[124] It would also protect the separation of governmental powers by respecting the Legislature's policy choices on how to provide and fund a free, public education, as well as its express desire that charter schools have the same governmental immunity from suit and liability as public schools.[125]

**B**

ERCOT "do[es] not fall neatly into any camp".[126] It is a unique entity serving a role that is not clearly analogous to a public entity like a police department or a public school. Yet, it provides an essential governmental service. While the Legislature has not expressly stated a desire that ERCOT be immune from suit, as it did in *Amex Properties*, the "the governing statutory authority"—PURA—nevertheless "demonstrates legislative intent to grant [ERCOT] the 'nature, purposes, and powers' of an 'arm of the State government' ".[127] ERCOT operates under the direct control and oversight of the PUC, it performs the governmental function of utilities regulation, and it possesses the power to adopt and enforce rules pursuant to that role. In addition, recognizing immunity satisfies the "political, pecuniary, and pragmatic policies" underlying immunity because it prevents the disruption of key governmental services, protects public funds, and respects separation of powers principles.[128] Thus, ERCOT is immune from suit.

ERCOT's governmental nature is demonstrated most prominently by the level of control and authority the state exercises over it and its accountability to the state. In this regard, it is much like a state agency, and it stands in stark contrast to the private university in *Redus II*. The PUC certified ERCOT as the ISO, and, as set forth in Section 39.151 of the Utilities Code, it has "complete authority" over ERCOT's operations.[129] In other words, the state has complete authority over everything ERCOT does to perform its statutory functions. The statute also grants the PUC authority over ERCOT's governance. ERCOT's bylaws and protocols are subject to PUC approval, and they "must reflect the input of the [PUC]."[130] While ERCOT has a board of directors, the state controls **\*624** that too. Specifically, under Section 39.151, ERCOT's "governing body must be composed of [eight] persons selected by the ERCOT

Appx. Page 361 of 740

board selection committee."[131] In turn, the board selection committee comprises members appointed by the three highest ranking officials in state government: the Governor, the Lieutenant Governor, and the Speaker of the House of Representatives.[132] In addition to the members selected by the committee, the board also includes two state officials, the Chairman of the PUC and the Counsellor of the Public Utility Counsel.[133] The final member of the board is ERCOT's CEO, whose selection is subject to PUC review and approval.[134]

Section 39.151 also grants the PUC "complete authority" over ERCOT's finances and budget.[135] ERCOT must submit its proposed annual budget to the PUC, which can "approve, disapprove, or modify any item" in it.[136] ERCOT is authorized to charge a system administration fee, but only after the PUC approves its budget and sets the fee range.[137] ERCOT must provide the PUC with reports that compare its actual expenditures with its budgeted expenditures, and the PUC is authorized to audit ERCOT's finances.[138]

In addition to the control the PUC exercises over ERCOT, Section 39.151(d) holds that ERCOT is "directly responsible and accountable to the [PUC]".[139] In *Amex Properties*, the open-enrollment charter school was entitled to governmental immunity in part because it "must adhere to state law and the [Commissioner of Education]'s regulations ... or risk revocation of its charter."[140] Here, the PUC is empowered to "take appropriate action against" ERCOT if it fails to adequately perform or adhere to the requirements set forth in Section 39.151, "including decertifying the organization or assessing an administrative penalty against the organization."[141] And should the PUC decide to decertify ERCOT, the statute requires that ERCOT "transfer[ ] [its] assets to the successor organization to ensure continuity of operations in the region", demonstrating the state's control and ownership of ERCOT's property.[142]

Finally, ERCOT is subject to requirements typically reserved for state entities. For example, among other things, ERCOT is subject to review (but not abolishment) under the Texas Sunset Act, and it is required to open its board meetings to the public.[143] While these requirements are not dispositive— the economic development corporation in *Rosenberg* was also subject to open meetings[144]—when coupled with **\*625** the state's control, they further support ERCOT's governmental nature.

The dissent argues that these statutory provisions are insufficient to show that ERCOT has been vested with the nature of an arm of the government.[145] Specifically, it argues that ERCOT would not be immune for discretionary and independent actions, and that a factual showing of actual control by the PUC of the complained-of conduct is necessary to determine whether ERCOT's actions were attributable to the government such that it shares in the state's immunity.[146] The dissent would wait to resolve the immunity question until after the PUC exercised its exclusive jurisdiction.[147] To come to this conclusion, the dissent relies heavily on cases involving derivative immunity for government contractors.[148] However, this reliance is misplaced. ERCOT is not a government contractor; it is an "[e]ssential [o]rganization[ ]" certified by the PUC pursuant to statute, and its argument for immunity is as an arm of the state, not derivative of the state.[149] In *Redus II*, we noted that a derivative immunity case, *Brown & Gay Engineering, Inc. v. Olivares*,[150] was "instructive" in holding that no control by or accountability to the state precludes arm-of-the-state immunity, but we have never held that a complete lack of discretion is required for immunity in an arm-of-the-state analysis for a legislatively authorized entity.[151] "Sovereign immunity is entity-based."[152] Our immunity inquiry looks to legislative intent, and Section 39.151's numerous provisions outlining the PUC's ultimate authority over ERCOT's operations, budget, governance, and property demonstrate the intent to vest ERCOT with the nature of an arm of the state independently of the PUC's actions on a given day.[153]

Moreover, the PUC had significant control and authority over the very conduct at issue in these cases. In CPS' case, the PUC issued the directive to ERCOT to increase pricing to $9,000 per megawatt-hour that resulted in CPS' alleged overcharge. The short-pay procedure and default-uplift process of which CPS complains are set forth in the ERCOT Protocols, and the Protocols are subject to PUC approval.[154] Finally, ERCOT's ability to conduct transaction settlements is through delegated authority from the PUC.[155] As to Panda, ERCOT is required by the PUC to publish CDRs, and those CDRs allegedly caused Panda's injury.[156] Panda conceded at oral argument that the PUC could have controlled the CDR data output had it wanted to.

Appx. Page 362 of 740

PURA also evinces a legislative intent to vest ERCOT with the "purposes" and **\*626** "powers" of an "arm of the State government."[157] PURA requires the PUC to certify an "[e]ssential [o]rganization[ ]" to operate a competitive electric market and to ensure "the reliability and adequacy" of the grid.[158] In this role, ERCOT regulates the electric utility market. It is statutorily authorized to establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants.[159] And market participants are statutorily obligated to abide by these rules.[160] This regulatory role over utilities is uniquely governmental.[161]

The fact that ERCOT is organized as a membership-based nonprofit corporation does not make it any less an arm of the state.[162] An entity's organizational form is not dispositive.[163] While corporations do not typically enjoy sovereign immunity, ERCOT is not a typical corporation. Apart from limited liability, one of the hallmarks of a corporation is management by a board of directors in accordance with corporate bylaws.[164] But here, the state has authority over both ERCOT's board and its bylaws.[165] Under Texas law, corporations have the power to, *inter alia*, own property, dispose of property, spend money, incur liabilities, and conduct their business.[166] However, ERCOT may not exercise any of those corporate powers independently of the state. ERCOT's assets are owned by the state.[167] ERCOT may not raise money, spend money, or obtain debt financing without PUC input and approval.[168] The "business" ERCOT conducts is governmental and for the public benefit, and it is set forth by statute and subject to PUC authority and oversight.[169] In short, the fact that the state is utilizing the corporate form to achieve its objectives for the Texas power region does not change governmental nature of ERCOT's actions.[170]

**\*627** In sum, "the governing statutory authority demonstrates legislative intent to grant [ERCOT] the 'nature, purposes, and powers' of an 'arm of the State government' ".[171]

**C**

Recognizing ERCOT's immunity also satisfies the "political, pecuniary, and pragmatic policies underlying our immunity doctrines."[172] "Governmental immunity benefits the public by preventing disruptions of key governmental services," and there are few things more fundamental to the state's ability to function than its electricity grid.[173]

The protection of public funds and assets justifies recognizing ERCOT's immunity. Even though ERCOT is not funded with tax dollars, any damages payments would nevertheless come from the state and the public. ERCOT is primarily funded by a system administration fee charged to wholesale buyers and sellers of electricity.[174] The fee is required to closely match the revenue necessary for its budget without exceeding it to avoid a surplus of funds.[175] In other words, ERCOT charges only what is necessary for it to function. Were a judgment rendered against it, ERCOT would be forced to raise the system administration fee to pay the judgment—assuming the PUC would authorize that[176]—resulting in higher costs for electricity for consumers.

Moreover, the Legislature appears to consider ERCOT's money and assets to be state assets. The system administration fee is statutorily authorized, subject to PUC approval, and collected pursuant to state power.[177] As mentioned, the PUC has authority over ERCOT's finances, including its ability to raise money and how it spends its money.[178] And were ERCOT to be decertified as the ISO, Section 39.151(d) requires that ERCOT "transfer[ ] [its] assets to the successor organization".[179] The state's ability to divest ERCOT of those assets and direct their transfer demonstrates the state's ownership over them. Thus, were the assets subject to judicial seizure, the judgment creditor would be the state —not ERCOT.

Finally, recognizing ERCOT's immunity respects separation of powers principles. The judicial imposition of a damages award against ERCOT would run afoul of the Legislature's determination that the PUC alone has "complete authority" over ERCOT's finances.[180] This directive necessarily prevents the courts from enforcing a monetary judgment against it.

Contrary to the dissent's claim, this does not leave ERCOT unaccountable.[181] It simply holds that the courts are not the proper avenue for redress. ERCOT is accountable to the state. Its shortfalls are being addressed by the Legislature, which

**Appx. Page 363 of 740**

is accountable to the people through the political process.[182] For example, in direct response **\*628** to the default of certain ERCOT market participants following Uri, the Legislature passed a bill authorizing the use of $800 million of the Rainy Day Fund for ERCOT to finance part of the default.[183] This helps ensure that short-paid market participants like CPS are repaid faster.[184] After the storm, the Legislature overhauled ERCOT's board of directors, making it more independent from electric-market stakeholders and further increasing governmental oversight.[185] It also passed an omnibus bill that required, among other things, weatherization of generation companies' and electric utilities' assets and gave ERCOT authority to inspect for compliance.[186] And it moved up ERCOT's Sunset date by two years, which ensured a comprehensive review of the organization in the near-term.[187]

We hold that ERCOT is entitled to sovereign immunity because PURA "evinces clear legislative intent"[188] to vest it with the " 'nature, purposes, and powers' of an 'arm of the State government' "[189] and because doing so satisfies the "political, pecuniary, and pragmatic policies underlying our immunity doctrines."[190] There is no evidence that ERCOT performs any functions outside its role as the ISO, but we note that ERCOT would not be immune outside that role. We also note that immunity would not bar CPS' constitutional claims.[191] Because we conclude that ERCOT enjoys sovereign immunity as an arm of the state, we need not and do not address ERCOT's argument that it is entitled to derivative immunity.

\* \* \* \* \*

In No. 22-0056, *CPS Energy v. Electric Reliability Council of Texas*, we affirm the court of appeals' judgment. CPS' motion to stay the court of appeals' dissolution of the trial court's temporary restraining order is dismissed as moot. In No. 22-0196, *Electric Reliability Council of Texas, Inc. v. Panda Power Generation Infrastructure Fund, LLC*, we reverse the court of appeals' judgment and dismiss the case for lack of jurisdiction.

Justice Boyd and Justice Devine filed a dissenting opinion, in which Justice Lehrmann and Justice Busby joined.

Justice Boyd and Justice Devine, joined by Justice Lehrmann and Justice Busby, dissenting.

**\*629** At the heart of sovereign immunity—the doctrine that the Sovereign cannot be sued without its consent—lies a contest between core values of constitutionalism.[1] On the one hand, constitutionalism entails a commitment to the rule of law: "the fundamental principle that government is subordinate to the law"[2] and the "very essence of civil liberty" that every individual has the right "to claim the protection of the laws, whenever he receives an injury."[3] "[I]f the laws furnish no remedy for the violation of a vested legal right," our government will "cease to deserve this high appellation" of "a government of laws, and not of men."[4]

On the other hand, sovereign immunity is essential as "a structural protection for democratic rule," preserving the separation of governmental powers and protecting legislative and executive policy-making—for example, the allocation of the public coffers—from judicial interference and control.[5] Although "protecting the purse comes at the expense of ensuring accountability under the law for the government's breaches,"[6] the political process often serves as a substitute for private lawsuits to deter arbitrary and imprudent governmental action. But immunizing the Sovereign creates considerable tension with the "very essence of civil liberty": it burdens injured individuals with the costs and consequences of the government's improvident actions and "foreclose[s]—absent a legislative waiver—the litigation and judicial remedies that would be available to the injured person had the complained-of acts been committed by private persons."[7]

In the face of this conflict of values, the touchstone for applying sovereign immunity must be the public's trust that the rules of the game are established for their benefit and by the proper institutions.[8] While **\*630** sovereign immunity was once theoretically justified by the feudal fiction that the "king can do no wrong,"[9] "in our system of government, the people"—not a king—"are the sovereign,"[10] and immunity must be for the benefit of *that* sovereign.[11] In applying the doctrine for the people's benefit, history and tradition serve as lodestars for ensuring trust.[12]

Although public trust may be challenging to earn, and even harder to sustain, the judiciary and the Legislature both play a

Appx. Page 364 of 740

vital role. "To facilitate equipoise in the doctrine's operation," the judiciary first determines its applicability, pruning and shaping its boundaries and contours.[13] And the Legislature, composed of the people's duly elected representatives, maintains the prerogative to waive any existing immunity.[14]

But the public's trust is undermined when the judiciary extends sovereign immunity, contrary to history and tradition, to what is undeniably not sovereign: purely private entities. Recently, the battle over the doctrine's conflicting values has protruded into a debate on whether private entities should be garbed with the Sovereign's immunity when they act as government contractors or legislatively authorized entities. For private entities acting as government contractors, this Court has contemplated but declined to apply derivative sovereign immunity in a conduct-specific inquiry based on the government's degree of control and the contractor's lack of discretion.[15] For entities the Legislature has specifically authorized to exist or act by statute, the Court has extended sovereign immunity if (1) the authorizing statute "evinces 'clear legislative intent' to vest the entity with the 'nature, purposes, and powers' of an 'arm of the State government' "[16] and (2) extending immunity "fits within the doctrine's underlying nature and purposes."[17] In both cases, the root justification **\*631** for possibly protecting private entities with the Sovereign's immunity is that, by statute or contract, they act as arms of the state: the government acted *through* the entity and the actions are *effectively attributed* to the government as "action taken by the government."[18]

Until today, however, this Court had never "extend[ed] sovereign immunity to a purely private entity—one neither created nor chartered by the government—even when that entity performs some governmental functions."[19] Broadly expanding the doctrine and primarily relying on the statutory oversight authority of the Public Utility Commission of Texas (the PUC), the Court declares that a purely private corporation, Electric Reliability Council of Texas, Inc. (ERCOT), may shield itself under the Sovereign's cloak of immunity as a legislatively authorized entity.[20] Yet unlike any other entity previously granted immunity by this Court, no statute designates ERCOT as a part of the government.[21]

For the reasons the Court explains, we join Parts I, II, and III of the Court's opinion and agree that ERCOT qualifies as a "governmental unit" under the Tort Claims Act (and thus can pursue an interlocutory appeal) and that the PUC has

exclusive jurisdiction over the issues underlying the parties' claims against ERCOT. But because Texas law has not vested the private corporation ERCOT with the nature of an arm of the state, we respectfully disagree that sovereign immunity should broadly prohibit courts from exercising jurisdiction over claims against it. Specifically, we first address ERCOT's "nature" as an entity, then consider the "control" the State exerts over ERCOT, and finally evaluate whether extending sovereign immunity to ERCOT would promote the doctrine's nature and purposes. **\*632** We conclude that none of these factors supports the monumental alteration of the crucial concept of sovereign immunity the Court announces today.

Because the Court holds otherwise, the Legislature could, and in our opinion should, correct the Court's error. To circumscribe the Court's broad expansion of the doctrine, the Legislature could enact a rule of construction that it does not intend to grant private entities the "nature, purposes, and powers" of an arm of the state for the purposes of sovereign immunity unless it explicitly designates the entity as part of the government. The Legislature could also waive some or all of ERCOT's newfound immunity. In this way, the Legislature could begin restoring the public's trust following this Court's erroneous extension of *sovereign* immunity to a purely private corporation.

## I. ERCOT, Inc.

As mentioned, we have recognized that sovereign immunity may apply to an entity when a Texas statute "evinces 'clear legislative intent' to vest the entity with the 'nature, purposes, and powers' of an 'arm of the State government.' "[22] This standard requires us to begin by considering ERCOT's nature as an entity, not just the nature of its functions. That ERCOT performs governmental functions and serves a public purpose "says nothing about the nature of the entity itself."[23] We thus begin by considering ERCOT's history leading up to its current status as an entity, which indisputably establishes that ERCOT exists as a purely private entity created and operated by purely private industry participants and, although selected to perform important governmental functions, has never been designated, considered, or characterized as an arm of the state.

### A. ERCOT's History

Appx. Page 365 of 740

The "electrification of America" occurred rapidly.[24] Within a year after Thomas Edison invented the incandescent electric light bulb in 1878, major cities were using electricity to light streets and selected buildings.[25] Pouncing on the obvious economic opportunities, private firms scrambled to construct generators to serve individual buildings and properties. Seeing the bigger picture, Edison and his General Electric Company opened the first central power plant in 1882.[26] Within two months, the Pearl Street station in New York City boasted 203 customers, and then 513 the following year.[27] By 1889, Edison had built 500 small power plants to serve individual buildings and fifty-eight larger plants to serve several of America's larger cities.[28]

Initially, the scattered power plants and their electricity-distribution systems were "isolated, competitive, and unregulated."[29] *633 The private firms (along with a few cities and rural cooperatives) that constructed and operated the facilities enjoyed "vertically integrated monopolies," each generating, transmitting, and distributing electricity to its own eager consumers.[30] With very few interconnections between their grids, they each served (and charged) their own local customers and, in reality, rarely competed against one another.[31]

That situation began to change in 1892, when Edison's long-time personal assistant, Samuel Insull, left General Electric for the Chicago Edison Company and embarked on a storied career producing huge electric monopolies and, ultimately, the nation's electric grid.[32] By the early 1930s, eight companies controlled two-thirds of the nation's private power producers, and three of them controlled half.[33] Not surprisingly, complaints quickly arose that the nation's electricity system gave "tyrannical power and exclusive opportunity to a favored few."[34]

To promote the on-demand availability of electricity and the reliability of its delivery system at the lowest possible cost, the private, investor-owned utilities began interconnecting their individual grids and exchanging power between themselves.[35] Instead of constructing multiple expensive transmission lines to cover the same areas, they began sharing their lines and charging each other for the transmission service.[36] As the electricity they each produced separately combined in the transmission grids, areas suffering shortages could purchase extra amounts and pass the costs along to their customers.[37] Eventually, three main electricity grids developed within the U.S. mainland: "the Eastern Interconnection, the Western Interconnection, and the Texas Interconnection."[38]

The federal government and most states bought in to Insull's idea that the privately owned electric utilities were "natural monopolies."[39] Instead of fighting against the monopolies, the governments legitimized them in exchange for the right to heavily regulate their rates and services.[40] After the United States Supreme Court held in 1927 that the Constitution's commerce clause prohibits the states from regulating most *inter*state electricity transactions,[41] *634 Congress passed the Federal Power Act of 1935, authorizing the Federal Power Commission to regulate interstate electricity transmissions and wholesale sales and prohibiting unreasonable rates and undue discrimination.[42] Congress left it to the states, however, to regulate *intra*state transactions and retail sales made directly to consumers.[43]

The uniquely intrastate Texas power grid began its development in 1924 when two privately owned Texas utilities interconnected and later joined with others to create the North Texas Interconnected System.[44] In the 1940s, other Texas utilities joined to create the South Texas Interconnected System to support the nation's World War II efforts.[45] In the 1960s, the North Texas System and the South Texas System joined with other Texas utilities to create the Texas Interconnected System (TIS).[46] The members of TIS adopted their own rules and guidelines to govern their interconnected system and their purchases of power from one another.[47]

Seeking to increase the national grid's reliability, hundreds of the industry's participants joined together in 1968 to create the North American Electric Reliability Corporation (NERC)—a "not-for-profit international regulatory authority"—to operate as the national grid's "electric reliability organization."[48] Operating as a private, independent, membership-based association, NERC adopted voluntary rules and reliability standards to govern the "bulk power system"—the "entire connection of power plants and transmission lines for the United States, Canada, and Baja California in Mexico that make up the continental system of electricity generation and transmission."[49] NERC's primary purpose was to ensure "that the bulk power system has enough resources to provide electricity to customers at all times, and

that electricity will be continuously delivered despite sudden or unexpected shocks to the system."[50]

Two years later, in 1970, TIS—joined by municipal utilities and rural electric cooperatives operating only within Texas—formed ERCOT to comply with NERC's *635 new voluntary reliability requirements.[51] Established as a "voluntary membership organization" serving as a "regional electric reliability council" under NERC's oversight, ERCOT's primary role was to coordinate electricity transfers among its members and to ensure reliability by maintaining the best possible balance between supply and demand on the Texas grid.[52]

In 1975, the Texas Legislature made its first major effort to regulate the intrastate and retail electric industry by enacting the first version of the Public Utility Regulatory Act (PURA75).[53] Like the 1935 Federal Power Act, PURA75 adopted the regulated-monopoly approach, declaring that electric utilities are "by definition monopolies in the areas they serve" and establishing a "comprehensive and adequate regulatory system" to ensure "just and reasonable" rates, operations, and services as a substitute for "the normal forces of competition."[54] It also created the PUC and empowered it to regulate and supervise the intrastate electricity industry.[55] PURA75 did not alter the nature or functions of ERCOT, however, which continued serving as its members' private coordinating organization for their Texas power grid.[56]

In the late 1970s, an international energy crisis, fears about nuclear power, and environmental concerns led Congress to pass the Public Utility Regulatory Policy Act.[57] This Act sought to promote increased electricity generation by directing the Federal Energy Regulatory Commission (FERC) —a federal agency created to replace the Federal Power Commission—to pass rules requiring private electric utilities to purchase power at a fair price from "qualifying facilities" that generated electricity using renewable, efficient sources.[58] The addition of these nonutility generators increased both competition in electricity generation and the demand for affordable access to the grids' transmission lines.[59]

By the late 1980s, however, policy views had shifted away from the regulated-monopolies approach in favor of electricity competition.[60] In 1992, Congress passed the Energy Policy Act, which amended the 1935 Federal Power Act to authorize FERC to combat "undue" rate discrimination by ordering utilities that owned transmission lines to make their lines available to their competitors.[61] In 1996, FERC exercised that authority by ordering all utilities that owned interstate transmission lines to "functional[ly] unbundl[e]" their *636 operations by separating their electricity-sales business from their transmission services and grant all wholesale buyers and sellers equal access to the transmission lines.[62] FERC's orders also encouraged the industry to establish "independent systems operators" (ISOs) to coordinate the companies' shared use of the transmission lines and the sale of power using those systems.[63] These orders "laid the groundwork for competition in wholesale electricity sales."[64]

Texas soon joined these national deregulation efforts. In 1995, the Legislature amended PURA to deregulate the wholesale electricity market.[65] These amendments required utilities that owned transmission lines to make their lines available to wholesale transmission customers.[66] ERCOT, as the industry-created, private, nonprofit corporation, continued to serve as the industry's coordinator of its privately owned transmission grid.

In 1999, the Legislature "overhauled" PURA "to create a 'fully competitive electric power industry' in Texas."[67] The thoroughly amended PURA now required all Texas electric utilities operating within the Texas power region to unbundle their services "into three distinct units: (1) a power-generation company; (2) a retail electric provider; and (3) a transmission and distribution utility," no later than January 1, 2002.[68] Under this new structure, the PUC continues to regulate rates charged by transmission and distribution utilities, but instead of regulating retail electricity rates, PURA created "a competitive retail electric market that allows each retail consumer to choose the customer's provider of electricity."[69]

To encourage the creation of generation and retail companies and vigorous competition between them, PURA now also required the PUC to ensure that all participants in the retail market would have equal access to the Texas power region's grid. The retail providers pay the transmission companies for the right to use the grid and then pass those costs along to their customers by incorporating them into their retail rates.[70]

The 1999 statutory amendments did not, however, create ERCOT, which had already existed as the industry-created, privately owned coordinating organization since 1970. Nor

Appx. Page 367 of 740

did the statute designate ERCOT as the ISO or give ERCOT any particular functions, duties, or powers. Instead, PURA requires industry participants **\*637** in each "power region" to "establish one or more independent organizations" to serve as the region's coordinating organization and empowers the PUC to "certify" the selected organizations to perform that function.[71] In 2001, the PUC certified ERCOT—which the industry had created in 1970 and formally established as a Texas nonprofit corporation in 1990—as the Texas power grid's ISO.[72] As a certified ISO, ERCOT's duties include managing the wholesale power market and ensuring the industry maintains generation capacity to meet projected demands.[73]

### B. ERCOT's Nature, Purposes, and Powers

With ERCOT's history and current status in mind, we now turn to whether PURA evinces clear legislative intent to vest ERCOT with the nature, purposes, and powers of an arm of the state government. ERCOT essentially concedes that the legislative scheme did not vest it with the nature of an arm of the state before the 1999 PURA amendments, but it insists that ERCOT's subsequent certification as the Texas power region's ISO fundamentally altered ERCOT's nature, purposes, and powers and transformed it into an arm of the state. We disagree.

As we have explained, ERCOT, an industry-created, private entity acting as the industry-designated, PUC-certified ISO for the Texas power region, is statutorily empowered to perform uniquely governmental functions as part of the state's electricity-regulation system: overseeing the region's transmission facilities, coordinating its participants' market transactions, transmissions planning, and network reliability, and—most significantly—exercising rule-making authority to govern the participants' operations.[74] Although ERCOT enjoyed many of these powers and performed many of these functions before 1999, its *functions* took on a different—and necessarily governmental—character when it began taking these actions as the certified ISO as part of the state's management of the competitive electricity market. Its *nature* as an entity, however, did not change.

Because ERCOT exercises statutorily authorized powers to perform governmental functions as part of the state's larger electricity-regulation program, we agree with the Court that it qualifies as a "governmental unit" under the Texas Tort

Claims Act.[75] But whether it also qualifies as an "arm of the state" that sovereign immunity protects presents a "separate question[ ]" and a "separate analytical framework[ ]."[76] To answer the sovereign-immunity question, we must focus on ERCOT's nature as an entity and not just the nature of its functions. That it performs **\*638** governmental functions and serves a public purpose "says nothing about the nature of the entity itself."[77]

As an entity, ERCOT began as a membership-based association of electric-industry participants, which later incorporated it as a private, nonprofit corporation. Its members consist mostly of private entities that participate in the deregulated electricity market, including electricity generators, marketers, utilities, retailers, and consumers.[78] The state did not create ERCOT or authorize its creation, and it has remained a private entity even after PURA's 1999 amendments. Its employees are not government employees and do not receive government retirement or other benefits.[79] It is funded not by tax dollars or legislative appropriations but by fees paid by its members and a system administration fee paid by wholesale electricity buyers.[80] It is governed by articles of incorporation and bylaws adopted by its members.[81] It is directly managed not by the PUC or another state agency but by its own board of directors.[82]

But as the Court notes, due to ERCOT's selection and certification as an ISO, PURA indirectly restricts and regulates ERCOT in numerous ways and indirectly grants it various functions and powers that are inherently governmental.[83] As we discuss further below, PURA's indirect grant and regulation of ERCOT's functions and powers are insufficient to alter its nature as a private entity. But our consideration of those functions and powers must begin with the recognition that all PURA's effects on ERCOT are *indirect*. Through all its provisions that empower, impede, or otherwise impact ERCOT, PURA never directly addresses ERCOT. Instead, it empowers, impedes, and impacts whatever ISO or other independent organization the "ERCOT" power region[84] has selected and the PUC has certified. PURA does not address, and therefore certainly does not alter, the private, nongovernmental nature of whatever entity is selected and certified as an ISO.

As an independent, privately owned, nonprofit corporation, ERCOT is subject to PURA's restrictions and requirements **\*639** only because it applied for and was granted the PUC's

**Appx. Page 368 of 740**

certification as the power region's ISO. The restrictions apply to ERCOT not because of its nature as an entity but because of its position as the PUC-certified ISO. The Legislature could have assigned an existing governmental entity or created a new one to serve as the ISO, or it could have amended PURA to directly address and regulate ERCOT itself in ways that could indicate an intent to transform it into a governmental entity that is, by nature, an arm of the state. But instead, the Legislature has authorized the PUC to select a private entity to fulfill the ISO's functions.[85] That choice was consistent with the 1999 PURA amendments, which deregulated the retail electricity market so that it would be subject to "normal forces of competition" and "customer choices," rather than state regulation.[86] Instead of governmentalizing the ISO, PURA authorizes the PUC to select a *private entity* to fill that role.

The PUC, in turn, chose to certify ERCOT as the ISO, but it has not understood the ISO, or ERCOT in particular, to be a governmental entity or otherwise protected by sovereign immunity. The PUC has adopted rules that purport to grant ERCOT protection against liability for certain specified actions.[87] Because sovereign immunity protects the government against both suit and liability, these rules would be unnecessary if ERCOT enjoys sovereign immunity. To the contrary, the PUC has expressly recognized that ERCOT may be subject to "civil relief that may be available under federal or state law."[88]

PURA never identifies the ISO as a governmental entity or expresses any intent that it be protected by sovereign immunity. It subjects the ISO to substantial regulation, but "heavily regulating an entity does not equate to conferring governmental-entity status."[89] Nor does it change the entity's "nature." In light of ERCOT's original and persistent nature as an industry-created, privately owned, nonprofit corporation, and in the absence of anything in PURA that purports to alter that nature, we conclude that PURA did not vest ERCOT with the nature, purposes, and powers of an arm of the state.

## II. State Control

Even if we were to ignore the fact that PURA never attempts to directly empower, impede, or impact ERCOT and instead assumed that all PURA's provisions addressing a PUC-certified ISO directly address ERCOT itself, we would still conclude that those provisions do not transform ERCOT's nature into that of an arm of the state. By indirectly granting

the PUC "complete authority to oversee and investigate" ERCOT's operations, finances, and budget "as necessary" to ensure accountability and adequate performance,[90] PURA provides the PUC with broad oversight authority over ERCOT (as the ISO). But for the PUC to act through ERCOT such that its actions are **\*640** effectively attributed to the government,[91] the PUC first must exercise its oversight authority to control ERCOT's actions, and, under PURA, the exercise of that authority must be "necessary."

As described below, our cases instruct that if a private entity has not been designated as part of the government and the government does not control the entity's conduct, the complained-of actions are considered the entity's independent and discretionary actions and it did not act as an arm of the state. Fundamentally, authority to oversee is not actual control. If the Court's inquiry rests on control, the proper question should be whether the PUC *exercised* its oversight authority to "sufficient[ly] control" ERCOT's complained-of actions such that they were "effectively attributable" to the government and were not ERCOT's discretionary actions.[92] As the PUC has exclusive jurisdiction over the issues underlying the parties' causes of action, we would, to "ensure[ ] an orderly procedure," at least wait for the PUC to "apply its expertise," "develop a complete factual record,"[93] and make relevant factual findings about any exercise of its oversight authority before determining whether or what type of immunity should be extended to ERCOT based on any government control.[94]

The Court instead concludes that PURA evinces clear legislative intent to vest ERCOT with the nature of an arm of the state because "ERCOT operates under the direct control and oversight of the PUC."[95] The Court relies largely on PURA provisions indirectly (1) granting the PUC "complete authority" over ERCOT's operations, finances, and budget, (2) making ERCOT "directly responsible and accountable to" the PUC, and (3) allowing the State to exercise some control or influence over ERCOT through various means, including by appointing members to the ERCOT board selection committee.[96] The Court, however, overreads both our case law and PURA and glosses over whether the complained-of conduct was not ERCOT's " 'independent action,' but rather 'action taken by the government.' "[97]

**Appx. Page 369 of 740**

### A. Relevant Case Law

The common-law doctrine of sovereign immunity rests on a historical tradition that precedes the constitutional founding of this State and even of the Union.[98] But **\*641** there is no history or tradition of extending common-law sovereign immunity to private corporations. As noted recently by Judge Oldham on the United States Court of Appeals for the Fifth Circuit, "[i]t's evident that at common law, both in England and the early American Republic, incorporated entities were not entitled to sovereign immunity," "regardless of whether they exercised governmental functions."[99] After extensive historical analysis,[100] Judge Oldham distilled the following rule: "If an entity has a separate legal status from the State (*e.g.*, as a corporation, LLC, or § 501(c)(3) nonprofit organization) ... the entity is not 'the State' and hence is not entitled to sovereign immunity."[101] But Judge Oldham noted that this rule would concern "what enjoys the State's sovereign immunity in *federal* court," and "States are obviously free to cloak non-State entities with all manner of governmental immunities in *state* court," citing as an example Section 12.1056(a) of the Texas Education Code.[102]

Texas's common-law history has followed a similar trajectory of considering private entities with a separate legal status from the State as not being an arm of the government. Indeed, we have departed from this rule as to private entities only once before today—in 2020.[103] But there, we relied on the same statute Judge Oldham referenced in his opinion, which directed that certain private entities have immunity to the same extent as public entities, and on a statutory designation that those entities were part of the state government.[104]

In that case, *El Paso Education Initiative, Inc. v. Amex Properties, LLC*, this Court extended governmental immunity[105] for the first time to a private entity—open-enrollment charter schools.[106] Although these schools are typically "private, nonprofit organization[s]," the Legislature expressly designated open-enrollment charter schools as "part of the public school system of this state" and directed that "[i]n matters related to operation of an open-enrollment charter school, an open-enrollment charter school or charter holder is immune from liability and suit to the same extent as a school district."[107] Because these charter schools "expressly operate as part of the State's public education system," are "accountable to State government through oversight of their charters and the receipt of substantial public funding," and "exercise the same powers and perform government tasks in **\*642** the same manner as traditional public schools," the Court concluded that they "act as an arm of the State government."[108]

On the same day as *Amex Properties*, the Court issued *University of the Incarnate Word v. Redus*.[109] There, the Court considered whether a private university, neither created nor chartered by the State, was entitled to sovereign immunity for actions taken by its legislatively authorized campus police department.[110] Specifically contrasting the Legislature's "limited authorization to private universities to commission peace officers" with its express "incorporation of open-enrollment charter schools into the State's public-education system," the Court noted that "no similar declaration exists" designating a private university as part of the government or directing that private universities have immunity from suit.[111] The Legislature did not "categorically transform[ ]" the private university's status to "government-entity status."[112]

In conducting its analysis, the *Redus* Court found "instructive" the "control" requirement contemplated in the government-contractor case *Brown & Gay Engineering, Inc. v. Olivares*.[113] The Court explained that "the extent to which the government *exercises* control ... is relevant" and "sovereign immunity *potentially* extends to the University if the complained-of conduct was not the University's 'independent action,' but rather 'action taken by the government.' "[114] Because the university's administration and governing board "are alone responsible for its police department's day-to-day operations and decision making" and not accountable to the taxpayers or public officials, the necessary control for the private university to be an arm of the state was absent.[115] Although the Court contemplated the entity's accountability to the government as a component of control, it did not hold that accountability would have been sufficient on its own to conclude that a private entity had the nature of an arm of the state; it held only that the absence of accountability demanded the conclusion that the government did not sufficiently control the entity for it to be considered an arm of the state.[116]

A month after *Redus*, the Court expounded on the *Brown & Gay* "control" requirement in the government-contractor case *Nettles v. GTECH Corp.*[117] At issue in *Nettles* was whether a government contractor for the Texas Lottery Commission

**Appx. Page 370 of 740**

had derivative immunity.[118] Because the Court concluded the control-based standard was not satisfied, it expressly declined **\*643** to recognize derivative sovereign immunity for contractors, just as it had declined to recognize such immunity in *Brown & Gay*.[119] But the Court clarified the standard as, put simply, asking "(1) did the government tell the contractor what to do and how to do it (as opposed to the contractor having 'some discretion in performing the contract'); and, if so, (2) did the contractor do as it was told?"[120]

As the Court explained in *Nettles*, applying this control-based standard requires looking "first to the 'complained-of conduct' in the pleadings" and then to any evidence " 'necessary to resolve the jurisdictional issues raised.' "[121] Ultimately, this control-based standard asks whether the government "had sufficient control over" the entity's actions such that they were "effectively attributable" to the government and were not the entity's "independent actions" or whether the entity "had some discretion."[122] Under the governing statute and the contract with the Texas Lottery Commission's contractor, "[f]inal decisions regarding the direction or control of the Lottery are always the prerogative of the [Commission] in its sole discretion,"[123] and the Commission has "broad authority and shall exercise strict control and close supervision over all lottery games."[124] But the Court held that "close supervision and final approval of work over which a contractor has discretion" do not make actions effectively attributable to the government.[125]

From these cases, we can derive a few controlling principles regarding the nature of an arm of the state. Private, incorporated entities have a distinct legal status separate from the State and, as a general proposition, are not an arm of the state. But when the Legislature expressly designates a private entity as part of the government and makes the entity accountable through government oversight —thereby "categorically transforming" the entity's status to "government-entity status"[126]—the government need not exercise actual control over the entity's actions for the entity to have the nature of an arm of the state.[127] If there is no express designation, however, sovereign immunity, at most, "potentially extends" to the private entity only if it is accountable to the government *and* the government "exercises control over the activities" such that the "complained-of conduct" is not " 'independent action,' " but rather 'action taken by the government.' "[128] For a private

entity's action **\*644** to be "effectively attributable" to the government based on control, close supervision and final approval is insufficient when the entity has discretion to perform the work.[129]

## B. Oversight or Control

The Legislature has not designated ERCOT as part of the government but has indirectly directed that ERCOT (as a PUC-certified ISO) "is directly responsible and accountable to" the PUC.[130] Applying the above-mentioned case-law principles, our inquiry concerns the extent to which the government exercised control such that ERCOT's actions could be effectively attributed to the government.

The Court asserts that "ERCOT operates under the direct control and oversight of the PUC" and "the state has complete authority over everything ERCOT does to perform its statutory functions."[131] But this reads PURA too broadly. PURA grants the PUC "complete authority to *oversee and investigate* the organization's finances, budget, and operations *as necessary* to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties."[132] Only if ERCOT, as the PUC-certified ISO, "does not adequately perform the organization's functions or duties or does not comply with this section" is the PUC authorized to "take appropriate action ... including decertifying the organization or assessing an administrative penalty against the organization."[133] Insofar as ERCOT, through its discretionary and independent actions, "adequately perform[s]" its ISO functions and duties, the PUC's statutory authority to control ERCOT's operations appears to be limited.

The Court notes that ERCOT's bylaws and protocols require input from and approval by the PUC and that the PUC can "approve, disapprove, or modify any item" in ERCOT's proposed annual budget.[134] But bylaws, protocols, and budgets set broad constraints within which ERCOT can exercise its discretion, and this authority is akin to the "close supervision and final approval" that this Court has found insufficient to establish the necessary control.[135]

The Court points out that state officials, by appointing members of a board selection committee, have the power to indirectly appoint members of the board of directors for

Appx. Page 371 of 740

the PUC-certified ISO for the ERCOT power region.[136] But the power to appoint is the power to influence, not control.[137] Ultimately, no state official has **\*645** been put in charge of ERCOT, and a private board still runs the nonprofit corporation.[138] Two of the eleven-member board are state officials: the PUC Chairperson and the Public Counsel of the Office of the Public Utility Counsel.[139] Only the latter is a voting director—one of nine voting directors—and by statute, represents not the public at large but "residential and small commercial consumer interests."[140]

ERCOT is subject to some requirements typically reserved for state entities: it is "subject to review (but not abolishment) under the Sunset Act" and "required to open its board meetings to the public."[141] But ERCOT is also "not subject to state contracting standards, the Open Meetings Act, Administrative Procedure Act, or other requirements traditional state agencies must meet."[142] And "heavily regulating an entity does not equate to conferring governmental-entity status."[143]

Although the "PUC's oversight of ERCOT's finances, budget, and operations is essential," this oversight authority is necessary because ERCOT, as a private corporation, "is not subject to other traditional oversight mechanisms, such as the legislative appropriations process."[144] And without a determination that ERCOT is not adequately performing its functions and duties, the PUC's oversight authority is more like "close supervision" of ERCOT's discretionary and independent actions.[145]

If the PUC found that ERCOT did not adequately perform its duties as the PUC-certified ISO, the PUC would be statutorily authorized to "take appropriate action" and exercise its "complete authority."[146] But whether the PUC *exercised* its oversight authority to "sufficient[ly] control" ERCOT's complained-of actions such that they "were effectively attributable to" the PUC and were not "independent actions"[147] would depend on a factual and complaint-specific inquiry. Currently, the PUC mainly uses rulemaking proceedings and contested cases to guide and direct ERCOT's actions.[148] Although PURA "does not clearly identify how [the] PUC can give ERCOT direction outside of a contested case or rulemaking proceeding," the PUC "has broadly interpreted its statutory authority" to allow "informal mechanisms to guide ERCOT's actions, including **\*646**

verbal directives, memos, and orders."[149] But even if the PUC desired to exercise its oversight authority over ERCOT, it may lack the necessary resources and capabilities to do so.[150] In short, without an additional factual showing of actual control, the PUC's oversight authority does not "evince[ ] 'clear legislative intent' " to vest the private corporation ERCOT with the nature of an arm of the state.[151]

The Court claims ERCOT "is much like a state agency" based on the "level of control and authority the state exercises over it, and its accountability to the state."[152] But a state agency necessarily acts in the government's name as an express part of the government and does not perform proprietary functions.[153] There is two-way accountability: (1) state agencies are accountable to the State *and* (2) the government is directly accountable to the people for the state agency's actions.

The same is not true for ERCOT. ERCOT is a private corporation that has not been expressly designated as part of the government. The PUC may be accountable to the people for failing to exercise its **\*647** oversight authority, or state officials may be accountable for appointing the wrong people to the PUC or even to the ERCOT board selection committee. But this is not direct accountability for ERCOT's actions. The government can politically disclaim responsibility for the private corporation's actions when ERCOT acts at its discretion and not under the PUC's control. In other words, ERCOT's actions are not "effectively attributable" to the government unless the PUC exercised sufficient control over ERCOT's actions; otherwise, ERCOT, as a private entity, "had some discretion" to conduct "independent actions."[154]

Indeed, legislatively authorizing private entities to perform public purposes without designating them as part of the government may provide the government with the political benefit of not having express accountability for those entities' actions.[155] The government could avoid blame or responsibility for any negative repercussions by disavowing the private entity's improvident actions, which could encourage a hands-off approach with minimal oversight before any public outcry.[156] And if a private entity were granted broad sovereign immunity regardless of the government's actual control, the entity would have little incentive to seek direction or guidance from the overseeing governmental agency. But if immunity instead depended on the government's actual control, a private entity would be

Appx. Page 372 of 740

motivated to collaborate with and seek direction from the overseeing governmental agency to cloak its actions with the Sovereign's immunity.

Since the 2020 *Amex Properties* decision—the only previous decision from this Court to extend sovereign or governmental immunity to a private entity—the Legislature has known that this Court relies on statutory provisions expressly designating an entity as part of the government and directing that immunity applies to an entity.[157] Yet, the Legislature has not designated ERCOT as part of the government or directed that it should have immunity, notwithstanding the Lieutenant Governor's announcement of ERCOT reform as a top priority for the 2021 Legislative Session[158] and the Legislature's significant enactments reforming ERCOT (as the PUC-certified ISO).[159] If the Legislature had "categorically transform[ed]" ERCOT by designating the private corporation as part of the government—as it did for open-enrollment **\*648** charter schools—this case might be different.[160] But it did not.

The parties do not argue, and the record does not establish, that the PUC exercised sufficient control such that the complained-of ERCOT actions are "effectively attribute[able] to" the government.[161] As this Court has done in the government-contractor context,[162] we would not decide at this stage whether, under the standard for legislatively authorized entities, the government's exercise of some degree of actual control would extend the Sovereign's immunity to a private entity not expressly designated as part of the government.[163] Because the PUC has exclusive jurisdiction over the underlying issues in these cases, the PUC perhaps will develop the factual record and make fact findings about any control it exercised over ERCOT's complained-of conduct.[164] Should the parties pursue judicial relief after exhausting administrative remedies, this Court could consider any sovereign-immunity arguments based on control with the added benefit of a developed factual record. This approach would respect the Legislature's decisions to (1) not designate ERCOT as part of the government, (2) grant the PUC "complete authority" as specified in PURA over ERCOT's operations, and (3) establish a pervasive regulatory regime that provides the PUC with exclusive jurisdiction over issues that fall under the PUC's "complete authority."[165]

### III. Sovereign Immunity's Nature and Purposes

As mentioned, we have concluded that sovereign immunity might reach a legislatively authorized private entity if (1) the entity's authorizing statute "evinces 'clear legislative intent' to vest the entity with **\*649** the 'nature, purposes, and powers' of an 'arm of the State government' "[166] *and* (2) extending immunity "fits within the doctrine's underlying nature and purposes."[167] Even if we concluded that PURA has somehow altered ERCOT's nature as an entity, we would nevertheless conclude that extending sovereign immunity to ERCOT would not promote the doctrine's "political, pecuniary, and pragmatic" purposes.[168]

Politically, we continue to recognize sovereign immunity because it "preserves separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars."[169] By preserving the common-law doctrine of sovereign immunity, the courts maintain an "equilibrium among the branches of government" by allowing the Legislature to decide, as a policy matter, when to "allow tax resources to be shifted 'away from their intended purposes toward defending lawsuits and paying judgments.' "[170] In short, sovereign immunity prevents the courts from "intruding into" the policy-making branch's role of managing and appropriating the public's funds.[171]

By requiring a legislative decision to make tax dollars available to pay the costs of litigation and judgments, sovereign immunity serves the pecuniary purpose of ensuring "that the taxes the public pays are used 'for their intended purposes.' "[172] It "protects the public treasury by shielding the public 'from the costs and consequences of improvident actions of their governments,' "[173] particularly the "unforeseen" costs of "defending lawsuits and paying judgments."[174]

And pragmatically, sovereign immunity "serves to prevent governmental paralysis"[175] by protecting "the State and its political subdivisions from endless litigation," which "hamper[s] government functions."[176] It safeguards "the public as a whole" by protecting its governmental agencies from both the "distraction" of lawsuits and the risks that

Appx. Page 373 of 740

litigants could control government action through the courts instead of through the political process.[177]

 *650 Extending sovereign immunity to ERCOT would, at best, only minimally promote these purposes. ERCOT does not receive tax dollars or appropriated funds, so permitting judgments against it would not require the unforeseen diversion of tax dollars from their legislatively appropriated purpose or interfere with or usurp the Legislature's policy decisions on how to allocate tax revenues.[178] The Court concludes that although ERCOT's funds are not taxes, they are effectively public funds because PURA empowers the PUC to authorize and set the amounts of the regulatory fees ERCOT charges to buyers and sellers of wholesale electricity.[179] But even if regulatory fees charged *by state agencies* constitute public funds that are equivalent to tax dollars, ERCOT's funds are paid by private entities to a private entity and are never held by a governmental entity. Like any other private entity, ERCOT can procure insurance to protect its funds against liabilities.[180] Sovereign immunity exists to protect against "the payment of taxpayer dollars subject to legislative discretion," not the payment of private funds that may be authorized or regulated by statute.[181]

ERCOT urges that judgments in the cases against them would be financially devastating to ERCOT and could undermine PURA's regulatory scheme.[182] But despite this "too big to fail" argument, ERCOT is not as indispensable to the legislative scheme as ERCOT suggests. As explained, PURA does not designate ERCOT as the ISO; it merely requires the power region to designate an organization to serve as the ISO and authorizes the PUC to certify that organization.[183] In fact, PURA provides that the PUC might certify "one or more" ISOs for the Texas power region and recognizes that an ISO may be decertified and replaced by a "successor organization."[184] Under PURA, *an ISO* may be critical to the State's oversight of the electricity industry, but ERCOT is not. Like the private university at issue in *Redus*, any expense ERCOT "incurs will fall on" ERCOT, "not the government or its taxpayers."[185]

The interplay between the exclusive-jurisdiction and sovereign-immunity doctrines provides further reason not to extend immunity to ERCOT. Sovereign immunity is not necessary to preserve "separation-of-powers principles"[186] and maintain an "equilibrium among the *651 branches of government"[187]—the exclusive-jurisdiction doctrine serves that function here. The PUC's exclusive jurisdiction respects the Legislature's decision to provide the executive branch, through the PUC, with "complete authority" over ERCOT.[188] It "honors the Legislature's intent that 'the appropriate body adjudicates the dispute' first, and thereby 'ensure[s] an orderly procedure to enforce those rights.' "[189] If litigation continues after the PUC has exercised its exclusive jurisdiction, any PUC fact findings would be given significant deference under the substantial-evidence rule.[190] And because the PUC applies its expertise in adjudicating issues first, litigation generally would not disrupt any key services without the PUC's first evaluating any complaint and determining ERCOT's continued fitness to serve as the ISO.[191] The PUC could determine whether decertification of ERCOT is appropriate and, if so, certify a successor ISO and transfer assets before any judicial litigation ensues.[192]

Although we acknowledge that extending sovereign immunity to ERCOT could offer some benefits for the State's efforts to ensure a reliable and economical electricity grid, we must also "remain ever mindful" of sovereign immunity's costs.[193] Sovereign immunity from suit "allows the 'improvident actions' of the government to go unredressed"[194] and thus "places the burden of shouldering" the "costs and consequences" of those actions "on injured individuals," rather than the entity that caused those consequences.[195] In short, "just as immunity is inherent to sovereignty, unfairness is inherent to immunity."[196] Under these circumstances, the cost of authorizing such "unfairness" to protect a purely private, nonsovereign entity outweighs any benefits. We thus conclude that extending sovereign immunity to ERCOT would not promote the doctrine's purposes.

## *652 IV. The Public's Trust

Finally, we must return to the concern over how the Court's decision will alter the public's trust in our State's justice system. The private corporation ERCOT, once unknown to the general public, has become a near-household name after more than 4.5 million people in Texas lost electric power during Winter Storm Uri.[197] For every three Texans, two lost power "for an average of 42 hours, during which they were without power on average for one single consecutive bloc of 31 hours, rather than for short rotating periods."[198]

Appx. Page 374 of 740

Not only did the storm expose needed improvements to the electric grid's reliability, but it also imposed a significant, tragic human toll:

> The Texas Department of State Health Services confirmed 246 deaths related to Winter Storm Uri, which included victims ranging from less than 1 year old to 102 years old. Hypothermia was the primary cause of the death for 161 people. The storm and power outages also exacerbated pre-existing illnesses, leading to the deaths of 25 people like the 83-year old Katy resident who lost power to the respirator he needed to live.... A grandmother and her three grandchildren likely numbered among the 10 Texans who died due to fires when attempts to warm their home ended in tragedy.[199]

Many lawsuits have already been filed against ERCOT based on damages resulting from the loss of electricity and the high wholesale prices ERCOT charged during Winter Storm Uri.[200]

The public expects and trusts that those injured can claim the protection of the laws and that those responsible—to the extent responsibility exists—will be held accountable: the government through the political process and at the ballot box[201] and private entities in court. But by granting sovereign immunity to a purely private entity that has not been designated as part of the government and without requiring a demonstration of the government's actual control over the complained-of conduct, the Court undermines this public trust.

The Legislature could, and in our opinion should, correct the Court's mistake. To specifically address the Court's holding as to ERCOT, the Legislature could waive ERCOT's newfound immunity in part or in full to give parties the right "to claim the protection of the laws, whenever he receives an injury."[202] More importantly, however, the Legislature could circumscribe this Court's broad and erroneous expansion of the sovereign-immunity doctrine to private entities. Although the judiciary defines sovereign immunity's **\*653** boundaries, "[b]ecause the legislature 'can modify or abrogate common law rules,' provided its intent is clear, we consider legislative intent in establishing the doctrine's common-law contours."[203] To clarify its intent, the Legislature could enact a law—a rule of construction for Texas courts to apply—that it does not intend to grant private entities (including private corporations like ERCOT) the "nature, purposes, and powers" of an arm of the state for the purposes of sovereign immunity unless it expressly designates the entity as part of the government.

Although such a rule of construction would generally establish the outer limits to the judicial extension of sovereign immunity, a governmental designation by the Legislature ultimately may or may not be sufficient to demonstrate the necessary indications for the judiciary to conclude that a private entity is entitled to sovereign immunity. But that is how it should be. The rule of construction would begin restoring the public's trust that private entities will not be extended sovereign immunity as legislatively authorized entities unless the people's duly elected representatives expressly designate the entity as part of the government and the judiciary determines that the entity is entitled to sovereign immunity.

This legislative rule of construction, however, should not be necessary to cabin the judicial expansion of sovereign immunity. Although "immunity is inherent to sovereignty, unfairness is inherent to immunity,"[204] especially when it is extended to what is not inherently sovereign: purely private entities. We therefore respectfully dissent from the Court's decision to extend sovereign immunity to the private corporation ERCOT.

**All Citations**

671 S.W.3d 605, 66 Tex. Sup. Ct. J. 1222

---

Footnotes

1      *CPS Energy v. Electric Reliability Council of Tex.*

2      648 S.W.3d 520 (Tex. App.—San Antonio 2021).

3      *Electric Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC.*

4      641 S.W.3d 893 (Tex. App.—Dallas 2022) (en banc).

Appx. Page 375 of 740

5    *Texas v. EPA*, 829 F.3d 405, 431 (5th Cir. 2016).

6    *See New York v. FERC*, 535 U.S. 1, 7, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) ("It is only in Hawaii and Alaska and on the 'Texas Interconnect'—which covers most of that State—that electricity is distributed entirely within a single State.").

7    *Oncor Elec. Delivery Co. v. Pub. Util. Comm'n*, 507 S.W.3d 706, 708 n.1 (Tex. 2017); *ERCOT Organization Backgrounder*, ERCOT, https://www.ercot.com/news/mediakit/backgrounder (last visited June 15, 2023); *Fact Sheet*, ERCOT (June 8, 2023), https://www.ercot.com/files/docs/2022/02/08/ERCOT_Fact_Sheet.pdf.

8    Tex. Util. Code § 39.151(a), (c). The Texas power region is also known as ERCOT. *See id.* § 31.002(5) (defining ERCOT as "the area in Texas served by electric utilities, municipally owned utilities, and electric cooperatives that is not synchronously interconnected with electric utilities outside the state"). To avoid confusion, we refer to the nonprofit corporation that is party to these cases as ERCOT and the area served by the interconnected grid as the Texas power region.

9    16 Tex. Admin. Code § 25.361; *ERCOT Organization Backgrounder, supra* note 7.

10   *See W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 808-809 (N.D. Tex. 1979); Jared M. Fleisher, *ERCOT's Jurisdictional Status: A Legal History and Contemporary Appraisal*, 3 Tex. J. Oil Gas & Energy L. 4, 10-11 (2008).

11   *W. Tex. Utils. Co.*, 470 F. Supp. at 808.

12   *Id.*; *see* Fleisher, *supra* note 10, at 11.

13   Act of May 27, 1999, 76th Leg., R.S., ch. 405 § 39, 1999 Tex. Gen. Laws 2543, 2558 (codified at Tex. Util. Code ch. 39).

14   Tex. Util. Code § 39.051; *see id.* § 39.001(a), (b); *Oncor Elec. Delivery Co.*, 507 S.W.3d at 708-709.

15   Tex. Util. Code § 39.151(a).

16   *Id.* § 39.151; 16 Tex. Admin. Code § 25.361. On May 28, 2023, the Legislature amended Section 39.151. The amendments are effective September 1, 2023, and they do not affect the proceeding analysis or our holding. *See* Act of May 28, 2023, 88th Leg., R.S., ch. 410, § 15, 2023 Tex. Sess. Law Serv. (H.B. 1500).

17   *See* ERCOT Nodal Protocols §§ 9.19(1)(d)-(e), 9.19.1.

18   *See id.* §§ 9.19(1)(d)-(e), 9.19.1.

19   CPS secured a temporary restraining order from the trial court that prevented ERCOT from applying these downward adjustments. The court of appeals dissolved its order extending the temporary restraining order when it dismissed CPS' claims. 648 S.W.3d at 541.

20   CPS also alleged that ERCOT's executives and board acted ultra vires and it sought prospective injunctive relief against downward adjustments for the storm-related default through the default-uplift process. CPS later nonsuited all individual defendants except Bill Magness, ERCOT's former CEO. The court of appeals determined that Magness was not a party to the plea to the jurisdiction that is the subject of this appeal. *Id.* at 532-533.

21   The trial court also denied ERCOT's motion to transfer venue to Travis County.

22   *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8).

23   661 S.W.3d 812 (Tex. App.—San Antonio 2021) (mem. op.).

24   *In re Elec. Reliability Council of Tex., Inc.*

25   648 S.W.3d at 531, 541.

Appx. Page 376 of 740

26    ERCOT's petition for writ of mandamus is dismissed as moot.

27    Tex. Util. Code § 39.155(b); 16 Tex. Admin. Code § 25.505(b).

28    Tex. Civ. Prac. & Rem. Code § 51.014(a)(8); *id.* § 101.001(3).

29    *Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 552 S.W.3d 297, 301 (Tex. App.—Dallas 2018), *pet. dism'd as moot*, 619 S.W.3d 628, 631 (Tex. 2021).

30    *Id.* Additional procedural history thereafter is available in this Court's prior opinion. *Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 632-634 (Tex. 2021).

31    641 S.W.3d at 899.

32    *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8); *id.* § 101.001(3).

33    *Univ. of the Incarnate Word v. Redus* (*Redus I*), 518 S.W.3d 905, 907 (Tex. 2017).

34    *Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 387 (Tex. 2020) (quoting *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001)).

35    *See id.* at 390 & n.3.

36    Tex. Civ. Prac. & Rem. Code § 51.014(a)(8); *see id.* § 101.001(3).

37    *Id.* § 101.001(3).

38    *Id.*; *Redus I*, 518 S.W.3d at 907.

39    342 S.W.3d 73, 76 (Tex. 2011).

40    *Id.* at 77.

41    *Id.* at 77-78.

42    *Id.* at 78 (quoting Tex. Educ. Code § 12.1053).

43    518 S.W.3d at 906.

44    *Id.* at 910.

45    *Id.* at 909; *see id.* at 910-911.

46    *Id.* at 909, 910, 911.

47    *Id.* at 910, 911.

48    Tex. Util. Code § 11.002(a).

49    *Id.* § 14.001; *see also id.* § 11.002(c).

50    *Id.* § 39.151(a).

51    *Id.*

52    *See id.* § 39.151(d).

53    342 S.W.3d at 80.

Appx. Page 377 of 740

54 Tex. Util. Code § 39.151(d).

55 *Id.* § 39.151(d), (d-4)(3); *see also id.* § 39.151(e).

56 *Id.* § 39.151(g-1).

57 *Id.* § 39.151(d), (d-4)(5).

58 *Redus I*, 518 S.W.3d at 911; *see Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983) ("[T]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.").

59 Tex. Util. Code § 39.151(d).

60 *Id.* § 39.151(i).

61 *Id.* § 39.151(j).

62 *Redus I*, 518 S.W.3d at 910, 911.

63 Tex. Civ. Prac. & Rem. Code § 101.001(3); *Redus I*, 518 S.W.3d at 907.

64 Tex. Util. Code § 39.151(a), (b).

65 *Id.* § 39.151(c).

66 *Id.* § 31.002(9); *see also id.* § 39.151.

67 Tex. Civ. Prac. & Rem. Code § 101.001(3); *id.* § 51.014(a)(8).

68 *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018) (citing *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004)); *see also* Tex. Const. art. V, § 8.

69 *Chaparral Energy*, 546 S.W.3d at 138 (citing *In re Sw. Bell Tel. Co.*, 235 S.W.3d 619, 624-625 (Tex. 2007)).

70 *Id.* (quoting *In re Sw. Bell Tel. Co.*, 235 S.W.3d at 624-625).

71 *Id.* at 139; *see id.* at 138.

72 *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 428 (Tex. 2017).

73 *Id.* (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002)).

74 Tex. Util. Code § 39.151(d) (emphasis added).

75 *Id.* § 39.151(d), (e), (g-1).

76 *Id.* § 39.151(d); *see also id.* § 39.151(j).

77 *Id.* § 39.151(d).

78 *Cf. In re Entergy Corp.*, 142 S.W.3d at 323 ("The Legislature's description of PURA as 'comprehensive,' coupled with the fact that PURA regulates even the particulars of a utility's operations and accounting, demonstrates the statute's pervasiveness.").

79 *See Chaparral Energy*, 546 S.W.3d at 139.

80 *Id.* at 138 (quoting *In re Sw. Bell Tel. Co.*, 235 S.W.3d at 624-625).

Appx. Page 378 of 740

81    Tex. Util. Code § 39.155(b); *see also* 16 Tex. Admin. Code § 25.505(c).

82    Tex. Util. Code § 39.151(d).

83    *See Chaparral Energy*, 546 S.W.3d at 141-142.

84    *In re Oncor Elec. Delivery Co.*, 630 S.W.3d 40, 49 (Tex. 2021).

85    Tex. Util. Code § 39.151(d).

86    *Id.* § 39.151(i).

87    *Id.* § 39.151(a)(1), (2).

88    *Id.* § 39.151(d).

89    *See id.* § 39.151(d) ("Rules adopted by an independent organization ... under delegated authority from the [PUC] are subject to [PUC] oversight ...."); *cf. Chaparral Energy*, 546 S.W.3d at 139-140 (holding that PUC had exclusive jurisdiction because the issue involved a public utility's services, even though customer asserted a breach-of-contract claim for money damages).

90    *Chaparral Energy*, 546 S.W.3d at 141-142.

91    *See* Tex. Util. Code § 39.151(d), (i).

92    *See Hous. Fed'n of Tchrs., Loc. 2415 v. Hous. Indep. Sch. Dist.*, 730 S.W.2d 644, 646 (Tex. 1987).

93    *See* 16 Tex. Admin. Code § 22.251(i).

94    *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 557-558 & n.13 (Tex. 2016).

95    *Garcia v. City of Willis*, 593 S.W.3d 201, 211 (Tex. 2019) (citing *City of Dallas v. Stewart*, 361 S.W.3d 562, 579 (Tex. 2012)).

96    *See id.* at 211-212.

97    *Chaparral Energy*, 546 S.W.3d at 141-142.

98    *Univ. of the Incarnate Word v. Redus* (*Redus II*), 602 S.W.3d 398, 403 (Tex. 2020) (quoting *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847)).

99    *Id.* at 403-404 (quoting *Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 429, 431 (Tex. 2016)).

100   *El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 527 (Tex. 2020) (quoting *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006)).

101   *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019).

102   *Redus II*, 602 S.W.3d at 405 (quoting *Ben Bolt*, 212 S.W.3d at 325-326).

103   571 S.W.3d at 749 (internal quotation marks omitted).

104   *Id.* at 741.

105   *Id.* at 741, 745.

106   *Id.* at 744.

Appx. Page 379 of 740

107    *Id.* at 745.

108    *Id.* (internal alterations and quotation marks omitted).

109    *Id.*

110    *Id.* at 750.

111    *Id.*

112    *See Redus II*, 602 S.W.3d at 401-402.

113    *See id.*

114    *Id.* at 407; *see id.* at 407-408.

115    *Id.* at 407.

116    *Id.* at 408.

117    *Id.* at 409.

118    *Id.*

119    *Id.*

120    *Id.* at 409-410.

121    602 S.W.3d at 529-530.

122    *Id.* at 529.

123    *Id.* at 528-530.

124    *Id.* at 530.

125    *Id.*

126    *Redus II*, 602 S.W.3d at 406.

127    *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

128    *Rosenberg*, 571 S.W.3d at 750.

129    Tex. Util. Code § 39.151(d).

130    *Id.* § 39.151(g-1).

131    *Id.* § 39.151(g), (g-1).

132    *Id.* § 39.1513.

133    *Id.* § 39.151(g-1). Under the recent amendments to Section 39.151, the PUC must have two commissioners on the ISO's board, the presiding officer of the PUC and one other commissioner who will serve a one-year term. *See* Act of May 28, 2023, *supra* note 16.

134    Tex. Util. Code § 39.151(g-1); 16 Tex. Admin. Code § 25.362(h).

135 Tex. Util. Code § 39.151(d).

136 *Id.* § 39.151(d-1).

137 *Id.* § 39.151(e).

138 *Id.* § 39.151(d-4)(3), (e).

139 *Id.* § 39.151(d).

140 602 S.W.3d at 529.

141 Tex. Util. Code § 39.151(d).

142 *Id.*

143 *Id.* §§ 39.151(n), 39.1511.

144 571 S.W.3d at 745.

145 *See post* at 631 (Boyd & Devine, JJ., dissenting).

146 *Id.* at 639-41, 644-49.

147 *Id.* at 640.

148 *Id.* at 642-49.

149 Tex. Util. Code § 39.151; *id.* § 39.151(c).

150 461 S.W.3d 117, 125 (Tex. 2015).

151 *Redus II*, 602 S.W.3d at 407; *see Amex Props.*, 602 S.W.3d at 529-530.

152 *Redus II*, 602 S.W.3d at 407.

153 *See, e.g., Amex Props.*, 602 S.W.3d at 527 (noting that we look to the "governing statutory authority"). The dissent also takes issue with the fact that PURA does not directly address ERCOT, but instead regulates the ISO. *See post* at 638-40 (Boyd & Devine, JJ., dissenting). But ERCOT *is* the ISO for the Texas power region and is, therefore, subject to PURA while it serves in that role.

154 Tex. Util. Code § 39.151(d), (g-1).

155 *Id.* § 39.151(i).

156 *Id.* § 39.155; 16 Tex. Admin. Code § 25.505.

157 *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

158 Tex. Util. Code § 39.151; *id.* § 39.151(a).

159 *Id.* § 39.151(d), (i), (j), (*l*).

160 *Id.* § 39.151(j).

161 *See Ark. Elec. Coop. Corp.*, 461 U.S. at 377, 103 S.Ct. 1905.

162 *ERCOT Organization Backgrounder, supra* note 7.

Appx. Page 381 of 740

163   *See Amex Props.*, 602 S.W.3d at 528-529.

164   Tex. Bus. Orgs. Code §§ 22.102, 22.152, 22.201.

165   *See* Tex. Util. Code § 39.151(g), (g-1); *id.* § 39.1513.

166   *See* Tex. Bus. Orgs. Code § 2.101(3), (4), (6), (7), (12), (22).

167   *See* Tex. Util. Code § 39.151(d).

168   *See id.* § 39.151(d), (d-1), (d-2).

169   *See id.* § 39.151(a), (c), (d); *see also id.* § 39.001(a).

170   Relying on a recent Fifth Circuit concurring opinion, *see Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 187-199 (5th Cir. 2023) (Oldham, J., concurring), the dissent contends that "there is no history or tradition of extending common-law sovereign immunity to private corporations." *Post* at 641 (Boyd & Devine, JJ., dissenting). We need not express any opinion on the correctness of that proposition today. But even assuming that it is correct, it does not address circumstances (like here) in which the state has exercised direct control over the corporation and has harnessed it for state-related objectives. Indeed, the U.S. Supreme Court has long recognized that the government cannot, for example, circumvent the state-action requirement by simply enlisting private entities to do its work. *See, e.g., Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 614, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). While a corporation is presumably *not* "the state", we reiterate that an entity's corporate form cannot in and of itself be dispositive of the immunity question.

171   *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

172   *Rosenberg*, 571 S.W.3d at 750.

173   *Id.*

174   Tex. Util. Code § 39.151(e).

175   *Id.*

176   *See id.* § 39.151(d), (d-1).

177   *Id.* § 39.151(e), (j).

178   *See id.* § 39.151(d), (d-1), (e).

179   *Id.* § 39.151(d).

180   *Id.*

181   *See post* at 646-47, 652-53 (Boyd & Devine, JJ., dissenting).

182   *See In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 297 (Tex. 2022) (observing various ways in which the Legislature could hold an agency accountable for the failure to carry out a statutory program and reasoning that a judicial remedy could "create[ ] a serious risk that the courts will intrude into the prerogatives of [the] other branches").

183   *See* Act of May 30, 2021, 87th Leg., R.S., ch. 908, §§ 1, 5, 2021 Tex. Gen. Laws 2218, 2218-2227 (H.B. 4492) (codified at Tex. Gov't Code § 404.0241, Tex. Util. Code §§ 39.601-39.609); *see also* Sunset Advisory Commission, Staff Report with Commission Decisions: Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel 106-107 (2023), https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf.

184   *See* Tex. Util. Code § 39.601(b)(1).

185    Act of May 30, 2021, 87th Leg., R.S., ch. 425, §§ 3, 4, 2021 Tex. Gen. Laws 830, 830-833 (S.B. 2) (codified at Tex. Util. Code §§ 39.151, 39.1513); *see also* Sunset Advisory Commission, *supra* note 183 at 1 ("In response to the disaster, the Legislature took swift action, completely overhauling PUC's and ERCOT's governance structures and making numerous changes to the electric industry and market ...."); *id.* at 106.

186    Act of May 30, 2021, 87th Leg., R.S., ch. 426, §§ 13, 16, 2021 Tex. Gen. Laws 833, 839-840, 841-843 (S.B. 3) (codified at Tex. Util. Code §§ 35.0021, 38.075); *see also* 16 Tex. Admin. Code § 25.55(b)(5), (d), (g); Sunset Advisory Commission, *supra* note 183, at 106.

187    Sunset Advisory Commission, *supra* note 183, at A1.

188    *Rosenberg*, 571 S.W.3d at 750.

189    *Amex Props.*, 602 S.W.3d at 527 (quoting *Ben Bolt*, 212 S.W.3d at 325).

190    *Rosenberg*, 571 S.W.3d at 750.

191    *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009).

1    *See* Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and Judicial Independence*, 35 Geo. Wash. Int'l L. Rev. 521, 521 (2003).

2    *Phillips v. McNeill*, 635 S.W.3d 620, 627 (Tex. 2021) (citing Tex. Const. art. I, §§ 13, 19).

3    *Marbury v. Madison*, 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803); *see also* Tex. Const. art. I, §§ 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."), 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by due course of the law of the land.").

4    *Marbury*, 5 U.S. at 163 ("In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.").

5    *See* Harold J. Krent, *Reconceptualizing Sovereign Immunity*, 45 Vand. L. Rev. 1529, 1530 (1992); *see also* Tex. Const. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy[.]"); *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 409 (Tex. 2020) ("Sovereign immunity restrains judicial interference in the executive and legislative branches so that ultimately the people, not the courts, strike the policy balance between immunizing the government's actions and providing a judicial remedy."). Bolstering the doctrine are also modern political, pragmatic, and pecuniary justifications. *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 740 (Tex. 2019).

6    *Rosenberg*, 571 S.W.3d at 741.

7    *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 122 (Tex. 2015).

8    *See, e.g.*, Krent, *supra* note 5, at 1530 ("The dominant justification for sovereign immunity must be that we trust Congress, unlike any other entity, to set the rules of the game.").

9    *Rosenberg*, 571 S.W.3d at 740; *see also Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 431 n.5 (Tex. 2016) (discussing the historical anomaly of relying on the legal fiction that the king could do no wrong).

10    *Hall v. McRaven*, 508 S.W.3d 232, 253 (Tex. 2017) (Brown, J., concurring).

11    *See* Tex. Const. art. I, § 2 ("All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit.").

12    The application of immunity to the Sovereign rests on a common-law tradition long predating this State's constitutional founding. *See Hosner v. DeYoung*, 1 Tex. 764, 769 (1847) ("[N]o state can be sued in her own courts without her

Appx. Page 383 of 740

consent[.]"); *see also Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (noting that at the time of *Hosner*, the common-law doctrine was "then more than six centuries old"). And "[l]ike sovereign immunity itself, its common-law limitations and exceptions have deep historical roots" and are "designed to ensure the rule of law." *Phillips v. McNeill*, 635 S.W.3d 620, 627-28 (Tex. 2021) (discussing the ultra vires exception to sovereign immunity and noting that the sovereign-immunity doctrine's limitations and exceptions "trac[e] their lineage to courts' issuance of writs of habeas corpus, mandamus, and injunction against government officials to check acts in excess of lawful authority or compel the performance of a clear legal duty").

13    *Rosenberg*, 571 S.W.3d at 741; *see also Wasson Ints.*, 489 S.W.3d at 432.

14    *Rosenberg*, 571 S.W.3d at 741.

15    *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 733 (Tex. 2020); *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 126 (Tex. 2015).

16    *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 405 (Tex. 2020) (quoting *Rosenberg*, 571 S.W.3d at 750, and *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006)).

17    *Id.* at 401 (quoting *Rosenberg*, 571 S.W.3d at 750).

18    *Id.* at 407 (quoting *Brown & Gay*, 461 S.W.3d at 125).

19    *Id.* at 401.

20    *Ante* at 623-24, 625-26, 628.

21    This Court has considered extending immunity to legislatively authorized entities four times and granted immunity twice. *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 527, 530 (Tex. 2020) (extending immunity to open-enrollment charter schools); *Redus*, 602 S.W.3d at 405, 413 (denying immunity to a private university for law-enforcement activities); *Rosenberg*, 571 S.W.3d at 750, 752 (denying immunity to an economic-development corporation created and operated by a municipality); *Ben Bolt*, 212 S.W.3d at 325-26 (extending immunity to a self-insurance fund composed of local political subdivisions). In *Amex Properties*, the Legislature expressly designated open-enrollment charter schools as part of the public school system and immune from suit and liability, 602 S.W.3d at 528-29 (quoting Tex. Educ. Code §§ 12.105, .1056(a)), and in *Ben Bolt*, "[b]ecause the term 'local government' includes a combination of political subdivisions," the self-insurance fund composed of local political subdivisions was itself a local governmental body, 212 S.W.3d at 324-25 (citing Tex. Gov't Code § 791.003(4)(A), (E)). *Ben Bolt* derived the test for legislatively authorized entities from a 1940 decision that did not involve sovereign immunity and instead concerned whether a statutorily created flood-control district constituted a separate and distinct governmental entity from the county. *See Harris Cnty. Flood Control Dist. v. Mann*, 135 Tex. 239, 140 S.W.2d 1098, 1101 (1940). As noted in later decisions, these flood-control districts are entitled to governmental immunity as constitutionally recognized "governmental agencies." *See* Tex. Const. art. XVI, § 59(b) (Flood-control "districts shall be governmental agencies and bodies politic and corporate with such powers of government[.]"); *Harris Cnty. Flood Control Dist. v. Mihelich*, 525 S.W.2d 506, 508 (Tex. 1975) ("Districts formed in accordance with Section 59 of Article XVI have been recognized to be governmental agencies and bodies politic and corporate, 'governed by the law applicable to counties,' with the same immunities from tort actions as were enjoyed by the State and its counties[.]").

22    *Redus*, 602 S.W.3d at 401, 405 (quoting *Rosenberg*, 571 S.W.3d at 750, and *Ben Bolt*, 212 S.W.3d at 325).

23    *Id.* at 407 (quoting *Rosenberg*, 571 S.W.3d at 750).

24    Robert L. Bradley, Jr., *The Origins of Political Electricity: Market Failure or Political Opportunism?*, 17 Energy L.J. 59, 61 (1996).

25    *Id.* at 59-60.

Appx. Page 384 of 740

26    Gina S. Warren, *Vanishing Power Lines and Emerging Distributed Generation*, 4 Wake Forest J.L. & Pol'y 347, 351 (2014); Hon. Richard D. Cudahy & William D. Henderson, *From Insull to Enron: Corporate (Re)regulation After the Rise and Fall of Two Energy Icons*, 26 Energy L.J. 35, 39 (2005).

27    Warren, *supra* note 26, at 350.

28    *Id.* at 350-51.

29    Mary Katherine Strahan, *Connecting Currents: Toward the Integration of North American Electricity Markets*, 21 Hous. J. Int'l L. 291, 292 n.8 (1999).

30    *Fed. Energy Reg. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267, 136 S.Ct. 760, 193 L.Ed.2d 661 (2016); *see also* Emily Hammonde & David B. Spence, *The Regulatory Contract in the Marketplace*, 69 Vand. L. Rev. 141, 149-50 (2016).

31    *New York v. Fed. Energy Reg. Comm'n*, 535 U.S. 1, 5, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002).

32    *See* Stephanie Phillips, *Federal Regulation for A "Resilient" Electricity Grid*, 46 Ecology L.Q. 415, 418 (2019); Warren, *supra* note 26, at 353-54; Cudahy & Henderson, *supra* note 26, at 41; Strahan, *supra* note 29, at 292 n.8.

33    Jeffrey D. Watkiss & Douglas W. Smith, *The Energy Policy Act of 1992—A Watershed for Competition in the Wholesale Power Market*, 10 Yale J. on Reg. 447, 450 (1993).

34    *Id.* at 451.

35    *W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 807 (N.D. Tex. 1979).

36    *New York*, 535 U.S. at 8-9, 122 S.Ct. 1012; *see also* Phillips, *supra* note 32, at 422.

37    *See* Hammonde & Spence, *supra* note 30, at 150-51.

38    *Id.* at 149-50.

39    Warren, *supra* note 26, at 353-54.

40    *See* Phillips, *supra* note 32, at 422; Hammonde & Spence, *supra* note 30, at 150-51.

41    *See* *Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89-90, 47 S.Ct. 294, 71 L.Ed. 549 (1927); *see also* *Fed. Energy Reg. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266, 136 S.Ct. 760, 193 L.Ed.2d 661 (2016); *New York*, 535 U.S. at 5-6, 122 S.Ct. 1012.

42    *New York*, 535 U.S. at 6-7, 122 S.Ct. 1012; *see also* *Gulf States Util. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 758, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973); Strahan, *supra* note 29, at 292 n.8.

43    *Elec. Power Supply Ass'n*, 577 U.S. at 266-67, 136 S.Ct. 760; *see also* Phillips, *supra* note 32, at 423-24.

44    *W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 808 (N.D. Tex. 1979).

45    *Id.*; *see also* Daniel M. Gonzales, *Shockingly Certain: Why Is the Public Utility Commission of Texas Steadfast in Its Resolve to Keep Texas's Energy Market Deregulated Amidst Turmoil?*, 10 Tex. Tech Admin. L.J. 497, 500 (2009); Jared M. Fleisher, *ERCOT's Jurisdictional Status: A Legal History and Contemporary Appraisal*, 3 Tex. J. Oil Gas & Energy L. 4, 10 (2008).

46    *W. Tex. Utils.*, 470 F. Supp. at 808.

47    *Pub. Util. Comm. of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001); *see also* Gonzales, *supra* note 45, at 500.

Appx. Page 385 of 740

48 *Del. Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1, 11 (D.C. Cir. 2015); *see also About NERC*, North American Electric Reliability Corporation (2023), https://www.nerc.com/AboutNERC/Pages/default.aspx; Ryan Suit, *Charging Forward with NERC: An International Approach to Solving North America's Grid Problem*, 24 Rich. J.L. & Tech. 3, 15-16 (2018).

49 Suit, *supra* note 48, at 15. In 2007, NERC's reliability standards became legal mandates governing participants in the bulk power system. *Id.* at 16.

50 *Id.* at 15-16.

51 *See* Fleisher, *supra* note 45, at 10-11.

52 *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 186 (Tex. 2007); *see also W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 808 (N.D. Tex. 1979); Gonzales, *supra* note 45, at 500; Fleisher, *supra* note 45, at 10-11.

53 Gonzales, *supra* note 45, at 501-02. Before 1975, some municipalities regulated rates through franchise agreements allowing electric utilities to run distribution lines along city streets. *Id.* at 501.

54 Tex. Util. Code § 11.002.

55 *See* Gonzales, *supra* note 45, at 501-02; Fleisher, *supra* note 45, at 11.

56 *See* Fleisher, *supra* note 45, at 11.

57 Watkiss & Smith, *supra* note 33, at 452-54.

58 *New York v. Fed. Energy Reg. Comm'n*, 535 U.S. 1, 8-9, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002); *see also Fed. Energy Reg. Comm'n v. Mississippi*, 456 U.S. 742, 751, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982); Phillips, *supra* note 32, at 424; Watkiss & Smith, *supra* note 33, at 452-54.

59 Hammonde & Spence, *supra* note 30, at 151.

60 *See* Phillips, *supra* note 32, at 424.

61 *New York*, 535 U.S. at 9, 122 S.Ct. 1012; *see also* Phillips, *supra* note 32, at 424; Watkiss & Smith, *supra* note 33, at 455-56, 487.

62 *New York*, 535 U.S. at 10-12, 122 S.Ct. 1012; *see also* Phillips, *supra* note 32, at 424-25.

63 *See* Phillips, *supra* note 32, at 424-25; Hammonde & Spence, *supra* note 30, at 152-53.

64 Hammonde & Spence, *supra* note 30, at 152.

65 *Pub. Util. Comm. of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001).

66 *Id.*

67 *State v. Pub. Util. Comm'n of Tex.*, 344 S.W.3d 349, 352 (Tex. 2011).

68 *Id.* PURA allowed the utilities to unbundle "through the creation of separate nonaffiliated companies, the creation of separate affiliated companies owned by a common holding company, or the sale of assets to a third party." *City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 237 (Tex. 2001).

69 *Oncor Elec. Delivery Co. v. Pub. Util. Comm'n of Tex.*, 507 S.W.3d 706, 711-12 (Tex. 2017); *see also Pub. Util. Comm'n of Tex.*, 344 S.W.3d at 352; *Tex. Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC*, 324 S.W.3d 95, 97-98 (Tex. 2010); Gonzales, *supra* note 45, at 502-03.

Appx. Page 386 of 740

70      *Oncor Elec. Delivery*, 507 S.W.3d at 712.

71      Tex. Util. Code § 39.151(a), (c). An "independent organization" is an ISO "or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller." *Id.* § 39.151(b).

72      *See* Tex. Pub. Util. Comm'n, *In re ERCOT*, Docket No. 22061, 2000 WL 33959260, at *4 (Apr. 4, 2000) (order); Fleisher, *supra* note 45, at 11; *About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

73      Tex. Util. Code § 39.151(a); *see also Fed. Energy Reg. Comm'n. v. Elec. Power Supply Ass'n*, 577 U.S. 260, 268, 136 S.Ct. 760, 193 L.Ed.2d 661 (2016) (explaining that ISOs "administer[ ] a portion of the grid, providing generators with access to transmission lines and ensuring that the network conducts electricity reliably"); Hammonde & Spence, *supra* note 30, at 152-53.

74      Tex. Util. Code §§ 31.002(9), 39.151.

75      *Ante* at 615-17.

76      *Univ. of the Incarnate Word v. Redus*, 518 S.W.3d 905, 911 (Tex. 2017).

77      *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 407 (Tex. 2020) (quoting *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019)).

78      *About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

79      *See Careers*, ERCOT (2023), http://www.ercot.com/careers.

80      Tex. Util. Code § 39.151(e); *see also About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

81      *See Amended and Restated Certificate of Formation of Electric Reliability Council of Texas, Inc.*, ERCOT (Jan. 31, 2019), https://www.ercot.com/files/docs/2019/02/06/ Amended_and_Restated_Certificate_of_Formation__eff_01.31.2019_.pdf; *Amended and Restated Bylaws of Electric Reliability Council of Texas, Inc.*, ERCOT (Oct. 12, 2021), https://www.ercot.com/files/docs/2022/09/09/01_Current% 20ERCOT% 20Bylaws.pdf.

82      *About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

83      *Ante* at 623-25, 625-26.

84      *See* Tex. Util. Code § 39.151. Somewhat confusingly, PURA designates the Texas power region for which ERCOT serves as the ISO as the "Electric Reliability Council of Texas" or "ERCOT." *Id.* § 31.002(5) (" 'Electric Reliability Council of Texas' or 'ERCOT' means the area in Texas served by electric utilities, municipally owned utilities, and electric cooperatives that is not synchronously interconnected with electric utilities outside the state."); *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 431 (5th Cir. 2016) (noting that the Texas grid "shares the name of its governing board, the Electric Reliability Council of Texas (ERCOT)").

85      Tex. Util. Code § 39.151(a), (c).

86      *See id.* § 39.001(a).

87      *See* 16 Tex. Admin. Code §§ 25.43(o)(2) (protecting ERCOT from liability for transitioning or attempting to transition a customer from a retail electric provider to a provider of last resort), .200(d) (protecting ERCOT from liability for negligently causing service interruptions while attempting to maintain system stability and safety), .361(c) (protecting ERCOT from liability for events beyond its control that could not reasonably be anticipated).

88      *Id.* § 25.362(j)(6).

89 *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019).

90 *See* Tex. Util. Code § 39.151(d).

91 *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 407 (Tex. 2020) (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)).

92 *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 733 (Tex. 2020).

93 *See Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 544 (Tex. 2016).

94 *See Redus*, 602 S.W.3d at 408 n.58 (surveying other state decisions and noting that (1) "[s]ome states hold that sovereign immunity does not extend to a private entity regardless of government control," (2) "[o]ther states hold that, if derivative immunity exists, it provides 'immunity' from liability if the defendant was not otherwise culpable," and (3) "to the extent it is recognized as 'immunity,' it is most often considered 'immunity from liability,' not immunity 'from suit' ").

95 *Ante* at 623.

96 *See id.* at 623-24 (citing Tex. Util. Code §§ 39.151(d), (d-1), (d-4)(3), (e), (g), (g-1), .1513).

97 *Redus*, 602 S.W.3d at 407 (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)).

98 *See Alden v. Maine*, 527 U.S. 706, 715-16, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) ("[T]he doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified."); *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (noting that in 1847, when this Court first recognized the doctrine in its second term, the rule was "then more than six centuries old").

99 *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 191 (5th Cir. 2023) (Oldham, J., concurring).

100 *Id.* at 191-98 (reviewing English common-law tradition, debates between Federalists and Anti-Federalists, and early American court cases).

101 *Id.* at 198.

102 *Id.* at 199 n.6.

103 *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 524 (Tex. 2020).

104 *See id.* at 528-31 (citing Tex. Educ. Code §§ 12.105, .1056(a)).

105 *Cf. Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 746 (Tex. 2019) (although not sovereign entities, political subdivisions share the State's immunity under the governmental-immunity doctrine when performing governmental functions as the State's agent).

106 *Amex Props.*, 602 S.W.3d at 529-30.

107 *Id.* at 528-29 (quoting Tex. Educ. Code §§ 12.105, .1056(a)).

108 *Id.* at 529-30; *see also Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 406 n.51 (Tex. 2020).

109 602 S.W.3d at 398.

110 *Id.* at 404.

111 *Id.* at 411-13 & n.79.

112 *Id.* at 412.

Appx. Page 388 of 740

113    *Id.* at 407 (citing *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)).

114    *Id.* (emphases added) (quoting *Brown & Gay*, 461 S.W.3d at 125). In *Brown & Gay*, the Court considered cases where "the complained-of conduct for which the contractor was immune was effectively attributed to the government. That is, the alleged cause of the injury was not the independent action of the contractor, but the action taken by the government *through* the contractor." 461 S.W.3d at 125.

115    *Redus*, 602 S.W.3d at 407-08.

116    *Id.*

117    606 S.W.3d 726, 731-36 (Tex. 2020).

118    *Id.* at 728.

119    *Id.* at 733.

120    *Id.* at 732 (footnote omitted) (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 130 n.6 (Hecht, C.J., concurring)); *see also Brown & Gay*, 461 S.W.3d at 125-26 ("In this case, the [plaintiffs] do not complain of harm caused by [the government contractor]'s implementing the [government]'s specifications or following any specific government directions or orders.").

121    606 S.W.3d at 733-34 (quoting *Brown & Gay*, 461 S.W.3d at 125, and *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)).

122    *Id.* at 733.

123    *Id.* at 735-36.

124    Tex. Gov't Code § 466.014(a); *Nettles*, 606 S.W.3d at 736.

125    *Nettles*, 606 S.W.3d at 736.

126    *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 412 (Tex. 2020).

127    *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 528-30 (Tex. 2020).

128    *Redus*, 602 S.W.3d at 407-08 (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)). The Court notes that "we have never held that a complete lack of discretion is required for immunity in an arm of the state analysis for a legislatively authorized entity." *Ante* at 625. But we also have never held that an entity not expressly designated as part of the government—like ERCOT—is entitled to sovereign immunity as a legislatively authorized entity.

129    *Nettles*, 606 S.W.3d at 731-37.

130    Tex. Util. Code § 39.151(d).

131    *Ante* at 623-24.

132    Tex. Util. Code § 39.151(d) (emphases added).

133    *Id.*; *see also* 16 Tex. Admin. Code § 25.364(d) (requiring the PUC to find that the ISO "has committed significant violations of PURA or [PUC] rules or failed to efficiently and effectively carry out the duties of an independent organization" before decertification).

134    *Ante* at 623-24 (quoting Tex. Util. Code § 39.151(d-1), (g-1)).

135    *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 736 (Tex. 2020) ("But close supervision and final approval of work over which a contractor has discretion are not the same as the government specifying the manner in which a task is to be performed.").

136    *Ante* at 623-24 (citing Tex. Util. Code §§ 39.151(g), (g-1), .1513).

137    The provisions providing the appointment power do not give the government any formal control over the board members' decisions once appointed. *See* Tex. Util. Code §§ 39.151(g)–(g-6), .1513; *cf. In re Abbott*, 645 S.W.3d 276, 280 n.1 (Tex. 2022) ("The Governor frequently appoints these officers, but the state agencies' enabling statutes rarely give the Governor formal control over the officers' decisions once appointed.").

138    *See Governance*, ERCOT (2023), https://www.ercot.com/about/governance.

139    *See* Tex. Util. Code § 39.151(g-1).

140    *See id.* § 39.151(g-1)(2).

141    *Ante* at 624-25 (citing Tex. Util. Code §§ 39.151(n), .1511).

142    Sunset Advisory Commission, Staff Report with Commission Decisions: Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel 3 (January 2023), https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf.

143    *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019).

144    Sunset Advisory Commission, *supra* note 142, at 80.

145    *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 736 (Tex. 2020).

146    *See* Tex. Util. Code § 39.151(d).

147    *See Nettles*, 606 S.W.3d at 733.

148    Sunset Advisory Commission, *supra* note 142, at 41.

149    *Id.* ("While these informal methods may help the commission move quickly, they do not always adhere to best practices for openness, inclusiveness, and transparency."). The Sunset Commission has also recently found that the "PUC needs more formalized structures and processes when giving ERCOT direction that affects the electric industry and millions of Texans," *id.* at A1, and recommended that the Legislature "[a]uthorize [the] PUC to issue directives to ERCOT through written memos and orders, in addition to rulemaking and contested cases, and authorize stakeholders to formally provide input on theses directives," *id.* at A2. For emergency situations, the Sunset Commission recommended to the Legislature:

> Clarify that [the] PUC can only direct ERCOT outside of these methods in an emergency or other urgent situation that poses an imminent threat to public health, safety, or grid reliability. If [the] PUC's direction to ERCOT is still necessary 72 hours after the emergency or urgent situation, [the] PUC must use the more formal process established under the recommendation to provide documentation of its direction to ERCOT.

*Id.* Neither the PUC nor ERCOT argues that the PUC used formal or informal mechanisms to control ERCOT's complained-of actions.

150    For example, the Sunset Commission's Report explains:

> [The] PUC currently lacks the expertise and staff resources to independently analyze an abundance of electric data and information to make fully informed regulatory decisions, including evaluating their impacts on market participants and the general public....

> While [the] PUC has complete authority to access ERCOT's data, which includes vast amounts of operational and financial data about electricity generation, consumption, and pricing, it lacks the technological capability to do so independently of ERCOT.... Further, any analysis provided by ERCOT may still carry inherent bias due to its focus on grid operations, which prioritizes reliability over considering the cost of such operations. Even if ERCOT were able to provide regulatory impact analysis, [the] PUC staff's current lack of analytical capabilities forces the agency to rely on ERCOT's analysis without independent verification.

> *Id.* at 37-38; *see also id.* at A1 ("The Sunset Commission found [the] PUC was ill-prepared for the task [of being a more active overseer of ERCOT] and is woefully under-resourced given its critical responsibilities and the work that still lies ahead.").

151 *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 405, 407 (Tex. 2020) (quoting *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019)).

152 *Ante* at 623.

153 *See Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 433 (Tex. 2016). Of course, state officials could act ultra vires, which are not considered acts of the state. *See Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) ("The basic justification for this *ultra vires* exception to sovereign immunity is that *ultra vires* acts—or those acts without authority— should not be considered acts of the state at all.").

154 *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 733 (Tex. 2020).

155 *See Rosenberg*, 571 S.W.3d at 750 ("[M]erely engaging in an act that serves a public purpose says nothing about the nature of the entity itself[.]").

156 *See, e.g.*, Sunset Advisory Commission, *supra* note 142, at 1 (noting that after blackouts in 2011 "signaled potential underlying problems," the PUC's "business as usual continued," and with ERCOT "generally managing the grid, [the] PUC never had cause to take a step back and consider how things were working, how it might improve operations, or what funding and staff may be needed to do so").

157 *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 528-29 (Tex. 2020); *see also Redus*, 602 S.W.3d at 412 (noting that "[t]he statutory text demonstrates the legislature's awareness of the ramifications of government-entity status" and "[r]ather than categorically transforming a private university's status, the statute links immunity to the peace officers who perform law enforcement functions").

158 *Lt. Gov. Dan Patrick Announces Top 31 Priorities for the 2021 Session*, Off. of the Lieutenant Governor (Feb. 23, 2021), https://www.ltgov.texas.gov/2021/02/23/lt-gov-dan-patrick-announces-top-31-priorities-for-the-2021-session/.

159 *See* Act of May 30, 2021, 87th Leg., R.S., ch. 908, 2021 Tex. Gen. Laws 2218, 2218-27; Act of May 28, 2021, 87th Leg., R.S., ch. 950, 2021 Tex. Gen. Laws 2465, 2465-72.

160 *See Redus*, 602 S.W.3d at 412. Of course, the mere designation of a private entity as part of the government is not sufficient to establish the entity as an arm of the state entitled to sovereign immunity. *See id.* at 405.

161 *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 731 (Tex. 2020) (citing *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)). The Court asserts that "the PUC had significant control and authority over the very conduct at issue in these cases." *Ante* at 625. But "ha[ving] significant control and authority" is not the same as exercising control over the complained-of conduct. CPS Energy expressly distinguishes between ERCOT's and the PUC's actions, stating that it "is not contesting the entire five-day period [of high wholesale electricity prices], or the PUC Orders, but only ERCOT's failure to follow those orders during the storm's last 33 hours," and that "CPS Energy's complaints do not concern these PUC Orders. The problem lies in ERCOT's decision not to follow them." And although Panda may have agreed that "the PUC *could have* controlled the CDR data output had it wanted to," *id.* at 625 (emphasis added), the issue is whether the PUC actually controlled ERCOT.

162 *See Brown & Gay*, 461 S.W.3d at 126 ("We need not establish today whether some degree of control by the government would extend its immunity protection to a private party; we hold only that no control is determinative.").

163 *Redus*, 602 S.W.3d at 407 (noting that sovereign immunity "potentially extends" if the complained-of conduct was effectively "action taken by the government").

164 The Court implies that we should not consider specific conduct because "[s]overeign immunity is entity-based." *Ante* at 625 (quoting *Redus*, 602 S.W.3d at 407). But the Court then holds that "ERCOT would not be immune outside that role" as the ISO, distinguishing between ERCOT's *conduct* as an ISO and its *conduct* outside that role for immunity purposes. *Id.* at 628. To the extent sovereign immunity possibly applies when the private entity is not expressly designated as part of the government, it should depend on whether the government has oversight authority *and* actually exercised that authority and control over the conduct at issue.

165 *See* Tex. Util. Code § 39.151(d).

166 *Redus*, 602 S.W.3d at 405 (quoting *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019), and *Ben Bolt-Palito Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006)).

167 *Id.* at 401 (citing *Rosenberg*, 571 S.W.3d at 750).

168 *Rosenberg*, 571 S.W.3d at 740.

169 *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015).

170 *Rosenberg*, 571 S.W.3d at 740-41 (quoting *Brown & Gay*, 461 S.W.3d at 121).

171 *See Hughes v. Tom Green County*, 573 S.W.3d 212, 218 (Tex. 2019).

172 *Hillman v. Nueces County*, 579 S.W.3d 354, 361 (Tex. 2019) (quoting *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006)); *see also Chambers–Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 347 (Tex. 2019).

173 *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 404 (Tex. 2020) (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006)).

174 *Brown & Gay*, 461 S.W.3d at 123.

175 *Hughes*, 573 S.W.3d at 218.

176 *Ben Bolt-Palito Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 326 (Tex. 2006).

177 *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 704 (Tex. 2019) (quoting *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 839 (Tex. 2018), and *Reata Constr.*, 197 S.W.3d at 382).

178 *See Brown & Gay*, 461 S.W.3d at 121.

179 *Ante* at 624, 627; *see also* Tex. Util. Code § 39.151(e); *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 175 n.3 (Tex. 2013) (addressing regulatory fees, which "support a regulatory regime governing those who pay the fee").

180 *See Brown & Gay*, 461 S.W.3d at 124 n.7 ("[P]rivate parties ... have an established means of protecting themselves from the specter of costly litigation—insurance.").

181 *Hughes v. Tom Green County*, 573 S.W.3d 212, 220 (Tex. 2019).

182    ERCOT admits, however, that although a "number of court cases have been brought against ERCOT arising out of the February 2021 extreme winter weather event," it "does not believe that the outcome of this litigation will affect its key functions." Elec. Reliability Council of Tex. (ERCOT), Self-Evaluation Report: A Report to the Texas Sunset Advisory Commission 14 (Sept. 2021), https://www.sunset.texas.gov/public/uploads/files/reports/ERCOT% 20SER_9-01-21.pdf.

183    *See* Tex. Util. Code § 39.151(a), (c).

184    *See id.* § 39.151(a), (d).

185    *See Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 410 (Tex. 2020).

186    *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015).

187    *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 740-41 (Tex. 2019).

188    Tex. Util. Code § 39.151(d).

189    *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 544 (Tex. 2016) (alteration in original) (quoting *Essenburg v. Dallas County*, 988 S.W.2d 188, 189 (Tex. 1998), and *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013)).

190    Tex. Util. Code § 15.001.

191    The PUC also purports to protect ERCOT from liability by mitigating risks of unforeseen expenditures through promulgated rules. *See* 16 Tex. Admin. Code §§ 25.200(d) (protecting ERCOT from liability "for its ordinary negligence" when it "cause[s] the interruption of transmission service for the purpose of maintaining ERCOT system stability and safety"), .361(c) ("ERCOT shall not be liable in damages for any act or event that is beyond its control and which could not be reasonably anticipated and prevented through the use of reasonable measures."); *cf. Rosenberg*, 571 S.W.3d at 751 (noting that "the statutory scheme itself contains provisions limiting liability and financial exposure" that prevent any "genuine risk of unforeseen expenditures").

192    *See* Tex. Util. Code § 39.151(d) ("The commission by rule shall adopt procedures governing decertification of an independent organization, selecting and certifying a successor organization, and transferring assets to the successor organization to ensure continuity of operations in the region."); 16 Tex. Admin. Code § 25.364 ("Decertification of an Independent Organization").

193    *See Rosenberg*, 571 S.W.3d at 751.

194    *Hall v. McRaven*, 508 S.W.3d 232, 243 (Tex. 2017).

195    *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121-22 (Tex. 2015).

196    *City of Galveston v. State*, 217 S.W.3d 466, 480 n.38 (Tex. 2007) (Willett, J., dissenting).

197    Fed. Energy Regul. Comm'n, N. Am. Elec. Reliability Corp., & Reg'l Entities, FERC, NERC and Regional Entity Staff Report: The February 2021 Cold Weather Outages in Texas and the South Central United States 9 (Nov. 16, 2021), https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and.

198    Sunset Advisory Commission, *supra* note 142, at 105 (quoting *Winter Storm 2021 and the Lifting of COVID-19 Restrictions in Texas*, Univ. of Hous. Hobby Sch. of Pub. Affs. (Mar. 25, 2021), https://uh.edu/hobby/winter2021/).

199    *Id.*

200    *See* Elec. Reliability Council of Tex. (ERCOT), *supra* note 182, at 14.

201    *See Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 411 (Tex. 2020) ("Political accountability is a vital counterweight to sovereign immunity's inequity.").

**Appx. Page 393 of 740**

202    *See Marbury v. Madison*, 5 U.S. 137, 163, 1 Cranch 137, 2 L.Ed. 60 (1803); *see also Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 435 (Tex. 2016) ("If immunity is applicable, *then* the judiciary defers to the legislature to waive such immunity.").

203    *Redus*, 602 S.W.3d at 411 (footnote omitted) (quoting *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 51 (Tex. 2015)).

204    *Id.* at 410-11 (quoting *Hillman v. Nueces County*, 579 S.W.3d 354, 361 (Tex. 2019)).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Appx. Page 394 of 740

# APPENDIX C

691 S.W.3d 448
Supreme Court of Texas.

PUBLIC UTILITY COMMISSION
OF TEXAS, Petitioner,

v.

LUMINANT ENERGY
COMPANY LLC, Respondent

No. 23-0231
|
Argued January 30, 2024
|
OPINION DELIVERED: June 14, 2024

**Synopsis**

**Background:** Energy company sought judicial review of Public Utility Commission's orders that directed the Electric Reliability Council of Texas (ERCOT) to ensure that firm load that was being shed was accounted for in ERCOT's scarcity-pricing signals during a winter storm, which orders resulted in ERCOT manually plugging a value into the scarcity-pricing mechanism (SPM) that had the effect of raising the wholesale price of electricity until the grid returned to normal operations. After several parties intervened on each side, a two-judge panel of the Austin Court of Appeals, 665 S.W.3d 166, determined that the orders exceeded the Commission's authority and were invalid. Commission and parties aligned with it petitioned for review.

**Holdings:** The Supreme Court, Hecht, C.J., held that:

energy company had constitutional standing to seek judicial review of the orders;

judicial-review proceedings were not moot;

orders met the Administrative Procedure Act's (APA) definition of a "rule,"

orders were "competition rules" under the Public Utility Regulatory Act's (PURA) provision that authorized judicial review of competition rules;

PURA permitted the orders; and

Commission substantially complied with the APA's emergency rulemaking procedures.

Judgment of Court of Appeals reversed; judgment affirming orders rendered.

**\*451** On Petition for Review from the Court of Appeals for the Third District of Texas

**Attorneys and Law Firms**

J. Mark Little, Macey Reasoner Stokes, George Harold Fibbe, Houston, Patrick Leahy, Andrea Moore Stover, Austin, for Petitioners Calpine Corporation, Talen Energy Corporation.

William Peacock III, Pro Se.

Kurt Kuhn, Lisa Hobbs, Austin, Michael J. Jewell, for Intervenor RWE Renewables Americas LLC.

Carter Gantt, Samuel W. Cooper, Houston, for Amicus Curiae EDF Trading North America, LLC.

Mark Oakes, Austin, Warren S. Huang, Houston, James Hughes, for Intervenors Pattern Gulf Wind LLC, Pattern Panhandle Wind, LLC, Logan's Gap Wind LLC, Pattern Energy Group LP.

Conor Harvey, Michelle Stratton, for Amicus Curiae Quality Sausage Company, LLC.

Ben Barnes, Dallas, Anna Rotman, Houston, Andrea DeLorimier, Austin, George W. Hicks, Jr., Jamie Aycock, for Petitioner TexGen Power, LLC.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Petitioners DGSP2 LLC, Distributed Generation Solutions LLC.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Amicus Curiae Aspire Commodities, LP.

John F. Bash III, Austin, Szymon S. Barnas, Lindsay May Weber, James C. Tecce, for Amicus Curiae Just Energy Texas LP, Fulcrum Retail Energy, LLC, Hudson Energy Services LLC, Just Energy Texas I Corp., and Just Energy Group, Inc.

Lara D. Pringle, Ewaen Woghiren, Jazmine Gomez, Houston, for Amicus Curiae Via Renewables, Inc.

Appx. Page 396 of 740

Michael Boldt, Lino Mendiola, Austin, for Intervenor Exelon Generation Company, LLC.

David Benjamin Gerger, Houston, for Amicus Curiae The Chamber of Commerce of The United States of America.

Joseph A. Garnett, Houston, for Amicus Curiae JSW Steel (USA) Inc.

Michael J. Jewell, for Intervenor TX Hereford Wind, LLC.

Eric B. Storm, Austin, William W. Russell, Houston, Robert Scott Potosky, for Intervenor Texpo Power LP.

Mark Foster, Austin, Henry Joel Simmons, for Amicus Curiae B&B Theatres Operating Company, Inc., Boles Children's Home, Brooklet Energy Distribution, LLC, Eligo Energy TX, LLC, Hartman Income REIT Management, Inc., Tubes, Inc., and Young Energy, LLC.

Angela V. Colmenero, Austin, Brent Webster, Houston, Kyle D. Highful, Lanora C. Pettit, Sara B. Baumgardner, Atty. Gen. W. Kenneth Paxton Jr., A. Lee Czocher, Lisa A. Bennett, Judd Stone II, Ryan Baasch, for Petitioner Public Utility Commission of Texas.

Ron Beal, Pro Se.

Elliot Clark, Wallace B. Jefferson, Elin Isenhower, Austin, Rachel Anne Ekery, Houston, for Amicus Curiae Electric Reliability Council of Texas, Inc.

Jay Quine, for Amicus Curiae Hartman vREIT XXI, Inc.

Denis Fallon, Paul Pantano Junior, Neal E. Kumar, for Amicus Curiae Futures Industry Association, Inc.

William A. Moore, Melissa A. Lorber, Austin, Allyson N. Ho, Elizabeth Kiernan, Dallas, Daniel Jude Kelly, Irving, Joseph Barakat, Katherine Montoya, Amy Leila Prueger, Michael Lawrence Raiff, Trenton Van Oss, Stephanie Renee Zapata, for Respondent.

Warren S. Huang, Houston, Mark Oakes, Eric B. Storm, Austin, James Hughes, for Intervenor Pattern Panhandle Wind 2 LLC.

Joseph Cecere, for Amicus Curiae South Texas Electric Cooperative.

## Opinion

Chief Justice Hecht delivered the opinion of the Court.

**\*452** During Winter Storm Uri, with the Texas electric grid on the brink of collapse, the Public Utility Commission issued two orders, the effect of which was to raise the market price of electricity to the regulatory ceiling of $9,000/MWh[1] to reflect the scarcity of supply, thereby incentivizing generators capable of adding supply to do so and large industrial users to reduce their demand. Some market participants went bankrupt. Litigation ensued.[2]

In this case, the court of appeals held that the Commission's orders exceeded its authority under Chapter 39 of the Public Utility Regulatory Act (PURA) because the statute prohibits price-setting.[3] We disagree. We also hold that the Commission substantially complied with the Administrative Procedure Act's (APA) procedural rulemaking requirements, an issue the court of appeals did not reach. We reverse the judgment of the court of appeals and render judgment affirming the orders.[4]

**\*453 I**

**A**

The Legislature added Chapter 39 to PURA in 1999 as part of Texas' transition to a competitive retail electric market.[5] Though its provisions are wide-ranging, only a few are at issue here. Among subchapter A's "General Provisions" is Section 39.001, which includes several statements of "Legislative Policy and Purpose". There, in subsection (a), the Legislature states its finding that "the public interest in competitive electric markets requires", with some exceptions, that "electric services and their prices should be determined by customer choices and the normal forces of competition."[6] Continuing that theme, subsection (d) states that "[r]egulatory authorities ... shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter to the greatest extent feasible and shall adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition."[7]

Subsections (c), (e), and (f) address rules. Subsection (c) prohibits regulatory authorities from "mak[ing] rules or

issu[ing] orders regulating competitive electric services, prices, or competitors or restricting or conditioning competition except as authorized in this title".[8] Subsections (e) and (f) authorize "[j]udicial review of competition rules"[9]—a concept we return to later—and set out the procedure for initiating such review directly in the court of appeals.[10]

The other provisions at issue are in subchapter D, which addresses "Market Structure". Section 39.151(c) requires the Commission to "certify an independent organization"—here, ERCOT[11]—"to perform the functions prescribed by this section."[12] Four functions are listed in subsection (a). The second is "ensur[ing] the reliability and adequacy of the regional electrical network".[13] The fourth is "ensur[ing] that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region."[14]

Section 39.151(d) sets out the Commission's oversight of ERCOT. "The commission shall adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators", or it may delegate that responsibility **\*454** to ERCOT.[15] ERCOT "is directly responsible and accountable to the commission", which "has complete authority to oversee and investigate [ERCOT's] finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties."[16] If ERCOT "does not adequately perform [its] functions or duties or does not comply with this section," the Commission can "take appropriate action", including decertification.[17]

**B**

As set out above, two of ERCOT's statutory duties are ensuring the adequacy and reliability of the electric grid and ensuring that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region.[18] Relatedly, the Commission is charged with making rules addressing those duties or delegating the rulemaking responsibility to ERCOT, over which the Commission has complete authority.[19] Under the Commission's rules, "ERCOT shall determine the market clearing prices of energy", "[e]xcept as otherwise directed by the commission".[20] "The protocols and other rules" adopted by ERCOT "shall promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system."[21]

Texas maintains an "energy only" market in which generators are compensated only for the energy they actually produce, as opposed to a "capacity market" in which generators are paid to maintain capacity for times of high demand. In an energy-only market, generators are incentivized to come online in times of high demand by higher prices for wholesale electricity. To ensure sufficient power generation during times of high demand, the Commission by rule established a scarcity-pricing mechanism—or SPM—and directed ERCOT to administer it.[22]

The SPM is a mathematical formula run on ERCOT's computers that sends price-based signals to energy generators regarding whether additional power is needed. Its goal is to ensure that in times of energy shortage, prices adequately account for high demand and the amount of reserves needed to keep the lights on. The formula should result in an inverse correlation between energy capacity in the grid and the price of electricity—the less energy available, the higher the price to incentivize generators to add power.

The SPM is complex, but only a few of its components need explanation here. The Commission by rule sets a ceiling on the price of energy, called the high system-wide offer cap, or HCAP. In February 2021, the HCAP was $9,000/ MWh.[23] Another component of the SPM is the value of lost load or VOLL, which reflects the hypothetical price a customer would pay to avoid the loss of electrical service. The **\*455** SPM was designed so that in times of extreme scarcity, when forced blackouts are imminent or occurring due to an insufficient supply of electricity to meet demand, the wholesale price of electricity approaches the VOLL. By Commission rule, the VOLL in February 2021 was set to be equal to the HCAP of $9,000/MWh.[24]

**C**

Appx. Page 398 of 740

For the ERCOT grid to remain functional, electricity supply and demand must remain balanced at a frequency of 60 hertz. The grid can operate at a frequency of 59.4 hertz for up to nine minutes before grid failure occurs.

Winter Storm Uri descended upon Texas over Valentine's Day weekend of 2021, bringing frigid air from the North Pole and record snowfall and low temperatures. As energy demand soared, almost 50% of the power-generation equipment in Texas froze and went offline. In the early morning hours of Monday, February 15, energy reserves dipped low enough to trigger the first level of grid emergency, Emergency Energy Alert Level 1. Within about an hour, reserves had dipped lower, triggering EEA2 and then EEA3—the highest level of alert. After breaching EEA3, ERCOT's protocols required it to "shed firm load"—start mandatory rolling blackouts—which it did. Available power continued to fall, which necessitated massive, more widespread blackouts. That morning, the grid operated at or below 59.4 hertz for just over four minutes. Texas was fewer than five minutes away from a total grid collapse that would have plunged the state into darkness for weeks, maybe months.

The mandatory blackouts averted the worst-case scenario, but ERCOT remained in EEA3. ERCOT called the Commission's attention to a problem that ERCOT perceived in the pricing signals that the SPM was sending to the market. Because the system was in load shed—mandatory blackouts were occurring—the price of energy should have been at the VOLL and HCAP of $9,000/MWh to incentivize generation. Instead, the price was fluctuating to as low as $1,200. ERCOT was having to hold some energy in reserve to maintain the system, and it believed the SPM interpreted the existence of those reserves to mean that load shed was no longer occurring.

**D**

The Commission called an emergency meeting for the evening of February 15. The notice advised that the meeting was "necessary to allow the Commission to address the imminent threat to public health and safety due to this loss of electricity for millions of citizens in the ERCOT region." At the meeting, the Commission would determine whether to "exercise its authority under section 39.151 of [PURA] to ensure that the electricity market provides clear signals to generators of the value of generation when customer loads must be shed to protect the ERCOT system". Specifically, the Commission would "consider whether the system demand

component of energy prices should be set at the system-wide offer cap when firm load is being shed." "Without such decisions," the notice stated, "the continuing lack of electricity for some of the citizens of Texas could result in loss of life or damage to property that otherwise could be prevented."

After a short meeting, the Commission issued the first of two orders at issue in this case. Citing the language in Section 39.151(d) that gives the Commission complete authority over ERCOT, the order "directs ERCOT to ensure that firm load **\*456** that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals":

**ORDER DIRECTING ERCOT TO TAKE ACTION AND GRANTING EXCEPTION TO COMMISSION RULES**

On February 12, 2021, pursuant to Texas Government Code § 418.014, in response to an extreme winter weather event, Governor Greg Abbott issued a Declaration of a State of Disaster for all counties in Texas.

Further, on February 15, 2021, the Electric Reliability Council of Texas, Inc. (ERCOT) declared its highest state of emergency, an Emergency Energy Alert Level 3 (EEA3), due to exceptionally high electric demand exceeding supply. ERCOT has directed transmission operators in the ERCOT region to curtail more than 10,000 megawatts (MW) of firm load. The ERCOT System is expected to remain in EEA3, and firm load shed is expected to continue, for a sustained period of time in light of the expected duration of the extreme weather event.

This Order addresses two significant market anomalies identified during this EEA3 event.

**I. Energy Prices Lower than System-Wide Offer Cap During Load-Shed Event**

ERCOT has informed the Commission that energy prices across the system are clearing at less than $9,000, which is the current system-wide offer cap pursuant to 16 TAC § 25.505(g)(6)(B). At various times today, energy prices across the system have been as low as approximately $1,200. The Commission believes this outcome is inconsistent with the fundamental design of the ERCOT market. Energy prices should reflect scarcity of the supply. If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest.

Utilities Code § 39.151(d) gives the Commission "complete authority" over ERCOT, the independent organization certified by the Commission pursuant to § 39.151. Further, 16 TAC § 25.501(a) provides that ERCOT determines market clearing prices of energy and other ancillary services in the ERCOT market unless "otherwise directed by the commission."

Pursuant to this authority, the Commission determines that adjustments are needed to ERCOT prices to ensure they accurately reflect the scarcity conditions in the market. Accordingly, the Commission directs ERCOT to ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals. The Commission further directs ERCOT to correct any past prices such that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals.[25]

The following day, February 16, the Commission issued a second order that is identical to the first except that it rescinds the last sentence under part I of the February **\*457** 15 order directing ERCOT to correct past prices.

ERCOT acted on the Commission's directive by manually plugging a value into the SPM that would have the effect of raising the price of electricity to $9,000. This manual change remained in place until the grid returned to normal operations on February 19.

### E

The storm's fallout was substantial. All three commissioners resigned. The Legislature sprang into action, enacting laws to improve preparation for winter weather emergencies[26] and to stabilize the market by offering a securitization program to market participants who had suffered defaults or losses from the high prices.[27] Still, some utilities went bankrupt.

Luminant is a power company that both buys and sells electricity. Although its sales offset some of the losses from purchasing electricity during the storm, Luminant claims that it suffered a net loss of a billion dollars from purchasing electricity at $9,000 during the storm. Luminant filed administrative challenges to the invoices it received for those purchases[28] and, in March 2021, sought judicial review of the Orders in the court of appeals under PURA Section 39.001(e)-(f). Several parties intervened on each side.

A two-judge panel rejected each of the jurisdictional objections raised by the Commission and held that the Orders exceed the Commission's authority under PURA and are therefore invalid.[29] The court did not reach Luminant's alternative argument that the Orders fail to comply with the procedural rulemaking requirements of the APA. The Commission and parties aligned with it filed petitions for review, which we granted.[30]

### II

We start, as we must, with jurisdiction. The Commission challenges the court of appeals' subject-matter jurisdiction on three bases.

### A

The Commission raises issues of standing and mootness. "Constitutional standing requires a concrete injury that is both traceable to the defendant's conduct and redressable by court order."[31] The Commission acknowledges that being overcharged for electricity is the "sort of pocketbook injury [that] is a prototypical form of injury in fact",[32] but it argues that Luminant's injuries are not redressable through this appeal. Specifically, the Commission argues that what Luminant "ultimately seek[s]" is "retrospective repricing"— it wants its money back—and PURA does not authorize the court of appeals to grant that relief. The court can only "render **\*458** judgment affirming the rule or reversing and, if appropriate on reversal, remand[ ] the rule to the commission for further proceedings, consistent with the court's opinion and judgment."[33]

But Luminant has challenged the invoices it received during the storm in an administrative proceeding, which is abated pending the outcome of this litigation. If the court of appeals' judgment invalidating the Orders were upheld, the decision would be binding in the administrative process. The Commission points out that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "[34] The Commission argues that whether Luminant could recoup its losses in the administrative proceeding is speculative because ERCOT does not maintain a fund of money—it just facilitates market transactions— and any payment would come out of the pocket of other

market participants. Essentially, the Commission's argument is that the egg cannot be unscrambled. Yet potentially it can. Luminant points us to ERCOT protocols authorizing invoice repricing and market-wide resettlements[35] and to a market-wide resettlement that occurred just prior to the storm.[36] We conclude that Luminant has standing to seek judicial review of the Orders.[37]

We are likewise unpersuaded by the Commission's argument that Luminant's appeal was moot[38] before it even began. The Commission argues that the Orders expired on their own terms when the market returned to normal operations on February 19, 2021. But Luminant suffered financial loss as a result of the Orders. Following the Commission's logic would mean that short-term rules could never be challenged. That is not the law.[39]

**B**

PURA authorizes judicial review of **\*459** *competition rules.*[40] The Commission argues that the Orders are not rules at all, much less competition rules. The APA defines *rule* as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency".[41] The definition "includes the amendment or repeal of a prior rule" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures."[42] The Commission argues that the Orders do not meet this definition because "they applied only to a single, discrete event: the EEA3 event that occurred [during Winter Storm Uri]."

We conclude that the Orders meet the APA's definition of a rule. They directed ERCOT to implement the Commission's policy that "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest." This policy applied to all market transactions.[43] And while the Orders were addressed to ERCOT, the policy they implemented affected market participants directly.[44]

We also conclude that the Orders are competition rules within the meaning of PURA. The statute does not define competition rule. Citing dictionary definitions of

*competition* and derivative terms, the Commission proffers that "competition rules are anti-monopolistic rules geared toward curbing the effects of monopolies and other anti-competitive practices." There is no language in PURA to support such a narrow construction. We need not delineate the precise contours of competition rule. The Orders were adopted under Chapter 39. A fair reading of Section 39.001 indicates that a rule regulating pricing of the wholesale electricity market is within the term's ambit.[45]

**\*460** The Commission points out that in 2023, the Legislature amended Chapter 39 to distinguish between rulemaking and a written order of the Commission adopted by majority vote and to authorize the Commission to give ERCOT verbal directives in an emergency.[46] The Commission argues that these amendments codify its preexisting authority to direct ERCOT through a written order that is distinct from rulemaking. Yet there is nothing in the text reflecting the Legislature's intent either to confirm existing authority of the Commission or to give the Commission new authority, and the amendments did not take effect until September 1, 2023. Our task, therefore, is to determine whether the Orders are competition rules under the 2021 version of PURA such that they could be challenged by direct appeal to the court of appeals. We hold that they are.

Having concluded that the court of appeals had jurisdiction over Luminant's suit, we turn to the merits.

**III**

The Commission argues that the court of appeals erred in its conclusion that the Orders exceed the Commission's authority under PURA. We agree.

**A**

Agency rules are presumed valid, and the challenger has the burden of proving a rule's invalidity.[47] A challenger can meet this burden by showing that the challenged rule (1) contravenes specific statutory language; (2) runs counter to the general objectives of the statute; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions.[48] Only (1) and (2) are at issue here.

**Appx. Page 401 of 740**

We discern a statute's objectives from its plain text.[49] That text must always be read "in context—not isolation."[50] We "give meaning to every word in a statute, harmonizing each provision",[51] while "consider[ing] the context and framework of the entire statute", in order **\*461** to "meld its words into a cohesive reflection of legislative intent."[52] At the same time, "[w]e take statutes as we find them, presuming the Legislature included words that it intended to include and omitted words it intended to omit."[53]

### B

The court of appeals' opinion acknowledges some of these principles, yet its analysis departs from them. The court compared the legislative findings on the desirability of competition in Section 39.001(a) and (d)[54] with the language setting out ERCOT's responsibility to ensure the reliability of the power grid and the Commission's responsibility to make rules on that topic in Section 39.151(a) and (d).[55] The court then phrased "[a] threshold question" as "whether the authority granted by Section 39.151 qualifies, or is qualified by, the limitations imposed by 39.001."[56] "Put another way," the court said, "the question is whether, or to what extent, Section 39.151's directive to ensure system reliability provides an exception to Section 39.001's general preference for reliance on competition rather than regulation to set prices."[57]

The court observed that "Section 39.151 is silent as to whether 'regulatory' rather than 'competitive' methods may be adopted to ensure grid reliability."[58] From there, it concluded that "the Commission's actions must be subject to the constraint provided by the text of Section 39.001."[59] The court believed this result to be directed by "the whole-text canon", which, the court said, "require[d] that [it] give effect to the phrase 'greatest extent feasible' " in Section 39.001(d).[60] To find that the Orders complied with the statement in Section 39.001(d) that the Commission "shall authorize or order competitive rather than regulatory methods to achieve the goals of [Chapter 39] to the greatest extent feasible", the court said that it "must find that the Orders could not have used 'competitive rather than regulatory methods' to any greater extent than they did as issued."[61] "This [it] [could not] do" because, prior to the Orders' being issued, the "SPM did not result in 'HCAP' pricing."[62]

### C

The whole-text canon "calls on the judicial interpreter to consider the entire text, **\*462** in view of its structure and of the physical and logical relation of its many parts."[63] It incorporates the principles of statutory interpretation we have set out above.[64] The canon does not support the court of appeals' analysis or conclusion. Applying it yields the opposite result. Instead of treating Sections 39.001 and 39.151 as conflicting,[65] the court should have asked whether they can be harmonized[66] within the context and framework of the entire statute,[67] giving effect to both.[68] The answer is yes.

Section 39.001 announces the legislative policy that the price of electricity should be determined by competition while also acknowledging that the new market will not be completely unregulated. Subsection (a) states that prices should be determined by competition "except for transmission and distribution services and for the recovery of stranded costs".[69] Subsection (c) reflects the Legislature's understanding that "[r]egulatory authorities" may indeed have to "make rules or issue orders regulating ... prices ... or restricting ... competition" by stating that such rules can only be made "as authorized in this title".[70] Subsection (d) provides that "[r]egulatory authorities ... shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter", but then the Legislature added, "to the greatest extent feasible".[71] Subsection (d) also directs regulatory authorities to "adopt rules and issue orders that are both practical and limited *so as to impose the least impact* on competition."[72] Luminant argues that Section 39.001 prohibits the Commission from engaging in any act whatsoever that regulates prices, but it gets there by disregarding much of the section's language.[73]

**\*463** The subchapters that follow flesh out how the transition to a competitive market will take place and how the new market will be structured. They reveal an additional legislative policy: the provision of reliable electric service. Within a subchapter addressing retail competition, Section 39.101 directs the Commission, prior to the transition's being completed, to establish protections entitling a customer "to safe, reliable, and reasonably priced electricity, including protection against service disconnections in an extreme

Appx. Page 402 of 740

weather emergency".[74] Later, Section 39.151 expressly directs ERCOT to "ensure the reliability and adequacy of the regional electrical network"[75] and gives the Commission "complete authority" to ensure that ERCOT adequately performs that duty, which includes rulemaking "relating to the reliability of the regional electrical network".[76] In sum, the Orders are authorized by Section 39.151. Nothing in Section 39.001 changes that;[77] to the contrary, Section 39.001 acknowledges that the goal of prices set by competition may, in some circumstances, have to yield.

Deciding when those circumstances are present—and how to respond—is the Commission's job, not the judiciary's. We addressed the judiciary's limited role in reviewing agency rules for validity in *Texas Board of Chiropractic Examiners v. Texas Medical Ass'n.*[78] That case involved rules by the Chiropractic Examiners Board defining two terms that the Legislature had used in defining the scope of chiropractic practice.[79] The Medical Association challenged the rules' validity under the APA, arguing that the rules enlarged the scope of chiropractic beyond its statutory bounds.

We criticized the trial court for "weigh[ing] evidence—specifically, witness testimony presenting each side's view of the appropriate line between chiropractic and [medicine]—as if it were doing the Board's work anew."[80] We reiterated that "[t]he proper question for the court was whether, despite [the rules'] presumption of validity, [they] contravene[ ] the Act's specific text or run[ ] counter to its purpose as a matter of law."[81] This textual analysis "ensures that courts will stay in their lane."[82] "Judges are experts in statutory analysis, not in healthcare", we said.[83] "To prevent expensive and time-consuming usurpations of administrative agencies' policymaking work, the court's inquiry in a ... suit challenging the validity of an agency rule must be limited."[84]

The lessons of *Chiropractic Examiners* apply squarely here. The Commission has the expertise to manage the electric utility industry; the courts do not. The court of appeals thus strayed from its lane by inquiring **\*464** whether the Orders could have used " 'competitive rather than regulatory methods' to any greater extent than they did".[85] And for the same reason, we must decline Luminant's invitation to second-guess the Orders' necessity and whether it was the price hike they enacted or the Commission's earlier load-shed directives that truly saved the grid from collapse.

When the claim is that an agency rule exceeds the scope of statutory law, the judiciary's role is purely textual. We have concluded that the Orders do not "contravene[ ] specific statutory language" or "run[ ] counter to the general objectives of" Chapter 39, so the presumption of validity holds.[86]

## IV

Because of the court of appeals' holding on PURA, the court did not reach Luminant's alternative argument that the Orders violate the APA's rulemaking procedures. The issue is fully briefed in this Court, and the parties urge us to address it. We do and conclude that the Orders substantially comply with the statutory requirements.

The Government Code authorizes a state agency to "adopt an emergency rule without prior notice or hearing, or with an abbreviated notice and a hearing that it finds practicable, if the agency":

> (1) finds that an imminent peril to the public health, safety, or welfare ... requires adoption of a rule on fewer than 30 days' notice; and

> (2) states in writing the reasons for [that] finding ....[87]

The finding of imminent peril "shall [be] set forth in an emergency rule's preamble".[88] The agency "shall file" the emergency rule and the written reasons for it "in the office of the secretary of state for publication in the Texas Register".[89] The Legislature has determined that substantial compliance with these requirements is enough to defeat a procedural challenge to an emergency rule.[90] "A mere technical defect that does not result in prejudice to a person's rights or privileges is not grounds for invalidation of a rule."[91]

### A

The requirement of a written finding of imminent peril and reasons for that finding in the rule's preamble is satisfied by language in the Orders' introductory paragraphs, which note:

> • the Governor's having issued a statewide disaster declaration under Section 418.014 of the Government Code;[92]

**Appx. Page 403 of 740**

- ERCOT's having "declared its highest state of emergency", an EEA3, "due to exceptionally high electric demand exceeding supply";

  **\*465** • ERCOT's having directed transmission operators to shed load; and

- the expectations that ERCOT would remain in EEA3 and load shed would continue "for a sustained period of time in light of the expected duration of the extreme weather event."

Luminant complains that the Commission did not quote the exact statutory language under a heading titled "preamble". But only substantial compliance is required. We have said that "[a]n agency's order substantially complies with" a procedural rulemaking requirement if it "accomplishes the legislative objectives underlying the requirement" and "comes fairly within [its] character and scope".[93] The requirement that a reasoned finding of imminent peril be set out at the beginning ensures that the agency explains to the public why it is not following the usual procedures and timeline before making the rule. The language the Commission included in the Orders' introduction achieves that goal.[94]

**B**

It is undisputed that the Commission did not file the Orders with the Secretary of State to be published in the Texas Register. Publication in the Register is the only formal statutory notice requirement for an emergency rule,[95] but under the Secretary's regulations, there is an almost two-week gap between the deadline for filing a rule and the date of its publication in the Register.[96] If the Commission had filed the Orders with the Secretary but done nothing else, the Orders would have expired before any interested party received notice of them.

Elsewhere, the APA states that an "agency shall take appropriate measures to make emergency rules known to

persons who may be affected by them."[97] The Commission did that by immediately posting the Orders on its website. The Orders were also summarized and linked in a notice that was posted on ERCOT's website and emailed to its distribution list. Under the circumstances, these measures provided better and faster notice to interested parties and the public than publication in the Register would have.

Luminant argues that substantial compliance does not apply to the filing requirement because the APA provides that emergency rules become "effective immediately on filing with the secretary of state".[98] Yet the statutory text says that it does. "A rule is voidable unless a state agency adopts it **\*466** in substantial compliance with Sections 2001.0225 through 2001.034."[99] The filing requirement for an emergency rule is in Section 2001.034(d).

Finally, neither Luminant nor any other respondent has articulated any prejudice resulting from the Commission's failure to file the Orders with the Secretary.[100] There is no dispute that respondents had actual notice of the Orders. Luminant contends that the Commission's "hasty process ... cost Luminant and other market participants hundreds of millions of dollars". But that complaint is about the Orders' substance, not their procedure.

We hold that the Commission substantially complied with the APA's emergency rulemaking procedure.

\* \* \* \* \*

We reverse the judgment of the court of appeals and render judgment affirming the Orders.[101]

Justice Huddle and Justice Young did not participate in the decision.

**All Citations**

691 S.W.3d 448, 67 Tex. Sup. Ct. J. 1070

---

Footnotes

1    MWh is an abbreviation for megawatt hour, which is a unit of energy.

Appx. Page 404 of 740

2   *See Pub. Util. Comm'n of Tex. v. RWE Renewables Ams.*, LLC, 691 S.W.3d 484 (Tex. June 14 2024) (No. 23-0555));
    *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605 (Tex. 2023).

3   665 S.W.3d 166, 191-192 (Tex. App.—Austin 2023).

4   *See* Tex. R. App. P. 60.2(c) ("The Supreme Court may ... reverse the lower court's judgment in whole or in part and render the judgment that the lower court should have rendered[.]"); Tex. Util. Code § 39.001(f) ("The court of appeals shall render judgment affirming the rule or reversing .... The Texas Rules of Appellate Procedure apply to an appeal brought under this section to the extent not inconsistent with this section.").

5   Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, 1999 Tex. Gen. Laws 2543, 2558 (codified at Tex. Util. Code ch. 39).

6   Tex. Util. Code § 39.001(a).

7   *Id.* § 39.001(d).

8   *Id.* § 39.001(c).

9   *Id.* § 39.001(e).

10  *Id.* § 39.001(e)-(f). When Luminant filed its suit for judicial review, Section 39.001(e) provided for review in the Third Court of Appeals. In 2023, the Legislature amended Section 39.001(e) to provide for review by the Fifteenth Court of Appeals going forward. Act of May 21, 2023, 88th Leg., R.S., ch. 459, § 1.13, 2023 Tex. Gen. Laws ___.

11  *See CPS Energy*, 671 S.W.3d at 611-612 (giving the history of ERCOT).

12  Tex. Util. Code § 39.151(c).

13  *Id.* § 39.151(a)(2).

14  *Id.* § 39.151(a)(4). The others are "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms", *id.* § 39.151(a)(1), and "ensur[ing] that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information", *id.* § 39.151(a)(3).

15  *Id.* § 39.151(d).

16  *Id.*

17  *Id.*

18  *Id.* § 39.151(a)(2), (4).

19  *Id.* § 39.151(d).

20  16 Tex. Admin. Code § 25.501(a).

21  *Id.*

22  *Id.* § 25.509(b).

23  *Id.* § 25.505(g)(6)(B) (version in effect between May 30, 2019, and July 13, 2021). Today the HCAP is $5,000/MWh. *Id.* § 25.509(b)(6)(B).

24  *Id.* § 25.505(g)(6)(C), (E) (version in effect between May 30, 2019, and July 13, 2021).

25  Commission rules also set a floor price for energy, called the low system-wide offer cap or LCAP. In February 2021, the LCAP was the greater of $2,000/MWh or 50 times the natural gas price index value determined by ERCOT. *Id.* §

25.505(g)(6)(A) (version in effect between May 30, 2019, and July 13, 2021). In part II of the order, the Commission suspended the LCAP due to abnormal fuel prices. "Due to exceptionally high natural gas prices at this time, if the LCAP is calculated as '50 times the natural gas price index value,' it may exceed the high system-wide offer cap (HCAP) of $9,000 per MWh", the order explains.

Respondents do not challenge the part of the orders suspending the LCAP.

26    Act of May 30, 2021, 87th Leg., R.S., ch. 426, 2021 Tex. Gen. Laws 833 (S.B. 3).

27    Act of May 30, 2021, 87th Leg., R.S., ch. 908, 2021 Tex. Gen. Laws 2218 (H.B. 4492).

28    The administrative proceedings are abated until this litigation concludes.

29    665 S.W.3d at 192.

30    Our references to the arguments of the Commission include the arguments of all petitioners, and our references to the arguments of Luminant include the arguments of all respondents.

31    *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021) (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 154-155 (Tex. 2012)).

32    *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 251 (Tex. 2023) (quoting *Collins v. Yellen*, 594 U.S. 220, 141 S. Ct. 1761, 1779, 210 L.Ed.2d 432 (2021)).

33    Tex. Util. Code § 39.001(f).

34    *Heckman*, 369 S.W.3d at 154-155 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

35    *See* ERCOT Nodal Protocols §§ 6.3(4), 20.10.

36    *See* Pub. Util. Comm'n of Tex., Complaints and Appeals of DC Energy Tex., LLC and Monterey TX, LLC Against ERCOT, Docket No. 50871 (Feb. 12, 2021) (final order at 11), https://interchange.puc.texas.gov/ Documents/50871_32_1110661.pdf.

37    *See San Jacinto River Auth. v. Medina*, 627 S.W.3d 618, 625 (Tex. 2021) (concluding that homeowners whose properties flooded during Hurricane Harvey had standing to sue the River Authority for statutory takings under Chapter 2007 of the Government Code, even though Chapter 2007 does not authorize damages, because the statute provides other remedies, including "invalidation of the governmental action resulting in the taking").

38    About mootness, we recently wrote:

The mootness doctrine—a constitutional limitation founded in the separation of powers between the governmental branches—prohibits courts from issuing advisory opinions. A case becomes moot when (1) a justiciable controversy no longer exists between the parties, (2) the parties no longer have a legally cognizable interest in the case's outcome, (3) the court can no longer grant the requested relief or otherwise affect the parties' rights or interests, or (4) any decision would constitute an impermissible advisory opinion.

*Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634-635 (Tex. 2021) (citation omitted).

39    *See City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 572 S.W.2d 290, 300 (Tex. 1978) (holding that the cities' challenge to an interim order of the Commission granting a rate increase was not moot, even though it had been superseded by a final order, because "if the interim order should be determined to be invalid, ... this court could grant relief by allowing the cities to recover the temporary rates paid under the interim order").

Appx. Page 406 of 740

40   *See* Tex. Util. Code § 39.001(e) ("Judicial review of competition rules adopted by the commission shall be conducted under Chapter 2001, Government Code, except as otherwise provided by this chapter."); *id.* § 39.001(f) ("A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals ....").

41   Tex. Gov't Code § 2001.003(6)(A).

42   *Id.* § 2001.003(6)(B)-(C).

43   *Cf. El Paso Hosp. Dist. v. Tex. Health & Hum. Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008) (holding that HHSC's imposition of a cutoff date for selecting claims data from which to calculate Medicaid reimbursement rates was a statement of general applicability because it "affect[ed] all hospitals receiving reimbursement for inpatient Medicaid services"); *id.* ("Thus, no question exists that the February 28 cutoff is a statement of general applicability because it applies to all hospitals."); *see also R.R. Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003) ("By 'general applicability', the APA definition references statements that affect the interest of the public at large such that they cannot be given the effect of law without public input.").

44   *Cf. El Paso Hosp. Dist.*, 247 S.W.3d at 714-715 (explaining that "the February 28 cutoff [was] not a statement regarding the agency's internal management or organization but rather affect[ed] the Hospitals' private rights" by "directly affecting [their] right to reimbursement").

     The parties dispute whether part I of the Orders, being challenged here, amended the pricing rules then in effect. *See* Tex. Gov't Code § 2001.003(6)(B). We need not resolve that dispute. However, we note that part II of the Orders, which has not been challenged, expressly "grant[s] an exception to" the pricing rules by suspending the LCAP then in effect. *See supra* note 25.

45   *See* Tex. Util. Code § 39.001(a) (mentioning "electric services and their prices"); *id.* § 39.001(c) (prohibiting rules that regulate "prices" "except as authorized in this title").

     Indeed, the Commission has previously labeled a rule it described as "governing the enforcement of wholesale electricity markets and ERCOT administered markets" as a competition rule. Pub. Util. Comm'n of Tex., Re Enforcement of Wholesale Market Rules, Project No. 26201, 230 P.U.R.4th 361, 2004 WL 367935, at *2 (Feb. 9, 2004) (order adopting 16 Tex. Admin. Code § 25.503). In addition, the Orders cite Section 39.151(d) specifically, and the Commission has designated rules adopted under Section 39.151 as competition rules. *See, e.g.*, Pub. Util. Comm'n of Tex., Order Adopting Amendment to § 25.363 as Approved at the June 20, 2014 Open Meeting, Project No. 41949 (July 1, 2014) (at 1), https://interchange.puc.texas.gov/Documents/41949_12_798868.pdf.

46   *See* Act of May 28, 2023, 88th Leg., R.S., ch. 410, § 17, 2023 Tex. Gen. Laws ___ (H.B. 1500) (codified at Tex. Util. Code § 39.1514); *see* Tex. Util. Code § 39.1514(a) (stating a general rule that "[t]he commission may direct [ERCOT] to take an official action only through: (1) a contested case; (2) rulemaking; or (3) a memorandum or written order adopted by a majority vote"); *id.* § 39.1514(c) (authorizing the Commission to "use a verbal directive to direct [ERCOT] to take an official action in an urgent or emergency situation", while requiring the Commission to "establish criteria for determining whether a situation is urgent or an emergency" and to "establish a process" for issuing emergency directives).

47   *Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 569 (citing *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017)).

48   *Id.* (citing *Marriage & Fam. Therapists*, 511 S.W.3d at 33).

49   *Id.* (citing *Marriage & Fam. Therapists*, 511 S.W.3d at 33).

50   *State v. Hollins*, 620 S.W.3d 400, 407 (Tex. 2020).

51   *Hogan v. Zoanni*, 627 S.W.3d 163, 175 (Tex. 2021).

52   *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017).

53 *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014).

54 *See* Tex. Util. Code § 39.001(a) (stating that "the public interest in competitive electric markets requires that, [with some listed exceptions], electric services and their prices should be determined by customer choices and the normal forces of competition"); *id.* § 39.001(d) ("Regulatory authorities ... shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter to the greatest extent feasible and shall adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition.").

55 *See id.* § 39.151(a)(2) (listing "ensure the reliability and adequacy of the regional electrical network" among ERCOT's functions); *id.* § 39.151(d) ("The commission shall adopt and enforce rules relating to the reliability of the regional electrical network ... or may delegate [that] responsibilit[y] to an independent organization.").

56 665 S.W.3d at 191.

57 *Id.*

58 *Id.*

59 *Id.*

60 *Id.*

61 *Id.*

62 *Id.*

63 Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 167 (2012) [hereinafter Reading Law].

64 The authors explain:

> Many of the other principles of interpretation are derived from the whole-text canon—for example, the rules that an interpretation that furthers the document's purpose should be favored (§ 4 [presumption against ineffectiveness]), that if possible no word should be rendered superfluous (§ 26 [surplusage canon]), that a word or phrase is presumed to bear the same meaning throughout the document (§ 25 [presumption of consistent usage]), that provisions should be interpreted in a way that renders them compatible rather than contradictory (§ 27 [harmonious-reading canon]), that irreconcilably contradictory provisions should be given no effect (§ 29 [irreconcilability canon]), and that associated words bear on one another's meaning (*noscitur a sociis*) (§ 31 [associated-words canon]).

> *Id.* at 168.

65 *See* 665 S.W.3d at 191.

66 *Hogan*, 627 S.W.3d at 175; *see* Reading Law, *supra* note 63, at 180 ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously.").

67 *Cadena Comercial*, 518 S.W.3d at 326; *see* Reading Law, *supra* note 63, at 167 ("The text must be construed as a whole.").

68 *Hogan*, 627 S.W.3d at 175; *see* Reading Law, *supra* note 63, at 174 ("If possible, every word and every provision is to be given effect ....").

69 Tex. Util. Code § 39.001(a).

70 *Id.* § 39.001(c).

71 *Id.* § 39.001(d).

Appx. Page 408 of 740

72  *Id.* (emphasis added).

73  Luminant urges that "to the greatest extent feasible" in Section 39.001(d) modifies the phrase immediately preceding it, "to achieve the goals of this chapter", rather than the earlier language directing the Commission to "authorize or order competitive rather than regulatory methods". But this reading does not change the sentence's overall meaning because the sentence must be read in context. And as we explain, the Legislature acknowledges in other statutory language, including the very next sentence, that competitive methods may not always suffice to achieve all the chapter's goals.

74  *Id.* § 39.101(a)(1).

75  *Id.* § 39.151(a)(2).

76  *Id.* § 39.151(d).

77  "[A] preamble or purpose clause ... cannot expand [text] beyond its permissible meaning. If they could, they would be the purposivists' playground ...."). Reading Law, *supra* note 63, at 35.

78  616 S.W.3d 558.

79  *Id.* at 560.

80  *Id.* at 571.

81  *Id.*

82  *Id.*

83  *Id.*

84  *Id.*

85  665 S.W.3d at 191 (quoting Tex. Util. Code § 39.001(d)).

86  *Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 569.

87  Tex. Gov't Code § 2001.034(a). An emergency rule "may be effective for not longer than 120 days and may be renewed once for not longer than 60 days." *Id.* § 2001.034(c).

88  *Id.* § 2001.034(b).

89  *Id.* § 2001.034(d).

90  *See id.* § 2001.035(a) ("A rule is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034.").

91  *Id.* § 2001.035(d).

92  To do so, the Governor must "find[ ] a disaster has occurred or that the occurrence or threat of disaster is imminent." *Id.* § 418.014(a).

93  *Nat'l Ass'n of Indep. Insurers v. Tex. Dep't of Ins.*, 925 S.W.2d 667, 669 (Tex. 1996).

94  Luminant also argues that the Commission was required to comply with Section 2001.033, which requires that a final state agency order adopting a rule include "a reasoned justification" for it. *See* Tex. Gov't Code § 2001.033(a)(1). This requirement applies to a final rules order promulgated in the ordinary course, not an emergency rule adopted under Section 2001.034. The "reasoned justification" required by Section 2001.033 must include "a summary of comments received from parties interested in the rule" and "the reasons why the agency disagrees with party submissions and

proposals". *Id.* § 2001.033(a)(1)(A), (C). But emergency rulemaking is authorized when there is not time for a notice-and-comment period. *See id.* § 2001.034(a) (authorizing the adoption of "an emergency rule without prior notice or hearing").

95    *See id.* § 2001.034(d).

96    *See* 1 Tex. Admin. Code § 91.6(a) ("The Texas Register publishes 52 issues yearly, excluding indexes. Friday is the day of publication."); *id.* § 91.6(b) ("Rule filing deadline: 12:00 noon, Monday, the week before publication.").

97    Tex. Gov't Code § 2001.036(b).

98    *Id.* § 2001.036(a)(2).

99    *Id.* § 2001.035(a).

100   *See id.* § 2001.035(d) ("A mere technical defect that does not result in prejudice to a person's rights or privileges is not grounds for invalidation of a rule."); *cf. City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 264 (Tex. 2001) (Owen, J., concurring) ("[W]e have previously held that failure to follow procedural requirements of statutes or rules is not reversible error without a showing of harm." (citing *Imperial Am. Res. Fund, Inc. v. R.R. Comm'n of Tex.*, 557 S.W.2d 280, 288 (Tex. 1977))).

101   Tex. Util. Code § 39.001(f); Tex. R. App. P. 60.2(c).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Appx. Page 410 of 740**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 92633915
Filing Code Description: RESPONSE
Filing Description: ERCOT'S AMENDED PLEA TO THE JURISDICTION AND ATERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT
Status as of 10/1/2024 11:25 AM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 10/1/2024 9:05:54 AM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 10/1/2024 9:05:54 AM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 10/1/2024 9:05:54 AM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 10/1/2024 9:05:54 AM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 10/1/2024 9:05:54 AM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 10/1/2024 9:05:54 AM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 10/1/2024 9:05:54 AM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 10/1/2024 9:05:54 AM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/1/2024 9:05:54 AM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/1/2024 9:05:54 AM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 10/1/2024 9:05:54 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/1/2024 9:05:54 AM | SENT |

Case Contacts

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 92633915
Filing Code Description: RESPONSE
Filing Description: ERCOT'S AMENDED PLEA TO THE JURISDICTION AND ATERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT
Status as of 10/1/2024 11:25 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 10/1/2024 9:05:54 AM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 10/1/2024 9:05:54 AM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 10/1/2024 9:05:54 AM | SENT |

10/4/2024 4:29 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Irene Silva

**BAKER BOTTS** L.L.P.

910 LOUISIANA STREET
HOUSTON, TEXAS
77002-4995

TEL +1 713.229.1234
FAX +1 713.229.1522
BakerBotts.com

AUSTIN
BRUSSELS
DALLAS
DUBAI
**HOUSTON**
LONDON

NEW YORK
PALO ALTO
RIYADH
SAN FRANCISCO
SINGAPORE
WASHINGTON

October 4, 2024

VIA E-FILE

George Fibbe
TEL: 7132291262
FAX: 7132292762
george.fibbe@bakerbotts.com

The Hon. Catherine Mauzy
419th Judicial District Court
1700 Guadalupe
11th Floor
Austin, TX 78701

Re:     Cause No. D-1-GN-24-003384, *Aspire Power Ventures v. Public Utility Commission et al.*

To the Honorable Judge Mauzy:

This letter is on behalf of Calpine Corporation, which is the largest generator of electricity from natural gas and geothermal resources in the United States. In Texas specifically, Calpine owns and operates approximately 9,000 MW of dispatchable power plants, providing critical electricity supply to the ERCOT market on a daily basis. Calpine has been apprised of the proceedings in this Court and understands from the status conference earlier this week that the Court has set a hearing on October 16 on threshold legal issues presented in Defendants' pleas to the jurisdiction, Rule 91a motion, and motion to abate. Calpine further understands that the Court may or may not proceed with a temporary injunction hearing later in the month or in November, depending on the outcome of the October 16 hearing.

Given the potential negative implications to the ERCOT market, and to Calpine specifically, of the relief sought by Plaintiff, Calpine may file a plea in intervention in support of Defendants' position if the case moves beyond the threshold legal issues to consideration of Plaintiff's requested injunctive relief. However, because such intervention may not be necessary depending on the outcome of the October 16 hearing, and in the interest of judicial economy, Calpine plans to reserve any such filing until after the October 16 hearing. Instead, by this letter we respectfully notify the Court of Calpine's interest in the case and its potential plea, especially given the expedited schedule.[1]

Respectfully

George Fibbe
Partner

---

[1] Calpine is cognizant of the need for efficient administration of this proceeding, and should a plea in intervention be filed, Calpine will work cooperatively with the parties to adhere to any hearing schedule set on Plaintiff's request for injunctive relief and avoid any unnecessarily duplicative briefing.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michelle  Wyman on behalf of George Fibbe
Bar No. 24036559
michelle.wyman@bakerbotts.com
Envelope ID: 92826609
Filing Code Description: No Fee Documents
Filing Description: LETTER TO JUDGE MAUZY
Status as of 10/4/2024 11:10 PM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 10/4/2024 4:29:21 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 10/4/2024 4:29:21 PM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 10/4/2024 4:29:21 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 10/4/2024 4:29:21 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 10/4/2024 4:29:21 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 10/4/2024 4:29:21 PM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 10/4/2024 4:29:21 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 10/4/2024 4:29:21 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/4/2024 4:29:21 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/4/2024 4:29:21 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 10/4/2024 4:29:21 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/4/2024 4:29:21 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Michelle  Wyman on behalf of George Fibbe
Bar No. 24036559
michelle.wyman@bakerbotts.com
Envelope ID: 92826609
Filing Code Description: No Fee Documents
Filing Description: LETTER TO JUDGE MAUZY
Status as of 10/4/2024 11:10 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
| --- | --- | --- | --- | --- |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 10/4/2024 4:29:21 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 10/4/2024 4:29:21 PM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 10/4/2024 4:29:21 PM | SENT |
| Carolyn Taylor | | ctaylor@ccsb.com | 10/4/2024 4:29:21 PM | SENT |
| Matthew Erickson | | Matthew.erickson@bakerbotts.com | 10/4/2024 4:29:21 PM | SENT |
| George Fibbe | 24036559 | george.fibbe@bakerbotts.com | 10/4/2024 4:29:21 PM | SENT |

10/4/2024 5:15 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Poodiack

Cause No. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS |
| TEXAS, ELECTRIC RELIABILITY | § | |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN JACKSON, | § | |
| and COURTNEY HJALTMAN, | § | |
| *Defendants*. | § | 345TH JUDICIAL DISTRICT |

---

### DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS' AMENDED PLEA TO THE JURISDICTION

---

Aspire Power Ventures, LP ("Aspire")'s suit challenges and seeks to enjoin the Electric Reliability Council of Texas ("ERCOT") from continuing to utilize an electric grid management ancillary service for which ERCOT began adopting operating standards, known as protocols, in 2019. Aspire claims jurisdiction under APA § 2001.038, contending that these protocols are agency rules. The PUCT Defendants[1] move to dismiss Aspire's suit for lack of jurisdiction because the ERCOT protocols and the PUCT orders approving them are not agency rules,

---

[1] Public Utility Commission of Texas ("PUCT" or "Commission") and Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Chairman and Commissioners of the PUCT (collectively, the "PUCT Defendants")

because Aspire's complaints about ERCOT's protocols must have been brought to the Commission prior to this suit seeking judicial review, and because the PUCT Defendants' actions were specifically authorized by statute and hence not *ultra vires*. The PUCT Defendants file this amended plea to the jurisdiction in response to Aspire's Second Amended Petition filed on September 24, 2024.

## I. Standard of Review

A court "must determine at its earliest opportunity whether it has the constitutional or statutory authority to decide the case before allowing the litigation to proceed." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Whether the Court has subject-matter jurisdiction is a question of law. *Id*. Moreover, courts have an "obligation" to consider a plea to the jurisdiction asserting immunity when filed. *See In re Lazy W Dist. No. 1*, 493 S.W.3d 538, 544 (Tex. 2016) (orig. proceeding). In short, jurisdiction must be resolved first; only after it has been determined can Aspire's claims for injunctive relief be heard.

The Court lacks jurisdiction over this case for several reasons. The first is sovereign immunity. Plaintiff's suit against the Commission and its officials in their official capacity is a suit against the State. "[A] suit against government employees in their official capacities is, in all respects, a suit against the State." *De Mino v. Sheridan,* 176 S.W.3d 359, 366 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The trial court lacks subject-matter jurisdiction absent a showing that the Texas

2

Appx. Page 417 of 740

Legislature by statute or express permission has given the State's consent to being sued in this matter. *See Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). There is no such consent here, as Aspire invokes a statutory provision that only authorizes judicial review of agency rules. But the matter at issue here is not an agency rule. *Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024) (PUCT order approving ERCOT protocol amendment "was not an agency-adopted 'rule' under the Administrative Procedure Act."). *See* Attach. 1. Thus, the limited waiver of the State's sovereign immunity under Texas Gov't Code § 2001.038 is not applicable here.

Nor does the *ultra vires* exception to sovereign immunity apply. Aspire alleges "[b]y approving the ECRS Rules, the Commissioners committed *ultra vires* acts for which they are liable in their official capacities." Second Am. Pet. ¶ 59. But "[a]n *ultra vires* action requires a plaintiff to 'allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act.'" *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). The PUCT Commissioners have not acted *ultra vires* by reviewing and ratifying amendments to the ERCOT protocols—because their actions are *specifically authorized by* Tex. Util. Code § 39.151. *See e.g.* Tex. Util. Code § 39.151(g-6): "The commission may approve, reject, or remand with suggested modifications . . . protocols adopted by [ERCOT]." *See* Attach. 2.

3

Thus, the *ultra vires* exception does not apply and Aspire's lawsuit against the PUCT officials in their official capacity is barred by sovereign immunity.

## II.      Factual Background

In its Second Amended Petition, Aspire's suit now challenges numerous amendments to ERCOT's protocols, the first of which was adopted in 2019. These protocol amendments relate to ERCOT's Contingency Reserve Service ("ECRS"), which the grid operator uses to balance supply and demand and keep the grid stable and operating. Aspire also challenges PUCT orders beginning on August 4, 2021, in which the PUCT approved or disapproved various ERCOT protocol amendments related to ECRS. The PUCT did not approve the earlier ERCOT amendments because the requirement that it review ERCOT protocols was only added to the Texas Public Utility Regulatory Act ("PURA") in 2021. Tex. Util. Code § 39.151(g-6).

Defendant ERCOT is the Commission's designated electric grid operator. Tex. Util. Code § 39.151(d), (i), (j). ERCOT manages the Texas electric grid under authority delegated to it by PUCT to "establish, adopt, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants." *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 626 (Tex. 2023). These protocols consist of thousands of pages of highly technical standards that govern every aspect of the

4

electric grid and the wholesale electric market, including detailed specifications and complex pricing formulas. *Id.* at 616-17; *Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 486-87 (Tex. 2024). ERCOT develops these protocols through an elaborate stakeholder process involving electric market participants, providing extensive opportunities for market participant involvement and comment, that is described in the recent Supreme Court decision in *RWE Renewables*, 691 S.W.3d at 490 (protocol development process "serves to leverage the expertise of ERCOT members and industry stakeholders while maintaining transparency and affording interested parties plentiful opportunities to weigh in").

ECRS is one of several ancillary services that ERCOT uses to keep supply and demand in balance to ensure that the grid stays stable and reliable for Texas consumers. *See* Tex. Util. Code § 39.159(b)(3) (grid operator to "procure[] ancillary or reliability services . . . to ensure appropriate reliability"); § 35.004(e) ("'[A]ncillary services' means services necessary to facilitate the transmission of electric energy including load following, standby power, backup power, reactive power, and any other services as the commission may determine by rule."); *see also* 16 Tex. Admin. Code § 25.5(9); ERCOT Nodal Protocols § 2.1. The Legislature gave ERCOT this authority because it is crucial that the experts that manage the grid have the tools they need to keep the grid in balance, functioning properly and to avoid load shed.

5

The particular ancillary service program at issue in this case, ECRS, was originally created in 2019. As ERCOT has explained in its own plea to the jurisdiction filed in this case, ECRS was developed to address reliability risks that the grid operator's other ancillary services did not adequately address, "including those risks created by rapid grid modernization (e.g., increasing amounts of intermittent wind and solar generation resources), which are only compounded by the ever-present heightened reliability risks presented by ERCOT's intrastate nature." ERCOT Plea to the Jurisdiction 8 (citing ERCOT Protocols § 6.5.7.6.2.4(1) (listing purposes of ECRS)). The latter need refers to the fact that the ERCOT grid is generally not interconnected to the grids in other parts of the country and thus it is uniquely vulnerable to sudden power shortages. *Id.* (ECRS is a critical reliability tool fulfilling a similar role to import capability in other parts of the country).

The Commission has established procedures for challenges to ERCOT protocols and ERCOT conduct, procedures Aspire could have utilized in 2019, or many times since then. But Aspire didn't complain to the Commission—not once. Instead, Aspire waited until May 31, 2024, over five years after the first ERCOT protocol and three years after the first PUCT order approving an ECRS-related protocol amendment, and filed this suit. Aspire subsequently amended its petition

6

Appx. Page 421 of 740

twice, adding ERCOT as a defendant,[2] and complaining of all the protocol amendments and PUCT approval orders related to the ECRS program going back to 2019. Second Am. Pet. ¶ 29.

## III. The Court lacks jurisdiction over Aspire's declaratory judgment claim because the PUCT's approval orders at issue are not agency rules.

Aspire's suit seeks a declaratory judgment against the PUCT Defendants under the Texas Administrative Procedure Act, Tex. Gov't Code § 2001.038.[3] That limited waiver of sovereign immunity only authorizes declaratory judgments regarding the validity or applicability of **agency rules**. Tex. Gov't Code § 2001.038(a) ("The validity or applicability of a rule . . . may be determined in an action for declaratory judgment if it is alleged that the rule or its application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff."). But the recent *RWE Renewables* decision of the Supreme Court makes clear that the challenged PUCT approval orders are not agency rules. In *RWE Renewables*, the Supreme Court held that the PUCT's protocol-approval determinations, such as those of which Aspire complains in this case, are **not** agency "rules." *Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 492 (Tex. 2024) (PUCT order approving ERCOT protocol amendment was "a

---

[2] The Amended Petition also added new PUCT Commissioner Hjaltman as a defendant.

[3] Aspire also seeks an injunction and a stay under PURA Section 15.004 in connection with this Tex. Gov't Code § 2001.038 declaratory claim. The Court lacks jurisdiction over these requests as well.

7

ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect," and "[c]onsequently, the PUC's order was not an agency-adopted 'rule' under the Administrative Procedure Act.").

In *RWE*, the plaintiff (like Aspire, an ERCOT wholesale market participant) was likewise challenging a PUCT order approving an ERCOT protocol amendment. But the Supreme Court rejected RWE's contention that the PUCT approval order at issue was a PUCT rule. The Court held that "PURA envisions a separate process for ERCOT-adopted protocols, and the statutory requirement that the PUC approve those adopted protocols does not transform PUC *approval orders* into PUC *rules*." *RWE Renewables*, 691 S.W.3d at 486. Thus, the PUCT order approving ERCOT's protocol amendment was only "a ratification decision" and "[c]onsequently, the PUC's order was not an agency-adopted 'rule' under the Administrative Procedure Act." *Id*. at 492. Here the Court noted that PURA designated ERCOT, not the PUCT, as the entity that "adopts" new or revised protocols, Tex. Util. Code § 39.151(g-6), which the PUCT (its overseer) then "approves." *Id*. The Supreme Court observed that "[w]e cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that 'adopts' ERCOT protocols given the comprehensive statutory use of that term" before concluding that the APA, which refers to and imposes requirements only with reference to *an agency's* adoption of a rule, did not establish

8

jurisdiction over RWE's challenge to those protocols and the PUCT's orders approving them. *RWE*, 691 S.W.3d at 491.

The Supreme Court's holding in *RWE* conclusively answers the jurisdictional question in this case—the PUCT's approval orders are not agency-adopted rules that Aspire can challenge under the APA, Tex. Gov't Code § 2001.038. There is no waiver of sovereign immunity. For this simple reason alone, the Court lacks jurisdiction over all of Aspire's claims against the PUCT. Because PUCT's approval order was not a rule under *RWE*, the Court has no jurisdiction over Aspire's declaratory judgment claims against the PUCT under Tex. Gov't Code § 2001.038. *See also R.R. Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 70 (Tex. 2003) (no Section 2001.038 jurisdiction regarding agency orders adopting field rules that were not APA rules).

## IV. The Court lacks jurisdiction over this case because Aspire's complaints about ERCOT's protocols must have been brought to the Commission.

To the extent Aspire challenges the protocol amendments themselves, the case should be dismissed because the PUCT has exclusive jurisdiction over Aspire's complaints about ERCOT's adoption of the challenged protocol amendments. Aspire's complaints must have been brought first to the Commission. Subject-matter jurisdiction is lacking "when the Legislature has granted [an] agency the sole authority to make an initial determination in a dispute," and thus the Court lacks jurisdiction "until the party has exhausted all administrative remedies before the

9

agency." *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018). This includes any complaints about the protocols that ERCOT has adopted.

Exclusive jurisdiction may be created by express statutory language or through the creation of a pervasive regulatory scheme indicating that "the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *Id.* at 138 (quoting *In re Sw. Bell Tel.*, 235 S.W.3d 619, 624-25 (Tex. 2007)). PURA Section 39.151, attached to this plea, sets forth a detailed framework outlining the PUCT's oversight and "complete authority" over ERCOT's functions. *See* Attach. 2. In *CPS Energy v. Electric Reliability Council of Texas*, 671 S.W.3d 605, 618 (Tex. 2023), the Supreme Court held that the PUCT's comprehensive regulatory authority over its designated grid operator, ERCOT, was such a pervasive regulatory scheme establishing exclusive jurisdiction with the agency that it deprived the Court of the authority to hear the dispute. *Id.* ("[PURA] Section 39.151's grant of extensive authority to the PUC over ERCOT and its detailed regulation of the particulars of ERCOT's functions constitute a pervasive regulatory scheme.").

Aspire's allegations about the protocol amendments themselves plainly fall within this scheme: they involve ERCOT's development of standards designed to ensure the reliability of the ERCOT grid through ancillary services programs such

10

as ECRS. Had Aspire filed complaints about ERCOT's protocol amendments with the Commission, and the Commission sustained ERCOT's action, then Aspire could have challenged that determination in this Court in accordance with the APA's judicial review provisions. Tex. Gov't Code § 2001.171. But Aspire did not file such a complaint with the PUCT, and the Court lacks jurisdiction to hear these complaints. For this additional reason, this Court lacks jurisdiction over Aspire's amended petition.

## V. The Court lacks jurisdiction over this challenge to ERCOT's protocol amendments because Aspire failed to exhaust its administrative remedies.

Aspire's attempt to frame the Commission's validation decisions as "rules" is not totally surprising given that Aspire has not pursued the necessary administrative remedies to bring a suit challenging the protocol amendments. To pursue such a challenge, Aspire must first exhaust its administrative remedies by (1) complaining to ERCOT about each of the protocol amendments and then (2) filing a complaint with the Commission about each of the protocol amendments. Aspire did neither of these, for any of the challenged protocol amendments. Thus, Aspire failed to exhaust its available administrative remedies.

Under the APA "[a] person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter." Tex. Gov't Code

11

§ 2001.171. The Commission's rules set out those procedures. Under PUCT rules, affected entities may issue formal complaints to the PUCT regarding ERCOT action. 16 Tex. Admin. Code § 22.251(b). *See* Attach. 3. Under these well-established procedures, Aspire must have sought relief through ERCOT's alternative dispute resolution ("ADR") procedures before then filing a formal complaint with the Commission. *Id.* § 22.251(c). When ADR is required, the complainant must file a formal complaint with the Commission within 35 days after completing ADR. *Id.* § 22.251(d).

Aspire failed to file such a complaint after ERCOT approved any of the protocol amendments, even though it had notice of and ample opportunity to comment and participate in the protocol-development process at ERCOT. *See* Section II above discussing ERCOT protocol amendment process; *RWE Renewables*, 691 S.W.3d at 490. Aspire then needed to complain of ERCOT's action to the Commission under 16 Tex. Admin. Code § 22.251. Again, it did not. Had Aspire exhausted its administrative remedies as the law requires, the Commission decision on that complaint would then be subject to judicial review under Tex. Gov't Code § 2001.171. Here again, the Supreme Court's recent decision in *RWE Renewables* is instructive, as it confirms that such a complaint is the proper way to challenge an ERCOT protocol. *RWE Renewables*, 691 S.W.3d at 492 n.11 ("PUC regulations provide a process for review of ERCOT protocols, 16 Tex. Admin. Code

12

§§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review in district court, Tex. Util. Code § 15.001."). Because Aspire did not avail itself of these remedies, the Court has no jurisdiction over this suit. *See* Section VI below.

## VI. The Court also lacks jurisdiction because Aspire waited too long to file suit to challenge the PUCT protocol-approval orders.

Had Aspire followed the proper procedure to complain about the protocol amendments as the Supreme Court explained in *RWE* (it did not), its complaint about the Commission's approval of ERCOT's protocols would have been subject to judicial review under the APA. But instead of following the proper procedure, Aspire instead skipped ahead to directly challenge the PUCT's approval orders in district court. But Aspire's *2024* suit challenging the Commission's *2021*, *2022, 2023, and 2024* approval decisions was, in any event, filed far too late. A challenge to an agency order must be brought within 30 days of the denial of the motion for rehearing. Tex. Gov't Code § 2001.176(a). Aspire did not file any sort of rehearing request after the approval orders were issued. Even if it had filed such a request, the motion would have been overruled by operation of law long before this suit was filed. *Id.* § 2001.146(c). Aspire would then have been required to bring its suit within 30 days. *Id.* § 2001.176(a). Aspire did not file this suit until late May 2024, far too late to invoke this Court's jurisdiction.

The obvious lateness of the suit aside, there is yet another problem fatal to the Court's jurisdiction here: Aspire did not even try to participate in the proceeding in

13

which the protocols were approved. It did not file anything at all (an intervention request, comments, or an objection) in response to ERCOT's requests for approval of three protocol amendments Aspire challenges.

## VII. The Court lacks jurisdiction over Aspire's *ultra vires* claims because the PUCT Commissioners' review and approval of the ERCOT protocol amendments was within their statutory authority.

The *ultra vires* doctrine allows suits against government officials who are alleged to have acted outside their legal authority. *Hall*, 508 S.W.3d at 238. To assert a valid *ultra vires* claim, the plaintiff "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Schroeder v. Escalera Ranch Owners' Ass'n*, 646 S.W.3d 329, 332 (Tex. 2022) (quoting *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). A government officer with some discretion to interpret and apply the law acts without legal authority "if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." *Id*. (quoting *Hall*, 508 S.W.3d at 238). "If the challenged actions 'were not truly outside the officer's authority or in conflict with the law,' then the plaintiff has not stated a valid *ultra vires* claim and governmental immunity will bar the suit." *Id*. at 332-33 (quoting *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021)).

Mere allegations that a state official's acts were unconstitutional or "without legal authority" are not enough to satisfy the *ultra vires* exception to sovereign

14

immunity. *Creedmoor-Maha Water Supply Corp. v. Tex. Comm'n on Env't Quality*, 307 S.W.3d 505, 515 (Tex. App.—Austin 2010, no pet.). "[I]f the plaintiff alleges only facts demonstrating acts within the officer's legal authority and discretion, the claim seeks to control state action, and is barred by sovereign immunity." *Id*. at 515-16. When determining whether a party has asserted a valid *ultra vires* claim, courts "construe the relevant statutory provisions and apply them to the facts as alleged in the pleadings." *Cockrell Inv. Partners, L.P. v. Middle Pecos Groundwater Conservation Dist*., 677 S.W.3d 727, 744 (Tex. App.—El Paso 2023, pet. pending).

Aspire has not alleged *any* facts that the PUCT Commissioners acted outside their legal authority. Indeed, the action they challenge is one they are statutorily mandated to do: under PURA, PUCT must review and approve all of ERCOT's protocol amendments before they are allowed to take effect. Tex. Util. Code § 39.151(g-6). Instead, all of Aspire's *ultra vires* conduct allegations take issue with the decisions reached by PUCT in its protocol-ratification order or the process by which the order was issued. To the extent Aspire complains about the procedures the PUCT employed in making a decision plainly within its authority, that is not a proper *ultra vires* claim. (And in any event, the Supreme Court has explained in *RWE Renewables* that the Commission's protocol ratification decisions are not rules and that the Commission was not required to employ APA procedures in adopting them.)

15

**Appx. Page 430 of 740**

To the extent that Aspire complains about the decision that the PUCT made (that is, approving a protocol that is allegedly contrary to PURA's prohibition on market participants withholding power from the ERCOT wholesale market and ERCOT's authority to create a new ancillary service), that is not the proper subject of an *ultra vires* claim, either. The Commission is statutorily charged with "approv[ing], reject[ing], or remand[ing] with suggested modifications to [ERCOT]'s governing body protocols adopted by the organization." Tex. Util. Code § 39.151(g-6). Thus, the determination of whether a proposed protocol amendment complies with PURA is within the Commission's discretion to make.

Similarly, and as recognized in *RWE*, the Commissioners have broad discretion and authority to delegate rulemaking authority and authority to manage the reliability of the Texas electric grid to its grid operator, ERCOT. "PURA empowers the PUC to 'adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants'. . . . [I]t also allows the PUC to 'delegate these responsibilities to an independent organization,' which the PUC has done by delegating rulemaking authority to ERCOT." *RWE Renewables,* 691 S.W.3d at 489 (quoting Tex. Util. Code § 39.151(d)). PURA 39.151(d) specifically authorizes the PUCT to delegate responsibility to adopt and enforce rules relating to reliability to ERCOT subject to PUC oversight and review.

16

And PURA 39.159(b)(1)-(2) provides that the Commission "shall ensure" that ERCOT "establishes requirements to meet the reliability needs of the power region . . . [and] determines the quantity and characteristics of ancillary or reliability services necessary to ensure appropriate reliability," while 39.159(d) directs it to require ERCOT to "develop and implement an ancillary services program to procure dispatchable reliability reserve services on a day-ahead and real-time basis." ECRS is just such an ancillary services program developed and implemented by ERCOT to procure dispatchable reliability services on a real-time basis.

Aspire's challenge to the Commissioners' exercise of discretion in carrying out their statutory duty to review ERCOT protocol amendments and to ensure that ERCOT develops and implements an ancillary services program to maintain grid reliability does not even allege true *ultra vires* conduct. *See Schroeder*, 646 S.W.3d at 335 ("Even if incorrect in their conclusion, the Commissioners did not exceed the scope of their authority."); *see also Hall*, 508 S.W.3d at 243 ("Based on the unrestricted nature of McRaven's authority under Section 5.4.6, we find his discretion to interpret collateral federal privacy law to be 'absolute' . . . . As such, McRaven—whether right or wrong—was not without legal authority in making that determination."). At most, Aspire complains of the Commissioners' exercise of discretion under the applicable statutes—and has failed to allege any conduct exceeding the Commissioners' authority under those statutes—Aspire has not

17

properly pled a valid *ultra vires* claim within the exception to the State's sovereign immunity. *Matzen v. McLane*, 659 S.W.3d 381, 388 (Tex. 2021) (plaintiff asserting an *ultra vires* claim must "allege facts affirmatively demonstrating actionable ultra vires conduct by state officials in order to avoid dismissal on jurisdictional grounds due to sovereign immunity"). Under Tex. Util. Code §§ 39.151 and 39.159 the Commission undeniably had the authority and discretion to issue the orders Aspire challenges. The *ultra vires* exception to sovereign immunity does not apply.

## PRAYER

The PUCT Defendants pray that this Court dismiss all claims against the PUCT and the PUCT Commissioner Defendants for lack of jurisdiction. The PUCT Defendants further pray for all other relief to which they may be entitled.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

18

*/s/ John R. Hulme*
JOHN R. HULME
Special Counsel
State Bar No. 10258400
John.Hulme@oag.texas.gov

AMANDA ATKINSON CAGLE
Assistant Attorney General
State Bar No. 00783569
Amanda.Cagle@oag.texas.gov

JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | *Fax* (512) 320-0911

**Attorneys for the Public Utility Commission of Texas and Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Chairman and Commissioners of the Public Utility Commission of Texas**

19

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the following attorneys via the Court's electronic filing case management system and/or electronic mail on October 4, 2024:

Chrysta L. Castañeda
chrysta@castaneda-firm.com
Nicole Michael
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201

Monica Latin
MLatin@ccsb.com
Brent M. Rubin
BRubin@ccsb.com
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202

*Attorneys for Plaintiff*
*Aspire Power Ventures, LP*

Elliot Clark
eclark@winstead.com
Elin Isenhower
eisenhower@winstead.com
WINSTEAD PC
600 W. 5th St., Suite 900
Austin, Texas 78701

*Attorneys for Defendant*
*Electric Reliability Council of Texas*

*/s/ John R. Hulme*
JOHN R. HULME

Appx. Page 435 of 740

# Attachment 1

*Pub. Util. Comm'n of Tex. v. RWE Renewables Ams., LLC*, 691 S.W.3d 484 (Tex. 2024)

691 S.W.3d 484
Supreme Court of Texas.

PUBLIC UTILITY COMMISSION
OF TEXAS, Petitioner,

v.

RWE RENEWABLES AMERICAS, LLC
and TX Hereford Wind, LLC, Respondents

No. 23-0555
|
Argued March 19, 2024
|
OPINION DELIVERED: June 14, 2024

**Synopsis**

**Background:** Market participants filed direct appeal of order of Public Utility Commission (PUC), 🚩2021 WL 3711693, approving protocols adopted by Electric Reliability Council of Texas (ERCOT) revising its protocols effectively setting price of electricity at regulatory maximum during emergency load-shed event, even if standard price-setting formula yielded different price. The Austin Court of Appeals, Jones, J., sitting by assignment, 🚩669 S.W.3d 566, reversed and remanded. Review was granted.

The Supreme Court, Lehrmann, J., held that PUC's approval of ERCOT's revised protocols was not subject to direct review by court of appeals.

Vacated and dismissed.

**Procedural Posture(s):** On Appeal; Review of Administrative Decision.

**\*485** On Petition for Review from the Court of Appeals for the Third District of Texas

**Attorneys and Law Firms**

Lisa Hobbs, Kurt Kuhn, Austin, Stephanie C. Sparks, Dallas, for Respondent RWE Renewables Americas, LLC.

Macey Reasoner Stokes, George Harold Fibbe, J. Mark Little, Elisabeth Butler, Houston, Andrea Moore Stover, Patrick Leahy, Austin, for Amicus Curiae Calpine Corporation.

Elliot Clark, Wallace B. Jefferson, Austin, Rachel Anne Ekery, Houston, Nicholas Bacarisse, for Amicus Curiae Electric Reliability Council of Texas.

Michael J. Jewell, for Respondent TX Hereford Wind, LLC.

Ron Beal, Pro Se.

John R. Hulme, Angela V. Colmenero, Priscilla M. Hubenak, Austin, Brent Webster, Houston, S. Grant Dorfman, Bellaire, Lanora C. Pettit, Kyle D. Highful, Shawn Cowles, Atty. Gen. W. Kenneth Paxton Jr., for Petitioner.

Chrysta L. Castaneda, Dallas, Nicole Michael, for Amicus Curiae Aspire Power Ventures, LP.

**Opinion**

Justice Lehrmann delivered the opinion of the Court.

In response to Winter Storm Uri, the Legislature amended the Public Utility Regulatory Act (PURA) to provide that protocols adopted by the Electric Reliability Council of Texas, or ERCOT, do not take effect before they are approved by the Public Utility Commission. ERCOT then adopted, and the PUC approved, a revision to its protocols effectively setting the price of electricity at the regulatory maximum under Energy Emergency Alert Level 3 conditions —the highest level of emergency that can be declared— even if the standard price-setting formula yields a different price. Pursuant to PURA's mechanism for seeking judicial review of the validity of "competition rules adopted by the commission [PUC]," TEX. UTIL. CODE § 39.001(e), two market participants initiated a challenge to the PUC's approval order directly in the Third Court of Appeals. That court held the order was both substantively invalid—because the PUC exceeded its statutory authority by setting the price of electricity—and procedurally invalid—because the PUC failed to comply with the Administrative Procedure Act's rulemaking procedures in issuing the order.

We first consider whether, in light of the amendments to PURA requiring PUC approval of ERCOT protocols, the approval order constitutes a "competition rule[ ] adopted by the commission." *Id.* If it does not, the court of appeals lacked jurisdiction over the proceeding for judicial review of the order. If it does, we must then evaluate whether the court of appeals correctly **\*486** determined that the order is both procedurally and substantively invalid.

**Appx. Page 437 of 740**

We hold that the PUC's approval order is not a "competition rule[ ] adopted by the commission" subject to the judicial-review process for PUC rules. PURA envisions a separate process for ERCOT-adopted protocols, and the statutory requirement that the PUC approve those adopted protocols does not transform PUC *approval orders* into PUC *rules* eligible for direct review by a court of appeals. The Third Court of Appeals therefore lacked jurisdiction over this proceeding. Accordingly, we vacate the court of appeals' judgment and dismiss the case for lack of jurisdiction. [1]

## I

### A

[PURA Section 39.151](#) requires the PUC to "certify an independent organization"—here, ERCOT—"to perform the functions prescribed by [that] section." *Id.* § 39.151(c). [2] Four such functions are listed, including "ensur[ing] the reliability and adequacy of the regional electric network" and "ensur[ing] that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region." *Id.* § 39.151(a)(2), (4). [3] PUC regulations likewise demand that the "protocols and other rules" adopted by ERCOT "promote economic efficiency in the production and consumption of electricity; support wholesale and retail competition; support the reliability of electric service; and reflect the physical realities of the ERCOT electric system." [16 TEX. ADMIN. CODE § 25.501(a).](#)

ERCOT "is directly responsible and accountable to the commission," which "has complete authority to oversee and investigate [ERCOT's] finances, budget, and operations as necessary to ensure [ERCOT]'s accountability and to ensure that [ERCOT] adequately performs [its] functions and duties." TEX. UTIL. CODE [§ 39.151(d).](#) If ERCOT "does not adequately perform [its] functions or duties or does not comply with this section," the PUC may take "appropriate action," including decertification. *Id.*

ERCOT possesses rulemaking authority delegated to it by the PUC, as authorized by PURA. *See id.* § 39.151(d), (g-6); [16 TEX. ADMIN. CODE § 25.362(c).](#) The "Nodal Protocols" developed and implemented by ERCOT "provide the framework for the administration of the Texas electricity market." *Pub. Util. Comm'n v. Constellation Energy*

*Commodities Grp., Inc.,* [351 S.W.3d 588, 594–95 (Tex. App.—Austin 2011, pet. denied)](#). Even before recent PURA amendments, ERCOT's protocols were "subject to commission oversight and review." *See* Act of May 30, 2005, 79th Leg., R.S., ch. 797, § 9, 2005 Tex. Gen. Laws 2728, 2729–30 (codified at TEX. UTIL. CODE [§ 39.151(d))](#) (amended 2021, 2023) **\*487** (current version at TEX. UTIL. CODE [§ 39.151(g-6)](#)).

ERCOT is uniquely positioned to manage the electricity market by virtue of its technical expertise, and ERCOT utilizes a variety of resources and systems to manage grid conditions. For example, ERCOT typically relies on a computer system that employs a mathematical formula to send price-based signals to energy generators regarding whether additional power is needed. *Luminant*, 691 S.W.3d at ——. The PUC has specifically delegated to ERCOT the task of developing protocols for how that mathematical formula calculates energy pricing in times of energy shortage, or "scarcity pricing." *Id.*; [16 TEX. ADMIN. CODE § 25.509(b).](#)

### B

In February 2021, Winter Storm Uri incapacitated the Texas electric grid and resulted in an Energy Emergency Alert Level 3 "load-shed" event, meaning ERCOT directed operators of the transmission system to reduce electricity consumption by involuntarily disconnecting customers from the grid. During the load-shed event, ERCOT and the PUC took various additional steps to balance supply and demand in the market to avoid total grid collapse. One such step was to supersede the standard price-setting system by administratively setting the wholesale price of electricity at the regulatory ceiling. In the storm's aftermath, ERCOT's Nodal Protocols were amended to codify the practice in case future load-shed events necessitated a similar response. That amendment is the subject of this suit.

### C

As noted, even before Uri, ERCOT's protocols were subject to commission oversight and review. After the storm, the Legislature amended PURA to additionally provide that "[r]ules adopted by an independent organization [i.e., ERCOT] ... may not take effect before receiving commission approval." Act of May 30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 830 (codified at TEX.

**Appx. Page 438 of 740**

UTIL. CODE § 39.151(d)) (amended 2023) (current version at TEX. UTIL. CODE § 39.151(g-6)). [4] In accordance with that provision, ERCOT's board of directors adopted Nodal Protocol Revision Request (NPRR) 1081, which would amend Nodal Protocol 6.5.7.3.1, and presented it to the PUC for approval. The revision would set the price of electricity at the regulatory ceiling during an emergency load-shed event to reflect scarcity of supply, regardless of whether the standard price-setting formula yields a different price. ERCOT reported to the PUC that the revision would "ensure that Real-Time energy prices reflect the VOLL [Value of Lost Load] when Load is being shed, which is fundamental **\*488** to an energy-only market design in order to provide effective economic signals." The proposal was accompanied by a report from ERCOT's board and an impact-analysis report. The PUC ultimately issued an order approving NPRR 1081.

It is undisputed that load shedding is not driven by market forces but is instead an important regulatory tool designed to protect the grid from long-term damage during an emergency. Load shedding accomplishes this by limiting the amount of demand that may enter the market so as not to exceed available supply. Of course, when that happens, demand *in* the market no longer accurately reflects demand *to enter* the market, and additional supply can only be "accurately" priced by considering the value of replacing that lost load. *See* Hearing of Sen. Comm. Bus. & Com., 87th Leg., R.S. (Feb. 25, 2021), 79–80 (discussing incentives for production at the cap). As supply decreases, the value of lost load increases until it is effectively at the regulatory cap. *Luminant,* 691 S.W.3d at ——.

### D

On July 30, 2021, respondents RWE Renewables Americas, LLC and TX Hereford Wind, LLC (collectively, RWE) sought judicial review of the PUC's order by the Third Court of Appeals. RWE asserted that the court of appeals had jurisdiction under PURA Section 39.001(e) and alleged that the PUC both exceeded its statutory authority under PURA and failed to comply with the Administrative Procedure Act in issuing the order. The PUC responded that the order was not a PUC rule subject to direct review by the court of appeals or the APA's rulemaking requirements, and that the PUC properly issued the order in furtherance of its statutory authority to oversee ERCOT and ensure the reliability of the Texas electric grid.

The court of appeals held that the PUC's order constituted a "competition rule adopted by the commission" under Section 39.001(e), giving the court jurisdiction over the proceedings. 669 S.W.3d 566, 575 (Tex. App.—Austin 2023). The court of appeals then held that the PUC's order was invalid because (1) the PUC lacked the authority to approve NPRR 1081 under PURA and (2) the PUC had failed to substantially comply with the APA's rulemaking procedures. *Id.* at 576–77. [5] We granted the PUC's petition for review.

### II

We necessarily begin by considering jurisdiction. The PUC challenges the court of appeals' subject matter jurisdiction over what is essentially a direct appeal of the PUC's order.

### A

PURA specifically provides for judicial review of "competition rules adopted by the commission." TEX. UTIL. CODE § 39.001(e) ("Judicial review of competition rules adopted by the commission shall be conducted under [the APA], except as otherwise provided by this chapter."). Unlike most suits for judicial review of an agency rule, review of a PUC competition rule begins in the court of appeals. *Id.*; *see also id.* § 39.001(f) ("A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals ...."). [6]

**\*489** The PUC argues that its order approving NPRR 1081 is not a rule at all, much less a "competition rule," and that PURA thus does not authorize direct review of the order by the court of appeals. The APA defines "rule" as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency." TEX. GOV'T CODE § 2001.003(6)(A)(i)–(ii). The definition "includes the amendment or repeal of a prior rule" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *Id.* § 2001.003(6)(B)–(C).

B

PURA empowers the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants." TEX. UTIL. CODE § 39.151(d). However, as noted, it also allows the PUC to "delegate these responsibilities to an independent organization," which the PUC has done by delegating rulemaking authority to ERCOT. *Id.*; 🚩*CPS Energy*, 671 S.W.3d at 616; *see* 16 TEX. ADMIN. CODE § 25.362(c) (requiring ERCOT to "adopt and comply with procedures [subject to certain parameters] concerning the adoption and revision of ERCOT rules"). ERCOT has utilized this delegated rulemaking authority to establish operational rules known as the Nodal Protocols. Under those protocols, generators make offers in advance on how much electricity they are willing to sell and at what price. ERCOT, NODAL PROTOCOLS § 4.4.9 (May 1, 2024). [7] ERCOT uses those prices to match demand to the lowest-price provider. *Id.* § 4.5. ERCOT serves as "the central counterparty for all transactions" that it settles and "is deemed to be the sole buyer to each seller" (typically, an energy generator) "and the sole seller to each buyer" (typically, a retail user) "of all energy." *Id.* § 1.2(4). Operating as a sort of clearinghouse, it is ERCOT that generates settlement statements providing the terms under which market participants must make payments for energy transactions. *Id.* §§ 9.2.4(1), 9.5.4(1), 9.5.5.

In accordance with the PUC's direction, ERCOT has implemented detailed procedures for adopting and revising its protocols. "A request to make additions, edits, deletions, revisions, or clarifications to these Protocols ... is called a Nodal Protocol Revision Request (NPRR)." *Id.* § 21.1(1) (June 1, 2023). A variety of entities may use the NPRR process, including market participants, the PUC, the independent market monitor, and ERCOT itself. *Id.* § 21.2(1) (a), (c), (f), (g). NPRRs are posted on ERCOT's website and reviewed by ERCOT's Protocol Revision Subcommittee. *Id.* §§ 21.4.1(4), 21.3(1). Market participants and other entities may comment on an NPRR. *Id.* § 21.4.4(1). In fact, RWE participated in this process with respect to NPRR 1081 by submitting comments in opposition to it. [8]

**\*490** After considering the NPRR, the revision subcommittee may take one of several actions, including recommending approval of the revision or rejecting it.

*Id.* § 21.4.4(3). ERCOT then posts a report describing the subcommittee's action. *Id.* § 21.4.4(5). Again, market participants and others may comment on the subcommittee report. *Id.* § 21.4.5(1). If the subcommittee recommends approval, ERCOT prepares an impact analysis, *id.* § 21.4.6(1), which is reviewed by the subcommittee, *id.* § 21.4.7(1). The NPRR then moves to the Technical Advisory Committee, which considers the subcommittee report and the impact analysis. *Id.* § 21.4.8(1). If the advisory committee recommends approval of an NPRR, the committee forwards its report to the ERCOT board of directors, *id.* § 21.4.8(5), and the report is also posted online, *id.* § 21.4.8(4). ERCOT's board then has the opportunity to approve the NPRR or take other action.

Before PURA was amended to require PUC approval for protocol revisions to become effective, ERCOT would implement them on the first day of the month following approval by ERCOT's board. *Id.* § 21.6(1) (Jan. 1, 2021). Now that protocols "may not take effect before receiving commission approval," TEX. UTIL. CODE § 39.151(g-6), they are implemented on the first day of the month following receipt of that approval, ERCOT, NODAL PROTOCOLS §§ 21.4.11(1), 21.6(1) (June 1, 2023).

A market participant, among others, may appeal a decision of the ERCOT board regarding an NPRR to the PUC. *Id.* § 21.4.12.3(1). The PUC's rules outline the procedure for review of ERCOT protocols. 16 TEX. ADMIN. CODE §§ 22.251, 25.362(c)(5). Those rules generally require that a complainant exhaust the process outlined in Section 21 of the protocols before challenging the protocol with the PUC. *Id.* § 22.251(c). Exceptions exist when, for example, "the complainant seeks emergency relief necessary to resolve health or safety issues." *Id.* § 22.251(c)(1)(C). Generally, the complaint must be filed within thirty-five days of "the ERCOT conduct complained of." *Id.* § 22.251(d); ERCOT, NODAL PROTOCOLS § 21.4.12.3(1) (June 1, 2023). In response to the complaint, the PUC may, among other things, provide ERCOT with "guidance on the development and implementation of protocol revisions" and order ERCOT "to promptly develop protocol[ ] revisions for commission approval." 16 TEX. ADMIN. CODE § 22.251(o)(3), (4). If the complainant is dissatisfied with the result of the PUC proceedings, it can then seek judicial review. TEX. UTIL. CODE § 15.001.

This painstaking procedure serves to leverage the expertise of ERCOT members and industry stakeholders while

**Appx. Page 440 of 740**

maintaining transparency and affording interested parties plentiful opportunities to weigh in. Moreover, we recognize that ERCOT and the PUC are uniquely situated as legislatively endorsed joint participants in a complex regulatory scheme—each serving its own distinct and essential purpose. As we recognized in *CPS Energy*, "ERCOT do[es] not fall neatly into any camp. It is a unique entity serving a role that is not clearly analogous to a public entity like a police department or a public school. Yet, it provides an essential governmental service." 671 S.W.3d at 623 (alteration in original) (citation and internal quotation marks omitted). While the PUC has broad administrative responsibilities, it simultaneously lacks "the expertise and staff resources" to make informed regulatory decisions independent of ERCOT. SUNSET ADVISORY COMM., STAFF REPORT WITH COMMISSION DECISIONS: PUBLIC UTILITY COMMISSION OF TEXAS, ELECTRIC RELIABILITY COUNCIL OF TEXAS, OFFICE OF PUBLIC UTILITY COUNSEL 37 (Jan. **\*491** 2023).[9]

**C**

A substantially similar version of the above-described process for adopting and revising ERCOT protocols has long been in effect. *See* ERCOT, NODAL PROTOCOLS § 21 (Mar. 1, 2005) (rev. Feb. 2010, Apr. 2011, May 2011, Oct. 2011, May 2012, Aug. 2012, Apr. 2013, Dec. 2013, May 2014, July 2016, Nov. 2016, Nov. 2017, Jan. 2021, Apr. 2023, June 2023). The legislative and regulatory schemes have in turn envisioned separate, complementary purposes of and procedures for PUC rules and ERCOT protocols, notwithstanding the fact that ERCOT and its protocols have consistently been subject to PUC oversight and review. TEX. UTIL. CODE § 39.151(d). RWE nevertheless suggests that, by amending PURA to require formal PUC approval of ERCOT-adopted protocols at the tail end of the process, the Legislature intended to overhaul that process entirely and effectively convert ERCOT protocols into PUC rules subject to the same review procedures. We do not discern such a sweeping intent from the language the Legislature chose.

For one thing, PURA makes clear that ERCOT, not the PUC, is the entity "adopting" new or revised ERCOT protocols. *See id.* § 39.151(g-6). The PUC then "approves" the protocols. *See id.* This distinction is deceptively significant because the APA's requirements, which RWE insists must be satisfied, are exclusively and repeatedly directed at rules "adopted"

by a "state agency." *See, e.g.*, TEX. GOV'T CODE § 2001.033(a) ("A state agency order finally adopting a rule must include: ...."). Indeed, the Legislature deliberately uses the term "adopt" throughout the APA—no reference is made to an agency's "approval" of a rule. *See, e.g., id.* § 2001.004(1) (requiring a state agency to "adopt rules of practice stating the nature and requirements of all available formal and informal procedures").[10] By contrast, the APA uses the term "approve" to describe the *governor's* action on legislation that allows it to become the law. *Id.* § 2001.006(a)(2).

PURA reinforces this distinction. For example, in a suit for judicial review of a competition rule under Section 39.001, the rulemaking record includes "the order *adopting* the rule." TEX. UTIL. CODE § 39.001(e)(4) (emphasis added). The PUC issues no such order with respect to ERCOT protocols. We cannot ignore the Legislature's deliberate decision not to designate the PUC as the entity that "adopts" ERCOT protocols given the comprehensive statutory use of that term.

RWE and the court of appeals highlight that, under PURA as amended, an ERCOT protocol does not take effect until it receives PUC approval. 669 S.W.3d at 574; TEX. UTIL. CODE § 39.151(g-6). True, but even in requiring PUC approval, the Legislature distinguished between ERCOT's role in adopting a protocol and the PUC's role in approving it. TEX. UTIL. CODE § 39.151(g-6) ("*Protocols adopted by [* **\*492** *ERCOT]* ... may not take effect before receiving commission approval." (emphasis added)). Again, the Legislature deliberately employed these terms to communicate two distinct administrative actions that have distinct legal consequences. *See Galveston Indep. Sch. Dist. v. Jaco*, 331 S.W.3d 182, 185–86 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (highlighting the Legislature's distinct use of "adopt" and "approve" in statutes describing the duties of the commissioner of education); TEX. EDUC. CODE § 7.055(b)(41) ("The commissioner shall *adopt* rules relating to extracurricular activities under Section 33.081 and *approve or disapprove* University Interscholastic League rules and procedures under Section 33.083." (emphases added)).

Finally, we cannot ignore that when the Legislature amended PURA in 2021 to require PUC approval of the independent organization's (ERCOT's) protocols, it simultaneously added the requirement that the organization "establish and implement a formal process for adopting new protocols or revisions to existing protocols." Act of May

30, 2021, 87th Leg., R.S., ch. 425, § 3, 2021 Tex. Gen. Laws 830, 832 (amended 2023) (codified at TEX. UTIL. CODE § 39.151(g-6)). As discussed above, ERCOT already had such a process in place; nevertheless, the requirement signals legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors.

In sum, consistent with the well-established regulatory scheme and the legislation governing it, we hold that the PUC's order approving NPRR 1081 was a ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect. Consequently, the PUC's order was not an agency-adopted "rule" under the Administrative Procedure Act. In turn, because the court of appeals' jurisdiction under Utilities Code Section 39.001(e) is limited to review of "competition rules adopted by the commission," the court lacked jurisdiction over RWE's challenge to the PUC's approval order. [11]

**III**

Having concluded that the court of appeals lacked jurisdiction over RWE's appeal of the PUC's approval order, we need not address RWE's remaining arguments. We note, however, that this Court contemporaneously holds in *Luminant* that the PUC did not exceed its authority under PURA in issuing temporary emergency orders that, like NPRR 1081, set the price of electricity at the regulatory ceiling during a period of emergency load-shed. 691 S.W.3d at ——.

\* \* \* \*

Because the PUC's order was not a "competition rule adopted by the commission" under PURA, Section 39.151 did not confer direct-review jurisdiction on the court of appeals. We therefore vacate the court of appeals' judgment and dismiss the suit for lack of jurisdiction.

**All Citations**

691 S.W.3d 484, 67 Tex. Sup. Ct. J. 1096

---

**Footnotes**

1   In our contemporaneously issued opinion in *Public Utility Commission v. Luminant Energy Co.*, we hold that the PUC did not exceed its authority in issuing two emergency orders during Winter Storm Uri that operated to a similar end by temporarily setting the price of electricity at the regulatory ceiling. 691 S.W.3d 448, —— (Tex. June 14, 2024) (No. 22-0231).

2   A more detailed explanation of the Texas electricity market appears in this Court's opinion in *Luminant*. *See id.* at ——. We also recently engaged in a thorough discussion of ERCOT's history, and its role in the Texas electricity market, in ⚑*CPS Energy v. ERCOT*, 671 S.W.3d 605, 611–12 (Tex. 2023).

3   The others are "ensur[ing] access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms" and "ensur[ing] that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information." TEX. UTIL. CODE § 39.151(a)(1), (3).

4   As further amended in 2023, Section 39.151(g-6) currently provides:

   In this subsection, a reference to a protocol includes a rule. Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval. To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or

**Appx. Page 442 of 740**

revisions to existing protocols. The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols. The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

Act of May 26, 2023, 88th Leg., R.S., ch. 464, § 4, 2023 Tex. Sess. Law Serv. (West) 1133 (codified at TEX. UTIL. CODE § 39.151(g-6)).

5 In support of its first holding, the court relied on its own decision in *Luminant*, which we also review today. 669 S.W.3d at 576.

6 When RWE instituted this proceeding, Section 39.001(e) provided for review in the Third Court of Appeals. In 2023, the Legislature amended Section 39.001(e) to provide for review by the Fifteenth Court of Appeals going forward. Act of May 22, 2023, 88th Leg., R.S., ch. 459, § 1.13, 2023 Tex. Sess. Law Serv. (West) 1119.

7 We cite the current version of the protocols unless substantive differences require citing the version in effect when the relevant events occurred. ERCOT's current protocols and a library of past versions of the protocols, with summaries of revisions, are available on ERCOT's website. Protocols - Nodal, https://www.ercot.com/mktrules/nprotocols.

8 RWE, Comment Letter on Nodal Protocol Request 1081 (June 23, 2021), https://www.ercot.com/mktrules/issues/NPRR1081#keydocs.

9 Available at https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report-with-Commission-Decisions_1-19-23.pdf).

10 *See also* TEX. GOV'T CODE § 2001.006 (describing when a rule "adopted" under Section 2001.006(b) may take effect); *id.* § 2001.021(a) ("An interested person by petition to a state agency may request the adoption of a rule."); *id.* § 2001.023(a) ("A state agency shall give at least 30 days' notice of its intention to adopt a rule before it adopts the rule."); *id.* § 2001.030 ("On adoption of a rule, a state agency, if requested to do so by an interested person either before adoption or not later than the 30th day after the date of adoption, shall issue a concise statement of the principal reasons for and against its adoption.").

11 As noted, PUC regulations provide a process for review of ERCOT protocols, 16 TEX. ADMIN. CODE §§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review in district court, TEX. UTIL. CODE § 15.001. RWE did not engage in that process, choosing instead to utilize the inapplicable procedure for reviewing PUC competition rules.

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Appx. Page 443 of 740

# Attachment 2

Tex. Util. Code § 39.151

Vernon's Texas Statutes and Codes Annotated
  Utilities Code (Refs & Annos)
    Title 2. Public Utility Regulatory Act (Refs & Annos)
      Subtitle B. Electric Utilities (Refs & Annos)
        Chapter 39. Restructuring of Electric Utility Industry
          Subchapter D. Market Structure

V.T.C.A., Utilities Code § 39.151

§ 39.151. Essential Organizations

Effective: September 1, 2023
Currentness

(a) A power region must establish one or more independent organizations to perform the following functions:

(1) ensure access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms;

(2) ensure the reliability and adequacy of the regional electrical network;

(3) ensure that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information; and

(4) ensure that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region.

(b) "Independent organization" means an independent system operator or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller.

(c) The commission shall certify an independent organization or organizations to perform the functions prescribed by this section. The commission shall apply the provisions of this section and Sections 39.1511, 39.1512, and 39.1515 so as to avoid conflict with a ruling of a federal regulatory body.

(d) The commission shall adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and all other market participants, or may delegate those responsibilities to an independent organization . An independent organization certified by the commission is directly responsible and accountable to the commission. The commission has complete authority to oversee and investigate the independent organization's finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties. The independent organization shall fully cooperate with the commission in the commission's oversight and investigatory functions. The commission may take appropriate action against an independent organization that does not adequately perform the organization's functions or duties or does not comply

with this section, including decertifying the organization or assessing an administrative penalty against the organization. The commission by rule shall adopt procedures governing decertification of an independent organization, selecting and certifying a successor organization, and transferring assets to the successor organization to ensure continuity of operations in the region. The commission may not implement, by order or by rule, a requirement that is contrary to an applicable federal law or rule.

(d-1) The commission shall require an independent organization certified by the commission under this section to submit to the commission the organization's entire proposed annual budget. The commission shall review the proposed budgets either annually or biennially and may approve, disapprove, or modify any item included in a proposed budget. The commission by rule shall establish the type of information or documents needed to effectively evaluate the proposed budget and reasonable dates for the submission of that information or those documents. The commission shall establish a procedure to provide public notice of and public participation in the budget review process.

(d-2) Except as otherwise agreed to by the commission and an independent organization certified by the commission under this section, the organization must submit to the commission for review and approval proposals for obtaining debt financing or for refinancing existing debt. The commission may approve, disapprove, or modify a proposal.

(d-3) An independent organization certified by the commission under this section shall develop proposed performance measures to track the organization's operations. The independent organization must submit the proposed performance measures to the commission for review and approval. The commission shall review the organization's performance as part of the budget review process under Subsection (d-1). The commission shall prepare a report at the time the commission approves the organization's budget detailing the organization's performance and submit the report to the lieutenant governor, the speaker of the house of representatives, and each house and senate standing committee that has jurisdiction over electric utility issues.

(d-4) The commission may:

(1) require an independent organization to provide reports and information relating to the independent organization's performance of the functions prescribed by this section and relating to the organization's revenues, expenses, and other financial matters;

(2) prescribe a system of accounts for an independent organization;

(3) conduct audits of an independent organization's performance of the functions prescribed by this section or relating to its revenues, expenses, and other financial matters and may require an independent organization to conduct such an audit;

(4) inspect an independent organization's facilities, records, and accounts during reasonable hours and after reasonable notice to the independent organization;

(5) assess administrative penalties against an independent organization that violates this title or a rule or order adopted by the commission and, at the request of the commission, the attorney general may apply for a court order to require an independent organization to comply with commission rules and orders in the manner provided by Chapter 15; and

Appx. Page 446 of 740

(6) resolve disputes between an affected person and an independent organization and adopt procedures for the efficient resolution of such disputes.

(e) After approving the budget of an independent organization under Subsection (d-1), the commission shall authorize the organization to charge to wholesale buyers and sellers a system administration fee, within a range determined by the commission, that is reasonable and competitively neutral to fund the independent organization's approved budget. The commission shall investigate the organization's cost efficiencies, salaries and benefits, and use of debt financing and may require the organization to provide any information needed to effectively evaluate the reasonableness and neutrality of the fee or to evaluate the effectiveness or efficiency of the organization. The commission shall work with the organization to establish the detail of information, both current and historical, and the time frames the commission needs to effectively evaluate the fee. The commission shall require the organization to closely match actual revenues generated by the fee and other sources of revenue with revenue necessary to fund the budget, taking into account the effect of a fee change on market participants and consumers, to ensure that the budget year does not end with surplus or insufficient funds. The commission shall require the organization to submit to the commission, on a schedule determined by the commission, reports that compare actual expenditures with budgeted expenditures.

(e-1) The review and approval of a proposed budget under Subsection (d-1) or a proceeding to authorize and set the range for the amount of a fee under Subsection (e) is not a contested case for purposes of Chapter 2001, Government Code.

(f) In implementing this section, the commission may cooperate with the utility regulatory commission of another state or the federal government and may hold a joint hearing or make a joint investigation with that commission.

(g) To maintain certification as an independent organization for the ERCOT power region under this section, an organization's governing body must be composed of persons selected by the ERCOT board selection committee.

(g-1) The bylaws of an independent organization certified for the ERCOT power region must be approved by and reflect the input of the commission. The bylaws must require that every member of the governing body be a resident of this state and must prohibit a legislator from serving as a member. The governing body must be composed of:

(1) two members of the commission as ex officio nonvoting members:

(A) one of whom must be the presiding officer of the commission; and

(B) one of whom must be designated by the presiding officer of the commission to serve a one-year term on the governing body ;

(2) the counsellor as an ex officio voting member representing residential and small commercial consumer interests;

(3) the chief executive officer of the independent organization as an ex officio nonvoting member; and

Appx. Page 447 of 740

(4) eight members selected by the selection committee under Section 39.1513 with executive-level experience in any of the following professions:

    (A) finance;

    (B) business;

    (C) engineering, including electrical engineering;

    (D) trading;

    (E) risk management;

    (F) law; or

    (G) electric market design.

(g-2) Members of the governing body are entitled to receive a salary for their service.

(g-3) A person does not qualify for selection as a member of the governing body of an independent organization for the ERCOT power region if the person has a fiduciary duty or assets in the electricity market for that region.

(g-4) To maintain certification as an independent organization under this section, the organization's governing body may not include more than two members who are employed by an institution of higher education, as defined by Section 61.003, Education Code, in a professorial role.

(g-5) A former member of the governing body of an independent organization certified under this section may not, before the second anniversary of the date the member ceases to be a member of the governing body, engage in an activity that requires registration under Chapter 305, Government Code.

(g-6) In this subsection, a reference to a protocol includes a rule. Protocols adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval. To maintain certification as an independent organization under this section, the organization's governing body must establish and implement a formal process for adopting new protocols or revisions to existing protocols. The process must require that new or revised protocols may not take effect until the commission approves a market impact statement describing the new or revised protocols. The commission may approve, reject, or remand with suggested modifications to the independent organization's governing body protocols adopted by the organization.

Appx. Page 448 of 740

<Text of (g-7) as provided by Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 15, eff. Sept. 1, 2023>

(g-7) The presiding officer of the commission shall designate commissioners to serve terms on the independent organization's governing body under Subsection (g-1)(1)(B) in the order in which the commissioners were first appointed to the commission. A commissioner may not serve an additional term until each commissioner has served a term.

<Text of (g-7) as provided by Acts 2023, 88th Leg., ch. 464 (S.B. 2013), § 4, eff. June 9, 2023.>

(g-7) To maintain certification as an independent organization under this section, the organization must:

   (1) identify all employee positions in the organization that are critical to the security of the electric grid; and

   (2) before hiring a person for a position described by Subdivision (1), obtain from the Department of Public Safety or a private vendor criminal history record information relating to the prospective employee and any other background information considered necessary by the independent organization or required by the commission.

(h) The ERCOT independent system operator may meet the criteria relating to the other functions of an independent organization provided by Subsection (a) by adopting procedures and acquiring resources needed to carry out those functions, consistent with any rules or orders of the commission.

(i) The commission may delegate authority to the existing independent system operator in ERCOT to enforce operating standards within the ERCOT regional electrical network and to establish and oversee transaction settlement procedures. The commission may establish the terms and conditions for the ERCOT independent system operator's authority to oversee utility dispatch functions after the introduction of customer choice.

(j) A retail electric provider, municipally owned utility, electric cooperative, power marketer, transmission and distribution utility, or power generation company shall observe all scheduling, operating, planning, reliability, and settlement policies, rules, guidelines, and procedures established by the independent system operator in ERCOT. Failure to comply with this subsection may result in the revocation, suspension, or amendment of a certificate as provided by Section 39.356 or in the imposition of an administrative penalty as provided by Section 39.357.

(j-1) Notwithstanding Subsection (j) of this section, Section 39.653(c), or any other law, the independent system operator in the ERCOT power region may not reduce payments to or uplift short-paid amounts to a municipally owned utility that becomes subject to the jurisdiction of that independent system operator on or after May 29, 2021, and before December 30, 2021, related to a default on a payment obligation by a market participant that occurred before May 29, 2021.

(k) To the extent the commission has authority over an independent organization outside of ERCOT, the commission may delegate authority to the independent organization consistent with Subsection (i).

(l) No operational criteria, protocols, or other requirement established by an independent organization, including the ERCOT independent system operator, may adversely affect or impede any manufacturing or other internal process operation associated with an industrial generation facility, except to the minimum extent necessary to assure reliability of the transmission network.

(m) A power region outside of ERCOT shall be deemed to have met the requirement to establish an independent organization to perform the transmission functions specified in Subsection (a) if the Federal Energy Regulatory Commission has approved a regional transmission organization for the region and found that the regional transmission organization meets the requirements of Subsection (a).

(n) An independent organization certified by the commission under this section is subject to review under Chapter 325, Government Code (Texas Sunset Act), but is not abolished under that chapter.The independent organization shall be reviewed during the periods in which the Public Utility Commission of Texas is reviewed.

(n-1) Expired.

(o) An independent organization certified by the commission under this section shall:

(1) conduct internal cybersecurity risk assessment, vulnerability testing, and employee training to the extent the independent organization is not otherwise required to do so under applicable state and federal cybersecurity and information security laws; and

(2) submit a report annually to the commission on the independent organization's compliance with applicable cybersecurity and information security laws.

(p) Information submitted in a report under Subsection (o) is confidential and not subject to disclosure under Chapter 552, Government Code.

**Credits**

Added by Acts 1999, 76th Leg., ch. 405, § 39, eff. Sept. 1, 1999. Amended by Acts 2005, 79th Leg., ch. 797, § 9, eff. Sept. 1, 2005; Acts 2011, 82nd Leg., ch. 1232 (S.B. 652), § 1.09, eff. June 17, 2011; Acts 2013, 83rd Leg., ch. 170 (H.B. 1600), § 1.08, eff. Sept. 1, 2013; Acts 2019, 86th Leg., ch. 509 (S.B. 64), § 23, eff. Sept. 1, 2019; Acts 2021, 87th Leg., ch. 425 (S.B. 2), § 3, eff. June 8, 2021; Acts 2021, 87th Leg., ch. 908 (H.B. 4492), § 3, eff. June 16, 2021; Acts 2023, 88th Leg., ch. 410 (H.B. 1500), § 15, eff. Sept. 1, 2023; Acts 2023, 88th Leg., ch. 464 (S.B. 2013), § 4, eff. June 9, 2023.

Notes of Decisions (25)

V. T. C. A., Utilities Code § 39.151, TX UTIL § 39.151
Current through the end of the 2023 Regular, Second, Third and Fourth Called Sessions of the 88th Legislature, and the Nov. 7, 2023 general election.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Appx. Page 450 of 740

# Attachment 3

16 Tex. Admin. Code § 22.251

Texas Administrative Code
  Title 16. Economic Regulation
    Part 2. Public Utility Commission of Texas
      Chapter 22. Procedural Rules
        Subchapter M. Procedures and Filing Requirements in Particular Commission Proceedings

16 TAC § 22.251

§ 22.251. Review of Electric Reliability Council of Texas (ERCOT) Conduct

Currentness

(a) Purpose. This section prescribes the procedure by which an entity, including the commission staff and the Office of Public Utility Counsel, may appeal a decision made by ERCOT or any successor in interest to ERCOT.

(b) Scope of complaints. Any affected entity may complain to the commission in writing, setting forth any conduct that is in violation or claimed violation of any law that the commission has jurisdiction to administer, of any order or rule of the commission, or of any protocol or procedure adopted by ERCOT pursuant to any law that the commission has jurisdiction to administer. For the purpose of this section, the term "conduct" includes a decision or an act done or omitted to be done. The scope of permitted complaints includes ERCOT's performance as an independent organization under the PURA including, but not limited to, ERCOT's promulgation and enforcement of procedures relating to reliability, transmission access, customer registration, and accounting for the production and delivery of electricity among generators and other market participants.

(c) Requirement of compliance with ERCOT Protocols. An entity must use Section 20 of the ERCOT Protocols (Alternative Dispute Resolution Procedures, or ADR), or Section 21 of the Protocols (Process for Protocol Revision), or other Applicable ERCOT Procedures, before presenting a complaint to the commission. For the purpose of this section, the term "Applicable ERCOT Procedures" refers to Sections 20 and 21 of the ERCOT Protocols and other applicable sections of the ERCOT protocols that are available to challenge or modify ERCOT conduct, including participation in the protocol revision process. If a complainant fails to use the Applicable ERCOT Procedures, the presiding official may dismiss the complaint or abate it to give the complainant an opportunity to use the Applicable ERCOT Procedures.

    (1) A complainant may present a formal complaint to the commission, without first using the Applicable ERCOT Procedures, if:

        (A) the complainant is the commission staff or the Office of Public Utility Counsel;

        (B) the complainant is not required to comply with the Applicable ERCOT Procedures; or

        (C) the complainant seeks emergency relief necessary to resolve health or safety issues or where compliance with the Applicable ERCOT Procedures would inhibit the ability of the affected entity to provide continuous and adequate service.

**Appx. Page 452 of 740**

(2) For any complaint that is not addressed by paragraph (1) of this subsection, the complainant may submit to the commission a written request for waiver of the requirement for using the Applicable ERCOT Procedures. The complainant shall clearly state the reasons why the Applicable ERCOT Procedures are not appropriate. The commission may grant the request for good cause.

(3) For complaints for which ADR proceedings have not been conducted at ERCOT, the presiding officer may require informal dispute resolution.

(d) Formal complaint. A formal complaint shall be filed within 35 days of the ERCOT conduct complained of, except as otherwise provided in this subsection. When an ERCOT ADR procedure has been timely commenced, a complaint concerning the conduct or decision that is the subject of the ADR procedure shall be filed no later than 35 days after the completion of the ERCOT ADR procedure. The presiding officer may extend the deadline, upon a showing of good cause, including the parties' agreement to extend the deadline to accommodate ongoing efforts to resolve the matter informally, and the complainant's failure to timely discover through reasonable efforts the injury giving rise to the complaint.

(1) The complaint shall include the following information:

(A) a complete list of all complainants and the entities against whom the complainant seeks relief and the addresses, and facsimile transmission numbers and e-mail addresses, if available, of the parties' counsel or other representatives;

(B) a statement of the case that ordinarily should not exceed two pages and should not discuss the facts. The statement must contain the following:

(i) a concise description of any underlying proceeding or any prior or pending related proceedings;

(ii) the identity of all entities or classes of entities who would be directly affected by the commission's decision, to the extent such entities or classes of entities can reasonably be identified;

(iii) a concise description of the conduct from which the complainant seeks relief;

(iv) a statement of the ERCOT procedures, protocols, by-laws, articles of incorporation, or law applicable to resolution of the dispute and whether the complainant has used the Applicable ERCOT Procedures for challenging or modifying the complained of ERCOT conduct or decision (as described in subsection (c) of this section) and, if not, the provision of subsection (c) of this section upon which the complainant relies to excuse its failure to use the Applicable ERCOT Procedures;

(v) a statement of whether the complainant seeks a suspension of the conduct or implementation of the decision complained of; and

(vi) a statement without argument of the basis of the commission's jurisdiction.

Appx. Page 453 of 740

(C) a detailed and specific statement of all issues or points presented for commission review;

(D) a concise statement without argument of the pertinent facts. Each fact shall be supported by references to the record, if any;

(E) a clear and concise argument for the contentions made, with appropriate citation to authorities and to the record, if any;

(F) a statement of all questions of fact, if any, that the complainant contends require an evidentiary hearing;

(G) a short conclusion that states the nature of the relief sought; and

(H) a record consisting of a certified or sworn copy of any document constituting or evidencing the matter complained of. The record may also contain any other item pertinent to the issues or points presented for review, including affidavits or other evidence on which the complainant relies.

(2) If the complainant seeks to suspend the conduct or the implementation of the decision complained of while the complaint is pending and all entities against whom the complainant seeks relief do not agree to the suspension, the complaint shall include a statement of the harm that is likely to result to the complainant if enforcement is not suspended. Harm may include deprivation of an entity's ability to obtain meaningful or timely relief if a suspension is not entered. A request for suspension of the conduct or enforcement of a decision shall be reviewed in accordance with subsection (i) of this section.

(3) All factual statements in the complaint shall be verified by affidavit made on personal knowledge by an affiant who is competent to testify to the matters stated.

(4) A complainant shall file the required number of copies of the formal complaint, pursuant to § 22.71 of this title (relating to Filing of Pleadings, Documents, and Other Materials). A complainant shall serve copies of the complaint and other documents, in accordance with § 22.74 of this title (relating to Service of Pleadings and Documents), and in particular shall serve a copy of the complaint on ERCOT's General Counsel, every other entity from whom relief is sought, the Office of Public Utility Counsel, and any other party.

(e) Notice. Within 14 days of receipt of the complaint, ERCOT shall provide notice of the complaint by email to all qualified scheduling entities and, at ERCOT's discretion, all relevant ERCOT committees and subcommittees. Notice shall consist of an attached electronic copy of the complaint, including the docket number, but may exclude the record required by subsection (d)(1)(H) of this section.

(f) Response to complaint. A response to a complaint shall be due within 28 days after receipt of the complaint and shall conform to the requirements for the complaint set forth in subsection (d) of this section except that:

(1) the list of parties and counsel is not required unless necessary to supplement or correct the list contained in the complaint;

**Appx. Page 454 of 740**

(2) the response need not include a statement of the case, a statement of the issues or points presented for commission review, or a statement of the facts, unless the respondent contests that portion of the complaint;

(3) a statement of jurisdiction should be omitted unless the complaint fails to assert valid grounds for jurisdiction, in which case the reasons why the commission lacks jurisdiction shall be concisely stated;

(4) the argument shall be confined to the issues or points raised in the complaint;

(5) the record need not include any item already contained in a record filed by another party; and

(6) if the complainant seeks a suspension of the conduct or implementation of the decision complained of, the response shall state whether the respondent opposes the suspension and, if so, the basis for the opposition, specifically stating the harm likely to result if a suspension is ordered.

(g) Comments by commission staff and motions to intervene. Commission staff representing the public interest shall file comments within 45 days after the date on which the complaint was filed. In addition, any party desiring to intervene pursuant to § 22.103 of this title (relating to Standing to Intervene) shall file a motion to intervene within 45 days after the date on which the complaint was filed. A motion to intervene shall be accompanied by a response to the complaint.

(h) Reply. The complainant may file a reply addressing any matter in a party's response or commission staff's comments. A reply, if any, must be filed within 55 days after the date on which the complaint was filed. However, the commission may consider and decide the matter before a reply is filed.

(i) Suspension of enforcement. The ERCOT conduct complained of shall remain in effect until and unless the presiding officer or the commission issues an order suspending the conduct or decision. If the complainant seeks to suspend the conduct or implementation of the decision complained of while the complaint is pending and all entities against whom the complainant seeks relief do not agree to the suspension, the complainant must demonstrate that there is good cause for suspension. The good cause determination required by this subsection shall be based on an assessment of the harm that is likely to result to the complainant if a suspension is not ordered, the harm that is likely to result to others if a suspension is ordered, the likelihood of the complainant's success on the merits of the complaint, and any other relevant factors as determined by the commission or the presiding officer.

(1) The presiding officer may issue an order, for good cause, on such terms as may be reasonable to preserve the rights and protect the interests of the parties during the processing of the complaint, including requiring the complainant to provide reasonable security, assurances, or to take certain actions, as a condition for granting the requested suspension.

(2) A party may appeal a decision of a presiding officer granting or denying a request for a suspension, pursuant to § 22.123 of this title (relating to Appeal of an Interim Order and Motions for Reconsideration of Interim Orders Issued by the Commission).

Appx. Page 455 of 740

(j) Oral argument. If the facts are such that the commission may decide the matter without an evidentiary hearing on the merits, a party desiring oral argument shall comply with the procedures set forth in § 22.262(d) of this title (relating to Commission Action After a Proposal for Decision). In its discretion, the commission may decide a case without oral argument if the argument would not significantly aid the commission in determining the legal and factual issues presented in the complaint.

(k) Extension or shortening of time limits. The time limits established by this section are intended to facilitate the expeditious resolution of complaints brought pursuant to this section.

(1) The presiding officer may grant a request to extend or shorten the time periods established by this rule for good cause shown. Any request or motion to extend or shorten the schedule must be filed prior to the date on which any affected filing would otherwise be due. A request to modify the schedule shall include a representation of whether all other parties agree with the request, and a proposed schedule.

(2) For cases to be determined after the making of factual determinations or through commission ADR as provided for in subsection (n) of this section, the presiding officer shall issue a procedural schedule.

(l) Standard for review. If the factual determinations supporting the conduct complained of have not been made in a manner that meets the procedural standards specified in this subsection, or if factual determinations necessary to the resolution of the matter have not been made, the commission will resolve any factual issues on a de novo basis. If the factual determinations supporting the conduct complained have been made in a manner that meets the procedural standards specified in this subsection, the commission will reverse a factual finding only if it is not supported by substantial evidence or is arbitrary and capricious. The procedural standards in this subsection require that facts be determined:

(1) In a proceeding to which the parties have voluntarily agreed to participate; and

(2) By an impartial third party under circumstances that are consistent with the guarantees of due process inherent in the procedures described in the Texas Government Code Chapter 2001 (Administrative Procedure Act).

(m) Referral to the State Office of Administrative Hearings. If resolution of a complaint does not require determination of any factual issues, the commission may decide the issues raised by the complaint on the basis of the complaint and the comments and responses. If factual determinations must be made to resolve a complaint brought under this section, and the parties do not agree to the making of all such determinations pursuant to a procedure described in subsection (n) of this section, the matter may be referred to the State Office of Administrative Hearings for the making of all necessary factual determinations and the preparation of a proposal for decision, including findings of fact and conclusions of law, unless the commission or a commissioner serves as the finder of facts.

(n) Availability of alternative dispute resolution. Pursuant to Texas Government Code Chapter 2009 (Governmental Dispute Resolution Act), the commission shall make available to the parties alternative dispute resolution procedures described by Civil Practices and Remedies Code Chapter 154, as well as combinations of those procedures. The use of these procedures before the commission for complaints brought under this section shall be by agreement of the parties only.

Appx. Page 456 of 740

(o) Granting of relief. Where the commission finds merit in a complaint and that corrective action is required by ERCOT, the commission shall issue an order granting the relief the commission deems appropriate, including, but not limited to:

    (1) Entering an order suspending the conduct or implementation of the decision complained of;

    (2) Ordering that appropriate protocol revisions be developed;

    (3) Providing guidance to ERCOT for further action, including guidance on the development and implementation of protocol revisions; and

    (4) Ordering ERCOT to promptly develop protocols revisions for commission approval.

(p) Notice of proceedings affecting ERCOT. Within seven days of ERCOT receiving a pleading instituting a lawsuit against it concerning ERCOT's conduct as described in subsection (b) of this section, ERCOT shall notify the commission of the lawsuit by filing with the commission, in the commission project number designated by the commission for such filings, a copy of the pleading instituting the lawsuit. In addition, within seven days of receiving notice of a proceeding at the Federal Energy Regulatory Commission in which relief is sought against ERCOT, ERCOT shall notify the commission by filing with the commission, in the commission project number designated by the commission for such filings, a copy of the notice received by ERCOT.

**Credits**
**Source:** The provisions of this § 22.251 adopted to be effective March 30, 2003, 28 TexReg 2489.

Current through 49 Tex.Reg. No. 6852, dated August 30, 2024, as effective on or before September 6, 2024. Some sections may be more current. See credits for details.

16 TAC § 22.251, 16 TX ADC § 22.251

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Appx. Page 457 of 740

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of John Hulme
Bar No. 10258400
david.laurent@oag.texas.gov
Envelope ID: 92829938
Filing Code Description: RESPONSE
Filing Description: DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS' AMENDED PLEA TO THE JURISDICTION
Status as of 10/7/2024 8:28 AM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 10/4/2024 5:15:19 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 10/4/2024 5:15:19 PM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 10/4/2024 5:15:19 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 10/4/2024 5:15:19 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 10/4/2024 5:15:19 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 10/4/2024 5:15:19 PM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 10/4/2024 5:15:19 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 10/4/2024 5:15:19 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/4/2024 5:15:19 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/4/2024 5:15:19 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 10/4/2024 5:15:19 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/4/2024 5:15:19 PM | SENT |

Case Contacts

_____

_____

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of John Hulme
Bar No. 10258400
david.laurent@oag.texas.gov
Envelope ID: 92829938
Filing Code Description: RESPONSE
Filing Description: DEFENDANTS PUBLIC UTILITY COMMISSION OF TEXAS AND PUBLIC UTILITY COMMISSION OF TEXAS OFFICIALS' AMENDED PLEA TO THE JURISDICTION
Status as of 10/7/2024 8:28 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lizzette Velazquez | | lvelazquez@ccsb.com | 10/4/2024 5:15:19 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 10/4/2024 5:15:19 PM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 10/4/2024 5:15:19 PM | SENT |
| Carolyn Taylor | | ctaylor@ccsb.com | 10/4/2024 5:15:19 PM | SENT |

10/9/2024 8:02 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Poodiack

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | |
| TEXAS, ELECTRIC RELIABILITY | § | TRAVIS COUNTY, TEXAS |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN | § | |
| JACKSON,  and COURTNEY | § | |
| HJALTMAN, | § | |
| | § | 345th JUDICIAL DISTRICT |
| *Defendants.* | § | |

**PLAINTIFF'S CONSOLIDATED RESPONSE TO
DEFENDANTS' AMENDED PLEAS TO THE JURISDICTION AND ERCOT's
<u>RULE 91a MOTION TO DISMISS AND REQUEST FOR ABATEMENT</u>**

Chrysta L. Castañeda
  Texas Bar No. 15325625
  chrysta@castaneda-firm.com
Nicole Michael
  Texas Bar No. 24067767
  nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Phone: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
  Texas Bar No. 00787881
  MLatin@ccsb.com
Brent M. Rubin
  Texas Bar No. 24086834
  BRubin@ccsb.com
Ken Carroll
  Texas Bar No. 03888500
  KCarroll@ccsb.com
CARRINGTON, COLEMAN,
  SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Phone: 214-855-3000
Fax: 214-580-2641

***Attorneys for Plaintiff***

# CONTENTS

INTRODUCTION ................................................................................................................. 4

FACTUAL BACKGROUND ................................................................................................. 7

    A.   About Aspire Power Ventures ................................................................................ 7

    B.   PUC and ERCOT rulemaking ............................................................................... 8

    C.   ERCOT Contingency Reserve Service (ECRS) .................................................... 9

    D.   The PUC did not authorize ECRS as a new ancillary service prior to ERCOT's ECRS rulemaking ............................................................................................... 11

    E.   ECRS constitutes withholding of electricity, contrary to PURA ............................ 11

    F.   The ECRS rulemaking failed to meet the requirements of the APA ...................... 12

ARGUMENT ...................................................................................................................... 14

    I.   Defendants' Amended Pleas to the Jurisdiction Should Be Denied ............................ 14

    A.   The standard for deciding pleas to the jurisdiction ................................................ 14

    B.   Government Code § 2001.038 waives sovereign or governmental immunity for Aspire's claims in this case ................................................................................. 15

        1.   Challenges to PUC Rules fall within § 2001.038 ................................................. 16

        2.   The PUC delegated its authority to formulate and adopt rules like the ECRS protocols to ERCOT .......................................................................................... 17

        3.   When ERCOT adopted NPRRs under rulemaking authority delegated by the PUC, it stood in the shoes of the PUC and was subject to the same requirements and limitations as the PUC, including the APA generally and § 2001.038 specifically .......................................................................................... 19

        4.   PURA signals that the APA applies to ERCOT ................................................... 21

        5.   *RWE* does not undermine Aspire's reliance on § 2001.038 as a waiver of sovereign immunity with respect to its challenge to the ECRS Rules ................... 22

        6.   PURA's directive that ERCOT be required to establish a "formal process" for its PUC-delegated rulemaking authority does not supplant the APA ........................ 25

    C.   Aspire was not required to "exhaust administrative remedies" before pursuing its challenge in this Court ............................................................................................ 27

    D.   PURA § 15.001 does not exempt ERCOT protocols from the APA. ....................... 28

    E.   The Court is vested with jurisdiction over Plaintiff's complaints, even those stemming from 2019 actions ................................................................................ 29

    F.   There is no sovereign immunity for *ultra vires* acts. .............................................. 30

    II.   ERCOT's Rule 91a Motion to Dismiss Should Be Denied ....................................... 33

    A.   A Rule 91a Motion to Dismiss is decided on the pleadings alone ........................... 33

    B.   Aspire incorporates by reference its Response to Defendants' Amended Pleas to the Jurisdiction ..................................................................................................... 34

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 2**

**Appx. Page 461 of 740**

C. Aspire's claims are not barred by the filed-rate doctrine............................................ 34

D. Aspire does not allege a "private cause of action" for PURA § 39.157 violations .. 36

III. ERCOT's Plea in Abatement Should Be Denied, Because There Is No Requirement That All Market Participants Be Joined in Aspire's Challenge in this Court........... 38

A. ERCOT fails to prove other parties are indispensable under TRCP 39.................... 38

B. An APA challenge requires only a complaining party and the state agency ............ 40

PRAYER FOR RELIEF ........................................................................................................ 41

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 3**

**Appx. Page 462 of 740**

Plaintiff Aspire Power Ventures, LP ("Aspire") opposes the Amended Pleas to the Jurisdiction asserted by Defendants Public Utility of Commission of Texas ("PUC"), Electric Reliability Council of Texas ("ERCOT"), Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman (collectively, "Commissioners" and, with the PUC, the "PUC Parties"), as well as ERCOT's alternative Rule 91a Motion to Dismiss and Plea in Abatement.[1]

ERCOT and the PUC Parties base their pleas to the jurisdiction on sovereign or governmental immunity. But § 2001.038 of the Texas Government Code expressly waives sovereign immunity for a declaratory judgment action, like that here, challenging the validity of rules and the process of their adoption. Further, the bar of sovereign immunity simply does not apply to challenges to *ultra vires* acts, such as those mounted here by Aspire. *See, e.g.*, *City of El Paso v. Heinrich*, 284 S.W. 3d 366, 368-69 (Tex. 2009); *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W. 3d 849, 855 (Tex. 2002). Defendants' Amended Pleas to the Jurisdiction therefore must be denied. And ERCOT's alternative Rule 91a Motion to Dismiss and Plea in Abatement fare no better. They, too, must be denied.

## INTRODUCTION

The ERCOT Contingency Reserve Service ("ECRS") artificially restrains the supply of electricity available to Texans on the ERCOT grid. Under ECRS,

---

[1] This Response addresses Defendants Public Utility Commission of Texas and Public Utility Commission of Texas Officials' Amended Plea to the Jurisdiction filed 10/4/2024, and ERCOT'S Amended Plea to the Jurisdiction and Alternatively, Motion to Dismiss under Rule 91(a) and Alternatively, Plea in Abatement filed 10/1/2024.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 4**

Appx. Page 463 of 740

companies that generate electricity are paid to withhold some of their existing generating capacity from the grid—to hold it in "reserve"—even when electricity demand is at a peak, such as in hot summer months. *See* 2d Am. Pet. ¶¶ 2, 30. Texas electricity consumers have paid inflated rates because of ECRS. According to ERCOT's Independent Market Monitor ("IMM"), ECRS inflated the cost of wholesale electricity in Texas by about $12 billion for the period June through November 2023 alone. *Id.* ¶¶ 32, 50-55.

ECRS is not only ineffectual, it is illegal and therefore invalid. *First*, ECRS violates the Public Utility Regulatory Act ("PURA"), which (i) prohibits withholding supply from the market, and (ii) grants only to PUC and not to ERCOT the authority to establish new "ancillary services" like ECRS. *See* Tex. Util. Code § 39.157(a) (PUC charged with preventing market power abuses and defining withholding of production as a market power abuse); 16 Tex. Admin. Code §§ 25.501(j), 25.503(a)(6), (d) (same); Tex. Util. Code § 35.004(e) & (h) (restricting to PUC itself the authority to create new ancillary services); 2d Am. Pet. ¶¶ 39-41, 59. *Second*—and centrally relevant to the threshold jurisdictional issues to be determined by the Court—the PUC and ERCOT promulgated and implemented ECRS without even attempting to comply with the mandatory requirements of the Administrative Procedure Act ("APA"), Tex. Gov't Code § 2001.001 *et seq.*, which were applicable to that process. *See* 2d Am. Pet. ¶¶ 42-49, 57.

The APA ensures that the public has an opportunity to participate in agency rulemaking and that agencies do not exceed their authority when making rules. But

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 5**

Appx. Page 464 of 740

the process the PUC and ERCOT used to create ECRS complied with none of the APA's safeguards—e.g., no equal opportunity for general public participation, inadequate notice, no published response to comments or explanation of the impact of the rules, and no publication in the Texas Register.

The Legislature allowed the PUC to delegate certain of its rulemaking responsibilities to ERCOT. Tex. Util. Code § 39.151(d). But when it did so, the Legislature did not dispense with the APA's mandatory requirements—applicable to the PUC and therefore necessarily to its delegee, ERCOT, as well. Aspire alleges that ERCOT's rulemaking processes do not come close to meeting the APA's rulemaking requirements; nor does the PUC's condensed process for approving ERCOT-adopted rules. *See* 2d Am. Pet. ¶¶ 42-49. In fact, the entire procedure—which must be judged as a single, integrated process—deliberately and illegally attempts to evade the APA. By fracturing the process of rulemaking—through delegation to ERCOT of the formulation of rules or "protocols" while reserving to itself the final say-so or "approval" over those rules—PUC attempts to sidestep the requirements of the APA.

Relying extensively on the Supreme Court's recent decision in *Pub. Util. Comm'n of Tex. v. RWE Renewables Americas, LLC*, 691 S.W.3d 484 (Tex. 2024), ERCOT and the PUC Parties argue that neither ERCOT's formulation of the rules nor PUC's "approval" of those rules, viewed in isolation, is subject to the APA or to the waiver of sovereign immunity in § 2001.038. But that is not what *RWE* says, and it is not and cannot be the law. The PUC and ERCOT cannot evade the APA

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 6**

Appx. Page 465 of 740

and § 2001.038 by simply divvying up the tasks that, taken together, constitute the adoption of a "rule." Viewed as a whole, as it must be, the PUC/ERCOT combined process for formulating and adopting the ECRS rules undeniably was governed by and failed to comply with the APA. And the resulting rules are subject to challenge, as here, under § 2001.038, because they are invalid.[2]

Finally, the Court should deny ERCOT's Rule 91a Motion to Dismiss and Plea in Abatement. The 91a motion fails because it misconstrues Aspire's pleadings and the statutes on which Aspire's claims are based and because it goes beyond the pleadings to attack Aspire's claims. Further, the 91a motion asks the Court to misapply the filed-rate doctrine because Aspire is not challenging agency-approved rates. The Plea in Abatement fails because ERCOT has not shown that any non-party actually claims an interest in the subject matter of the litigation, which Texas Rule of Civil Procedure 39(a)(2) requires.

## FACTUAL BACKGROUND

### A. About Aspire Power Ventures

Aspire is a Market Participant on the ERCOT grid. Specifically, it is a Qualified Scheduling Entity ("QSE") that participates in several markets administered by ERCOT. Aspire buys and sells wholesale electricity in ERCOT's

---

[2] A rule is invalid when an agency promulgates it without complying with the proper APA rulemaking procedures. *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008) (citing Tex. Gov't Code § 2001.035(a)). "Under these procedures the agency must provide notice, publication, and invite public comment, among other things." *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 255 (Tex. 1999) (citing Tex. Gov't Code §§ 2001.023-.030).

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 7**

real-time electricity market, serving as a conduit between companies that generate electricity and companies that sell electricity on a retail basis. 2d Am. Pet. ¶¶ 25-27.

QSEs like Aspire bear the risk of price fluctuations in the real-time electricity market, because they must contractually commit in advance to buy and sell electricity at specific prices before Security Constrained Economic Dispatch ("SCED")[3] creates the actual wholesale market prices. *Id*. ¶ 27. As a result, artificial fluctuations in prices—fluctuations that don't reflect normal drivers of the market like changes in weather, demand, and generation—cause prices to deviate from expectations. *Id*. Because they are unexpected, these artificial fluctuations not only represent an additional risk to QSEs like Aspire but also can result in financial losses. For example, when Aspire sells to a retail provider, it enters into an agreement to sell the retailer electricity at a fixed price and then bears the risk that the wholesale price that Aspire buys at will be higher than the contract price with the retail provider, resulting in a loss. *Id*.

## B. PUC and ERCOT rulemaking

Texas's electricity market is governed in relevant part by Nodal Protocol Revision Requests ("NPRRs") promulgated by ERCOT under rulemaking authority delegated to it by the PUC. *See* Tex. Util. Code § 39.151(d). Since June 2021, ERCOT's protocols must be approved by the PUC. Tex. Util. Code § 39.151(g-6); *see* Act of May 30, 2021, 87th Leg., R.S., ch. 426, § 3, 2021 Tex. Gen. Laws 830, 831, *amended by* Act of May 28, 2023, 88th Leg., R.S., H.B. 1500, § 15. Before PURA

---

[3] SCED is the primary tool ERCOT uses to ensure that demand and supply are in constant balance—the foundation of the wholesale electricity market.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 8**

required PUC approval of the NPRRs, they became effective when adopted by ERCOT, subject to "commission oversight and review." *RWE*, 691 S.W.3d at 486-87.

The NPRRs are rules promulgated by ERCOT that detail how ERCOT and market participants are required to operate and to interact with one another and how the wholesale electricity market is designed. 2d Am. Pet. ¶ 19. Section 21 of ERCOT's Nodal Protocols details the process for adopting new protocols and revising existing protocols. *Id*. A request to revise a Nodal Protocol is called a NPRR. *Id*. After ERCOT adopts an NPRR, the PUC can approve the NPRR through an order. *Id*.

## C. ERCOT Contingency Reserve Service (ECRS)

ECRS was created and adopted by ERCOT in February 2019 through NPRR 863. *Id*. ¶ 29. After almost five years of development, ECRS was finally implemented in June 2023. *Id*. ¶¶ 28-29. Since its creation, ERCOT and the PUC have modified ECRS through numerous ECRS-related NPRRs, as shown in Table 1 below ("ECRS Rules"). *See id*. ¶ 29. Many of the ECRS Rules established operative parameters and others were adopted to "cleanup" ERCOT protocol language. *Id*. Beginning in 2023, ERCOT and the PUC began implementing operative parameters such as deployment obligation requirements, setting prices for other resources,[4] and a proposal to implement a trigger allowing ERCOT to manually release ECRS from SCED-dispatchable resources.[5] *Id*.

---

[4] *See* NPRR 1178 (setting the offer floor on capacity for resources providing ECRS concurrently with other resources).

[5] *See* NPRR 1224; *also see* PUCT memo (the PUC rejected this Protocol, concluding that it did not "align with the intended risks ECRS is procured to mitigate").

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 9**

Appx. Page 468 of 740

**TABLE 1**[6]

| ERCOT NPRR | PUC Approval Orders | Date Adopted |
|---|---|---|
| NPRR 863 – Creation of ECRS and Revisions to Responsive Reserve | N/A[7] | Feb. 12, 2019 |
| NPRR 992 – Updated Day-Ahead Liability for NPRR863 | N/A | Aug. 11, 2020 |
| NPRR 1015 – Clarification of DAM implementation of NPRR863 Phase 2 | N/A | Aug. 11, 2020 |
| NPRR 1079 – Day-Ahead Market RRS/ECRS 48 Hour Report Clarification (Aug. 10, 2021) | Approval Order (PUC Project No. 52307) | Aug. 24, 2021 |
| NPRR 1096 – Require Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (April 28, 2022) | Approval Order (PUC Project No. 52934) | May 12, 2022 |
| NPRR 1148 – Language Cleanup Related to ECRS (Dec. 20, 2022) | Approval Order (PUC Project 54445) | Jan. 26, 2023 |
| NPRR 1178 – Expectations for Resources Providing ECRS (Jun. 20, 2023) | Approval Order (PUC Project 54445) | June 28, 2023 |
| NPRR 1196 – Require Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (Dec. 19, 2023) | Approval Order (PUC Project No. 54445) | Feb. 1, 2024 |
| NPRR 1213 – Allow DGRs and DESRs on Circuits Subject to Load Shed to Provide ECRS and Clarify Language Regarding DGRs and | Approval Order (PUC Project No. 54445) | Apr. 11, 2024 |

[6] At the October 1, 2024, status conference, the parties addressed the record relating to the adoption and approval of the NPRRs at issue in this lawsuit. While the parties have not been able to reach agreement on how the record should be presented to the Court, ERCOT's and PUC's counsel made representations regarding their respective materials relating to the NPRRs. Specifically, ERCOT's counsel represented that "ERCOT's protocol revisions are on its website. It's very well organized. [Aspire has] full access to them" and "we're not going to contest authenticity." Status Conf. Tr. at 30:12, 30:24-31:1 (attached as Ex. A to Aspire's Motion for Judicial Notice). PUC's counsel added "All the PUC materials are readily available on the PUC's website. They already have them. There's no issue there." *Id.* at 31:6-8. Accordingly, Aspire is concurrently filing a Motion for Judicial Notice regarding these materials.

[7] NPRR 863, NPRR 992, and NPRR 1015 were adopted by ERCOT before PURA was amended in 2021 to require the PUC's review and approval of NPRRs before they would become effective. *See supra* at 7-8.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 10**

**Appx. Page 469 of 740**

| DESRs Providing Non-Spin (Feb. 27, 2024) | | |
|---|---|---|
| NPRR 1224 – ECRS Manual Deployment Triggers (June 18, 2024) | Rejection Order (PUC Project No. 54445) | Aug. 5, 2024 |

**D. The PUC did not authorize ECRS as a new ancillary service prior to ERCOT's ECRS rulemaking.**

By ERCOT's own characterization, ECRS is a new type of ancillary service in the ERCOT wholesale market. *See, e.g.*, ERCOT Board Report, NPRR 1196 ("The Protocols changes approved in NPRR 1149 included provisions that would go into effect upon implementation of the new Ancillary Service, ERCOT Contingency Reserve Service (ECRS)."); *see* 2d Am. Pet. ¶¶ 39-41. PURA provides that ancillary services, like ECRS, must be created by PUC, not ERCOT. Tex. Util. Code § 35.004(e). NPRR 863, which created ECRS, was never adopted by the PUC, as a rule or otherwise, and exceeded ERCOT's authority. 2d Am. Pet. ¶¶ 39-41. Further, all subsequent ERCOT protocols modifying ECRS, and PUC approvals of such protocols, rested on ERCOT's initial and unauthorized creation of ECRS. *Id.*

**E. ECRS constitutes withholding of electricity, contrary to PURA.**

ERCOT pays generators who participate in ECRS to withhold part of their generating capacity as reserves unless certain operational criteria are met, which is expressly prohibited under PURA. Tex. Util. Code § 39.157(a) (PUC charged with preventing market power abuses and defining withholding of production as a market power abuse); 16 Tex. Admin. Code §§ 25.501(j), 25.503(a)(6), (d) (same); *see* 2d Am. Pet. ¶ 30. The PUC and ERCOT claim that ECRS is a "critical reliability tool" which was developed to address certain reliability risks not adequately covered

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 11**

Appx. Page 470 of 740

by ERCOT's other ancillary services.[8] 2d Am. Pet. ¶ 31. But ERCOT's Independent Market Monitor ("IMM") determined that ECRS has actually "diminished reliability."[9] 2d Am. Pet. ¶ 32. As explained in the IMM's State of the Market Report published in May 2024, ECRS caused ERCOT to withhold procured resources from the real-time market dispatch even when such resources were needed to meet energy demand or manage congestion.[10] 2d Am. Pet. ¶ 32. The increased ECRS procurements that ERCOT sequestered "substantially exceeded levels that could be justified by reliability."[11] See 2d Am. Pet. ¶ 53.

## F. The ECRS rulemaking failed to meet the requirements of the APA.

As previously stated, before 2021 ERCOT promulgated the ECRS Rules without prior authorization or subsequent approval by the PUC. From 2021 on, the PUC was required to issue approval orders before the ECRS Rules could take effect. But at no point has the process complied with the following requirements of the APA, among other omissions:

- Posting of a notice of proposed rulemaking in the Texas Register with at least 30 days' notice to the public
- A notice of proposed rulemaking that meets all of the requirements of the APA, including:
  - A statement of the statutory or other authority under which the rule is proposed to be adopted
  - A fiscal note showing the name and title of the officer or employee responsible for preparing or approving the note and

---

[8] PUC Am. PTJ at 5; ERCOT Am. PTJ at 8.

[9] https://www.ercot.com/files/docs/2023/12/11/13%20Independent%20Market%20Monitor%20(IMM)%20Report.pdf (slide 6); *see also* 16 Tex. Admin. Code § 25.365 (Prescribing the IMM's role and responsibilities, which include evaluation of rules and protocols that affect supply, demand, and the efficient functioning of the ERCOT market.)

[10] https://www.potomaceconomics.com/wp-content/uploads/2024/05/2023-State-of-the-Market-Report_Final_060624.pdf (pp. xix, 24)

[11] *Id.* at p. 26.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 12**

Appx. Page 471 of 740

> stating for each year of the first five years that the rule will be in effect its impact on state and local government
> - A notice of agency adoption posted in the Texas Register that complies with all of the requirements of the APA, including a reasoned justification for the rule.

Tex. Gov't Code §§ 2001.023, .024, .033.

Moreover, the ERCOT/PUC process proscribes actual public participation. The ERCOT stakeholder process is not designed to comply with the requirements of the APA, nor does it. *See* 2d Am. Pet. ¶¶ 46-49. While it has public meetings and opportunities to submit comments, the ERCOT process falls well short of the public participation requirements set by the APA. *Id.*

Most notably, the ERCOT process does not permit the participation of all interested persons, as the APA requires. *Id.* Participation is limited to ERCOT Members and Market Participants at multiple stages, and the barriers to entry to become a ERCOT Member or Market Participant, and therefore a part of the preferred commenting class, are significant.[12] Becoming a Market Participant

---

[12] A Market Participant is:

> An Entity, other than ERCOT, that engages in any activity that is in whole or in part the subject of these Protocols, regardless of whether that Entity has signed an Agreement with ERCOT. Examples of such an Entity include but are not limited to the following:
> (a)    Load Serving Entity (LSE);
> (b)    Qualified Scheduling Entity (QSE);
> (c)    Transmission and/or Distribution Service Provider (TDSP);
> (d)    Congestion Revenue Right (CRR) Account Holder;
> (e)    Resource Entity;
> (f)    Independent Market Information System Registered Entity (IMRE); and
> (g)    Renewable Energy Credit (REC) Account Holder.

ERCOT Nodal Protocols § 2.1.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 13**

Appx. Page 472 of 740

requires significant investment and is limited to those with particular experience and expertise as a practical matter. *See* 2d Am. Pet. ¶ 21.[13] And some entities receive preferential treatment in the rulemaking process, and they are selected by the Commission (i.e., Commission Staff, the Reliability Monitor, and the Independent Market Monitor).

## ARGUMENT

I.    **DEFENDANTS' AMENDED PLEAS TO THE JURISDICTION SHOULD BE DENIED.**

**A. The standard for deciding pleas to the jurisdiction**

On a Plea to the Jurisdiction, the "burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction." *PUC v. AMA Commc'ns*, LLC, No. 03-21-00597-CV, 2022 WL 3220405, at *3 (Tex. App.—Austin Aug. 10, 2022, no pet.) (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012)). "When … a plea to the jurisdiction challenges the pleadings, [the court] determine[s] if the plaintiff has 'alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause.'" *Id.* (quoting *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)); *accord* ERCOT Am. PTJ at 14. In so doing, the court must "construe the pleadings liberally in the plaintiff's favor, taking factual assertions as true and looking to the plaintiff's intent." *Id.* (citing *Miranda*, 133 S.W.3d at 226). Finally, the court "may also consider evidence that the parties have submitted that is relevant to the jurisdictional issues, and … must do so when

---

[13] Even for residential consumers, ERCOT Membership costs $100 per year. *See* ERCOT Market Notice, M-C100923-03 General, ERCOT Membership Application for 2024 Membership Year - FINAL REMINDER (Nov. 13, 2023), available at https://www.ercot.com/services/comm/mkt_notices/M-C100923-03 .

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 14**

Appx. Page 473 of 740

necessary to resolve those jurisdictional issues." *Id.* (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)).

While ERCOT states that its Amended Plea to the Jurisdiction "challenges the pleadings," ERCOT Am. PTJ at 14, it acknowledges that a court can receive and consider evidence "and must do so when necessary to resolve the jurisdictional issues raised," *id.* at 6 n.5 (quoting *Bland*, 34 S.W.3d at 554-55). It then proceeds to cite to and rely on a raft of evidence beyond the pleadings, which is why Aspire must be given the opportunity to do the same. *See, e.g.*, ERCOT Am. PTJ at 7 & n.8, 8, 9, 10-12 & nn.9-23 (referencing and relying on various ERCOT Protocols, NPRRs, "market rules," and "other binding documents" not in issue here, as well as ERCOT Board Reports and Projects).

**B. Government Code § 2001.038 waives sovereign or governmental immunity for Aspire's claims in this case.**

Both ERCOT and the PUC Parties commence their Amended Pleas by arguing that the doctrine of sovereign immunity bars this Court's jurisdiction over Aspire's challenge to the original and amended ECRS Rules at issue in this case. ERCOT Am. PTJ at 3, 15 (citing *CPS Energy v. ERCOT*, 671 S.W.3d 605, 628 (Tex. 2023)); PUC Am. PTJ at 2-3 (citing *Tex. Nat. Res. Conserv. Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002)). Both acknowledge, however, that sovereign immunity is no bar if the Legislature has waived it by statute. ERCOT Am. PTJ at 15; PUC Am. PTJ at 2-3.

Section 2001.038 of the APA provides just such a waiver. It says, "The validity or applicability of a rule … may be determined in an action for declaratory

PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 15

Appx. Page 474 of 740

judgment **if it is *alleged*** that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff," and it requires that "[t]he state agency must be made a party to the action." Tex. Gov't Code § 2001.038(a) & (c) (emphasis added). Section 2001.038 expressly waives sovereign immunity for claims falling within its scope. *Tex. Dep't of State Health Services v. Balquinta*, 429 S.W.3d 726, 744 (Tex. App.—Austin 2014, pet. dism'd); *Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 700 (Tex. App.—Austin 2011, no pet.).

But, relying on the Texas Supreme Court's recent decision in *PUC v RWE Renewables Americas, LLC*, 691 S.W.3d 484 (Tex. 2024), ERCOT and the PUC Parties argue that § 2001.038's waiver of sovereign immunity doesn't apply here because "neither ERCOT's [ECRS] Protocols, nor the PUCT's orders approving the adoption of or revisions to those Protocols, are 'rules' under the APA" generally, and § 2001.038 specifically. ERCOT Am. PTJ at 16; *see* PUC Am. PTJ at 7-9. Defendants' argument, however, flows from a myopic and improperly fragmented characterization of the process by which ERCOT and the PUC promulgate rules like the ECRS protocols and from an unduly expansive reading of the Supreme Court's opinion in *RWE*. *See* Am. Pet. ¶¶ 15-16.

### 1. Challenges to PUC Rules fall within § 2001.038.

Rules adopted by the PUC are subject to the APA, including § 2001.038. *See, e.g., Tex. Tel. Ass'n v. PUC*, 653 S.W.3d 227, 263-67 (Tex. App.—Austin 2022, no pet.) (rendering declaratory judgment that PUC rules were void for lack of APA compliance); *see also PUC v. AMA Commc'ns, LLC*, No. 03-21-00597-CV, 2022 WL

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 16**

Appx. Page 475 of 740

3220405, at *3 (Tex. App.—Austin Aug. 10, 2022, no pet.); *Sw. Bell Tel. Co. v. PUC*, 888 S.W.2d 921, 929 (Tex. App.—Austin 1994, writ denied). Section 2001.003(6) of the APA defines a "rule" as "a state agency statement of general applicability" that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency," including "the amendment or repeal of a prior rule." The PUC is a "state agency" and the ECRS Rules are "statements of general applicability" that implement law or policy and describe the procedure for doing so. In fact, the very statute that authorized ERCOT to adopt the ECRS Rules states that they are rules. *See* Tex. Util. Code § 39.151(d) ("[t]he commission [PUC] shall adopt and enforce *rules* relating to the reliability of the regional electrical network"… "or may delegate those responsibilities to [ERCOT]" (emphasis added)). If the PUC, acting alone, had formulated and adopted the ECRS Rules, the process of their adoption would be subject to the requirements of the APA and to challenges under § 2001.038. Defendants cannot avoid its application simply through delegation.

**2. The PUC delegated its authority to formulate and adopt rules like the ECRS protocols to ERCOT.**

Although the Legislature in PURA directed the PUC to "adopt and enforce *rules* relating to the reliability of the regional electrical network," it went on to provide that the PUC "may delegate those responsibilities to an independent organization … directly responsible and accountable to the commission." Tex. Util. Code § 39.151(d) (emphasis added). And the PUC has in fact delegated rulemaking authority to ERCOT, including the authority by which ERCOT formulated and

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 17**

Appx. Page 476 of 740

adopted the original and amended ECRS protocols at issue here. *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484, 486 (Tex. 2024); 16 Tex. Admin. Code § 25.362(c).

Originally, this delegation of authority allowed ERCOT to promulgate and adopt rules with immediate effect (subject to PUC's overarching authority over ERCOT's activities as a whole, *see* Tex. Util. Code § 39.151(d)). In 2021, however, the Legislature amended PURA to provide that "Protocols adopted by an independent organization … under delegated authority from the commission … may not take effect before receiving commission approval." Tex. Util. Code § 39.151(g-6); *see* Act of May 30, 2021, 87th Leg., R.S., ch. 426, § 3, 2021 Tex. Gen. Laws 830, 831, *amended by* Act of May 28, 2023, 88th Leg., R.S., H.B. 1500, § 15; *see also* Tex. Util. Code § 39.151(g-6) ("a reference to a protocol includes a rule").

Exercising the authority delegated to it by the PUC,[14] ERCOT adopted the Protocol creating ECRS in 2019, before the Legislature required PUC approval for such rules to take effect. NPRR 863, Creation of ERCOT Contingency Reserve Service and Revisions to Responsive Reserve (Feb. 12, 2019). Most of the other ECRS Rules amending or revising that original protocol or rule were promulgated after PURA was amended in 2021 to require a joint process of ERCOT adoption and PUC approval for the protocol or rule to take effect. *See* 2d Am. Pet. ¶ 29 (listing ECRS Rules in issue).

---

[14] The PUC did not have authority to delegate rulemaking authority to ERCOT for the original creation of an ancillary service to ERCOT. *See infra* at I.F.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 18**

Appx. Page 477 of 740

ERCOT and the PUC Parties would have this Court believe that the PUC's delegation to ERCOT of its rulemaking authority to adopt the ECRS protocols, rather than undertaking that task itself, somehow immunized that process from the requirements of the APA. But that just isn't true. To allow the PUC Parties and ERCOT to evade the APA by simply divvying up the tasks that, taken together, constitute the adoption of a "rule" would be the regulatory equivalent of money laundering.

> **3. When ERCOT adopted NPRRs under rulemaking authority delegated by the PUC, it stood in the shoes of the PUC and was subject to the same requirements and limitations as the PUC, including the APA generally and § 2001.038 specifically**.

ERCOT argues that its "adoption and revision of [ECRS] Protocols …does not constitute APA rulemaking" subject to the APA and § 2001.038 because "ERCOT is not a 'state agency.'" ERCOT Am. PTJ at 16-17; *see* Texas Gov't Code § 2001.003(6) (defining "rule" for APA purposes as "a ***state agency*** statement of general applicability" that "implements, interprets, or prescribes law or policy" (emphasis added)).[15] True enough, on the surface. While ERCOT has been recognized as an "organ of [state] government," it is a "private, nonprofit corporation," albeit one certified by the PUC to perform certain state functions. *CPS Energy v. ERCOT*, 671 S.W.3d 605, 617 (Tex. 2023). But ERCOT's argument misses the point.

When, as here, ERCOT (or any other entity) exercises authority delegated to it by a "state agency" like the PUC, its conduct in doing so is subject to the same

---

[15] ERCOT does not contest the fact that its ECRS protocols are "statements of general applicability" that "implement … law or policy." *See id*.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 19**

Appx. Page 478 of 740

constraints and requirements as those applicable to the delegating agency. The delegee, ERCOT here, is treated as that delegating agency would be, *not* in its own right as a private corporation (with no authority to undertake the conduct at issue). It "stands in the shoes" of the delegating entity. *See, e.g.*, *City of Garland v. Byrd*, 97 S.W.3d 601, 606 (Tex. App.—Dallas 2002, pet. denied) (when private hearing examiner conducts hearing in lieu of commission, "the examiner is granted the same duties and powers as the commission [and] stands in the shoes of the commission" and "the power being exercised is the same as that exercised by the commission"); *Mainland Sav. Ass'n v. Hoffbrau Steakhouse, Inc.*, 659 S.W.2d 101, 102 (Tex. App.—Houston [14th Dist.] 1983, no writ) ("assignee/delegatee … stands in [delegor's] place with respect to any benefits or obligations under the original agreement"); *cf.*, *DuPuy v. City of Waco*, 396 S.W.2d 103, 108 (Tex. 1965) ("In the exercise of the power to take or appropriate private property for public use, [entities] to which the power of eminent domain has been delegated, are in the same position and are governed by the same rule" as the state.). As the delegee of the PUC's rulemaking authority under PURA § 39.151(d), therefore, ERCOT "stands in the shoes" of the PUC and must be treated as a "state agency" in the exercise of that authority.

Fundamentally, a delegor like the PUC here can only delegate such authority as it has, itself. *See* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "delegate," in part, to mean "[t]o give part of one's power or work to someone"). Because the PUC is and would be subject to the APA (including § 2001.038) in exercising rulemaking authority under PURA—e.g., if the PUC alone had adopted the ECRS Rules—it

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 20**

Appx. Page 479 of 740

could not delegate to ERCOT the authority to exercise that power shorn of the limitations and requirements of the APA, an authority greater than the PUC itself possessed.

### 4. PURA signals that the APA applies to ERCOT.

Regardless of whether a strict reading of the term "state agency" includes ERCOT, *see* Tex. Gov't Code § 2001.003(7), the Texas Legislature has indicated that the APA applies to ERCOT, nevertheless. The APA recognizes two types of proceedings: rulemaking and contested cases. *See* Tex. Gov't Code § 2001.003(1), (6); *R.R. Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 76 (Tex. 2003). As noted, "rules" are defined in the APA as certain "*state agency* statement[s] of general applicability"; whereas contested cases are "proceeding[s] … in which the legal rights, duties, or privileges of a party are to be determined by a *state agency* after an opportunity for adjudicative hearing." Tex. Gov't Code § 2001.003(1), (6) (emphases added). So, if the APA were the Legislature's only word, APA rulemaking and contested cases might be limited to state agency actions. The Legislature, however, has said more.

PURA provides that an independent organization like ERCOT "may adopt a policy allowing [its] governing body or subcommittee to enter into an executive session … to address a contested case, as defined by Section 2001.003, Government Code," *i.e.*, the APA. Tex. Util. Code § 39.1511(a-1)). If ERCOT can go into executive session to address a contested case under the APA, it follows that ERCOT can conduct contested cases generally under the APA—even though the APA's definition

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 21**

Appx. Page 480 of 740

of "contested case" does not authorize actors other than a "state agency" to conduct contested cases.

Similarly, the Legislature has signaled through PURA that ERCOT can engage in APA rulemaking even though it is not a state agency. The Supreme Court has noted that ERCOT is "much like a state agency." *CPS Energy v. ERCOT*, 671 S.W.3d 605, 623 (Tex. 2023). So, as explained in more detail above, when ERCOT exercises rulemaking authority delegated by the PUC—when the PUC would have to satisfy the APA if the PUC itself had made the same rule—the Legislature has directed that ERCOT follow the APA. *See* Tex. Util. Code § 39.151(g-6) (an ERCOT "protocol includes a rule").

**5. RWE does not undermine Aspire's reliance on § 2001.038 as a waiver of sovereign immunity with respect to its challenge to the ECRS Rules.**

ERCOT and the PUC Parties nevertheless contend that Aspire's arguments are foreclosed by the Texas Supreme Court's recent decision in *PUC v. RWE Renewables Americas, LLC*, 691 S.W.3d 484 (Tex. 2024). They are wrong.

At the outset, the only issue in *RWE* was whether the Third Court of Appeals had original jurisdiction over a direct appeal from a "competition rule" under PURA § 39.001(e), and the only respondent was the PUC. The Supreme Court held that the order issued by the PUC in that particular case was not a competition rule and dismissed the case for want of jurisdiction. *Id*. The jurisdictional issue before the Supreme Court in *RWE* is unrelated to the bases for jurisdiction in this case, APA § 2001.038 and *ultra vires* actions of the Defendants.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 22**

Appx. Page 481 of 740

Moreover, what the Supreme Court did **not** say is telling. The petitioner in *RWE* challenged only a PUC approval order under the APA. The Supreme Court did not hold that the APA did not apply to the combined ERCOT/PUC rulemaking process, or even to the ERCOT adoption process alone. Rather, in *dicta,* the Supreme Court commented that there are stakeholder processes before ERCOT through which the petitioner might have mounted a challenge. *E.g., id.* at 486. It did not go so far, however, as to say that the post-2021 ERCOT/PUC processes met the requirements of the APA.

ERCOT contends that "*RWE* held … that neither ERCOT's Protocols, nor the PUCT's orders approving the adoption of or revisions to those Protocols, are 'rules' under the APA" and § 2001.038 in particular. ERCOT Am. PTJ at 16 (citing *RWE*, 691 S.W.3d at 492). This is false. ERCOT was not even a party to *RWE* and the Court's holding did not address ERCOT's adoption of or revisions to its protocols. Instead, the Court was clear about the narrow jurisdictional issue it was deciding and the holding it reached:

> We hold that the PUC's approval order is not a "competition rule[] adopted by the commission" subject to the judicial review process for PUC [competition] rules. … [T]he statutory requirement the PUC approve [ERCOT] adopted protocols does not transform PUC **approval orders** into PUC **rules** eligible for direct review by a court of appeals [under Tex. Util. Code § 39.001(e)].

*RWE*, 691 S.W.3d at 486 (italics original); *see also id*. at 492 ("we hold that the **PUC's order approving** NPRR 1081…was not an agency-adopted 'rule' under the Administrative Procedure Act," so that "***the court [of appeals] lacked jurisdiction*** over RWE's challenge to the **PUC's approval order**" (emphasis

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 23**

Appx. Page 482 of 740

added)). The Supreme Court's holding resulted from a painstaking linguistic analysis of the difference between "adoption" (as used in the APA definition of an agency "rule") and a PUC order "approving" an ERCOT-adopted rule (as Tex. Util. Code § 39.151(g-6) now requires for such a rule to take effect)—with the latter being the only issue before the Court. *See RWE*, 691 S.W.3d at 491-92. *RWE*, therefore, does not undermine Aspire's contention that § 2001.038 waives sovereign immunity for its APA challenge to the validity of the ECRS Rules adopted by ERCOT as the PUC's delegee—and particularly those protocols adopted prior to 2021 when the requirement for PUC approval was added by the Legislature.

While ERCOT oversells the true scope of *RWE*, the PUC Parties invoke that decision in an effort to artificially circumscribe Aspire's challenge here. Multiple times, the PUC Parties argue that Aspire's claims must be dismissed because the Supreme Court concluded in *RWE* that "PUCT approval orders are not agency rules." *See, e.g.*, PUC Am. PTJ at 7, 8, 9. But that is a myopic and artificially constricted view of Aspire's claims. Aspire does not challenge the "PUCT approval orders" in isolation, as did the petitioner in *RWE*. Instead, Aspire challenges the combined actions of ERCOT and the PUC in enacting the ECRS rules.

After the Legislature amended PURA § 39.151(g-6) in 2021 to require PUC approval of ERCOT-adopted rules or protocols, the promulgation of rules "adopted" by ERCOT and "approved" by the PUC must be evaluated as a combined, integrated process—not fractured into its component parts, as ERCOT and the PUC seek to

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 24**

Appx. Page 483 of 740

do.[16] After the 2021 amendments, no ERCOT-adopted protocol can become effective without PUC approval; and, obviously, the PUC cannot "approve" an ERCOT protocol unless it is first created and "adopted" by ERCOT. Viewed properly as products of a single integrated process, therefore, the ECRS protocols undeniably are "agency rules" subject to challenge under § 2001.038, with its waiver of sovereign immunity.[17] *Cf.*, *Tex. Tel. Ass'n v. PUC*, 653 S.W.3d at 263-67 (ruling that PUC actions it characterized as "guidelines" were in fact and in substance agency "rules" subject to the requirements of the APA).

### 6. PURA's directive that ERCOT be required to establish a "formal process" for its PUC-delegated rulemaking authority does not supplant the APA.

Finally, ERCOT argues that the 2021 amendment to PURA requiring ERCOT to "establish and implement a formal process for adopting new protocols or revisions to existing protocols" to maintain its certification as a PUC ISO demonstrates the Legislature's intention that those unspecified "formal procedures" alone should govern the process, supplanting the APA. *See* ERCOT Am. PTJ at 17-18 (citing Tex. Util. Code § 39.151(g-6)). It contends that if the Legislature had intended the APA to apply to the adoption and effectuation of ERCOT protocols, it would have said so. *Id.* at 18 (citing, e.g., Tex. Agric. Code § 74.120(c)).

---

[16] ERCOT notes that *RWE* observes "that ERCOT rulemaking and PUC rulemaking are independent endeavors." ERCOT Am. PTJ at 17-18 (quoting *RWE*, 691 S.W.3d at 492). Given the Supreme Court's determination in *RWE* that "PUC approval orders" are not "rules," however, "PUC rulemaking" in that passage cannot refer to the PUC's role in approving ERCOT-adopted protocols as part of the post-2021 integrated process. After 2021, taken together, they are one *combined* endeavor.

[17] ECRS Rules adopted by ERCOT before the statute was amended to require PUC approval for them to take effect would, of course, be evaluated simply at the ERCOT level, in its implementation of authority delegated to it by the PUC.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 25**

Appx. Page 484 of 740

But ERCOT infers too much from that amendment. At the outset, of course, nothing in the statutory language even suggests that the "formal process" to be adopted by ERCOT would not have to reflect and embody the requirements of the APA, tailored to ERCOT's specific situation. While the amendment does not expressly state that the APA will apply to ERCOT/PUC rules, it also does not exempt those rules and processes from the APA or state that the APA will not apply. And the Legislature certainly knew how to make clear, expressly, when it did not want the APA to apply to any given administrative process. *See, e.g.*, Tex. Gov't Code § 411.180(a) (hearing on any denial, revocation, or suspension of handgun license "is not subject to Chapter 2001 (Administrative Procedure Act)"); Tex. Hum. Res. Code § 40.063 ("Section 2001.038 and Subchapters C through H, Chapter 2001, Government Code do not apply" to described categories of medical benefit decisions); Tex. Parks & Wild. Code § 32.006 (provision entitled "Nonapplicability of Chapter 2001, Government Code" states "provisions of the Administrative Procedure Act … do not apply to this chapter"). The APA itself contains an explicit list of administrative proceedings to which it does not apply. Tex. Gov't Code §§ 2001.221-.227. That list of exemptions does not include ERCOT/PUC rulemaking. *Id*.

The APA expressly states, "It is the public policy of the state through this chapter to: (1) provide ***minimum standards*** of uniform practice and procedure for state agencies …." Tex. Gov't Code § 2001.001. In the absence of an express statement by the Legislature that the "minimum standards" of the APA were to be supplanted by an unspecified, yet-to-be-developed "formal process" to be crafted by

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 26**

Appx. Page 485 of 740

an entity like ERCOT, the rulemaking activities of ERCOT and its supervising agency, the PUC, cannot escape the application of the APA.

## C. Aspire was not required to "exhaust administrative remedies" before pursuing its challenge in this Court.

Both ERCOT and the PUC Parties devote considerable attention to detailed descriptions of the internal processes within ERCOT and the PUC by which Aspire allegedly might have challenged the ECRS protocols—unrealistic timetables and other obstacles notwithstanding—and then argue that Aspire's challenge in this Court is barred because it did not exhaust those administrative remedies. *See* ERCOT Am. PTJ 19-22; PUC Am. PTJ at 9-13. But they miss the boat with these arguments, which are entirely immaterial.

Government Code § 2001.038(d) expressly provides that, "A court may render a declaratory judgment [regarding the validity or invalidity of a rule] without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of the rule in question.**"** Courts have rightly interpreted that provision to mean that "***there is no requirement to exhaust administrative remedies before bringing a Section 2001.038(a) challenge***," such as that mounted here by Aspire. *Tex. Tel. Ass'n v. PUC*, 653 S.W.3d 227, 264 n.17 (Tex. App.—Austin 2022, no pet.) (emphasis added); *accord, e.g., PUC. v. AMA Commc'ns, LLC*, No. 03-21-00597-CV, 2022 WL 3220405, at *4 (Tex. App.—Austin Aug. 10, 2022, no pet.). And that makes practical sense, because asking an agency to judge the validity of a rule the agency itself promulgated would be an exercise in futility. Moreover, given that jurisdiction over APA challenges is exclusively vested in this Court, *see*

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 27**

Appx. Page 486 of 740

§ 2001.038(b) (action may only be brought in Travis County district court), the PUC has no jurisdiction to decide APA challenges.

**D. PURA § 15.001 does not exempt ERCOT protocols from the APA.**

ERCOT also contends that the APA should not apply because Aspire had a path to challenge the ECRS protocols, by first appealing to the PUC and then seeking "judicial review of that decision under the APA through the contested case process and under the substantial evidence rule." ERCOT Am. Plea at 21 (citing, *inter alia*, PURA § 15.001). But this "path" is a red herring—especially in light of § 2001.038(d)'s express statement that exhaustion of administrative remedies is not a prerequisite to challenging the validity of a rule in this Court.

**Contested cases** determine "legal rights, duties, or privileges of *a party* … after an opportunity for adjudicative hearing" whereas **rules**, among other things, are "statement[s] of *general applicability* that implement[], interpret[], or prescribe[] law or policy." Tex. Gov't Code § 2001.003(1), (7) (emphases added). As ERCOT notes, its protocols "govern every aspect of Texas's electric grid and wholesale market." ERCOT Am. Plea at 8. And its protocols are not the product of an adjudicative hearing.

Under the APA, there are "different methods of judicial review," which "can be justified by the profound procedural differences between contested case proceedings and rulemaking proceedings." *R.R. Comm'n of Tex. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 76 (Tex. 2003). Judicial review of rules under the APA is "largely unlimited in

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 28**

Appx. Page 487 of 740

time and scope" compared to the more limited judicial review of contested cases for "substantial evidence." *Id.* at 75.

According expedited and more limited review to contested cases makes sense, because a contested case resolves disputes between a discrete set of parties directly involved in a specific dispute. *Id.* at 78. In contrast, "it makes perfect sense to allow less restricted judicial review of rules. It may well be that the effect of a rule cannot be fully appreciated except as time passes." *Id.* at 77-78.

Accordingly, ERCOT is wrong that judicial review of a contested case under PURA § 15.001 somehow pulls the ECRS protocols outside the APA and § 2001.038's procedure for challenging rules through a declaratory judgment, because the ECRS protocols bear the hallmarks of rules, not a contested case. *See RWE*, 691 S.W.3d at 486 (NPRRs are the product of delegated rulemaking).

## E. The Court is vested with jurisdiction over Plaintiff's complaints, even those stemming from 2019 actions.

The PUC Parties argue that this Court lacks jurisdiction because Aspire did not challenge the ECRS Orders before the PUC within the abbreviated time frame for "contested cases" prescribed in APA § 2001.176. PUC Am. PTJ at 13-14. As explained in the previous section, the PUC's citations to contested-case statutes are a red herring. Moreover, to the extent the PUC complains about the timeliness of Aspire's suit, limitations is not a jurisdictional issue. *E.g., City of New Braunfels v. Allen*, 132 S.W.3d 157, 167 (Tex. App.—Austin 2004, no pet.) (plea to jurisdiction improper mechanism for limitations defense). Finally, because neither ERCOT nor the PUC filed their materials in the Texas Register as the APA requires, the

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 29**

Appx. Page 488 of 740

limitations period for Aspire's APA complaints has not yet even begun to run. Tex. Gov't Code §§ 2001.035(b), .036 (APA complaint must be filed within two years of filing in Texas Register).

## F. There is no sovereign immunity for *ultra vires* acts.

Sovereign immunity does not bar a suit if the claimant affirmatively alleges facts demonstrating that the agency's action is unconstitutional or beyond the agency's statutory authority—i.e., *ultra vires. See Texas Highway Comm'n v. Texas Ass'n of Steel Importers*, 372 S.W.2d 525, 530 (Tex. 1963); *Sw. Bell Tel. Co. v. PUC*, 735 S.W.2d 663, 668 (Tex. App.—Austin 1987, no writ). Claims that an agency action is *ultra vires* are said to invoke the trial court's "inherent jurisdiction" to protect against agency action that is unconstitutional or beyond the agency's statutory authority. *See id.* at 667-68.

"[A]n agency may not, in the guise of implied powers, exercise what is effectively a new power, or ***a power contrary to a statute***, on the theory that such exercise is expedient for the agency's purpose, ***nor may it contravene specific statutory language***, run counter to the general objectives of the statute, or impose additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions." *Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 690 (Tex. App.—Austin 2005, pet. denied) (emphasis added) (*citing City of Austin v. Sw. Bell Tel. Co.*, 92 S.W. 3d 434, 441 (Tex. 2002); *State v. PUC*, 131 S.W.3d 314, 321 (Tex. App.—Austin 2004, pet. denied)).

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 30**

Appx. Page 489 of 740

Pursuant to PURA § 35.004(e), "'ancillary services' means services necessary to facilitate the transmission of electric energy including load following, standby power, backup power, reactive power, and any other services as *the commission* may determine by rule." Tex. Util. Code § 35.004(e) (emphasis added). The ECRS ancillary service was not determined by the Commission by rule as prescribed in § 35.004(e); it was established by ERCOT in the first instance. The ratification of ERCOT's creation of ECRS contravenes specific statutory language requiring that new ancillary service products be determined by PUC rulemaking—not ERCOT rulemaking.

The Commission's ability to delegate rulemaking authority to ERCOT is limited by PURA to issues of reliability and accounting. Tex. Util. Code § 39.151(d) ("The commission shall adopt and enforce rules *relating to the reliability* of the regional electrical network and *accounting* for the production and delivery of electricity among generators and all other market participants, or may delegate to an independent organization responsibilities for establishing or enforcing such rules." (emphasis added)). It does not include the creation of ancillary service products because, *inter alia*, PURA explains that ancillary services are intended for the purpose of "facilitat[ing] the *transmission* of electric energy." *See* Tex. Util. Code § 35.004(e) (emphasis added). PURA does not allow the PUC to delegate rulemaking authority to ERCOT related to electricity transmission; there is no provision similar to § 39.151(d), which allows the PUC to delegate rulemaking authority to ERCOT only for reliability and accounting issues. To the extent ERCOT attempted to adopt

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 31**

Appx. Page 490 of 740

rules to create ECRS based on a delegation from the PUC, the PUC lacks statutory authority to make such a delegation, making any such action *ultra vires.*

While PURA § 35.004(h) provides that "[t]he commission shall require the independent organization certified under Section 39.151 for the ERCOT power region to **modify** the design, procurement, and cost allocation of ancillary services for the region in a manner consistent with cost-causation principles and on a nondiscriminatory basis" (emphasis added), this provision does not allow ERCOT to **create** new ancillary services products because that responsibility remains solely with the Commission per PURA § 35.004(e). Again, PURA does not provide the Commission authority to delegate its rulemaking responsibilities related to PURA § 35.004(e) away from itself and to ERCOT.

*Ultra vires* acts, like ratifying ERCOT's actions to create the new ECRS ancillary service product outside of a Commission rulemaking, are not entitled to sovereign immunity protections. *Federal Sign v. Texas S. Univ.*, 951 S.W. 2d 401, 404 (Tex. 1997) ("[A]n action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars."); *see also Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W. 3d 849, 855 (Tex. 2002) ("Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority. But such suits are not 'suits against the State.' This is because suits to compel state officers to act within their official capacity do not attempt to subject the State to liability. Therefore, certain declaratory-judgment actions

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 32**

Appx. Page 491 of 740

against state officials do not implicate the sovereign-immunity doctrine.") (citations omitted). Further, governmental immunity does not preclude injunctive remedies to prevent the perpetuation or implementation of *ultra vires* acts. *See City of El Paso v. Heinrich*, 284 S.W. 3d 366, 368-69 (Tex. 2009) ("[W]hile governmental immunity generally bars suits for retrospective monetary relief, it does not preclude prospective injunctive remedies in official-capacity suits against governmental actors who violate statutory or constitutional provisions.").

## II.     ERCOT'S RULE 91A MOTION TO DISMISS SHOULD BE DENIED.

## A. A Rule 91a Motion to Dismiss is decided on the pleadings alone.

The purpose of a Rule 91a motion to dismiss is to determine whether a pleading has no basis in law or fact. Tex. R. Civ. P. 91a.1, 91a.6. The Court may not consider evidence in ruling on the motion and must decide the motion based solely on the pleading of the cause of action. Tex. R. Civ. P. 91a.6.

Under the fair notice standard, the pleadings are liberally construed in favor of the plaintiff, with consideration given to the plaintiff's intent, and the factual allegations in the pleading are accepted as true to determine if the cause of action has a basis in law or fact. *In re RNDC Tex., LLC*, No. 05-18-00555-CV, 2018 WL 2773262, at *1 (Tex. App.—Dallas June 11, 2018, orig. proceeding). "A cause of action has no basis in law if the allegations, taken as true, together with inferences reasonably drawn from them, do not entitle the claimant to the relief sought." Tex. R. Civ. P. 91a.1. There is no basis in law "(1) where the plaintiff fails to plead a legally cognizable cause of action" or (2) where the plaintiff's pleadings "establish a

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 33**

Appx. Page 492 of 740

complete legal bar to its claims by affirmatively negating entitlement to the relief requested." *17714 Bannister v. TAS Envtl. Services LP*, No. 05-22-00820-CV, 2023 WL 7401502, at *4 (Tex. App.—Dallas Nov. 9, 2023, no pet.).

## B. Aspire incorporates by reference its Response to Defendants' Amended Pleas to the Jurisdiction.

ERCOT (but not the PUC Parties) moves for 91a dismissal on many of the same grounds asserted in the Defendants' Pleas to the Jurisdiction: that ERCOT's protocol revision process is not subject to the APA, that ECRS does not violate Tex. Util. Code § 39.157, and that ERCOT had the power to create ECRS. ERCOT Am. PTJ at 25-26, 28-33. Aspire therefore incorporates by reference the portions of its response, above, that address these issues. Below, Aspire addresses the alleged grounds for 91a dismissal not already discussed in its response to the Pleas to the Jurisdiction.

## C. Aspire's claims are not barred by the filed-rate doctrine.

ERCOT pleaded the filed-rate doctrine as an affirmative defense. Because Rule 91a does not permit consideration of evidence, affirmative defenses that are not conclusively established by the facts in a plaintiff's petition are not a proper basis for a motion to dismiss under that rule. Tex. R. Civ. P. 91a.1, 91a.6; *Reynolds v. Quantlab Trading Partners US, LP*, 608 S.W.3d 549, 556 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (reversing Rule 91a dismissal because trial court improperly considered facts not asserted in plaintiff's petition to support collateral estoppel and res judicata defenses). The filed-rate doctrine does not bar Aspire's

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 34**

Appx. Page 493 of 740

claims in this case, and nothing in Aspire's pleadings assists ERCOT in proving otherwise.

ERCOT argues that the filed-rate doctrine precludes judicial recourse for claims that the rates approved by a regulatory agency are unreasonable or excessive. ERCOT Am. PTJ at 22-23. The first flaw in ERCOT's argument is apparent: it necessarily relies on extrinsic evidence to establish "approval" by a "regulatory agency" (all while arguing that ERCOT is no such agency). Semantics aside, the Court would need to find as a matter of fact based on evidence extrinsic to the Second Amended Petition that the "rates" were approved by the PUC, when in fact the original adoption of ECRS was not approved by the PUC.

Second, Aspire claims that the ECRS Rules violate the APA and are *ultra vires* acts and are therefore invalid. Aspire does not challenge specific rates for electricity that were generated by or because of the ECRS Rules (even if those rates were untangled from the rest of the mechanisms driving electricity prices). The cases ERCOT cites address tariffs—documents that list "a public utility's services and the rates for those services"[18]—not NPRRs or any rules similar to NPRRs.[19]

---

[18] *CenterPoint Energy Res. Corp. v. Ramirez*, 640 S.W.3d 205, 210 (Tex. 2022).

[19] ERCOT Am. PTJ at 22-25 (citing *CenterPoint Energy Res. Corp. v. Ramirez,* 640 S.W.3d 205, 221 (Tex. 2022) (tariff was reasonable under the filed-rate doctrine when it limited the liability of gas utility for personal injuries caused by utility's negligence); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 217 (Tex. 2002) (tariff limiting an electric utility's liability for personal-injury damages was reasonable as a matter of law); *Houston Lighting & Power Co. v. Auchan USA, Inc*., 995 S.W.2d 668, 669 (Tex. 1999) (tariff was not unreasonable when it limited the liability of an electrical utility for economic damages caused by utility's negligence); *Sw. Bell Tel. Co. v. Metro-Link Telecom, Inc*., 919 S.W.2d 687, 698 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (filed-rate doctrine shielded phone company from liability for enforcing its own tariffs); *Micron SBC Corp. v. Worldcom, Inc*., 994 S.W.2d 785, 791 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (filed-rate doctrine applied to telecom service carrier's tariff in action to collect charges that customer refused to pay); *Jenkins v. Entergy*

---

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 35**

Appx. Page 494 of 740

Most of ERCOT's cases involve claims for damages or monetary relief.[20] It is no surprise that the filed-rate doctrine bars such cases, because any monetary award would require the court to examine the agency's filed rates and retroactively determine what would have been appropriate.

ERCOT identified a single case in which the filed-rate doctrine precluded claims for equitable relief.[21] That case involved federal RICO claims, restraint of competition, and price fixing, and the equitable relief sought had nothing to do with agency rulemaking or the APA.

Because Aspire's claims are not based on filed rates, because the ECRS Rules were not approved by PUC in the first instance, and because ERCOT relies on matters extrinsic to Plaintiffs' Petition, the 91a challenge must be denied.

## D. Aspire does not allege a "private cause of action" under PURA § 39.157.

ERCOT also argues that Aspire's claim alleging *ultra vires* acts should be dismissed because Aspire has no private cause of action for violations of PURA § 39.157. ERCOT Am. PTJ at 26-27. But Aspire does not assert a private cause of action under § 39.157. Rather, Aspire seeks a declaration that the ECRS Rules violate PURA § 39.157 and that by approving the ECRS Rules, the PUC

---

*Corp.*, 187 S.W.3d 785, 791 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied) (trial court erred in dismissing suit for want of jurisdiction in suit alleging that electric companies conspired with utility in a price-gouging scheme under a federal tariff); *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 506 (5th Cir. 2005) (filed-rate doctrine precluded energy retailer from recovering damages for violations of federal and state antitrust law in suit against electric power generators)).

[20] *See supra* at n.19.

[21] ERCOT Am. PTJ at 24-25 (citing *Util. Choice, L.P. v. TXU Corp.*, No. CIV.A.H-05-573, 2005 WL 3307524 (S.D. Tex. Dec. 6, 2005)).

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 36**

**Appx. Page 495 of 740**

Commissioners committed *ultra vires* acts.[22] APA § 2001.038 and the Uniform Declaratory Judgments Act allow this type of relief. *See* Tex. Civ. Prac. & Rem. Code. § 37.004(a); *see also Tex. Tel. Ass'n v. PUC*, 653 S.W.3d 227, 272 (Tex. App.— Austin 2022, no pet.) (rural telecom-services providers were entitled to a declaratory judgment that the PUC acted *ultra vires* in failing to fully fund Texas Universal Service Fund as required by PURA).

Furthermore, the thrust of ERCOT's 91a challenge is based on factual arguments that appear nowhere in the Petition. ERCOT argues that the ECRS program does not violate PURA, asserting that "ERCOT is revenue-neutral," ERCOT "acts as a market clearinghouse," "ECRS is exclusively a reliability tool," and ECRS is "necessary to ensure ERCOT can keep supply and demand in balance." ERCOT Am. PTJ at 28-30. ERCOT's 91a challenge, moreover, misstates Aspire's claim: "Aspire seeks to invalidate various PUCT orders and the entire ECRS program based on the claim that ECRS's alleged costs outweigh its reliability benefits." *Id*. at 30. Again, not so: Aspire seeks to invalidate the ECRS Rules on the grounds that they violate the APA and that Defendants lacked power to enact them. If the Court finds it has jurisdiction to reach the merits of Plaintiff's application for temporary injunction, Aspire asserts that the Court should enjoin further use of the ECRS Rules because they will continue to inflict irreparable harm But that is an issue for another day. It is not a valid basis for ERCOT's 91a challenge.

---

[22] Petition at 22.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 37**

Appx. Page 496 of 740

Because ERCOT has asserted no valid grounds for dismissal, its Rule 91a Motion must be denied.

### III. ERCOT'S PLEA IN ABATEMENT SHOULD BE DENIED, BECAUSE THERE IS NO REQUIREMENT THAT ALL MARKET PARTICIPANTS BE JOINED IN ASPIRE'S CHALLENGE IN THIS COURT.

In addition to its Plea to the Jurisdiction and its motion to dismiss under Rule 91a, ERCOT has asserted a Plea in Abatement, arguing that even if the Court finds jurisdiction, Aspire's challenge still "must nonetheless be dismissed or abated because Aspire failed to join all necessary and indispensable parties." ERCOT Am. PTJ at 33-37. Again, ERCOT is wrong.[23]

### A. ERCOT fails to prove other parties are indispensable under TRCP 39.

When a party seeks to compel joinder of non-parties, including in a declaratory-judgment action, Texas Rule of Civil Procedure 39 governs. *In re Kappmeyer*, 668 S.W.3d 651, 655 (Tex. 2023) (orig. proceeding). ERCOT relies on Rule 39(a)(2), which provides in relevant part that

> A person … shall be joined as a party in the action if he ***claims an interest relating to the subject of the action*** and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

(Emphasis added.) "[T]he difference between having an interest and claiming one is at the heart of the Rule 39(a)(2) analysis." *Kappmeyer*, 668 S.W.3d at 658. "Claim,"

---

[23] It is not clear that ERCOT's Plea in Abatement is set for hearing. It is not jurisdictional. And in announcing the hearing for October 16, the Court said only that it would "set the plea [to jurisdiction] and the 91a," making no mention of the Plea in Abatement. Status Conf. Tr. at 26, 29. But Aspire addresses it in an abundance of caution.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 38**

Appx. Page 497 of 740

in the context of Rule 39, means to demand or assert. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 912 (Tex. 2017). The Supreme Court has explained that Rule 39(a)(2) "does not require joinder of persons who potentially ***could*** claim an interest in the subject of the action; it requires joinder, in certain circumstances, of persons who ***actually*** claim such an interest." *Id.* at 913 (emphasis added). Accordingly, the fact that the ultimate judgment could affect nonparties does not in itself require their joinder under Rule 39. *Kappmeyer*, 668 S.W.3d at 658.

ERCOT, as the party seeking to compel joinder, has the burden to show that the non-parties it contends are necessary are in fact necessary under Rule 39. *In re Austin Hous. Fin. Corp.*, No. 03-22-00091-CV, 2022 WL 2960796, at *3 (Tex. App.— Austin July 27, 2022, orig. proceeding); *see also Crawford*, 509 S.W.3d at 912 (noting that despite the arguments of the party seeking to compel joinder, "no record evidence shows or even suggests that a single one of the [non-party] adjacent landowners has ever demanded or asserted ownership of or a royalty interest in those minerals").

Simply put, ERCOT has not provided any evidence, or even any argument, that any non-party has "actually claim[ed]" an interest in the subject matter of this litigation. *Crawford*, 509 S.W.3d at 913. At most, ERCOT has provided links to a list of all participants in the ERCOT market, as well as lists of all market participants participating in ECRS. ERCOT Am. PTJ at 37 & nn. 45-46. But ERCOT has not shown how any of these market participants has actually *claimed* an interest, which is fatal to its plea in abatement. *See Kappmeyer*, 668 S.W.3d at

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 39**

Appx. Page 498 of 740

657 n.8 (spreadsheet of non-party property owners insufficient to require joinder when there was no evidence of any of them claiming an interest).[24]

## B. An APA challenge requires only a complaining party and the state agency.

The statute that confers jurisdiction in this Court over Aspire's APA challenge also makes clear that the only necessary parties are Aspire and the government agency that violated the APA. Tex. Gov't Code § 2001.038(c). If the APA required the addition of all parties who might be impacted—as ERCOT argues—the statute would have said so. Case law is replete with APA challenges in which the only defendants are the state actors. *See, e.g., Tex. Dep't of Ins. v. Tex. Ass'n of Health Plans*, 598 S.W.3d 417, 420 (Tex. App.—Austin 2020, no pet.); *Hegar v. Ryan, LLC*, No. 03-13-00400-CV, 2015 WL 3393917, at \*4 (Tex. App.—Austin May 20, 2015, no pet.). To hold that every person impacted by a state agency's violation of the APA must be joined in a declaratory judgment action to void the rule would be to require most of the State of Texas to be joined in any such action. That is not the law.

Finally, ERCOT argues that the non-party Market Participants are "jurisdictionally indispensable." ERCOT Am. PTJ at 34-36. But critically, for a party to be jurisdictionally indispensable, Rule 39's requirements must first be

---

[24] On October 4, 2024, Calpine Corporation filed a letter with the Court noting that it might intervene if the case proceeds beyond the jurisdictional dispute. Yet, ERCOT's plea in abatement is tellingly silent about Calpine. While ERCOT insists each and every Market Participant is a necessary party, it has offered no evidence of any "claim" made by a Market Participant relating to Aspire's requested declaratory judgment. Moreover, Calpine's letter demonstrates that if other Market Participants want to "claim" an interest in the dispute, they have a procedural mechanism to do so.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 40**

**Appx. Page 499 of 740**

satisfied, and then other requirements must be met. *Vondy v. Commissioners Court of Uvalde Cnty.*, 620 S.W.2d 104, 106 (Tex. 1981). Here, because ERCOT has not even cleared the hurdle of Rule 39, its plea in abatement fails.

## PRAYER FOR RELIEF

For these reasons, Aspire respectfully asks that this Court deny Defendants' Amended Pleas to the Jurisdiction and ERCOT's alternative Rule 91a Motion to Dismiss and Plea in Abatement, and award Aspire any other relief to which it is justly entitled.

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 41**

Appx. Page 500 of 740

Respectfully Submitted,

/s/ Chrysta L. Castañeda
Chrysta L. Castañeda
Texas Bar No. 15325625
chrysta@castaneda-firm.com
Nicole Michael
Texas Bar No. 24067767
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Phone: (214) 282-8579
Fax: (214) 602-9187

&

Monica Latin
Texas Bar No. 00787881
MLatin@ccsb.com
Brent M. Rubin
Texas Bar No. 24086834
BRubin@ccsb.com
Ken Carroll
Texas Bar No. 03888500
KCarroll@ccsb.com
CARRINGTON, COLEMAN,
  SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Phone: 214-855-3000
Fax: 214-580-2641

**ATTORNEYS FOR PLAINTIFF**

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 42**

**Appx. Page 501 of 740**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 9, 2024, a true and correct copy of the foregoing document was electronically filed with the Court and served on all counsel of record through the eFiling Service Provider pursuant to the Texas Rules of Civil Procedure.

*/s/ Brent Rubin*

**PLAINTIFF'S CONSOLIDATED RESPONSE TO AMENDED PLEAS TO JURISDICTION, AND ALTERNATIVE RULE 91a MOTION AND PLEA IN ABATEMENT – PAGE 43**

**Appx. Page 502 of 740**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brent Rubin
Bar No. 24086834
brubin@ccsb.com
Envelope ID: 92997792
Filing Code Description: Answer/Response
Filing Description: PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANTS' AMENDED PLEAS TO THE JURISDICTION AND ERCOT's RULE 91a MOTION TO DISMISS AND REQUEST FOR ABATEMENT
Status as of 10/10/2024 8:33 AM CST

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 10/9/2024 8:02:32 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 10/9/2024 8:02:32 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 10/9/2024 8:02:32 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 10/9/2024 8:02:32 PM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 10/9/2024 8:02:32 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 10/9/2024 8:02:32 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 10/9/2024 8:02:32 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/9/2024 8:02:32 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/9/2024 8:02:32 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/9/2024 8:02:32 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| George Fibbe | 24036559 | george.fibbe@bakerbotts.com | 10/9/2024 8:02:32 PM | SENT |
| Laura Natelson | | laura.natelson@bakerbotts.com | 10/9/2024 8:02:32 PM | SENT |
| Matthew Erickson | | Matthew.erickson@bakerbotts.com | 10/9/2024 8:02:32 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brent Rubin
Bar No. 24086834
brubin@ccsb.com
Envelope ID: 92997792
Filing Code Description: Answer/Response
Filing Description: PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANTS' AMENDED PLEAS TO THE JURISDICTION AND ERCOT's RULE 91a MOTION TO DISMISS AND REQUEST FOR ABATEMENT
Status as of 10/10/2024 8:33 AM CST

Case Contacts

| Matthew Erickson | | Matthew.erickson@bakerbotts.com | 10/9/2024 8:02:32 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 10/9/2024 8:02:32 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 10/9/2024 8:02:32 PM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 10/9/2024 8:02:32 PM | SENT |
| Carolyn Taylor | | ctaylor@ccsb.com | 10/9/2024 8:02:32 PM | SENT |

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Elliot Clark | | eclark@winstead.com | 10/9/2024 8:02:32 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 10/9/2024 8:02:32 PM | SENT |

10/9/2024 5:52 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Candy Schmidt

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | |
| TEXAS, ELECTRIC RELIABILITY | § | TRAVIS COUNTY, TEXAS |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN | § | |
| JACKSON,  AND COURTNEY | § | |
| HJALTMAN, | § | |
| | § | 345th JUDICIAL DISTRICT |
| *Defendants.* | | |

## UNOPPOSED MOTION FOR JUDICIAL NOTICE

Pursuant to Texas Rule of Evidence 201, Plaintiff Aspire Power Venture, LP submits this Unopposed Motion for Judicial Notice and respectfully shows the Court as follows.

1.      This lawsuit concerns ERCOT's adoption of, and in some cases PUC's approval of, Nodal Protocol Revision Requests (NPRRs) creating and modifying the ERCOT Contingency Reserve Service (ECRS).

2.      At the October 1, 2024, status conference in this lawsuit, the parties addressed the record relating to the creation and revision of ECRS. The Court indicated that it desired to know the documents that were put in front of the public relating to ECRS.

3.      ERCOT's and PUC's counsel made representations regarding their respective materials relating to the NPRRs. Specifically, ERCOT's counsel

---

**UNOPPOSED MOTION FOR JUDICIAL NOTICE**

represented that "ERCOT's protocol revisions are on its website. It's very well organized. [Aspire has] full access to them" and "we're not going to contest authenticity." Status Conference Transcript, Ex. A at 30:12, 30:24-31:1. PUC's counsel added, "All the PUC materials are readily available on the PUC's website. They already have them. There's no issue there." *Id.* at 31:6-8.

4.      Further, neither ERCOT nor PUC oppose this Motion.

5.      Texas Rule of Evidence 201(b)(2) provides that the Court may judicially notice facts not subject to dispute because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

6.      Based on the representations of ERCOT's and PUC's counsel, the materials on ERCOT's and PUC's websites relating to the adoption and approval of the NPRRs can be accurately and readily determined and their accuracy cannot reasonably be disputed. Therefore, Aspire respectfully requests that the Court take judicial notice of the records relating to the following NPRRs, available at the urls from the ERCOT and PUC websites linked below, including the documents contained within these links:

| ERCOT NPRR | PUC Approval Orders | Date Adopted |
| --- | --- | --- |
| NPRR 863 – Creation of ECRS and Revisions to Responsive Reserve | N/A | Feb. 12, 2019 |
| NPRR 992 – Updated Day-Ahead Liability for NPRR863 | N/A | Aug. 11, 2020 |
| NPRR 1015 – Clarification of DAM implementation of NPRR863 Phase 2 | N/A | Aug. 11, 2020 |
| NPRR 1079 – Day-Ahead Market RRS/ECRS 48 Hour Report Clarification (Aug. 10, 2021) | Approval Order | Aug. 24, 2021 |

Appx. Page 506 of 740

| | (PUC Project No. 52307)[1] | |
|---|---|---|
| NPRR 1096 – Require Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (April 28, 2022) | Approval Order (PUC Project No. 52934)[2] | May 12, 2022 |
| NPRR 1148 – Language Cleanup Related to ECRS (Dec. 20, 2022) | Approval Order (PUC Project 54445)[3] | Jan. 26, 2023 |
| NPRR 1178 – Expectations for Resources Providing ECRS (Jun. 20, 2023) | Approval Order (PUC Project 54445)[4] | June 28, 2023 |
| NPRR 1196 – Require Sustained Two-Hour Capability for ECRS and Four-Hour Capability for Non-Spin (Dec. 19, 2023) | Approval Order (PUC Project No. 54445)[5] | Feb. 1, 2024 |
| NPRR 1213 – Allow DGRs and DESRs on Circuits Subject to Load Shed to Provide ECRS and Clarify Language Regarding DGRs and DESRs Providing Non-Spin (Feb. 27, 2024) | Approval Order (PUC Project No. 54445)[6] | Apr. 11, 2024 |
| NPRR 1224 – ECRS Manual Deployment Triggers (June 18, 2024) | Rejection Order (PUC Project No. 54445)[7] | Aug. 5, 2024 |

---

[1] Additional materials regarding NPRR 1079 are available at
https://interchange.puc.texas.gov/search/documents/?controlNumber=52307&itemNumber=4.
[2] Additional materials regarding NPRR 1096 are available at
https://interchange.puc.texas.gov/search/documents/?controlNumber=52934&itemNumber=8;
https://interchange.puc.texas.gov/search/documents/?controlNumber=52934&itemNumber=9.
[3] Additional materials regarding NPRR 1148 are available at
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=2;
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=3.
[4] Additional materials regarding NPRR 1178 are available at
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=17;
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=18;
[5] Additional materials regarding NPRR 1196 are available at
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=67.
[6] Additional materials regarding NPRR 1213 are available at
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=71.
[7] Additional materials regarding NPRR 1224 are available at
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=81;
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=82;
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=84;
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=85;
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=86;

## CONCLUSION

For these reasons, Aspire respectfully asks the Court to take judicial notice of the materials listed and linked above and grant Aspire any other relief to which it is entitled.

Respectfully Submitted,

/s/ Chrysta L. Castañeda
Chrysta L. Castañeda
Texas Bar No. 15325625
chrysta@castaneda-firm.com
Nicole Michael
Texas Bar No. 24067767
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Phone: (214) 282-8579
Fax: (214) 602-9187

Monica Latin
Texas Bar No. 00787881
MLatin@ccsb.com
Brent M. Rubin
Texas Bar No. 24086834
BRubin@ccsb.com
Ken Carroll
Texas Bar No. 03888500
KCarroll@ccsb.com
CARRINGTON, COLEMAN,
  SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Phone: 214-855-3000
Fax: 214-580-2641
**ATTORNEYS FOR PLAINTIFF**

---

https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=87;
https://interchange.puc.texas.gov/search/documents/?controlNumber=54445&itemNumber=88.

**Appx. Page 508 of 740**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on various dates through and including October 9, 2024, she conferred with counsel for Defendants regarding the relief requested in this Motion, who stated that they are not opposed to the relief requested.

/s/ *Chrysta L. Castañeda*
Chrysta L. Castañeda


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 9, 2024, a true and correct copy of the foregoing document was electronically filed with the Court and served on all counsel of record through the eFiling Service Provider pursuant to the Texas Rules of Civil Procedure.

/s/ *Chrysta L. Castañeda*
Chrysta L. Castañeda

REPORTER'S RECORD

VOLUME 1 OF 1

TRIAL COURT CAUSE NO. D-1-GN-24-003384

ASPIRE POWER VENTURES, LP, § IN THE DISTRICT COURT OF
      *Plaintiff*, §
§
v. §
§
PUBLIC UTILITY COMMISSION §
OF TEXAS, ELECTRIC § TRAVIS COUNTY, TEXAS
RELIABILITY COUNCIL OF §
TEXAS, THOMAS GLEESON, §
LORI COBOS, JIMMY §
GLOTFELTY, KATHLEEN §
JACKSON, AND COURTNEY §
HJALTMAN, §
      *Defendants*. § 345TH JUDICIAL DISTRICT

-------------------------------

**STATUS HEARING**

-------------------------------

On the 1st day of October, 2024, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Catherine A. Mauzy, Judge presiding in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

**A P P E A R A N C E S**

FOR THE PLAINTIFF ASPIRE POWER VENTURES, LP:

    MS. CHRYSTA CASTANEDA
    SBOT NO. 15325625
    NICOLE LYNNE GRUNT MICHAEL
    SBOT NO. 24067767
    THE CASTANEDA FIRM
    325 N. ST. PAUL
    SUITE 2030
    DALLAS, TEXAS 75201
    PHONE: (214)282-8579
    chrysta@castaneda-firm.com
    nicole@castaneda-firm.com

    - and -

    MS. MONICA WISEMAN LATIN
    SBOT NO. 00787881
    MR. BRENT RUBIN
    SBOT NO. 24086834
    CARRINGTON COLEMAN SLOMAN & BLUMENTHAL LLP
    901 MAIN STREET, SUITE 5500
    DALLAS, TEXAS 75202
    PHONE: (214)855-3000
    mlatin@ccsb.com
    brubin@ccsb.com

FOR THE DEFENDANT PUBLIC UTILITY COMMISSION:

    MR. JOHN R. HULME
    SBOT NO. 10258400
    MS. AMANDA CAGLE
    SBOT NO. 00783569
    MR. JORDAN PRATT
    SBOT NO. 24140277
    OFFICE OF THE ATTORNEY GENERAL
    P.O. BOX 12548
    AUSTIN, TEXAS 78711
    PHONE: (512)475-4229
    john.hulme@oag.texas.gov
    amanda.cagle@oag.texas.gov
    jordan.pratt@oag.texas.gov

**A P P E A R A N C E S**

FOR THE DEFENDANT ERCOT:

    MR. ELLIOT CLARK
    SBOT NO. 24012428
    WINSTEAD, LP
    600 W. 5TH STREET
    SUITE 900
    AUSTIN, TEXAS 78701
    PHONE: (512)370-2800
    eclark@winstead.com

**INDEX**

**VOLUME 1**

**STATUS HEARING**

**OCTOBER 1, 2024**

|  | PAGE | VOL |
|---|---|---|
| Proceedings | 5 | 1 |
| Announcements | 5 | 1 |
| Argument by Ms. Castaneda | 6, 22 | 1 |
| Argument by Mr. Hulme | 14 | 1 |
| Argument by Mr. Clark | 17 | 1 |
| Recess | 29 | 1 |
| Hearing resumes | 29 | 1 |
| Adjournment | 32 | 1 |
| Reporter's Certificate | 33 | 1 |

419th District Court
Rachelle Primeaux, CSR, RMR, FCRR
Official Court Reporter

PROCEEDINGS

* * * * *

(*Open court*)

THE COURT: Let me call Cause Number D-1-GN-24-003384, *Aspire Power Ventures LP versus Public Utility Commission of Texas, et al.* May I have your appearances, please.

MS. CASTANEDA: Yes. Chrysta Castaneda and Nicole Michael, Monica Latin, and Brent Rubin for the Plaintiff Aspire Power Ventures.

MR. HULME: For the Defendant, Public Utility Commissioners, John Hulme with my colleagues Amanda Cagle and Jordan Pratt.

MR. CLARK: Elliot Clark for the Defendant, ERCOT.

THE COURT: Thank you. All right. So I understand we're having this little hearing today because you-all couldn't reach an agreement about what we're going to hear when, while I was gone. So I have perused some pleadings, and correct me if I'm wrong, but I think the issue is whether or not we're going to hear the pleas to the jurisdiction first or we're going to set them at the same time as the TI, correct?

MS. CASTANEDA: Yes, Your Honor, that is the issue.

THE COURT: All right. So I will hear from both sides briefly, but I don't think -- I don't think this is an hour-long hearing.

MS. CASTANEDA: I completely agree with Your Honor. May I proceed?

THE COURT: Yes.

MS. CASTANEDA: Would you like me to proceed from here or up there?

THE COURT: Whatever you're most comfortable with is fine with me.

MS. CASTANEDA: Okay. I'll just stay here.

Your Honor, what is this lawsuit about? Let me just start with that. Plaintiff, Aspire Power Ventures, is a qualified services entity market participant on the ERCOT grid. I know that's a lot of acronyms. I'm going to go through some of these briefly just to set the stage.

THE COURT: I'm glad you did, and I should have brought -- I had been reading your pleadings, and I was making myself a cheat sheet of all those acronyms, but go ahead.

MS. CASTANEDA: Long and short of it is Aspire participates in financial transactions on the ERCOT grid. The Court may be aware that ERCOT has a physical component, the delivery of electricity, and a

financial component, the settlement of all the transactions that drive the delivery of electricity.

The essence of this lawsuit is that certain nodal protocol provision requests and the adopting orders were not issued in accordance with the Administrative Procedures Act and that the temporary injunction we seek is to enjoin the use of specific orders.

THE COURT: Isn't that, though, a legal issue that I have to decide? Because the other side is going to tell me that the statement you just made about the law is not correct and that the adoption of those orders does not fall under the Administrative Procedures Act; and therefore, there's not jurisdiction.

MS. CASTANEDA: That's why the two issues should be tried together, Your Honor, because that is a central legal issue. If I might approach -- well, let me back up for just a minute. The NPRRs at issue concern the ERCOT Contingency Reserve Service, ECRS. What the ECRS does is it withholds, under certain circumstances, a certain portion of the generation capacity of the grid by paying the generators an enhanced price to keep it off the grid, in quote, reserve.

However, the independent market monitor

that evaluates all of this has opined that not only does it not really result in increased reliability, it has cost Texans in the first six months of its deployment alone an additional $12 billion. It doesn't work. But that's not really the critical issue right now. The critical issue is that it does not comply with the Administrative Procedures Act. And furthermore, Your Honor, it is ultra vires. It is the beyond the capacity of the agencies to have adopted it.

THE COURT: And you need to explain to me why I need an evidentiary hearing to decide that specific legal issue.

MS. CASTANEDA: Sure, Your Honor. Well, first, I would point to the plea to the jurisdiction filed by ERCOT in particular, which lays out a number of evidentiary pieces in connection with its plea to the jurisdiction.

At base, the plea to the jurisdiction and the temporary injunction have at their heart the recent June decision of the Texas Supreme Court in *PUC versus RWE Renewables*.

Now, the essential holding for this case is actually the Texas Supreme Court's discussion relating to the APA. And what it does not say is that the PUC and ERCOT are exempt from complying with the APA. In

the face of a challenge to specific orders as to whether they complied with the APA, the Court doesn't say, oh, we're beyond all of that because of a new statute or because of the way that they do their business. None of that.

It went on to describe how there's an interplay, a delegation of rule-making authority from the PUC to ERCOT and that there's stakeholder processes and there are things going on that involve the public, and that's the answer as far as that question got reached. But it didn't actually get reached on the merits because it found that the Third Court of Appeals did not have jurisdiction over the direct appeal in the first place.

So the real issue in *RWE*, the essential issue was, did a direct appeal lie over the orders of the PUC, were they competition rules such that the Public Utilities Regulation Act, under which all of this was set up, authorize a direct appeal to the Court of Appeals, or more properly, should that APA challenge have been lodged in the District Court, which the APA provides for.

The Supreme Court said no jurisdiction, Third Court of Appeals, we dismiss the entire thing for want of jurisdiction. But again, what wasn't directly

answered and would be contrary to the express language of the APA if answered in the way that Defendants would like it answered was the question of, how does the APA apply to the combined efforts of the PUC and ERCOT in enacting the NPRRs, which are then approved by the PUC.

Plaintiff, Aspire Power Ventures, submits there is no work-around, that the APA must be satisfied, and it is not satisfied in a number of ways. They are obvious and frankly are unlikely to be contested, but must be established by the record.

So the evidence the Court needs to hear from the Plaintiff's perspective that pertains to both is the entire record of the rule-making, and there are a number of rules that are at issue here, although it's Plaintiff's assertion that none of it meets the several requirements that are missing from the APA. That evidence has to be admitted, and then Plaintiff intends to call a single expert witness in support of the temporary injunction to explain how this has been and continues to inflict imminent harm to the state of Texas and to the participants on the grid in the way it's been administered, and the independent market monitor has directly opined.

If I might, Your Honor, I would like to approach with a handout. This is a listing of just a

few cases that are reported in the Third Court of Appeals.

THE COURT: Thank you.

MS. CASTANEDA: And here is a copy of some of those cases -- where a temporary injunction and the plea to the jurisdiction were tried together by the District Court, including a case against the Public Utility Commission of Texas.

And in none of these cases was it held that it would be improper to try the plea to the jurisdiction along with the temporary injunction. And in fact, in the case I would specifically would like to point to, *In Re Pablos*, in which the Austin Court of Appeals was asked to issue mandamus to force the trial judge to rule on the plea to the jurisdiction before taking up the temporary injunction, mandamus did not issue. It is not an abuse of this Court's discretion to try the two issues together because, in particular, they are interrelated.

THE COURT: No, I -- I agree with you. That has happened since I've been on the bench. I don't think it's -- I'm aware it's not an abuse of my discretion to try them together. I'm with you on that.

MS. CASTANEDA: Thank you, Your Honor.

THE COURT: But nonetheless, I think it is

my opinion I have to be persuaded that I can't try the plea without hearing evidence that would pertain to the TI, and that's what I'm focused on. Because if they can be separated, it is my opinion that the plea ought to be tried first.

MS. CASTANEDA: So, Your Honor, the plea to the jurisdiction filed by ERCOT has a number of factual references throughout it that are supported by specific documents; for example, let me just cite Footnote 14: See final ERCOT board adopting NPRR 1096.

It goes on on several other counts. Notably, in the comments to NPRR 1224, Aspire made certain statements. There is evidentiary references baked into their plea to the jurisdiction that are directly related to the evidence that plaintiffs will present in connection with the temporary injunction.

And for those reasons, the issue of judicial economy plus the issue of the direct appeal -- I mean the interlocutory appeal that will result from any decision this Court makes on either issue. There will be an interlocutory appeal. If the Court denies jurisdiction, as Plaintiff, Aspire, contends is appropriate -- I'm sorry, denies the plea to the jurisdiction, which we contend is appropriate, Defendants will have an immediate right of interlocutory

appeal when that issues. That will stay all proceedings in this trial court.

Aspire and the people of Texas will not be able to present the merits of why this order is void for failure to comply with the law and why it should be enjoined, because it is arbitrarily driving up the price of electricity for no beneficial purpose, according to the independent market monitor.

If those two issues are not tried together, that hearing happens well down the road. And let me also state --

THE COURT: Well, but if they are tried together and I grant the plea to the jurisdiction, then if we're talking about judicial economy, that is not judicial economy. Because how long -- first of all, how long would a combined hearing take, the plea plus the TI if I were to decide to hear them together?

MS. CASTANEDA: One day. One day. And the benefit for judicial economy is if the Court is wrong on the granting of the plea to the jurisdiction, it goes up with the evidence on the temporary injunction, which the Court of Appeals then can deal with the entirety of the record to decide what is the appropriate result under this circumstance. That would be best for not only the litigants, for the Court's judicial economy, but also

for the people of Texas.

Let me also say in closing on these remarks, it's obvious that the Texas Legislature is going to be meeting again soon. The functioning of the ERCOT grid remains a huge challenge for people of Texas and the Legislature. It would be beneficial for everyone concerned to know what is the law pertaining to this particular issue before further errors are committed, as Plaintiff Aspire Ventures would suggest are being committed on a daily basis when Defendants fail to comply with the Administrative Procedures Act.

And with that, Your Honor, we would ask that the Court set a temporary injunction hearing for a full day if the Court is available on October 16th, 17th, or 18th; and I'll be prepared to address pre-hearing scheduling if the Court sets a date.

And with that, I'll rest for the moment.

THE COURT: Thank you.

Yes, sir, Mr. Hulme.

MR. HULME: Good afternoon, Your Honor. Let me start with one thing. It will take more than a day to address all of these issues that counsel has been talking about. The plea to the jurisdiction, ERCOT and the Commission have asked for a two-hour hearing on that. The injunction hearing itself would have to take

a day. It involves some complicated issues and multiple witnesses.

So I think Your Honor has already hit upon the key question here: What's the best way to approach this? The best way to approach this is to take up that plea first and make a decision on what we submit is a very straightforward issue as to whether the Court has jurisdiction in this instance.

*RWE's* case could not be more clear. We would submit that what we have in these approval letters are not agency rules; therefore, there was no jurisdiction of the Court appeals. For the same reason, there is no jurisdiction on the 038 claim.

Now, the pleas to the jurisdiction are not set for hearing today, nor is the preliminary injunction, although we've heard a lot of argument about that today. So I will try to be very brief to conserve the Court's time, but we submit again the best way to approach this to save the Court's time as well as the parties' time, would be to set that plea first at the first available date when that is possible and then proceed, if necessary, with the injunction.

I don't want to get too far into arguing the plea, Your Honor, because that's not --

THE COURT: That's not what we're here for.

MR. HULME: That's not what we're here for, but I do want to respond to some of what counsel said.

There is a process under which an aggrieved party can complain about something that ERCOT has done, complain to ERCOT and complain to the Commission. And if they're unhappy with what the Commission has done, then you can come to Travis County District Court.

The Commission has exclusive jurisdiction over those sorts of claims, those sorts of issues. You can't jump directly to Travis County District Court. That is what Aspire is trying to do in this case. They are arguing as if the Court of Appeals had somehow punted this case to Travis County District Courts. That could not be further from the case, from the truth.

The truth is --

THE REPORTER: I'm sorry, can you pull your mic closer?

MR. HULME: Sure.

If you look at the *RWE* opinion, and I don't want to be arguing the opinion here, but I think it's very straightforward. These orders are not agency rules, so there is no APA 038 claim, and that's what Aspire has brought in this case.

So we are happy to get that plea heard as soon as possible to save everyone time. If we set both

of those matters for the same day, as Aspire proposes, that means that the Commission and ERCOT are going to have to prepare for an injunction hearing. That would be, I would argue, a massive waste of state resources, as well as the resources of ERCOT and its potential witnesses. And personally, I would rather see those individuals working to keep our grid in balance rather than preparing for an injunction hearing that will never be necessary because the Court simply lacks jurisdiction because Aspire did not do what it needed to do here.

THE COURT: Thank you.

MR. HULME: Thank you.

THE COURT: Yes, sir, Mr. Clark.

MR. CLARK: Thank you, Your Honor. I mean, I agree with Mr. Hulme. We don't need witnesses. We don't need evidence to decide the plea. Included with our plea is a 91a as well as a plea in abatement. Those are all legal on the pleadings, so we won't need to put on any evidence at the plea hearing for the 91a or the abatement. There are -- I'm not going to argue those today as we said, but there are many reasons why this case shouldn't proceed, most prominently the lack of jurisdiction.

So the way I would think of it is, in the *RWE* case, there's a special rule that says if you have a

competition rule that the PUC adopted, you can directly appeal that to the Third Court of Appeals. But if you have a rule that the PUC adopted, you can go to Travis County Court. And so you say, think of a rule as a duck and a competition rule as a white duck. And so what the Texas Supreme Court said in *RWE* was, this order is not even a duck, much less a white duck, so you don't have jurisdiction here.

Well, that's exactly what our case is. This is a duck. They're claiming that they have a rule adopted by the PUC that gives this Court jurisdiction. The Texas Supreme Court has clearly stated that is not the case. Consequently, the PUC's order was not an agency adopted rule under the APA. It couldn't be more clear.

So if this is not an agency adopted rule that we're here fighting about, this Court lacks jurisdiction. And we'll save the rest of the argument on the plea until then. But I agree that I shouldn't have to pull witnesses from their jobs operating the grid to prepare for this hearing and then have them come down and testify for this hearing.

And if we have a combined hearing and you determine at the beginning of that hearing, you know what, I don't have jurisdiction, sorry, we're not going

to go forward with the temporary injunction hearing, that would be -- at that point, I think it might be an abuse of discretion, but it would be unnecessary. Right? Like, once you determine you don't have jurisdiction, the case is done. It should just be dismissed. We wouldn't then march through to a temporary injunction hearing after you've already determined you don't have jurisdiction.

And this argument that they're delegating around the APA, *RWE* made all those arguments at the Texas Supreme Court. The Legislature is not waiting on anybody. The Texas Supreme Court has spoken on this. So there's nothing that anyone is waiting for in this Court on these issues. So I think it would be a monumental waste of time. It would be a drain on ERCOT's resources. We shouldn't have to pay to prepare for a hearing that ultimately may not be necessary.

And there are many parties who, if this Court decides it does have jurisdiction, get past that. If you decide there are viable claims, you get past the 91a. The relief that they're seeking has market-wide implications. And because they brought a claim under the declaratory judgment, there are hundreds of other parties that they would need to bring into this lawsuit.

They're asking you to declare the entire

ERCOT rule book void. So there's billions and billions of dollars at stake for people who work in the market every day. But I think before we ever get to any of that, all of those decisions need to be made. As we put in our 91a, the filed rate doctrine doesn't allow a court to give them the relief they're asking for. It is not for a court to judicially lower energy rates in the ERCOT market through equitable relief.

The Fifth Circuit has made clear that the prices that get set in the ERCOT market are final rates. Under the filed rate doctrine, those are judicially unassailable. But there is a forum. As Mr. Hulme said, there is a forum. They could have easily gone to the PUC five years ago when ERCOT first passed the first NPRR and said, you know what, we want to appeal that ERCOT action. And then, that would have gone into a contested case. And then possibly, if they didn't get the result they wanted, they could have been in a Travis County Court under a contested case review, but they didn't do that.

So again, I apologize for previewing too much of the argument, but I just think, as a matter of judicial efficiency, we shouldn't be put to the time, burden, and expense of preparing for and showing up for a hearing that doesn't ultimately happen. There are

legal issues that they can be decided without evidence, and we would ask the Court to first set the pleas and the 91a.

And as a matter of logistics, Your Honor, because they amended their petition last week and added a new substantive claim, we amended our plea and 91a this morning. They're entitled to 21 days' notice before we have a hearing on that, so that would put October 22nd as the first day to have that heard. That's a jury week. So then, that puts us into the next week of October 28th. And if that 91a is granted, obviously the case is done, and there's no need to have an injunction hearing.

I would also point out they've said today they're going to bring an expert witness to a hearing that they're asking for in two and a half weeks. I would like to get -- at least get a Rule 195.5 disclosure if we're going to have expert testimony. I don't have that. And so, you know, I don't want to lay behind the log on that and show up at any hearing and object, but they don't get to just put an expert witness on the stand without providing expert disclosures.

But I don't think we need to do any of that. These are legal issues. The case law is very clear, and I think we should get that done first; and

then if there's anything left, there will be an injunction hearing.

THE COURT: From your side, if I were to agree with you and think that the plea and the 91a need to be heard first, can you do that in three hours?

MR. CLARK: We can do it in two, I think.

THE COURT: For both sides?

MR. HULME: Yes.

THE COURT: All right. You may close the argument briefly.

MS. CASTANEDA: Thank you, Your Honor. If the Court reads *RWE*, which I'm sure the Court has or will, what the Supreme Court does -- and recognize ERCOT was not a party. It was the PUC alone. And the challenge was simply to the orders. They're a single page. It was two orders that were issued during Winter Storm Uri. One was two pages, and one was three pages. There was no other process around those orders. They were issued in an emergency situation. There was no ERCOT-related process beyond it.

ERCOT was not a party to it. The Court did not address whether ERCOT complied. The Court simply did not say the APA doesn't apply to the combined entities; and furthermore, what the Court very carefully did was describe the process, the stakeholder process

that occurs at ERCOT.

Now, the Supreme Court thought it was important to look at that issue in the context of deciding whether or not the APA challenge might lie. So I would submit that it's going to be important for this Court to understand the NPRR process that went on with these specific orders to understand whether or not their plea to the jurisdiction is good. Again, we are back to an evidentiary issue on the same record that underlies our application for a temporary injunction.

Let me speak briefly to failure to exhaust administrative remedies. I have handed up to the Court *Public Utilities Commission of Texas versus AMA*, in which the Court squarely rejected the argument.

We like -- it's on page 3 under star 4, We likewise overrule the PUC party's contention that AMA failed to exhaust administrative remedies before bringing its APA Section 2001-038(a) challenge. Specifically citing the statute, there is no exhaustion of administrative remedies required on the issue of whether they comply with the APA. Why? Because the PUC does not have jurisdiction to decide its own compliance with the statute. That's this Court's jurisdiction. There is no failure to exhaust administrative remedies.

The filed rate doctrine, I would just

observe that what Aspire is asking for is for disuse going forward prospectively of these orders because they do not comply with the APA. I do believe that addresses a lot of the concerns that defense counsel have raised relating to the issue of what relief is being sought.

Finally, Your Honor, on the issue of disclosure, we have laid out a very fulsome petition with basically all the factual assertions. We will bring a witness to call, and we have actually previously served to verify -- verification by said expert of that testimony. We can provide that verification again so that they know squarely. And I'm not opposed to giving a Rule 195.5 disclosure, but we're happy to provide whatever information is necessary once we know what the Court's schedule is.

We will be happy to confer for maybe two or three minutes and then tell the Court what we can jointly do.

THE COURT: What about the argument that since you've amended your pleading and ERCOT has amended their response that I can't hear you as early as you want to be heard because the notice you're entitled to?

MS. CASTANEDA: That all pertains to the Rule 91a. That has really nothing to do with the Court's jurisdiction, and it has nothing do with the

temporary injunction.

THE COURT: Well, I'm not going to slice and dice those. That would be a waste of judicial economy. The plea and the 91a will be heard at the same time.

MS. CASTANEDA: Okay.

THE COURT: I'm not -- I'm not going to do that.

MS. CASTANEDA: We're willing to proceed with less than 21 days' notice on the 91a. It's all the same subject matter that the Court has already heard. There really is a central theme to the defense here, and it underlies all of those issues.

THE COURT: Do counsel for the Defendants have any issue with the stipulation that they waive the required notice for the 91a to be heard quicker?

MR. CLARK: I don't think I do. I would like to confirm. I know there were some deadlines in 91a that courts have held are jurisdictional that can't be waived and some that aren't. So if it is true that they are allowed to waive it, then they can waive it. I will say that -- well, I'll let Mr. Hulme speak.

MR. HULME: I was just going to say I have no issue with that, Your Honor. The Commission doesn't.

THE COURT: I am well aware of the fight

that's gone on and gone up to the appellate court about whether or not a plea has to be heard and ruled on before a TI. That's happened in this courthouse repeatedly, so that's not an issue that I have. I'm willing to take that up. But in this instance, I'm not persuaded that I have to have an evidentiary hearing to decide the legal issues. So I'm going to go ahead and set the plea and the 91a.

It may be that I'll hold a ruling. It may be that you'll convince me then that I need to hear the evidence that would come out at a TI hearing, but I'm not willing to set that now. So let's do this.

Ms. Chambers is here. I'll hear it as quickly as possible. And it looks to me like the first date -- well, are you-all, counsel for the Defendants, available on Wednesday the 16th of October?

MR. HULME: Yes, I am, Your Honor.

MR. CLARK: Yes, Your Honor, I can be available.

THE COURT: All right. I'm going to set it at 9:30 on Wednesday the 16th. It's going to be set for three hours, but that will leave me some time if I need it. If you-all get here, I might let it go a little longer. Yes, ma'am.

MS. CASTANEDA: Well, Your Honor, I would

just observe that it very well may be that we would still be calling a witness in support of our opposition to the plea to the jurisdiction because we do believe evidentiary support is appropriate.

THE COURT: We can take that up, and you're going to have to give me some law because that is not my understanding of ruling on a plea to the jurisdiction, but I may very well be wrong. So if you convince me I'm wrong, fine. But I would get any sort of disclosures that the Rules of Procedure require to be done so that somebody doesn't lodge an objection if I allowed you to do that.

MS. CASTANEDA: And Your Honor, on that front, we could use the Court's guidance. The automatic disclosures that are provided for normally under the Rules of Civil Procedure are not applicable in the case of a suit against a governmental entity, and so that's been a little bit of a sticking point. If the Court would -- I'm happy to confer and see if we can't come to an agreement on that issue.

THE COURT: You-all confer, and if you can't, then you can -- I can set up a Zoom hearing or I could take brief -- you know, do it on submission. But you have to explain -- yeah.

MS. CASTANEDA: If we might just recess for

a few moments here and come back into court?  I know the Court is in the middle of another proceeding.

THE COURT:  I'm in the middle of another proceeding, so I mean I can give you five minutes, but I've got to let these other folks finish their trial.  I'll give you five minutes.

MS. CASTANEDA:  Thank you.

MR. CLARK:  Your Honor, just to be clear, should we send out a notice of hearing for October 16th at 9:30 a.m.?

THE COURT:  I don't think you need to send a notice of hearing.  I'm giving you an open court notice, and I will make docket note to that effect that you-all were given open court notice.

MR. CLARK:  Thank you, Your Honor.

THE COURT:  You're welcome.  And let me say this.  If I determine that I need to hear evidence or I'm going to go into a TI, I will make sure and leave myself some time on the week of the 28th.  So you-all ought to confer about what days that week because at this point my calendar is -- that week of the 28th, 29th, or 1st, it looks like.

MS. CASTANEDA:  28th, 29th, or 1st?

THE COURT:  Yes, that's Monday, Tuesday, or Friday.  Okay.  You-all can go confer for just a minute

while I make a docket note.  Thank you.

(Recess taken)

MS. CASTANEDA:  As I understand it, the Court has set the plea to the jurisdiction and the 91a motions for hearing on October 16th at 9:30 a.m.

Defendant ERCOT has filed its papers in support of that hearing.  Defendant PUC will file any amendments to its papers in support of that hearing by Friday the 4th.  Plaintiff will file its brief in response on October 9th, and we will provide a disclosure of any witnesses that we intend to call for that hearing at the same time and the substance of their testimony.

We will need a stipulation, I believe, for some kind of way to have in front of the Court the actual agency record.  And we have a dispute about the nature of who is called an agency; but between them, there's stuff at the PUC, there's stuff at ERCOT.  It is all on the website.  We're supposed to receive a request for admissions response from the Defendants on October 9th, I believe.

The only exception to this is, if for some reason they refuse to admit what is a matter of agency record, which I hope is not going to be the case, but maybe they can let the Court know.

MR. CLARK: I'm sorry we're taking up so much time, Your Honor. I can address that if you like or we can save it for another time.

THE COURT: Address it briefly.

MR. CLARK: As I told Ms. Castaneda on the phone, we're not going to agree to go along with the fiction that there is an administrative record here when they didn't go through the administrative process to create such a record. There's not a rule-making record because there wasn't a rule that's at issue. I told them, I said everything on these NPRRs on ERCOT's website we're not going to contest authenticity, but I'm not going to go along with this idea there's some agency record when you didn't exhaust your administrative remedies against ERCOT to create one.

So that's what they're going to get when they get my response to their discovery. And this is not an administrative appeal under the local rules, and therefore there is no administrative record under the local rules. An administrative appeal comes from a contested case. If they had done that, they would have a record, but they didn't do that, so there is no record.

ERCOT's protocol revisions are on its website. It's very well organized. They have full

access to them. Their client has submitted comments to some of those, so the they know how it works, but we don't agree that there's an administrative record. We've made that very clear.

MR. HULME: If I may add quickly, Your Honor. All the PUC materials are readily available on the PUC's website. They already have them. There's no issue there. There is no rule-making record because there was no rule-making.

THE COURT: I understand. They're not going to admit there is an administrative record or rule-making because they -- so what am I going to do about that, except if I have to decide the legal issues?

MS. CASTANEDA: Right, Your Honor. And what the Court calls it is part of the issue the Court is going to decide; however, the existence of whatever the contents of the notice were to the public is very much an issue for the APA claim and the plea to the jurisdiction.

THE COURT: Well, that is something you ought to be able to get ahold of it. That is public record. So I don't see --

MS. CASTANEDA: I totally agree.

THE COURT: What's the issue with that?

MS. CASTANEDA: Only to the extent it needs

to be admitted into evidence under judicial process, we have a very short period of time. Assuming there is actually no contest to what we're attempting to admit, it should not be an issue. I only raise it to the Court because the Court is going to want to have the record of what was put before the public, I believe.

THE COURT: I suspect I will want to have the record of what was put before the public, so I trust that counsel are going to figure out how to get that in front of me at the hearing set on the 16th. Right?

MS. CASTANEDA: Thank you, Your Honor.

THE COURT: Thank you.

MS. CASTANEDA: May we be dismissed?

THE COURT: You may.

MS. CASTANEDA: Thank you.

(*Court adjourned*)

**REPORTER'S CERTIFICATE**

THE STATE OF TEXAS)

COUNTY OF TRAVIS  )

I, RACHELLE PRIMEAUX, Official Court Reporter in and for the 419th District Court, Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court, in chambers, and/or remotely via videoconference and were reported by me.

WITNESS MY OFFICIAL HAND this 4th day of October, 2024.

/s/*Rachelle Primeaux*

RACHELLE PRIMEAUX, CSR NO. 4073
Expiration Date: 4/30/25
Official Court Reporter
419th District Court
Travis County, Texas
P.O. Box 1748
Austin, Texas 78767
Phone: (512)854-9329

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 92995831
Filing Code Description: Motion (No Fee)
Filing Description: UNOPPOSED MOTION FOR JUDICIAL NOTICE
Status as of 10/10/2024 9:23 AM CST

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Monica Latin | 787881 | mlatin@ccsb.com | 10/9/2024 5:52:14 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 10/9/2024 5:52:14 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 10/9/2024 5:52:14 PM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 10/9/2024 5:52:14 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 10/9/2024 5:52:14 PM | SENT |

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Elliot Clark | | eclark@winstead.com | 10/9/2024 5:52:14 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 10/9/2024 5:52:14 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| George Fibbe | 24036559 | george.fibbe@bakerbotts.com | 10/9/2024 5:52:14 PM | SENT |
| Laura Natelson | | laura.natelson@bakerbotts.com | 10/9/2024 5:52:14 PM | SENT |
| Matthew Erickson | | Matthew.erickson@bakerbotts.com | 10/9/2024 5:52:14 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 10/9/2024 5:52:14 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 10/9/2024 5:52:14 PM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 10/9/2024 5:52:14 PM | SENT |
| Carolyn Taylor | | ctaylor@ccsb.com | 10/9/2024 5:52:14 PM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 92995831
Filing Code Description: Motion (No Fee)
Filing Description: UNOPPOSED MOTION FOR JUDICIAL NOTICE
Status as of 10/10/2024 9:23 AM CST

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/9/2024 5:52:14 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/9/2024 5:52:14 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 10/9/2024 5:52:14 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/9/2024 5:52:14 PM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 10/9/2024 5:52:14 PM | SENT |

10/15/2024 11:38 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Schmidt

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS |
| TEXAS, ELECTRIC RELIABILITY | § | |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN JACKSON, | § | |
| AND COURTNEY HJALTMAN, | § | |
| *Defendants.* | § | 345ᵀᴴ JUDICIAL DISTRICT |

### ERCOT'S REPLY IN SUPPORT OF ITS
### AMENDED PLEA TO THE JURISDICTION AND
### ATERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND
### ALTERNATIVELY, PLEA IN ABATEMENT

Defendant Electric Reliability Council of Texas, Inc. ("ERCOT") hereby files this Reply in support of its Amended Plea to the Jurisdiction and Alternatively, Motion to Dismiss Under Rule 91(a) and Alternatively, Plea in Abatement (the "Amended Plea"). For the reasons set forth herein and in ERCOT's Amended Plea, the Court should dismiss (or, alternatively, abate) Plaintiff Aspire Power Ventures, LP's ("Aspire") claims.

### REPLY ARGUMENT & AUTHORITIES

I. **Neither the ERCOT Protocols nor the PUCT's orders approving Protocol revisions are APA "rules"; Aspire's claims are, therefore, barred by immunity.**

Aspire asserts the PUCT and ERCOT have "deliberately" and "illegally" "fractur[ed] the process of rulemaking" in an effort to "sidestep the requirements of the APA." Resp. at 6. But, in fact, the creation of this two-part, non-APA process was a deliberate decision *by the Legislature*—as the Texas Supreme Court recognized in *RWE*, when it rejected the very same arguments Aspire improperly rehashes here. *PUCT v. RWE Renewables Ams., LLC*, 691 S.W.3d 484, 491–92 (Tex. 2024).

- 1 -

Knowing that the PUCT "lacks the expertise and staff resources to make informed regulatory decisions independent of ERCOT"[1] regarding the "exceptional complexity of grid reliability concerns"[2] and the "complex inner workings of Texas's utility markets,"[3] the Legislature authorized the PUCT to delegate rulemaking authority to ERCOT—a non-agency—to adopt, through its "painstaking" NPRR process,[4] Protocols for every minutia of the ERCOT market and grid. And in 2021—knowing that ERCOT has long used this "painstaking" NPRR process to adopt and revise Protocols—the Legislature sanctioned the long-existing NPRR process, and modified that process to now require that every ERCOT Protocol:

> (1) first be "adopted" by ERCOT through its already-existing "formal process," PURA § 39.151(g-6)—the NPRR process, *see* Protocols § 21;[5] and then

> (2) "approved" by the PUCT, as an exercise of its "complete" supervisory authority over ERCOT, PURA §§ 39.151(d), (g-6).

Neither ERCOT's adoption of Protocols, nor the PUCT's final approval of those Protocols, are subject to the APA. *RWE*, 691 S.W.3d at 491. Indeed, by this recent PURA amendment, the Legislature recognized that "**ERCOT rulemaking and PUC rulemaking are independent endeavors**"—and have been since ERCOT's decades-ago certification as the "independent organization" for the ERCOT region. *Id.* at 492; *see also id.* at 491 ("The legislative and regulatory schemes have in turn envisioned **separate, complementary purposes of and procedures for PUC rules and ERCOT protocols**, notwithstanding the fact that ERCOT and its protocols have consistently been subject to PUC oversight and review.") (emphasis added).

---

[1] *RWE*, 691 S.W.3d at 490.

[2] *In re Entrust Energy*, 101 F.4th 369, 380 n.4 (5th Cir. 2024).

[3] *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016).

[4] *RWE*, 691 S.W.3d at 490–91 (walking through the NPRR process and concluding that "[t]his painstaking procedure serves to leverage the expertise of ERCOT members and industry stakeholders while maintaining transparency and affording interested parties plentiful opportunities to weigh in.").

[5] *See also* **Supplemental Appendix D** (Protocols § 21).

**Appx. Page 546 of 740**

*RWE* squarely resolves the jurisdictional question here. Aspire's arguments to the contrary are entirely divorced from *RWE*'s and PURA's plain language and, as outlined below, must be rejected.

## A.    Aspire mischaracterizes *RWE*.

No doubt aware that *RWE* forecloses its claims—particularly given its direct participation in that case—Aspire goes through great and disingenuous lengths to distinguish this case from *RWE*. These attempted distinctions are baseless.

First, Aspire claims that the "only issue" in *RWE* was whether the therein-challenged PUCT order approving an ERCOT Protocol revision was a "competition rule" under PURA § 39.001. *See* Resp. at 22. Thus, Aspire asserts, the "[t]he jurisdictional issue . . . in *RWE* is unrelated to the bases for jurisdiction in this case." *Id.* That is patently untrue.

To determine whether it had jurisdiction over RWE's direct appeal of an alleged "competition rule," the Texas Supreme Court first had to determine whether the PUCT's Protocol approval order was even a "rule" under the APA. *RWE*, 691 S.W.3d at 492. Because, at step one, the Court determined the PUCT's Protocol approval order was not an APA "rule," it did not even reach the question of whether the order was a "competition rule":

> **In sum, consistent with the well-established regulatory scheme and the legislation governing it, we hold that the PUC's order approving NPRR 1081** was a ratification decision that simply allowed protocol revisions, already developed and adopted by ERCOT in accordance with its own detailed procedures, to take effect. Consequently, the PUC's order **was not an agency-adopted "rule" under the Administrative Procedure Act**. *In turn*, because the court of appeals' jurisdiction under Utilities Code Section 39.001(e) is limited to review of "competition rules adopted by the commission," the court lacked jurisdiction over RWE's challenge to the PUC's approval order.

*Id.* (emphasis added); *compare PUCT v. Luminant Energy Co.*, 691 S.W.3d 448, 459 (Tex. 2024) (analyzing whether a PUCT order that was first determined to be an APA "rule" was also a "competition rule" under PURA § 39.001).

**Appx. Page 547 of 740**

Aspire next contends that *RWE* is inapposite because Aspire "does not challenge the 'PUCT['s] [Protocol] approval orders' in isolation, as did the petitioner in *RWE*"; it only "challenges the combined actions of ERCOT and the PUC[T] in enacting the ECRS rules." Resp. at 24. But the alleged "combined actions" of ERCOT and the PUCT is ***exactly*** what RWE challenged under the APA—a challenge that was soundly rejected:

> A substantially similar version of the above-described process for adopting and revising ERCOT protocols has long been in effect. . . . The legislative and regulatory schemes have in turn envisioned separate, complementary purposes of and procedures for PUC rules and ERCOT protocols, notwithstanding the fact that ERCOT and its protocols have consistently been subject to PUC oversight and review. [PURA] § 39.151(d). **RWE nevertheless suggests that, by amending PURA to require formal PUC approval of ERCOT-adopted protocols at the tail end of the process, the Legislature intended to overhaul that process entirely and effectively convert ERCOT protocols into PUC rules subject to the same review procedures**. We do not discern such a sweeping intent from the language the Legislature chose.

*RWE*, 691 S.W.3d at 491 (emphasis added).

Finally, Aspire claims that *RWE* "did not address ERCOT's adoption of or revisions to its [P]rotocols," and "did not hold that the APA did not apply to . . . the ERCOT [Protocol] adoption process." Resp. at 23–24. Not true. In addressing the argument that "the Legislature intended to . . . **effectively convert ERCOT protocols into PUC rules** subject to the same review procedures," *RWE*, 691 S.W.3d at 491 (emphasis added), the Texas Supreme Court directly addressed whether ERCOT's NPRR process was subject to the APA. *See id.* at 491–92. It is not:

> **PURA makes clear that ERCOT, not the PUC, is the entity "adopting" new or revised ERCOT protocols**. See [PURA] § 39.151(g-6). The PUC then "approves" the protocols. *See id.* **This distinction is deceptively significant because the APA's requirements**, which RWE insists must be satisfied, **are exclusively and repeatedly directed at rules "adopted" by a "state agency."**
>
> ***
>
> [T]he Legislature deliberately employed these terms to communicate two distinct administrative actions that have distinct legal consequences.

*See id.* at 491–92.

- 4 -

**Appx. Page 548 of 740**

In fact, Aspire re-urges virtually the same APA arguments concerning the NPRR process that were raised—and rejected—in *RWE*:[6]

| Aspire's Pleadings | *RWE Renewables* |
|---|---|
| "Making matters worse, the PUC and ERCOT implemented ECRS without even attempting to comply with the mandatory requirements of the APA." Sec. Am. Pet. ¶ 5. | "The new load shed price-setting rule is invalid because the PUC did not follow—or even attempt to satisfy—APA rulemaking requirements." RWE Respondent's Brief on the Merits at 40.[7] |
| "In fact, the process for adopting rules concerning ERCOT's operations deliberately and illegally sidesteps the APA. The Legislature allowed the PUC to delegate its rulemaking responsibilities to ERCOT. But the Legislature did not dispense with the APA's mandatory requirements when allowing the PUC to delegate rulemaking responsibilities to ERCOT. And ERCOT's own rulemaking processes do not come close to meeting the APA's rulemaking requirements, nor does the PUC's condensed process for approving ERCOT-adopted rules." *Id.* ¶ 6. | "The PUC cannot circumvent APA rulemaking requirements by 'delegating' rulemaking to ERCOT, which the PUC must still adopt." *Id.* at 47.<br><br>"The Legislature requires market rules be adopted by the PUC to become effective, and the PUC cannot use ERCOT to shield new rules from APA requirements." *Id.* at 48. |
| ERCOT and the PUC Did Not Substantially Comply with the APA's Notice Requirements *Id.* at 17. | New or amended wholesale market pricing rules should be subject to public notice and comment. *Id.* at 52. |
| "The APA's requirements apply to 'rules,' and the ECRS Rules, adopted under rulemaking authority originally given to the PUC and then delegated to ERCOT, are 'rules' to which the APA applies. . . The APA defines a 'rule' broadly to include 'a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy, or (ii) describes the procedure or practice requirements of a state agency.' Tex. Gov't Code § 2001.003(6)(A). 'Rules' also include 'amendment or repeal of a prior rule.' *Id.* § 2001.003(6)(B), (C)." *Id.* ¶ 44 (citations omitted). | "The issue is whether the statement falls within the broad definition of a 'rule.' The APA defines a 'rule' as 'a state agency statement of general applicability' that either 'implements, interprets, or prescribes law or policy' or 'describes the procedure or practice requirements of a state agency' and 'includes the amendment or repeal of a prior rule,' but not those regarding only the internal management or organization of an agency and not affecting private rights or procedures. Tex. Gov't Code § 2001.003(6)." *Id.* at 43. |
| "Neither ERCOT nor the PUC made any pretense of complying with the APA when adopting and approving the ECRS Rules, respectively. ERCOT followed its own processes for protocol revisions, which require far less than the APA in terms of notice, public participation, and the order. And the PUC largely relied on ERCOT's efforts in adopting the ECRS Rules, rather than undertaking its own efforts to satisfy the APA." *Id.* ¶ 46. | "The PUC does not even argue it (or ERCOT) took the steps required by the APA to adopt or make changes to administrative rules. Instead, the PUC argues it was not required to comply with the APA, claiming the new price-setting rule is not a rule because it was developed through ERCOT and the PUC merely made 'a ratification decision.'" *Id.* at 42. |

---

[6] *See* **Supplemental Appendix E** (RWE's Brief on the Merits); **Supplemental Appendix F** (Aspire's amicus brief); **Supplemental Appendix G** (ERCOT's amicus brief).

[7] *See* **Supplemental Appendix E** (RWE's Brief on the Merits).

Appx. Page 549 of 740

| | |
|---|---|
| "The APA ensures that the public gets an opportunity to participate in agency rulemaking and that agencies do not exceed their authority when making rules. But the process ERCOT and the PUC used to implement ECRS provided none of the APA's safeguards." *Id.* ¶ 5. | "'In this way, the APA assures that the public and affected persons are heard on matters that affect them and receive notice of new rules.' . . . However, in adopting the new price-setting rule, the PUC admittedly did not even attempt to satisfy APA requirements." *Id.* at 41 (citation omitted). |
| "By fracturing the process of rulemaking—through delegation to ERCOT of the formulation of rules or 'protocols' while reserving to itself the final say-so or 'approval' over those rules—PUC attempts to sidestep the requirements of the APA." Aspire Resp. to Am. Pleas at 6. | "The PUC's approach would create the absurd result that the same rule would be subject to APA requirements and judicial review if directly adopted by the PUC under § 39.151(d), but could avoid APA requirements and be unreviewable simply by the agency having ERCOT (under the same statutory provision) propose it first for the PUC's subsequent rubberstamp." *Id.* at 50. |

Aspire cannot feign ignorance of *RWE*'s resolution of this Court's jurisdiction. Aspire was directly involved in *RWE*, and submitted an amicus brief asking the Court to determine that the combined actions of the PUCT and ERCOT "f[a]ll so far short of [the APA's] requirements." *See* **Supplemental Appendix F** (Aspire *RWE* amicus) at 2 (taking aim at the "ERCOT/PUC process for approval of NPRRs"). Aspire alleged additional ways in which it believed the Protocol revision process fails to comply with the APA, explaining its APA arguments had "been overlooked by the parties' briefs." *See id.* at 1. Again, the Texas Supreme Court considered—and rejected—these arguments. So too must this Court.

## B. PURA § 39.1511 does not support Aspire's jurisdictional theories.

Aspire also relies on PURA § 39.1511(a-1) to claim that ERCOT is subject to the APA's rulemaking requirements. So the argument goes: "[i]f ERCOT can go into executive session to address a contested case under the APA, it follows that ERCOT can conduct contested cases generally under the APA." *See* Resp. at 21–22. And if "ERCOT can conduct contested cases," then it must be a "state agency" for purposes of promulgating APA "rules." *See id.*

**Appx. Page 550 of 740**

Aspire is confused. ERCOT does not "conduct" contested cases. It is a party to them when, for example, an entity files a complaint against ERCOT at the PUCT.[8] The PUCT commissioners "conduct" those cases and are the arbiters of those disputes. *See* PURA § 39.151(d-4)(6); 16 Tex. Admin. Code ("TAC") § 22.251(b). PURA § 39.1511(a-1) is an exception to the general requirement that ERCOT comply with the Open Meetings Act. It allows ERCOT to discuss contested cases in a closed session, out of the public eye <u>and</u> <u>without</u> its PUCT-Commissioner *ex officio* Board members present, who are the arbiters of such disputes. *Id.* That ERCOT is permitted to privately discuss PUCT-determined contested cases ***to which it is a party*** says nothing about whether ERCOT is subject to APA rulemaking.[9] *See* APA § 2001.003(1) (defining contested cases as "proceeding[s] . . . in which the legal rights, duties, or privileges of a party ***are to be determined by a state agency*** after an opportunity for adjudicative hearing.") (emphasis added).

### C. The Legislature did, in fact, recognize the NPRR process is separate from the APA.

Aspire also claims that, if the Legislature wanted to exempt the ERCOT Protocol amendment and revision process from the APA, it "certainly knew how" to do that. Resp. at 26. Because PURA does not specifically exempt the NPRR process from the APA, then, Aspire argues the APA applies by default. *See id.*

Aspire's argument ignores that the APA provides the default "minimum standards of uniform practice and procedure ***for state agencies***." Resp. at 26 (quoting APA § 2001.001; instead emphasizing the "minimum standards"). And, as Aspires concedes, Resp. at 19; Sec. Am. Pet. ¶ 11,

---

[8] *See, e.g.*, *Complaint of Aspire Commodities, LLC against ERCOT*, Docket No. 49673 (June 25, 2019), available at https://interchange.puc.texas.gov/Documents/49673_1_1023438.PDF.

[9] *See, e.g.*, PUCT Docket No. 53377, *Complaint of Engie Market NA, Inc. and Viridity Energy Solutions, Inc. Against ERCOT* (Mar. 18, 2022) (contested case at the PUCT to which ERCOT was party, which, under PURA 39.1511(a-1), ERCOT was authorized to discuss in closed sessions); *see also, e.g.*, 16 TAC §§ 25.251, 22.207 (allowing any "entity" to appeal any "decision made by ERCOT" to the Commission, which may then be referred to SOAH for a contested case proceeding).

Appx. Page 551 of 740

ERCOT is not a state agency, meaning these default rules (that the "painstaking" NPRR process, in any event, goes above and beyond, *RWE*, 691 S.W.3d at 490–91) do not apply to ERCOT in the first place, so there was no need for the Legislature to expressly exempt the Protocols from the APA. *See RWE*, 691 S.W.3d at 491. The PUCT's oversight and approval authority does not change that simple and determinative fact. *Id.* (holding the PUCT's final approval does not "convert ERCOT protocols into PUC rules").[10]

And the Legislature has, in fact, expressly sanctioned the NPRR process as its own unique non-APA rulemaking process. As the *RWE* Court explained, in 2021, the Legislature amended PURA to direct that ERCOT implement a "formal process" for adopting and revising Protocols—knowing that such a "formal process," the non-APA NPRR process, "has long been in effect."[11] *RWE*, 691 S.W.3d at 492. This signals the Legislature's "recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors," contrary to Aspire's claims here:

> **A substantially similar version of the above-described process for adopting and revising ERCOT protocols has long been in effect**. *See* ERCOT, Nodal Protocols § 21 (Mar. 1, 2005) (rev. Feb. 2010, Apr. 2011, May 2011, Oct. 2011, May 2012, Aug. 2012, Apr. 2013, Dec. 2013, May 2014, July 2016, Nov. 2016, Nov. 2017, Jan. 2021, Apr. 2023, June 2023). The legislative and regulatory schemes have in turn envisioned separate, complementary purposes of and procedures for PUC rules and ERCOT protocols, notwithstanding the fact that ERCOT and its protocols have consistently been subject to PUC oversight and review. [PURA] § 39.151(d).
>
> **\* \* \***
>
> **Finally, we cannot ignore that when the Legislature amended PURA in 2021 to require PUC approval of the independent organization's (ERCOT's) protocols, it simultaneously added the requirement that the organization "establish and**

---

[10] Aspire cites several statutes that it claims show that the Legislature "kn[ows] how to make clear, expressly, when it d[oes] not want the APA to apply to any given administrative process." Resp. at 26. All of those statutes exempt ***state agencies*** from complying with the APA for certain proceedings. *See* Tex. Gov't Code § 411.180(a) (Department of Public Safety); Tex. Hum. Res. Code § 40.063 (Department of Family and Protective Services); Tex. Parks & Wild. Code § 32.006 (Parks and Wildlife Department). ERCOT is not a state agency, so the APA does not apply by default.

[11] *In re Pirelli Tire, LLC*, 247 S.W.3d 670, 677 (Tex. 2007) (noting that "all statutes are presumed to be enacted by the Legislature with full knowledge of the existing condition of the law and with reference to it") (cleaned up).

**Appx. Page 552 of 740**

**implement a formal process** for adopting new protocols or revisions to existing protocols." . . . **As discussed above, ERCOT already had such a process in place**; nevertheless, **the requirement signals legislative recognition that ERCOT rulemaking and PUC rulemaking are independent endeavors**.

*RWE*, 691 S.W.3d at 491–92 (internal citations omitted) (emphasis added).

Aspire also cites three cases that it claims stand for the proposition that, when an agency delegates rulemaking authority to a non-agency, that non-agency stands in the delegating agency's shoes for purposes of APA compliance. *See* Resp. at 20. But, in fact, none of those cases have anything to do with rulemaking or the APA. Aspire's cited authorities instead concern: (1) whether a private hearing examiner could properly review a police officer's appeal of his indefinite suspension;[12] (2) the rights of an assignee under an earnest money contract;[13] and (3) the scope of a plaintiff's recoverable damages for its constitutional takings claim.[14]

The only case that directly answers the jurisdictional question here is *RWE*. And *RWE* mandates dismissal of all of Aspire's claims.

## II. Aspire's claims fall within the PUCT's exclusive jurisdiction.

As set forth in ERCOT's Amended Plea, this Court also lacks subject-matter jurisdiction because the PUCT has exclusive jurisdiction over matters pertaining to ERCOT's operations and Protocols, and Aspire failed to exhaust its administrative remedies before the PUCT before bringing suit. *See* Amended Plea at 19–22. Aspire does not substantively address this issue in its response. *See* Resp. at 27–29. It instead doubles down on its assertion that the ERCOT Protocols, and PUCT orders

---

[12] *City of Garland v. Byrd*, 97 S.W.3d 601, 605 (Tex. App.—Dallas 2002, pet. denied).

[13] *Mainland Sav. Ass'n v. Hoffbrau Steakhouse, Inc.*, 659 S.W.2d 101, 102 (Tex. App.—Houston [14th Dist.] 1983, no writ).

[14] *DuPuy v. City of Waco*, 396 S.W.2d 103, 104 (Tex. 1965).

**Appx. Page 553 of 740**

finally approving Protocol revisions, are "rules" under the APA; therefore, it asserts, the exhaustion of remedies doctrine does not apply. *See id.* (citing APA § 2001.038(d)).[15]

Because, as explained above, neither the ERCOT Protocols nor the PUCT's orders finally approving those Protocols are APA "rules," Aspire was required to first bring its complaints about the ECRS program to the PUCT before filing those complaints in this Court. *See CPS Energy v. ERCOT*, 671 S.W.3d 605, 619–20 (Tex. 2023); *RWE*, 691 S.W.3d at 492 n.11 (recognizing that the "PUC regulations provide a process for review of ERCOT protocols . . . which culminates in a suit for judicial review in the district court.").[16] Outside of relying on its false premise, Aspire does nothing to show otherwise.

## III. Alternatively, Aspire's claims must be dismissed under Rule 91a.

### A. The filed rate doctrine bars Aspire's claims.

Though Aspire attempts to package its claims as an APA rule challenge, this lawsuit really concerns Aspire's dissatisfaction with the "artificially increased" wholesale electricity rates allegedly produced by the ECRS program. *See* Sec. Am. Pet. ¶¶ 3–4, 7, 26–28, 30, 32, 34–38, 50–55. Aspire

---

[15] APA § 2001.038(d) directs that "[a] court may render a declaratory judgment without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of **the rule** in question," meaning a plaintiff bringing a proper APA rule challenge is not required to exhaust its administrative remedies. Because this case does not concern an APA "rule," however, APA § 2001.038(d) is inapplicable, and does not excuse Aspire from failing to exhaust its administrative remedies before the PUCT if it wishes to contest ERCOT's Protocols.

[16] After concluding that neither the ERCOT Protocols nor the PUCT's order approving Protocol revisions are APA "rules," the Texas Supreme Court directed that the proper path for a Protocol challenge is through the administrative process set forth in 16 Tex. Admin. Code §§ 22.251, 25.362(c)(5), which culminates in a suit for judicial review. *RWE*, 691 S.W.3d at 492 n.11. Aspire dismisses this directive as mere "dicta," suggesting the Court need not consider it here. Resp. at 23. Even if the Court's admonishment regarding the proper "process for review of ERCOT protocols" could be characterized as dicta (it is not), that does not cast that admonishment aside—it must still be followed. *See Elledge v. Friberg–Cooper Water Supply Corp.*, 240 S.W.3d 869, 870 (Tex. 2007) (disagreeing with the lower court's characterization of certain of the Court's statements as dicta, but in any event holding that "[o]ur statements . . . **though not essential to the outcomes** in [the cited precedent], **should have been followed**.") (emphasis added).

- 10 -

**Appx. Page 554 of 740**

does not dispute the fact that it challenges the rates it paid because of ECRS; instead, it argues the filed rate doctrine does not apply here because: (1) ERCOT has not, and on a Rule 91a cannot, prove the existence of any PUCT-approved filed rate; (2) Aspire "does not challenge specific rates"; and (3) the filed rate doctrine does not apply to claims for equitable relief. *See* Resp. at 34–36.

These arguments all miss the same point: the complained-of wholesale electricity prices are "filed rates"—i.e., rates approved by the governing regulatory agency, the PUCT—by virtue of the PUCT's comprehensive oversight of the wholesale ERCOT market. *See Tex. Com. Energy v. TXU Energy, Inc.* ("*TCE*"), 413 F.3d 503, 509–10 (5th Cir. 2005)[17] (holding that the "PUCT's oversight over the market is sufficient to conclude that the [complained-of wholesale] energy rates are 'filed' within the meaning of the filed rate doctrine."). That comprehensive market oversight is established by PURA—it does not rely on "extrinsic evidence," as Aspire contends, Resp. at 35; *see TCE*, 413 F.3d at 509–10 (analyzing various PURA provisions to conclude the PUCT's market oversight makes wholesale market rates "filed rates").

The existence of this comprehensive, PUCT-administered regulatory market scheme is also what demands dismissal of Aspire's rate-disguised-as-a-"rule" challenge. As one Texas court explained, the purpose of the filed rate doctrine is to:

> **preserve[] the exclusive role of regulatory agencies in approving rates and keeping courts, which are far less competent to perform this function, out of the rate-making process** ("nonjusticiability"). The nonjusticiability strand recognizes that (1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime.

*Winn v. Alamo Title Ins. Co.*, No. A-09-CA-214-SS, 2009 WL 7099484 (W.D. Tex. May 13, 2009) (internal citations omitted). The plaintiff in *Winn*, like Aspire, also sought declaratory and injunctive

---

[17] *See* **Supplemental Appendix H**.

- 11 -

**Appx. Page 555 of 740**

relief. *Id.* at \*2.[18] The district court dismissed all of the plaintiff's claims under Rule 91a's federal equivalent, Federal Rule 12(b)(6). In so doing, the court noted that "the Fifth Circuit ha[s] found the electric energy market subject to regulation by the [PUCT] and thus **challenges to the price of energy were effectively challenges to a filed rate.**" *Id.* at \*8 (emphasis added).

That Aspire pleads its claims in equity is thus of no moment—the same driving nonjusticiability concerns are raised by Aspire's complaint that ECRS produces wholesale prices that are "too high, unfair, or unlawful." *TCE*, 413 F.3d at 507. That complaint must be adjudicated by the PUCT. *See Util. Choice v. TXU Corp.*, No. H-05-573, 2005 WL 3307524, at \*2, 4 (S.D. Tex. Dec. 6, 2005)[19] (rejecting the argument that the filed rate doctrine did not apply to the plaintiff's claims for equitable and injunctive relief, as those claims "would [have] require[d] the Court to engage in continued oversight of the Texas energy market," and asked the Court to "unduly infringe upon the rate setting authority held by the PUCT" just the same as its claims for monetary relief).[20]

What's more, as expressly alleged by Aspire, the PUCT approved the ECRS rules implementing the ECRS program's current pricing mechanisms. *See* Sec. Am. Pet. ¶ 29. And the "filed rate doctrine is not limited to 'rates' per se,"—it also applies to rate-setting mechanisms, like those set forth in the complained-of ECRS rules. *Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986); *see Entergy Louisiana, Inc. v. Louisiana Public Service Comm'n*, 539 U.S. 39, 49–50 (2003). For this additional reason, the filed rate doctrine plainly bars Aspire's claims.

---

[18] Aspire argues incorrectly that ERCOT only identified one case in which the filed rate doctrine barred claims for equitable relief. Resp. at 36. But ERCOT cited both *Winn* and *Utility Choice* for this proposition, Am. Plea at 25, and Aspire has made no meaningful attempt to distinguish their holdings here. *See* Resp. at 36.

[19] *See* **Appendix I**.

[20] To distinguish *Utility Choice*, Aspire again relies exclusively on its false premise that this is only an APA challenge, making all of ERCOT's non-APA arguments inapplicable. *See* Resp. at 36. (claiming that "the equitable relief sought [in *Utility Choice*] had nothing to do with agency rulemaking or the APA."). Resp. at 36. As explained *supra*, this is not an APA challenge because there is no APA "rule" at issue here.

Appx. Page 556 of 740

**B.        Aspire is not authorized to enforce PURA § 39.157.**

Aspire only briefly, and non-substantively, addresses ERCOT's argument that Aspire has no private right of action under PURA § 39.157, which Aspire claims makes ECRS "illegal." Sec. Am. Pet. ¶ 7. To start, Aspire misunderstands this ground for dismissal—it claims that "ERCOT . . . argues that Aspire's claim alleging *ultra vires* acts should be dismissed because Aspire has no private cause of action for violation of PURA § 39.157." Resp. at 36. That is not ERCOT's argument. *See* Amended Plea at 26–28.

Aspire asks for two forms of declaratory and injunctive relief. First, Aspire asks for a "declaration under Chapter 37 of the Texas Civil Practice and Remedies Code and Texas Government Code § 2001.038" that the "ECRS Rules" failed to substantially comply with the APA and were created without authority and are, therefore, invalid and void. Sec. Am. Pet. ¶ 58. This procedural validity challenge fails because, as detailed above, the "ECRS Rules" are not APA "rules."

Separately, Aspire asks the Court to declare that, and enjoin further operations of, the ECRS program because ECRS allegedly violates the antitrust prohibitions set forth in PURA § 39.157.[21] *Id.* ¶ 59. As ERCOT has explained, however—and as the plain language of the statute and various Texas courts have made clear, *see* Amended Plea at 26–28—PURA § 39.157 is a tool for the market's *regulator*, the PUCT, to prevent market abuses by market participants; it is not a tool for *the regulated* to sue for declaratory and injunctive relief. *See, e.g.*, *City of Garland v. PUCT*, 165 S.W.3d 814, 816 (Tex. App.— Austin 2005, pet. denied) (explaining that under PURA § 39.157, "the [L]egislature granted *the Commission* certain oversight powers over market structure, . . . including the authority to monitor market power associated with the generation, transmission, distribution, and sale of electricity in Texas.") (emphasis added).

---

[21] This substantive validity challenge is likewise barred by the Court's lack of jurisdiction.

- 13 -

**Appx. Page 557 of 740**

In cases like this, where the relevant statutes are silent on a private right of action, but provide detailed administrative enforcement mechanisms, *see* PURA §§ 39.157(c)–(f), 39.151(d), (d-4), the Court must presume that the Legislature intended that a separate private right of action not be included. *See Witkowski v. Brian, Fooshee and Yonge Props.*, 181 S.W.3d 824, 831 (Tex. App.—Austin 2005, no pet.).

### C. PURA § 39.157 application does not turn on facts outside the petition.

As another ground for dismissal, ERCOT has explained why PURA § 39.157, which directs the PUCT to monitor and enforce against "market power abuses," does not apply to ERCOT (who is not a market participant and has no "market power" to abuse), or the ECRS program (which does not "withhold generation," as proscribed by PURA § 39.157). *See* Amended Plea at 28–30.

Because it has no substantive response, Aspire instead complains that this ground of ERCOT's Amended Rule 91a motion cannot be considered, as it purportedly relies on facts outside the petition; namely, that ERCOT is a revenue-neutral market clearinghouse that possesses no "market power" under PURA § 39.157, and that ERCOT must hold generation in reserves to maintain grid reliability. Resp. at 37. But these are not evidentiary facts—they are matters of law set forth under PURA and the PUCT's regulations,[22] and have been recognized as such by the Texas Supreme Court. *See, e.g.,* *CPS Energy*, 671 S.W.3d at 627 (recognizing the "ERCOT is primarily funded by a system

---

[22] *See* PURA §§ 39.151(a) (establishing the "independent organization" and outlining its functions); 39.151(b) (directing that this "independent organization" must be "independent of any producer or seller of electricity" to ensure its "decisions will not be unduly influenced"); 39.151(e) (establishing the system administration fee that funds ERCOT's operations, and directing that "[C]ommission shall require [ERCOT] to closely match actual revenues generated by the fee and other sources of revenue with revenue necessary to fund the budget"; i.e., ERCOT must, by Legislative command, be revenue-neutral); *see also* 16 TAC 25.363)(e) (governing PUCT review of ERCOT's budget and expenditures, and reaffirming that "ERCOT shall closely match actual revenues generated by the system administration fee and other sources of revenue with . . . to ensure that the budget year does not end with a surplus or insufficient funds."); *id.* § 25.361(b) (outlining ERCOT's functions as the "independent organization," which include "administer[ing], on a daily basis, the operational and market functions of the ERCOT system, including procuring and deploying ancillary services").

Appx. Page 558 of 740

administration fee," which "is required to closely match the revenue necessary for [ERCOT's budget without exceeding it to avoid a surplus of funds"); *RWE*, 691 S.W.3d 484 (observing that "ERCOT serves as the central counterparty for all [wholesale energy] transactions," and thereby "[o]perat[es] as a sort of clearinghouse" for the market); *Luminant*, 691 S.W.3d at 459 (explaining that ERCOT's wholesale pricing mechanisms take into account, *inter alia*, "the amount of reserves needed to keep the lights on."). The Court may properly apply the plain language of PURA § 39.157 to these legal matters.

**IV.**      **The other market participants who have claimed an interest in the ECRS program must be joined.**

Aspire does not dispute that hundreds of other ERCOT market participants have significant pecuniary interests that are threatened by Aspire's attempts to do away with the ECRS program and entire market rulebook. Rather, Aspire challenges ERCOT's alternative plea in abatement for failure to join necessary parties on the ground that the other market participants have not "actually claimed" those interests in connection with this proceeding. *See* Resp. at 38–39.

In making this argument, however, Aspire ignores that it purports to assert claims under the UDJA. Sec. Am. Pet. ¶¶ 58, 59.[23] And under the UDJA, all persons that would be affected "must be made parties." Tex. Civ. Prac. & Rem. Code § 37.006(a). Aspire is also incorrect that no one has "actually claimed an interest in the subject matter of this litigation." Resp. at 39. As Aspire acknowledges, another market participant, Calpine Corporation, has already made its claim known to the Court. *See* Resp. at 40 n.24. Moreover, the "record" that Aspire asks the Court to take judicial notice of also demonstrates that others "claim an interest" in the ECRS program. *See* Unopposed Mot.

---

[23] On this issue of joinder, too, Aspire once more relies on its tireless insistence that this is an APA challenge, and nothing more; thus, it asserts, the only necessary party to an APA dispute is the "government agency that violated the APA." Resp. at 40. But, as noted, Aspire expressly pleads this as a declaratory judgment action under Chapter 37 of the Texas Civil Practice and Remedies Code. *See* Sec. Am. Pet. ¶¶ 58–59. This argument also fails on its face because, again, there are no APA "rules" at issue here.

Appx. Page 559 of 740

for Judicial Notice ¶ 6, NPRR1224, Joint Commenters' Comments (dated May 20 and June 10, 2024). Given Aspire's acknowledgement that its requested relief will affect other market participants and that those interested parties "have a procedural mechanism" to assert their interests in this lawsuit, Aspire concedes it has no grounds to object to any future intervention—in the unlikely event the Court first finds it has jurisdiction and that Aspire has pled viable claims.

## CONCLUSION

For the reasons set forth herein and in ERCOT's Amended Plea to the Jurisdiction and Alternatively, Motion to Dismiss Under Rule 91(a) and Alternatively, Plea in Abatement, the Court should dismiss Aspire's claims. ERCOT requests such other and further relief, at law or in equity, to which it may be entitled.

Respectfully submitted,

**WINSTEAD PC**

600 W. 5th Street, Suite 900
Austin, Texas 78701
(512) 370-2800 telephone
(512) 370-2850 fax

By: _/s/ Elliot Clark_
    Elliot Clark    SBN 24012428
    eclark@winstead.com
    Elin Isenhower    SBN 24104206
    eisenhower@winstead.com

**ATTORNEYS FOR DEFENDANT ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.**

**Appx. Page 560 of 740**

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that a true and correct copy of this document has been served on all counsel of record in accordance with the Texas Rules of Civil Procedure on October 15, 2024.

_/s/ Elliot Clark_
Elliot Clark

**Appx. Page 561 of 740**

| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | TRAVIS COUNTY, TEXAS |
| TEXAS, ELECTRIC RELIABILITY | § | |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN JACKSON, | § | |
| AND COURTNEY HJALTMAN, | § | |
| *Defendants.* | § | 345TH JUDICIAL DISTRICT |

## SUPPLEMENTAL APPENDIX
## TO ERCOT'S AMENDED PLEA TO THE JURISDICTION

ERCOT submits with its Reply this Supplemental Appendix in support of ERCOT's Amended Plea to the Jurisdiction and alternatively, Motion to Dismiss under Rule 91(a) (the "Amended Plea"). The original Appendix attached to the Amended Plea contained three recent Texas Supreme Court opinions that ERCOT contends indisputably demonstrate that the Court lacks jurisdiction over this suit. For the Court's convenience, ERCOT submits this Supplemental Appendix, and asks the Court to take judicial notice of these legal authorities and materials.

| TAB | DESCRIPTION |
|---|---|
| **D** | ERCOT Protocol Section 21 (NPRR Process) (last amended June 1, 2023) |
| **E** | RWE's SCOTX Brief on the Merits, *PUCT v. RWE*, Case No. 23-0555 (Feb. 8, 2024) (without appendix) |
| **F** | Aspire's SCOTX Amicus Brief, *PUCT v. RWE*, Case No. 23-0555 (Apr. 26, 2024) |
| **G** | ERCOT's SCOTX Amicus Brief, *PUCT v. RWE*, Case No. 23-0555 (Mar. 7, 2024) (without appendix) |
| **H** | *Tex. Com. Energy v. TXU Energy, Inc.* ("TCE"), 413 F.3d 503 (5th Cir. 2005) |
| **I** | *Util. Choice v. TXU Corp.*, No. H-05-573, 2005 WL 3307524 (S.D. Tex. Dec. 6, 2005) |

# APPENDIX D

# ERCOT Nodal Protocols

# Section 21:  Revision Request Process

**June 1, 2023**

PUBLIC

## *21 Revision Request Process*....................................................................................*21-1*

21.1    Introduction ....................................................................................................................21-1

21.2    Submission of a Nodal Protocol Revision Request or System Change Request ............................21-2

21.3    Protocol Revision Subcommittee ....................................................................................21-2

21.4    Nodal Protocol Revision and System Change Procedure ....................................................21-3

      21.4.1    Review and Posting of Nodal Protocol Revision Requests ...............................................21-3

      21.4.2    Review and Posting of System Change Requests...............................................................21-4

      21.4.3    Withdrawal of a Nodal Protocol Revision Request or System Change Request ...............21-5

      21.4.4    Protocol Revision Subcommittee Review and Action.........................................................21-5

      21.4.5    Comments to the Protocol Revision Subcommittee Report ................................................21-6

      21.4.6    Revision Request Impact Analysis .....................................................................................21-7

      21.4.7    Protocol Revision Subcommittee Review of Impact Analysis ...........................................21-7

      21.4.8    Technical Advisory Committee Vote ..................................................................................21-8

      21.4.9    ERCOT Impact Analysis Based on Technical Advisory Committee Report ....................21-9

      21.4.10    ERCOT Board Vote .........................................................................................................21-9

      21.4.11    PUCT Approval of Revision Requests ............................................................................21-10

      21.4.12    Appeal of Action .............................................................................................................21-10

            21.4.12.1    Appeal of Protocol Revision Subcommittee Action ........................................21-10

            21.4.12.2    Appeal of Technical Advisory Committee Action...........................................21-10

            21.4.12.3    Appeal of ERCOT Board Action ....................................................................21-11

21.5    Urgent and Board Priority Nodal Protocol Revision Requests and System Change Requests ......21-11

21.6    Nodal Protocol Revision Implementation...........................................................................21-12

21.7    Review of Project Prioritization and Annual Budget Process ......................................................21-12

21.8    Review of Guide Changes .................................................................................................21-13

## 21   REVISION REQUEST PROCESS

### 21.1      Introduction

(1)      A request to make additions, edits, deletions, revisions, or clarifications to these Protocols, including any attachments and exhibits to these Protocols, is called a Nodal Protocol Revision Request (NPRR).  Except as specifically provided otherwise in the following sentence or in other sections of these Protocols, Sections 21.2, Submission of a Nodal Protocol Revision Request or System Change Request, through 21.8, Review of Guide Changes, apply to all NPRRs.  ERCOT Members, Market Participants, Public Utility Commission of Texas (PUCT) Staff, the Reliability Monitor, the Independent Market Monitor (IMM), the North American Electric Reliability Corporation (NERC) Regional Entity, ERCOT, and any other Entities are required to utilize the process described herein prior to requesting, through the PUCT or other Governmental Authority, that ERCOT make a change to these Protocols, except for good cause shown to the PUCT or other Governmental Authority.

(2)      A request that ERCOT change its computer systems that does not require a revision to the Protocols is called a System Change Request (SCR).  Except as specifically provided in other sections of these Protocols, Sections 21.2 through 21.7, Review of Project Prioritization and Annual Budget Process, apply to all SCRs.

(3)      The "next regularly scheduled meeting" of the Protocol Revision Subcommittee (PRS), the Technical Advisory Committee (TAC), an assigned TAC subcommittee (as defined below), the ERCOT Board, or the PUCT, shall mean the next regularly scheduled meeting for which required notice can be timely given regarding the item(s) to be addressed, as specified in the appropriate PUCT, ERCOT Board, or committee procedures.

(4)      ERCOT may make non-substantive corrections at any time during the processing of a particular NPRR.  Under certain circumstances, however, the Nodal Protocols can also be revised by ERCOT rather than using the NPRR process outlined in Section 21.4, Nodal Protocol Revision and System Change Procedure.

      (a)      This type of revision is referred to as an "Administrative NPRR" or "Administrative Changes" and shall consist of non-substantive corrections, such as typos (excluding grammatical changes), internal references (including table of contents), improper use of acronyms, and references to ERCOT Protocols, PUCT Substantive Rules, the Public Utility Regulatory Act (PURA), NERC regulations, Federal Energy Regulatory Commission (FERC) rules, etc.  Additionally, updates to Section 23, Forms, may also be processed as Administrative NPRRs.

      (b)      ERCOT shall post such Administrative NPRRs to the ERCOT website and distribute the NPRR to PRS.  If no Entity submits comments to the Administrative NPRR within ten Business Days in accordance with paragraph (1) of Section 21.4.4, Protocol Revision Subcommittee Review and Action, the Administrative NPRR shall be subject to PUCT approval.  Following PUCT approval, ERCOT

PUBLIC

**Appx. Page 566 of 740**

shall implement the Administrative NPRR according to paragraph (4) of Section 21.6, Nodal Protocol Revision Implementation. If any Entity submits comments to the Administrative NPRR, then it shall be processed in accordance with the NPRR process outlined in Section 21.4.

**21.2     Submission of a Nodal Protocol Revision Request or System Change Request**

(1)     The following Entities may submit a Nodal Protocol Revision Request (NPRR) or System Change Request (SCR) ("Revision Request"):

(a)     Any Market Participant;

(b)     Any ERCOT Member;

(c)     Public Utility Commission of Texas (PUCT) Staff;

(d)     The Reliability Monitor;

(e)     The North American Electric Reliability Corporation (NERC) Regional Entity;

(f)     The Independent Market Monitor (IMM);

(g)     ERCOT; and

(h)     Any other Entity that meets the following qualifications:

(i)     Resides (or represents residents) in Texas or operates in the Texas electricity market; and

(ii)     Demonstrates that Entity (or those it represents) is affected by the Customer Registration or Renewable Energy Credit (REC) Trading Program sections of these Protocols.

**21.3     Protocol Revision Subcommittee**

(1)     The Protocol Revision Subcommittee (PRS) shall review and recommend action on formally submitted Nodal Protocol Revision Requests (NPRRs) and System Change Requests (SCRs) ("Revision Requests") provided that:

(a)     PRS meetings are open to ERCOT, ERCOT Members, Market Participants, the Reliability Monitor, the North American Electric Reliability Corporation (NERC) Regional Entity, the Independent Market Monitor (IMM), and the Public Utility Commission of Texas (PUCT) Staff;

(b)     Each Market Segment is allowed to participate; and

(c)     Each Market Segment has equal voting power.

**Appx. Page 567 of 740**

(2)     Where additional expertise is needed, the PRS may refer a Revision Request to working groups or task forces that it creates or to existing Technical Advisory Committee (TAC) subcommittees, working groups or task forces for review and comment on the Revision Request.  Suggested modifications—or alternative modifications if a consensus recommendation is not achieved by a non-voting working group or task force—to the Revision Request should be submitted by the chair or the chair's designee on behalf of the subcommittee, working group or task force as comments on the Revision Request for consideration by PRS.  However, the PRS shall retain ultimate responsibility for the processing of all Revision Requests.

(3)     ERCOT shall consult with the PRS chair to coordinate and establish the meeting schedule for the PRS.  The PRS shall ensure that reasonable advance notice of each meeting, including the meeting agenda, is posted on the ERCOT website.

## 21.4     Nodal Protocol Revision and System Change Procedure

### 21.4.1     *Review and Posting of Nodal Protocol Revision Requests*

(1)     Nodal Protocol Revision Requests (NPRRs) shall be submitted electronically to ERCOT by completing the designated form provided on the ERCOT website.  Excluding ERCOT-sponsored NPRRs, ERCOT shall provide an electronic return receipt response to the submitter upon receipt of the NPRR.

(2)     The NPRR shall include the following information:

    (a)     Description of requested revision and reason for suggested change;

    (b)     Impacts and benefits of the suggested change on ERCOT market structure, ERCOT operations, and Market Participants, to the extent that the submitter may know this information;

    (c)     List of affected Nodal Protocol Sections and subsections;

    (d)     General administrative information (organization, contact name, etc.); and

    (e)     Suggested language for requested revision.

(3)     ERCOT shall evaluate the NPRR for completeness and shall notify the submitter, within five Business Days of receipt, if the NPRR is incomplete, including the reasons for such status.  ERCOT may provide information to the submitter that will correct the NPRR and render it complete.  An incomplete NPRR shall not receive further consideration until it is completed.  In order to pursue the NPRR, a submitter must submit a completed version of the NPRR.

**Appx. Page 568 of 740**

(4)     If a submitted NPRR is complete or upon completion of an NPRR, ERCOT shall post the NPRR on the ERCOT website and distribute to the Protocol Revision Subcommittee (PRS) within three Business Days.

(5)     For any ERCOT-sponsored NPRR, ERCOT shall also post an initial Impact Analysis on the ERCOT website, and distribute it to PRS.  The initial Impact Analysis will provide PRS with guidance as to potential ERCOT computer systems, operations, or business functions that could be affected by the submitted NPRR.

### 21.4.2     *Review and Posting of System Change Requests*

(1)     System Change Requests (SCRs) shall be submitted electronically to ERCOT by completing the designated form provided on the ERCOT website.  Excluding ERCOT-sponsored SCRs, ERCOT shall provide an electronic return receipt response to the submitter upon receipt of the SCR.

(2)     The SCR shall include the following information:

(a)     Description of desired additional system functionality or the additional information desired and reason for suggested change;

(b)     Impacts and benefits of the suggested change to ERCOT market structure, ERCOT operations and Market Participants, to the extent that submitter may know this information;

(c)     General administrative information (organization, contact name, etc.); and

(d)     Summary of requested changes to ERCOT systems.

(3)     ERCOT shall evaluate the SCR to determine whether the request should be submitted as an NPRR.  If ERCOT determines that the SCR should be submitted as an NPRR, ERCOT will notify the submitter within five Business Days of receipt, and the submitter shall withdraw its SCR and may submit an NPRR in its place.  If ERCOT deems it necessary for further review beyond the five Business Days, ERCOT shall notify the submitter.

(4)     ERCOT shall evaluate the SCR for completeness and shall notify the submitter, within five Business Days, if the SCR is incomplete, including the reasons for such status. ERCOT may provide information to the submitter that will correct the SCR and render it complete.  An incomplete SCR shall not receive further consideration until it is completed.  In order to pursue the SCR requested, the submitting Entity must submit a completed version of the SCR.

(5)     If a submitted SCR is complete or upon completion of an SCR, ERCOT shall post the SCR on the ERCOT website and distribute to the PRS within three Business Days.

(6)     For any ERCOT-sponsored SCR, ERCOT shall also post an initial Impact Analysis on the ERCOT website, and distribute it to PRS.  The initial Impact Analysis will provide

**Appx. Page 569 of 740**

PRS with guidance as to potential ERCOT computer systems, operations, or business functions that could be affected by the submitted SCR.

### 21.4.3 Withdrawal of a Nodal Protocol Revision Request or System Change Request

(1) A submitter may withdraw or request to withdraw an NPRR or SCR ("Revision Request") by submitting a completed Request for Withdrawal form provided on the ERCOT website. ERCOT shall post the submitter's Request for Withdrawal on the ERCOT website within three Business Days of submittal.

(2) The submitter of a Revision Request may withdraw the Revision Request at any time before PRS recommends approval of the Revision Request. If PRS has recommended approval of the Revision Request, the Request for Withdrawal must be approved by the Technical Advisory Committee (TAC) if the Revision Request has not yet been recommended for approval by TAC. If TAC has recommended approval of the Revision Request, the Request for Withdrawal must be approved by the ERCOT Board if the Revision Request has not yet been recommended for approval by the ERCOT Board. Once recommended for approval by the ERCOT Board, a Revision Request cannot be withdrawn.

### 21.4.4 Protocol Revision Subcommittee Review and Action

(1) Any ERCOT Member, Market Participant, the Public Utility Commission of Texas (PUCT) Staff, the Reliability Monitor, the North American Electric Reliability Corporation (NERC) Regional Entity, the Independent Market Monitor (IMM), or ERCOT may comment on a Revision Request.

(2) To receive consideration, comments must be delivered electronically to ERCOT in the designated format provided on the ERCOT website within 14 days from the posting date of the Revision Request. Comments submitted after the 14-day comment period may be considered at the discretion of PRS after these comments have been posted. Comments submitted in accordance with the instructions on the ERCOT website—regardless of date of submission—shall be posted to the ERCOT website and distributed to the PRS within three Business Days of submittal.

(3) The PRS shall consider the Revision Request at its next regularly scheduled meeting after the end of the 14-day comment period. At such meeting, the PRS may take action on the Revision Request. The quorum and voting requirements for PRS action are set forth in the Technical Advisory Committee Procedures. In considering action on a Revision Request, PRS may:

    (a) Recommend approval of the Revision Request as submitted or as modified;

    (b) Reject the Revision Request;

    (c) Table the Revision Request; or

Appx. Page 570 of 740

(d)     Refer the Revision Request to another TAC subcommittee, working group, or task force as provided in Section 21.3, Protocol Revision Subcommittee.

(4)     If a motion is made to recommend approval of a Revision Request and that motion fails, the Revision Request shall be deemed rejected by PRS unless at the same meeting PRS later votes to recommend approval of, table, or refer the Revision Request. If a motion to recommend approval of a Revision Request fails via e-mail vote according to the Electric Reliability Council of Texas Technical Advisory Committee Procedures, the Revision Request shall be deemed rejected by PRS unless at the next regularly scheduled PRS meeting or in a subsequent e-mail vote prior to such meeting, PRS votes to recommend approval of, table, or refer the Revision Request. The rejected Revision Request shall be subject to appeal pursuant to Section 21.4.12.1, Appeal of Protocol Revision Subcommittee Action.

(5)     Within three Business Days after PRS takes action, ERCOT shall post a PRS Report reflecting the PRS action on the ERCOT website. The PRS Report shall contain the following items:

(a)     Identification of submitter of the Revision Request;

(b)     Protocol language or summary of requested changes to ERCOT systems, recommended by the PRS, if applicable;

(c)     Identification of authorship of comments;

(d)     Proposed effective date(s) of the Revision Request;

(e)     Priority and rank for any Revision Requests requiring an ERCOT project for implementation; and

(f)     PRS action.

(6)     The PRS chair shall notify TAC of Revision Requests rejected by PRS.

### 21.4.5      *Comments to the Protocol Revision Subcommittee Report*

(1)     Any ERCOT Member, Market Participant, PUCT Staff, the Reliability Monitor, the NERC Regional Entity, the IMM, or ERCOT may comment on the PRS Report. Comments submitted in accordance with the instructions on the ERCOT website—regardless of date of submission—shall be posted on the ERCOT website and distributed to the committee(s) (i.e., PRS and/or TAC) considering the Revision Request within three Business Days of submittal.

(2)     The comments on the PRS Report will be considered at the next regularly scheduled PRS or TAC meeting where the Revision Request is being considered.

**Appx. Page 571 of 740**

*21.4.6*     *Revision Request Impact Analysis*

(1)     If PRS recommends approval of a Revision Request, ERCOT shall prepare an Impact Analysis based on the proposed language or proposed system changes in the PRS Report. If ERCOT has already prepared an Impact Analysis, ERCOT shall update the existing Impact Analysis, if necessary, to accommodate the language or system changes recommended for approval in the PRS Report.

(2)     The Impact Analysis shall assess the impact of the proposed Revision Request on ERCOT staffing, computer systems, operations, or business functions and shall contain the following information:

    (a)     An estimate of any cost and budgetary impacts to ERCOT for both implementation and on-going operations;

    (b)     The estimated amount of time required to implement the Revision Request;

    (c)     The identification of alternatives to the Revision Request that may result in more efficient implementation; and

    (d)     The identification of any manual workarounds that may be used as an interim solution and estimated costs of the workaround.

(3)     Unless a longer review period is warranted due to the complexity of the proposed PRS Report, ERCOT shall post an Impact Analysis on the ERCOT website, for a Revision Request for which PRS has recommended approval of, prior to the next regularly scheduled PRS meeting, and distribute to PRS. If a longer review period is required by ERCOT to complete an Impact Analysis, ERCOT shall submit comments with a schedule for completion of the Impact Analysis.

*21.4.7*     *Protocol Revision Subcommittee Review of Impact Analysis*

(1)     After ERCOT posts the results of the Impact Analysis, PRS shall review the Impact Analysis at its next regularly scheduled meeting. PRS may revise its PRS Report after considering the information included in the Impact Analysis or additional comments received on the PRS Report.

(2)     Within three Business Days of PRS consideration of the Impact Analysis and PRS Report, ERCOT shall post the PRS Report on the ERCOT website. If PRS revises the PRS Report, ERCOT shall update the Impact Analysis, if necessary, post the updated Impact Analysis on the ERCOT website, and distribute it to the committee(s) (i.e., PRS and/or TAC) considering the Impact Analysis. If a longer review period is required for ERCOT to update the Impact Analysis, ERCOT shall submit comments with a schedule for completion of the Impact Analysis.

(3)     If the Revision Request requires an ERCOT project for implementation, at the same meeting, PRS shall assign a recommended priority and rank for the associated project.

Appx. Page 572 of 740

### *21.4.8    Technical Advisory Committee Vote*

(1)     TAC shall consider any Revision Requests that PRS has submitted to TAC for consideration for which both a PRS Report and an Impact Analysis (as updated if modified by PRS under Section 21.4.7, Protocol Revision Subcommittee Review of Impact Analysis) have been posted on the ERCOT website.  The following information must be included for each Revision Request considered by TAC:

(a)     The PRS Report and Impact Analysis;

(b)     The PRS-recommended priority and rank, if an ERCOT project is required; and

(c)     Any comments timely received in response to the PRS Report.

(2)     The quorum and voting requirements for TAC action are set forth in the Technical Advisory Committee Procedures.  In considering action on a PRS Report, TAC shall:

(a)     Recommend approval of the Revision Request as recommended in the PRS Report or as modified by TAC;

(b)     Reject the Revision Request;

(c)     Table the Revision Request;

(d)     Remand the Revision Request to PRS with instructions; or

(e)     Refer the Revision Request to another TAC subcommittee or a TAC working group or task force with instructions.

(3)     If a motion is made to recommend approval of a Revision Request and that motion fails, the Revision Request shall be deemed rejected by TAC unless at the same meeting TAC later votes to recommend approval of, table, remand, or refer the Revision Request.  If a motion to recommend approval of a Revision Request fails via email vote according to the Electric Reliability Council of Texas Technical Advisory Committee Procedures, the Revision Request shall be deemed rejected by TAC unless at the next regularly scheduled TAC meeting or in a subsequent email vote prior to such meeting, TAC votes to recommend approval of, table, remand, or refer the Revision Request.  The rejected Revision Request shall be subject to appeal pursuant to Section 21.4.12.2, Appeal of Technical Advisory Committee Action.

(4)     Within three Business Days after TAC takes action on the Revision Request, ERCOT shall post a TAC Report reflecting the TAC action on the ERCOT website.  The TAC Report shall contain the following items:

(a)     Identification of the submitter of the Revision Request;

(b)     Modified Revision Request language proposed by TAC, if applicable;

(c)     Identification of the authorship of comments;

(d)     Proposed effective date(s) of the Revision Request;

(e)     Priority and rank for any Revision Requests requiring an ERCOT project for implementation;

(f)     PRS action;

(g)     TAC action;

(h)     Credit review;

(i)     IMM Opinion;

(j)     ERCOT Opinion; and

(k)     ERCOT Market Impact Statement.

(5)     If TAC recommends approval of a Revision Request, ERCOT shall forward the TAC Report to the ERCOT Board for consideration pursuant to Section 21.4.10, ERCOT Board Vote.


### 21.4.9     ERCOT Impact Analysis Based on Technical Advisory Committee Report

(1)     ERCOT shall review the TAC Report and, if necessary, update the Impact Analysis as soon as practicable.  ERCOT shall distribute the updated Impact Analysis, if applicable, to TAC and post it on the ERCOT website.  If a longer review period is required for ERCOT to update the Impact Analysis, ERCOT shall submit comments with a schedule for completion of the Impact Analysis.


### 21.4.10    ERCOT Board Vote

(1)     Upon issuance of a TAC Report and Impact Analysis to the ERCOT Board, the ERCOT Board shall review the TAC Report and the Impact Analysis at the next regularly scheduled meeting.  For Urgent Revision Requests, the ERCOT Board shall review the TAC Report and Impact Analysis at the next regularly scheduled meeting, unless a special meeting is required due to the urgency of the Revision Request.

(2)     The quorum and voting requirements for ERCOT Board action are set forth in the ERCOT Bylaws.  In considering action on a TAC Report, the ERCOT Board shall:

(a)     Recommend approval of the Revision Request as recommended in the TAC Report or as modified by the ERCOT Board;

(b)     Reject the Revision Request;

Appx. Page 574 of 740

(c)     Table the Revision Request; or

(d)     Remand the Revision Request to TAC with instructions.

(3)     If a motion is made to recommend approval of a Revision Request and that motion fails, the Revision Request shall be deemed rejected by the ERCOT Board unless at the same meeting the ERCOT Board later votes to recommend approval, table, or remand the Revision Request.  The rejected Revision Request shall be subject to appeal pursuant to Section 21.4.12.3, Appeal of ERCOT Board Action.

(4)     Within three Business Days after the ERCOT Board takes action on a Revision Request, ERCOT shall post a Board Report reflecting the ERCOT Board action on the ERCOT website.

### 21.4.11     PUCT Approval of Revision Requests

(1)     All Revision Requests require approval by the PUCT prior to implementation.

(2)     Within three Business Days after the PUCT takes action on a Revision Request, ERCOT shall post a PUCT Report reflecting the PUCT action on the ERCOT website.

### 21.4.12     Appeal of Action

(1)     The following processes are to be used to appeal an action related to a Revision Request.

### 21.4.12.1     Appeal of Protocol Revision Subcommittee Action

(1)     Any ERCOT Member, Market Participant, PUCT Staff, the Reliability Monitor, the IMM, the NERC Regional Entity, or ERCOT may appeal a PRS action to reject, table, or refer a Revision Request, directly to the TAC.  Such appeal to the TAC must be submitted electronically to ERCOT by completing the designated form provided on the ERCOT website within seven days after the date of the relevant PRS appealable event. ERCOT shall reject appeals made after that time.  ERCOT shall post appeals on the ERCOT website within three Business Days of receiving the appeal.  Appeals shall be heard at the next regularly scheduled TAC meeting that is at least seven days after the date of the requested appeal.  An appeal of a Revision Request to TAC suspends consideration of the Revision Request until the appeal has been decided by TAC.

### 21.4.12.2     Appeal of Technical Advisory Committee Action

(1)     Any ERCOT Member, Market Participant, PUCT Staff, the Reliability Monitor, the IMM, the NERC Regional Entity, or ERCOT may appeal a TAC action to reject, table, remand or refer a Revision Request directly to the ERCOT Board.  Appeals to the ERCOT Board shall be processed in accordance with the ERCOT Board Policies and Procedures.  An appeal of a Revision Request to the ERCOT Board suspends

**Appx. Page 575 of 740**

consideration of the Revision Request until the appeal has been decided by the ERCOT Board.

### 21.4.12.3    Appeal of ERCOT Board Action

(1)    Any ERCOT Member, Market Participant, PUCT Staff, the Reliability Monitor, the IMM, or the NERC Regional Entity may appeal any decision of the ERCOT Board regarding a Revision Request to the PUCT or other Governmental Authority.  Such appeal to the PUCT or other Governmental Authority must be made within any deadline prescribed by the PUCT or other Governmental Authority, but in any event no later than 35 days of the date of the relevant ERCOT Board appealable event.  Notice of any appeal to the PUCT or other Governmental Authority must be provided, at the time of the appeal, to ERCOT's General Counsel.  If the PUCT or other Governmental Authority rules on the Revision Request, ERCOT shall post the ruling on the ERCOT website.

### 21.5    Urgent and Board Priority Nodal Protocol Revision Requests and System Change Requests

(1)    The party submitting a Nodal Protocol Revision Request (NPRR) or System Change Request (SCR) ("Revision Request") may request that the Revision Request be considered on an urgent timeline ("Urgent") only when the submitter can reasonably show that an existing Protocol or condition is impairing or could imminently impair ERCOT System reliability or wholesale or retail market operations, or is causing or could imminently cause a discrepancy between a settlement formula and a provision of these Protocols.

(2)    The Protocol Revision Subcommittee (PRS) may designate the Revision Request for Urgent consideration upon a valid motion in a regularly scheduled meeting of the PRS or at a special meeting called by the PRS leadership.  Criteria for designating a Revision Request as Urgent are that the Revision Request requires immediate attention due to:

    (a)    Serious concerns about ERCOT System reliability or market operations under the unmodified language or existing conditions; or

    (b)    The crucial nature of settlement activity conducted pursuant to any settlement formula.

(3)    The ERCOT Board may designate any existing Revision Request a Board Priority Revision Request.  If the ERCOT Board directs ERCOT Staff to file a Revision Request, it may further direct that a Revision Request be designated a Board Priority Revision Request.  All Board Priority Revision Requests will be considered on an Urgent timeline.

(4)    ERCOT shall prepare an Impact Analysis for Urgent and Board Priority Revision Requests as soon as practicable.

**Appx. Page 576 of 740**

(5)     The PRS shall consider the Urgent or Board Priority Revision Request and Impact Analysis, if available, at its next regularly scheduled meeting, or at a special meeting called by the PRS leadership to consider the Urgent or Board Priority Revision Request.

(6)     If recommended for approval by PRS, ERCOT shall post a PRS Report on the ERCOT website within three Business Days after PRS takes action.  The Technical Advisory Committee (TAC) chair may request action from TAC to accelerate or alter the procedures described herein, as needed, to address the urgency of the situation.

(7)     Any Urgent or Board Priority Revision Requests shall be subject to an Impact Analysis pursuant to Section 21.4.9, ERCOT Impact Analysis Based on Technical Advisory Committee Report, and ERCOT Board consideration pursuant to Section 21.4.10, ERCOT Board Vote.


**21.6     Nodal Protocol Revision Implementation**

(1)     Following Public Utility Commission of Texas (PUCT) approval, ERCOT shall implement Nodal Protocol Revision Requests (NPRRs) on the first day of the month following PUCT approval, unless otherwise provided in the PUCT Report for the approved NPRR.

(2)     For such other NPRRs, the Impact Analysis shall provide an estimated amount of time required to implement the NPRR and ERCOT shall issue a Market Notice as soon as practicable, but no later than ten days prior to actual implementation, unless a different notice period is required in the PUCT Report for the approved NPRR.

(3)     If the PUCT approves changes to the Protocols, such changes shall be:

    (a)     Filed with the PUCT for informational purposes as soon as practicable, but no later than one day before the effective date of the changes; and

    (b)     Incorporated into the Protocols and posted on the ERCOT website as soon as practicable, but no later than one day before the effective date of the changes.

(4)     ERCOT shall implement an Administrative NPRR on the first day of the month following PUCT approval.


**21.7     Review of Project Prioritization and Annual Budget Process**

(1)     The Protocol Revision Subcommittee (PRS) shall recommend to the Technical Advisory Committee (TAC) an assignment of a project priority for each approved Nodal Protocol Revision Request (NPRR) and System Change Request (SCR) ("Revision Request") that requires an associated project.

(2)     Annually, the PRS shall review the priority of all market-requested projects and recommend new or revised project priorities for market-requested projects.

**Appx. Page 577 of 740**

(3) TAC shall consider the project priority of each Revision Request and make recommendations to the ERCOT Board.

(4) The ERCOT Board shall take one of the following actions regarding the project prioritization recommended by TAC:

(a) Approve the TAC recommendation as originally submitted or as modified by the ERCOT Board;

(b) Reject the TAC recommendation;

(c) Remand the TAC recommendation to TAC with instructions; or

(d) Table the TAC recommendation.

## 21.8 Review of Guide Changes

(1) The revision process for the ERCOT market guides shall be governed by the individual guides and assigned subcommittees. The Protocol Revision Subcommittee (PRS) shall review changes to market guides proposed by other subcommittees that may conflict with existing Protocols and report the results of its review to the submitting subcommittee.

**Appx. Page 578 of 740**

# APPENDIX E

FILED
23-0555
2/8/2024 9:15 PM
tex-84324539
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

NO. 23-0555

# In the
# Supreme Court of Texas

_____

## Public Utility Commission of Texas,

*Petitioner,*

v.

## RWE Renewables Americas, LLC and Tx Hereford Wind, LLC

*Respondents.*

_____

*On Petition for Review*
*Third Court of Appeals in Austin, Texas*
*No. 03-21-00356-CV*

_____

## BRIEF ON THE MERITS OF
## RWE RENEWABLES AMERICAS LLC AND TX HEREFORD WIND, LLC

_____

Michael J. Jewell
  State Bar No. 10665175
  michael@jewellandassociates.com
Jewell & Associates, PLLC
8404 Lakewood Ridge Cove
Austin, Texas 78738-7674
(512) 423-4065
(512) 236-5170 (fax)

Stephanie C. Sparks
  State Bar No. 24042900
  ssparks@vedderprice.com
Vedder Price PC
100 Crescent Court, Ste. 350
Dallas, Texas 75201
(469) 895-4830

Kurt Kuhn
  State Bar No. 24002433
  Kurt@KuhnHobbs.com
Lisa Bowlin Hobbs
  State Bar No. 24026905
  Lisa@KuhnHobbs.com
KUHN HOBBS PLLC
7000 North MoPac Expy., Suite 315
Austin, Texas 78731
(512) 476-6005
(512) 476-6002 (fax)

COUNSEL FOR RESPONDENTS

February 8, 2024

**Appx. Page 580 of 740**

# TABLE OF CONTENTS

Index of Authorities ..................................................................................................... v

Statement of the Case ................................................................................................. x

Statement Regarding the Record ............................................................................. xi

Issues Presented ........................................................................................................ xii

Reasons to Affirm ...................................................................................................... 1

Statement of Facts ...................................................................................................... 2

    A.    The Legislature amended PURA to require the unbundling of vertically integrated utility monopolies and establish a competitive electric power industry with wholesale prices set by the market. ................... 2

    B.    In response to its legislative mandate, the PUC created a competitive wholesale electric market through the adoption of a series of carefully crafted competition rules that require price be set by the market. ................. 4

    C.    In the middle of Winter Storm Uri, the PUC ordered the price of electricity being set by the market to be replaced by an artificially inflated fixed price set at the $9,000 cap. .......................................................... 8

    D.    The load shed price-setting orders replaced market prices with a fixed regulatory price, which had nothing to do with protecting the grid from collapse and did not generate more energy. ......................................... 10

    E.    After Storm Uri, without even attempting to follow the APA, the PUC quickly adopted the same approach from the February orders as a permanent new price-setting rule for future load shed events. .................... 13

Summary of Argument ............................................................................................. 17

Argument .................................................................................................................... 19

I.    Through PURA, the Legislature requires the wholesale price of electricity be set by the competitive market, and the PUC has no authority to adopt a rule to replace the market price with a fixed government price ....................... 19

Appx. Page 581 of 740

A.    While the PUC can regulate the market, the plain language and intent of PURA requires the wholesale price must still be set by the market, not government regulators. ............................................................ 20

    1.    This case is not about whether the PUC can regulate the market; the question is whether it can replace competitive pricing. ..................... 21

    2.    PURA requires the PUC allow competition to set the price of electricity, and it cannot adopt a rule to set a fixed price. ......................... 23

    3.    The PUC can regulate the market; it just cannot replace it with a fixed, non-competitive price. .................................................................. 26

    4.    The PUC cannot adopt rules to assert new powers not authorized by PURA. ........................................................................................ 29

B.    An inflated, fixed price set by the government is not an "accurate" market price determined by the normal forces of competition. ................... 30

    1.    This is no single VOLL for an ERCOT load shed event, and VOLL cannot tell the PUC what the market price should be. ............................ 31

    2.    Market prices fluctuate, and the PUC cannot predict the price. ............. 33

C.    The new price-setting rule seeks to adopt a policy decision that should be left to the Legislature and is a direct assault on the pro-competition policy adopted in PURA. ................................................................ 36

II.    This case has nothing to do with protecting the grid, and upholding the PUC's actions would undermine future investment in Texas. ............................ 38

III.    The new load shed price-setting rule is invalid because the PUC did not follow—or even attempt to satisfy—APA rulemaking requirements. ............... 40

A.    The new load shed price-setting rule is a "rule" requiring the PUC to comply with the APA for its adoption. ......................................................... 42

B.    The price-setting rule is a competition rule that alters or amends several existing competition rules that regulated pricing on the ERCOT market. ................................................................................... 45

C.    The PUC cannot circumvent APA rulemaking requirements by "delegating" rulemaking to ERCOT, which the PUC must still adopt. ................................................................................................ 47

Appx. Page 582 of 740

       1.     ERCOT cannot "adopt" new competition rules, and the PUC cannot shield new rules from validity challenges...................................... 47

       2.     New or amended wholesale market pricing rules should be subject to public notice and comment. ................................................... 52

   D.     Under PURA, validity challenges to the PUC's adoption of a new or amended competition rule must be brought by direct appeal. ..................... 53

       1.     There is no administrative process after the PUC has already issued a final order. ....................................................................... 54

       2.     The protocols cannot cut off the statutory right to file a direct appeal to challenge the validity of a new or amended rule....................... 55

       3.     There is no requirement to file a motion for rehearing or exhaust administrative remedies in order to challenge a rule................................ 58

Prayer ....................................................................................................... 59

Certificate of Compliance............................................................................ 60

Certificate of Service .................................................................................. 61

Appendix ................................................................................................... 62

**Appx. Page 583 of 740**

# INDEX OF AUTHORITIES

## CASES

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
141 S.Ct. 2485 (2021) ..................................................................................... 37

*Arizona v. Maricopa Cnty. Med. Soc'y*,
457 U.S. 332 (1982) ........................................................................................ 37

*Carreras v. Marroquin*,
339 S.W.3d 68 (Tex. 2011) ............................................................................. 50

*City of Alvin v. Pub. Util. Comm'n of Tex.*,
143 S.W.3d 872 (Tex. App.—Austin 2004, no pet.) .................................... 57, 58

*City of Corpus Christi v. Pub. Util. Comm'n*,
51 S.W.3d 231 (Tex. 2001) ...............................................................2, 3, 19, 34

*City of Laredo v. Laredo Merchs. Ass'n*,
550 S.W.3d 586 (Tex. 2018) ........................................................................... 37

*City of Richardson v. Oncor Elec. Delivery Co. LLC*,
539 S.W.3d 252 (Tex. 2018) ........................................................................... 37

*Collins v. Cnty. of El Paso*,
954 S.W.2d 137 (Tex. App.—El Paso 1997, pet. denied) ............................. 50

*Combs v. Entm't Publ'ns, Inc.*,
292 S.W.3d 712 (Tex. App.—Austin 2009, no pet.) ...................................... 45

*CPS Energy v. Elec. Reliability Council of Tex.*,
671 S.W.3d 605 (Tex. 2023) .....................................................................passim

*El Paso Hosp. Dist. v. Tex. Health & Human Servs. Comm'n*,
247 S.W.3d 709 (Tex. 2008) .....................................................................passim

*Garza v. Harrison*,
574 S.W.3d 389 (Tex. 2019) ........................................................................... 21

*Goeke v. Houston Lighting & Power Co.*,
797 S.W.2d 12 (Tex. 1990) ............................................................................. 34

*In re Konzak,*
    78 B.R. 990 (Bankr. D. N.D. 1987) ............................................... 33

*In re Oncor Elec. Delivery Co.,*
    630 S.W.3d 40 (Tex. 2021) (orig. proceeding) ...............................22, 34

*John Gannon, Inc. v. Tex. Dep't of Transp.,*
    No. 03-18-00696-CV, 2020 WL 6018646 (Tex. App.—Austin Oct. 9,
    2020, pet. denied) ....................................................................... 42

*Mosley v. Tex. Health & Human Servs. Comm'n,*
    593 S.W.3d 250 (Tex. 2019) ......................................................... 51

*Nat'l Soc. of Prof'l Eng'rs v. United States,*
    435 U.S. 679 (1978) ..................................................................... 37

*NCAA v. Alston,*
    141 S. Ct. 2141 (2021) ................................................................ 37

*Office of Pub. Util. Counsel v. Pub. Util. Comm'n,*
    131 S.W.3d 314 (Tex. App.—Austin 2004, pet. denied) ................... 41, 43, 47, 56

*Phillips v. Carlton Energy Grp., LLC,*
    475 S.W.3d 265 (Tex. 2015) ......................................................... 33

*Powell v. City of Houston,*
    628 S.W.3d 838 (Tex. 2021) .........................................................22, 49

*Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio,*
    53 S.W.3d 310 (Tex. 2001) ...........................................................passim

*Pub. Util. Comm'n v. Constellation Energy Commodities Grp., Inc.,*
    351 S.W.3d 588 (Tex. App.—Austin, 2011, pet. denied) ................... 43

*R.R. Comm'n of Tex. v. WBD Oil & Gas Co.,*
    104 S.W.3d 69 (Tex. 2003) ...........................................................44, 58

*Rodriguez v. Serv. Lloyds Ins. Co.,*
    997 S.W.2d 248 (Tex. 1999) ..........................................................41, 50, 51

**Appx. Page 585 of 740**

*State v. Jackson,*
  376 S.W.2d 341 (Tex. 1964)......................................................................29

*Teladoc, Inc. v. Tex. Med. Bd.,*
  453 S.W.3d 606 (Tex. App.—Austin 2014, pet. denied) ............................43, 46

*Tex. Mun. Power Agency v. Pub. Util. Comm'n,*
  253 S.W.3d 184 (Tex. 2007)......................................................................25

*Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n,*
  511 S.W.3d 28 (Tex. 2017)........................................................................29

*Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.,*
  136 S.W.3d 643 (Tex. 2004)......................................................................48

*TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns,*
  397 S.W.3d 173 (Tex. 2013)......................................................................37

*TXU Generation Co., L.P. v. Pub. Util. Comm'n,* 165 S.W.3d 821 (Tex. App.—
  Austin 2005, pet. denied) ....................................................................passim

*U.S. v. Socony-Vacuum Oil Co.,*
  310 U.S. 150, 220-21 (1940)......................................................................36

*United States v. Trenton Potteries Co.,*
  273 U.S. 392 (1927)..................................................................................36

## STATUTES, CODE, & RULES

16 TEX. ADMIN. CODE §22.1 ...............................................................................56, 58

16 TEX. ADMIN. CODE §22.251 ......................................................................55, 56, 57

16 TEX. ADMIN. CODE §25.501 ...........................................................................6, 45

16 TEX. ADMIN. CODE §25.505 (2021) ...............................................................6, 45

16 TEX. ADMIN. CODE §25.509 ...........................................................................6, 39

2021 Tex. Sess. Law Serv. Ch. 425 (S.B. 2) .........................................................13

Protocol §5.5.2 ................................................................................ 27

Protocol §6.5.7.3.1 ........................................................ 14, 22, 23, 24

Protocol §21.4.10 ........................................................................... 40

Protocol §21.4.11 ........................................................................... 49

TEX. GOV'T CODE §2001.001 ......................................................... 41

TEX. GOV'T CODE §2001.003 .................................................... 43, 44

TEX. GOV'T CODE §311.016 ........................................................... 21

TEX. R. APP. PROC. 4 .................................................................... 57

TEX. REV. CIV. STAT. ANN. art. 1446c, Act of June 2, 1975, 64th Leg., R.S., ch. 721, §1, 1975 TEX. GEN. LAWS 2327 ...................................... 2

TEX. UTIL. CODE §11.007 ........................................................ 41, 50

Tex. Util. Code §39.001 ..........................................................passim

Tex. Util. Code §39.151 ..........................................................passim

**OTHER AUTHORITIES**

28 Tex. Reg. 8901 (Oct. 10, 2003) ............................... 6, 34, 35, 46

31 Tex. Reg. 7317 (Sept. 8, 2006) ......................... 6, 7, 27, 38, 46

35 Tex. Reg. 6823 (Aug. 6, 2010) ................................................ 46

35 Tex. Reg. 10213 (Nov. 19, 2010) ............................................ 46

37 Tex. Reg. 8959 (Nov. 9, 2012) ............................................ 7, 46

Commission Proceeding to Ensure Resource Adequacy in Texas, PUC Docket No. 40000, "Submission of the Brattle Group's 'ERCOT Investment Incentives and Resource Adequacy Report,'" (July 24, 2012) ............... 39

ERCOT Nodal Operating Guides, Section 4: Emergency Operation .......................... 26

ERCOT Nodal Protocols, Section 5: Transmission Security and Reliability Unit Commitment .................................. 26

ERCOT, Load Participation in the ERCOT Nodal Market (Apr. 2015) .................. 5, 30

ERCOT, Methodology for Implementing Operating Reserve Demand Curve (ORDC) to Calculate Real-Time Reserve Price Adder (2013) ............................ 32

Feb. 15, 2021 Open Meeting Act Notice, Secretary of State ...................................... 8, 11

London Econ. Int'l LLC, *Estimating the Value of Lost Load* (June 17, 2013) ............ 31, 32

Merriam-Webster Dictionary ................................................................................ 49

Potomac Econ. Ltd., 2019 STATE OF THE MARKET REPORT FOR THE ERCOT ELEC. MARKETS (May 2020) ..................................................................... 27, 28, 33

Potomac Economics Ltd, 2020 STATE OF THE MARKET REPORT FOR THE ERCOT ELECTRICITY MARKETS (May 2021) ......................................................... 28

POTOMAC ECON. LTD., 2021 STATE OF THE MARKET REPORT FOR THE ERCOT WHOLESALE ELEC. MARKETS (May 2022) ............................................. 13

Sunset Advisory Commission, Staff Report with Final Results, Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel (June 2023) ................................................................ passim

**Appx. Page 588 of 740**

*Nature of Case*: This is a direct appeal, pursuant to TEX. UTIL. CODE §39.001(e)-(f), for judicial review of the validity of a new load shed price-setting rule adopted by the Public Utility Commission that changed existing competition rules governing the pricing of electricity and the use of the scarcity pricing mechanism in the ERCOT competitive market.[1]

In February 2021, during Winter Storm Uri, the PUC adopted orders creating an "exception to commission rules" which required that, during load shed, the actual price of electricity being set by the competitive market be replaced by an inflated, fixed regulatory price equal to the $9,000 price cap.[2]

In July 2021, without following the Administrative Procedure Act, the PUC adopted a new price-setting rule to provide a "permanent pricing solution" consistent with the approach taken by the PUC during Storm Uri. Under the new rule, while load shed is being ordered during EEA3, the wholesale price of electricity is required to be administratively set and fixed at the price cap. The rule is admittedly designed to create "price outcomes."[3]

*Court of Appeals*: Third Court of Appeals. Justices Baker, Theofanis, and Jones.[4]

*Disposition by*
*Court of Appeals*: In a unanimous opinion authored by Justice Jones, the court held the new load shed price-setting rule is invalid based on two independent grounds: (1) it exceeds the PUC's statutory authority by setting a fixed regulatory price for electricity instead of a competitive market price; and (2) the PUC adopted the new price-setting rule without complying with mandatory APA rulemaking procedures.[5]

---

[1] July 16, 2021 Order Approving Nodal Protocols, 3AR84-86.

[2] Feb. 15, 2021 Order Directing ERCOT to Take Action and Granting Exception to Comm'n Rules (PUC Project No. 51617), attached to Resp. to Pet. as Tab B; Feb. 16, 2021 Second Order Directing ERCOT to Take Action and Granting Exception to Comm'n Rules (PUC Project No. 51617), attached to Resp. to Pet. as Tab C.

[3] 3AR84-86; July 14, 2021 PUC Mem. for July 15, 2021 Open Meeting, relevant pages attached as Tab A, 2AR5-10, 26-41.

[4] J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment.

[5] *RWE Renewables Americas, LLC v. Pub. Util. Comm'n*, 669 S.W.3d 566 (Tex. App.—Austin 2023, pet. granted).

## STATEMENT REGARDING THE RECORD

In response to the court of appeals' notice to file the rulemaking record, the PUC filed a notice indicating that no such record exists.[6] In its place, the PUC filed a compilation of two documents, which it indicated are the only two documents filed in Project No. 52307 from the records of the agency that relate to the protocols approved in the July 16 order. The documents are not consecutively paginated, and (although there are only two documents), they are labelled as items "2" and "3." Respondents will refer to these documents as the Agency Record. For clarity, citations to tabs and pages in the Agency Record are provided by first citing to the "Item No." and then to the actual page of the filed PDF, and are listed as "__AR__."

---

[6] Aug. 30, 2021 Notice Regarding Filing of Record, No. 03-21-00356-CV, in the Third Court of Appeals.

## ISSUES PRESENTED

1.  Through PURA, the Legislature requires the wholesale price of electricity be set by the competitive market, not government regulators. But the PUC adopted a new price-setting rule that, during load shed, replaces the wholesale market price for electricity on the ERCOT market with a price fixed at the maximum cap. Does PURA give the PUC authority to replace the market price of electricity with a fixed regulatory price?

2.  An agency pronouncement that departs from and effectively changes an agency rule is itself a "rule" under the Administrative Procedure Act. The PUC adopted the new load shed price-setting rule and changed the method of pricing electricity and the use of the scarcity pricing mechanism during load shed. Is the new price-setting rule a "rule" under the APA that departed from or changed existing competition rules on the market?

3.  The Administrative Procedure Act sets out the minimum standards an agency must follow when adopting a new or amended rule, and failure to comply with those requirements renders the rule invalid. With the July 16 Order, the PUC approved and adopted the new load shed price-setting rule, but did not even attempt to comply with any of the requirements of the APA. Is the new rule invalid because the PUC did not follow the APA's requirements?

# REASONS TO AFFIRM

Despite the PUC's feigned alarm, this case is not about protecting the grid or preventing the PUC from regulating the market or balancing competing interests. The issue is whether the agency can simply override or ignore clear policy choices made by the Legislature. The court of appeals correctly held that the agency could not.

To the benefit of all Texans, the Legislature deregulated the electric utility industry and mandated the price of electricity be determined by the competitive market. Over two decades later, the PUC has adopted a new load shed price-setting rule, by which it can order market pricing to stop and to be replaced by a fixed price. Under PURA, the PUC cannot eliminate market pricing and replace it with a fixed government price. Every agreement to fix prices eliminates competition, and the price-setting rule is a direct assault on the Legislature's policy choice. If the PUC wants the ability to turn off the market, it should ask the Legislature for such authority.

In adopting this new rule that changes both the method of pricing and the use of the scarcity pricing mechanism, the PUC did not even attempt to satisfy APA rule-making requirements. The Legislature has made it clear the APA requirements apply to proceedings under PURA and sets the floor for rulemaking. The PUC followed the APA when it originally adopted its competition rules to create competitive pricing and the scarcity pricing mechanism. If the PUC wants to amend or abandon those rules for the fixed-price model it used during Storm Uri, it should follow the same process, with public notice and comment, instead of adopting the new rule in an echo chamber.

1

**A.** **The Legislature amended PURA to require the unbundling of vertically integrated utility monopolies and establish a competitive electric power industry with wholesale prices set by the market.**

In 1975, the Public Utility Regulatory Act (PURA) was enacted to create a comprehensive regulatory scheme for electric utilities.[7] At the time, the Legislature concluded these utilities were "by definition monopolies in the areas they serve," and that as a result the "normal forces of competition which regulate prices in a free enterprise society do not operate."[8] Under the original statutory scheme, "[r]egulation was intended to be a substitute for competition."[9]

Over the years, however, there were significant changes to the electric industry, with partial deregulation at the national level and deregulation in other states.[10] In 1999, the Texas Legislature restructured the electric utility industry, amending PURA to require the unbundling of vertically integrated electric utility monopolies and establishing a fully competitive electric market.[11] Each electric utility was required to separate into distinct companies responsible for either power generation, retail electricity, or transmission and distribution.[12]

---

[7] *City of Corpus Christi v. Pub. Util. Comm'n*, 51 S.W.3d 231, 236 (Tex. 2001).

[8] *Id.* (quoting former TEX. REV. CIV. STAT. ANN. art. 1446c, Act of June 2, 1975, 64th Leg., R.S., ch. 721, §1, 1975 TEX. GEN. LAWS 2327).

[9] *Id.*

[10] *Id.* at 237.

[11] *CPS Energy v. Elec. Reliability Council of Tex.*, 671 S.W.3d 605, 612 (Tex. 2023).

[12] *City of Corpus Christi*, 51 S.W.3d at 237.

2

Underpinning the Legislature's decision to restructure the electric power industry was its finding that "the production and sale of electricity is not a monopoly warranting regulation of rates, operations, and services."[13] It further found that, except for transmission and distribution services and the recovery of stranded costs, "the public interest in competitive electric markets requires . . . electric services and their prices should be determined by customer choices and the normal forces of competition."[14] As a result, the Legislature ordered competition in the wholesale electricity market.[15]

To protect the public interest in the competitive market, the Legislature enacted Chapter 39 of the Texas Utilities Code. The statute precludes regulators from making any rules or orders regulating competitive electric services, prices, and competitors, or restricting or conditioning competition, except as authorized by the statute.[16] The law requires that regulatory authorities use competitive rather than regulatory methods and "adopt rules and issue orders that are both practical and limited so as to impose the least impact on competition."[17] The Legislature "decided that both retail and wholesale electricity markets should be governed by market forces," and "both wholesale and retail rates are now set by the market."[18]

---

[13] *Id.*; TEX. UTIL. CODE §39.001(a), attached as Tab C. Many of the statutes, rules, and protocols at issue have been amended in various ways. When relevant, the prior version will be noted; otherwise, citations herein are to the current version.

[14] TEX. UTIL. CODE §39.001(a).

[15] *Pub. Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 312 (Tex. 2001).

[16] TEX. UTIL. CODE §39.001(c).

[17] TEX. UTIL. CODE §39.001(d).

[18] *TXU Generation Co., L.P. v. Pub. Util. Comm'n*, 165 S.W.3d 821, 831, 834 (Tex. App.—Austin 2005, pet. denied).

Appx. Page 594 of 740

**B. In response to its legislative mandate, the PUC created a competitive wholesale electric market through the adoption of a series of carefully crafted competition rules that require price be set by the market.**

The electric market in Texas runs through a network of transmission lines that form a grid covering the majority of the state, overseen by the Electric Reliability Council of Texas.[19] PURA requires the PUC certify an independent system operator (ISO) for the power region, and the PUC certified ERCOT.[20] "ERCOT is essentially a large, sophisticated IT organization that manages the flow of electricity through the 'ERCOT grid,' delivering power to more than 26 million Texas customers, representing about 90 percent of the electricity consumed in the state."[21] ERCOT's authority to act in the capacity as the certified ISO is derived from PURA.[22] ERCOT performs its functions under the direct oversight of the PUC, and must do so in compliance with PURA.[23] ERCOT is directly accountable to the PUC, and the PUC has authority over ERCOT, including its protocols, which are the rules by which ERCOT manages the market and grid.[24] While ERCOT is the ISO for the grid, "[u]nder PURA, the PUC—a governmental entity—was given the 'general power' to regulate and supervise public utilities."[25]

---

[19] *City Pub. Serv. Bd.*, 53 S.W.3d at 312.
[20] *CPS Energy*, 671 S.W.3d at 612.
[21] Sunset Advisory Commission, Staff Report with Final Results, Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel, at A9 (June 2023), attached as Tab B.
[22] *CPS Energy*, 671 S.W.3d at 612.
[23] *Id.* at 616.
[24] *Id.* at 612, 616; Tab B at 20.
[25] *Id.* at 616.

In response to the Legislature's mandate to deregulate the electric power industry and set prices by competition, the PUC created a competitive wholesale market. The wholesale electric market is the buying and selling of electricity between generators and those who ultimately sell it to consumers.[26] Underlying both the legislative mandate and the marketplace is the fact that "[e]lectricity is a consumable resource that can be bought, sold, and traded in a marketplace."[27] As found by the Legislature, "the sale of electricity is not a monopoly warranting regulation of rates" and "prices should be determined by customer choices and the normal forces of competition."[28] As originally designed, the wholesale competitive marketplace did exactly that.

The competitive wholesale electric market is "an economic system for the production and sale of wholesale electricity relying on competitive forces of supply and demand rather than PUC regulation to set wholesale electricity rates in the ERCOT region."[29] The actual prices paid for electricity are supposed to be "based on bids and offers in the various ERCOT-operated markets."[30]

The design of the competitive market was a deliberative process. After the Legislature mandated price be set by competition, the PUC implemented that approach by adopting a series of carefully considered competition rules over several years.

---

[26] Tab B at 9.

[27] *Id.* at 8.

[28] TEX. UTIL. CODE §39.001(a).

[29] Tab B at 116.

[30] ERCOT, Load Participation in the ERCOT Nodal Market, at 7 (Apr. 2015), attached as Tab D.

Appx. Page 596 of 740

The current market framework originated in 2003 with the PUC's adoption of §25.501, laying out the wholesale market design for ERCOT. It requires the use of competitive nodal energy prices determined through auctions. It also requires ERCOT's protocols and rules for the wholesale electric market support competition.[31] The PUC recognized §25.501 constituted a major step in implementing an improved wholesale market design for ERCOT that is consistent with microeconomic principles.[32] Section 25.501 was designed to increase price transparency and "provide participants in the wholesale and retail markets with more accurate wholesale prices."[33]

In 2006, the PUC adopted §25.505, establishing a scarcity pricing mechanism.[34] The rule seeks to induce investment in new generating facilities by allowing prices to rise in response to scarcity in the market.[35] Prices are allowed to rise and fall according to the market, only limited by a pair of offer caps—the low system-wide offer cap (LCAP) and the high system-wide offer cap (HCAP).[36] At the time of its adoption, some argued price should rise without limit, but the PUC determined a cap was necessary to avoid "excessive transfers of wealth from load to generation without any additional benefits to the market."[37]

---

[31] 16 TEX. ADMIN. CODE §25.501(a), (f), attached as Tab E; 28 Tex. Reg. 8901, 8902 (Oct. 10, 2003), attached as Tab F (highlights added).
[32] Tab F, at 8911.
[33] *Id.* at 8901-02.
[34] 16 TEX. ADMIN. CODE §25.505(a), (g) (2021), attached as Tab G. The scarcity pricing mechanism has been relocated to 16 TEX. ADMIN. CODE §25.509.
[35] 31 Tex. Reg. 7317, 7319 (Sept. 8, 2006) (highlights added), attached as Tab H .
[36] 16 TEX. ADMIN. CODE at §25.505(g)(6).
[37] Tab H at 7333-34, -46.

6

Prior to the adoption of the current system, the PUC had set a system-wide offer cap at $1,000 per megawatt hour. The PUC recognized that level was not sustainable.[38] The current system employed two caps.[39] Recognizing the need to monitor the scarcity pricing mechanism, the PUC indicated the Independent Market Monitor would review it annually, subject to public comment.[40] Following extensive study and comment, using a rule-making, the PUC incrementally raised the HCAP over the years, before, in 2015, it was set at $9,000 per megawatt hour—the level it stayed until recently.[41]

These competition rules are fundamental to the proper design and function of the competitive wholesale market. The PUC designed the market as an energy-only market, which means power generators receive payment only for the electricity they produce.[42] This contrasts with a capacity market in which generators also receive compensation for reserving generation capacity in case it becomes necessary.[43] Instead of creating a capacity market, the PUC adopted the scarcity pricing mechanism, in conjunction with nodal auctions, to "use competitive rather than regulatory methods to achieve the goals of PURA."[44] The PUC adopted the scarcity pricing approach as "an appropriate tool for maintaining adequate reserves in a competitive market."[45]

---

[38] *Id.* at 7328.
[39] *Id.* at 7318, 7348.
[40] *Id.* at 7346.
[41] 37 Tex. Reg. 8959, 8961-62, 8971 (Nov. 9, 2012).
[42] Tab B at 117.
[43] *Id.* at 115.
[44] Tab H at 7319.
[45] *Id.* at 7331.

Appx. Page 598 of 740

**C.     In the middle of Winter Storm Uri, the PUC ordered the price of electricity being set by the market to be replaced by an artificially inflated fixed price set at the $9,000 cap.**

In February 2021, a polar air mass resulted in historic low temperatures in Texas. Cold air combined with other weather systems to produce ice storms and record snow. The severe weather had effects throughout the state, including on the electricity market. The low temperatures resulted in high energy demand while severe weather curtailed generation. Demand exceeded supply, and on February 15, ERCOT issued its highest state of emergency, an Energy Emergency Alert Level 3, which results in customer load shed (commonly known as "blackouts"). Given weather predictions, ERCOT expected to remain at EEA3 and load shed to continue for a sustained period.[46]

As expected, the weather dramatically raised energy prices on the competitive market. On February 15, 2020, the price ranged from $10.22 to $28.74 per megawatt hour. On the same day in 2021, the price ranged from $1,403.49 to $9,004.59.[47]

That night, the PUC commissioners held an abrupt telephone meeting. The PUC decided to "consider whether the system demand component of energy prices should be set at the system-wide offer cap when firm load is being shed."[48] Simply understood, the PUC was deciding whether to order the price of electricity being set by the market to be replaced by a price administratively fixed at the cap.

---

[46] Feb. 15, 2021 Open Meeting Act Notice, Secretary of State's website here, last visited February 8, 2024; Resp. to Pet. Tab B.
[47] These numbers reflect ERCOT's average real-time settlement hub prices as publicly posted on its website: http://www.ercot.com/mktinfo/prices/.
[48] Open Meeting Act Notice, supra n. 46.

Chair DeAnn Walker said she believed there were "distortions" in the market. Walker admitted it "may be the wrong term, but that's what I'm going to call it right now." Commissioner Arthur D'Andrea said, "I think we all expected that when we were in load shed, we would be at $9,000." Walker added, "I was a little surprised when I learned today that, you know, we've been in load shed since about 1:00 this morning and that the prices weren't at the scarcity pricing, and – and I was somewhat surprised about that."[49]

Commissioner Shelly Botkin noted "these changes are – they are a big deal." Walker agreed. However, after just a few minutes, the PUC voted to order "ERCOT to take immediate action in granting exception to Commission rules."[50]

In the resulting order, the PUC indicated it "believes" it was "inconsistent with the fundamental design of the ERCOT market" for the price to be lower than the cap. Explaining its false supposition, the order states, "Energy prices should reflect scarcity of the supply. If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest." The PUC ordered ERCOT to replace the competitive market price of electricity by administratively fixing the wholesale price of electricity, during load shed, at the maximum allowed, which was then $9,000.[51]

---

[49] Feb. 15, 2021 Open Meeting, at 2-4, attached to Resp. to Pet. as Tab D.
[50] *Id.* at 3-5.
[51] Resp. to Pet. Tab B.

9

Appx. Page 600 of 740

The following afternoon, the PUC held a second meeting. Walker said, after "discussions with some people who really understand this issue," she wanted to modify the order. Walker felt she "made a mistake" and "moved . . . too quickly" when making the decision retroactive. Walker admitted she acted "in haste" and "probably incorrectly" because "many companies had relied on the market as it stood at the time and made decisions in the market based on what they were seeing and where the market was at that time."[52] The PUC rescinded the retroactive portion of the order.[53]

**D.** **The load shed price-setting orders replaced market prices with a fixed regulatory price, which had nothing to do with protecting the grid from collapse and did not generate more energy.**

Trying to justify replacing the market price, the PUC now cites its own court of appeals' brief to claim the pricing orders were merely correcting a problem with a computer algorithm and were necessary to save a grid within minutes of collapse.[54] Neither of these claims is true.

The Independent Market Monitor testified to the Legislature that there was no "glitch" in the real-time pricing and the software worked the way it was written.[55] ERCOT's VP for Commercial Operations, Kenan Ogelman testified, "[t]he system was generating prices consistent with the protocols that we had."[56] ERCOT's interim CEO,

---

[52] Feb. 16, 2021 Open Meeting, at 2, 4-7, attached Resp. to Pet. as Tab I; Resp. to Pet. Tab C.
[53] *Id.* at 4-7; Resp. to Pet. Tab C.
[54] PUC Br. 7-8, 38-39.
[55] Mar. 11, 2021 Senate Comm. on Jurisprudence, at 57, attached as Tab I.
[56] Mar. 4, 2021 Senate Comm. on Bus. & Commerce, at 10, attached as Tab J.

Brad Jones, testified it would be inaccurate to claim administratively raising and holding the price at $9,000 was done within the market rules.[57]

As to the threat of grid collapse, ERCOT CEO Bill Magness testified the threat to the grid occurred between 1:23 a.m. and 2:03 a.m. on the morning of February 15.[58] ERCOT's response to fix the threat to the grid was to "shed additional load." Magness testified "we stabilized the frequency at that point, and we kept the frequency stabilized for the rest of the event."[59] Replacing the market price had nothing to do with protecting the grid.

The PUC did not even meet to discuss the pricing orders until 5:20 p.m., more than 15 hours after ERCOT was able to stabilize the grid using load shed.[60] Moreover, not once during the PUC's February 15, 2021 meeting—nor in the accompanying order—was there any mention of the grid or needing to stabilize it.[61] Instead, the meeting was simply about the wholesale price being set by the market, and the only issue discussed was the commissioners' agreement to replace the market price with a regulatory price pegged to the $9,000 cap—which is exactly what the PUC did with its orders.

---

[57] May 4, 2021 Senate Comm. on Bus. & Commerce, at 9, attached as Tab K.
[58] Feb. 25, 2021 Senate Comm. on Bus. & Commerce, at 19, attached as Tab L.
[59] *Id.* at 20-21.
[60] Open Meeting Act Notice, *supra* n. 46; Resp. to Pet Tab M at 1.
[61] *See* Resp. to Pet Tab B; Resp. to Pet. Tab H.

11

Appx. Page 602 of 740

While the internal mechanics of ERCOT protocols can be complicated, the PUC's actions during Storm Uri were not. The PUC entered orders for a "pricing intervention to occur during firm load shed."[62] Instead of letting market pricing continue to function as designed, the PUC ordered ERCOT to implement "pricing outcomes" set by the PUC.[63] This was an "out-of-market action" that caused the price of electricity to be higher than the market price.[64] This is the first time since deregulation "the market rules have been abandoned for a price set by the government."[65]

The fixed-price ordered by the PUC did not lead to any additional generation of electricity during the Storm Uri event. Instead, after the PUC set the price, generation continued to fall.[66] This occurred even though generators are not allowed to shut down during an emergency regardless of the price set by the market.[67]

Generation did not increase with the inflated price because the problem had nothing to do with the market price.[68] Magness testified, "everything that was available was running, and there was no reason it wouldn't run for price."[69] The reason ERCOT

---

[62] Tab I at 13.
[63] ERCOT, M-C021521-01: Emergency Order of the Pub. Util. Comm'n Affecting ERCOT Market Prices (Feb. 15, 2021), ERCOT's website available here, last visited February 8, 2024.
[64] Tab I at 199-200.
[65] Tab J at 93-94; Tab I at 41.
[66] Tab L at 161.
[67] Tab I at 36.
[68] Tab L at 161.
[69] *Id.* at 192.

Appx. Page 603 of 740

could not add capacity was strictly because generators could not run due to the weather—everything "that could run was running."[70]

Instead, the PUC's inflated government price simply increased energy charges for both consumers and electric companies by billions of dollars. Soon after the event, there was legislative testimony that, while the total spent for electricity invoiced on the ERCOT market for 2020 was around $5 billion, the PUC's artificial price charged users four times that amount—over $21 billion—in just five days.[71] The independent market monitor has since placed the total spent for electricity during the event at $59 billion.[72]

**E.     After Storm Uri, without even attempting to follow the APA, the PUC quickly adopted the same approach from the February orders as a permanent new price-setting rule for future load shed events.**

While generating no additional energy during the storm, the PUC's February orders spawned bankruptcies, lawsuits, legislative hearings and action. A major piece of legislation that came out of the aftermath was S.B.2, addressing the governance of the PUC and ERCOT.[73] The new law required: (1) the establishment and implementation of a formal process for adopting any new protocols or revisions to existing protocols that includes PUC approval; and (2) ERCOT protocols and rules cannot take effect before receiving PUC approval.[74] After the law passed, ERCOT did

---

[70] *Id.* at 201.

[71] Tab J at 24.

[72] POTOMAC ECON. LTD., 2021 STATE OF THE MARKET REPORT FOR THE ERCOT WHOLESALE ELEC. MARKETS, at ii (May 2022) available Here; Tab B at 80.

[73] 2021 Tex. Sess. Law Serv. Ch. 425 (S.B. 2).

[74] *Id.* These requirements were originally added to §39.151(d), but have subsequently been moved to §39.151(g-6) without any material change.

Appx. Page 604 of 740

not establish a new formal process for adopting new or revised protocols with PUC approval, but the PUC still quickly adopted a new price-setting rule.

Following the passage of S.B.2, the PUC opened Project No. 52307 to review proposed rules adopted by ERCOT during 2021. Relevant to this appeal was Nodal Protocol Revision Request (NPRR) 1081, which proposed revisions to the Real-Time Reliability Deployment Price Adder to "consider" firm load shed. While the new language adds load shed as one factor considered by the price adder,[75] it also separately adopts a price-setting rule that, while load shed is being ordered during EEA3, the price adder is set to automatically require wholesale electricity be priced at the cap.[76]

ERCOT indicated the proposed changes were designed to be a permanent solution consistent with the PUC's February price-setting orders. The new rule is designed to create "pricing outcomes."[77] The PUC's staff said that, "[w]hile a comprehensive analysis of the February 2021 events related to Winter Storm Uri and its impacts on the ERCOT wholesale electric market is ongoing . . . . Consistent with the direction provided during Uri, NPRR1081 will provide a permanent pricing solution . . . ."[78]

On July 14, 2021, the staff filed NPRR1081 at the PUC for the Commission to consider and take action on the proposed rule during its open meeting the following

---

[75] Protocol §6.5.7.3.1(1)(i).
[76] Protocol §6.5.7.3.1(2)(p); 2AR26-27, 40.
[77] 2AR27, 39.
[78] 2AR40.

Appx. Page 605 of 740

day.[79]  At the meeting, there was no substantive discussion before the new rule was adopted:

Chairman Lake: All right.  We do not have anything for Closed Session.

. . . .

Mr. Journeay: We do have Item 26, sir.

Chairman Lake: Oh, sorry.  Oh, I'm sorry.  Sorry, Rebecca.  It's an important one.

(Laughter)

Ms. Zerwas: Rebecca Zerwas for Commission Staff.  I filed a memo.  I speak to require the Commission to formally adopt ERCOT rules.  There have been two NPRRs, NPRR1080 and 1081, and two OBDRRs, OBDRR030 and 031, that have been approved since the SB 2 signing dates.

So, we have proposed an interim process for the Commission to approve these rule changes and are working with ERCOT on confirming to a more formal process, and it will be opening ERCOT Governance Rules, as well.

Chairman Lake: Yes, this is an important one.  Apologize for my oversight.  Thank you for the memo.  That works for me.

Thoughts?

Comm. McAdams: Same.

Chairman Lake: All right.  Is there a –

Comm. Cobos: Agree.

Chairman Lake: Is there a motion to approve the rules?

Mr. Journeay: The proposed order --

Chairman Lake: The proposed order.

Comm. McAdams: So moved.

---

[79] 2AR6.

15

| Chairman Lake: | Second? |
|---|---|
| Comm. Cobos: | Second. |
| Chairman Lake: | All in favor, say, "Aye." |

(All those voting in favor so responded)

| Chairman Lake: | The motion passes.[80] |
|---|---|

There was no other discussion of the new rule by the Commission.

This direct appeal of the Commission's new price-setting rule timely followed. The court of appeals held the new load shed price-setting rule was a "rule" under the APA because it implements or proscribes a new pricing policy that is intended to and will affect the rights of private parties.[81] The court also held it was a "competition rule" under Section 39.001(e), noting neither side argued there was any material distinction in this case between a "competition rule" under PURA and a "rule" as defined by the APA.[82] The court held that, by effectively setting the price of wholesale power during load shed, the new rule exceeded the PUC's statutory authority.[83] Finally, as an independent basis for its ruling, the court held the rule was invalid because the PUC did not comply with the mandatory rulemaking procedures set forth in the APA.[84]

---

[80] July 15, 2021 PUC Open Meeting, at 90-91, attached as Tab M.
[81] *RWE Renewables Americas*, 669 S.W.3d at 574.
[82] *Id.* at 573 n.3.
[83] *Id.* at 575-76.
[84] *Id.* at 576-83.

16

## SUMMARY OF ARGUMENT

Two decades ago, the Legislature made an important policy decision to unbundle electric utility monopolies and establish a competitive electric market. Under the old scheme, regulation substituted for competition. But the Legislature decided that practice should end. It mandated the wholesale price of electricity be determined by the competitive market. The result of that policy choice has benefited all Texans, by creating efficient competition and keeping electricity prices low.

Now, for the first time since deregulation, the PUC is trying to abandon market pricing. Copying the pricing orders it threw together during Storm Uri, the PUC has adopted a new, permanent price-setting rule. The rule creates pricing outcomes chosen by the Commission. Under the rule, when load shed is ordered, market pricing stops, and the price for electricity is fixed at the cap.

PURA does not give the PUC authority to suspend the market and set a government price. The plain text of PURA requires the price of electricity be set by the market, not regulators. This case has nothing to do with protecting the grid. The PUC can regulate the market and must balance competing interests. But it cannot, under PURA, do so by eliminating market-based pricing.

None of the PUC's other tools for regulating the market involve eliminating market pricing. During load shed, while the number of participating consumers is reduced, price is still set by market auctions. If the PUC requires generators to produce, the rules still allow the generator to choose to be paid the market price. And the scarcity

17

pricing mechanism has caps and price adders to prevent market abuse or distortion, but they do not stop competitive market forces from fluctuating and setting the price.

The PUC cannot claim to be able to better predict market price than the market. The PUC's theory that it can "pull on generation" during an emergency by setting price was proven wrong during Storm Uri. Prior to the fixed price, all generators running were willing and able to sell on the market for less than the cap most of the time, and the price-setting rule only created a windfall for generators and punished consumers.

Regardless of justification, every agreement to fix prices eliminates competition, and the price-setting rule is a direct assault on the Legislature's policy choice. If the PUC thinks it needs authority to suspend the market and order a fixed, regulatory price, the proper way to seek such authority is at the Legislature, not by administrative fiat.

Compounding error, in adopting the new price-setting rule, the PUC did not follow or even attempt to satisfy APA rule-making requirements. The PUC's order adopting the new price-setting rule is a "rule" under the APA because it interprets its authority and the competition rules, and it implements and prescribes a new requirement that, during load shed, the price of electricity be administratively fixed at the cap. In adopting the new rule, the PUC altered or amended several competition rules, including the use of nodal auctions and the scarcity pricing mechanism. Each of the prior rules was a competition rule, adopted by the PUC following APA requirements. The PUC cannot amend those rules without going through the same APA rule-making process.

18

Appx. Page 609 of 740

**I.** **Through PURA, the Legislature requires the wholesale price of electricity be set by the competitive market, and the PUC has no authority to adopt a rule to replace the market price with a fixed government price.**

More than two decades ago, the Texas Legislature made an important policy decision to unbundle vertically integrated utility monopolies and establish a competitive electric market. Under the old scheme, "regulation was intended to be a substitute for competition." *City of Corpus Christi*, 51 S.W.3d at 236. But the Legislature decided that practice should end. The Legislature found "the production and sale of electricity was not a monopoly warranting the regulation of rates," and it amended PURA to require "prices should be determined by customer choices and the normal forces of competition." TEX. UTIL. CODE §39.001(a).

The result of the Legislature's policy choice to embrace a competitive electricity market has greatly benefited Texans. "Following deregulation of major portions of the electric market in 1999, Texas' 'energy-only' electric market operated as designed, with lucrative competition keeping electricity prices low."[85]

The PUC, however, would like to go back to the way things were. The PUC believes it can order market pricing to stop and substitute what the agency thinks should be the price. The new rule was designed to create "pricing outcomes" chosen by the PUC.[86] Under the PUC's view, once it orders load shed, "there is no truly competitive

---

[85] Tab B at A1.
[86] 2AR27, 39.

Appx. Page 610 of 740

market in operation to regulate."[87]  The PUC claims to "ensure accurate market prices," it should be able to ignore the real price on the market.[88]

But there is no authority under PURA for the PUC to suspend the market and set a government price for wholesale electricity, and the new price-setting rule is contrary to the statute.  PURA requires the Commission allow the "normal market forces to set the price of power."  *TXU Generation*, 165 S.W.3d at 835.  The actual prices on the market must be based on offers and bids made by the participants.  Real market prices do not jump and become fixed at the maximum price just because the PUC assumes some theoretical desperate user might pay more.  As Lieutenant Governor Dan Patrick observed in the aftermath of Storm Uri, "the market's supposed to go up there by demand, not by decree."[89]  The agency's new price-setting rule is a direct assault on the Legislature's policy choice to use a competitive electric market.

**A.  While the PUC can regulate the market, the plain language and intent of PURA requires the wholesale price must still be set by the market, not government regulators.**

The plain text of PURA requires the wholesale price of electricity be set by competitive market forces, instead of government regulators—this was the entire purpose and policy decision driving the Legislature's 1999 overhaul of PURA.  TEX. UTIL. CODE §39.001.  The statute dictates that "prices should be determined by

---

[87] PUC Br. 28.

[88] *Id.*, at xii.

[89] Mar. 15, 2021 Press Conf. of the Lieutenant Governor, at 17, attached as Tab N.

20

Appx. Page 611 of 740

customer choices and the normal forces of competition." TEX. UTIL. CODE §39.001(a). It proscribes that, "Regulatory authorities . . . may not make rules or issue orders regulating competitive electric services, prices, or competitors or restricting or conditioning competition except as authorized in this title." TEX. UTIL. CODE §39.001(c). And it mandates that "Regulatory authorities . . . shall authorize or order competitive rather than regulatory methods to achieve the goals of this chapter to the greatest extent feasible." TEX. UTIL. CODE §39.001(d). The Legislature's use of the word "shall" imposes a duty. TEX. GOV'T CODE §311.016(2); *Garza v. Harrison*, 574 S.W.3d 389, 402 (Tex. 2019). Through PURA, the Legislature requires that the PUC allow the wholesale price of electricity be set by the market. *TXU Generation*, 165 S.W.3d at 831, 835.

### 1. This case is not about whether the PUC can regulate the market; the question is whether it can replace competitive pricing.

Unable to point to any specific statutory authority to support its claim to be able to replace market pricing, the PUC spends much of its brief attempting to rewrite the court of appeals' opinion to claim the dispute is about something it is not. The PUC claims it is merely attempting to "balance" competing interests under PURA and that the court's opinion would prohibit it from regulating the competitive market at all.[90] None of these "sky is falling" arguments are true.

---

[90] PUC Br. 1-2, 37-38.

Appx. Page 612 of 740

Neither Respondents nor the court of appeals has ever said the PUC cannot balance competing interests and regulate the competitive electric market under PURA. By definition, any regulatory scheme involves regulation. "Regulation is the government's prospective ordering of marketplace conduct." *In re Oncor Elec. Delivery Co.*, 630 S.W.3d 40, 43 (Tex. 2021) (orig. proceeding). But just like any grant of regulatory authority, the Legislature can impose limits or procedural requirements on the exercise of that regulatory power. *Powell v. City of Houston*, 628 S.W.3d 838, 856 (Tex. 2021). In amending PURA, the Legislature created just such a limit by requiring the PUC to allow wholesale prices to be set by the competitive market. TEX. UTIL. CODE §39.001(a), (c), (d). The problem is that the PUC's new price-setting rule does not "regulate" competitive pricing or "balance" competing responsibilities—it simply stops the competitive market from working and replaces it with a government price based on the agency's assumption that it can decide price better than the actual market.

In fact, neither Respondents nor the court of appeals ever said the PUC cannot consider load shed as one factor in setting a price adder—it just cannot use load shed as a means to stop market pricing and order a fixed regulatory price. To be clear, in the new rule, the PUC injects consideration of load shed in two places, in two very different ways. First, the protocol was amended to include firm load shed as one factor, among nine different factors, that should be considered in determining the price adder.[91] The

_____

[91] Protocol §6.5.7.3.1(1)(i); 2AR30.

Appx. Page 613 of 740

Respondents did not challenge, and the court did not consider, whether load shed could be one of the many factors considered.

However, in order to carry out the PUC's decision to replace the market price during load shed with a fixed price, the rule was also amended to require that, if load shed is ordered during an EEA Level 3, the adder will be adjusted to automatically fix and keep the price of electricity at the cap.[92] Under the new rule, load shed is the *only* factor that is used to set a fixed price at the cap. Respondents' direct appeal specifically challenged the new price-setting rule. The court did not strike down regulatory price adders *per se* or decide if load shed could be a factor considered—those issues were not even before it. The court only held that the PUC exceeded its authority by adopting a rule that, during load shed, fixes the price of wholesale electricity at the cap.[93]

### 2. PURA requires the PUC allow competition to set the price of electricity, and it cannot adopt a rule to set a fixed price.

The court of appeals' reasoning is based on the same statutory construction and limitation on the PUC's regulatory authority recognized in the *TXU Generation* case. That case was a direct appeal involving whether the Wholesale Market Oversight Rule exceeded the PUC's authority. *TXU Generation*, 165 S.W.3d at 827. "The WMO Rule addresses the Commission's oversight of the wholesale market by enumerating the duties of market participants and defining prohibited activities." *Id.* at 829. The court

---

[92] Protocol §6.5.7.3.1(2)(p); 2AR32.
[93] *RWE Renewables Americas*, 669 S.W.3d at 575-76.

23

Appx. Page 614 of 740

held that, as amended, PURA required the PUC to "allow the market to set the price of electricity" while balancing the sometimes-competing statutory obligations of creating the competitive market and ensuring safe, reliable, and reasonably priced power to consumers. *Id.* at 834-37.

The WMO Rule satisfied this dual mandate because, while it regulated the competitive market, it still "allows the market to set the price of electricity in accordance with the normal forces of supply and demand." *Id.* at 835. Under the WMO Rule, "[m]arket participants are merely prevented from manipulating the market or acting in such a way as to disrupt the reliability of electricity service or artificially inflating price." *Id.* at 835. The court recognized that, under PURA, "wholesale and retail rates are now set by the market." *Id.* at 831. The WMO Rule satisfied this requirement because it "allows normal market forces to set the price of power, it does not favor regulation over competition." *Id.* at 834.

Here, the PUC's new price-setting rule does exactly what the *TXU Generation* opinion recognized is forbidden by the statute: it orders a regulatory price for electricity. The rule requires that, during load shed, a price adder be modified such that—no matter what the offers and bids are on the competitive market—the price is fixed at the cap.[94] The entire point of the rule is to create "pricing outcomes"[95] chosen by the PUC. Instead of allowing "the market to set the price of electricity in accordance with the

_____

[94] Protocol §6.5.7.3.1(2)(p); 2AR26-27, 40.
[95] 2AR27, 39.

24

**Appx. Page 615 of 740**

normal forces of supply and demand," the price-setting rule automatically sets a fixed regulatory price.

The Court has previously held invalid PUC pricing rules that exceed the PUC's authority under PURA. *City Pub. Serv. Bd.*, 53 S.W.3d at 317-21; *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184 (Tex. 2007). In *City Public Service Board*, the Court considered whether the PUC had authority to set rates for wholesale transmission service provided by investor-owned utilities and municipal-owned utilities. The Court held the provisions in chapter 36, which applies to investor-owned utilities, gave the PUC authority to set rates because it included express authority to establish and regulate rates and provisions implying the regulation of rates. *Id.* 317-18. The Court held the opposite, however, for municipal-owned utilities covered by chapter 35. The Court noted chapter 35 lacked the express authority to establish and regulate rates, and the powers awarded under chapter 35 did not imply the type of rate-setting authority found in chapter 36. *Id.* at 318-21. The answer in this case should be even clearer.

Nowhere in chapter 39 is the PUC given either express or implied authority to set the price of wholesale electricity. Instead, the statute requires "prices should be determined by customer choices and the normal forces of competition." TEX. UTIL. CODE §39.001(a). Through chapter 39, the Legislature requires the PUC allow the wholesale price of electricity be set by the market. *TXU Generation*, 165 S.W.3d at 831, 835. The PUC has no authority under chapter 39 to adopt a rule to set the price of wholesale electricity.

25

Appx. Page 616 of 740

### 3. The PUC can regulate the market; it just cannot replace it with a fixed, non-competitive price.

As part of its "sky-is falling" defense, the PUC wrongly claims that, if its new price-setting rule is outside of its statutory authority, the same would be true of any other out-of-market actions it might take.[96] But that argument misconstrues the court of appeals' ruling and the statutory limits it recognized. For instance, the PUC claims the ruling would prohibit ordering load shed to protect the grid. But unlike the price-setting rule, ordering load shed does not replace market prices. The procedures for load shed are a designed way to provide orderly, predetermined steps for curtailing demand during emergency shortages and restoring services thereafter and have nothing to do with the ongoing pricing of electricity on the market.[97] By necessity, load shed shrinks the number of customers who receive electricity at any given moment, but the electricity being sold is still being priced by the market. As Storm Uri showed, even during load shed, the prior pricing mechanisms continued to function as designed.

The same is true of reliability unit commitments (RUCs), by which the PUC can require generators to produce during an emergency.[98] While the procedure is designed to ensure resource capacity is available, it does not stop prices from being set by the

---

[96] PUC Br. 1-2, 37-38.

[97] *See* ERCOT Nodal Operating Guides, Section 4: Emergency Operation, at 4.5.1(1), available <u>Here</u>.

[98] *See* ERCOT Nodal Protocols, Section 5: Transmission Security and Reliability Unit Commitment, available <u>Here</u>.

26

competitive market. The rules specifically allow the supplier to opt out of the make-whole payment and instead accept the price set by the market.[99]

Likewise, as originally designed, the scarcity pricing mechanism, including the price caps and price adders, were not a tool for the PUC to replace market prices. The price caps were designed to prevent market abuse from causing "excessive transfers of wealth from load to generation without any additional benefits to the market."[100] Before the price-setting rule, even with caps, prices were allowed to be set by the market.

The price adders were adopted to more properly value existing reserves and account for ERCOT's out-of-market actions as to existing reserves, and they did not replace competitive pricing. The operating reserve price adder accounts for the value of reserves based on the probability of reserves falling below the minimum contingency level and the value of lost load. The reliability price adder ensures certain reliability deployments do not distort energy prices.[101]

Prior to the price-setting rule, the reliability price adder did not significantly affect the total cost of electricity, even during scarcity pricing. For instance, in 2019, with shortage pricing in the summer, the reliability adder added $3.55 per MWh, with the

---

[99] POTOMAC ECONOMICS LTD, 2019 STATE OF THE MARKET REPORT FOR THE ERCOT ELECTRICITY MARKETS at 63 (May 2020), available Here; Protocol §5.5.2(18).
[100] Tab H at 7333-34, -46.
[101] Potomac Economics Ltd, 2019 State of the Market Report for the ERCOT Electricity Markets at 2.

Appx. Page 618 of 740

average real-time price of $47.06 per MWh.[102]  In 2020, the average real-time price was $25.73 per MWh, and the reliability adder was $0.01.[103]

While the scarcity pricing mechanism was designed to prevent abuse or distortions of market prices, it did not replace competitive pricing.  Moreover, the scarcity pricing mechanism did not artificially *fix and keep* the price at the cap, nor was that result ever intended.  The fact that, during Storm Uri—before the PUC replaced the price—the market price rocketed up to the cap, but then continued to oscillate, as designed, shows the price continued to be set by the market with the scarcity pricing mechanism.[104]

Until the creation of the new price-setting rule, the PUC followed the Legislature's mandate by creating competition rules requiring the price of electricity be set by competition.  By permanently adopting the approach created during Storm Uri, the PUC's price-setting rule reflects the first time since deregulation that "the market rules have been abandoned for a price set by the government."[105]  Before Storm Uri, the PUC never overrode the price being set by the market to install a fixed, regulatory price.[106]  The question is whether the PUC has authority to do so.

---

[102] *Id.* at 3
[103] Potomac Economics Ltd, 2020 State of the Market Report for the ERCOT Electricity Markets, at 3 (May 2021).
[104] Tab J at 10.
[105] *Id.* at 93-94.
[106] Tab I at 41.

## 4. The PUC cannot adopt rules to assert new powers not authorized by PURA.

The PUC is a creature of the Legislature with no inherent authority. *City Pub. Serv. Bd.*, 53 S.W.3d at 316. It has only those powers the Legislature expressly confers, and implied powers necessary to carry out express responsibilities given it. *Id.* at 315-16. The PUC cannot exercise "what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes." *Id.* at 316. An agency can adopt only those rules that are authorized by or consistent with its statutory authority. *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017).

Nothing in PURA gives the PUC authority to override the Legislature's mandate that the price of electricity be set by competition. The Legislature did not give the PUC authority to set a government price for electricity—it did the opposite, requiring the PUC let the price be set by the market. "When the Legislature acts with respect to a particular matter, the administrative agency may not so act with respect to the matter as to nullify the Legislature's action even though the matter be within the agency's general regulatory field." *State v. Jackson*, 376 S.W.2d 341, 344-45 (Tex. 1964). Absent statutory authority, an agency rule is made without legal authority and is invalid. *City Pub. Serv. Bd.*, 53 S.W.3d at 318-21. The PUC's new price-setting rule is contrary to PURA and is invalid.

Appx. Page 620 of 740

**B.** **An inflated, fixed price set by the government is not an "accurate" market price determined by the normal forces of competition.**

To justify its new price-setting rule, the PUC claims it is intended "to help ensure accurate market prices for electricity" during future load shed events.[107] But the PUC's argument misapplies the concept of VOLL to justify its actions. Actual market prices fluctuate based on market forces, as they did during Storm Uri. The PUC cannot credibly claim to create market prices by eliminating the market.

The PUC argues that because it ordered load shed, the price of electricity should have gone to its maximum "to pull generation on."[108] One major problem with the PUC's economic theory is that the events during Storm Uri prove it to be wrong. During load shed, "everything that was available was running, and there was no reason it wouldn't run for price."[109] Under the rules in place at the time, the market price for electricity was "based on bids and offers in the various ERCOT-operated markets."[110] The auction rules set prices based on the highest generator offer actually accepted.[111] While prices initially rose to the $9,000 cap, they began to fluctuate, until the market price was replaced by the PUC.[112] Thus, during most of the event, all available generators were willing and able to sell for less than the $9,000 cap.

---

[107] PUC Br. xii, 13.

[108] PUC Br. 7.

[109] Tab L at 192.

[110] Tab D at 7.

[111] *See* trial testimony of Magness, *Brazos Electric Power Coop. Inc. v. ERCOT*, No. 21-03863-11 (S.D. Tex. Bankr. Feb. 23, 2022) at 57:24-58:11, attached as Tab O.

[112] Tab J at 10.

Appx. Page 621 of 740

### 1. This is no single VOLL for an ERCOT load shed event, and VOLL cannot tell the PUC what the market price should be.

Despite the reality of what happened with the market price during Storm Uri, the PUC tries to brush off pricing during the event as an "anomaly," citing a study to claim that under the concept of the Value of Lost Load ("VOLL") it can assume market price should have been at the cap based on the idea a nonparticipating consumer would have been willing to pay the legal maximum. But that is not what the report says or how VOLL works.

The PUC's argument is based on a misapplication of the concept of VOLL. Contrary to the PUC's claim, VOLL does not require the price of electricity to be at the cap during load shed. VOLL is a theoretical value that represents a customer's willingness to pay for reliable electricity service.[113] At the time ERCOT adopted the use of VOLL, it retained a report on the issue of determining the value of lost load as it relates to rotating outages caused by insufficient operating reserves in the region.[114] The report indicated that accurately estimating VOLL for any given region or specific type of outage is challenging because "VOLL depends on multiple factors such as the type of customer affected, regional economic conditions and demographics, time and duration of the outage, and other specific traits of an outage."[115] The major finding of

---

[113] London Econ. Int'l LLC, *Estimating the Value of Lost Load*, at 4 (June 17, 2013), available on the ERCOT website Here .
[114] *Id.* at 1.
[115] *Id.* at 6.

31

the report was that a single VOLL cannot be estimated for the ERCOT region for rotating outages caused by insufficient operating reserves.[116] The study did recognize that "VOLL can be used to inform resource adequacy rules and scarcity pricing algorithms"[117]—which is how ERCOT historically used it. VOLL was used in the ERCOT system as merely one input, in a series of complicated mathematical equations, to calculate real-time reserve price adders.[118] There is no magic VOLL number that says what the market price of energy would be in ERCOT during an extended load shed event like Storm Uri.

The PUC also misreads the Senate hearing testimony, claiming Magness said that demand to enter the market should be priced at VOLL.[119] But that is not what Magness said. Instead, he testified that, as the system was set up, "when we go into scarcity conditions, the prices go, you know, dramatically higher. They *can* go up to a cap of $9,000."[120] Magness did not testify load shed meant the price of electricity should be fixed at the cap; he merely testified to what actually happened during Storm Uri—scarcity conditions caused the price to increase, including up to the cap.

---

[116] *Id.* at 1.

[117] *Id.* at 6.

[118] ERCOT, *Methodology for Implementing Operating Reserve Demand Curve (ORDC) to Calculate Real-Time Reserve Price Adder* (2013).

[119] PUC Br. 10.

[120] Tab L at 79-80 (emphasis added).

Appx. Page 623 of 740

## 2. Market prices fluctuate, and the PUC cannot predict the price.

Before the PUC intervened, the market price rocketed up to the cap, but continued to oscillate—as designed.[121] This price volatility is what market participants expected. "Volatility in real-time wholesale electricity markets is expected because system load can change rapidly and the ability of supply to adjust can be restricted by physical limitations of the resources and the transmission network."[122] By their nature, real-time energy prices vary substantially throughout the day.[123] While market participants expect prices to fluctuate, there is no expectation prices will be pegged at the cap. ERCOT's Ogelman testified that, "from a financial standpoint that was a paradigm change or a change relative to the rules that the market expected."[124]

The Commission cannot reasonably claim to be able to predict what the price will be on the wholesale market. "No one can predict what prices will be in the future . . . future yields and market prices are at best often unpredictable and at worst even imaginary." *In re Konzak*, 78 B.R. 990, 994 (Bankr. D. N.D. 1987). Fair market value is not determined, as the PUC suggests, by the maximum legal limit a monopoly could squeeze out of a desperate buyer. Fair market value is what a willing buyer would pay a willing seller, neither acting under compulsion. *Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 278 (Tex. 2015). Based on what actually happened during Storm Uri,

---

[121] Tab J at 10.
[122] 2019 STATE OF THE MARKET REPORT FOR THE ERCOT ELEC. MARKETS, at 19.
[123] *Id.* at 4.
[124] Tab J at 11.

33

**Appx. Page 624 of 740**

there is no reason to believe market prices should be at the cap when, before the PUC changed the rules, all generators available were for most of the time willing and able to sell electricity for less.

The irony of the PUC's argument should not go unnoticed. When utilities function as a monopoly, the law recognizes that normal market forces do not regulate prices, and regulation is necessary to protect consumers and make sure rates are fair. *Goeke v. Houston Lighting & Power Co.*, 797 S.W.2d 12, 16 n.2 (Tex. 1990) (Gonzalez, J., dissenting); *In re Oncor Elec. Delivery Co.*, 630 S.W.3d at 43. Regulation serves as a substitution for competition. *City of Corpus Christi*, 51 S.W.3d at 236. Here, however, sellers on the competitive market are offering lower rates, and the agency is arguing it should be able to use regulation to instead set the price at the maximum, guaranteeing only a windfall profit. If the market does not set the price at the maximum, no justification supports doing so by regulation.

The PUC previously recognized that it cannot control or predict pricing in the ERCOT market. When it adopted the wholesale market design, the PUC noted that "[d]ecentralized decision-making based on economic forces is one of the key features of a successful competitive market."[125] "A key reason for deregulating the electric industry in Texas was to devolve decision-making and to provide electric retailers and wholesalers with flexibility in the face of changing market conditions." Because the

---

[125] Tab F at 8917.

ERCOT market "is open to market forces" and "so too should market outcomes be governed by the laws of economics," the PUC agreed that "[t]he ERCOT wholesale and retail markets are open to future opportunities that are not fully understood by market participants or regulators, and never will be."[126]

The PUC likened the philosophy underpinning the ERCOT market to the game of handball, where "within the bounds of the court, the ball can go anywhere a player hits it. Just as the ball's motion is governed by the law of physics, so too should market outcomes be governed by the law of economics." "Under PURA, the commission supervises, not micromanages, the electricity market."[127] In designing the competitive market based on economic principles, the PUC made it "clear that the commission's intent in referring to economic principles is not to prescribe a specific outcome."[128]

However, to defend its new price-setting rule, the PUC now claims the ability to foresee what market price "should be" and assumes the authority to reach out and "grab the ball" and place it at the PUC's chosen spot. The entire point of the rule is to "prescribe a specific outcome" chosen by the agency.[129] That approach is inconsistent with how markets function. The PUC's new price-setting rule does not simply tweak the rules—it is manipulating the outcome of the game.

---

[126] *Id.*
[127] *Id.*
[128] *Id.* at 8923.
[129] 2AR27, 39.

Appx. Page 626 of 740

**C.  The new price-setting rule seeks to adopt a policy decision that should be left to the Legislature and is a direct assault on the pro-competition policy adopted in PURA.**

To justify its new price-setting rule, the Commission makes a number of assertions about why allowing it to eliminate the market during load shed and issue a fixed price could have some purported benefits, including helping competition in the long run.[130]  None of this should be a surprise.  Claims of "fairer competitive prices," "ruinous competition," and "financial disasters" are all standard defensive claims to justify price-fixing schemes.  *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220-21 (1940).  But none of it should matter here.  If the PUC wants an exception to the pro-competition policy adopted in PURA, it should seek it from the Legislature.

The PUC appears to agree[131] on at least one point: in amending PURA, the Legislature adopted a pro-competition policy and meant to prevent anti-competitive conduct in the wholesale electric market.  TEX. UTIL. CODE §39.001(a).  The parties differ on what that means in practice.  Any combination formed for the purpose of raising, fixing, pegging or stabilizing the price of a commodity is price-fixing.  *Socony-Vacuum Oil Co.*, 310 U.S. at 223.  "The aim and result of every price fixing agreement, if effective, is the elimination of one form of competition."  *United States v. Trenton Potteries Co.*, 273 U.S. 392, 398 (1927).  The Supreme Court has repeatedly rejected any attempt to justify anti-competitive price-fixing based on some purported societal good

---

[130] PUC Br. 36-39.
[131] PUC Br. 24-25.

36

as "nothing less than a frontal assault on the basic policy of the Sherman Act." *NCAA v. Alston*, 141 S. Ct. 2141, 2159 (2021) (quoting *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978)). That includes arguments, like the PUC makes here, that the price-fixing scheme could have pro-competitive benefits. *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351-52 (1982). The proper way to seek an exemption from a statutory pro-competition policy is to seek it from the Legislature, not by court decision. *NCAA*, 141 S. Ct. at 2160.

The PUC's belief that it can set electricity prices more efficiently than the market—no matter how heartfelt or misguided—does not allow it to abandon the market contrary to the Legislature's mandate. "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2490 (2021). It is up to the Legislature, not the PUC, "to decide whether the public interest merits further action here." *Id.*

The Court "must take statutes as they are written," and policy arguments are for the Legislature to resolve. *City of Laredo v. Laredo Merchs. Ass'n*, 550 S.W.3d 586, 590 (Tex. 2018). In amending PURA, the Legislature dictated that wholesale electricity prices had to be set by competition, not regulators. TEX. UTIL. CODE §39.001. An agency's policy-making determinations cannot override the Legislature's policy as adopted in PURA. *City of Richardson v. Oncor Elec. Delivery Co. LLC*, 539 S.W.3d 252, 265 (Tex. 2018). Policy changes, including gap-filling, "is best left to legislators, not courts or agencies." *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d

37

Appx. Page 628 of 740

173, 176 (Tex. 2013). If the PUC thinks it needs authority to stop competitive pricing in the wholesale electric market during load shed, the Legislature can grant such authority if it agrees. Until then, the PUC cannot adopt a rule to create its own exception to PURA's requirements.

## II. This case has nothing to do with protecting the grid, and upholding the PUC's actions would undermine future investment in Texas.

The PUC repeatedly paints any challenge to the load shed price-setting rule as an attack on the PUC's ability to protect Texans and the grid during an emergency.[132] But that has nothing to do with whether the PUC has authority to replace the market price. No one has challenged the PUC's ability to order load shed to protect the grid from collapse, and the authority to shed load or order generation is not the same as purported authority to order electricity be bought and sold at an inflated, fixed government price. As noted, the PUC's abandonment of market pricing did not generate more electricity during Storm Uri—everything that could run was running.

It is the PUC's price-setting actions that threaten future electricity investment in Texas and the stability of the grid. When the scarcity pricing mechanism was adopted, the PUC noted that, "for the energy-only resource adequacy mechanism to be successful, the commission needs to minimize what the market perceives as arbitrary and frequent intervention in ERCOT markets."[133]

---

[132] PUC Br. 1-2, 37-38.
[133] Tab H at 7346.

Appx. Page 629 of 740

Years later, as generation investment stalled, ERCOT commissioned a study of the problem.[134]  The study warned that a danger with energy-only markets is they can be susceptible to regulatory intervention due to political pressure in response to price shocks associated with high prices or low reliability.[135]  "If public officials were to succumb to the pressure and intervene in the market (e.g., by changing the rules or sponsoring out-of-market supplies), they would not only depress in-market investment but also undermine investor confidence generally.  Resisting political pressures to intervene is essential if an energy-only market is to attract investment."[136]

The PUC has done exactly what it was warned not to do—intervene in market pricing.  Not only did it intervene during Storm Uri with the price-setting orders, but in response to the fallout it has now lowered the cap from $9,000 to $5,000.[137] "Generators may discount any expectations of high scarcity margins earned under high price caps if they fear that the future regulators will reinstate lower caps."[138]  It is the PUC's own price-intervention actions that most threaten the future of the ERCOT grid. Markets cannot function efficiently if regulators can constantly change the rules.

---

[134] Commission Proceeding to Ensure Resource Adequacy in Texas, PUC Docket No. 40000, "Submission of the Brattle Group's 'ERCOT Investment Incentives and Resource Adequacy Report,'" (July 24, 2012) ("Brattle Report"), available here.
[135] *Id.* at 19.
[136] *Id.*
[137] 16 TEX. ADMIN. CODE §25.509(b)(6)(B).
[138] Brattle Report at 74.

Appx. Page 630 of 740

**III. The new load shed price-setting rule is invalid because the PUC did not follow—or even attempt to satisfy—APA rulemaking requirements.**

In response to the debacle of Storm Uri, the Legislature completely overhauled the PUC's and ERCOT's governance structures, including making it "clear PUC would be a more active overseer of ERCOT."[139] The Legislature amended PURA to require: (1) the establishment and implementation of a formal process by which ERCOT adopts new or revised protocols with PUC approval; and (2) new or revised protocols cannot take effect until approved by the PUC. TEX. UTIL. CODE 39.151 (g-6). The PUC always had authority over ERCOT and the protocols. *CPS Energy*, 671 S.W.3d at 616. Now new or amended rules are only effective after PUC approval.

Despite the legislative mandate, the PUC did not implement any formal process for adopting new or revised protocols before it adopted the price-setting rule.[140] The new rule alters or amends several prior competition rules on pricing and the scarcity pricing mechanism. The PUC admits its new rule was created under the rulemaking authority in §39.151 and was approved by the PUC by the order challenged here.[141] The new rule marked the first time a competition rule was amended or adopted after the Legislature changed PURA to require prior approval from the PUC. The question is whether the PUC's use of its rulemaking authority requires it to comply with the APA.

---

[139] Tab B at A1.

[140] Two years after it adopted the price-setting rule, in June 2023, the ERCOT protocol for revision requests was amended to simply add that "All Revision Requests require approval by the PUCT prior to implementation." Protocols 21.4.11(1). The rule was not otherwise meaningfully updated, and still does not include procedures for challenging a decision reached by the PUC.

[141] PUC Br. at 14.

40

Through PURA, the Legislature requires the PUC adopt rules for the energy market. TEX. UTIL. CODE §39.151(d). Proceedings under PURA are subject to the APA. *Id.* §11.007(a). The APA "details the procedure that a state agency must follow when adopting rules." *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 255 (Tex. 1999). The PUC "must provide: (1) public notice; (2) an opportunity for and full consideration of comments; and (3) a reasoned justification for the rule enacted." *Office of Pub. Util. Counsel v. Pub. Util. Comm'n*, 131 S.W.3d 314, 327 (Tex. App.—Austin 2004, pet. denied). "In this way, the APA assures that the public and affected persons are heard on matters that affect them and receive notice of new rules." *Rodriguez*, 997 S.W.2d at 255. However, in adopting the new price-setting rule, the PUC admittedly did not even attempt to satisfy APA requirements.

The PUC's failure to follow the APA's mandatory rulemaking requirements should make the new price-setting rule invalid. The APA's rulemaking procedures set a floor for agency decision making, providing "minimum standards of uniform practice and procedure for state agencies" that allow for "public participation in the rulemaking process." TEX. GOV'T CODE §2001.001(1)-(2). "When an agency promulgates a rule without complying with the proper rulemaking procedures, the rule is invalid." *El Paso Hosp. Dist. v. Tex. Health & Human Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008). Because the PUC did not even attempt to comply with APA rulemaking requirements, the court of appeals correctly held the new price-setting rule is invalid.

41

Appx. Page 632 of 740

## A. The new load shed price-setting rule is a "rule" requiring the PUC to comply with the APA for its adoption.

The PUC does not even argue it (or ERCOT) took the steps required by the APA to adopt or make changes to administrative rules.  Instead, the PUC argues it was not required to comply with the APA, claiming the new price-setting rule is not a rule because it was developed through ERCOT and the PUC merely made "a ratification decision."[142]  The PUC's claim is more than suspect, given that ERCOT specifically said it proposed the new price-setting rule to be "[c]onsistent with the action directed by the PUCT in February."[143]  Regardless, under the APA, the new price-setting rule is a rule adopted by the PUC under §39.151(d), (g-6), and nothing exempts the PUC from mandatory APA rulemaking requirements or direct judicial review.

The PUC's claim that its order adopting the new price-setting rule is not a rule is hardly a novel defense from the agency.  The Court has repeatedly confronted the question of whether an agency's pronouncement of law or policy constitutes a "rule" as the APA defines the term.  *See, e.g.*, *El Paso Hosp. Dist.*, 247 S.W.3d at 714.  "But an agency's insistence that its statement is not a rule is not determinative."  *John Gannon, Inc. v. Tex. Dep't of Transp.*, No. 03-18-00696-CV, 2020 WL 6018646, at *5 (Tex. App.— Austin Oct. 9, 2020, pet. denied).

---

[142] PUC Br. 14-19.
[143] 2AR27.

The issue is whether the statement falls within the broad definition of a "rule." The APA defines a "rule" as "a state agency statement of general applicability" that either "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency" and "includes the amendment or repeal of a prior rule," but not those regarding only the internal management or organization of an agency and not affecting private rights or procedures. TEX. GOV'T CODE §2001.003(6).

The Court has jurisdiction to review the validity not just of the PUC's new competition rules, but also of any amendments to them. *Office of Pub. Util. Counsel,* 131 S.W.3d at 321; TEX. UTIL. CODE §39.001(e), (f). Thus, the question for the Court is whether the PUC's order adopting the new price-setting rule "went beyond a mere restatement of the existing formally promulgated rules or underlying statutes," and if "the substance and nature of this pronouncement distinguishes it as a 'rule' under the APA." *Teladoc, Inc. v. Tex. Med. Bd.*, 453 S.W.3d 606, 608 (Tex. App.—Austin 2014, pet. denied). Under any rational reading, the price-setting rule is a "rule" under this analysis.

The protocols are "rules" that are used by ERCOT to "manage the market and the grid." *CPS Energy*, 671 S.W.3d at 612. "ERCOT protocols are rules that provide the framework for the administration of the Texas electricity market." *Pub. Util. Comm'n v. Constellation Energy Commodities Grp., Inc.*, 351 S.W.3d 588, 594-95 (Tex. App.—Austin, 2011, pet. denied). The PUC's adoption of the new price-setting rule is a statement that "implements, interprets, or prescribes law or policy" or "describes the procedure or

43

Appx. Page 634 of 740

practice requirements of a state agency." TEX. GOV'T CODE §2001.003(6)(A). The PUC's order adopting the new rule interprets its authority and the competition rules, and implements and prescribes a new requirement that, during load shed, the price of electricity be administratively fixed at the cap.

The PUC claims, without authority, that the price-setting rule is not a "statement of general applicability" because it adopted the new rule in conjunction with ERCOT.[144] But the test for "general applicability" is the impact of the rule, not how it was crafted. The "general applicability" requirement means "statements that affect the interest of the public at large such that they cannot be given the effect of law without public input." *R.R. Comm'n v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003). The price-setting rule is a statement of general applicability because it amends and implements a rule affecting all participants buying or selling electricity in the market. *El Paso Hosp. Dist.*, 247 S.W.3d at 714 (holding interpretation of payment system and calculations met "general applicability" because it affected all hospitals receiving reimbursements).

The order adopting the new price-setting rule communicates the PUC's interpretation of its authority and its reading of the enabling statute and competition rules and also implements and proscribes the PUC's intent that ERCOT modify and fix the price of electricity during load shed to equal the cap. A written statement communicating an agency's interpretation and intent to apply the law in a certain

---

[144] PUC Br. 19.

44

manner is a statement implementing, interpreting, or prescribing law or policy for purposes of the APA. *Combs v. Entm't Publ'ns, Inc.*, 292 S.W.3d 712, 721(Tex. App.— Austin 2009, no pet.) (holding letters from Comptroller were a "rule" under the APA). The new price-setting rule is a "rule" subject to the APA.

## B. The price-setting rule is a competition rule that alters or amends several existing competition rules that regulated pricing on the ERCOT market.

The pricing orders are not just "rules" under the APA; they are "competition rules" that changed existing competition rules that previously regulated the market. By adopting the new price-setting rule, the PUC altered or departed from several existing competition rules governing the pricing of electricity and the use of the scarcity pricing mechanism in the ERCOT marketplace.

For instance, in approving the price-setting rule, the PUC altered the requirement under §25.501 that prices be determined by nodal energy prices determined at auction. 16 TEX. ADMIN. CODE §25.501(a), (f). The new price-setting rule also changed the use of the scarcity pricing mechanism. 16 TEX. ADMIN. CODE §25.505 (2021). Even the PUC admits that the new price-setting rule changes the scarcity-pricing mechanism.[145]

The PUC has repeatedly recognized that its rules governing the pricing of electricity and the scarcity pricing mechanism are competition rules. When it adopted §25.501, the PUC noted that "most of the functions impacted by the rule are

---

[145] PUC Br. 10.

45

competitive."[146]  Likewise, when the PUC adopted §25.505 to create the scarcity pricing mechanism, it recognized that "[t]he amendment and new sections are competition rules subject to judicial review as specified in PURA §39.001(e)."[147]  And the PUC has admitted that any amendments to these rules are themselves "competition rules subject to judicial review as specified in Public Utility Regulatory Act §39.001(e)."[148]

Because the PUC's new price-setting rule does not follow—or altered or departed from—the existing competition rules governing the pricing of electricity and the use of the scarcity pricing mechanism in the ERCOT marketplace, the order adopting the new price-setting rule is reviewable as a "competition rule." *El Paso Hosp. Dist.*, 247 S.W.3d at 715; *Teladoc*, 453 S.W.3d at 620.  Because the PUC, without even attempting to follow the requirements of the APA, issued an order adopting a new price-setting rule, and departed from or did not follow the existing competition rules regarding the pricing of electricity and the use of the scarcity pricing mechanism, the order and new rule are invalid.

The PUC's new price-setting rule changed existing competition rules governing the pricing of electricity and the use of the scarcity pricing mechanism.  The PUC cannot ignore the requirements of the APA, adopt a new rule that changes the method of pricing in the market, and avoid judicial review.

---

[146] Tab F at 8919.
[147] Tab H at 7319.
[148] 35 Tex. Reg. 6823, 6824 (Aug. 6, 2010); *see also* 35 Tex. Reg. 10213 (Nov. 19, 2010); 37 Tex. Reg. 8959 (Nov. 9, 2012).

Appx. Page 637 of 740

**C. The PUC cannot circumvent APA rulemaking requirements by "delegating" rulemaking to ERCOT, which the PUC must still adopt.**

Rules adopted by ERCOT were always subject to PUC oversight and review. TEX. UTIL. CODE §39.151(d). After Storm Uri, the Legislature amended PURA to make it clear any new or revised rule created by ERCOT—including protocols—may not go into effect until approved by the PUC. TEX. UTIL. CODE §39.151(d), (g-6). The PUC admits its new price-setting rule was created under the rulemaking authority in §39.151(d), (g-6), and was approved by the PUC by the order challenged here. It argues, however, that—by having ERCOT initially develop any new competition rule under §39.151(d)—the PUC can avoid both APA rulemaking requirements and review.[149] Neither the APA's requirements nor judicial review are so easily circumvented.

**1. ERCOT cannot "adopt" new competition rules, and the PUC cannot shield new rules from validity challenges.**

Section 39.001 allows for "[j]udicial review of competition rules adopted by the commission" without distinction as to whether the rule was originally proposed by ERCOT or the agency itself. TEX. UTIL. CODE §39.001(e)-(f). In permitting an appeal of market rules, "[t]he statute does not have separate provisions" for ERCOT proposed rules or "limit the scope of our jurisdiction to challenges" to rules first proposed by ERCOT. *See Office of Pub. Util. Counsel*, 131 S.W.3d at 321 (rejecting a similar argument when the PUC sought to avoid validity challenge of amended rule).

---

[149] PUC Br. 14-22.

**Appx. Page 638 of 740**

Moreover, the Legislature does not allow ERCOT delegated authority to create rules independent of the PUC. A "delegation occurs only when an entity is given the power and the discretion to set public policy and promulgate rules to achieve that policy or ascertain conditions upon which existing laws may operate." *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 653 (Tex. 2004). There is no "delegation" when the entity must follow the policy as mandated by the Legislature and executed by an agency. *Id.* at 655. That is exactly what happens now under PURA.

The PUC maintains authority over ERCOT and its protocols. *CPS Energy*, 671 S.W.3d at 616. As of 2021, PURA specifically requires that rules adopted through ERCOT are "subject to commission oversight and review and may not take effect before receiving commission approval." TEX. UTIL. CODE §39.151(g-6). ERCOT's protocols have to be "approved by the commission and must reflect the input of the commission." TEX. UTIL. CODE §39.151(g-1). Because the Legislature requires the PUC retain authority to review and approve any new rule, no actual delegation occurs. *Patient Advocates*, 136 S.W.3d at 655. The Legislature requires market rules be adopted by the PUC to become effective, and the PUC cannot use ERCOT to shield new rules from APA requirements.

To support avoiding the APA and a direct appeal, the PUC argues it should be legally significant that, when ERCOT proposes a rule, the statute requires its "approval" instead of its "adoption." The PUC argues ERCOT should be considered the entity

48

Appx. Page 639 of 740

that "adopts" the rule, and the PUC merely "approves" the rule.[150]  But even the PUC's proffered definitions do not support its argument.  To begin with, under PURA, ERCOT cannot satisfy the PUC's definition of "adopt" because it cannot "take and follow" any course of action, nor can it "choose" any standard or required course of action with a new or amended protocols.  ERCOT can only recommend changes to the PUC, and the rule is only effective with the PUC's order.  ERCOT's own protocols do not even call for it to "adopt" or "approve" any revision—it can simply "recommend[s] approval" to the PUC.[151]  Because any new or amended protocol is only effective (and can only be followed) once approved by the PUC, it is that action that adopts the rule for purposes of the statute.

The statute makes clear the protocol is only effective after the PUC's action, and thus it is the PUC action that makes it subject to judicial review.  Undefined terms in a statue should be given their common, ordinary meaning unless a contrary meaning is apparent from the statute's language.  *Powell*, 628 S.W.3d at 843.  The *Merriam-Webster Dictionary* defines "adopt" to mean "to accept and establish (something, such as a law or policy) in a formal or official way."[152]  Similarly, it defines "approve" as "to accept as satisfactory" or "to give formal or official sanction."[153]  Likewise, while not included by

---

[150] PUC Br. 20-21.

[151] Protocol 21.4.10(2)(a).

[152] *Adopt*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/adopt (last visited Feb. 8, 2024).

[153] *Approve*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/approve (last visited Feb. 8, 2024).

Appx. Page 640 of 740

the PUC's brief, the *American Heritage Dictionary* also defines "adopt" as "to vote to accept." *Black's Law Dictionary* has defined "adopt" as:

> To accept, appropriate, choose, or select. To make that one's own (property or act) which was not so originally. To accept, consent to, and put into effective operation; as in the case of a constitution, constitutional amendment, ordinance, court rule, or by-law.

*Collins v. Cnty. of El Paso*, 954 S.W.2d 137, 149 (Tex. App.—El Paso 1997, pet. denied). Under any of these definitions, it is clear that a new rule is only actually adopted once it is accepted and approved by the PUC and thereby put into action.

The PUC's approach would create the absurd result that the same rule would be subject to APA requirements and judicial review if directly adopted by the PUC under §39.151(d), but could avoid APA requirements and be unreviewable simply by the agency having ERCOT (under the same statutory provision) propose it first for the PUC's subsequent rubberstamp. The Court must interpret the statute to avoid absurd results. *Carreras v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011). Allowing an agency to make amendments to its rules while avoiding the rulemaking process undercuts the APA. *Rodriguez*, 997 S.W.2d at 255. No logical reading of PURA allows the PUC to flaunt APA requirements and the judicial review created by the statute.

The PUC is not excused from following mandatory APA rulemaking requirements when adopting market rules, including the load shed price-setting rule. Proceedings under PURA are subject to the APA. *Id.* §11.007(a). The PUC admits the purported authority to adopt the new price-setting rules is provided, through §39.151,

50

Appx. Page 641 of 740

by the rulemaking authority PURA gives the Commission.[154]  That should be enough to trigger the PUC to comply with APA rulemaking requirements before moving forward with adoption of the price-setting rule.  "Indeed, the Legislature delegates formal rulemaking power to an agency in the expectation that an agency will ordinarily adopt rules of general application through that power."  *Rodriguez*, 997 S.W.2d at 255.  Even if PURA was silent on rulemaking, the answer would be the same.  "The APA has already spoken."  *Mosley v. Tex. Health & Human Servs. Comm'n*, 593 S.W.3d 250, 258 (Tex. 2019).  The APA "details the procedure that a state agency must follow when adopting rules."  *Rodriguez*, 997 S.W.2d at 255.  Allowing an agency to make amendments to its rules while avoiding the rulemaking process undercuts the APA.  *Id.*  The APA's provisions "would be wasted ink if they did not generally apply to all state agencies."  *Mosley*, 593 S.W.3d at 258.

If the Legislature intended the PUC to not have to comply with APA rulemaking, "the legislature has certainly proved itself able to exempt an agency procedure from the APA's minimum procedure when it wants to."  *Id.* at 259.  Because PURA does not contain any language that limits the APA's rulemaking mandates, the PUC is required to comply with the APA when adopting new rules.

---

[154] PUC Br. 14, 35.

Appx. Page 642 of 740

**2. New or amended wholesale market pricing rules should be subject to public notice and comment.**

The PUC's failures during Storm Uri show why APA rulemaking requirements are so important, and why the PUC should not be allowed to install a permanent end-run around the normal rulemaking process. As the Sunset Commission recognized, "[b]efore Winter Storm Uri, most Texans had little to no idea what ERCOT was or what functions it performed."[155] The "PUC's use of informal methods to instruct ERCOT means the agency does not always adhere to best practices for openness, inclusiveness, and transparency."[156] The PUC is responsible for ensuring that it and ERCOT provide clear, consistent, and understandable information the public needs.[157]

The PUC argues it would be burdensome or duplicative to make it follow APA procedures for adopting new or amended rules.[158] But this argument makes little sense. There is no requirement for duplication. As the court of appeals recognized, "given the close association between the Commission and ERCOT, it would seem to be a readily achievable task to accomplish the mandated APA requirements of notice, public participation, and order contents in an efficient, coordinated process."[159] There is no reason the process would be any more difficult than when the PUC adopted any other competition rule. As the Sunset Commission report noted, the PUC has failed to

---

[155] Tab B at 2.
[156] *Id.* at 3.
[157] *Id.* at 4.
[158] PUC Br. 1-2, 22.
[159] *RWE Renewables Americas*, 669 S.W.3d at 582.

52

meaningfully review and revise its administrative rules on a timely basis, "resulting in outdated rules that do not reflect the current regulatory environment."[160] The PUC could easily include review of the price-setting rule into a formal review process combined with any other competition rules it needs to update.

A presumption favors adopting rules of general applicability through the formal rule-making procedures under the APA. *El Paso Hosp. Dist.*, 247 S.W.3d at 715. "The process assures notice to the public and affected persons and the opportunity to be heard on matters that affect them." *Id.* There is no justification for the PUC to amend or adopt new competition rules for the market without going through the APA rule-making process.

**D.** **Under PURA, validity challenges to the PUC's adoption of a new or amended competition rule must be brought by direct appeal.**

This is a validity challenge of the PUC's adoption of the new price-setting rule. By statute, this challenge must be quickly brought by a direct appeal to the court of appeals. TEX. UTIL. CODE §39.001(e)-(f). While it never made the argument below, the PUC now argues Respondents were required to instead follow the administrative process for appealing ERCOT decisions to the PUC.[161] The PUC claims Respondents are somehow trying to "bypass" the administrative process.[162] It is unclear how exercising the statutory right to appeal the validity of the PUC's new rule could "bypass"

---

[160] Tab B at 80.
[161] PUC Br. 14, 17, 32.
[162] PUC Br. 1, 33.

Appx. Page 644 of 740

the PUC after the agency has already issued its order. The PUC's failure to adopt a new procedure as required by PURA may cause confusion, but the administrative appeal process for ERCOT actions does not apply to the PUC's decision. The judicial review sought here is specifically provided for by PURA, and the PUC cannot supplant it.

## 1. There is no administrative process after the PUC has already issued a final order.

In 2021, the Legislature amended PURA to require the PUC to establish and implement a formal process by which ERCOT adopts new or revised protocols with PUC approval. TEX. UTIL. CODE §39.151 (g-6). At the time the PUC adopted the new price-setting rule, it was aware PURA now "requires both the Commission and the Electric Reliability Council of Texas (ERCOT) to establish processes for Commission approval of any rules or protocols adopted under authority delegated from the Commission to the independent organization."[163] However, despite acknowledging the new requirement, no such processes were established before the PUC adopted the new price-setting rule. Instead, PUC staff "anticipate[d] further conversation regarding the revision request approval process as part of a rulemaking to consider ERCOT governance."[164] To date, the PUC has still not updated its rules or the protocols to reflect any steps that should or can be taken after a rulemaking has occurred.

---

[163] Tab A, 2AR5.
[164] *Id.* at 2AR6.

54

The Sunset Commission actually noted the PUC's failure, and directed the PUC again to update its policy. The report noted, the "PUC has not updated its rules to account for the Legislature's decision to require PUC to approve ERCOT protocols, leaving market participants unsure of their rights."[165] While the process at the PUC remains unclear, the requirements for a direct appeal of the PUC's new rule are not.

Under PURA, judicial review of the validity of a competition rule adopted by the PUC must be brought in a direct appeal. TEX. UTIL. CODE §39.001(e)-(f). By contrast, on its face, the administrative procedure the PUC cites does not apply to challenging a PUC order. Instead, its stated purpose is to "prescribe[] the procedure by which an entity . . . may appeal a decision made by ERCOT." 16 TEX. ADMIN. CODE §22.251(a). Nothing in §22.251 applies to challenging a PUC order or decision. The Sunset Report reached the same conclusion, stating the "PUC should [] update its existing rules to eliminate the formal appeal process for ERCOT protocols, which is no longer appropriate or necessary since protocols must now be approved by the commission."[166]

### 2. The protocols cannot cut off the statutory right to file a direct appeal to challenge the validity of a new or amended rule.

Even when the PUC finally does create a process for adopting competition rules first proposed by ERCOT, it cannot conflict with or cut off the statutory right to judicial review. As a state agency, the PUC has only those powers expressly given it by statute

---

[165] Tab B A4, 42.
[166] *Id.* at 44.

Appx. Page 646 of 740

or those implied powers reasonably necessary to carry out the express responsibilities given it by statute. *City Pub. Serv. Bd.*, 53 S.W.3d at 315-16. The PUC's own procedural rules recognize they "shall not be construed so as to enlarge, diminish, modify, or otherwise alter the jurisdiction, powers, or authority of the commission, the commission staff, or the substantive rights of any person." 16 TEX. ADMIN. CODE §22.1(b)(3). To the extent the PUC rules conflict with any statute, the statute controls. 16 TEX. ADMIN. CODE §22.1(b)(4).

The Legislature created a statutory process to seek judicial review of new rules. "PURA permits timely challenge to a 'rule' adopted by the commission." *Office of Pub. Util. Counsel*, 131 S.W.3d at 321. This includes, like here, a challenge that the new rule exceeds or is contrary to the statutory authority granted under PURA. *Id.* A party can seek judicial review of the validity of a competition rule through a direct appeal by filing a notice of appeal no later than 15 days after the new rule is published in the Texas Register. TEX. UTIL. CODE §39.001(e)-(f). Respondents timely filed their notice of appeal in this case fourteen days after the PUC's order.

The facts in this case show how misapplying the rules for challenging an ERCOT action would conflict with the statutory right to appeal the PUC's adoption of a rule. Section 22.251 allows that a complaint of an ERCOT action can be brought within 35 days of the ERCOT action. 16 TEX. ADMIN. CODE §22.251(d). Once a complaint of an ERCOT action is filed with the PUC, ERCOT has 14 days to provide notice of the complaint to other entities, and a response to the complaint is not due until 28 days

56

**Appx. Page 647 of 740**

after receipt. 16 TEX. ADMIN. CODE §22.251(e)-(f). The PUC staff is also given 45 days from the filing of the complaint to file comments and a motion to intervene. *Id.* §22.251(g).

Requiring a party to follow these alternative timelines to challenge the PUC's order adopting a new rule would prevent timely filing a direct appeal. In this case, ERCOT voted on the new price-setting rule on June 28, 2021, and the PUC issued its order adopting the new rule on July 16, 2021—just 18 days later.[167] If, as required by statute, the PUC had published its new rule at that time, any notice of appeal challenging the validity of the PUC's new rule would have been due by Monday, August 2, 2021. TEX. UTIL. CODE §39.001(f); TEX. R. APP. P. 4.1. Any direct appeal to the validity of the new rule would have been barred if filed with the Court after that date. *City of Alvin v. Pub. Util. Comm'n*, 143 S.W.3d 872, 879-80 (Tex. App.—Austin 2004, no pet.).

But, under the PUC's new alternative approach, an administrative complaint based on ERCOT's actions would not even have been due under §22.251 until August 2, 2021—35 days after the board of directors acted. And even if an administrative complaint was filed the same day the PUC issued its order adopting the new rule (July 16, 2021), the PUC staff's response to such a complaint would not be due until 45 days later (August 30, 2021). The PUC's approach would result in any appeal being time-barred and immunize the PUC's new rule from judicial review.

---

[167] 2AR6, 3AR84-86.

Appx. Page 648 of 740

### 3. There is no requirement to file a motion for rehearing or exhaust administrative remedies in order to challenge a rule.

Even if an appeal could have been timely filed after some extra administrative proceeding, the process was not required. Neither PURA nor the APA requires a party to file an administrative proceeding or seek reconsideration with the PUC before filing a rule challenge. Instead, the Legislature specifically requires that validity challenges to the competition rules be brought through a direct appeal. The APA provides for two modes of judicial review of agency decisions—one from contested cases and another for challenging rules—that are substantially different. *WBD Oil & Gas*, 104 S.W.3d at 74. To seek judicial review in a contested case, the party must normally file for rehearing and exhaust administrative remedies. *Id.* at 75. "A person seeking judicial review of a rule need not do any of these things." *Id.*

Instead, the Legislature requires a validity challenge of a PUC competition rule be brought in a direct appeal. "PURA requires that challenges to the validity of competition rules be brought directly and quickly in this Court." *City of Alvin*, 143 S.W.3d at 880. A direct appeal to the validity of the new rule would have been time barred if not filed directly with the court of appeals. *Id.* at 879-80. To the extent the PUC rules conflict with the statutory right to appeal, the statute controls. 16 Tex. Admin. Code §22.1(b)(4). The proper path for appeal was followed here.

Appx. Page 649 of 740

## PRAYER

For these reasons, Respondents ask the Court to affirm the court of appeals' judgment and hold the load shed price-setting rule invalid and for any further relief to which they may be entitled.

Dated: February 8, 2024

Respectfully submitted,

By:   /s/ Kurt Kuhn

Michael J. Jewell
  State Bar No. 10665175
  michael@jewellandassociates.com
JEWELL & ASSOCIATES, PLLC
8404 Lakewood Ridge Cove
Austin, Texas 78738-7674
(512) 423-4065
(512) 236-5170 (fax)

*Counsel for TX Hereford Wind, LLC*

Kurt Kuhn
  State Bar No. 24002433
  Kurt@KuhnHobbs.com
Lisa Bowlin Hobbs
  State Bar No. 24026905
  Lisa@KuhnHobbs.com
KUHN HOBBS PLLC
7000 N. MoPac Exwy., Ste. 315
  Austin, Texas 78731
  (512) 476-6005
  (512) 476-6002 (fax)

Stephanie C. Sparks
  State Bar No. 24042900
  ssparks@vedderprice.com
  VEDDER PRICE PC
  100 Crescent Court, Ste. 350
  Dallas, Texas 75201
  (469) 895-4830

*Counsel for RWE Renewables
Americas LLC*

59

Pursuant to TEX. R. APP. P. 9.4, I hereby certify that this response contains 14,835 words. This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

<div align="right">

      /s/ Kurt Kuhn        
Kurt Kuhn

</div>

## CERTIFICATE OF SERVICE

I certify that, on February 8, 2024, I electronically served a copy of this brief on counsel of record, as listed below:

Lanora C. Pettit
Office of the Attorney General
Austin, Texas 78711
Lanora.Pettit@oag.texas.gov

*Counsel for Petitioner*

**Appx. Page 652 of 740**

# APPENDIX

Tab A ...........Relevant Pages July 14, 2021 PUC Mem. for July 15, 2021 Open Meeting

Tab B ......Sunset Advisory Commission, Staff Report with Final Results, Public Utility Commission of Texas, Electric Reliability Council of Texas, Office of Public Utility Counsel (June 2023)

Tab C ..................................................................................TEX. UTIL. CODE §39.001

Tab D ………..ERCOT, Load Participation in the ERCOT Nodal Market (Apr. 2015)

Tab E …………………………………………………..…16 TEX. ADMIN. CODE §25.501

Tab F ………………..……………………………….…..28 Tex. Reg. 8901 (Oct. 10, 2003)

Tab G …………………………………………..............16 TEX. ADMIN. CODE §25.505

Tab H …………………………………………………....31 Tex. Reg. 7317 (Sept. 8, 2006)

Tab I …………....……Tr. Excerpts of Mar. 11, 2021 Senate Comm. on Jurisprudence, video available [here](here)

Tab J …………….Tr. Excerpts of Mar. 4, 2021 Senate Comm. on Bus. & Commerce video available [here](here)

Tab K …………….Tr. Excerpts of May 4, 2021 Senate Comm. on Bus. & Commerce video available [here](here)

Tab L ………….Tr. Excerpts of Feb. 25, 2021 Senate Comm. on Bus. & Commerce, video available [here](here)

Tab M.............................................................Tr. of July 15, 2021 PUC Open Meeting, video available [here](here)

Tab N ............ Tr. Excerpts of Mar. 15, 2021 Press Conf. of the Lieutenant Governor, video available [here](here)

Tab O ………Testimony of Magness, *Brazos Electric Power Coop. Inc. v. ERCOT*, No. 21-03863-11 (S.D. Tex. Bankr. Feb. 23, 2022)

**Appx. Page 653 of 740**

# APPENDIX F

FILED
23-0555
4/26/2024 5:02 PM
tex-87128503
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

NO. 23-0555

IN THE SUPREME COURT OF TEXAS

PUBLIC UTILITY COMISSION OF TEXAS,
*Petitioner,*

v.

RWE RENEWABLES AMERICAS, LLC AND TX HEREFORD WIND, LLC,
*Respondents.*

On Petition for Review from the Third Court of Appeals at Austin, Texas
No. 03-21-00356-CV

## AMICUS BRIEF OF ASPIRE POWER VENTURES, LP

Chrysta L. Castañeda
Texas Bar No. 15325625
chrysta@castaneda-firm.com
Nicole Michael
Texas Bar No. 24067767
nicole@castaneda-firm.com
**THE CASTAÑEDA FIRM**
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Telephone: (214) 282-8579
Facsimile: (214) 602-9187

*Counsel for Aspire Power Ventures, LP*

**To the Honorable Supreme Court of Texas:**

Aspire Power Ventures[1] is an ERCOT Market Participant and operated as a Qualified Services Entity on the ERCOT grid during the period impacted by the case under review. It traded electricity on the ERCOT grid and as a Market Participant, is subject to the NPRRs at issue. Aspire submits this brief to explain how the Public Utility Commission of Texas ("PUC" or "Commission") and ERCOT disregarded certain requirements of the Administrative Procedures Act ("APA") necessary to safeguard Texans from unlawful takings and from regulatory overreach. These specific requirements discussed herein have been overlooked by the parties' briefs but warrant the Court's consideration.

First, the APA requires that the PUC analyze and determine whether the Legislature has delegated it the authority to issue the proposed rule. Section 2001.024 of the APA requires that the PUC include in its public notice of the proposed rulemaking the following items:

(3) A statement of the statutory or other authority under which the rule is proposed to be adopted, including:
(A) *a concise explanation of the particular statutory or other provisions under which the rule is proposed*;
(B) the section or article of the code affected;
(C) if applicable, the bill number for the legislation that enacted the statutory authority under which the rule is proposed to be adopted if the legislation was enacted during the four-year period preceding the date notice of the proposed rule is given; and

---

[1] As required by Rule 11(c) of the Texas Rules of Appellate Procedure, all fees for this amicus brief will be paid by Aspire.

1

(D) *a certification that the proposed rule has been reviewed by legal counsel and found to be within the state agency's authority to adopt.*

TEX. GOV'T CODE § 2001.024(a)(3) (emphasis added).

Because the ERCOT/PUC process for approval of NPRRs fell so far short of these requirements, the *RWE* decision below disposed of the matter in a single sentence: "The administrative record does not reveal that the Commission gave any notice to the public of NPRR 1081 before approving the rule." *RWE Renewables v. PUC*, 669 S.W.3d 566, 577 (Tex. App.—Austin 2023, pet. granted). But the problem extends far beyond a simple lack of public notice. The content of the notice—and in particular, addressing the agency's authority to issue the rule—serves as an important safeguard against the risk of an agency asserting authority beyond that delegated to it. Yet, nowhere in the record does it reflect that legal counsel rendered the opinion that the Legislature delegated the necessary authority to the PUC as required by TEX. GOV'T CODE § 2001.024(a)(3)(D) or that anyone else analyzed agency authority. Whether the PUC lacked statutory authority related to the issues addressed in NPRR 1081 or not, it is critical that the Commission comply with APA processes designed to prevent potential regulatory overreach.[2]

---

[2] Similarly, the APA requires that the PUC include a fiscal analysis:

2

The APA also contains critical safeguards for alerting the public to possible taking of private property. Under TEX. GOV'T CODE § 2007.042(b), if the Commission proposes a governmental action that might cause a taking of private property, then the Commission must (1) provide notice in the manner prescribed by Section 2001.023; and (2) file with the secretary of state for publication in the Texas Register in the manner prescribed by Chapter 2002 a reasonably specific summary of the takings impact assessment that was prepared by the agency. *Id.* Where a potential takings issue is implicated, the PUC must additionally "provide at least 30 days' notice of its intent to engage in the proposed action." TEX. GOV'T CODE §

---

(4) a fiscal note showing the name and title of the officer or employee responsible for preparing or approving the note and stating for each year of the first five years that the rule will be in effect:
   (A) the additional estimated cost to the state and to local governments expected as a result of enforcing or administering the rule;
   (B) the estimated reductions in costs to the state and to local governments as a result of enforcing or administering the rule;
   (C) the estimated loss or increase in revenue to the state or to local governments as a result of enforcing or administering the rule; and
   (D) if applicable, that enforcing or administering the rule does not have foreseeable implications relating to cost or revenues of the state or local governments.

TEX. GOV'T CODE § 2001.024(a)(4). This fiscal analysis is critical to avoiding unfunded mandates on the state and local governments, and the analysis may demonstrate to the public and a reviewing court that the rule is either justified or unjustified from a cost and revenue perspective. Like its failure to address whether it had necessary authority to approve the rulemaking, the PUC failed to address this APA-required element.

3

2007.042(a). In application, it is possible for an ERCOT NPRR to risk an unlawful taking of private property. As an example, in NPRR 1186, ERCOT sought to create new limits on the rights of battery storage facility owners to discharge their batteries and to sell that power onto the grid. At least one ERCOT Market Participant submitted comments in the ERCOT committee processes raising the concern that NPRR 1186 implicated takings issues.[3] While there might be debate on whether the proposal in NPRR 1186 would have resulted in a taking, the APA requires the due process protections of enhanced public notice if there were even a possibility that the rule change would constitute a taking. The essential safeguard for constitutional property rights does not exist in the Commission's process under review in this proceeding.

In summary, the PUC's position that its practices satisfied the intent of the APA is wrong. Key APA requirements perform crucial functions, like keeping agencies in check in their rulemaking, protecting against the risk of impermissible takings of private property, and ensuring that the public is well informed so it can meaningfully participate in the rulemaking process. The PUC's position would reduce the APA's requirements to little more than a list of suggestions. The Court

---

[3] *See* Comments of Octopus Energy, NPRR 1186 (Sept. 22, 2023)
 https://www.ercot.com/files/docs/2023/09/22/1186NPRR-
28%20Octopus%20Energy%20Comments%20092223.docx

4

should uphold the decision of the court below that the PUC was required to comply with the APA.

<div align="right">

Respectfully submitted,

*/s/ Chrysta Castañeda*
Chrysta L. Castañeda
Texas Bar No. 15325625
chrysta@castaneda-firm.com
Nicole Michael
Texas Bar No. 24067767
nicole@castaneda-firm.com
**THE CASTAÑEDA FIRM**
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Telephone: (214) 282-8579
Facsimile: (214) 602-9187

**Counsel for Aspire Power Ventures, LP**

</div>

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of foregoing has been served via e-file upon all counsel of record on April 26, 2024.

*/s/ Chrysta Castañeda*
Chrysta Castañeda

5

# APPENDIX G

FILED
23-0555
3/7/2024 5:57 PM
tex-85334007
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

## No. 23-0555

IN THE SUPREME COURT
OF TEXAS

PUBLIC UTILITY COMMISSION OF TEXAS,
*Petitioner,*

v.

RWE RENEWABLES AMERICAS, LLC AND TX HEREFORD WIND, LLC,
*Respondents.*

On Petition for Review from the
Third Court of Appeals at Austin, Texas
No. 03-21-00356-CV

AMICUS BRIEF OF ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC.

Elliot Clark
State Bar No. 24012428
eclark@winstead.com
Elin Isenhower
WINSTEAD PC
401 Congress Avenue
Suite 2100
Austin, Texas 78701
Telephone: (512) 370-2800
Facsimile:  (512) 370-2850

Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Rachel A. Ekery
Nicholas Bacarisse
ALEXANDER DUBOSE &
 JEFFERSON LLP
100 Congress Avenue, Suite 1450
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303

ATTORNEYS FOR AMICUS CURIAE ELECTRIC RELIABILITY
COUNCIL OF TEXAS, INC.

## TABLE OF CONTENTS

Table of Contents ................................................................................... i

Index of Authorities.................................................................................ii

Interests of Amicus Curiae .................................................................... 1

Statement of Facts ................................................................................. 2

Summary of the Argument ..................................................................... 9

Argument.............................................................................................. 12

I.      The court of appeals lacked jurisdiction over RWE's challenge
        to NPRR 1081. ............................................................................ 12

        A.      NPRR 1081 was adopted by ERCOT, not the PUC............. 12

        B.      RWE could have challenged NPRR 1081 before the PUC. . 17

        C.      RWE's demand for duplicative ERCOT and PUC
                rulemaking will cripple ERCOT's ability to regulate the
                grid and market.................................................................. 19

II.     The court of appeals' substantive holding threatens the
        stability of the ERCOT grid and market. ....................................25

        A.      ERCOT's energy-only market design demands that
                prices be at VOLL during load shed. ................................. 26

        B.      RWE's cramped conception of PURA would gravely
                harm ERCOT's ability to protect the grid and ensure
                efficient economic outcomes. .............................................. 33

Prayer ................................................................................................... 39

Certificate of Service ........................................................................... 41

Certificate of Compliance.................................................................... 42

Index

# INDEX OF AUTHORITIES

## Cases

*CPS Energy v. ERCOT,*
671 S.W.3d 605 (Tex. 2023) ........................................................... 9, 14

*Luminant Energy Co. v. PUC,*
665 S.W.3d 166 (Tex. App.—Austin 2023, pet. granted) ................... 33

*Panda Power Generation Infrastructure Fund, LLC v.
ERCOT*, 641 S.W.3d 893 (Tex. App.—Dallas 2022) (en
banc), *rev'd sub nom.*, *CPS Energy v. ERCOT, 671 S.W.3d
605 (Tex. 2023)*...................................................................... 13, 14, 16

*RWE Renewables Am., LLC v. PUC,*
669 S.W.3d 566 (Tex. App.—Austin 2023, pet. granted)
................................................................................ 9, 13, 25, 33, 38

## Statutes

Tex. Util. Code § 15.001 ........................................................................ 18

Tex. Util. Code § 39.001 ............................................................. 8, 12, 26

Tex. Util. Code § 39.003 ........................................................................ 18

Tex. Util. Code § 39.151 ............................................................... *passim*

Tex. Util. Code § 39.1511 ........................................................................ 8

Tex. Util. Code § 39.160 ........................................................................ 37

## Other Authorities

16 Tex. Admin. Code § 22.251............................................. 8, 17, 18, 19

37 Tex. Reg. 8959 (Nov. 9, 2012)........................................................ 38

Brattle Group, *ERCOT Investment Incentives & Resource
Adequacy* (June 1, 2012) ........................................................ *passim*

ii

Brattle Group, *Estimation of the Market Equilibrium & Economically Optimal Reserve Margins for the ERCOT Region* 77 (Dec. 20, 2018)..................................................................3

ERCOT, *Market Rules*..................................................................20

ERCOT, *Markets and Reliability: Operating Reserve & Reliability Deployment Price Adders* (2018).............................................3

ERCOT, *Nodal Protocol Revision Requests (NPRRs)*............................21

*ERCOT Presentation Regarding Potential Implementation of Scarcity Pricing Proposal Offered by Professor Hogan,* PUC Docket No. 40000, Item No. 369 (Jan. 22, 2013)......................30

ERCOT, Other Binding Documents, Methodology for Setting Maximum Shadow Prices for Network and Power Balance Constraints § 4.1 (eff. Apr. 1, 2022) ..................................................36

ERCOT Protocols § 1.1 ..................................................................15

ERCOT Protocols § 3.22.2 ..................................................................22

ERCOT Protocols § 6.5.7.5 ..................................................................22

ERCOT Protocols § 6.6.13.2 ..................................................................23

ERCOT Protocols § 8.1.1.4.1 ..................................................................22

ERCOT Protocols § 21 ..................................................................16

ERCOT Protocols § 21.2 ..................................................................6, 20

ERCOT Protocols § 21.3 ..................................................................6, 20

ERCOT Protocols § 21.4.1 ..................................................................6, 20

ERCOT Protocols § 21.4.4 ..................................................................6, 20

ERCOT Protocols § 21.4.5 ..................................................................6, 20

ERCOT Protocols § 21.4.6 ..................................................................20

Appx. Page 665 of 740

ERCOT Protocols § 21.4.8 ...................................................... 7

ERCOT Protocols § 21.4.9 .................................................... 20

ERCOT Protocols § 21.4.10 .................................................... 7

ERCOT Protocols § 21.4.11 .................................................... 8

ERCOT Protocols § 21.4.12 .................................................... 8

ERCOT Protocols § 21.4.12.3 ............................................ 8, 18

London Economics, Ltd., *Estimating the Value of Lost Load*
(June 17, 2013)................................................................. 27, 30

NPRR 1120 ...........................................................................22

NPRR 1157 ...........................................................................16

NPRR 1172 ...........................................................................22

Potomac Economics, *2012 State of the Market Report for the
ERCOT Electricity Markets* (2013)............................... 29, 30, 31, 32

Potomac Economics, *2020 State of the Market Report for the
ERCOT Electricity Markets* (May 2021).................................5

PUC, Docket No. 5445........................................... 15, 19, 21

Tex. PUC, Docket No. 52307..............................................12

Tex. PUC, Docket No. 55837..............................................30

Tex. R. App. P. 11(c) ........................................................1

William W. Hogan, *On an "Energy Only" Electricity Market
Design for Resource Adequacy* (Sept. 23, 2005)
................................................................................. *passim*

iv

**Appx. Page 666 of 740**

## INTERESTS OF AMICUS CURIAE

Pursuant to the Public Utility Regulatory Act and Public Utility Commission certification, Electric Reliability Council of Texas, Inc., is responsible for ensuring the reliability and adequacy of Texas's grid and managing Texas's wholesale electricity market. In that capacity, ERCOT has statutory authority to adopt, administer, and implement the legally binding rules—known as Protocols—that govern the market and grid.

This case concerns the validity of a Protocol revision that ERCOT adopted and the PUC approved. While ERCOT is not a formal party to this dispute, this case will directly impact both procedural and substantive aspects of ERCOT's rulemaking authority. Additionally, ERCOT is well-positioned to advise this Court regarding the pro-competitive justifications for the rule at issue, as well as the widespread collateral damage that the court of appeals' decision will do to ERCOT's and the PUC's efforts to regulate and secure the market and grid.

ERCOT will pay the fees incurred in preparing this brief. Tex. R. App. P. 11(c).

## STATEMENT OF FACTS

In its *Luminant* amicus brief, ERCOT explained its complex pricing mechanism. ERCOT's Security-Constrained Economic Dispatch system sets a Locational Marginal Price based on generators' offers and consumer demand. ERCOT's *Luminant* Br. 10. But under the PUC-required Scarcity Pricing Mechanism, two administrative adders may raise prices when special circumstances require: the Operating Reserves Demand Curve (ORDC) Adder and the Reliability Deployment Price Adder (RDPA). *Id.* at 11–13.

The ORDC ensures that in times of scarcity—when demand approaches the maximum amount of available supply—the price of electricity automatically reaches the Value of Lost Load. VOLL is the theoretical price the average consumer would pay to avoid curtailment if that consumer were bidding into the market. *Id.* at 13. Thus, when available reserves dip below a critical level (today, 3,000 MW), ERCOT's Protocols set the price of electricity at VOLL (today, $5,000/MWh).[1] The

_____

[1] During Winter Storm Uri, the maximum price was higher ($9,000), but the threshold for triggering it was lower (2,000 MW). *See* ERCOT's *Luminant* Br. 12–13.

2

economic concept is that as the "probability of shedding load" increases, the price of electricity should increase until it reaches VOLL.[2]

Consistent with these market-driven principles, ERCOT, the PUC, and market participants all expected that if demand threatened to exceed (or in fact exceeded) available supply, and ERCOT were forced to order load shed to protect the grid, prices would remain at VOLL. For instance, RWE cites (at 39) a 2012 Brattle Group report that calls VOLL "the efficient price level during severe scarcity conditions *when ERCOT must enact involuntary load shedding.*" Brattle Group, *ERCOT Investment Incentives & Resource Adequacy* 77 (June 1, 2012) (emphasis added). Based on this understanding of the market design, ERCOT's Technical Advisory Committee rejected Luminant's 2014 proposal to make load shed a trigger for the RDPA: there was broad agreement that the proposal was redundant because the ORDC would cause VOLL pricing during load shed. *See* ERCOT's *Luminant* Br. 14–18.[3]

---

[2] ERCOT, *Markets and Reliability: Operating Reserve & Reliability Deployment Price Adders* 16 (2018).

[3] *See also, e.g.*, Brattle Group, *Estimation of the Market Equilibrium & Economically Optimal Reserve Margins for the ERCOT Region* 77 (Dec. 20, 2018) (explaining that during load shed, the ORDC would cause prices to be at VOLL).

3

Appx. Page 669 of 740

Winter Storm Uri exposed a flaw in that assumption. During the Storm, supply was highly volatile—resources would come online, only to trip off again soon after. To ensure there were sufficient reserves to protect the grid from a catastrophic blackout during these recurring drops in available capacity, ERCOT was compelled to order an unprecedented amount of load shed. *See id.* at 18. As a result, the ORDC occasionally failed to produce VOLL pricing because it showed "available" reserves of more than 2,000 MW. *Id.* at 18–19. But those so-called "available" reserves were a product of ERCOT ordering transmission operators to shed thousands of megawatts of demand, representing *millions* of customers. *Id.* at 19. Because those customers' service had been curtailed, their demand could not be accounted for by the bids and offers being cleared by ERCOT's pricing algorithm. *Id.* In other words, ERCOT's pricing system interpreted the millions of shed customers as a reduction in demand when, in reality, demand was unprecedentedly high.

Following the Storm, the Independent Market Monitor explained that the failure of ERCOT's pricing system to ensure that prices were at

4

VOLL during load shed was inconsistent with the competitive economic theory driving ERCOT's energy-only design:

> Real-time energy prices should reflect that shedding firm load is an out-of-market action with a cost equal to the Value of Lost Load (VOLL) . . . . This is clear because one additional MW of energy under these conditions would allow ERCOT to serve an additional MW of load, so the value of this energy must equal VOLL. Efficient pricing during these extreme shortages is essential in an energy-only market because it provides necessary economic signals to increase the electric generation needed to restore the load in the short term and service it reliably over the long term.

Potomac Economics, *2020 State of the Market Report for the ERCOT Electricity Markets* xi (May 2021); *accord id.* at 31 (explaining that a "flaw in [the RDPA] was revealed in 2021," insofar as it "does not directly account for firm load shed"). The IMM thus "recommend[ed]" that ERCOT revise the Protocols "to designate that firm load shedding directed by ERCOT be included in the calculation of the" RDPA. *Id.* at xi, 31.

This recommendation spurred NPRR 1081, which was proposed jointly by ERCOT and the IMM. App. A.[4] Under the ORDC, prices rise to VOLL as the probability of load shed increases. The economic theory

---

[4] ERCOT has appended to this brief all of the key documents related to the adoption of NPRR 1081.

underlying ERCOT's energy-only market assumes that prices will remain at that level *during* severe load shed, when reserves are effectively *negative*. NPRR 1081 ensures that the market acts according to its intended design and underlying economic principles, producing efficient pricing outcomes that reflect the forces of supply and demand in a moment when those forces are not operating normally.

NPRR 1081 was a product of ERCOT's collaborative, stakeholder-led rulemaking process. ERCOT and the IMM proposed the revision to "ensure that Real-Time energy prices reflect the VOLL when Load is being shed, which is fundamental to an energy-only market design in order to provide effective economic signals." App. A; ERCOT Protocols § 21.2(1) (providing how to initiate an NPRR). After ERCOT publicly posted the NPRR and solicited comments, ERCOT Protocols § 21.4.1, the NPRR was reviewed by ERCOT's Protocol Revision Subcommittee, ERCOT Protocols §§ 21.3, 21.4.5. At an open PRS meeting, the revision was recommended for approval by representatives of consumers and every market segment (with three abstentions). Apps. E, F; ERCOT Protocols § 21.4.4.

6

The revision was next presented to ERCOT's Technical Advisory Committee.[5] ERCOT Protocols § 21.4.8. RWE commented that ERCOT should not consider the revision while *Luminant* was pending. App. L. But RWE did not affirmatively argue that the revision exceeded ERCOT's authority under PURA. *Id.* The PUC's Staff urged adoption, explaining that shedding load "is an out-of-market reliability action and therefore should be reflected in Real-Time energy prices," and that the price in those circumstances "should reflect VOLL" because "efficient pricing is needed during extreme shortages to provide the economic signals necessary to increase the generation needed to restore Load in the short-term and service it reliably over the long-term." App. K. At an open meeting, every market segment recommended the revision for approval (with four abstentions). Apps. M, N.

Finally, ERCOT's Board adopted the revision. App. O; ERCOT Protocols § 21.4.10. Neither RWE nor any other stakeholder sought to exercise its statutory right to address the Board about its concerns. *See*

---

[5] The TAC is comprised of stakeholder representatives and reports directly to ERCOT's Board. The TAC plays an important role in the development of ERCOT's policies and procedures. The PRS is a subcommittee of the TAC that reviews and recommends action on formally submitted NPRRs.

7

PURA § 39.1511(b). Nor did RWE (or any other interested person) file an administrative appeal with the PUC concerning the Board's actions. ERCOT Protocols § 21.4.12.3; 16 Tex. Admin. Code § 22.251.

The Board's adoption of NPRR 1081 was then approved by the PUC at an open meeting. *See* ERCOT Protocols § 21.4.11. Following that approval, RWE appealed directly to the Third Court of Appeals, pursuant to a statute permitting direct appeals of "competition rules adopted by the commission"—but *not* rules adopted by ERCOT. PURA § 39.001(e). *Contra* ERCOT Protocols § 21.4.12 (providing how to appeal ERCOT action on an NPRR).

8

## SUMMARY OF THE ARGUMENT

As the PUC explains, the simplest resolution of this case would be to dismiss RWE's direct appeal for want of jurisdiction. The court of appeals only has direct-appeal jurisdiction over a "competition rule[]" adopted *by the commission.*" PURA § 39.001(e) (emphasis added). The court of appeals held, and RWE argues, that RWE's challenge to NPRR 1081 comes within this jurisdictional grant because ERCOT merely "propose[s]" rules for the *PUC's* adoption. *RWE Renewables Am., LLC v. PUC*, 669 S.W.3d 566, 575 (Tex. App.—Austin 2023, pet. granted).

This Court considered and rejected an identical argument in *CPS Energy v. ERCOT*, holding—consistent with the statutory text—that *ERCOT itself* "adopt[s]" rules, subject to the PUC's approval. 671 S.W.3d 605, 616, 623, 626 (Tex. 2023); *id.* at 618 ("ERCOT is empowered to *enact* rules . . . ." (emphasis added)). Because ERCOT, rather than the PUC, "adopted" NPRR 1081, RWE's challenge should be dismissed.

However, if this Court reaches the merits it should hold that NPRR 1081 was well within ERCOT's and the PUC's rulemaking authority. NPRR 1081 provides that when ERCOT is shedding load in EEA3 (because available capacity is critically low or negative), then the price of

9

electricity on the wholesale market should equal VOLL, i.e., the estimated price that a customer would pay to avoid curtailment.

RWE insists that administratively setting VOLL and requiring prices to be at that level during load shed is inconsistent with the competitive principles underlying ERCOT's energy-only market design. RWE's own authorities prove it wrong. For instance, a report RWE cites several times describes the "rich theoretical literature demonstrating the economic efficiency" of administratively "[s]etting the price cap at VOLL" during load shed. Brattle Group, *ERCOT Investment Incentives & Resource Adequacy* 77 (June 1, 2012).

The economic literature on which the ERCOT market is based broadly recognizes that VOLL pricing during scarcity, including load shed, is *fundamental* to ensuring sufficient investment in generation resources and demand response in an energy-only market like ERCOT's. And it recognizes that this pricing can *only* be accomplished by regulatory intervention. Based on this literature, and the ORDC that ERCOT put in place to implement it, ERCOT, the PUC, and market participants long expected prices would be at VOLL during load shed. Winter Storm Uri

10

showed that assumption was wrong, at least when ERCOT was forced to shed unprecedented load.

NPRR 1081 does nothing more than return ERCOT's pricing mechanism to its competitive design, in line with longstanding market expectations. Were this Court to hold that ERCOT and/or the PUC lacked the power to implement NPRR 1081, that ruling would broadly imperil much of ERCOT's and the PUC's current market design, including the ORDC itself. And it would discard the essential economic principles on which the market was built.

ERCOT prays that this Court dismiss RWE's appeal for lack of jurisdiction or render judgment for the PUC.

11

## ARGUMENT

## I. The court of appeals lacked jurisdiction over RWE's challenge to NPRR 1081.

### A. NPRR 1081 was adopted by ERCOT, not the PUC.

Direct appeals are permitted only from "competition rules *adopted by the commission*." PURA § 39.001(e). Competition rules[6] *adopted by ERCOT* are not subject to that provision.

This distinction defeats RWE's appeal. RWE seeks to invalidate NPRR 1081, a revision to the ERCOT Protocols. It is NPRR 1081 itself (rather than the PUC's approval order) that market participants are obliged to obey, PURA § 39.151(j), and it is NPRR 1081 itself that makes firm load shed a trigger for VOLL pricing. The PUC's approval order, by contrast, merely states that the PUC "approves NPRR 1081." Tex. PUC, Docket No. 52307, Item No. 3 (July 16, 2021) (order). RWE thus surgically attacks specific portions of NPRR 1081 itself, not merely the approval order.[7]

---

[6] ERCOT agrees with the PUC that NPRR 1081 is not a "competition rule." But this Court need not reach that question because, whether or not it's a competition rule, NPRR 1081 was adopted by ERCOT, rather than the PUC.

[7] Specifically, RWE (at 21–22) makes much of the fact that it "did not challenge" the portion of NPRR 1081 that "include[s] firm load shed as one factor, among nine different factors, that should be considered in determining" the RDPA, but only challenged the provision requiring prices to reach VOLL during load shed. Note,

12

ERCOT alone "adopted" NPRR 1081. *See* PUC's Reply Br. 6. RWE's contrary position, and the court of appeals' holding, relies on the contra-textual position that ERCOT merely "proposes" rules for the PUC's adoption. RWE's Br. 47;[8] *RWE*, 669 S.W.3d at 575. But this Court has already rejected RWE's argument, which has no basis in PURA's text.

In *Panda Power*, the Dallas Court of Appeals held that ERCOT does not exercise sovereign rulemaking authority because it merely "suggests or recommends rules . . . to the PUC." *Panda Power Generation Infrastructure Fund, LLC v. ERCOT*, 641 S.W.3d 893, 909 (Tex. App.—Dallas 2022) (en banc), *rev'd sub nom.*, *CPS Energy v. ERCOT*, 671 S.W.3d 605 (Tex. 2023). When ERCOT sought this Court's review, Panda made the same argument. Panda's Br. 16, *ERCOT v. Panda Power Generation Infrastructure Fund, LLC*, No. 22-0196 (Tex. filed Oct. 31, 2022) (arguing that ERCOT merely "propose[s] rules" because they

---

however, that the portion of NPRR 1081 that RWE "did not challenge" has no operative effect without the portion that the court of appeals invalidated.

[8] Likewise, RWE's resort (at 49–50) to dictionary definitions of "adopt" are irrelevant in light of the Legislature's express statement that ERCOT itself adopts the rule *before* the PUC approves it.

Appx. Page 679 of 740

"cannot take effect until the PUC says so"); *id.* at 29 n.19 (referring dismissively to "ERCOT's power to *propose* rules" (emphasis added)).[9]

In *CPS*, this Court reversed *Panda Power* and rejected Panda's argument that ERCOT merely "proposes" rules. *CPS* held instead that "ERCOT exercises delegated authority from the PUC to *adopt* and enforce rules." *CPS*, 671 S.W.3d at 616 (emphasis added; internal quotation marks omitted); *id.* at 618 (explaining that "ERCOT is empowered to *enact* rules," which "must be approved by the PUC" (emphasis added)); *id.* at 626 ("[ERCOT] is statutorily authorized to establish, *adopt*, and enforce a variety of policies, rules, guidelines, standards, procedures, protocols, and other requirements to govern the operations of market participants." (emphasis added)).[10]

*CPS*'s holding accords with the plain statutory text, which considers a rule to be "adopted" by ERCOT *before* it is approved by the PUC. PURA § 39.151(g-6) ("Protocols *adopted by* [*ERCOT*] . . . under

[9] As it does here, ERCOT argued in *CPS* that "the Legislature explicitly deems [ERCOT-adopted Protocols] 'rules' *before* PUC approval." ERCOT's Reply Br. 13, No. 22-0196 (Tex. filed Nov. 15, 2022); ERCOT's Br. 28 & n.11, No. 22-0196 (Tex. filed Oct. 3, 2022).

[10] Both *CPS* and PURA's plain language reject RWE's strange argument that ERCOT lacks delegated rulemaking authority because it "must follow the policy as mandated by the Legislature and executed by an agency."

14

delegated authority from the commission . . . may not take effect before receiving commission approval." (emphasis added)); *id.* ("The [PUC] may approve, reject, or remand with suggested modifications . . . protocols *adopted by* [*ERCOT*]." (emphasis added)).[11]

The unambiguous statutory text and this Court's precedent thus leave no question that *ERCOT*—not the PUC—"adopted" NPRR 1081. And the Legislature intended for ERCOT to do so *outside* the APA. The Legislature's post-Storm amendments to PURA reflect its profound awareness of the ERCOT Protocols and revision process. The Legislature could easily have specified in those amendments that ERCOT's rulemaking process be governed by the APA. Instead, the Legislature ratified ERCOT's preexisting rulemaking mechanism by codifying the requirement that ERCOT "establish and implement a formal process for adopting new protocols or revisions to existing protocols." PURA

---

[11] RWE's resort (at 49–50) to dictionary definitions of "adopt" are irrelevant in light of the Legislature's (and this Court's) express statements that ERCOT itself adopts a rule before the PUC approves it. Similarly, RWE claims (at 49) that the ERCOT Protocols "do not even call for it to 'adopt' or 'approve' any revision." In fact, the term "ERCOT Protocols" is defined as "document[s] *adopted by ERCOT*." ERCOT Protocols § 1.1(1) (emphasis added). The PUC also considers the protocols to be adopted before they are approved. *E.g.*, PUC, Docket No. 54445 ("Review of Rules *Adopted by* [*ERCOT*]" (emphasis added)).

Appx. Page 681 of 740

§ 39.151(g-6).[12] *This* "process"—i.e., ERCOT's "formal process"—"must require that new or revised protocols may not take effect until the commission approves a market impact statement." *Id.*

In other words, the PUC's approval of an ERCOT-adopted Protocol revision is part of the non-APA "formal process" by which the Legislature requires ERCOT to adopt new or revise existing Protocols. In this context, the PUC does not itself engage in rulemaking. It *supervises* ERCOT's rulemaking: the PUC "may approve, reject, or remand with suggested modifications . . . protocols *adopted by* [*ERCOT*]." *Id.* (emphasis added).[13]

ERCOT alone "adopted" NPRR 1081. *Id.* In approving ERCOT's adoption of that Protocol revision, the PUC did not itself make a rule; it exercised its supervisory powers of "oversight and review" over ERCOT's delegated rulemaking authority. PURA § 39.151(g-6). Because the PUC

---

[12] Of course, ERCOT revised this process in light of changes the Legislature made to ERCOT's role. *See* ERCOT Protocols § 21; NPRR 1157.

[13] The Legislature's decision to place ERCOT's rulemaking outside the APA is not "absurd," as RWE asserts. RWE's Br. 50. The Legislature made a conscious decision to ratify ERCOT's Protocol revision process, knowing that the process provides notice-and-comment opportunities to interested parties, as well as administrative and judicial review, while also harnessing ERCOT's substantial subject-matter expertise and the expertise of market participants themselves.

16

did not "adopt" NPRR 1081, the court of appeals lacked jurisdiction over RWE's direct appeal, which must therefore be dismissed.

## B.    RWE could have challenged NPRR 1081 before the PUC.

RWE asserts it is entitled to challenge NPRR 1081 via a direct appeal because it cannot challenge NPRR 1081 administratively. RWE's Br. 55–57. RWE argues that administrative complaints about ERCOT must be filed with the PUC within 35 days, after which the PUC has time to respond, 16 Tex. Admin. Code §§ 22.251(e)–(g), while a direct appeal must be filed within 15 days, PURA § 39.151(f). RWE thus claims that if it waited for administrative review before filing its direct appeal, its direct appeal would be time-barred.

RWE's argument is question begging: it assumes that RWE may challenge ERCOT-adopted Protocol revisions by direct appeal. But because RWE cannot do so, the purported incompatibility between the administrative regime and the direct-appeal statute falls away.

In any event, RWE has a clear path to administrative and judicial review under PURA, PUC Rules, and ERCOT Protocols. ERCOT's Protocol revision process provides market participants and other interested person notice and numerous opportunities for comment. RWE

17

received notice of NPRR 1081, and it filed a comment urging ERCOT not to adopt it. App. L.

After ERCOT nevertheless adopted NPRR 1081, RWE had a right to complain to the PUC about ERCOT's action. *See* ERCOT Protocols § 21.4.12.3(1) (providing that a market participant, among others, may "appeal *any* decision of the ERCOT Board regarding a Revision Request to the PUCT" (emphasis added)). RWE could have filed a complaint with the PUC and argued that ERCOT's adoption of NPRR 1081 "violat[ed]" a "law that the commission has jurisdiction to administer," namely PURA. 16 Tex. Admin. Code § 22.251(a). If the PUC rejected RWE's appeal, RWE could have sought judicial review under the APA (albeit in district court, rather than directly in the court of appeals). PURA §§ 15.001, 39.003. But RWE chose to forego administrative review.

It is true that, in this case, the PUC approved NPRR 1081 just before RWE's time to administratively appeal ERCOT's adoption expired. But that approval did not prevent RWE from filing its administrative appeal and arguing that NPRR 1081 was inconsistent with PURA (an argument no party had presented to the PUC). Had the PUC agreed with RWE—or if it agrees with some future party challenging a Protocol

18

revision—the PUC could have suspended NPRR 1081's operation or ordered ERCOT to revise it. 16 Tex. Admin. Code § 22.251(*o*).[14]

RWE may be right that, in light of recent PURA amendments, PUC Rule 22.251 should be amended to provide clearer guidance on how to challenge ERCOT's adoption of rules given the PUC's new supervisory role. But whether the PUC should clarify its rules has no bearing on this Court's jurisdiction over a direct appeal from a rule that the PUC did not adopt. And even without clarification, RWE had an explicit path to administrative and judicial review.

### C. RWE's demand for duplicative ERCOT and PUC rulemaking will cripple ERCOT's ability to regulate the grid and market.

The Legislature requires ERCOT to "adopt[] new protocols or revisions to existing protocols" using a "formal process." PURA § 39.151(g-6). As the Legislature knew when it enacted this requirement, ERCOT adopts Protocols using a collaborative, stakeholder-led process.

---

[14] There is an alternative route to administrative review. The PUC has an open project in which it reviews ERCOT-adopted revisions. PUC, Docket No. 54445 ("Review of Rules Adopted by the Independent Organization"). Market participants and other interested persons may file comments in that project advocating for or against approval of an ERCOT-adopted revision. This recently happened with NPRR 1186: numerous parties filed comments with the PUC, in response to which the PUC remanded the revision to ERCOT with instructions to further revise it. PUC, Docket No. 54445, Item No. 64 (order).

Appx. Page 685 of 740

ERCOT Protocols § 21.2(1). This process provides multiple opportunities for comment, and representatives of consumers and each market segment are able to vote on the proposals as they progress through ERCOT's Protocol Revision Subcommittee, Technical Advisory Committee, and State-appointed Board. *Id.* §§ 21.3, 21.4.1, 21.4.4, 21.4.5.

ERCOT employs subject-matter experts in a range of relevant areas, including economics, market design, and a variety of engineering specialties. These experts are engaged at every stage of the Protocol-revision process, analyzing the effect of any proposal on ERCOT's functions and the grid and market. *See id.* §§ 21.4.6, 21.4.9. Additionally, because market participants have a hands-on role in the Protocols' drafting and revision, ERCOT is able to harness their substantial expertise as well.

The result of this process is thousands of pages of binding rules that govern every aspect of Texas's electric grid and wholesale market—not only the Protocols, but also a numerous other "guides, policies and procedures" containing legally binding rules. *See* ERCOT, *Market Rules*; PURA § 39.151(j).

The PUC "by design lacks ERCOT's expertise in this highly technical field," PUC's Reply Br. 10, and it thus has neither the staff nor deep technical knowledge necessary to craft these immensely complex rules. This is *why* the Legislature authorized the PUC to delegate that authority to ERCOT, authorized the use of public funds to pay for ERCOT's operations, and ratified ERCOT's specialized rulemaking process. Requiring the PUC to engage in a second rulemaking *after* ERCOT engages in the "formal process" the Legislature requires would cripple ERCOT's ability to regulate the grid and market.

In 2023 alone, there were 56 NPRRs initiated in ERCOT, of which 28 were approved that year (along with numerous others initiated in 2022). *See* ERCOT, *Nodal Protocol Revision Requests (NPRRs)*. That same year, an additional 66 revisions to other binding ERCOT rules were initiated, of which 60 were approved.[15] ERCOT considers all of these revisions to be rulemakings subject to the PUC's approval. *See* PURA §§ 39.151(g-6), (j); *see, e.g.*, Tex. PUC, Docket 5445, Item No. 51 (Dec. 27,

---

[15] These include revisions to ERCOT's Planning Guide, Nodal Operating Guide, Settlement Metering Operating Guide, Retail Market Guide, Load Profile Guide, Verifiable Cost Manual, and Other Binding Documents.

2023) (submitting ERCOT-adopted revisions to the Nodal Operating Guide, Planning Guide, and Retail Market Guide for PUC approval).

Most of the NPRRs that ERCOT adopts affect numerous provisions of the Protocols, often in entirely different sections. *See, e.g.*, NPRR 1172 (involving 60 pages of revisions to seven different sections of the Protocols). They are detailed and highly technical, often "look[ing] more like an electrical engineering textbook than anything the PUC usually adopts." ERCOT's Amicus Letter 4; *e.g.*, ERCOT Protocols §§ 3.22.2, 6.5.7.5, 8.1.1.4.1. One recent example is NPRR 1120, which ERCOT adopted to implement a PUC directive to develop a firm-fuel product that provides additional grid reliability during extreme cold-weather events. Like many sections of the Protocols, NPRR 1120 includes complex mathematical pricing formulas like this:

**Appx. Page 688 of 740**

(4) → ERCOT shall pay an FFSS payment to each QSE for each FFSSR. The FFSS payment for each hour of November 15, through March 15, during the FFSS obligation is calculated as follows:

$$\text{FFSSAMT}_{q,r} = (-1) * (\text{FFSSSBF}_{q,r} + \text{FFSSFRC}_{q,r})$$

**Where:**

$$\text{FFSSSBF}_{q,r} = \text{FFSSPR}_{q,r} * \text{FFSSCRF}_{q,r} * \text{FFSSARF}_{q,r} * (1 - \text{FFSSDRP})$$

And:

FFSS Capacity Reduction Factor

If $(\text{FFSSTCAP}_{q,r} \geq \text{FFSSACAP}_{q,r})$

Then: → → $\text{FFSSCRF}_{q,r} = 1$

Otherwise: → $\text{FFSSCRF}_{q,r} = \text{Max}(0, 1 - 2 * (\text{FFSSACAP}_{q,r} - \text{FFSSTCAP}_{q,r}) / \text{FFSSACAP}_{q,r})$

FFSS Availability Reduction Factor

If $(\text{FFSSHREAF}_{q,r} \geq 0.90)$

Then: → → $\text{FFSSARF}_{q,r} = 1$

Otherwise: → $\text{FFSSARF}_{q,r} = \text{Max}(0, 1 - (0.90 - \text{FFSSHREAF}_{q,r}) * 2)$

FFSS Hourly Rolling Equivalent Availability Factor

If the FFSSR is a Combined Cycle Resource:

Then: → $\text{FFSSHREAF}_{q,train} = [\sum_{hr=h-1451}^{h} \max_{train,hr}(\max(\text{FFSEDFLAG}_{q,train,hr},$
$\text{FFSSAFLAG}_{q,ccgr,hr}) * (\min(\text{HSL}_{q,ccgr,hr}, \text{FFSSACAP}_{q,train})))] / \sum_{hr=h-1451}^{h}(\text{FFSSACAP}_{q,train})$

Otherwise:

$\text{FFSSHREAF}_{q,r} = \sum_{hr=h-1451}^{h}(\max(\text{FFSEDFLAG}_{q,r,hr}, \text{FFSSAFLAG}_{q,r,hr}) *$
$(\min(\text{HSL}_{q,r,hr}, \text{FFSSACAP}_{q,r}))) /$
$\sum_{hr=h-1451}^{h}(\text{FFSSACAP}_{q,r})$

ERCOT Protocols § 6.6.13.2(4).

By comparison, the PUC approved only *ten* rulemaking projects in 2023 across its multiple regulatory domains. Just six of these concerned electricity regulation, and none involved the level of technical complexity

23

that is the norm in ERCOT's Protocols. RWE's interpretation of PURA would require the PUC to engage in many times more rulemakings than it currently does, and those rulemakings will be far more technically demanding. Even putting aside the delay and wastefulness of double-rulemaking, *see* ERCOT's Amicus Letter 5, this would—to put it mildly—strain the PUC's resources while making it more difficult for ERCOT and the PUC to protect the grid and market. The Legislature, in granting ERCOT the power to "adopt" rules and endorsing its non-APA rulemaking process, could not have foreseen or intended the chaos that the court of appeals' rule will wreak.

RWE has no real response. It insists that "[t]here is no requirement for duplication" in the court of appeals' reading of PURA. RWE's Br. 52. On the contrary, the Legislature explicitly envisioned a two-part process: first, ERCOT "adopt[s]" the rule using a "formal process" that it establishes; second, the PUC exercises its supervisory power and "approve[s], reject[s], or remand[s] with suggested modifications." PURA § 39.151(g-6). In other words, the Legislature expects ERCOT to create and adopt the Protocols using its longstanding process and substantial

24

technical expertise; and it expects the PUC to review the work done by ERCOT.

Yet, according to RWE, that second-step review is, itself, a rulemaking governed by the APA. Were that right, the PUC would absolutely have to engage in a duplicative second rulemaking *after* ERCOT engages in its stakeholder-led "formal process" and "adopt[s]" the protocol revision.

## II. The court of appeals' substantive holding threatens the stability of the ERCOT grid and market.

NPRR 1081 sets the price of electricity at VOLL when ERCOT is ordering load shed in EEA3 (i.e., when market-wide demand exceeds, or nearly exceeds, supply). The court of appeals held that this revision exceeded ERCOT's and the PUC's power under PURA because it was insufficiently competitive. 669 S.W.3d at 576. RWE defends this rule, insisting that PURA prohibits ERCOT and the PUC from setting the price of electricity under specific circumstances.

RWE's arguments are internally inconsistent and fundamentally misstate the design and operation of the ERCOT wholesale electricity market.

25

## A. ERCOT's energy-only market design demands that prices be at VOLL during load shed.

RWE grounds its substantive arguments in a legislative "find[ing]"[16] that "electric services and their prices should be determined by customer choices and the *normal* forces of competition." PURA § 39.001(a) (emphasis added). RWE fails to reckon with that italicized word.

RWE attacks the very concept of VOLL, asserting that it "cannot tell the PUC what the market price should be." RWE's Br. 31 (emphasis removed); *id.* ("VOLL does not require the price of electricity to be at the cap during load shed."). RWE's argument lacks any basis in economic theory or market design, and RWE ignores what its own authority calls the "rich theoretical literature demonstrating the economic efficiency" of "[s]etting the price cap at VOLL" during load shed. *ERCOT Investment Incentives* 77.

---

[16] PURA § 39.001(a) contains no operative language: it does not require or prohibit any action. Instead, § 39.001(a) explains why the Legislature enacted Chapter 39. And § 39.001's operative provisions do not "tie[]" ERCOT and the PUC "to the mast of competition in a way that prevents them from taking action" in response to emergency conditions or to correct prices in light of ERCOT's out-of-market actions. Oral Argument, *PUC v. Luminant*, No. 23-0231, 2024 WL 386329 (Tex. held Jan. 30, 2024) (Blacklock, J.); *see* ERCOT's *Luminant* Br. 28–33.

The only authority RWE musters is the introduction to an ERCOT-commissioned report, which notes that VOLL is necessarily an inexact measure because the price that a customer would pay to avoid load shed necessarily differs based on a variety of factors (e.g., the type of customer, the reason load is being shed, etc.). RWE's Br. 31 (citing London Economics, Ltd., *Estimating the Value of Lost Load* 1, 6 (June 17, 2013)). RWE misuses this true and important fact to suggest that the price of electricity during load shed should be determined by market forces, without regulatory intervention.

RWE is mistaken at the most fundamental level. The ERCOT market is designed so that in "normal" times, the "forces of competition"—demand bids and generator offers—determine wholesale prices. But NPRR 1081 was not built for "normal" times.

NPRR 1081 operates when, because of ERCOT's out-of-market reliability actions, competitive forces cease to operate normally. ERCOT orders load shed when reserves fall below a certain threshold because those reserves are critical to ensuring reliability and the physical health of system components.

27

When load is shed, however, it artificially suppresses systemwide demand: the customers who are not receiving power are, for that reason, absent from the market, which consequently cannot account for their demand. Absent regulatory intervention to correct prices, therefore, generators' offers would clear based only on the demand of the customers still receiving power. *See ERCOT Investment Incentives* 75–76 (explaining that it is "difficult to determine the marginal system cost during scarcity events because typical dispatch and price-setting mechanisms are not sufficient to bring supply and demand into balance").[17] Econ 101 principles describe the effect of ERCOT's out-of-market actions: prices fall due to artificially suppressed demand. *See id.* (explaining that that out-of-market reliability actions, including "shedding firm load," can "inappropriately suppress market prices when high prices are most needed").

---

[17] RWE suggests (at 39) that this report cautioned ERCOT and the PUC against "interven[ing] in market pricing" by requiring VOLL pricing during load shed. In fact, as ERCOT explains below, the report specifically endorses VOLL pricing in those circumstances. *ERCOT Investment Incentives* 6–7, 75–77, 79. The report's warnings concerned regulatory interventions that *suppress* prices, like price caps and "sponsoring out-of-market supplies" of energy. *Id.* at 12–13; *see also* PUC's Reply Br. 13.

28

It is widely understood in the economic and market-design literature that, in an energy-only market built on competitive principles, regulatory intervention is necessary in these circumstances to ensure efficient pricing.[18] And the nature of this critical intervention is well known and widely agreed: the system operator or regulator must administratively determine VOLL and ensure that prices are at that level during scarcity and load shed.

RWE's own authorities make this very point: Because "market-based supply offers and demand bids *cannot be used* to determine the marginal cost of power during scarcity events, . . . the price must be administratively determined." *ERCOT Investment Incentives* 75 (emphasis added). This is "the price that the average customer would have been willing to pay to avoid curtailment." *Id.* at 76.[19]

---

[18] "In the vast majority of hours, the marginal cost of the marginal action is associated with the dispatch of the last generator required to meet demand. It is appropriate and efficient in these hours for this generator to 'set the price.' *However, this is not true under shortage conditions*." Potomac Economics, *2012 State of the Market Report for the ERCOT Electricity Market* 82 (2013) (emphasis added).

[19] RWE is correct that—precisely because VOLL cannot be determined by bids and offers—determining VOLL is a difficult endeavor. Generally, a regulator or system operator must perform customer surveys to set an average VOLL (or a variety of averages for different customer classes). *See Estimating the Value of Lost Load* 7 ("A key conclusion from this literature review is that surveys provide more accurate estimates of VOLL . . . ."); *On an "Energy Only" Market* 11; *ERCOT Investment Incentives* 77–78. ERCOT is in the midst of such a study. *See* Tex. PUC, Docket No.

Appx. Page 695 of 740

As this RWE-cited report thus explains, VOLL is critical to ensuring the competitive pricing of reserves in times of scarcity. Because offers from generators are generally expected to reflect their short-run marginal cost, the operator of an energy-only market must implement a demand curve (in ERCOT, the ORDC) that "raise[s] prices towards the average VOLL when operating reserve levels approach the minimum reserve level." William W. Hogan, *On an "Energy Only" Electricity Market Design for Resource Adequacy* 13 (Sept. 23, 2005).[20] This ensures that prices account for "the effects of scarcity or capturing the true opportunity cost at margin." *Id.*[21] Without the ORDC, "the resulting price determination would be flawed in the periods of scarcity when it would be needed the most." *Id.*; *see also* *ERCOT Investment Incentives* 79

---

55837 (Review of Value of Lost Load in the ERCOT Market). However, RWE does not challenge the PUC's chosen VOLL, and the need to administratively choose an imperfect average value does not diminish the importance of the concept to competitive-market design.

[20] Notably, Professor Hogan's work provided the theoretical framework for ERCOT's ORDC. *See, e.g.*, *ERCOT Presentation Regarding Potential Implementation of Scarcity Pricing Proposal Offered by Professor Hogan*, PUC Docket No. 40000, Item No. 369 (Jan. 22, 2013).

[21] During a shortage of supply, the operator's first action is "generally not to satisfy operating reserves requirements." *2012 State of the Market Report* 83. This "results in diminished reliability, which has a real cost to electricity consumers" that must be "reflected in energy prices to achieve efficient economic signals governing investment in generation, demand response and transmission." *Id.*

Appx. Page 696 of 740

(explaining that "the efficient price" as reserves diminish "will also increase with the severity of the event and ultimately reach VOLL").

Identical economic logic applies when ERCOT is shedding load, rebutting RWE's position that PURA permits the ORDC but forbids NPRR 1081. If prices should be at VOLL when reserves are minimal, prices should also be at VOLL when reserves are effectively *negative* and the system operator must order firm load shed in order to ensure reserves sufficient to protect the system. As Professor Hogan explains:

> As the market tightens relative to available supply, reserves would be reduced and prices for energy and reserves would rise. When operating reserves reach the minimum level, the price reaches the . . . *average VOLL and involuntary load curtailments would be required.*

[On an "Energy Only" Electricity Market](#) 14 (emphasis added). When "scarcity reaches the point that reserves are reduced to the minimum operating level, the system operator" must implement "rotating involuntary load curtailments." *Id.* at 16. "*Under these conditions the price of energy would be at the average VOLL*, with a corresponding price of reserves." *Id.* (emphasis added).

> The report that RWE touts agrees. It explains that VOLL

> is the efficient price level during severe scarcity conditions when ERCOT must enact involuntary load shedding . . . . A

31

VOLL-based price cap approximates what the demand curve would have been had customers been actively bidding to avoid curtailment. *Setting the price cap at VOLL is supported by a rich theoretical literature demonstrating the economic efficiency of this approach.*

*ERCOT Investment Incentives* 77; *see also 2012 State of the Market Report* 83 ("At times when there is insufficient capacity to meet both energy and minimum operating reserve requirements, all available capacity will be dispatched and the clearing price will rise in a predetermined manner to a maximum of the system-wide offer cap.").

This literature explains the longstanding design of ERCOT's market, including the ORDC, and the rationale for NPRR 1081. ERCOT's pricing system relies on bids and offers to the greatest degree possible. But bids and offers are insufficient to put a price on scarcity, let alone tens of thousands of megawatts of load shed. For years, ERCOT, the PUC, and the market believed that the ORDC would be sufficient to produce efficient pricing outcomes during load shed. Winter Storm Uri proved that wrong. So ERCOT adopted NPRR 1081 to return the market to its intended design.

The critical point is that NPRR 1081 is pro-competitive because it corrects price suppression caused by ERCOT's out-of-market reliability

32

actions, ensuring that the price of energy reflects the true conditions of the market. VOLL is *necessarily* set administratively because the market is incapable of pricing the opportunity cost of demand that—because of regulatory intervention—is not currently in the market.

NPRR 1081 is consistent with (indeed, critical to) the competitive principles PURA implements and around which the ERCOT market was designed. The court of appeals erred in holding that it exceeded the PUC's or ERCOT's authority.

**B.    RWE's cramped conception of PURA would gravely harm ERCOT's ability to protect the grid and ensure efficient economic outcomes.**

The court of appeals held that ERCOT and the PUC exceed their statutory authority if they set "a single price at the rule-based maximum price." *RWE*, 669 S.W.3d at 576 (quoting *Luminant Energy Co. v. PUC*, 665 S.W.3d 166, 191–92 (Tex. App.—Austin 2023, pet. granted)).

Tellingly, RWE makes no effort to defend the actual substance of the court of appeals' holding. Indeed, it insists (at 27) that the ORDC is not threatened by the court of appeals' decision, even though it likewise sets "a single price at the rule-based maximum price" when reserves are between zero and 3,000 megawatts. And RWE even concedes that

33

ERCOT may use load shed as "one of the many factors considered" in *increasing* (but not increasing *to VOLL*) prices under the RDPA. RWE's Br. 21–22.

In its efforts to do minimal damage to the regulatory regime, RWE thus ties itself in knots. According to RWE, ERCOT can administratively set the price of energy at VOLL when reserves are low (the ORDC), but not when they are effectively negative and ERCOT is shedding load to *maintain* those reserves. And ERCOT can use load shed (i.e., effectively negative reserves) as a factor for increasing price, but ERCOT cannot increase that price to an economically efficient level, i.e., VOLL.

The resulting position is incoherent. RWE contends that the ORDC is appropriate because it "accounts for the value of reserves based on the probability of reserves falling below the minimum contingency level." RWE's Br. 27. But there is no daylight between that rationale and NPRR 1081: both do an identical thing (set energy prices at VOLL) under nearly identical circumstances (low vs. effectively negative reserves). Indeed, the reason ERCOT sheds load is to maintain sufficient reserves—the very reserves RWE concedes can properly be "value[d]" by VOLL pricing. If

34

PURA prohibits NPRR 1081, then the ORDC's validity is also in grave doubt.

RWE also cannot explain the premise underlying its implicit distinction between correcting price suppression by (1) administratively *increasing* a price, which RWE suggests may be allowed; and (2) administratively increasing a price *to VOLL*, which it argues is illegal (at least if it responds to load shed, rather than merely low reserves). *E.g.*, RWE's Br. 27 (defending ERCOT's other price adders because they "properly value existing reserves," "account for ERCOT's out-of-market actions," and "ensure[] reliability deployments do not distort energy prices"); *see also id.* at 23 (asserting that the court of appeals "did not strike down regulatory price adders *per se*"). If PURA prohibits ERCOT and the PUC from setting the price of energy at VOLL when compelled by economic logic and market-design principles, there is no conceivable reason why ERCOT and the PUC could nevertheless displace prices based on bids and offers to some lesser (and less economically sound) degree.

35

Moreover, all of ERCOT's regulatory adders (as well as other pricing mechanisms[22]) can, ultimately, drive the price to VOLL in certain circumstances.[23] RWE suggests that ERCOT could incorporate load shed into the RDPA in some other way, mistakenly claiming that ERCOT "historically used" load shed as "one input" in its "calculat[ion of] real-time reserve price adders." RWE's Br. 32.[24] But even if this were possible,[25] it would likely still produce VOLL pricing in some intervals—and would (under RWE's rule) presumably be illegal in those instances.

RWE also cannot explain why price caps are appropriate when price floors are not. The theoretical literature undergirding ERCOT's energy-

---

[22] *See, e.g.*, ERCOT, Other Binding Documents, Methodology for Setting Maximum Shadow Prices for Network and Power Balance Constraints § 4.1 (eff. Apr. 1, 2022).

[23] For example, when ERCOT (not the PUC, as RWE incorrectly claims at 26) uses its Reliability Unit Commitment tool, the RDPA can cause prices to reach VOLL. *See* ERCOT's *Luminant* Br. 31–32 & n.25. RWE is also wrong to suggest that RUC-committing resources "does not stop prices from being set by the competitive market" because generators can "opt out of the make-whole payment." A generator that opts out has effectively not been RUC-committed; when a generator *is* RUC-committed that impacts the RDPA.

[24] Before NPRR 1081, ERCOT did not use load shed as an RDPA input—because ERCOT and the market believed the ORDC would produce VOLL pricing in that circumstance. *See* ERCOT's *Luminant* Br. 15–17. There is no truth to RWE's contrary claim, which is based on a non-pincited reference to a 2013 ERCOT report that does not support RWE's assertion.

[25] As ERCOT explains above, there is not an alternative way to incorporate firm load shed into the RDPA because the only efficient pricing outcome when load is being shed is VOLL.

36

only market *depends upon* administratively set VOLL pricing and *criticizes* price caps. [On an "Energy Only" Electricity Market](#) 4, 14–16; [ERCOT Investment Incentives](#) 1–2, 77–79. RWE inverts this, suggesting that while VOLL pricing is anathema, price caps are appropriate to "prevent market abuse from causing 'excessive transfers of wealth.'" RWE's Br. 27. But price caps are not perfectly aligned with competitive forces because they prevent willing parties from contracting for energy at higher prices. However justified on regulatory grounds, it is thus difficult to fathom how such caps could survive under the court of appeals' rule.[26]

NPRR 1081—like the ORDC and RDPA—is fundamentally pro-competitive. It operates only at times when market forces falter. During load shed, customers who, for reliability reasons, have been forced offline cannot bid into the market to have their power restored, and their demand cannot be accounted for by ERCOT's normal pricing mechanism. In these circumstances, normal market forces—bids and offers—cannot

---

[26] Notably, the Legislature does not view price caps as inconsistent with PURA's competitive scheme. While the Legislature has never specifically empowered ERCOT or the PUC to impose price caps (except in one specific instance, *see* PURA § 39.160(d)), it recently imposed *limits* on how long such caps may remain in effect, if the PUC and ERCOT opt to use them. PURA §§ 39.160(b), (e).

37

produce a competitive solution. So the PUC has administratively determined the price customers would be willing to pay to avoid load shed.

The relevant literature is clear that this is the efficient price during scarcity conditions, including load shed. Without such an intervention, prices would be suppressed and the energy-only market would not provide the proper incentives for demand response or the building of needed additional generation capacity. *See* 37 Tex. Reg. 8959, 8964 (Nov. 9, 2012) (order adopting Scarcity Pricing Mechanism rule).

\* \* \*

Even the court of appeals recognized that ERCOT and the PUC should rely on "competitive methods" only "*to the greatest extent feasible.*" *RWE*, 669 S.W.3d at 576 (quoting *Luminant*, 665 S.W.3d at 191–92) (emphasis added). But in all the circumstances discussed above, such reliance is not feasible—a point that both the court of appeals and RWE have missed.

Relying solely on competitive forces cannot protect the physical grid when demand exceeds supply, so ERCOT must take out-of-market regulatory action to protect it. These regulatory actions, including load

38

shed, suppress prices. In those circumstances, the "normal" forces of competition cease to operate and reliance on purely "competitive methods" cannot produce efficient pricing outcomes. Consistent with the competitive economic principles that underly the ERCOT market design, ERCOT must in these circumstances take administrative action to ensure that prices reflect actual economic conditions.

That is all NPRR 1081 does, consistent with substantial economic literature and longstanding market expectations. If NPRR 1081 was not a valid exercise of ERCOT's delegated rulemaking authority, it is likely that many other similar Protocols are likewise invalid. The result would be a convulsive change in the nature of the ERCOT market, and it would severely cripple the Legislature's, the PUC's, and ERCOT's efforts to ensure the grid's reliability.

### PRAYER

ERCOT prays that this Court reverse the court of appeals' judgment and render judgment dismissing RWE's direct appeal for want of jurisdiction or, alternatively, render judgment for the PUC.

39

Respectfully submitted,

/s/ *Wallace B. Jefferson*
Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Rachel A. Ekery
State Bar No. 00787424
rekery@adjtlaw.com
Nicholas Bacarisse
State Bar No. 24073872
nbacarisse@adjtlaw.com
ALEXANDER DUBOSE &
 JEFFERSON LLP
100 Congress Avenue, Suite 1450
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile:  (512) 482-9303

Elliot Clark
State Bar No. 24012428
eclark@winstead.com
Elin Isenhower
State Bar No. 24104206
eisenhower@winstead.com
WINSTEAD PC
401 Congress Avenue, Suite 2100
Austin, Texas 78701
Telephone: (512) 370-2800
Facsimile:  (512) 370-2850

**ATTORNEYS FOR ELECTRIC
RELIABILITY COUNCIL OF TEXAS**

40

# CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2024, this brief was served via electronic service through eFile.TXCourts.gov on all parties_through counsel of record, listed below:

Kurt Kuhn
Lisa Bowlin Hobbs
KUHN HOBBS PLLC
3307 Northland Dr., Suite 310
Austin, Texas 78731
(512) 476-6005

Stephanie C. Sparks
VEDDER PRICE PC
100 Crescent Court, Ste. 350
Dallas, Texas 75201
Telephone: (469) 895-4830

**ATTORNEYS FOR RESPONDENT RWE RENEWABLES AMERICAS, LLC**
Michael J. Jewell
michael@jewellandassociates.com
JEWELL & ASSOCIATES, PLLC
8404 Lakewood Ridge Cove
Austin, Texas 78738-7674
Telephone: (512) 423-4065

**ATTORNEYS FOR RESPONDENT TEXAS HEREFORD WIND, LLC**

Angela Colmenero
Brent Webster
Lanora C. Pettit (lead counsel)
Bill Davis
Priscilla M. Hubenak
John R. Hulme
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Telephone: (512) 936-1700

**ATTORNEYS FOR PETITIONER PUBLIC UTILITY COMMISSION OF TEXAS**

/s/ *Wallace B. Jefferson*
Wallace B. Jefferson

41

# APPENDIX H

413 F.3d 503
United States Court of Appeals,
Fifth Circuit.

TEXAS COMMERCIAL

ENERGY, a Texas Limited Liability

Company, Plaintiff–Appellant,

v.

TXU ENERGY, INC., et al., Defendants,

TXU Energy Inc., TXU Generation Services

Company LP, TXU Portfolio Management

Company LP, formerly known as TXU Energy

Trading Company LP, TXU Energy Solutions

Management Company, formerly known as

TXU Energy Services Co., American Electric

Power Inc.; AEP Texas Central Company,

AEP Texas North Company, American

Electric Power Service Corp., AEP Texas

Commercial Industrial Retail LP, Reliant

Energy Inc., Reliant Resources Inc., Reliant

Energy Electric Solutions LLC, Reliant Energy

Retail Services LLC, Reliant Energy Solutions

LLC, Automated Power Exchange Inc., Electric

Reliability Counsel of Texas, Texas Genco LP,

Centerpoint Energy Inc., Centerpoint Energy

Houston Electric LLC, Texas Independent

Energy LP, Odessa–Ector Power Partners LLP,

Guadalupe Power Partners LLP, Tractebel

Energy Marketing, Inc., Defendants–Appellees.

No. 04–40962.
|
June 17, 2005.

**Synopsis**

**Background:**

**Holdings:**

**Attorneys and Law Firms**

*505

**Appx. Page 709 of 740**

Texas Commercial Energy v. TXU Energy, Inc., 413 F.3d 503 (2005)

2005-1 Trade Cases P 74,836, Util. L. Rep. P 14,559

*506

## Opinion

c

*507

**Appx. Page 710 of 740**

**Texas Commercial Energy v. TXU Energy, Inc., 413 F.3d 503 (2005)**

2005-1 Trade Cases P 74,836, Util. L. Rep. P 14,559

*Keogh v. Chicago & Northwestern Railway, Co.,*

*Keogh,*

*Id.*

*Id.*

**508**

*Id.*

*Keogh,*

*See, e.g., Ark. La. Gas Co. v. Hall,*

*Gulf States Utilities Co. v. Fed. Power Comm'n* ... *D. E. Transmission Corp. v. Fed. Energy Regulatory Comm'n,*

*Wegoland, Ltd. v. NYNEX Corp.,*

cc

... *de novo. Martin K. Eby Const. Co. v. Dallas Area Rapid Transit,*

... *Conley v. Gibson,*

*See, e.g., Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,*

ccc

E

Texas Commercial Energy v. TXU Energy, Inc., 413 F.3d 503 (2005)
2005-1 Trade Cases P 74,836, Util. L. Rep. P 14,559

[illegible] *In re CPDC, Inc.*, [illegible] *Crown Life Ins. Co. v. Casteel*, [illegible]

[illegible] *Square D Co.*, [illegible] *see also Wegoland*, [illegible] *Square D Co.*, [illegible] *Id.* [illegible] *509 [illegible]

[illegible] *Wegoland Ltd.*, [illegible] *see also H.J. Inc. v. Northwestern Bell Tel. Co.*, [illegible]

[illegible] *Taffet v. Southern Co.*, [illegible] *Korte v. Allstate Ins. Co.*, [illegible] *Johnson v. Hosp. Corp. of Am.*, [illegible]

[illegible] *Town of Norwood, Massachusetts v. New England Power Co.* [illegible] *Pub. Util. Dist. No. 1 of Snohomish County v. Dynegy Power Marketing, Inc.*, [illegible] *510 [illegible]

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 4

Appx. Page 712 of 740

**Texas Commercial Energy v. TXU Energy, Inc., 413 F.3d 503 (2005)**

2005-1 Trade Cases P 74,836, Util. L. Rep. P 14,559

%

1%8 -2.I#= 'A-' 'A#J&)#2-'# 7*6'2&4#A*I)74*' : # ->>)&#7 :#6-I=# - 4'&'2I=#9#3>'&*4=A*I)7:# 4-22*+)$6*4='2I#7c' 3*2>A='A&.#4#2-) -==#2'&*&4'*- 3 *2#=>#6&J&)0#.-'&*4 'A-' &'6)-&3=-2##9#3>' J2*3 'A#J&)#2-'# 7*6'2&4#47#2 'A#[6*3>#'&'*2#96#>'&*4<\A#6*3>#'&'*2#96#>'&*4?A&6A A-=4#0#2 :##4 2#6*.4&V#7.$ 'A&=6*I2' *2 'A# MI>2#3# %*I2'?A*)7='A-' [-4 -4'&6*3>#'&'&0#2-6'&6#6#3:*7&#7 &4 - oJ&)#7p2&J 3 -$ o='&))0&*)-'#'A#-4'&'2I=')-+= &J&'<< &3>-6'=I>*4 6*3>#'&'*2==*>>*=#7* 6I='*3#2=<*City of* *Groton v. Conn. Light and Power* %*<?@@F<F7UFH.UFU BF7%&HUkHDee also *Utilimax.com, Inc. v. PPL Energy, LLC,* gSk , <g7gGg?gGSBg7%&FGGHD*3>#'*2#96#>'&*4 #9&='F.#6-I=# 6*3>#'&'*2= 2#4*' 'A#&'47#7 :#4#J6&-2=-2&# *J 'A-' 2I)# *J >I:)&6 '&)&' .I)-'#*4\D BjI*'&4. *Essential Communications Sys. v. Am. Telephone & Telegraph Co.,* @HG , <F7HHP7HFHFBg7%&HUSDBut cf. *Pinney Dock & Transp. Co. v. Penn Central Corp.,* kgk , <F7HPPT_PSB@'A%&HUkkD B2#i#6'&4. 6*3>#'&'*2 #96#>'&*4D<

E==I3&4.?+&'A*I' 7#6&7&4'A-' =6A -4 #96#>'&*4#9&='=? +# J&47'A-' 'A#6*3>#'&'*2#96#>'&*4&=#4*' ->>)&6-:)#'* 'A&6-=#<\ ^L A-=-JJ&)&-'#7#'A#->)&6-:2*0&=&*4*0&7#2-2' *J &'=I:=&7&-2&#*J? 1%8 & 4*' - 6*3>#'&'*2'* 1^L &4 A#6*4'#9' *J 'A&A6-=# :#6-I=# -)) *J &'6)-&3=*J

3-2K#' 3-4&>I)-'&*4-2# J*6I=#7*=*)#)$ *4 1^LX=-6'&*4== -4 #)#6'2&6&4#4&2-'&*4*46*3>#'&'&0#<1 AI=?A#6I2' 7&74*' #22&4 2#JI=&4.4. '* ->>)$ 'A# #96#>'&*4<

5

,&4-))?1%8 -2.I#= 'A-' 'A#J&)#2-'# 7*6'2&4#==*>>)&6-:&#:#6-I=# YLZE 7&74*' 62#-'# - [=I='&'I'# 3 #6A-4&=3*2'A# 2#6*0#2$*J 7-3-.#=<\ c' -)=* -))#.#= 'A-' 'A#[&3>)&6-'&*4 7*6'2&4#\-22-4'=2#0#2=-)47 'A-' 'A#->>)&6-'&7 'A#J&)#2-'# 7*6'2&4#0&*)-'#A#7I6 6*4='&'I'&*4)Y%8 J-&)#7'* 2-&=#=# 'A#=#-2.I3#4'= : #J*2# 'A#7&='2&6'6*I2'<E66*27&4.)$'A#$ -2#+-&0#7<Horton v. Bank One, N.A., gkS , <g7PF@PgTBT'A%&FGGHD

cb

,*2 'A# -:*0# =-'#7 2#-=*4=? +# E,,cZC 'A# 7&='2&6' 6*I2'X= ii7.3#4'<

**All Citations**

PHg, <g7TGg7FGGT!H2-7# %-=#=Y SP?kg@I'&)R<Z#><Y HP?TTU

---

Footnotes

\* Judge Garwood recused himself after oral argument in this case. As a result, this opinion is being entered by quorum pursuant to 28 U.S.C. § 46.

1 Texas' electrical system is independent from the rest of the United States' which is administered through the Federal Energy Regulatory Commission ("FERC"). PUCT fulfills a similar role as FERC.

2 TCE does not challenge the district court's decision to dismiss their negligent misrepresentation and fraud claims under the filed rate doctrine.

3 TCE also contends that the district court erred by ruling that only the U.S. Congress has the authority to determine the applicability of the filed rate doctrine and that the doctrine may only be abrogated through an amendment to the Sherman Act. The defendants, however, "do not dispute that the Texas legislature, had it chosen to do so, could have repealed the application of the filed rate doctrine to cases brought under the TFEAA." Since we conclude there is no evidence that the state legislature sought to eliminate this doctrine from state antitrust suits, this argument is moot.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Appx. Page 713 of 740**

# APPENDIX I

2005 WL 3307524
United States District Court,
S.D. Texas, Houston Division.

UTILITY CHOICE, L.P. d/b/a Utility Choice Electric, and Cirro Group, Inc. d/b/a Cirro Energy Corporation, Plaintiffs,
v.
TXU CORP. d/b/a Txu Energy, et al., Defendants.

No. Civ.A.H-05-573.
|
Dec. 6, 2005.

**Attorneys and Law Firms**

"#$%$ &' (#%)*%+#, -++./%*0 $+,1$2 "$5#6 -%6*/3.% 7)8..4 &9#+: ; <, " $44$3,=>, 7#?$4 <' @$++3 @$++3 1$2 A#/9 11; , &$%-%+.%#.,=>, B.C*/+ &).++ ;.+.3?0 , D+#4#+0 <:.#)* E4*)+/#)F .G3+.%,=>, H/*I./0 1$9$/ H.2$%, @$++3 1$2 A#/9 11; , <./JG3 <:/#3+#, =>, K./ ;4$#%+#KK

B#):$/6 1' - 6$93, @./3:$9 A./30+:* *+ $4, L.:% < F.44.2$0 , -+9.3 E%*I0 <./J', 1$2/*%)* -%6/*2 H$06.3, F$0%*3M N..%*, "$44$3,=>, =:.9$3 7 ' FGI:*3 , FG%+.% M @#44#$9311; , 7$/0 -%%*7 $3.%, B.C*/+ N' @. 4#%3?0 &+*5*% B.G+:, F.I$% M F$/+3.%11; , @$3:#%I+.%"<, =:.9$3 H' &4$+*L', N*%O$9#PF$+):, FG%+.%M @#44#$93 11; , B#):9.%6, ( - , 7G//$0 L'AI4*/ , 7)"$6* AI4*/ *+$4, BGKG@' P4#5*, QQQ$?*/ N.++3,"$%#*8 ' F*6I*3 , ;./+*/ M F*6I*3, P3C./%* L' "0?*3, QQQ$%)* B#):$/6 N/*9*/ , AG4C/#I:M L$2./3?#, F$//0 1** H.6K/*0, &G39$%H.6K/*0, <:$/4*3 -' 7 ../* , &*$%B"" H./9$%, 1*C.*GK 1$9C H/**% M 7$)B$*, F .G3+.%,=>, -%6/*2 F' H..69$% , N' B#):$/6 7../* , E/%*3+' E62$/63, 1$2/*%)* L'F $%6,L', 1*94* M 8*44*:*/ 11; , R*2 P/4*$%3, 1-, K./ "*K*%6$%+3'

*ORDER*

FQ==REB, L'

***1** ; *%6#%C*K./* +:* <.G/+ #3 "*K*%6$%+3S+#.% +. "#39#33T".)G9*%+R.' UVUW$5#%I).%3#6*/*6+:* 9 .+#.%, 3GC9#33#.%3,$%6$JJ4#)$C4*4$2, +:* <.G/+ 6*+*/9#%*3 +:* 9.+#.% 3:.G46 C* I/$%+*6 #% J$/+'

*BACKGROUND*

;4$#%+#KK D+#4#+0 <:.#)* E4*)+/#) $%6 <#//. E%*I0 <./J./$+#.% T).44*)+#5*40 ;4$#%+#KKW* +2. 3*J$/$+*$%6 C%$KK4#$+*6 *+$#4* 4*)+/#)J./5#6*/3 +:$+ J./5#6* *4*)+/#) 3*/5#)* #%=*Z$3' "*K*%6$%+3$/* 3#3+*/J/#9$/#40 .K J.2* / I *%*/$+#.%9J$%#*3 $%6 /*+$#4*4*)+/#)J./5#6*/3 #% +:* =*Z$3*%*I0 9$/?*+' =:* =*Z$3*%*I0 9$/?*+ #%)4G6*3 2. 3*I9*%+3T).44*)+#5*40 X9$/?*+YW Q%+:* C#4$+*/$4*%+/$)+ 3*I9*%+,*%*I0 #3JG/):$3*6 5#$).%+/$)+G$4I/**9*%+3' Q% +:* 3J.+ ./ NE& 3*I9*%+,. K*/3 +. 3*44$%6JG/):$3* $/* 9 $+):*6 C0 $ )4*$/#%I:.G3*+. C$4$%)*3GJJ40$%6*9$%6' U =:* ;GC4#) D+#4#+0 <099#33#.% .K =*Z$3TX;D<=YW IG4$+*3 +:* 9$/?*+3' [

Q%4$#%+#KK3S[ J$I* B*3+$+*&*).%6-9*%6*6 <.9J4$#%+, +:*0 $33*/+2*%+0!+2.)$G3*3 .K $)+#.%$I$#%3+"*K*%6$%+3' ;4$#%+#KK3 K*6*/$44$#93 #%)4G6*B$)?*+**/Q%K4G*%)*6 <.//GJ+ P/I $%#]$+#.%3 +TXBQ<PYW $#93^)4$#93G%6*/ U .K +:* &:*/9$% -)+, U` D'&'<' _ U, C$3*6.% ).%3J#/$)0 +. /*3+/$#%9J*+#+#.%$%6J/#)* K#Z#%I4$#93G%6*/ [ .K +:* &:*/9$% -)+, U` D'&'<' _ [, C$3*6.% 9.%.J.4#]$+#.%, $++*9J+*6 9.%.J.4#]$+#.%$%6).%3J#/$)0+. 9.%.J.4#]*^ $%6 )4$#93 K./ 5#.4$+#.%3K +:* <4$0+.%-)+, U` D'&'<' _ U ' V H*%*/$440 4$#%+#KK3$44*I*" *K*%6$%+3G%4$2KG440 %*/*6 $%6).%3J#/*6 +. 9 .%.J.4#]* $%69$%#JG4$+*/#)*3 #3 +:* =*Z$3 *%*I0 9$/?*+'

P%- GIG3+ U,[aa`, "*K*%6$%+3 5*6 +. 6#39#33 4$#%+#KK3S ).9J4$#%+ K./K$#4G/* 3+$+* $)4$#9' &J*)#K#)$440 "*K*%6$%+3 $33*/++:$+ $44 4$#%+#KK3S)4$#93, *Z)*J+.%*, $/* C$//*6 C0 +:* K#4*6 /$+*6.)+/#%* =:*0 $43. $33*/++:$+:* )4$#9%+ C$//*6 C0 +:* K#4*6 /$+*6.)+/#%* #3 C$//*6 C0 +:* *Noerr-Pennington* 6.)+/#%*'

*STANDARD OF REVIEW*

- ).9J4$#%+ 9$0 C* 6#39#33*6 K./K$#4G/* 3+$+* $)4$#9 GJ.% 2:#): /*4#*K$%C* I/$%+*6' A*6'B' <#5 ;' U[TCWTVW G3+ $JJ*$/ C*0.%6 6.GC+ +:$+ +:* J4$#%+#KK)$% J/.5* %0 K$)+3 #% 3GJJ./+ .K :#3 )4$#9 +:$+ 2 .G46 *%+#+4* :#9 +. /*4#*K' *Conley v. Gibson,* V`` D'&' cU,c`!cb, de &'<+'ff, [ 1'E6'[6 ea TUf`dW =:* ).9J4$#%+ 9G3+ C* 3+$+*6 #+:3 K#)#*%4$/#+0 3G): +:$+ $ ).G/+ ./ %.JJ.3#%I J$/+0 )$% 6*+*/9#%* 2:$+ )4$#93 $/* $44*I*6' *Elliott v. Foufas,* ebd A[6 edd, eea T`+:

Utility Choice, L.P. v. TXU Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3307524, 2006-1 Trade Cases P 75,102, Util. L. Rep. P 14,583

*Brown v. Nationsbank Corp., Oppenheimer v. Prudential Secs. Inc., Fernandez-Montes v. Allied Pilots Ass'n, see also Guidry v. Bank of LaPlace, Cinel v. Connick*

## LAW AND ANALYSIS

### Filed Rate Doctrine

**\*2** *Arkansas Louisiana Gas Co. v. Hall,* ... *Tex. Commercial Energy v. TXU Energy, Inc.,* ... *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* ... *Marcus v. AT & T Corp.,* ... *See Tex. Commercial Energy,*

### TCE Decision

*Texas Commercial Energy v. TXU Energy* (*TCE*)

*See Tex. Commercial Energy v. TXU Energy, Inc.,* ... *Tex. Commercial Energy,* ... *Tex. Commercial Energy,* ... TXAEB ... *Id.* ... *See id.* ... *See id.* TX ...

### Plaintiffs' Federal Claims

**\*3** ... *TCE* ... *TCE.*

**Appx. Page 716 of 740**

Utility Choice, L.P. v. TXU Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3307524, 2006-1 Trade Cases P 75,102, Util. L. Rep. P 14,583

.K $%0.K +:*3*$/IG9*%+3 .G46/*3G4#%$ /G4#%3kG$/*40
#%).%K4#)2#+: +* /G4#%#%TCE.[d] - )).6#%I40 $44+:*3*
$/IG9*%+3 9G3+ K$#4'

*1. Substitute Mechanism for Recovery.*
;4$#%KBS/IG* +$+ K./ +:* K#4*6*+*6.)+/#%*+. C$/ +*#/
)4$#93K./ 6$9$I*3, +*/* 9 G3+C*$%$4+*/%$+#%$*%#39
+:$+$44.23 +:*9 + /*).5*/ 6$9$I*3 K./ " *K*%6$%K3/
+:*#/2/.%IKG4).%6G)+'=:*0 $/IG* +$+ +:;D<=S3 4$)? . K
$G+:./#+0. ./6*/ 6#3I./I*9*%+.KJ/.K#+3%64$)?.K J.2*/
+. /*KG%6.K#+36*/#5*6K/.9 2/.%IKG4.%6G)#%*)*33$/#40
9$?*3 +:* ).G/+3 +:* .%40 J4$)* ;4$#%KBS)$% 3**? 3G):
/*9*6#*3[e] ; 4$#%KBSK40.%+:*D%#+*&+$+*%GJJ'9*% <.G/+
)$3* .K *Keogh v. Chicago N.W. Ry. Co.,* [ba D'&' U`b, cV
&'<+'cd, bd 1'E6' UeVTUf[[W$3 J/#9$/0 3GJJ./+ K./ +:*#/
$/IG9*%+:$+$9%$4+*/%$+#5$9I*3 9*):$%#39 #3%3*)*33$/0
K./+:*K#4*6*+*6.)+/#%*+. C$/) 4$#93K./6$9$I*3' F.2*5*/,
*Keogh* 6.*3 %.+3+*$+* $%$4+*/%$+#5$9I*3 9*):$%#39
#3/*kG#/*6CG#+$+:*/ #%6#)$+*$3 +:* J4$#%K#K*$+ )$3*
).G46 :$5* /*).5*/ 6$9$I*3 +:.GI: $I*%%)0J/.)**6#%I3'
*See id.* $+Ub[' =:G3, +:* .46#%I .K *Keogh* #3 %.+$3 C/.$6
$3; 4$#%KBSGII*3+'7./*.5*/, 3GC3*kG*%+*)#3#.%6#)$+*
+:$+$%$4+*/%$+#5$9I*3 9*):$%#39 #3%.+/*kG#/*6K./
)4$#93 +* C*C$//*6 C0+:* K#4*6*+*6.)+/#%*'*See Taffett v.*
*Southern Co.,* fbd A'[6 UceV,Ucf[ TU+:<#/Uff[WT%.+#%I
+:$+K#4*6$*6.)+/#%*C$//*6 BQ<P )4$#93,6*3J#+*+:* K$)+
+:3+$+$+*9GC4#3*/5#)* ).99#33#.%3 ).G46%.+/6*/ /*KG%6
.K *Z)*33#5*3*+*3*3W*Wegoland, LTD. v. NYNEX Corp.,* eab
A&GJJ' UU[, U[a T&'""R'm'Uff[W, *aff'd* [d A'V6 Ud T[6
<#/UffcWTX5$5$4$SC#44K*$6*kG$+*$6%6#%$3+/$+#5*K*43
%*5*/C**%$ J/*/*kG#3#+* SJJ40#%I+:*K#4*6*+*6.)+/#%*YW
-)).6#%I40 , +:* <.G/+6+*+*/9#%*$3GC3+#+*9*):$%#39K./
/*).5*/0 #3%.+$ %)*)33$/0J*/*kG#3#+*$ SJJ40#%I+:*K#4*6
/$+* 6.)+/#%%* +. ;4$#%KBSKK*6*/$4 $%+#+/G3+ )4$93'

*2. Implication Doctrine and the Texas Constitution Arguments*
;4$#%KBS9 $?* +2. $66#+#.%$$/IG9*%+3+$+ 2*/* %.+
3J*/)#K#)$44466*/#33*6C0+:* A#K+<#/)G##*%#TCE. =:* K#/3+
$/IG9*%+#3+:$++:*X#9J4#)$+#.%0/#%%*%Y+*kG#/*3:*<.G/+
+. K#%6:$+:+* =*Z$34*I#34$#$G#*%+%%6#%%OG/'/6/+#3+.
C*$C4.+. 3G*K./.6$9$I*3 K./5#*.4$+#.%K;DB-' F.2*5*/,
+:*+<.G/+ 9 G3+/*O*Y)+#3 $/IG9*%+3$3#$JJ4#*3+. ; 4$#%K#SK
K*6*/$4$%+#+/G)4$#93 C*)$G3+#+/G)3K.G4K +:* A#K+:
<#/)G##+3$46#%I#%TCE +$+ )4$#93K./ 6$9$I*3 $/* C$//*6
G%6*K*6*/$4$%+#+/G3+3$+G+*3e' *See Tex. Commercial Energy,*
cUV A'V6 $+ `af!U4

*4 ; 4$#%KBSKZ+$/IG* +:$++:* =*Z$3).%3+#+G+#.%KG#/*3
.J*% ).G/+3 $%6$ OG/0/#/#$4% ;4$#%KBS3S4$#93' -4+:.GI:
;4$#%KBS/IG9*%+#3K$/ K/.9 J*44G)#$3+* /*I$#/6 +. .2
+:* =*Z$3).%3+#+G+#%4*+*3. +* K+4*6*/$+*6.)+/#%%*S3$/
.% K*6*/$44$$#93K./ 6$9$I*3, ; 4$#%KBSKJJ*$/ +. J/*9#3*
+:*#/$/IG9*%+.% %$%33*/+#.%:+:+* K+4*6*/$+*6.)+/#%*S3
$JJ4#)$C#4#40J*6$J%63.% =*Z$34$2' F.2*5*/, +:#3$/IG9*%+
$43. ).%K4#)23#+:+: A#K+<#/)G#+*)3#3#.%#%TCE, 2:#):
*Z$9#%*6*6* 3+$+G+G%6*/40#%I+:;D<=S3 $G+:./#+0+:
/*$): +:36*+**/9#%$+#.%$+$:#%$++:* K+4*6*/$+*6.)+/#%*S
=<ES3K*6*/$44%+*+/G)4$#93'*See id.* - )).6#%I40, ; 4$#%KBS
=*Z$3 ).%3+#+G+#.%3G9*%+ K$#43'

*RICO Claims*
Q%66#+#.%.K*6*/$44$%*+*/#/G)4$#93,;4$#%KBS33*/*K*6*/$4
)4$#93G%6*6*BQ<P'F.2*5*/, ; ; 4$#%KBSBQ<P )4$#932:#):
$44*I*; 4$#%KBS* */* 6$9$I*6 C0 J$0#%I$/+#K#)#$44%#3$44I:
J/#)*3, 9G3+C* 6$39#33*6*C*)$G3+:*0 ):$44*%I*+: /$+*3
J$#6,$%6$%/* +:#3C3//*6 C0 +:*K#4*6*+*6.)+/#%*'*See Taffett,*
fdb A'[6 $+ Ucef'

*R.*//!;*%%#%I+.%*
;4$#%KBSK33*/+ K*6*/$4)4$#93 $I$#%3+B*4#$%$%$5$5///#%I
B*4#$%$%$*+*/K*/*6$+. ; 4$#%KBSGCG3#%*33%*3$+*$.%3#:#%J3
C0 :5$#%I *%I$#*6 #%$%6 C0 ).%+#%$%G#%I *%I$#* #%
#%%+*%+#.%$$$%$$%+#).9J*+#+#%K*$G6G4$*%+$,J$/+#)#J$#%%I
#%#44I#$%4%+/$)+)+#%$)0,5*/+/40I #5#%9$*+*/#$4%6#%9J/.J*/
#%6G)*9*%+3 $ 3+$+*%$#*%)0, %6.6.+:*/ G%4$2K2G4%3""Y[f]
B*4#$%$%$%/IG*3 +:$++*3* )4$#93$/* C$//*6 C0 +:* *Noerr-*
*Pennington* 6.)+/#%%*+:* *Noerr-Pennington* 6.)+/#%%*X$44.23
#%6+5#6G$$43 CG3#%*%33*3 J*+*+#%.%%+* I.5*/%9*%+,K/**
.K +:* +:/*$+.K $%+#+/G3+C#$C#4#K0 /%$/ /)+:$+#+3+9 +$+*
$%*+#).9J*+#+#5**%3+*$,*.%33#6* Noerr-Pennington J/.+*)+#.%
#3I./.G%6*6.%+.+:**/0 +:$+*+ /#I:++ J*+#+#.%.%6G)$/*%**6
C0 +:* A#/3+$9*%69*%+ *Z*+*%63, J*+#+#.%#%K. /. 3*4K#3:,
*5%*)%$*+).9J*+#+#5**%63'Y*Greenwood Util. Comm'n v.*
*Miss. Power. Co.,* d`U A'[6 Ucec, Ucfd T`+: <#/Ufe`W Q%
/*3J.%3*,;4$#%KBS35*/ +:* 3:$9 *Z)*J+#.%+.+* *Noerr-*
*Pennington* 6.)+/#%%*$JJ4#**3+. B*4#$%$%$%$3+5#*+#$%Q%6*6*6,
+:* *Noerr-Pennington* 6.)+/#%%*6.*3 %.+J/.+*)+ $)+#5#+#*3
+:$+$/* 9 */*40 $ 3:$9 + ).5*/ $++*9J+3C0 %$*$).9 +.
#%+*/K*/K2#+:+:* ).9J*+#+./Y3$).9J*+#+./Y3$%6+*+#.%4*3:$+
2:. I*%G#%*40? 2 + $):#*5* $%4*I#+#9$+*3%%66G4+'*Bayou*
*Fleet, Inc. v. Alexander,* [Vc A'[6 e`[, eb[ T`+: <#/[aaaW
T)#+#%%*City of Columbia v. Omni Outdoor Advertising,* cff
D'&'Vb`,Vea,UUU&<+'UVcc,UUVl'E6'[6 Ve[ TUffUWWF*/*,

Utility Choice, L.P. v. TXU Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3307524, 2006-1 Trade Cases P 75,102, Util. L. Rep. P 14,583

*5 [text illegible due to image corruption]

### Equitable Relief

[text illegible] *TCE,* [text illegible] *Tex. Commercial Energy,* cUV AV6 $+ `aeTkG.+#% *Square D Co.,* cdb D'&' $+ c[[W'

[text illegible] *See, e.g., Town of Norwood, Mass. v. New England Power Co.,* [a[ AV6 cae TU3 #/'[aaaW^ *Marcus v. AT & T Corp.,* UVeAV6 cb T[6 #/'UffeW [text illegible] *Norwood,* [text illegible] *Town of Norwood,* [a[ AV6$+cUf' [text illegible] *Id.* $+ c[a' [text illegible] *Marcus,* [text illegible] *Marcus,* UVe AV6 $+ `f [text illegible] *Id.* $+b[!bV' [text illegible] $+ b['

N. +: *Norwood* [text illegible] *Marcus* [text illegible] *In Re California Wholesale Electricity Antitrust Litigation,* [cc A&GJJ'[6 Uad[ T&'""<$4'[aaVW [text illegible] *Id.* $+Uade' [text illegible]

*6 [text illegible] *TCE,* [text illegible] *Tex. Commercial Energy,* cUV AV6 $+ `ab [text illegible] *See id.* [text illegible] *See Town of Norwood,* [a[ AV6 $+cUf^ *Cal. Wholesale,* [cc A&GJJ'[6 $+Uade' [text illegible]

### State Law Claims

[text illegible]

Utility Choice, L.P. v. TXU Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3307524, 2006-1 Trade Cases P 75,102, Util. L. Rep. P 14,583

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 3307524, 2006-1 Trade Cases P 75,102, Util. L. Rep. P 14,583

Footnotes

1   The spot market is sometimes referred to as the balancing energy or "BES" market.

2   As the detailed workings of the regulation of the Texas energy market can be found in *Texas Commercial Energy v. TXU Energy, Inc.,* 413 F.3d 503 (5th Cir.2005) and *Texas Commercial Energy v. TXU Energy,* No. CA NO. C-03-249, 2004 WL 1777597 (S.D.Tex. June 24, 2004), the Court need not recite the details of the market's operations or oversight here *ad nauseam.*

3   Plaintiffs remaining claims allege Texas state statutory and common law violations.

4   Defendants acknowledge that Plaintiffs' allegations that the Reliant Defendants (collectively "Reliant") engaged in improper dealings with the Texas General Land Office ("GLO") do not fall within the ambit of the filed rate doctrine. This allegation will be discussed independently. Accordingly, Plaintiffs' claims relating to the Reliant/GLO relationship are not implicated when the Court discusses the application of the filed rate doctrine to the remainder of Plaintiffs' federal claims.

5   The *TCE* plaintiff's § 1 Sherman Act claims alleged defendants "engag[ed] in economic withholding, physical withholding, and market manipulation." *Tex. Commercial Energy,* 2004 WL 1777597, at *6. Here, Plaintiffs' claims include conspiracy to restrain competition and price fixing under § 1 of the Sherman Act. TCE's claims under § 2 of the Sherman Act alleged violations based on "exercising monopoly power, attempting to monopolize, and/or conspiring to monopolize." *Id.* In the case at bar, Plaintiffs' claims under § 2 of the Sherman Act allege monopolization, attempted monopolization and conspiracy to monopolize. Hence, the federal antitrust claims in *TCE* and the case at bar are indistinguishable for the purposes of determining whether the filed rate doctrine bars claims for damages under the Sherman Act and Clayton Act.

6   Although the *TCE* case involved the spot or BES markets, PUCT has similar responsibility to monitor the bilateral segment of the market. PUCT has enacted reporting rules governing the bilateral market to "[i]mprove the commission's ability to investigate allegations of market power abuse and anticompetitive behavior that may arise with respect to the wholesale electricity market." PUCT Subst. R. § 25.93(d)(2). It would be paradoxical to conclude that the spot market portion of the Texas market is subject to judicial oversight of rates while the bilateral segment is not and vice versa. Thus, the Court reasons that the only way it can reach the conclusion that the filed rate doctrine does not bar claims in the bilateral segment is to conclude that the filed rate doctrine is inapplicable to the spot market.

7   The Court notes that Plaintiffs spend much time in their response to the motion to dismiss arguing that the Fifth Circuit wrongly decided *TCE.* This Court, however, will not revisit Plaintiffs' arguments previously rejected by the Fifth Circuit.

8   Defendants do not dispute that the PUCT lacks the authority to grant Plaintiffs the monetary damages sought.

Appx. Page 719 of 740

**Utility Choice, L.P. v. TXU Corp., Not Reported in F.Supp.2d (2005)**

2005 WL 3307524, 2006-1 Trade Cases P 75,102, Util. L. Rep. P 14,583

9    Plaintiffs assert an independent state cause of action for this alleged intentional interference with business relations. They also assert this conduct violates the Sherman Act.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Appx. Page 720 of 740**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 93168642
Filing Code Description: RESPONSE
Filing Description: ERCOT'S REPLY IN SUPPORT OF ITS AMENDED PLEA TO THE JURISDICTION AND ALTERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT
Status as of 10/15/2024 1:57 PM CST

Associated Case Party: ELECTRIC RELIABILITY COUNCIL OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 10/15/2024 11:38:21 AM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 10/15/2024 11:38:21 AM | SENT |

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 10/15/2024 11:38:21 AM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 10/15/2024 11:38:21 AM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 10/15/2024 11:38:21 AM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 10/15/2024 11:38:21 AM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 10/15/2024 11:38:21 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| George Fibbe | 24036559 | george.fibbe@bakerbotts.com | 10/15/2024 11:38:21 AM | SENT |
| Laura Natelson | | laura.natelson@bakerbotts.com | 10/15/2024 11:38:21 AM | SENT |
| Matthew Erickson | | Matthew.erickson@bakerbotts.com | 10/15/2024 11:38:21 AM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 10/15/2024 11:38:21 AM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 10/15/2024 11:38:21 AM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 10/15/2024 11:38:21 AM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Elliot Clark
Bar No. 24012428
eclark@winstead.com
Envelope ID: 93168642
Filing Code Description: RESPONSE
Filing Description: ERCOT'S REPLY IN SUPPORT OF ITS AMENDED PLEA TO THE JURISDICTION AND ALTERNATIVELY, MOTION TO DISMISS UNDER RULE 91(a) AND ALTERNATIVELY, PLEA IN ABATEMENT
Status as of 10/15/2024 1:57 PM CST

Case Contacts

| Becky Dunn | | bdunn@ccsb.com | 10/15/2024 11:38:21 AM | SENT |
|---|---|---|---|---|
| Carolyn Taylor | | ctaylor@ccsb.com | 10/15/2024 11:38:21 AM | SENT |

Associated Case Party: PUBLIC UTILITY COMMISSION OF TEXAS

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/15/2024 11:38:21 AM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/15/2024 11:38:21 AM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 10/15/2024 11:38:21 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/15/2024 11:38:21 AM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 10/15/2024 11:38:21 AM | SENT |

10/21/2024 02:16:04 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, *Plaintiff,* | § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| PUBLIC UTILITY COMMISSION OF TEXAS, ELECTRIC RELIABILITY COUNCIL OF TEXAS, THOMAS GLEESON, LORI COBOS, JIMMY GLOTFELTY, KATHLEEN JACKSON, AND COURTNEY HJALTMAN, *Defendants.* | § § § § § § § § | TRAVIS COUNTY, TEXAS |
| | § | 345TH JUDICIAL DISTRICT |

**ORDER GRANTING DEFENDANT ERCOT'S
AMENDED PLEA TO THE JURISDICTION**

On this day, the Court considered Defendant Electric Reliability Council of Texas, Inc.'s ("ERCOT") Amended Plea to the Jurisdiction (the "Plea"). After considering the Plea, Aspire Power Ventures, LP's ("Aspire") Response thereto, the Reply, the arguments of counsel, and all other matters properly before it, the Court has determined that the Plea is meritorious and should be **GRANTED.**

It is therefore **ORDERED** that the Plea is **GRANTED**, and that all claims asserted against ERCOT in the above-numbered cause are hereby **DISMISSED** for lack of jurisdiction.

Having determined that ERCOT's Plea should be granted and that jurisdiction is lacking, the Court does not reach ERCOT's Rule 91a Motion to Dismiss Aspire's Second Amended Petition.

Signed this __21__ day of __Oct__, 2024.

HON. CATHERINE A. MAUZY
Judge Presiding

**Appx. Page 723 of 740**

**AGREED AS TO FORM**

**THE CASTAÑEDA FIRM**

---

Chrysta L. Castañeda    SBN 15325625
chrysta@castaneda-firm.com
Nicole Michael    SBN 24067767
nicole@castaneda-firm.com
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Telephone: 214-282-8579
Fax: 214-602-9187
and
Monica Latin    SBN 00787881
MLatin@ccsb.com
Brent M. Rubin    SBN 24086834
BRubin@ccsb.com
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Ph: 214-855-3000
Fax: 214-580-2641

**ATTORNEYS FOR PLAINTIFF**

/s/ *Elliot Clark*
Elliot Clark    SBN 24012428
eclark@winstead.com
Elin Isenhower    SBN 24104206
eisenhower@winstead.com
600 W. 5th Street, Suite 900
Austin, Texas 78701
(512) 370-2800 telephone
(512) 370-2850 fax

**ATTORNEYS FOR DEFENDANT
ELECTRIC RELIABILITY COUNCIL
OF TEXAS, INC.**

---

John R. Hulme    SBN 10258400
Assistant Attorney General
John.Hulme@oag.texas.gov
Amanda Atkinson Cagle   SBN 00783569
Assistant Attorney General
Amanda.Cagle@oag.texas.gov
Jordan Pratt    SBN 24140277
Assistant Attorney General
Jordan.Pratt@oag.texas.gov
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel: 512-463-2012
Fax: 512-320-0911

**ATTORNEYS FOR DEFENDANTS
THE PUBLIC UTILITY COMMISSION
OF TEXAS, and THOMAS GLEESON,
LORI COBOS, JIMMY GLOTFELTY,
KATHLEEN JACKSON, and
COURTNEY HJALTMAN, in their
official capacities as Commissioners of
the Public Utility Commission Texas**

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | |
| TEXAS, ELECTRIC RELIABILITY | § | TRAVIS COUNTY, TEXAS |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN | § | |
| JACKSON,  AND COURTNEY | § | |
| HJALTMAN, | § | |
| | § | 345th JUDICIAL DISTRICT |
| *Defendants.* | § | |

## ORDER

On October 16, 2024, the Court considered Plaintiff's Unopposed Motion for Judicial Notice and the materials appended to it, any response on file, and argument relating to the Motion, if any. The Court GRANTS the Motion and therefore takes judicial notice of the materials listed and linked in the motion.

SO ORDERED on __16 Oct.__, 2024.

_____
The Honorable Catherine Mauzy
District Judge

**Appx. Page 725 of 740**

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION | § | TRAVIS COUNTY, TEXAS |
| OF TEXAS, ELECTRIC | § | |
| RELIABILITY COUNCIL OF | § | |
| TEXAS, THOMAS GLEESON, | § | |
| LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN | § | |
| JACKSON, AND COURTNEY | § | |
| HJALTMAN | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

**ORDER GRANTING PUCT DEFENDANTS'
AMENDED PLEA TO THE JURISDICTION**

On this day, the Court considered the Amended Plea to the Jurisdiction filed by the Public Utility Commission of Texas ("PUCT" or "Commission") and Thomas Gleeson, Lori Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman, in their official capacities as Chairman and Commissioners of the PUCT (collectively, the "PUCT Defendants.") The Court, having considered the live pleadings and attached exhibits, and having also considered the arguments, exhibits and authorities urged by counsel, finds that the plea should be **GRANTED**.

Accordingly, it is **ORDERED** that all of Plaintiff's claims against the PUCT Defendants are **DISMISSED**, and therefore Plaintiff's entire suit against the PUCT Defendants is **DISMISSED**.

All other relief not expressly granted herein is denied.

SIGNED: _21 Oct. 2024_

CATHERINE A. MAUZY
Judge Presiding

2

10/28/2024 2:32 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Poodiack

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | |
| TEXAS, ELECTRIC RELIABILITY | § | TRAVIS COUNTY, TEXAS |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN | § | |
| JACKSON, and COURTNEY | § | |
| HJALTMAN, | § | |
| | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

## NOTICE OF APPEAL BY
## PLAINTIFF ASPIRE POWER VENTURES, LP

Pursuant to Tex. R. App. P. 25.1, Plaintiff Aspire Power Ventures, LP,

provides its Notice of Appeal, stating:

1.      Plaintiff Aspire hereby gives notice that it desires to appeal the trial

court's Order Granting PUCT Defendants' Amended Plea to the Jurisdiction and

Order Granting ERCOT's Amended Plea to the Jurisdiction, both dated October 21,

2024, in the above-styled case.

2.      The party filing this appeal is Plaintiff Aspire Power Ventures, LP.

3.      The cause appealed from is *Aspire Power Ventures, LP v. Public Utility

Commission of Texas, Electric Reliability Council of Texas, Thomas Gleeson, Lori

Cobos, Jimmy Glotfelty, Kathleen Jackson, and Courtney Hjaltman*, Cause No. D-1-

GN-24-003384, in the 345th Judicial District of Travis County, Texas.

---

**PLAINTIFF'S NOTICE OF APPEAL – PAGE 1**

4.      This appeal involves a matter brought against a state board, commission, department, office, or other agency, and its officers. *See* Tex. R. App. P. 25.1(d)(9)(A) & (B).

5.      This appeal is taken to the Fifteenth District Court of Appeals.

Dated this 28th day of October, 2024.

Respectfully Submitted,

*/s/ Chrysta L. Castañeda*
Chrysta L. Castañeda
Texas Bar No. 15325625
chrysta@castaneda-firm.com
Nicole Michael
Texas Bar No. 24067767
nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Phone: (214) 282-8579
Fax: (214) 602-9187

&

Monica Latin
Texas Bar No. 00787881
MLatin@ccsb.com
Brent M. Rubin
Texas Bar No. 24086834
BRubin@ccsb.com
Ken Carroll
Texas Bar No. 03888500
KCarroll@ccsb.com
CARRINGTON, COLEMAN,
   SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Phone: (214) 855-3000
Fax: (214) 580-2641

***Attorneys for Plaintiff-Appellant***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 28, 2024, a true and correct copy of the foregoing document was electronically filed with the Court and served on all counsel of record through the eFiling Service Provider pursuant to the Texas Rules of Civil Procedure.


*/s/ Brent Rubin*

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brent Rubin
Bar No. 24086834
brubin@ccsb.com
Envelope ID: 93645411
Filing Code Description: Notice of Appeal
Filing Description: NOTICE OF APPEAL BY PLAINTIFF ASPIRE POWER VENTURES, LP
Status as of 10/29/2024 9:05 AM CST

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 10/28/2024 2:32:16 PM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 10/28/2024 2:32:16 PM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 10/28/2024 2:32:16 PM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 10/28/2024 2:32:16 PM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 10/28/2024 2:32:16 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 10/28/2024 2:32:16 PM | SENT |
| George Fibbe | 24036559 | george.fibbe@bakerbotts.com | 10/28/2024 2:32:16 PM | SENT |
| Laura Natelson | | laura.natelson@bakerbotts.com | 10/28/2024 2:32:16 PM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/28/2024 2:32:16 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/28/2024 2:32:16 PM | SENT |
| Matthew Erickson | | Matthew.erickson@bakerbotts.com | 10/28/2024 2:32:16 PM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 10/28/2024 2:32:16 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 10/28/2024 2:32:16 PM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/28/2024 2:32:16 PM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 10/28/2024 2:32:16 PM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 10/28/2024 2:32:16 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 10/28/2024 2:32:16 PM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 10/28/2024 2:32:16 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brent Rubin
Bar No. 24086834
brubin@ccsb.com
Envelope ID: 93645411
Filing Code Description: Notice of Appeal
Filing Description: NOTICE OF APPEAL BY PLAINTIFF ASPIRE POWER VENTURES, LP
Status as of 10/29/2024 9:05 AM CST

Case Contacts

| Becky Dunn | | bdunn@ccsb.com | 10/28/2024 2:32:16 PM | SENT |
|---|---|---|---|---|
| Carolyn Taylor | | ctaylor@ccsb.com | 10/28/2024 2:32:16 PM | SENT |

10/30/2024 11:45 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Susan Poodiack



**Ken Carroll**
Partner
214.855.3029
kcarroll@ccsb.com

October 30, 2024

***Via E-File and Email***
Rachelle Primeaux, CSR No. 4093
  rachelle.preimeaux@traviscountytx.gov
Official Reporter, 419th District Court
  Travis County, Texas
P.O. Box 1748
Austin, Texas 78767

>      Re:   **Cause No. D-1-GN-24-003384**, *Aspire Power Ventures, LP v. Public*
>            *Utilities Commission of Texas, et al.* (345th District Court, Travis
>            County, Texas)
>            **Appeal No. 15-24-00118-CV**, *Aspire Power Ventures, LP v. Public*
>            *Utilities Commission of Texas, et al.* (Tex. App—15th District)

Ms. Primeaux:

On behalf of Plaintiff-Appellant Aspire Power Ventures, LP, we have filed a Notice of Appeal from The Hon. Catherine A. Mauzy's Orders dated October 21, 2024 in the above-captioned case, Granting the Amended Pleas to the Jurisdiction filed by ERCOT and the PUCT Parties. Pursuant to Tex. R. App. P. 25.1(e), I have delivered a copy of that Notice of Appeal to you by email.

I ask that you prepare and file the Reporter's Record for that appeal—specifically, transcripts of the hearings held October 1 and 16, 2024, before Judge Mauzy in that case. You have already transcribed both hearings. Please let me know the additional charge for preparing and filing the Reporter's Record, and we will promptly forward payment. *See* Tex. R. App. P. 34.6(b).

> Sincerely,
>
> Ken Carroll

KC/bd

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
www.ccsb.com                    901 Main Street, Suite 5500 • Dallas, Texas 75202 • fax: 214.580-2641

## <u>Certificate of Service</u>

I hereby certify that a true copy of this letter requesting the Reporter's Record was served on counsel for all parties on this 30th day of October 2024, via efileTexas, through which this letter was filed with the Court.

_____
Ken Carroll

i_11939000v.1

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ken Carroll on behalf of Ken Carroll
Bar No. 03888500
kcarroll@ccsb.com
Envelope ID: 93736387
Filing Code Description: No Fee Documents
Filing Description: REQUEST FOR REPORTER'S RECORD
Status as of 10/31/2024 9:09 AM CST

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 10/30/2024 11:45:16 AM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 10/30/2024 11:45:16 AM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 10/30/2024 11:45:16 AM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 10/30/2024 11:45:16 AM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 10/30/2024 11:45:16 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 10/30/2024 11:45:16 AM | SENT |
| George Fibbe | 24036559 | george.fibbe@bakerbotts.com | 10/30/2024 11:45:16 AM | SENT |
| Laura Natelson | | laura.natelson@bakerbotts.com | 10/30/2024 11:45:16 AM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 10/30/2024 11:45:16 AM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 10/30/2024 11:45:16 AM | SENT |
| Matthew Erickson | | Matthew.erickson@bakerbotts.com | 10/30/2024 11:45:16 AM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 10/30/2024 11:45:16 AM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 10/30/2024 11:45:16 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 10/30/2024 11:45:16 AM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 10/30/2024 11:45:16 AM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 10/30/2024 11:45:16 AM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 10/30/2024 11:45:16 AM | SENT |
| Becky Dunn | | bdunn@ccsb.com | 10/30/2024 11:45:16 AM | SENT |
| Carolyn Taylor | | ctaylor@ccsb.com | 10/30/2024 11:45:16 AM | SENT |

11/8/2024 9:55 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003384
Irene Silva

CAUSE NO. D-1-GN-24-003384

| | | |
|---|---|---|
| ASPIRE POWER VENTURES, LP, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| PUBLIC UTILITY COMMISSION OF | § | |
| TEXAS, ELECTRIC RELIABILITY | § | TRAVIS COUNTY, TEXAS |
| COUNCIL OF TEXAS, THOMAS | § | |
| GLEESON, LORI COBOS, JIMMY | § | |
| GLOTFELTY, KATHLEEN | § | |
| JACKSON, and COURTNEY | § | |
| HJALTMAN, | § | |
| | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

## PLAINTIFF-APPELLANT ASPIRE POWER VENTURES, LP'S
## NOTICE OF ELECTION UNDER TEX. R. APP. P. 34.5a

Pursuant to Tex. R. App. P. 34.5a(a), Plaintiff-Appellant Aspire Power Ventures, LP, hereby provides notice of its election to file an Appendix in lieu of a Clerk's Record for the appeal it has noticed from this case. *See Aspire Power Ventures, LP v. Public Utility Comm'n of Texas*, No. 15-24-00118-CV (Tex. App.—15th Dist.). Aspire is filing notice of this election with the Court of Appeals, as well, in accordance with Tex. R. App. P. 34.5a(a).

Dated this 8th day of November, 2024.

Respectfully Submitted,

*/s/ Chrysta L. Castañeda*
Chrysta L. Castañeda
 Texas Bar No. 15325625
 chrysta@castaneda-firm.com
Nicole Michael
 Texas Bar No. 24067767
 nicole@castaneda-firm.com
THE CASTAÑEDA FIRM
325 N. St. Paul, Suite 2030
Dallas, Texas 75201
Phone: (214) 282-8579
Fax: (214) 602-9187

&

Monica Latin
 Texas Bar No. 00787881
 mlatin@ccsb.com
Brent M. Rubin
 Texas Bar No. 24086834
 brubin@ccsb.com
Ken Carroll
 Texas Bar No. 03888500
 kcarroll@ccsb.com
CARRINGTON, COLEMAN,
 SLOMAN & BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202
Phone: (214) 855-3000
Fax: (214) 580-2641

**Attorneys for Plaintiff-Appellant**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 8, 2024, a true and correct copy of the foregoing document was electronically filed with the Court and served on all counsel of record through the eFiling Service Provider pursuant to the Texas Rules of Civil Procedure.

*/s/ Ken Carroll*
Ken Carroll

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ken Carroll on behalf of Ken Carroll
Bar No. 03888500
kcarroll@ccsb.com
Envelope ID: 94081530
Filing Code Description: Notice
Filing Description: PLAINTIFF-APPELLANT ASPIRE POWER VENTURES, LP'S NOTICE OF ELECTION UNDER TEX. R. APP. P. 34.5a
Status as of 11/11/2024 1:09 PM CST

Associated Case Party: ASPIRE POWER VENTURES, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Latin | 787881 | mlatin@ccsb.com | 11/8/2024 9:55:31 AM | SENT |
| Nicole Michael | 24067767 | nicole@castaneda-firm.com | 11/8/2024 9:55:31 AM | SENT |
| Brent Rubin | 24086834 | Brubin@ccsb.com | 11/8/2024 9:55:31 AM | SENT |
| Chrysta Castaneda | | chrysta@castaneda-firm.com | 11/8/2024 9:55:31 AM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 11/8/2024 9:55:31 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elliot Clark | | eclark@winstead.com | 11/8/2024 9:55:31 AM | SENT |
| George Fibbe | 24036559 | george.fibbe@bakerbotts.com | 11/8/2024 9:55:31 AM | SENT |
| Laura Natelson | | laura.natelson@bakerbotts.com | 11/8/2024 9:55:31 AM | SENT |
| Amanda Cagle | | amanda.cagle@oag.texas.gov | 11/8/2024 9:55:31 AM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 11/8/2024 9:55:31 AM | SENT |
| Matthew Erickson | | Matthew.erickson@bakerbotts.com | 11/8/2024 9:55:31 AM | SENT |
| Lizzette Velazquez | | lvelazquez@ccsb.com | 11/8/2024 9:55:31 AM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 11/8/2024 9:55:31 AM | SENT |
| Laura Courtney | | laura.courtney@oag.texas.gov | 11/8/2024 9:55:31 AM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 11/8/2024 9:55:31 AM | SENT |
| Elin Isenhower | | eisenhower@winstead.com | 11/8/2024 9:55:31 AM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 11/8/2024 9:55:31 AM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Ken Carroll on behalf of Ken Carroll
Bar No. 03888500
kcarroll@ccsb.com
Envelope ID: 94081530
Filing Code Description: Notice
Filing Description: PLAINTIFF-APPELLANT ASPIRE POWER VENTURES, LP'S NOTICE OF ELECTION UNDER TEX. R. APP. P. 34.5a
Status as of 11/11/2024 1:09 PM CST

Case Contacts

| Judy Garrison | | jgarrison@ccsb.com | 11/8/2024 9:55:31 AM | SENT |
|---|---|---|---|---|
| Becky Dunn | | bdunn@ccsb.com | 11/8/2024 9:55:31 AM | SENT |
| Carolyn Taylor | | ctaylor@ccsb.com | 11/8/2024 9:55:31 AM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Brent Rubin
Bar No. 24086834
brubin@ccsb.com
Envelope ID: 95464675
Filing Code Description: Appendix
Filing Description: 2024.12.18  Appellant's Appendix in Lieu of Clerk's Record
Status as of 12/18/2024 3:11 PM CST

Associated Case Party: Aspire Power Ventures, LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Chrysta L.Castaneda | | chrysta@castaneda-firm.com | 12/18/2024 2:57:37 PM | SENT |
| Nicole Michael | | nicole@castaneda-firm.com | 12/18/2024 2:57:37 PM | SENT |
| Monica Latin | | mlatin@ccsb.com | 12/18/2024 2:57:37 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 12/18/2024 2:57:37 PM | SENT |
| Ken Carroll | | kcarroll@ccsb.com | 12/18/2024 2:57:37 PM | SENT |

Associated Case Party: Public Utility Commission of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John Hulme | | John.Hulme@oag.texas.gov | 12/18/2024 2:57:37 PM | SENT |
| Amanda AtkinsonCagle | | Amanda.Cagle@oag.texas.gov | 12/18/2024 2:57:37 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 12/18/2024 2:57:37 PM | SENT |

Associated Case Party: Electric Reliability Council of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Elin Isenhower | | eisenhower@winstead.com | 12/18/2024 2:57:37 PM | SENT |
| Elliot Clark | | eclark@winstead.com | 12/18/2024 2:57:37 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| David Laurent | | david.laurent@oag.texas.gov | 12/18/2024 2:57:37 PM | SENT |